IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WILLIAM LYON HOMES, *et al.*,[1] | ) | Case No.: 11-14019 (___) |
| | ) | |
| Debtors. | ) | [Joint Administration Requested] |
| | ) | |

**DECLARATION OF MATTHEW R. ZAIST,**
**EXECUTIVE VICE PRESIDENT OF WILLIAM LYON HOMES,**
**IN SUPPORT OF FIRST DAY MOTIONS**

I, Matthew R. Zaist, declare as follows:

1.       I am the Executive Vice President of William Lyon Homes, a Delaware

corporation ("DE Lyon") and William Lyon Homes, Inc., a California corporation ("CA Lyon").

CA Lyon is an operating company primarily engaged in the design, construction and sale of

single family detached and attached homes and is a wholly-owned subsidiary of DE Lyon.  DE

Lyon is a non-operating holding company and the direct or indirect owner of 100% of the

interests in the remaining debtors (collectively with CA Lyon and DE Lyon, the "Debtors").  DE

Lyon and its debtor and non-debtor subsidiaries are referred to collectively herein as the

"Company".

---

[1] The debtors and debtors in possession in these cases and the last four digits of their respective taxpayer identification numbers are as follows:  William Lyon Homes (4902); William Lyon Homes, Inc. (3855); Mountain Falls Golf Course, LLC (3291); Mountain Falls, LLC (9631); Circle G at the Church Farm North Joint Venture, LLC (1322); Presley CMR, Inc. (3862); William Lyon Southwest, Inc. (8474); Sycamore CC, Inc. (1307); PH-LP Ventures (9119); PH Ventures – San Jose (5089); HSP, Inc. (6045); PH Rielly Ventures (7710); Lyon Waterfront, LLC (1928); Lyon East Garrison Company I, LLC (5692); WLH Enterprises (3333); Duxford Financial, Inc. (0824); California Equity Funding, Inc. (0016); Laguna Big Horn, LLC (2590); Presley Homes (5035); Cerro Plata Associates, LLC (5090); Whitney Ranch Village 5, LLC (5256); and Duxford Insurance Services, LLC (8232). The Debtors' mailing address is 4490 Von Karman Avenue, Newport Beach, CA 92660.

2.      The Company's corporate headquarters are located at 4490 Von Karman Avenue, Newport Beach, California.

3.      Since joining the Company in 2000, I have served in a number of operational roles, including Chief Information Officer, Corporate Vice President of Business Development and Operations, and Project Manager and Director of Land Acquisition for the Company's Southern California Region.  In my current role, I assist with the overall management of the Company's operations and am responsible for all new real estate acquisitions.  I also serve as a member of the Company's Land Committee.

4.      Prior to joining the Company, I was a Principal with American Management Systems (now CGI) in their State & Local Government practice.  I hold a Bachelor of Science from Rensselaer Polytechnic Institute.

5.      In order to enable the Debtors to minimize the adverse effects on their business from the commencement of these chapter 11 cases, the Debtors have requested various types of relief in "first-day" applications and motions (each a "First Day Motion" and collectively, the "First Day Motions").  The First Day Motions seek relief aimed at, among other things, bolstering employee morale and maintaining customer and supplier confidence.  All of the First Day Motions are crucial to the success of the Debtors' chapter 11 cases.

6.      I submit this Declaration in support of the First Day Motions.  Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Motion or the Plan (defined below).  In addition to the personal knowledge that I have acquired while working with the Debtors, I also have knowledge of, and familiarity with, the Debtors' books and records, and financial and operational affairs.  I have directly

2

communicated and negotiated with the Debtors' vendors, customers, and others, and worked closely with the Debtors' personnel who handle business operations and financial management, as well as with the Debtors' outside counsel and other advisors.  Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of the Debtors' books and records, and other relevant documents, or information prepared or collected by the Debtors' employees at my direction, or upon my opinion based upon my experience with the Debtors' operations and financial condition.  In making the statements herein, based upon the foregoing, I have relied in part upon others to accurately record, prepare, and collect any such documentation and other information.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized to submit this Declaration.

7.    Part I of this Declaration describes the Debtors' business and the circumstances surrounding the commencement of these chapter 11 cases.  Part II sets forth the relevant facts in support of the First Day Motions filed by the Debtors concurrently herewith.

## PART I - BACKGROUND AND PREPACKAGED PLAN SUMMARY

8.    On December 19, 2011 (the "Petition Date"), concurrently with the commencement of these chapter 11 cases, the Debtors filed the *Prepackaged Joint Plan of Reorganization for William Lyon Homes, et al. dated November 17, 2011* (the "Plan")[2] and related disclosure statement (the "Disclosure Statement").  The Plan represents a significant milestone for the Company and embodies the agreement reached with their major debt holders.  If confirmed, the Plan will reduce the Company's leverage by approximately $182 million in

---

[2] Unless otherwise noted, capitalized terms used in Part I of this Declaration have the meanings ascribed to them in the Plan.

3

funded note indebtedness, restructure the Company's primary secured credit facility, and provide for new equity capital investments of $85 million in the aggregate.

9.      Based on a prepetition solicitation of the Plan, the Plan has been overwhelmingly approved by those voting classes of creditors who are impaired under the Plan – (i) the Prepetition Secured Term Loan Agreement; and (ii) the Old Notes (discussed below). Significantly, other than the holders of Prepetition Secured Term Loan Agreement Claims, Old Notes Claims, and equity holders of DE Lyon (whose interests are being cancelled), the Plan provides for the Debtors' remaining creditors to be unimpaired, which may not have been possible absent the agreements reached under the Plan. The Plan will allow the Company to improve its liquidity position from its operations and be well-positioned going forward.

**B.      General Background**

10.     The predecessor to DE Lyon, The Presley Companies, was formed in 1956. In 1987, General William Lyon purchased 100% of the stock of The Presley Companies, which subsequently went public in 1991 and listed on the New York Stock Exchange under the symbol "PDC". DE Lyon, currently the parent corporation of the Company, was formed in 1999. Also in 1999, The Presley Companies acquired CA Lyon, and The Presley Companies changed its name to William Lyon Homes and its ticker symbol to "WLS". DE Lyon was subsequently taken private in 2006 by way of a tender offer by General William Lyon for the shares of DE Lyon that were then publicly owned. General Lyon is the Debtors' Chairman and Chief Executive Officer.

11.     DE Lyon currently has one class of stock with 1,000 shares outstanding, of which 94.6% of the shares of DE Lyon (946 shares) are owned by General William Lyon

4

individually and 5.4% of the shares of DE Lyon (54 shares) are owned by The William Harwell

Lyon Separate Property Trust. DE Lyon owns directly or indirectly 39 operating entities as set

forth on the organization chart attached as **Exhibit A** hereto, of which only 22 (including DE

Lyon) are Debtors in these cases.

**C.      The Company's Homebuilding Operations**

12.     The Debtors conduct their homebuilding operations through four

reportable operating segments:  Southern California, Northern California, Arizona and Nevada.

The Company is most active in California.  In 2010, approximately 78% of the home closings of

the Company and its joint ventures were derived from the Northern California and Southern

California segments, and 88% of the Company's homes sales revenue was derived from these

segments.  The Company markets its homes through 18 sales locations.

13.     The prices of the Company's homes vary widely, but the Company targets

mostly entry-level and first time move-up homebuyers.  The Company utilizes a variety of

product lines in its various markets but largely standardizes its home designs to encourage

efficiency in the purchasing of materials and construction process.  The Company hires third-

party subcontractors to perform virtually all of the construction necessary to develop its various

projects (discussed below in more detail).

14.     Due to the Company's product and geographic diversification strategy, the

prices of the Company's homes vary substantially.  During 2010, base sales prices for the

Company's attached housing ranged from approximately $120,000 to $575,000, and base sales

prices for detached housing ranged from approximately $118,000 to $700,000.  On a

5

consolidated basis, the average sales price of homes closed for the year ended December 31, 2010 was $351,100.

15.    During the nine months ended September 30, 2011, the Company had preaudit consolidated revenues from home sales of $148.1 million and delivered 430 homes. The Company's dollar amount of backlog of homes sold but not closed as of September 30, 2011 was $54.3 million. The cancellation rate of buyers who contracted to buy a home but did not close escrow was approximately 17% in through September 30, 2011. The Company had preaudit consolidated net loss of $37.1 million during the nine months ended September 30, 2011.

16.    The Company normally builds, decorates, furnishes and landscapes three to eight model homes for each product line and maintains on-site sales offices, which typically are open seven days a week. Interior decorations vary among the Company's models and are carefully selected based upon the lifestyles of targeted buyers. Structural changes in design from the model homes are not generally permitted, but home buyers may select various other optional construction and design amenities.

17.    The management team responsible for any given project develops marketing objectives, formulates pricing and sales strategies, and develops advertising and public relations programs for approval of senior management. The Company makes extensive use of advertising and other promotional activities, including on-line media, newspaper advertisements, brochures, direct mail and the placement of strategically located sign boards in the immediate areas of its developments. In addition, the Company markets all of its products through a comprehensive use of electronic media including the Company's website at

6

www.lyonhomes.com, email lists and interest lists. The Company's advertising emphasizes each project's strengths, the quality and value of its products and its reputation in the marketplace.

18.    The Company employs in-house commissioned sales personnel to sell its homes. In some cases, outside brokers are incentivized in the selling of the Company's homes. The Company typically engages its sales personnel on a long-term, rather than a project-by-project basis. Sales personnel are trained by the Company and attend weekly meetings to be updated on the availability of financing, construction schedules and marketing and advertising plans.

19.    The Company contracts with a number of architects and other consultants who are involved in the design process of the Company's homes. Designs are constrained by municipal entitlements, building codes, energy efficiency laws and master-planned community architectural guidelines, among other factors. Engineering, landscaping, master-planning and environmental impact analysis work are subcontracted to independent firms that are familiar with local requirements.

20.    Substantially all construction work is done by subcontractors, with the Company acting as the general contractor. The Company manages subcontractor activities with on-site supervisory employees and management control systems. The Company does not have long-term contractual commitments with its subcontractors or suppliers; instead, it contracts development work by project and, where possible, by phase size.

## D.    The Company's Financial Condition and Significant Prepetition Indebtedness

21.    Pursuant to the Company's books and records, as of September 30, 2011, the Company had, on a consolidated book-value basis, approximately $593,527,000 in total

7

assets, including approximately $25,360,000 in cash and short-term investments, $18,552,000 in accounts receivable, $485,338,000 in owned real property, $47,408,000 in not owned real property, $1,094,000 in equipment and personal property, $9,715,000 in deferred loan costs, and $6,060,000 in other assets (excluding goodwill).

22.    Pursuant to the Company's books and records, as of September 30, 2011, the Company had, on a consolidated basis, approximately $606,612,000 in liabilities (including intercompany liabilities), including $9,712,000 in accounts payable, $39,653,000 in accrued expenses, $47,408,000 in liability from not owned real property, $206,000,000 on the Prepetition Secured Loan Agreement (defined below), $283,404,000 on account of the Old Notes (as defined below) and $20,436,000 in other liabilities.

23.    As of September 30, 2011, the Debtors had outstanding funded indebtedness in the principal amount of approximately $509.8 million. Upon emergence from chapter 11, pursuant to the Plan, the Debtors expect to have outstanding debt of approximately $327.8 million. Accordingly, the Reorganized Debtors will have an improved balance sheet and more appropriate capital structure. In addition to the reduction of indebtedness of the Debtors upon emergence from chapter 11, the Debtors also expect to benefit from an annual decrease in cash interest obligations of approximately $24.7 million, comprised of $19.9 million annual reduction associated with the conversion to equity of a portion of the Old Notes and $4.8 million annual reduction resulting from the reduction in interest rate from 14% under the Prepetition Secured Loan Agreement to 10 ¼% under the Restructured First Lien Loan Agreement.

DOCS_DE:176178.2 93949-001

Case 11-14019-CSS   Doc 10   Filed 12/19/11   Page 9 of 65

(a)     **The Prepetition Secured Loan**

24.     CA Lyon is a borrower under that certain Senior Secured Term Loan Agreement, dated October 20, 2009, as amended from time to time (the "Prepetition Secured Loan Agreement"), by and among CA Lyon, ColFin WLH Funding, LLC, as Administrative Agent, Initial Lender and Lead Arranger (in such capacity, the "Administrative Agent"), and the other lenders party thereto (the "Prepetition Secured Lenders").

25.     The Prepetition Secured Loan Agreement consists of a secured term loan in the aggregate principal amount of $206 million bearing interest at 14% per annum, payable monthly. Immediately prior to the Petition Date, the scheduled maturity date for the Prepetition Secured Loans was October 20, 2014 and the outstanding principal amount was $206 million. Based on such outstanding balance of the Prepetition Secured Loan, interest payments were approximately $28.8 million annually.

26.     DE Lyon guaranteed absolutely, irrevocably and unconditionally, as a guarantee of payment and not merely of collection, prompt payment in full when due, whether at stated maturity, of any and all Obligations upon acceleration or otherwise, amounts due under the Prepetition Secured Loan Agreement.

(b)     **The Old Notes**

27.     Also prior to the Petition Date, CA Lyon issued three series of unsecured notes prepetition (the "Old Notes"). The first series was issued in an aggregate principal amount of $150 million in 2004, bears a 7 ⅝% interest rate, and is due on December 15, 2012 (the "7 ⅝% Senior Notes"); the second was issued in an aggregate principal amount of $250 million in 2003, bears a 10 ¾% interest rate, and is due on April 1, 2013 (the "10 ¾% Senior Notes");

9

DOCS_DE:176178.2 93949-001

the third was issued in an aggregate principal amount of $150 million in 2004, bears a 7 ½%

interest rate, and is due on February 15, 2014 (the "7 ½% Senior Notes" and, together with the 7

⅝% Senior Notes and the 10 ¾% Senior Notes, the "Old Notes"). Each of the series of Old

Notes is governed by an indenture (each, a "Prepetition Indenture," and collectively, the

"Prepetition Indentures") by and among CA Lyon as issuer, DE Lyon and the other Prepetition

Guarantors, and U.S. Bank National Association, as Trustee (the "Prepetition Indenture

Trustee"). Interest on the Old Notes is payable semi-annually.

        28.     The Old Notes are unconditionally guaranteed on a senior unsecured basis

by the following Debtors (the "Prepetition Guarantors"): DE Lyon; California Equity Funding,

Inc.; PH-LP Ventures; Duxford Financial, Inc.; Sycamore CC, Inc.; Presley CMR, Inc.; William

Lyon Southwest, Inc.; PH-Reilly Ventures; HSP, Inc.; PH Ventures-San Jose; WLH Enterprises,

formerly Carmel Mountain Ranch; Lyon Waterfront, LLC; and Lyon East Garrison Company I,

LLC.

        29.     As a result of previous redemptions in 2010, the 7 ⅝% Senior Notes have

a current outstanding balance of approximately $66.7 million; the 10 ¾% Senior Notes,

approximately $138.7 million; and the 7 ½% Senior Notes, approximately $77.8 million.

Accordingly, the Old Notes now have an aggregate outstanding amount of $283.2 million in

principal and approximately $299.5 million in the aggregate after including interest and fees.

The outstanding balance of the Old Notes per the Company's financial statements changes

monthly due to the amortization of Original Interest Discount on account of the 10 ¾% Senior

Notes.

30.    In early 2011, an ad hoc group of entities holding Old Notes (the "Ad Hoc Noteholders Group") was formed.  As of November 10, 2011, the members of the Ad Hoc Noteholders Group who are parties to the Noteholders RSA hold an aggregate of approximately 63.5% in principal of the Old Notes.

(c)    **Other Debt Financing**

31.    The Company also has outstanding loans of lesser amounts that finance specific development projects as discussed in more detail in Part II of this Declaration.

E.    **Events Leading to the Chapter 11 Filing**

32.    In late 2010 and early 2011, the Company realized that the decrease in its tangible net worth, due primarily to its non-cash impairment losses, could result in violations of tangible net worth covenants in the Prepetition Secured Loan Agreement, among other agreements.  In addition, the Company became uncertain of its future ability to repay the 7 ⅝% Senior Notes on December 15, 2012.  To guide it through the restructuring process and help identify options and funding sources, the Company hired financial advisors, Alvarez & Marsal LLC, in January 2011.

33.    The Company, with the assistance of its advisors, proactively evaluated strategic alternatives to address ongoing liquidity and financing concerns, including the sale of non-core assets and/or alternative debt structures, such as debt-for-debt or debt-for-equity agreements.  In the face of the impending maturity of its 7 ⅝% Senior Notes on December 15, 2012, the Company undertook a series of measures to explore available new money financing solutions involving third party investors beginning in March 2011.

DOCS_DE:176178.2 93949-001

34.     Under the direction of the Board of Directors, the Company, with the assistance of Alvarez & Marsal, undertook a process to identify available new financing alternatives from potential third-party investors to be used to address its capital structure issues, including raising new capital to refinance all or a portion of the Debtor's existing indebtedness and to provide a new source of liquidity for the Debtors' operations.  After a comprehensive marketing process, that included discussions and face-to-face meetings with 25 different financial institutions (including traditional banks, credit funds and hedge funds), the Debtors' determined that the available capital-raising alternatives to the Rights Offering (discussed below) were either more expensive or less feasible than the Rights Offering. The Company believes the process of exploring financing alternatives was comprehensive and exhaustive.

35.     Contemporaneous with their financial restructuring efforts, the Debtors have continually taken action to rationalize and right-size operations.  Management continually analyzes and assesses overhead and operating costs in an attempt to implement cost savings where possible.  Among other things, the Company has reduced head count by approximately 80% since its peak in 2006.  In addition, in response to the declining demand for housing in the homebuilding industry, the Debtors focused on consolidating office locations and improving liquidity and managing cash flow by reducing inventory levels.

36.     Notwithstanding the global economic circumstances that contributed to the Company's current liquidity challenges, the Company has managed its business to reduce costs, protect margins, maintain relationships and competitive advantages, and increase its operational flexibility.  The Company's senior management team has significant experience in managing through adverse business cycles.

12

(a)    **Credit Agreement Waivers**

37.    CA Lyon entered the first amendment on March 18, 2011 with the lenders of the Prepetition Secured Loans, which modified the tangible net worth covenant in the Prepetition Secured Loan Agreement to require the borrower thereunder to prevent DE Lyon's tangible net worth from falling below $75 million for two consecutive quarters (whereas the original covenant had required the same for any quarter) until December 31, 2011, when the terms of the original covenant will again apply.

38.    The Company also reached out both to Colony in the first quarter of 2011 to discuss a possible renegotiation of the Prepetition Secured Loan Agreement, and to the Ad Hoc Noteholders Group in March, 2011 to discuss a possible renegotiation of the Prepetition Indentures.  Over the course of several months, the Company held numerous discussions over email, telephone and in-person meetings, participated in exchanges of information, and held extensive negotiations in an effort to reach a resolution of its impending debt obligations.  Since the Company first realized the need to refinance its debt obligations or otherwise reorganize its capital structure, the Company has made, and continues to make, great efforts to reach a solution acceptable to all of its constituencies.

(b)    **10¾% Senior Notes Indenture Interest Payment Default**

39.    In June 2011, the Company began the discussions with the Old Notes on a potential restructuring.  Those negotiations continued throughout the third quarter 2011.  On October 31, 2011, CA Lyon failed to make the scheduled interest payment on the 10 ¾% Senior Notes within the 30-day grace period specified in the 10 ¾% Senior Notes Indenture, resulting in an event of default under the 10 ¾% Senior Notes Indenture, and a cross-default under the

Prepetition Secured Loan Agreement.  In the event that Holders of the 10 ¾% Senior Notes

exercised their right to accelerate the 10 ¾% Senior Notes, a cross-default under the other

Prepetition Indentures would have also resulted.

       40.     After several weeks of active and arm's-length negotiations, the Debtors,

in consultation with their advisors, reached prepetition agreements in principle with their

Prepetition Secured Lenders and the Ad Hoc Noteholders Group, on a prepackaged restructuring

plan, including the key terms of the restructured Prepetition Secured Loan Agreement,

distributions under the Plan to holders of Old Notes Claims, and the treatment of general

unsecured claims.

       41.     On November 4, 2011, the Company entered into (1) a restructuring

support agreement (the "Colony RSA") with the Prepetition Secured Lenders holding 100% of

the principal amount of the loans outstanding under the Prepetition Secured Loan Agreement;

and (2) a noteholder restructuring support agreement (the "Noteholder RSA" and, collectively

with the Colony RSA, the "Restructuring Support Agreements"), with the holders of

approximately 63.5% of the principal amount of the Old Notes then outstanding (each, a

"Consenting Noteholder" and collectively, the "Consenting Noteholders").  Pursuant to the

Noteholders RSA, subject to the terms and conditions set forth therein, the Debtors have

obtained the agreement of the Consenting Noteholders to vote in support of the Plan.  Pursuant to

the Colony RSA, subject to the terms and conditions set forth therein, the Debtors have obtained

the agreement of 100% of the Prepetition Secured Lenders under the Prepetition Secured Loan

Agreement to vote in support of the Plan.  A discussion of the Colony RSA and the Noteholders

RSA is set forth in more detail below.

DOCS_DE:176178.2 93949-001

**F.**    **The Restructuring Support Agreements ("RSAs")**

42.    In order to effectuate the transactions contemplated by the Plan, the Debtors, the Administrative Agent, the Prepetition Lenders, and the members of the Ad Hoc Noteholders Group have entered into the following agreements:

(a)    **The Colony RSA**

43.    On November 4, 2011, the Company entered into a restructuring support agreement (the "Colony RSA")[3] with the Prepetition Secured Lenders holding 100% of the principal amount of the loans outstanding under the Prepetition Secured Loan Agreement.  A copy of the Colony RSA is attached as Exhibit B to the motion to approve the Colony RSA. Pursuant to the Colony RSA, each Prepetition Secured Lender party thereto (each, a "Consenting Lender" and collectively, the "Consenting Lenders") agreed, subject to the terms and conditions of the Colony RSA, to exercise all votes to which it is entitled to accept the Plan.

44.    While the Colony RSA is in effect, the Consenting Lenders agreed to not transfer any Claims except to a transferee who agrees to be bound by the Colony RSA.

45.    In exchange, CA Lyon and DE Lyon agreed to pay the fees and expenses incurred by the legal and financial advisors to the Administrative Agent (including Akin Gump Strauss Hauer & Feld LLP and Pepper Hamilton LLP) as they become due (the "Lender Transaction Expenses").  In addition, CA Lyon and DE Lyon agreed to indemnify and hold harmless (the "Lender Indemnification")[4] the Administrative Agent, the Consenting Lenders, and

---

[3] The description of the Colony RSA presented herein is a summary of the principal terms of the Colony RSA, and is qualified in all respects – and the parties' obligations thereunder are subject – to the actual terms and conditions of the Colony RSA.
[4] The rights and obligations with respect to the payment of Lender Transaction Expenses and Lender Indemnification obligations herein are without prejudice, and in addition to any rights and obligations provided in

15

certain other parties (each, a "Lender Indemnified Party" and, collectively, the "Lender Indemnified Parties") from and against any and all losses, claims, damages, liabilities, and reasonable fees and expenses, joint or several, to which a Lender Indemnified Party may become subject to the extent arising out of or in connection with (i) any third party claim, challenge, litigation, investigation or proceeding with respect to the Colony RSA, the Chapter 11 Cases, or the transactions contemplated thereby, or (ii) any breach by the Company of the Colony RSA and to reimburse such Lender Indemnified Party for any reasonable legal or other reasonable out of pocket expenses as they are incurred in connection with investigating, responding to or defending any of the foregoing, all in accordance with terms of the Colony RSA.[5]

46.     The Consenting Lenders may terminate the Colony RSA upon the occurrence of certain events, including the following:[6] (i) failure to obtain an order authorizing the assumption of the Colony RSA by the 45th day after the Petition Date; (ii) a material breach or termination of the Noteholders RSA (as defined below); (iii) failure to obtain Court approval of the Rights Offering by the 58th day after the Petition Date (or, if such day is not a Court date, the next succeeding Court date); (iv) failure to pay any of the Lender Transaction Expenses as they become due; or (v) failure to obtain an order confirming the Plan by the 60th day after the Petition Date(or, if such day is not a Court Date, the next succeeding Court Date).[7]

---

the Prepetition Secured Loan Agreement or any other rights of the Administrative Agent and the Prepetition Secured Lenders.

[5] The Lender Indemnification does not apply to losses, claims, damages, liabilities or expenses to the extent that they are finally judicially determined to have resulted from any breach of the Colony RSA by a Lender Indemnified Party or bad faith, gross negligence, or willful misconduct of the Lender Indemnified Party seeking indemnification.

[6] A discussion of events that could trigger a termination of the Colony RSA is located at Section II.F.2 of the Disclosure Statement.

[7] In the event that an order approving the Rights Offering is not entered within 30 days after the Petition Date, this deadline shall be extended by 30 days.

DOCS_DE:176178.2 93949-001

(b)    **The Noteholders RSA**

47.    On November 4, 2011, the Debtors entered into a noteholder restructuring support agreement (the "Noteholders RSA"[8] and, collectively with the Colony RSA, the "Restructuring Support Agreements"), with the holders of approximately 63.5% of the principal amount of the Old Notes then outstanding (each, a "Consenting Noteholder" and collectively, the "Consenting Noteholders"). A copy of the Noteholders RSA is attached as Exhibit C to the motion to approve the Noteholders RSA. Pursuant to the Noteholders RSA, each Consenting Noteholder agreed to exercise all votes to which it is entitled with respect to the principal amount of Old Notes subject to the Noteholders RSA to accept the Plan pursuant to the terms of the Noteholders RSA.

48.    While the Noteholders RSA is in effect, each Consenting Noteholder also agreed not to transfer any Old Notes held by it that are subject to the Noteholders RSA, except to a transferee who agrees to be bound by the Noteholders RSA.

49.    In exchange for the various concessions and settlements agreed to in the Noteholders RSA, and pursuant to the critical terms thereof, CA Lyon and DE Lyon agreed to pay the reasonable and documented fees and out of pocket expenses of the legal and financial advisors of the Ad Hoc Noteholders Group incurred in connection with the Noteholders RSA and the Chapter 11 Cases (the "Noteholder Transaction Expenses" and, collectively with the Lender Transaction Expenses, the "Transaction Expenses"). In addition, CA Lyon and DE Lyon agreed to indemnify (the "Noteholder Indemnification" and, collectively with the Lender

---

[8] The description of the Noteholders RSA presented herein is a summary of the principal terms of the Noteholders RSA, and is qualified in all respects – and the parties' obligations thereunder are subject – to the actual terms and conditions of the Noteholders RSA.

17

Indemnification, the "Indemnification") the Consenting Noteholders and certain related parties, as defined in section 28 of the Noteholders RSA (each, a "Noteholder Indemnified Person" and, collectively with the Lender Indemnified Parties, the "Indemnified Persons") from and against any and all losses, claims, damages, liabilities and reasonable fees and expenses, joint or several, to which any such Noteholder Indemnified Person may become subject to the extent arising out of or in connection with (i) any third party claim, challenge, litigation, investigation or proceeding with respect to the Noteholders RSA, the Chapter 11 Cases or the transactions contemplated thereby, or (ii) any breach by the Company of the Noteholders RSA and to reimburse such Noteholder Indemnified Persons for any reasonable legal or other reasonable out of pocket expenses as they are incurred in connection with investigating, responding to or defending any of the foregoing.[9]

     50.    The Consenting Noteholders may terminate the Noteholders RSA upon the occurrence of certain events, including the following:[10] (i) failure to obtain an order authorizing the assumption of the Noteholders RSA within 45 days after the Petition Date; (ii) the company entering into a DIP Facility that is materially inconsistent with the Noteholders RSA in a manner that is not reasonably acceptable to the Requisite Noteholders (as defined in the Noteholders RSA); (iii) a material breach or termination of the Colony RSA by the 58th day after the Petition Date (or, if such day is not a Court date, the next succeeding Court date); (iv) the Rights Offering Order shall not have been entered; (v) failure to pay the Noteholder Transaction

---

[9] The Noteholder Indemnification does not apply to losses, claims, damages, liabilities or expenses to the extent that they are finally judicially determined to have resulted from any breach of the Noteholders RSA by such Noteholder Indemnified Persons or bad faith, gross negligence or willful misconduct on the part of such Noteholder Indemnified Person.

[10] A complete discussion of events that could trigger a termination of the Noteholders RSA is located at Section II.F.1 of the Disclosure Statement.

Expenses; or (vi) failure to obtain an order confirming the Plan by the 60th day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date).[11]

## G.    The Rights Offering

51.    Under the Rights Offering incorporated in the Plan, holders of Class 7 Old Notes Claims that are (i) "accredited investors" as defined in Rule 501(a) of Regulation D under the Securities Act and (ii) hold at least $500,000 in outstanding principal amount of Old Notes as of the Rights Offering Record Date (the "Eligible Participants"), shall receive the right (the "Subscription Rights") to purchase a percentage of the shares of new Class C Common Stock (the "Class C Common Shares"), to be offered for an aggregate purchase price of $10 million, together with the same pro rata percentage of the shares of new Convertible Preferred Shares (the "Preferred Shares") to be offered for an aggregate purchase price of $50 million (the Class C Common Shares and the Preferred Shares, collectively constitute the "Rights Offering Securities")[12] in each case, issued by Reorganized Parent.[13]  The Reorganized Parent shall issue 16,110,366 Class C Common Shares, and 64,831,831 Preferred Shares.  The Subscription Rights are not transferrable.

52.    Each Eligible Participant shall have the right, but not the obligation, to exercise its Subscription Rights and purchase Rights Offering Securities.  If an Eligible Participant decides to exercise its Subscription Rights, the Eligible Participant must indicate the

---

[11] In the event that an order approving the Rights Offering is not entered within 30 days after the Petition Date, this deadline shall be extended by 30 days.

[12] The Debtors believe that the Rights Offering Securities, as provided under the Plan, will be exempt from the registration requirements of the Securities Act, pursuant to section 4(2) of the Securities Act, as transactions by an issuer not involving any public offering, and equivalent exemptions in state securities laws.

[13] All Rights Offerings Securities shall be subject to the terms and conditions of the Amended and Restated Certificate of Incorporation Reorganized William Lyon Homes (the "Certificate of Incorporation").  A copy of the Certificate of Incorporation has been filed with the Plan and a copy is attached as Exhibit 2 to Exhibit A to the Rights Offering Approval Motion.

amount of the investment it desires to make up to a maximum amount of $40 million (such

Eligible Participant's "<u>Bid</u>"). Eligible Participants may only invest in Rights Offering Securities

in the proportion of one Class C Common Share for every five Preferred Shares, and may not

elect any other proportional allocation. In the event that the Rights Offering is over-subscribed,

(a) the Backstop Investors reserve the right to purchase up to $20 million of the Rights Offering

Securities, and (b) of the remaining $40 million, each other (non-backstop) Eligible Participant

shall be entitled to purchase Rights Offering Securities (in the form of one Class C Common

Share for each five Preferred Shares) in an amount pro-rated on the basis of the ratio of its Bid to

the aggregate Bids of all other such (non-backstop) Eligible Participants. In the event that the

Rights Offering is under-subscribed, all Rights Offering Securities that are not purchased by

Eligible Participants shall be purchased by the Backstop Investors after the Bid Remittance

Deadline but in all events, no later than the Effective Date.

## H.    <u>The Backstop Agreement</u>

53.    Under the terms of the Backstop Commitment Agreement, the Backstop

Parties (as defined in the Backstop Commitment Agreement) would purchase the lesser of (1)

$60,000,000 of Rights Offering Securities, or (2) the amount of Rights Offering Securities that

are offered pursuant to the Rights Offering in connection with the Restructuring and not

otherwise purchased (after accounting for the minimum reserve described in paragraph 50) (the

"<u>Commitment</u>"). The Commitment is subject to the terms and conditions set forth or referred to

in the Backstop Commitment Agreement.

54.    In consideration of their agreement to provide the Commitment, the

Assuming Debtors propose to pay the Initial Backstop Party (as defined in the Backstop

20

Commitment Agreement) a nonrefundable fee (the "Backstop Fee") in an amount of 2.0% of the outstanding Capital Stock of DE Lyon, payable in Class C Common Shares if the Rights Offering Securities are purchased pursuant to the Commitment. If the Backstop Parties do not purchase the Rights Offering Securities pursuant to the Commitment because of any of the reasons enumerated in the Backstop Commitment Agreement, the Assuming Debtors propose to pay the Initial Backstop Party a cash fee of $2,500,000 (the "Breakup Fee") all in accordance with the terms and provisions of the Backstop Commitment Agreement. The Assuming Debtors would be obligated to pay either the Backstop Fee or the Breakup Fee, but not both. The Company agrees to reimburse the Initial Backstop Party for all reasonable and documented out-of-pocket fees and expenses (including, but not limited to, the reasonable fees, disbursements and other charges of Gibson, Dunn & Crutcher LLP, as counsel to the Initial Backstop Party, and of any special and local counsel to the Backstop Parties (the "Initial Backstop Party Expenses")) and up to $150,000 of reasonable and documented out-of-pocket fees and expenses of one additional Backstop Party incurred in connection with the Commitment and the other aspects of the Restructuring (together with the Initial Backstop Party Expenses, the "Backstop Expenses"). Upon the execution of the Backstop Commitment Agreement, the Assuming Debtors deposited a sum of $200,000 (the "Deposit") with the Initial Backstop Party to cover the Initial Backstop Party Expenses. Under the Backstop Agreement, the Assuming Debtors are required to replenish the Deposit to an amount equal to $200,000, at the Initial Backstop Party's request.

55.    As set forth more fully in the Backstop Commitment Agreement, the Assuming Debtors have also agreed to indemnify (the "Indemnification") the Backstop Parties and each of their respective affiliates and all their respective officers, directors, partners, trustees,

21

employees, shareholders, advisors, agents, representatives, attorneys and controlling persons and each of their respective heirs, successors and assigns (each an "Indemnified Person") from and against any losses, damages, liabilities, and claims arising out of or relating to (i) the Backstop Commitment Agreement, (ii) the Restructuring, (iii) the Rights Offering, and (iv) any other transaction relating to the Restructuring, the Backstop Commitment Agreement or the Rights Offering; provided that the Indemnification shall not extend to losses, damages, liabilities, claims, or expenses, to the extent that they are found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted directly from the gross negligence or willful misconduct of such Indemnified Person.

## I.    The Prepackaged Plan

56.    As discussed above, as of September 30, 2011, the Debtors had outstanding funded indebtedness in the principal amount of approximately $509.8 million.  Upon emergence from chapter 11, pursuant to the Plan, the Debtors expect to have outstanding debt of approximately $327.8 million.  Accordingly, the Reorganized Debtors will have an improved balance sheet and more appropriate capital structure.  In addition to the reduction of indebtedness of the Debtors upon emergence from chapter 11, the Debtors also expect to benefit from an annual decrease in cash interest obligations of approximately $24.7 million, comprised of $19.9 million annual reduction associated with the conversion to equity of a portion of the Old Notes and $4.8 million annual reduction resulting from the reduction in interest rate from 14% under the Prepetition Secured Loan Agreement to 10 ¼% under the Restructured First Lien Loan Agreement.

DOCS_DE:176178.2 93949-001

57.     Other than the Holders of Old Notes and the Prepetition Secured Loan

Agreement Claims whose claims are the subject of the proposed restructuring under the Plan,

and old equity, whose interests are being cancelled under the Plan, all of the Debtors' other

creditors, including general unsecured creditors, are Unimpaired under the Plan within the

meaning of section 1124 of the Bankruptcy Code, and deemed to vote in favor of the Plan

pursuant to section 1126(f) of the Bankruptcy Code.

58.     The Company believes that the prepackaged restructuring Plan is the best

restructuring alternative reasonably available to the Company.  In order to effect the provisions

of the Plan, the Company has succeeded in securing commitments for new equity capital

investments aggregating $85 million, in two separate private placements:  (a) a commitment to

backstop the entire proposed Rights Offering of up to $60 million in cash on the terms set forth

in the Backstop Commitment Agreement should the Rights Offering not otherwise by fully

subscribed, and (b) an additional commitment for $25 million pursuant to Class B Common

Stock Purchase Commitment Agreement, in the form of cash or a combination of cash and

membership interests in certain limited liability companies that hold real property, to be provided

by the Company's current equity owners.  The Company plans to utilize the proceeds of these

investments to fund its working capital requirements, and to make certain distributions under the

Plan.  After extensive efforts to seek new equity capital, the Company believes that the Rights

Offering (inclusive of the Backstop Commitment Agreement) and the Class B Common Stock

Commitment Agreement represent the best terms for equity financing available to the Company

in this market.

23

59.     The Plan represents a significant achievement for the Company and should greatly enhance the Company's ability to reorganize successfully and expeditiously through the addition of $85 million of new equity capital pursuant to the Rights Offering and Class B Common Stock Purchase Commitment Agreement.  The Plan will also provide an efficient restructuring through the prepackaged process, designed to minimize disruption to the Company's business endeavors, stabilize the Company's balance sheet, and provide a platform for future success.  Through confirmation of the Plan implementing the terms of the pre-packaged restructuring, the Company will restructure and substantially deleverage its balance sheet; reduce its cash interest expense to a level that is aligned with its expected future cash flows; retain additional flexibility to invest in growth initiatives to maximize enterprise value; and maintain favorable pricing to the Company under the Prepetition Secured Loan Agreement.  The Company also will improve its liquidity position.  The Company believes that it will have sufficient liquidity during the course of the Chapter 11 Cases and will be well-positioned going forward.

**J.      Solicitation Of the Prepackaged Plan**

60.     The Board of Directors of each Debtor approved the Solicitation of the Plan on November 1, 2011.

61.     Beginning on November 17, 2011 through December 16, 2011, the Debtors solicited votes to accept or reject the Plan (the "**Solicitation**").  All claim holders entitled to vote under the Plan (i.e., Class 4 – Prepetition Secured Loan Agreement Claims and Class 7 – Old Notes Claims) (the "**Voting Classes**") voted overwhelmingly to accept the Plan, thus satisfying the statutory percentages specified in section 1126(c) of the Bankruptcy Code.

24

Accordingly, on the Petition Date, the Debtors commenced these cases and are seeking expedited approval of their Plan and Disclosure Statement.

**PART II - FIRST DAY MOTIONS**

62.     The Debtors believe that an important element in achieving a successful result for creditors through this bankruptcy proceeding is the approval of the first day motions submitted concurrently herewith.  The factual background and support for each of these first day pleadings is set forth in detail in each of the first day motions, which the Debtors and I have reviewed, and is discussed below.  To the extent that any factual background is contained in the motions and not contained herein, such factual background is adopted herein by this reference as though full set forth herein.

A.      *Motion for Entry of an Order Authorizing Joint Administration of Related Chapter 11 Cases*

63.     The Debtors seek entry of an order consolidating the  Cases for procedural purposes only. Accordingly, the Debtors respectfully request that the Clerk of the Court maintain one case file and one docket for the Cases, under the number assigned to William Lyon Homes, and that the one official caption be used by all parties in all pleadings.

64.     The Debtors in these proceedings are affiliates whose financial affairs and business operations are closely related.  I am informed that through joint administration of these Cases, the Debtors will be able to reduce fees and costs resulting from the administration of these Cases and ease the onerous administrative burden of having to file multiple and duplicative documents.

25

65.     I understand that the Court also will be relieved of the burden of entering duplicative orders and maintaining duplicative files.   I also understand that the Debtors' creditors will not be adversely affected by the joint administration of these Cases because this motion requests only administrative, not substantive, consolidation of the estates.

66.     Accordingly, I believe that the relief requested in the motion is in the best interests of the Debtors, their estates, creditors and other parties in interest and, therefore, I respectfully request that the Court enter an order granting the relief requested.

**B.**     *Application of Debtors Pursuant to 28 U.S.C. § 156(C) and Local Rule 2002-1(F) for an Order Authorizing the Retention of Kurtzman Carson Consultants LLC as Claims, Noticing, Balloting and Subscription Agent for the Debtors*

67.     The Debtors seek to retain KCC as their notice and claims agent ("Claims Agent") in these Cases in accordance with the KCC Agreement for Services (the "Services Agreement") between the Debtors and KCC.  By reason of KCC's extensive experience in the industry, the Debtors believe that the retention of KCC is in the best interests of the Debtors and their estates and creditors.

68.     The Debtors estimate that there may be over 200 creditors holding claims against the Debtors' estates.  Furthermore, the Debtors believe that there are hundreds of creditors, former employees and other parties-in-interest who require notice of various matters, and in particular the deadline for filing proofs of claim.  Additionally, many of these parties may file proofs of claim and cast ballots with respect to a chapter 11 plan.

69.     I believe that this retention is the most effective and efficient manner of noticing the creditors and parties in interest of the filing of the Cases and other developments in

Case 11-14019-CSS    Doc 10    Filed 12/19/11    Page 27 of 65

the Cases.  Accordingly, I respectfully request that the Court authorize the Debtors to retain

KCC.

**C.**     ***Motion of Debtors for Entry of Order (A) Providing Extension of Time to File Schedules and Statements of Financial Affairs; (B) Waiver of Requirement to File Same if Plan Becomes Effective Prior to Expiration of Such Extension; (C) Waiver of Requirement to Convene Section 341(A) Meeting of Creditors if Plan Becomes Effective Prior to Expiration of Such Extension; and (D) Limiting Notices Required Under Bankruptcy Rule 2002 to Be Provided in these Cases***

70.     By this Motion, the Debtors request an order (i) extending the time within

which to file their Schedules and Statements for an additional seventy (70) days to March 28,

2012 (for a total of one hundred (100) days from the Petition Date); (ii) waiving the requirement

to file the same if the Plan becomes effective prior to the expiration of the Extension Date; (c)

waiving the requirement to convene the section 341(a) meeting of creditors if the Plan becomes

effective prior to expiration of the Extension Date; and (d) limiting notices required under

Bankruptcy Rule 2002 to be provided in these cases.

71.     Given the prepackaged nature of the chapter 11 cases, the Debtors believe

that the relief requested in this motion is appropriate and I respectfully request that the Court

grant the relief requested in the motion.

72.     In addition, the Debtors have over 23,000 current or former homeowners

(the "Homeowners").  Given the nature of the Plan, which leaves all general unsecured creditors

unimpaired (other than the Old Notes), Homeowners are not being impacted under the Plan and

whatever warranty rights Homeowners have are riding through the Plan unimpaired.  I believe

limiting notices required to be provided and doing so would be appropriate here where it would

likely cause undue confusion and concern amongst the Homeowners and require the Debtors to

DOCS_DE:176178.2 93949-001

spend an inordinate amount of time responding to such inquiries. In addition, the Debtors also have many pending buyers (the "Pending Buyers") who have signed a sales contract but have not yet closed on a home. The Debtors may be holding a deposit for the Pending Buyers. Given the nature of the Plan, however, the Pending Buyers will be unimpaired and are not being impacted under the Plan. As such, I believe that cause also exists to limit notices required to be provided to the Pending Buyers because such notices would likely also cause undue confusion and concern amongst the Pending Buyers. In addition, the Debtors intend to continue operating in the ordinary course of business post-petition, including closing on pending home sales.

**D.**     ***Motion of the Debtors for Order: (A) Scheduling Combined Hearing to Consider Approval of Disclosure Statement and Prepackaged Plan; (B) Establishing Deadlines and Procedures to Object to Same; (C) Approving Solicitation Procedures and Solicitation Package; (D) Approving Form and Manner of Notice of Plan Confirmation Hearing Commencement of Cases; and (E) Granting Related Relief***

73.     The Debtors respectfully entry of an order: (a) scheduling an objection deadline for objections to the Plan and Disclosure Statement and scheduling the Confirmation Hearing; (b) approving the form and manner of notice of the Confirmation Hearing; (c) establishing procedures for objections to the Plan and Disclosure Statement; (d) approving the Solicitation Procedures; and (e) granting related relief as set forth in this Motion.

74.     I understand this type of procedural relief is similar to relief granted in other prepackaged bankruptcy cases and will promote the prompt and efficient consideration of the Disclosure Statement and Plan in the Cases. Thus, I respectfully request that the motion be granted.

28

E.  ***Motion of Debtors for Order Under 11 U.S.C. §§ 105(a), 345, 363, 364, 503(b)(1), 553, 1107, and 1108 and Local Rule 2015-2 (I) Authorizing Continued Use of Existing (A) Bank Accounts, (B) Cash Management System, and (C) Business Forms and Checks; (II) Authorizing the Continuation of Intercompany Transactions Among Debtors and Non-Debtor Affiliates and According Superpriority Status to Post-Petition Debtor Intercompany Transactions; and (III) Waiving Investment and Deposit Requirements of 11 U.S.C. § 345(b) on an Interim Basis***

75.    By this Motion, the Debtors seek an order (i) authorizing the Debtors to continue to use their existing (a) Bank Accounts, (b) Cash Management System (including payment of banking fees), (c) Business Forms and checks, (ii) authorizing the continuation of the Intercompany Transactions among Debtors and the Non-Debtor Affiliates and according superpriority status to all post-petition Intercompany Transactions between the Debtors and, (iii) waiving investment and deposit requirements of 11 U.S.C. § 345(b) on an interim basis to the extent set forth in the Order.

76.    Prior to the commencement of these cases, the Debtors used a complex centralized cash management system to collect, transfer, and disburse funds generated by their operations and to accurately record all such transactions as they are made (the "Cash Management System") involving a system of 34 bank accounts (the "Bank Accounts").  The Bank Accounts are part of a carefully constructed and complex, automated cash management system that ensures the Debtors' ability to efficiently monitor and control all of their cash receipts and disbursements.  Closing the existing Bank Accounts and opening new accounts inevitably would disrupt the Debtors' businesses and result in delays impeding the Debtors' ability to transition smoothly into chapter 11, and would likewise jeopardize the Debtors' efforts to successfully reorganize in a timely and efficient manner.

29

77.    I am informed that, upon the filing of a petition for relief under chapter 11 of the Bankruptcy Code, debtors in possession are normally required by the U.S. Trustee Operating Guidelines (the "UST Guidelines") to (i) close all of their existing bank accounts, (ii) open new "debtors in possession" bank accounts, and (iii) ensure that all checks and forms bear the designation "debtors in possession." If strictly enforced in this case, the United States Trustee's requirements would cause a severe disruption in the Debtors' activities and would impair the Debtors' ability to operate under chapter 11. Accordingly, the Debtors seek a waiver of these requirements to the extent set forth in the motion.

78.    The cash management procedures utilized by the Debtors are ordinary, usual and essential business practices, and are similar to those used by other major corporate enterprises. The Cash Management System provides significant benefits to the Debtors, including the ability to control corporate funds centrally, segregate cash flows, ensure availability of funds when necessary, and reduces administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information.

79.    The operation of the Debtors' business requires that the Cash Management System continue during the pendency of these Chapter 11 Cases. Requiring the Debtors to adopt new cash management systems at this critical stage of these cases would be expensive, would create unnecessary administrative burdens and problems (including the possibility that transactions might not be adequately documented), and would likely disrupt and adversely impact the Debtors' ability to reorganize successfully. Indeed, requiring Cash Management System changes could irreparably harm the Debtors, their estates and their creditors by creating

30

cash flow interruptions while systems were changed.  I believe that maintenance of the existing

Cash Management System and granting the relief requested in the motion is therefore in the best

interests of all creditors and other parties-in-interest.

**F.**  ***Motion of Debtors for Entry of Order Authorizing Debtors to (I) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation; (II) Remit Withholding Obligations; (III) Maintain Employee Compensation and Benefits Programs and Pay Related Administrative Obligations; and (IV) Have Applicable Banks Honor Certain Checks Presented for Payment***

80.    As of the Petition Date, the Debtors employ approximately 248 employees

(collectively, the "Employees"), including 178 full-time salaried employees (the "Full-Time

Salaried Employees"), and 70 hourly employees (the "Hourly Employees").

81.    The average bi-weekly payroll for the Employees is approximately

$1,000,000.  Salaried and Hourly Employees are paid on a biweekly basis and are paid five (5)

days in arrears.  The Employees were last paid on December 9, 2011 for the two-week period

from November 21, 2011 through December 4, 2011.  The Debtors' next payroll is scheduled to

be paid on December 23, 2011 for the two-week period from December 5, 2011 through

December 18, 2011.  Therefore, as of the Petition Date, there will be due and owing one full

payroll cycle in the amount of approximately $650,000 in earned and unpaid salary, which

amounts may also include checks in float from the prior payroll made on December 9, 2011 (the

"Unpaid Wages").  By this Motion, the Debtors request authority to pay up to $650,000 of

Unpaid Wages that may have accrued before the Petition Date.

82.    The Debtors also seek authority to pay, in their sole discretion, prepetition

employee-related obligations in the ordinary course.  In particular, the Debtors seek authority to

pay and/or honor, as the case may be, in their sole discretion, certain prepetition claims of

31

Employees, for, among other things, (a) wages, salaries, commissions, and other accrued compensation, (b) reimburse all prepetition Employee business expenses and maintain corporate credit cards, (c) make prepetition contributions and pay benefits under certain Employee benefit plans, including without limitation, certain medical, dental, vision, 401(k), flexible spending, and (d) honor disability, life insurance, and other workers' compensation obligations (the foregoing and other similar obligations collectively referred to herein as the "Employee Obligations").

83.    The Debtors seek authority to make the foregoing payments and honor the foregoing obligations because the nonpayment of Employee compensation and the failure to honor Employee benefit obligations could seriously undermine morale, impose hardship on the Employees, generate doubt about the stability of the Debtors and their prospects for reorganization, and create a significant risk of Employee attrition. The relief requested in the Wages Motion is critical to the Debtors' reorganization effort and, therefore, I respectfully request that the Court enter an order granting the relief requested in the motion.

84.    Certain of the Debtors' Employees also provide human resources, tax and other services to their Chairman in his personal capacity or to companies partially owned by the Chairman, as more fully described herein. The Debtors request authority to continue to provide such services on the terms set forth in the motion.

**G.**   ***Motion Of Debtors For Entry Of An Order (I) Authorizing Debtors To Continue To Sell Homes Free And Clear Of Liens, Claims, Encumbrances And Other Interests In The Ordinary Course Of Business; And (II) Establishing Procedures For Resolution And Payment Of Lien Claimants***

   **(a)    Home Sale Contracts**

85.    <u>Sale Contracts</u>.  In the ordinary course of their business, the Debtors routinely contract with their customers to build and close on the sale of homes in the various states in which they operate (the "<u>Sale Contracts</u>").  The terms of the Sale Contracts vary, but generally provide for, among other things, the payment of a deposit, the purchase price, selection of options for the property, payment of closing costs, inspection rights and numerous disclosures.

86.    The Debtors believe that they are authorized to continue to honor existing Sale Contracts and enter into new Sale Contracts to build and sell homes in the ordinary course of business without the need for a court order.  Nonetheless, in an abundance of caution, and to provide assurances to the Debtors' customers, contractors, and title insurers, the Debtors seek authority to (a) continue to close on sales of homes currently under contract and to continue to contract for and complete the construction and sale of homes to customers in the ordinary course of business, (b) continue to enter into Sale Contracts with customers on a going forward basis, and (c) close on the sale of homes, including pursuant to the Sale Contracts, once construction is finished and other conditions for closing are satisfied, all as set forth in further detail in the underlying motion.

   **(b)    Operational Lien Claimants**

87.    As part of their homebuilding operations, the Debtors rely on, and routinely contract with vendors that may be able to assert liens under applicable state law against

the Debtors' property (the "Operational Lien Claimants") to secure payment for certain

prepetition goods and services delivered to the Debtors or for other prepetition claims (the

"Operational Lien Claims"). These Operational Lien Claimants may be subcontractors, civil

engineers, architects, suppliers, vendors or a host of other service providers and suppliers. If

Operational Lien Claimants are not paid for prepetition services, they may have a right under

applicable state law to assert and perfect, construction, materialman's, warehouseman's and

mechanics' or other liens (the "Operational Liens"), which attach to the Debtors' unsold homes

and related real property. These liens will make it difficult if not impossible for the Debtors to

obtain title insurance. Without title insurance guaranteeing clean title to their homes, it will be

impossible for the Debtors to sell homes to customers in the ordinary course of business.

       88.    The Debtors pay all the Operational Lien Claimants under progress

payment contracts by which the Debtors pay the Operational Lien Claimants as work progresses

on a house or improvement design (the "Progress Payment System"). Under the Progress

Payment System, the Operational Lien Claimants are paid as they complete work on the

property. Under state law, the Operational Lien Claimants have the ability to record Operational

Liens against any property that benefits from their improvements if they are not paid in full for

their services. Because of the Progress Payment System, the Operational Lien Claimants very

rarely record Operational Liens against the Debtors' projects; however, it has occurred in cases

where the asserted fees were disputed.

       89.    On an average monthly basis, the Debtors pay approximately $8 million

on account of contractors and vendors who may be able to assert Operational Lien Claims.

Although the Debtors are generally current with the Progress Payment Systems, because of

34

unbilled work in progress, the Debtors estimate that the prepetition outstanding amount of such claims is approximately $17 million. If the Debtors do not have the ability to pay the Operational Lien Claimants in the ordinary course, the Debtors' businesses likely will be severely impaired. If Operational Lien Claimants are not timely paid, the Operational Lien Claimants may stop work that they are currently performing, devastating the Debtors' current operations. Switching contractors mid-stream would delay completion of the affected homes, providing buyers the opportunity to back out of a sale and jeopardizing or delaying the Debtors' receipt of cash. Lost home sales cost the Debtors much needed revenue at a time when they need to maximize revenue to continue operations. As well, Operational Lien Claimants would be able to assert liens against the Debtors' customers' homes for the Debtors' inability to pay. Further, the Debtors believe that failing to pay the Operational Lien Claimants in the ordinary course of business will cause many of them to require that the Debtors pay for all goods and services cash on delivery, causing an immediate liquidity issue for the Debtors, assuming they are prepared to work with the Debtors at all.

(c)     **Resmark Projects**

90.     In addition to developing and selling properties that it owns, the Company is party to certain construction management agreements with Resmark Equity Partners, LLC and its affiliate, Olympic Realty Advisors (together, "Resmark") under which the Company builds, sells and markets homes on land owned by Resmark in three separate communities. After the home is sold, the Debtors further provide a warranty against defects and workmanship similar to the warranty provided for their owned homes. For such services, the Company receives a 3% contractor's fee on the closing of each home sale, as well as a fee to compensate them for the

35

costs associated with selling and marketing the homes in the Resmark Projects (the "Sale Fee"). The amount of the Sale Fee differs based on the Resmark Project and costs that the Debtors incur. Additionally, the Debtors receive reimbursement for on-site supervision costs and a fee of 1% of the purchase price upon the closing of each home sale to compensate them for any warranty claims that may arise in the future. Once all homes in the Resmark Projects are sold, the Debtors may be eligible to receive an incentive fee tied to the profitability and other performance metrics generated by the Resmark Projects. The Resmark contracts are valuable to the Company and represent a net positive source of revenue.

91.    Currently, there are three Resmark Projects in various stages of completion. The Debtors and their supervisors hire the subcontractors (the "Resmark Subcontractors") and oversee the building and sale of homes that are built in the Resmark Projects. Time that the Debtors' employees spend working on the Resmark Projects is allocated to the Resmark Projects and it is billed to Resmark as part of the Resmark Progress Payments (defined below). Twice a month, the Debtors send Resmark a list of all of the Resmark Subcontractors that require payment and the amount of the proposed payment, including the proposed payment for the work that the Debtors' employees complete on the Resmark projects. Upon receipt of the list, Resmark wires the amount due to the Resmark Subcontractors into a designated account at California Bank and Trust (the "Resmark Progress Payments"). Each Resmark Project has its own dedicated and restricted account that is held by William Lyon Homes, Inc. ("CA Lyon"). The Debtors then use the money deposited in the account to make the Resmark Progress Payments; the Resmark Progress Payments do not flow through the Debtors' primary operating account. Only the Resmark Progress Payments designated to compensate the

Debtors for the work that their employees performed are transferred from the restricted accounts to the Debtors' general operating account. If the subcontractors do not receive the Resmark Progress Payments, they may be entitled to record Operational Liens against the Resmark Projects. The Debtors estimate that as of the Petition Date, the Resmark Subcontractors are owed $4.3 million for unbilled work in progress, which amounts are payable by Resmark (as opposed to the Debtors).

  **(d)**  **Arizona Sale Procedures**

  92.  In Arizona, the Debtors sell their homes through William Lyon Southwest, Inc., an Arizona corporation ("Lyon Southwest"). CA Lyon, which is the Debtors' primary operating company, builds the homes that Lyon Southwest sells and transfers the home title to Lyon Southwest, simultaneously as the home closes. Lyon Southwest also uses Lyon California's operating account, which is the Debtors' primary operating account for purposes of holding customer deposits and net sale proceeds (the "Arizona Sales Procedure"). The Debtors request authority to continue to sell homes in Arizona pursuant to the Arizona Sales Procedure consistent with their ordinary course of business.

  **(e)**  **Irvine Sales Procedures**

  93.  CA Lyon is the borrower under that certain Builder Agreement dated January 26, 2010 by and between CA Lyon and Irvine Community Development Company LLC ("Irvine"). The purchase money promissory note under this agreement bears interest at 7% per annum, payable upon certain specified dates and events, and matures in May, 2015 (the "Irvine Loan"). The original principal amount under the Irvine Loan was approximately $10.7 million and the outstanding balance as of September 30, 2011 was approximately $3.9 million. The

37

Irvine Loan is secured by certain real property of CA Lyon in Orange County, California. Under the terms of the Irvine Loan, CA Lyon is required to pay Irvine $115,000 for each lot that it sells that is encumbered by Irvine's security interest in exchange for Irvine releasing its lien against the lot. The average sales prices of homes sold that are encumbered by Irvine's security interest is approximately $381,000. In addition, the Debtors pay Irvine approx $17,500 per month on account of interest for the Irvine Loan, which amounts are reflected in the DIP Budget and proposed DIP financing motion filed concurrently herewith. Through this Motion, the Debtors request authority, in their sole and absolute discretion to continue to make all required payments under the Irvine Loan as may be required to release Irvine's liens on homes sold that are encumbered by Irvine.

94.    In these cases, there is sufficient business justification for the Debtors to close sales of homes, pay the associated costs and continue to contract for the construction and sale of homes in the ordinary course of business. The Debtors have received the necessary votes to approve their prepackaged Plan and are seeking to confirm such Plan on an expedited basis. The seamless development and sale of the homes pursuant to the existing Sale Contracts and future sales would provide the Debtors' estates with the best opportunity to realize value from the homes, provide immediate cash recovery to the Debtors' creditors, and enable the Debtors to emerge from bankruptcy quickly. Conversely, failure of the Debtors to meet their obligations under existing Sale Contracts would cause immediate and substantial damage to the Debtors reputation in the marketplace, and destroy the going concern value of the Debtors' businesses. For the reasons set forth in the motion, the Debtors should be authorized to continue to enter into

new Sale Contracts in order to maximize the value of their businesses for the benefit of all of

their stakeholders and be granted the additional relief set forth therein.

**H.**    ***Motion of Debtors for Order Pursuant to Sections 105(a), 363(c), 1107(a), and 1108 of the Bankruptcy Code Authorizing But Not Requiring the Debtors to Honor Prepetition Obligations to Customers and to Otherwise Continue Customer Practices in the Ordinary Course of Business***

95.    Prior to the Petition Date and in the ordinary course of their businesses,

the Debtors engaged in certain practices to maximize sales, engender customer loyalty, and

develop and sustain a positive reputation in the marketplace.  These practices include, but are not

limited to, offering warranties on the sale of homes (the "Warranty Program"), sales incentive

programs provided to induce homebuyers to enter into sales contracts for the construction of

homes ("Sales Incentive Program"), returning customer deposits as required by law, contract, or

in the Debtors' business judgment (the "Customer Deposits"), programs to pay, in whole or in

part, the homeowners association fees of existing homeowners (the "HOA Fee Payment

Programs"), programs for customers of the Debtors' golf course (the "Golf Course Programs"

and, together with the Warranty Program, Sales Incentive Program, Customer Deposits, and

HOA Fee Payment Programs are the "Customer Programs").  Approval of the Debtors' request

to honor the Customer Programs will permit the Debtors to meet certain prepetition and

postpetition obligations to their homebuyers and other customers, enhance customer satisfaction

and protect the Debtors' reputation for outstanding customer service and its overall brand.   Any

payments proposed to be made under this Motion will be subject to the Debtors' proposed DIP

Budget, the terms of the DIP financing order proposed concurrently herewith, or as may be

required by applicable law with respect to return of Customer Deposits.

39

96.    While the types of Customer Programs offered by the Debtors are commonplace among homebuilders similar to the Debtors, the Debtors have developed a unique reputation in the marketplace for customer service that sets the Debtors apart from their competitors and adds significant value to the Debtors' brand name.

97.    The Customer Programs are a cornerstone of the Debtors' businesses, and the Debtors must continue to offer their customers the same exceptional service if they wish to continue to attract and retain business.  The common goals of the Customer Programs have been to meet competitive pressures, ensure customer satisfaction, and protect the Debtors' reputation in the marketplace, thereby satisfying current customers, attracting new ones, and ultimately enhancing net revenue.  For the reasons set forth in the motion, I believe it is in the best interests of the Debtors, their estates and creditors, to honor, in the Debtors' discretion, their prepetition obligations in connection with the Customer Programs, and to continue the Customer Programs in the ordinary course of business.

I.    ***Motion of Debtors Pursuant to Sections 105(a) and 363 of Bankruptcy Code for Authorization to Pay Prepetition Claims of General Unsecured Claims Not Covered in Other First Day Motions in the Ordinary Course of Business***

(a)    **The General Unsecured Claims**

98.    The Debtors estimate that the vast majority, or approximately 90% of their outstanding trade payables, are covered under other first day motions already filed with this Court, including, in particular, the motion to sell homes free and clear of liens in the ordinary course of business, under which the Debtors are requesting approval to pay their vendors who are capable of asserting a lien against any of their projects or homes.  However, the Debtors owe approximately $5 million to unsecured creditors that are not capable of asserting a lien against

40

the Debtors' collateral or customers' homes, but nonetheless are a critical component of the

Debtors' businesses and are Unimpaired under the Plan, including but not limited to:

(1)    Vendors that are necessary to their homebuilding activities such as those who provide security, trailers, temporary fencing/ barricades, disposal services, that are critical to the Debtors' business, but are not capable of asserting a lien against the Debtors' assets under applicable law;

(2)    Goods providers who provide major appliances for the Debtors' homes and suppliers to the Debtors' golf course (e.g., golf balls, golf clubs, golf accessories) who may be able to assert claims under Section 503(b)(9) of the Bankruptcy Code;

(3)    Services of third parties who market and sell their homes, such as printers who print the marketing brochures and newspapers who run advertisements for the sale of the Debtors' homes, internet web designers and other third party providers who maintain the Debtors' website, all of whom are essential unsecured creditors that do not fall under any other first day motion, but are Unimpaired under the Plan;

(4)    Utility companies that provide the necessary electricity and power to the Debtors' homes and development projects that would otherwise likely require the Debtors to post a deposit;

(5)    Design professionals such as architects who may not be entitled to assert a lien under applicable law, but provide essential services for the Debtors' homebuilding business; and

(6)    Additional categories of unsecured creditors who provide essential services to the Debtors' businesses include, but are not limited to:  corporate support for the Debtors' headquarters including, facilities expenses (FedEx, UPS), technology, temporary employment agencies, and ordinary course professionals.

99.    In light of the prepackaged nature of these chapter 11 cases, the Debtors

expect to emerge from chapter 11 on an expedited basis.  The requested relief aids the impaired

DOCS_DE:176178.2 93949-001

and consenting creditor classes that have a direct interest in the uninterrupted operation of the business.

100.    The Debtors do not seek authority to pay all Unimpaired Claims immediately, but only to pay such undisputed amounts that come due in the ordinary course of business and on satisfactory terms.  In addition, to the extent a Creditor refuses to extend satisfactory credit terms, the Debtors reserve their rights not to pay prepetition amounts and to recover any previous payments for the estates' benefit as avoidable postpetition transfers under section 549 of the Bankruptcy Code.  Further, the amount of unsecured Unimpaired Claims, estimated at $5 million, is insignificant in relation to both the size of these estates and the potential disruption that would occur if relationships with these Creditors were to be compromised.  Thus, I believe that the relief requested in this motion is narrowly tailored to facilitate the Debtors' reorganization.

**J.**      *Motion of Debtors for Order (A) Authorizing Debtors to Pay Pre-Petition Sales, Use, Franchise, Property Taxes, and Similar Taxes in the Ordinary Course of Business, (B) Authorizing Debtors to Pay Certain Pre-Petition Fees in the Ordinary Course of Business and (C) Authorizing Banks to Honor and Process Checks and Transfers Related Thereto*

101.    In the normal operation of their businesses, the Debtors pay various sales, use, franchise, property, and similar taxes (collectively, the "Taxes") to various federal, state, and local taxing authorities and agencies  (collectively, the "Taxing Authorities"), including, but not limited to Sales Taxes, Use Taxes, Franchise Taxes, Personal Property Taxes, Real Property Taxes as more fully set forth in the applicable motion.  The local jurisdictions in which the Debtors develop land and build homes often charge the Debtors fees to appraise the Debtors'

42

land, approve the Debtors' building and development plans, inspect the homes that the Debtors

build, and charge fees related to community facility districts (collectively the "Fees").

102.    For the reasons set forth in the motion, the payment of pre-petition Taxes

and Fees will help the Debtors avoid serious disruption to their operations that would result from

the nonpayment of such taxes and fees, including the distraction, adverse effect on morale and

consequent difficulty in retaining key officers and directors that could result from liability for

nonpayment imposed upon the Debtors' directors and officers.  Furthermore, nonpayment of

these obligations may cause Taxing Authorities to take precipitous action, including, but not

limited to, filing liens, preventing the Debtors from conducting business in applicable

jurisdictions, and seeking to lift the automatic stay, all of which could disrupt the Debtors' day-

to-day operations, impose significant costs on the Debtors' estates, and materially impair the

going-concern value of the Debtors' businesses.  Accordingly, I believe that the relief requested

is in the best interests of these estates.

**K.**    *Motion of Debtors for Order Under Sections 105 and 366 of the Bankruptcy Code (A) Prohibiting Utility Providers From Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment*

103.    The Debtors receive essential utility services from a number of utility

companies.  In the normal course of their daily business operations, the Debtors have

relationships with various utility companies and other providers (each a "Utility Provider" and

collectively, the "Utility Providers") for the provision of telephone, gas, electricity, water,

sanitation, waste removal, and related services.  Approximately fifty Utility Providers provide

43

services to the Debtors. (the "Utility Services").  The Debtors estimate that their average monthly

payments to the Utility Providers aggregate approximately $400,000.00.

104.     At this critical time, and given the nature of the Debtors' business,

continued and uninterrupted utility service is essential to the Debtors' ongoing operations.  The

Debtors use the utilities at their building sites in the construction of homes.  The Debtors also

supply utilities to model homes in developments under construction, and to homes not yet sold to

customers.  If the Debtors lost any utility service, particularly electricity, building completion

could be delayed and the ongoing marketing of completed homes would be interrupted.  Any

delay or interruption may make it impossible for the Debtors to deliver their homes to the

promised buyers in a timely manner.  The buyers could then potentially back out of their

contracts, causing immediate and irreparable harm.  It is therefore critical that the Court prohibit

the Utility Providers from altering, refusing, or discontinuing service to the Debtors.  Therefore, I

believe the relief requested in the utilities motion is essential to these estates and their

reorganization efforts.

**L.**     ***Motion of Debtors for Order Under Sections 105, 361, 362, 363, 364 1107 and 1108 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 6003 Authorizing Debtors to (A) Maintain and Renew Existing Insurance Policies; (B) Continue Insurance Premium Financing Programs, (C) Pay Insurance Premium Financing Obligations Arising Thereunder, (D) Authorizing Financial Institutions to Honor All Obligations Related Thereto***

105.     In the ordinary course of the Debtors' businesses, the Debtors maintain

numerous insurance policies providing coverage for, inter alia: general liability, property,

workers compensation, builders risk and fixed property, errors and omissions, and directors &

officers liability (collectively, the "Policies").  These Policies are essential to the preservation of

44

the Debtors' business and assets, and, in many cases, such insurance coverage is required by various regulations, laws, and contracts that govern the Debtors' business conduct.

106.     Certain of the Debtors' policies are financed through the Insurance Premium Finance Agreement ("PFA") with an insurance financier.  Currently the Debtors have one PFA with Premium Assignment Corporation (the "Insurance Financier").  The PFA covers seven liability policies (the "Financed Policies") that the Debtors carry to cover potential liability created by their home building operations.  In the PFA, the Debtors, among other things, grant the Insurance Financier a security interest in the Debtors' unearned premiums, return premiums, dividend payments and loss payments under the Financed Policies.

107.     Pursuant to the PFA, the Insurance Financier agreed to pay each Insurance Carrier the entire premium on the Financed Policies.  In return, the Debtors paid the Insurance Financier a down payment of $2,170,000.  The Debtors pay the Insurance Financier the remaining premiums at $322,428.28 per month for a period of eighteen months.  The interest rate on the PFA is 4.11% per annum.  The Debtors will have paid the PFA in full on July 31, 2012.

108.     I believe that the Policies are essential to the Debtors' business and the Debtors believe that it is in the best interests of their estates to continue to pay the amounts due under the PFA, regardless of whether the payment became due prior to or after the Petition Date. Unless the Debtors are authorized to continue to pay the PFA on a monthly basis, the Insurance Financier will have the right to cancel the Financed Policies and will be entitled to recover from its collateral, the unearned premiums.  The termination of the Financed Policies would leave the Debtors' estates at risk of catastrophic loss if an unforeseen event occurred.  Accordingly, I believe that the relief requested in this motion is in the best interest of these estates.

DOCS_DE:176178.2 93949-001

**M.**    *Motion of Debtors for Order (A) Authorizing the Maintenance and Renewal of Surety Bonds, (B) Authorizing the Payment of Surety Bond Premiums, (C) Preventing the Sureties From Giving Any Notice of Termination or Otherwise Modifying or Canceling Any Surety Bonds, and (D) Authorizing Banks to Honor and Process Checks and Transfers Related Thereto*

109.    In the ordinary course of business, the Debtors are required to post bonds (the "Surety Bonds") as collateral to secure certain of their performance obligations under various contracts, principally in connection with infrastructure improvements that the Debtors are obligated to complete for various local governmental units (the "Contracting Authority") as a condition for obtaining permits and other approvals necessary for the development of their projects.  Currently, the Debtors have approximately $63,000,000 in Surety Bonds outstanding.

110.    By this Motion, the Debtors request that this Court enter an order (a) authorizing, but not directing, the Debtors to maintain surety bonds (including the authority to revise, extend, supplement, renew, or modify surety bond coverage) and to pay any pre-petition and/or post-petition premiums or surety bond renewals that may come due, and (b) preventing the Sureties from giving any notice of termination or otherwise modifying or canceling any of the Surety Bonds without obtaining relief from the Automatic Stay.  I believe the relief requested in the Motion is in the best interests of the estates for the reasons set forth therein.

**N.**    *Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to Obtain Interim Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507, (II) Authorizing Debtors to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507, (IV) Modifying the Automatic Stay, and (V) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001*

111.    During the course of the review of strategic alternatives, it became apparent that a significant new capital investment would be required in order for the Company to

46

satisfy its working capital and liquidity requirements, whether in the context of an out-of-court or in-court restructuring. In an effort to obtain financing, the Debtors and its advisors (Alvarez and Marsal) approached 15 different debtor-in-possession financial institutions, including banks, credit funds and hedge funds. In particular, the Debtors and their advisors solicited these parties' interest in providing funding on either a priming or junior basis to the Prepetition Secured Lender (Colony). Seven outside parties indicated an interest in providing financing to the Debtors and were willing to sign confidentiality agreements to receive additional information, which was subsequently sent to them. As a result of these efforts, the Debtors received four offers for post petition financing in addition to a proposal by the Prepetition Secured Lender (Colony). Of these four institutions that delivered proposals, three were for priming financing and one was interested in lending on a non-priming basis. The Colony proposal was within the range of all-in costs associated with the three priming proposals and avoided a costly priming fight.

112.    As a result of the foregoing efforts, the Debtors engaged in negotiations with Colony and a single third party providing a non-priming proposal for debtor in possession financing. After negotiating terms with Colony which improved from their initial proposal, the Debtors together with their advisors determined that Colony's proposal provided the most advantageous terms to the Debtors under the circumstances and pre-packaged nature of the deal. The other proposal to provide debtor in possession financing was substantially inferior to Colony's proposal because it was more expensive with respect to interest rate and fees. And by accepting the Colony proposal, the Debtor eliminated an unnecessary priming fight in an already negotiated pre-packaged deal.

113.     The Debtors do not believe they are able to obtain postpetition financing or other financing accommodations from any prospective lender or group of lenders on more favorable terms and conditions than those contained in the DIP Facility and described in the underlying motion. The DIP Facility was negotiated in good faith and at arm's length, extensively and diligently considered by the Debtors. The management of the Debtors believes that the proposed terms of the DIP Facility are fair and reasonable in light of current market conditions and is in the best interests of the Debtors' Estates.

114.     The financing to be provided under the DIP Facility and the use of Cash Collateral will allow the Debtors to, among other things:  (a) continue to operate their businesses in an orderly manner; (b) maintain their valuable relationships with vendors, shippers, suppliers, customers and employees; (c) pay various interest, fees and expenses under the DIP Facility; (d) satisfy adequate protection and other obligations to the Prepetition Agent and Prepetition Secured Lenders under the Prepetition Secured Loan Agreement; and (e) support the Debtors' working capital, general corporate and overall operational needs - all of which are necessary to preserve and maintain the going-concern value of the Debtors' businesses and, ultimately, help ensure a successful reorganization.

O.     ***Motion of Debtors for Interim and Final Orders Authorizing the Debtors to Honor Pursuant to Sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 6004 Land Development and Project Finance Agreements in the Ordinary Course of Business***

(a)     **The Company's Land Development Activity Generally**

115.     The homebuilding industry is highly competitive, particularly in the low- and medium-price range where the Company currently concentrates its activities. The Company

48

does not have a large share of the market in any geographic area in which it operates due to the fragmented and highly competitive nature of the market. A number of the Company's competitors have larger staffs, larger marketing organizations, and substantially greater financial resources than those of the Company. However, the Company competes effectively in its existing markets as a result of its product and geographic diversity, substantial development expertise, and reputation as a low-cost producer of quality homes. Further, the Company sometimes gains a competitive advantage in locations where changing regulations make it difficult for competitors to obtain entitlements or government approvals that the Company has already obtained.

116. The Company uses a land acquisition team, which includes members of its senior management, to manage the risks associated with land ownership and development. The Company's land acquisition strategy has generally been to undertake projects with shorter life-cycles in order to reduce development and market risk, while maintaining an inventory of owned lots sufficient for construction of homes over a two-year period. Currently, the Company has 18 actively selling Company-owned projects, all of the homes of which the Company also owns prior to sale to retail purchasers.

**(b)    Hearthstone Land Banking Agreement**

117. As a method of acquiring land in staged takedowns, thereby minimizing the use of funds from the Company's available cash or other corporate financing sources and limiting the Company's financial and market risk associated with land holdings, the Company has, in certain instances, transferred its rights in certain land purchase agreements to entities owned by third parties in "land banking arrangements." These entities typically use equity

contributions or incur debt to finance the acquisition and/or development of the land being purchased. These entities, in turn, grant the Company an option to acquire lots in staged takedowns. In consideration for this option, the Company is usually required to make a non-refundable, upfront deposit of typically 15% to 25% of the total purchase price, which deposit can be used as a credit against the purchase price for land that is eventually acquired by the Company. The Company in most circumstances has no obligation to purchase the balance of these lots, but would forfeit remaining deposits and could be subject to other post-termination obligations if any option is not exercised.

118.    Currently, the Company has one land banking arrangement under which the seller (Hearthstone) initially offered options to purchase 625 lots for a total purchase price of approximately $162.3 million (the "Hearthstone Agreement"). As of September 30, 2011, the Company had purchased 400 of those lots; the rest remain under option. On an average monthly basis, the Company pays $262,000 per month on account of interest and fees under the Hearthstone Agreement.

119.    On December 13, 2011, the Company entered into an amendment that extends the time by which it would exercise its options to purchase the remaining lots under the Hearthstone Agreement (the "Hearthstone Amendment"). By extending the time by which the Company is required to decide whether to exercise its options, the Hearthstone Amendment also reduces the Debtors' cash outlay by approximately $11.2 million through December of 2012, and reduces the associated draws on the Debtors' DIP loan by approximately $4.7 million through February 28, 2012. In consideration of the extensions granted to the Company under the Hearthstone Amendment, the Debtors are obligated to increase its applicable deposit with

Hearthstone by $1.25 million by January 20, 2012, which amount is provided for under the DIP

Budget filed concurrently herewith. In addition, under the Hearthstone Amendment, the Debtors

must increase the applicable deposit by an additional $1.25 million by April 20, 2012, by which

time the Debtors anticipate they will have exited bankruptcy.

>        (c)        **Irvine Unified School District Agreements**

>        120.        The Debtors have two option agreements for the purchase of land owned

by the Irvine Unified School District ("**IUSD**") over two parcels of land as set forth in the (i)

Agreement for Purchase and Sale and Joint Escrow Instructions between IUSD and William

Lyon Homes, Inc. dated February 3, 2009 (Vista Verda Site); and (ii) Agreement for Purchase

and Sale and Joint Escrow Instructions between IUSD and William Lyon Homes, Inc. dated

February 3, 2009 (Alderwood Site) (collectively, the "**IUSD Agreements**"). Prior to the Petition

Date, the Debtors executed amendments to the IUSD Agreements that extend the term by which

the Debtors must exercise their option for the purchase of the IUSD land through June 2012. In

exchange for the consideration granted under the IUSD Agreements, the Debtors have agreed to

pay 6% simple interest on the underlying purchase price, which is approximately $137,000 per

month.

>        (d)        **Rancho Mission Viejo**

>        121.        Upon the Effective Date of the Plan, under that certain Purchase and Sale,

and Security Agreement attached hereto as **Exhibit A** (the "**RMV Agreement**"), the Debtors

may purchase the membership interests in Lyon RMV, LLC from Lyon Rancho, LLC. Lyon

RMV, LLC owns two options to purchase real property from RMV Development Community,

LLC. The Debtors believe that the real property parcels are valuable parcels of land that will

inure to the benefit of Reorganized Debtors. Lyon Rancho, LLC is a non-debtor third party

entity owned in part by General William Lyon, who is also the Debtors' majority equity owner.

122.    Under the RMV Agreement, DE Lyon has agreed to act as the general

contractor for Lyon Rancho, LLC with respect to the Rancho Mission Viejo projects and to fund

out of pocket costs related to these projects to third party vendors (such as architects, engineers,

surveyors, etc.) in an amount not to exceed an aggregate amount of $500,000. In the event that

the Debtors incur costs less than the amount budgeted for any month, the remaining amount of

the budget may be carried over to the following month (which thereby increases the budget for

the following month).

123.    The RMV Agreement is consistent with the Debtors' ordinary course

practices. The Debtors often pay for pre-development costs of land before they actually

purchase the land. This practice allows the Debtors the benefit of preparing the land for home

building and to begin building on the land immediately after they take ownership of the land

without the concurrent obligation of owing the land and paying the carrying costs associated with

the land.

    **(e)**    **Mayfield Agreement**

124.    Prior to the Petition Date, the Debtors were able to close the purchase of

certain real property located in Mountain View and Palo Alto, California (the "Mayfield

Property") on terms favorable to the Debtors. The acquisition was consummated on October 28,

2011 pursuant to the terms of an agreement for purchase and sale that William Lyon Homes, Inc.

("CA Lyon") had entered into on July 19, 2010, which required the Debtors to either purchase

the Mayfield Property or forfeit its deposit of $1 million by the end of October 2011. The

52

acquisition was financed with a $55 million loan (the agreement evidencing such loan, the "Mayfield Loan Agreement") to Lyon Mayfield, LLC (a wholly-owned, special purpose subsidiary of CA Lyon, which is not a Debtor, to which CA Lyon assigned its rights under the purchase and sale agreement) by Qina, LLC (the "Mayfield Lender"), an affiliate of the largest holder of the Old Notes. The Mayfield Loan Agreement required, among other things, the grant of a security interest in the property and cash collateral to the Mayfield Lender, an environmental indemnification, certain payment and performance guaranties by CA Lyon and certain guarantors of the Old Notes (the "Mayfield Guaranty Documents"). Prior to the acquisition, the Debtors obtained the consent of the Prepetition Lenders, to whom the Debtors also pledged the stock in Lyon Mayfield, Inc., the sole member of Lyon Mayfield, LLC, in connection with the acquisition.

125.    Prior to the Petition Date, CA Lyon, the Mayfield Lender, and Lyon Mayfield, LLC (among others) entered into a Modification Agreement of the Mayfield Loan Agreement and certain of the related Mayfield Guaranty Documents to reduce and stage the amount of additional cash collateral that Lyon Mayfield, LLC is required to deposit into its cash collateral account from $5 million to $3.25 million, among other things (the "Mayfield Modification", and collectively, with the Mayfield Loan Agreement and Mayfield Guaranty Documents, the "Mayfield Agreement").

### (f)    Mountain Falls Loan

126.    Mountain Falls, LLC and Mountain Falls Golf Course, LLC (the "Mountain Falls Entities"), direct and indirect subsidiaries of CA Lyon, respectively, are borrowers under that certain Amended and Restated Loan Agreement by and between the

53

Mountain Falls Entities and Bank of the West Dated April 23, 2010 (the "Mountain Falls Loan"). The Mountain Falls Loan bears interest at 10% per annum, payable monthly. The Mountain Falls Loan matures on May 5, 2015. The Mountain Falls Loan's original principal amount was approximately $39.8 million, and the outstanding balance as of October 1, 2011 was $7 million. Principal payments of $500,000 are made quarterly, with the next quarterly payment being due on January 1, 2012. In addition, monthly interest payments are made in the amount of $61,000 on account of the Mountain Falls Loan.

127.    The Mountain Falls Loan is guaranteed by CA Lyon and secured by certain real property of the Mountain Falls Entities in Nye County, Nevada and the personal property located thereon.

(g)    **Circle G at Church Farms Loan**

128.    Circle G at the Church Farm North Joint Venture, LLC ("Circle G"), which is a Debtor in these cases, is the borrower under that certain Loan Agreement dated February 16, 2006 with U.S. Bank N.A. ("U.S. Bank"), successor to the Federal Deposit Insurance Corporation, as receiver for California National Bank, N.A., as amended from time to time (the "U.S. Bank Loan Agreement"). The U.S. Bank Loan Agreement is secured by a first priority lien on certain real property of Circle G located in Maricopa County, Arizona and the personal property located thereon (the "U.S. Bank Collateral"), and the obligation under this agreement are guaranteed by CA Lyon and DE Lyon.

129.    The amount outstanding under the U.S. Bank Loan Agreement, is approximately $9 million. The Debtors estimate that the value of the collateral securing the loan is substantially higher than the underlying debt. Prior to the Petition Date, the Debtors reached

54

agreement in principle with U.S. Bank for a one-year extension of the maturity date from

January 1, 2012 to January 1, 2013. Under the U.S. Bank Loan Agreement, the Debtors pay

monthly interest at a rate of 6%, which is approximately $47,000 per month as reflected in the

DIP Budget.

      **(h)**      **Easement Agreements**

      130.    CA Lyon is party to three (3) land easement agreements (the "Easement

Agreements") with ColFin WLH Land Acquisitions, LLC ("ColFin Land"), an affiliate of the

Debtors' proposed DIP Lender, pursuant to which ColFin Land, as the owner of certain real

property, granted CA Lyon certain easements in exchange for, among other things, monthly

payments totaling, in the aggregate, $176,500 per month (the "Monthly Easement Payments")

which amount is provided for in the DIP Budget. Specifically, the Easement Agreements include

the following: (i) pursuant to that certain Easement Agreement dated December 24, 2009, ColFin

Land, as the owner of certain real property in Las Vegas, Nevada, granted CA Lyon an easement

over such property in exchange for, among other things, payments by CA Lyon in the amount of

$66,500 per month; (ii) pursuant to that certain Easement Agreement dated December 24, 2009,

ColFin Land, as the owner of certain real property in San Diego, California, granted CA Lyon an

easement over such property in exchange for, among other things, payments by CA Lyon in the

amount of $45,000 per month; and (iii) pursuant to that certain Easement Agreement dated

December 24, 2009, ColFin Land, as the owner of certain real property in Maricopa County,

Arizona, granted CA Lyon an easement over such property in exchange for, among other things,

payments by WLH in the amount of $65,000 per month. By this Motion, the Debtors request

authority to honor all obligations under the Easement Agreements, to the extent permitted in the

DOCS_DE:176178.2 93949-001

DIP Budget.  On an interim basis, the Debtors request authority to pay up to $180,000 in

Monthly Easement Payments to ColFin Land on account of the Easement Agreements.

131.    I believe that the Debtors believe that their ability to capitalize on their

existing land development agreements as describe above is one of the essential requirements to

effectively reorganizing these businesses.  The willingness of the counterparties to the Land

Development Agreements to allow extensions of the Debtors' obligations under those

agreements or to accommodate the Debtors greatly facilitates the Debtors' reorganization efforts.

The Land Development Agreements allow the Debtors a cost-effective way to have access to

land that they need to build homes upon without having to carry the cost of owning the

underlying land.  Accordingly, I believe that it is in the best interest of the Debtors, their estates,

and all stakeholders in these chapter 11 cases, to honor the obligations under the Land

Development Agreements.

132.    With respect to the U.S. Bank Agreement Loan, U.S. Bank has agreed to

accommodate the Debtors through the U.S. Bank Extension, provided that the Debtors are able

to pay interest in the ordinary course of business during these cases.  Payment of obligations

under the U.S. Bank Agreement Loan will preserve the value of those assets for the benefit of the

Debtors.

133.    The Debtors are in the process of restructuring or negotiating terms on

their Mountain Falls Loan.  In the interim, the Debtors request authority to make any payments

required to be made under the Mountain Falls Loan in their sole discretion.

DOCS_DE:176178.2 93949-001

**P.**   *Application Pursuant to Section 327(a) of the Bankruptcy Code, Rule 2014 of the*
*Federal Rules of Bankruptcy Procedure and Local Rule 2014-1 for Authorization to*
*Employ and Retain Pachulski Stang Ziehl & Jones LLP as Counsel for the Debtors*
*and Debtors in Possession Nunc Pro Tunc to the Petition Date*

134.   The Debtors seek to employ Pachulski Stang Ziehl & Jones ("PSZ&J") as

their bankruptcy counsel with regard to the filing and prosecution of the Cases and all related

proceedings.   The Debtors seek to retain PSZ&J as counsel because of the Firm's extensive

experience and knowledge in the field of debtors' and creditors' rights and business

reorganizations under chapter 11 of the Bankruptcy Code.   In preparing for their representation

of the Debtors in these cases, PSZ&J has become familiar with the Debtors' affairs and many of

the potential legal issues which may arise in the context of the Cases.

135.   The Debtors believe the PSZ&J is both well-qualified and uniquely able to

represent the Debtors in these cases.   Thus, I respectfully request that the Court authorize the

Debtors to retain PSZ&J as their bankruptcy counsel.

**Q.**   *Motion of Debtors for Order Authorizing Debtors to Retain, Employ and Compensate*
*Professionals Utilized in the Ordinary Course of the Debtors' Business*

136.   The Debtors seek entry of an order authorizing them to (a) retain and

employ the Ordinary Course Professionals on an "as needed" basis without the submission of

separate, formal retention applications for each Ordinary Course Professional, and (b) establish

procedures to compensate the Ordinary Course Professionals for postpetition services rendered

and expenses incurred.

137.   The Debtors cannot continue to operate their businesses unless they retain

and pay for the services of the Ordinary Course Professionals listed on Exhibit A to the motion.

The work of the Ordinary Course Professionals is directly related to the preservation of the value

of the Debtors' estates, even though the amount of fees and expenses incurred by the Ordinary Course Professionals represents only a small fraction of that value.

138.    The operation of the Debtors' businesses would be severely hindered if the Ordinary Course Professionals were delayed in performing their work on behalf of the Debtors while the Debtors (i) submitted to this Court an application, affidavit and proposed retention order for each Ordinary Course Professional; (ii) waited until such order was approved before such Ordinary Course Professional continued to render services; and (iii) withheld payment of the normal fees and expenses of the Ordinary Course Professionals until they complied with the compensation procedures applicable to Chapter 11 professionals.

139.    Further, a number of Ordinary Course Professionals are unfamiliar with the fee application procedures employed in bankruptcy cases. Some Ordinary Course Professionals might be unwilling or unable to assume the administrative and cost burden of such procedures, and may therefore be unwilling to work with the Debtors if these requirements are imposed, forcing the Debtors to incur additional and unnecessary expenses to retain other professionals without such background and expertise and at potentially higher rates. The uninterrupted services of the Ordinary Course Professionals are vital to the Debtors' continuing operations and their ultimate ability to reorganize. More importantly, the cost of preparing and prosecuting these retention applications and fee applications would be significant, and such costs would be borne by the Debtors' estates. Accordingly, the Debtors request entry of the order attached to the motion.

**R.**    ***Motion of the Debtors Pursuant to Sections 105(A) and 331 of the Bankruptcy Code for an Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals***

140.    I believe that the procedures requested in this motion will enable the Debtors to closely monitor the costs of administration and implement efficient cost management procedures.  In addition, the proposed Compensation Procedures will allow the Court and the key parties-in-interest, including the Office of the United States Trustee, to more efficiently monitor the compensation and reimbursement of Professionals.  Accordingly, I believe the relief requested is in the best interests of these estates.

**S.**    ***Motion and Orders for Admission Pro Hac Vice***

141.    The Debtors have chosen the law firm of Pachulski Stang Ziehl & Jones LLP to represent them as general bankruptcy counsel during the course of their chapter 11 Cases. By this motion, the Debtors seek to have David Bertenthal, Esquire, Joshua M. Fried, Esquire, Maxim Litvak, Esquire, and Shirley Cho, Esquire (collectively, the "Admittees") admitted pro hac vice before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") to represent the Debtors, as proposed attorneys, pursuant to Local Rule 83.5(c) of the United States District Court for the District of Delaware.

142.    I believe that the pro hac vice admissions of the Admittees to file pleadings and appear and be heard in the chapter 11 Cases will be in the best interest of the Debtors and their estates.

**T.**    ***Motion of Debtors Pursuant to Bankruptcy Code Sections 105(a) and 363(b) Approving Certain Rights Offering Procedures and Forms in Connection Therewith***

143.    By this motion, the Debtors seek entry of an order: (a) setting the Rights Offering Record Date as December 19, 2011; (b) authorizing the Debtors to carry out the Rights

Offering to issue and sell in a private placement to certain accredited investors new capital stock

in the Reorganized Parent in the manner described herein; and (c) approving (i) the Subscription

Agreement, and (ii) the Registration Agreement.

144.    I believe that an order immediately approving the Rights Offering is

critical to the Debtors' ability to reorganize.  If the Rights Offering is not approved quickly, the

Debtors may become in breach of the RSAs, jeopardizing their ability to confirm the Plan and

efficiently reorganize.  If the Debtors cannot reorganize under the Plan, the Debtors may be

unable to continue as a going concern.  Further, completing the Rights Offering is a critical step

that must be completed to Plan confirmation.  Therefore, I believe the relief requested in this

motion is essential to the Debtors' reorganization process.

U.    ***Motion of Debtors for Order Authorizing (I) Assumption of Backstop Commitment
Letter, (II) Payment of Related Fees and Expenses, and (III) Indemnification of
Backstop Parties***

145.    By this motion, the Debtors respectfully request that the Court (i)

authorize the Assuming Debtors assume the Backstop Commitment Agreement pursuant to

Bankruptcy Code section 365(a); (ii) authorize the payment of the Backstop Fee, Backstop

Expenses and the Breakup Fee (if required under the Backstop Commitment Agreement), and the

funding and replenishment of the Deposit, pursuant to the terms and conditions of the Backstop

Commitment Agreement, and (iii) authorize the Indemnification of the Indemnified Parties,

pursuant to the terms and conditions of the Backstop Commitment Agreement, all as provided

for more fully in the Backstop Commitment Agreement.

146.    The Debtors submit that a fully subscribed Rights Offering can only be

assured by obtaining the commitment of the Backstop Parties to backstop the Rights Offering

60

and purchase all shares not purchased through the Rights Offering through assumption of the

Backstop Commitment Agreement.  Further, the Restructuring Support Agreements require that

the Backstop Commitment Agreement be approved within forty-five days of the Petition Date or

the Debtors risk that the Restructuring Support Agreements will cease to be binding, making the

Debtors' reorganization difficult.

147.    In return, and with regard to economic terms, the Backstop Parties require

payment of the Backstop Fee, reimbursement of the Backstop Expenses, the replenishment of the

Deposit and the Indemnification.  The Debtors believe that the terms and conditions set forth in

the Backstop Commitment Agreement are fair and reasonable, are well within the range of

"market" fees, protections and other terms typically received by backstop parties in rights

offerings of similar size and complexity and reflect an exercise of their sound business judgment.

Moreover, the terms of the Backstop Commitment Agreement are the product of extensive

negotiations among the Debtors, the parties to the Restructuring (the "Restructuring Parties") and

the Initial Backstop Party, as well as their respective counsel and financial advisors.  The

Debtors also believe that, in light of all of the facts and circumstances of the Chapter 11 Cases,

not only are these terms (and the other terms provided for in the Backstop Commitment

Agreement) fair, reasonable, appropriate and negotiated at arm's length, but they are integral to

assuring that the Debtors' estates can maximize their value for all of their stakeholders.

148.    In light of the foregoing, the Debtors submit that the relief requested

herein is a prudent exercise of their business judgment, as it will aid in providing the Debtors

with the financing necessary for the implementation of the Plan and an effective and successful

emergence from chapter 11.  It should also provide the Debtors with additional capital that

61

should leave the Debtors with a healthy balance sheet upon exit and allow the Debtors to continue their current operations and undertake future improvements and developments in their operations.

149.    The Debtors further submit that the reimbursement of Backstop Expenses, the replenishment of the Deposit and the Indemnification are reasonable, appropriate and customary in financing transactions such as this, both in and out of chapter 11, and should be approved.  The Backstop Expenses and the Deposit, specifically, will compensate the Backstop Parties for their actual costs incurred in connection with their obligations under the Backstop Commitment Agreement and participating in the negotiation of Plan.  The Backstop Expenses, the Deposit and the Indemnification are also the result of arm's length negotiations between the Debtors, the Restructuring Parties and the Initial Backstop Party, and the Debtors believe that the terms thereof are fair and reasonable in light of the undertakings that the Initial Backstop Party has made to date, and will continue to make, in developing and pursuing confirmation of the Plan, as well as the consummation of the Rights Offering.

150.    The Backstop Parties' future efforts and their ongoing commitments under the Backstop Commitment Agreement have been, and will be, of direct benefit to the Debtors, their estates and the future success of the Chapter 11 Cases.  The Initial Backstop Party has been integrally involved in the negotiation and formulation of the proposed Plan and its key terms. Under the terms of the Backstop Commitment Agreement, the Backstop Parties propose to support a necessary infusion of equity financing that will facilitate the Debtors' emergence from chapter 11 under the terms of the Plan.  Absent the Backstop Parties' commitment and the assumption of the Backstop Agreement by the Assuming Debtors, the Debtors would be without

the capital needed to effectuate a successful reorganization of their business if the Rights

Offering Securities was not purchased under the Rights Offering.

151.    For all of the foregoing reasons, and the reasons set forth in the motion, I

believe that the Backstop Fee, the Breakup Fee (if a triggering event occurs), the Backstop

Expenses and Indemnification associated with the proposed Rights Offering and Backstop

Commitment Agreement are actual and necessary costs of preserving the Debtors' estates and

should be approved.

**V.    *Motion of Debtors for an Order Authorizing the Debtors to (I) Assume the Restructuring Support Agreements With Certain Secured Lenders and Noteholders, (II) Pay and Reimburse Related Fees and Expenses, and (III) Indemnify the Parties to the Restructuring Support Agreements***

152.    By this motion, the Debtors seek authority to (i) assume the Restructuring

Support Agreements, (ii) pay and reimburse the Transaction Expenses in accordance with the

terms of the Restructuring Agreements, and (iii) indemnify the Indemnified Persons (including

the Administrative Agent, the Consenting Lenders, and the Consenting Noteholders) in

accordance with the terms of the Restructuring Support Agreements.

153.    Given the significance of the support of the Consenting Lenders and

Consenting Noteholders to confirmation of the Plan (and that approval of the Restructuring

Support Agreements within 45 days of the Petition Date is a condition to these parties' support

for the Plan), the Debtors have determined that obtaining Court approval to assume the

Restructuring Support Agreements is in their best interests and in the best interests of their

estates. The Debtors believe that, in light of all of the facts and circumstances of the Chapter 11

Cases, the terms of the Restructuring Support Agreements are fair, reasonable and appropriate

and are integral to assuring that the Debtors' estates can maximize their value for all of their stakeholders.

154.    Moreover, the Debtors believe that the provisions of the Restructuring Support Agreements providing for the reimbursement of the Transaction Expenses and the Indemnification (if an indemnification event occurs) are fair and reasonable and should be awarded on an administrative expense basis in accordance with the terms and conditions of the Restructuring Support Agreements.  The ongoing commitments of the Administrative Agent, the Consenting Lenders, the Consenting Noteholders, and the Ad Hoc Noteholders Group under the Restructuring Support Agreements have been, and will be, of direct benefit to the Debtors, their estates and the future success of the Chapter 11 Cases.  The foregoing parties have been integrally involved in the negotiation and formulation of the proposed Plan and its key terms and, absent their support, it would be difficult (if not impossible) for the Debtors to successfully reorganize.  These reimbursement provisions are designed to compensate the Administrative Agent and the Ad Hoc Noteholders Group for the financial risk they are undertaking to aid the Debtors in their restructuring efforts.   The Debtors believe that the terms and conditions set forth in the Restructuring Support Agreements are well within the range of "market" fees, protections and other terms typically received by parties entering into similar agreements and reflect an exercise of their sound business judgment.

155.    Accordingly, after careful analysis and in the exercise of their business judgment, the Debtors have determined, and respectfully submit that, for all of the foregoing reasons, the relief requested in this Motion is in the best interests of their estates and creditors.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December  19 , 2011 in Newport Beach, California.

By: _____

Matthew R. Zaist
Executive Vice President
William Lyon Homes