IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WILLIAM LYON HOMES, *et al.*,[1] | ) | Case No.  11-14019 (____) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**MOTION OF DEBTORS FOR ORDER AUTHORIZING (I) ASSUMPTION OF BACKSTOP COMMITMENT LETTER, (II) PAYMENT OF RELATED FEES AND EXPENSES, AND (III) INDEMNIFICATION OF BACKSTOP PARTIES**

William Lyon Homes, a Delaware corporation ("DE Lyon") and its affiliated debtors and debtors in possession (collectively, the "Debtors" or the "Company") file this motion (the "Motion") for entry of an order, substantially in the form attached as Exhibit A hereto (the "Order"), authorizing DE Lyon and William Lyon Homes, Inc., a California Corporation ("CA Lyon" and together with DE Lyon, the "Assuming Debtors") to (i) assume that certain *Backstop Commitment Letter,* dated as of November 4, 2011 (the "Backstop Commitment Agreement"),[2] substantially in the form set forth in Exhibit B attached hereto, executed by and among Luxor Capital Partners, LP; Luxor Wavefront, LP; Luxor Capital Partners Offshore Master Fund, LP; OC 19 Master Fund, L.P.-LCG; Luxor Spectrum, LLC; GAM Equity Six, Inc; and Luxor

---

[1] The debtors and debtors in possession in these cases and the last four digits of their respective taxpayer identification numbers are as follows:  William Lyon Homes (4902); William Lyon Homes, Inc. (3855); Mountain Falls Golf Course, LLC (3291); Mountain Falls, LLC (9631); Circle G at the Church Farm North Joint Venture, LLC (1322); Presley CMR, Inc. (3862); William Lyon Southwest, Inc. (8474); Sycamore CC, Inc. (1307); PH-LP Ventures (9119); PH Ventures – San Jose (5089); HSP, Inc. (6045); PH Rielly Ventures (7710); Lyon Waterfront, LLC (1928); Lyon East Garrison Company I, LLC (5692); WLH Enterprises (3333); Duxford Financial, Inc. (0824); California Equity Funding, Inc. (0016); Laguna Big Horn, LLC (2590); Presley Homes (5035); Cerro Plata Associates, LLC (5090); Whitney Ranch Village 5, LLC (5256); and Duxford Insurance Services, LLC (8232). The Debtors' mailing address is 4490 Von Karman Avenue, Newport Beach, CA 92660.

[2] The description of the Backstop Commitment Agreement presented herein is a summary of the principal terms of the Backstop Commitment Agreement, and is qualified in all respects and the parties' obligations thereunder are subject to the actual terms and conditions of the Backstop Commitment Agreement.  To the extent not defined herein, all capitalized terms shall have the meanings ascribed in the Backstop Commitment Agreement.

Spectrum Offshore Master Fund; LP (collectively, the "Initial Backstop Party"), and the

Assuming Debtors, in connection with the *Joint Chapter 11 Plan of Reorganization for William*

*Lyon Homes et al.* (as may be amended, modified or supplemented from time to time, the

"Plan"); (ii) pay the Backstop Fee (as defined below) and the Breakup Fee (as defined below);

(iii) fund and replenish the Deposit (as defined below); (iv) reimburse the reasonable fees,

expenses, disbursements and charges of the Initial Backstop Party and up to $150,000 of

reasonable fees and expenses of one additional Backstop Party incurred in connection with the

Backstop Commitment Agreement; and (v) indemnify the Indemnified Persons (as defined

below), all pursuant and in accordance with the provisions set forth in the Backstop Commitment

Agreement.  In support of this motion, the Debtors respectfully state as follows:

## JURISDICTION

1.      This Court has jurisdiction pursuant to 28 U.S.C. § 1334.  This matter is a

core proceeding within the meaning of 28 U.S.C.  § 157(b)(2).

2.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105(a),

363(b), and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy

Code").

## BACKGROUND

**A.      General Background**

4.      On the date hereof (the "Petition Date"), the Debtors commenced these

cases by filing voluntary petitions for relief under chapter 11 the Bankruptcy Code.

Concurrently with the filing of this Motion, the Debtors have requested joint administration of the above captioned cases.

5.      The Debtors have continued in possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      No request has been made for the appointment of a trustee or an examiner in this case, and no official committee has yet been appointed by the Office of the United States Trustee.

7.      The factual background regarding the Debtors, including their current and historical business operations and the events precipitating the chapter 11 filing, are set forth in detail in the *Declaration of Matthew R. Zaist, Executive Vice President of William Lyon Homes, in Support of First Day Motions* (the "Zaist Declaration") filed concurrently herewith and incorporated herein by reference.  The Debtors are homebuilders with operations in Northern and Southern California, Arizona and Nevada.

8.      On the Petition Date, the Debtors filed the *Prepackaged Joint Plan of Reorganization for William Lyon Homes, et al.* dated November 17, 2011 (the "Plan")  and related disclosure statement (the "Disclosure Statement").  The Plan represents a significant milestone for the Company and embodies the agreement reached with their major debt holders. If confirmed, the Plan will reduce the Company's leverage by approximately $182 million in funded note indebtedness, restructure the Company's primary secured credit facility, and provide for new equity capital investments of $85 million in the aggregate.  Based on a prepetition

3

solicitation of the Plan, the Plan has been overwhelmingly approved by those voting classes of creditors who are impaired under the Plan – claims related to (i) the Prepetition Secured Term Loan Agreement; and (ii) the Old Notes. Significantly, other than the holders of Prepetition Secured Term Loan Agreement Claims, Old Notes Claims, and equity holders of DE Lyon (whose interests are being cancelled), the Plan provides for the Debtors' remaining creditors to be unimpaired, which may not have been possible absent the agreements reached under the Plan. The Plan will allow the Company to improve its liquidity position from its operations and be well-positioned going forward.

## FACTUAL BACKGROUND

**B.     Significant Prepetition Indebtedness**

9.      As of September 30, 2011, the majority of the Debtors' outstanding funded indebtedness was on account of: (i) $206 million of secured indebtedness owing to their prepetition secured lenders under their Prepetition Secured Loan Agreement (discussed below); and (ii) $283.2 million of unsecured indebtedness on account of three series of note issuances (the "Old Notes").

**C.     The Prepetition Secured Loan**

10.     CA Lyon is a borrower under the Senior Secured Term Loan Agreement, dated October 20, 2009, as amended from time to time (the "Prepetition Secured Loan Agreement"), by and among CA Lyon, ColFin WLH Funding, LLC, as Administrative Agent,

4

Initial Lender and Lead Arranger (in such capacity, the "Administrative Agent"), and the other lenders party thereto (the "Prepetition Secured Lenders").[3]

11.    The Prepetition Secured Loan Agreement governs a secured term loan in the aggregate principal amount of $206,000,000, bearing interest at 14% per annum, payable monthly. Immediately prior to the Petition Date, the scheduled maturity date for the Prepetition Secured Loans was October 20, 2014 and the outstanding principal amount was $206,000,000.[4] Based on such outstanding balance of the Prepetition Secured Loan, interest payments were approximately $28.8 million annually.

12.    DE Lyon guaranteed absolutely, irrevocably and unconditionally, as a guarantee of payment and not merely of collection, prompt payment in full when due, whether at stated maturity, of any and all Obligations upon acceleration or otherwise, amounts due under the Prepetition Secured Loan Agreement.[5]

**D.    The Old Notes**

13.    Also prior to the Petition Date, CA Lyon issued three series of unsecured notes (the "Old Notes"). The first series was issued in an aggregate principal amount of $150 million in 2004, bears a 7 ⅝% interest rate, and is due on December 15, 2012 (the "7 ⅝% Senior

---

[3] At the end of this last waiver period, the Debtors and the Prepetition Secured Lenders engaged in extensive negotiation of the terms of the Debtors' proposed restructuring, but the parties did not reach an agreement on a further extension of the waiver.

[4] Pursuant to a compromise with respect to certain make whole amounts and exit fees provided in the Prepetition Secured Loan Agreement to be effected if and when the Plan is consummated, the principal amount due and owing under the Prepetition Secured Loan Agreement will be increased from $206,000,000 to $235,000,000.

[5] As discussed in greater detail in Section II.C.1 of the Disclosure Statement, the Prepetition Secured Loans are secured by senior liens on substantially all of the assets of DE Lyon and CA Lyon, but excluding specified "Excluded Property."

Notes"); the second was issued in an aggregate principal amount of $250 million in 2003, bears a

10 ¾% interest rate, and is due on April 1, 2013 (the "10 ¾% Senior Notes"); the third was

issued in an aggregate principal amount of $150 million in 2004, bears a 7 ½% interest rate, and

is due on February 15, 2014 (the "7 ½% Senior Notes" and, together with the 7 ⅝% Senior Notes

and the 10 ¾% Senior Notes, the "Old Notes").  Interest on the Old Notes is payable semi-

annually.

        14.     The Old Notes are unconditionally guaranteed on a senior unsecured basis

by the following Debtors (the "Prepetition Guarantors"): DE Lyon; California Equity Funding,

Inc.; PH-LP Ventures; Duxford Financial, Inc.; Sycamore CC, Inc.; Presley CMR, Inc.; William

Lyon Southwest, Inc.; PH-Reilly Ventures; HSP, Inc.; PH Ventures-San Jose; WLH Enterprises,

formerly Carmel Mountain Ranch; Lyon Waterfront, LLC; and Lyon East Garrison Company I,

LLC.

        15.     As a result of previous redemptions in 2010, the 7 ⅝% Senior Notes have

a current outstanding balance of approximately $66.7 million; the 10 ¾% Senior Notes,

approximately $138.7 million; and the 7 ½% Senior Notes, approximately $77.8 million.  Each

of the series of Old Notes is governed by an indenture (each, a "Prepetition Indenture," and

collectively, the "Prepetition Indentures") by and among CA Lyon as issuer, DE Lyon and the

other Prepetition Guarantors, and U.S. Bank National Association, as Trustee (the "Prepetition

Indenture Trustee").  The Old Notes now have an aggregate outstanding amount of $283.2

million in principal and approximately $299.5 million in the aggregate after including interest

and fees.  The outstanding balance of the Old Notes per the Company's financial statements

changes monthly due to the amortization of Original Interest Discount on account of the 10 ¾% Senior Notes.

16.    In early 2011, an ad hoc group of entities holding Old Notes (the "Ad Hoc Noteholders Group") was formed.  As of November 10, 2011, the members of the Ad Hoc Noteholders Group who are parties to the Noteholders RSA hold an aggregate of approximately 63.5% in principal of the Old Notes.

**E.    The Prepetition Restructuring**

17.    After several weeks of active and arm's-length negotiations, the Debtors, in consultation with their advisors, reached prepetition agreements in principle with their Prepetition Secured Lenders and the Ad Hoc Noteholders Group holding 63.5% in principal amount of the holders of claims arising from the Old Notes (the "Old Notes Claims"), on a prepackaged restructuring plan, including the key terms of the restructured Prepetition Secured Loan Agreement, distributions under the Plan to holders of Old Notes Claims, and the treatment of general unsecured claims.

18.    As of September 30, 2011, the Debtors had outstanding total funded indebtedness in the principal amount of approximately $509.8 million.  Upon emergence from chapter 11, pursuant to the Plan, the Debtors expect to have outstanding debt of approximately $327.8 million.  Accordingly, the Reorganized Debtors (as defined in the Plan) will have an improved balance sheet and more appropriate capital structure.  In addition to the reduction of indebtedness of the Debtors upon emergence from chapter 11, the Debtors also expect to benefit from an annual decrease in cash interest obligations of approximately $24.7 million, comprised

7

of $19.9 million annual reduction associated with the conversion to equity of a portion of the Old

Notes and $4.8 million annual reduction resulting from the reduction in interest rate from 14%

under the Prepetition Secured Loan Agreement to 10¼% under the Restructured First Lien Loan

Agreement.

19.    Other than the Holders of Old Notes and the Prepetition Secured Loan

Agreement Claims whose claims are the subject of the proposed restructuring under the Plan,

and old equity, whose interests are being cancelled under the Plan, all of the Debtors' other

creditors, including general unsecured creditors, are Unimpaired under the Plan within the

meaning of section 1124 of the Bankruptcy Code, and deemed to vote in favor of the Plan

pursuant to section 1126(f) of the Bankruptcy Code.

20.    The Company believes that the prepackaged restructuring Plan is the best

restructuring alternative reasonably available to the Company.  In order to effect the provisions

of the Plan, the Company has succeeded in securing commitments for new equity capital

investments aggregating $85 million, in two separate private placements: (a) a commitment to

backstop the entire proposed Rights Offering in the amount of up to $60 million in cash on the

terms set forth in the Backstop Commitment Agreement should the Rights Offering not

otherwise be fully subscribed, and (b) an additional commitment for $25 million pursuant to

Class B Common Stock Purchase Commitment Agreement, (as defined in the Plan), in the form

of cash or a combination of cash and, subject to certain conditions, membership interests in

certain limited liability companies that hold real property, to be provided by the Company's

current equity owners.  The Company plans to utilize the proceeds of these investments to fund

8

its working capital requirements, and to make certain distributions under the Plan. After extensive efforts to seek new equity capital, the Company believes that the Rights Offering (inclusive of the Backstop Commitment Agreement) and the Class B Common Stock Commitment Agreement represent the best terms for equity financing available to the Company in this market.

21.    The Plan represents a significant achievement for the Company and should greatly enhance the Company's ability to reorganize successfully and expeditiously through the addition of $85 million of new equity capital pursuant to the Rights Offering and Class B Common Stock Purchase Commitment Agreement (as defined in the Plan). The Plan will also provide an efficient restructuring through the prepackaged process, designed to minimize disruption to the Company's business endeavors, stabilize the Company's balance sheet, and provide a platform for future success. Through confirmation of the Plan implementing the terms of the pre-packaged restructuring, the Company will restructure and substantially deleverage its balance sheet; reduce its cash interest expense to a level that is aligned with its expected future cash flows; retain additional flexibility to invest in growth initiatives to maximize enterprise value; and maintain favorable pricing to the Company under the Prepetition Secured Loan Agreement. The Company also will improve its liquidity position. For all of these reasons and the proposed DIP financing (described in greater detail in the Zaist Declaration) and the concurrently filed motion for DIP financing, the Company believes that it will have sufficient liquidity during the course of the Chapter 11 Cases and will be well-positioned going forward.

**F.**     **Solicitation of the Prepackaged Plan**

22.     Prior to the Petition Date, beginning on November 17, 2011 through

December 16, 2011, the Debtors solicited votes to accept or reject the Plan (the "Solicitation").

Claim holders entitled to vote under the Plan (i.e., Class 4 – Prepetition Secured Loan Agreement

Claims and Class 7 – Old Notes Claims) (the "Voting Classes") voted overwhelmingly to accept

the Plan, thus satisfying the statutory percentages specified in section 1126(c) of the Bankruptcy

Code.

23.     The Solicitation Packages, including the ballots on the Plan, were

distributed by the Debtors' voting and solicitation agent, Kurtzman Carson Consultants LLC

("KCC") on November 17, 2011 to those holders of Claims in the Voting Classes.  The Voting

Deadline was established as December 16, 2011, or 29 days from the start of the Solicitation

period.  Votes received by the Voting Deadline that complied with the voting instructions were

then tabulated by KCC.  A more detailed declaration of the voting tabulation is set forth in the

*Declaration of Peter Walsh of Kurtzman Carson Consultants LLC Regarding the Mailing,*

*Voting and Tabulation of Ballots Accepting and Rejecting Prepackaged Joint Chapter 11 Plan of*

*Reorganization for William Lyon Homes, et al.*  (the "Voting Declaration"), filed concurrently

herewith.

**G.**     **The Rights Offering**

24.     Under the Rights Offering incorporated in the Plan, Holders of Class 7

Old Notes Claims (as defined in the Plan) that are (i) "accredited investors" as defined in Rule

501(a) of Regulation D under the Securities Act and (ii) hold at least $500,000 in outstanding

10

principal amount of Old Notes as of the Rights Offering Record Date (as defined in the Plan) (the "Eligible Participants"), shall receive the right (the "Subscription Rights") to purchase a portion of shares of new Class C Common Stock (the "Class C Common Shares"), offered for an aggregate purchase price of $10 million, together with the same pro rata amount of shares of new Convertible Preferred Shares (the "Preferred Shares") offered for an aggregate purchase price of $50 million (the Class C Common Shares and the Preferred Shares, collectively constitute the "Rights Offering Securities")[6] in each case, issued by Reorganized Parent (as defined in the Plan).[7] The Reorganized Parent shall issue 16,110,366 Class C Common Shares, and 64,831,831 Preferred Shares. The Subscription Rights are not transferrable.

        25.     Each Eligible Participant shall have the right, but not the obligation, to exercise its Subscription Rights and purchase Rights Offering Securities. If an Eligible Participant decides to exercise its Subscription Rights, the Eligible Participant must indicate the amount of the investment it desires to make (such Eligible Participant's "Bid") it shall be obligated to purchase one share of Class C Common Shares for every five shares of Preferred Shares that it purchases. In the event that the Rights Offering is over-subscribed, (a) the Backstop Parties reserve the right to purchase up to $20 million of the Rights Offering Securities, and (b) of the remaining $40 million, each other (non-backstop) Eligible Participant shall be

---

[6] The Debtors believe that the Rights Offering Securities, as provided under the Plan, will be exempt from the registration requirements of the Securities Act, pursuant to section 4(2) of the Securities Act, as transactions by an issuer not involving any public offering, and equivalent exemptions in state securities laws.

[7] All Rights Offerings Securities shall be subject to the terms and conditions of the Amended and Restated Certificate of Incorporation of Reorganized William Lyon Homes (the "Certificate of Incorporation"). A copy of the Certificate of Incorporation has been filed with the *Motion of Debtors Pursuant to Bankruptcy Code Sections 105(a) and 363(b) Approving Certain Rights Offering Procedures and Forms in Connection Therewith*, filed concurrently herewith.

entitled to purchase Rights Offering Securities in an amount pro-rated on the basis of the ratio of

its Bid to the aggregate Bids of all other such (non-backstop) Eligible Participants.  In the event

that the Rights Offering is under-subscribed, all Rights Offering Securities that are not purchased

by Eligible Participants shall be purchased by the Backstop Parties.

26.    Once an Eligible Participant exercises its Subscription Rights, it shall be

obligated to pay for its shares once the Plan is confirmed and other conditions ( collectively, the

"Precedent Conditions") are satisfied.  The Rights Offering Securities shall collectively represent

51.5% of the capital stock of DE Lyon on a fully diluted basis.[8]

## H.    The Backstop Agreement

27.    Under the terms of the Backstop Commitment Agreement, the Backstop

Parties (as defined in the Backstop Commitment Agreement) would purchase the lesser of (1)

$60,000,000 of Rights Offering Securities, or (2) the amount of Rights Offering Securities that

are offered pursuant to the Rights Offering in connection with the Restructuring and not

otherwise purchased (after accounting for the minimum reserve described in paragraph 25) (the

"Commitment").  The Commitment is subject to the terms and conditions set forth or referred to

in the Backstop Commitment Agreement.

28.    In consideration of their agreement to provide the Commitment, the

Assuming Debtors propose to pay the Initial Backstop Party (as defined in the Backstop

Commitment Agreement) a nonrefundable fee (the "Backstop Fee") in an amount of 2.0% of the

---

[8] The fully diluted basis does not give effect to the Management Incentive Plan or the Warrants (as each of those terms is defined in the Plan) and after giving effect to the payment of the Backstop Fee (defined below).

outstanding Capital Stock of DE Lyon, payable in Class C Common Shares if the Rights

Offering Securities are purchased pursuant to the Commitment.  If the Backstop Parties do not

purchase the Rights Offering Securities pursuant to the Commitment because of any of the

reasons enumerated in the Backstop Commitment Agreement, the Assuming Debtors propose to

pay the Initial Backstop Party a cash fee of $2,500,000 (the "Breakup Fee") all in accordance

with the terms and provisions of the Backstop Commitment Agreement.  The Assuming Debtors

would be obligated to pay either the Backstop Fee or the Breakup Fee, but not both.  The

Company agrees to reimburse the Initial Backstop Party for all reasonable and documented out-

of-pocket fees and expenses (including, but not limited to, the reasonable fees, disbursements

and other charges of Gibson, Dunn & Crutcher LLP, as counsel to the Initial Backstop Party, and

of any special and local counsel to the Backstop Parties (the "Initial Backstop Party Expenses"))

and up to $150,000 of reasonable and documented out-of-pocket fees and expenses of one

additional Backstop Party incurred in connection with the Commitment and the other aspects of

the Restructuring (together with the Initial Backstop Party Expenses, the "Backstop Expenses").

Upon the execution of the Backstop Commitment Agreement, the Assuming Debtors deposited a

sum of $200,000 (the "Deposit") with the Initial Backstop Party to cover the Initial Backstop

Party Expenses.  Under the Backstop Agreement, the Assuming Debtors are required to replenish

the Deposit to an amount equal to $200,000, at the Initial Backstop Party's request.

      29.     As set forth more fully in the Backstop Commitment Agreement, the

Assuming Debtors have also agreed to indemnify (the "Indemnification") the Backstop Parties

and each of their respective affiliates and all their respective officers, directors, partners, trustees,

employees, shareholders, advisors, agents, representatives, attorneys and controlling persons and

each of their respective heirs, successors and assigns (each an "Indemnified Person") from and

against any losses, damages, liabilities, and claims arising out of or relating to (i) the Backstop

Commitment Agreement, (ii) the Restructuring, (iii) the Rights Offering, and (iv) any other

transaction relating to the Restructuring, the Backstop Commitment Agreement or the Rights

Offering; provided that the Indemnification shall not extend to losses, damages, liabilities,

claims, or expenses, to the extent that they are found by a final, non-appealable judgment of a

court of competent jurisdiction to have resulted directly from the gross negligence or willful

misconduct of such Indemnified Person.

## RELIEF REQUESTED

30.     By this motion, the Debtors respectfully request that the Court

(i) authorize the Assuming Debtors assume the Backstop Commitment Agreement pursuant to

Bankruptcy Code section 365(a); (ii) authorize the payment of the Backstop Fee, Backstop

Expenses and the Breakup Fee (if required under the Backstop Commitment Agreement), and the

funding and replenishment of the Deposit, pursuant to the terms and conditions of the Backstop

Commitment Agreement, and (iii) authorize the Indemnification of the Indemnified Parties,

pursuant to the terms and conditions of the Backstop Commitment Agreement, all as provided

for more fully in the Backstop Commitment Agreement.

14

## BASIS FOR RELIEF REQUESTED

I.   **Sound Business Justification Exists for Assumption of the Backstop Commitment Agreement**

31.     Section 363(b)(1) provides that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  A court may authorize use of the property of an estate if a debtor demonstrates a sound business judgment for it and when the use of the property is proposed in good faith. *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Delaware & Hudson R.R. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *The Official Comm. of Unsecured Creditors v. The LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992); *see also Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991).

32.     The debtor has the burden to establish that a valid business purpose exists for the use of estate property in a manner that is not in the ordinary course of business. *See In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999). *See also Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2d Cir. 1983). Once the debtor articulates a valid business justification, a presumption arises that the debtor's decision was made on an informed basis, in good faith and in the honest belief the action was in the best interest of the company. *See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *see also In re S.N.A. Nut Co.*, 186 B.R. 98 (Bankr. N.D. Ill. 1995). The business judgment rule has vitality in chapter 11 cases and shields a debtor's management from judicial second-guessing. *Integrated Res., Inc.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see*

15

*Committee of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.),*

60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a

business by a debtor and a presumption of reasonableness attaches to a debtor's management

decisions"). Thus, the Court should grant the relief requested in this Motion if the Debtors

demonstrate a sound business justification. *See Schipper*, 933 F.2d at 515; *Lionel*, 722 F.2d at

1071.

33.     Section 365(a) of the Bankruptcy Code provides that a debtor in

possession, "subject to the Court's approval, may . . . assume any executory contract or

unexpired lease of the debtor." 11 U.S.C. § 365(a). The standard to be applied by a court in

determining whether an executory contract or unexpired lease should be assumed is the

"business judgment" test, which is premised upon the debtor's business judgment that

assumption would be beneficial to its estate. *See Orion Pictures Corp. v. Showtime Networks,*

*Inc. (In re Orion Pictures)*, 4 F.3d 1095, 1099 (2nd Cir. 1993). "More exacting scrutiny would

slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy

Code's provision for private control of administration of the estate, and threaten the court's

ability to control a case impartially. *Richmond Leasing Co. v. Capital Bank. N.A.*, 762 F.2d

1303, 1311 (5th Cir. 1985).

34.     Upon finding that a debtor has exercised its sound business judgment in

determining that assumption of an agreement is in the best interests of its estate, the Court should

approve the assumption under section 365(a) of the Bankruptcy Code. *See e.g., In re Bankvest*

*Capital Corp.*, 360 F.3d 291 (1st Cir. 2004) ("If a debtor wants to assume a contract in its

16

business judgment . . . the debtor should be allowed to do so."); *In re Child World, Inc.*, 142 B.R.

87, 89 (Bankr. S.D.N.Y. 1992); *In re TS Indus., Inc.*, 117 B.R. 682, 685 (Bankr. D. Utah 1990);

*In re Del Grosso*, 115 B.R. 136, 138 (Bankr. N.D. Ill. 1990).

        35.     Additionally, § 105(a) provides that the "court may issue any order,

process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11

U.S.C. § 105(a). Pursuant to § 105(a), orders are appropriate where they are essential to the

debtor's reorganization efforts and do not pose a burden on the debtor's creditors. *See U.S.*

*Lines, Inc. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n (In re U.S. Lines, Inc.)*, 197 F.3d 631,

640 (2d Cir. 1999); *Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg.*

*Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994) ("It is well settled that bankruptcy courts are courts of

equity, empowered to invoke equitable principles to achieve fairness and justice in the

reorganization process.").

        36.     Courts in this district and other districts have approved similar relief. *See*

*e.g.*, *In re Nebraska Book Company, Inc.* Case No. 11-12005 (PW) (Bankr. D. Del. Sept. 7,

2011); *In re Appleseed's Intermediate Holdings, LLC, et al.* Case No. 11-10160 (KG) (Bankr. D.

Del. March 1, 2011); *In re Loehmann's Holdings, Inc.* Case No. 10-16077 (REG) (Bankr.

S.D.N.Y. Dec. 15, 2010); *In re American Media, Inc.* Case No. 10-16140 (MG) (Bankr.

S.D.N.Y. Nov. 29, 2010.

        37.     The Debtors submit that assumption of the Backstop Commitment

Agreement by the Assuming Debtors for purposes of commencing the Rights Offering is a sound

exercise of business judgment. In consultation with their advisors and other interested parties,

17

the Debtors have concluded that the Rights Offering must be fully subscribed for the Debtors to

exit chapter 11 with sufficient liquidity to continue post-Effective Date (as defined in the Plan)

operations.  The funds provided by the Rights Offering are integral to the Debtors' ability to

successfully emerge from chapter 11 and the Rights Offering is one of the key elements to the

viability of the Plan.  If the Debtors do not receive the funds derived from the Rights Offering, it

will be difficult if not impossible to consummate the Plan.  In that case, the Colony RSA and the

Noteholders RSA (each as defined in the Plan, and collectively the "Restructuring Support

Agreements") would no longer be binding, making it difficult if not impossible for the Debtors to

complete their reorganization.

38.     The Debtors submit that a fully subscribed Rights Offering can only be

assured by obtaining the commitment of the Backstop Parties to backstop the Rights Offering

and purchase all shares not purchased through the Rights Offering through assumption of the

Backstop Commitment Agreement.  Further, the Restructuring Support Agreements require that

the Backstop Commitment Agreement be approved within forty-five days of the Petition Date or

the Debtors risk that the Restructuring Support Agreements will cease to be binding, making the

Debtors' reorganization difficult.

39.     In return, and with regard to economic terms, the Backstop Parties require

payment of the Backstop Fee, reimbursement of the Backstop Expenses, the replenishment of the

Deposit and the Indemnification.  The Debtors believe that the terms and conditions set forth in

the Backstop Commitment Agreement are fair and reasonable, are well within the range of

"market" fees, protections and other terms typically received by backstop parties in rights

offerings of similar size and complexity and reflect an exercise of their sound business judgment. Moreover, the terms of the Backstop Commitment Agreement are the product of extensive negotiations among the Debtors, the parties to the Restructuring (the "Restructuring Parties") and the Initial Backstop Party, as well as their respective counsel and financial advisors. The Debtors also believe that, in light of all of the facts and circumstances of the Chapter 11 Cases, not only are these terms (and the other terms provided for in the Backstop Commitment Agreement) fair, reasonable, appropriate and negotiated at arm's length, but they are integral to assuring that the Debtors' estates can maximize their value for all of their stakeholders.

40.    In light of the foregoing, the Debtors submit that the relief requested herein is a prudent exercise of their business judgment, as it will aid in providing the Debtors with the financing necessary for the implementation of the Plan and an effective and successful emergence from chapter 11. It should also provide the Debtors with additional capital that should leave the Debtors with a healthy balance sheet upon exit and allow the Debtors to continue their current operations and undertake future improvements and developments in their operations.

## J.    The Backstop Fee, Breakup Fee, Backstop Expenses, Replenishment of the Deposit, and Indemnification Are Reasonable

41.    The Debtors submit that the Backstop Fee, (or, alternatively, the Breakup Fee), Backstop Expenses, the replenishment of the Deposit and Indemnification, all in accordance with the terms of the Backstop Commitment Agreement, are necessary inducements for the Backstop Parties to enter into the Backstop Commitment Agreement, particularly in light

19

of the financial risks that the Backstop Parties are undertaking. The fees are both reasonable and properly designed to compensate the Backstop Parties for their respective commitments to guarantee the Rights Offering. The Backstop Fee and Breakup Fee[9] were necessary conditions for the Initial Backstop Party to enter into the Backstop Commitment Agreement. Absent the Backstop Fee and the Breakup Fee, the Debtors would have been unlikely to obtain the financing commitments required by the Plan.

42.     The Debtors further submit that the reimbursement of Backstop Expenses, the replenishment of the Deposit and the Indemnification are reasonable, appropriate and customary in financing transactions such as this, both in and out of chapter 11, and should be approved. The Backstop Expenses and the Deposit, specifically, will compensate the Backstop Parties for their actual costs incurred in connection with their obligations under the Backstop Commitment Agreement and participating in the negotiation of Plan. The Backstop Expenses, the Deposit and the Indemnification are also the result of arm's length negotiations between the Debtors, the Restructuring Parties and the Initial Backstop Party, and the Debtors believe that the terms thereof are fair and reasonable in light of the undertakings that the Initial Backstop Party has made to date, and will continue to make, in developing and pursuing confirmation of the Plan, as well as the consummation of the Rights Offering.

43.     Courts in this and other districts have approved similar fees and premiums as a reasonable use of assets in other recent chapter 11 cases. *See In re Aventine Renewable*

---

[9] As described above, the Assuming Debtors would only owe the Breakup Fee or the Backstop Fee, not both.

*Energy Holdings, Inc.*, Case No. 09-11214 (KG) (Bankr. D. Del. Jan. 13, 2010) (approving a

breakup fee, expense reimbursement and indemnification obligations); *In re Accuride Corp.*,

Case No. 09-13449 (BLS) (Bankr. D. Del. Nov. 2, 2009) (approving (i) a $5,600,000 backstop

fee plus 4% of new equity issued under a plan related to a $140,000,000 notes offering, (ii) a

break-up fee of $10,000,000, and (iii) expense reimbursement); *In re Dayton Superior Corp.*,

Case No. 09-11351 (BLS) (Bankr. D. Del. Aug. 24, 2009) (alternate transaction fee of 3% of the

rights offering amount); *In re Landsource Cmtys. Dev. LLC*, Case No. 08-11111 (KJC) (Bankr.

D. Del. June 2, 2009) (approving premium equal to 5% of a $140,000,000 offering, which was

payable in cash in the event that an "Alternative Transaction" occurred, and approving expense

reimbursement); *In re Key Plastics, Inc.*, Case No. 08-13324 (MFW) (Bankr. D. Del. Dec. 17,

2008) (approving an alternate transaction fee of 7.5% of the rights offering amount); *In re Dura

Auto. Sys., Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del. Aug. 17, 2007) (approving a backstop

fee of 4% of the rights offering amount and an alternative transaction fee of 3% of the rights

offering amount).

K.    **The Backstop Fee, Break up Fee, Backstop Expenses and Indemnification Should
      Be Afforded Administrative Expense Status**

        44.      Finally, in accordance with §§ 503(b)(1)(A) and 507(a)(2), the Backstop

Fee, Breakup Fee (if a triggering event occurs), Backstop Expenses and Indemnification (if an

indemnification event occurs) should be afforded administrative expense priority (which, solely

with respect to the Breakup Fee shall be treated as a Subordinated Administrative Expense

Claim) in accordance with the terms of the Backstop Commitment Agreement.[10] The costs and

expenses charged and incurred by the Backstop Parties for the benefit of the Debtors in

connection with the Commitment and the Rights Offering are entitled to the highest level of

priority for their "actual, necessary costs and expenses of preserving the estate...." 11 U.S.C.

§ 503(b)(1). Under the prevailing test, for a claim to be entitled to administrative expense

priority under § 503(b)(1), "the debt must arise from a transaction with the debtor in

possession...[and] the consideration supporting the claimant's right to payment [must be]

beneficial to the debtor in possession in the operation of the business." *See, e.g., Calpine Corp.*

*v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 532-33 (3d Cir.

1999) (quoting *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950 (1st

Cir. 1976)).

      45.    The Backstop Parties' future efforts and their ongoing commitments under

the Backstop Commitment Agreement have been, and will be, of direct benefit to the Debtors,

their estates and the future success of the Chapter 11 Cases. The Initial Backstop Party has been

integrally involved in the negotiation and formulation of the proposed Plan and its key terms.

Under the terms of the Backstop Commitment Agreement, the Backstop Parties propose to

---

[10] Upon approval of the *Debtors' Motion for Order (i) Authorizing Debtors to Obtain Interim Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 64(c)(2), 364(c)(3), 364(d)(1), 364(d) and 507, (ii) Authorizing Debtors to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (iii) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507, (iv) Modifying the Automatic Stay, and (v) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* (the "DIP Motion") filed contemporaneously herewith, and as a condition to the DIP Financing (as defined in the DIP Motion), the DIP Agent and DIP Lenders (as defined in the DIP Motion) shall hold Superpriority Claims (as defined in the DIP Motion), which are senior to, among other claims, the claims of the Administrative Agent and the Prepetition Secured Lenders and all claims of the Backstop Parties, including those on account of the Backstop Fee, Breakup Fee, or the Backstop Expenses and Indemnification.

support a necessary infusion of equity financing that will facilitate the Debtors' emergence from chapter 11 under the terms of the Plan. Absent the Backstop Parties' commitment and the assumption of the Backstop Agreement by the Assuming Debtors, the Debtors would be without the capital needed to effectuate a successful reorganization of their business if the Rights Offering Securities was not purchased under the Rights Offering.

46.     For all of the foregoing reasons, the Backstop Fee, the Breakup Fee (if a triggering event occurs), the Backstop Expenses and Indemnification associated with the proposed Rights Offering and Backstop Commitment Agreement are actual and necessary costs of preserving the Debtors' estates, and should therefore be granted administrative expense priority under § 503(b)(1)(a).

### WAIVER OF THE STAY PROVIDED BY BANKRUPTCY RULE 6004

47.     The Debtors further seek a waiver of any stay of the effectiveness of the Order. Pursuant to Bankruptcy Rule 6004(h), "[an] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Based upon the facts and circumstances set forth herein, the Debtors submit that ample cause exists to justify a waiver of any stay imposed by Bankruptcy Rules 6004(h), 7062 or 9014 to the extent they apply. The Debtors must proceed expeditiously to commence the Rights Offering. The Plan, of course, is premised in significant part upon obtaining a successful Rights Offering, which in turn depends upon the support of the Backstop Parties. By approving this motion, this Court will be approving a motion integral to confirmation of the Plan.

23

48.    The Debtors submit that the waiver of the stay under Bankruptcy Rule

6004 is appropriate here to facilitate the immediate commencement of the Rights Offering, as

backstopped by the Backstop Parties.  The certainty of funding of the Rights Offering, and

consequently the viability of the Plan, depends on the assumption of the Backstop Commitment

Agreement and the related relief sought in this motion.  Accordingly, the Debtors submit that a

waiver of the stay under Bankruptcy Rule 6004 is appropriate and necessary.

### THE RELIEF REQUESTED IN THIS MOTION IS NECESSARY TO AVOID IMMEDIATE AND IRREPARABLE HARM

49.    Bankruptcy Rule 6003 provides:

> Except to the extent that relief is necessary to avoid immediate and
> irreparable harm, the court shall not, within 21 days after the filing
> of the petition, grant relief regarding the following:  . . . (b) a
> motion to use, sell, lease or otherwise incur an obligation regarding
> property of the estate, including a motion to pay all or part of a
> claim that arose before the filing of the petition, but not a motion
> under Rule 4001.

50.    Pursuant to Bankruptcy Rule 6003, the Court may grant relief regarding a

motion to use, sell, lease or otherwise incur an obligation within 21 days after the Petition Date if

the relief is necessary to avoid immediate and irreparable harm.  Immediate and irreparable harm

exists where the absence of relief would impair a debtor's ability to reorganize or threaten the

debtor's future as a going concern.  *See In re Ames Dept Stores, Inc.* 115 B.R. 34, 36 n.2 (Bankr.

S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to

Bankruptcy Rule 4001).

51.    Assumption of the Backstop Commitment Agreement is necessary to

avoid immediate and irreparable harm.  If the Court does not authorize assumption of the

24

Backstop Commitment Agreement immediately, the Debtors will not be able to initiate the

Rights Offering, delaying their exit from bankruptcy and putting their entire reorganization at

risk. Further, if the Debtors cannot raise funds through the Rights Offering, they will have

insufficient working capital to maintain ordinary operations once they exit bankruptcy.

52.     Accordingly, the Debtors submit that because the relief requested in this

Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set

forth herein and in the Zaist Declaration, Bankruptcy Rule 6003 has been satisfied and the relief

requested herein should be granted.

## NOTICE

53.     Notice of this Motion has been given to the following parties or, in lieu

thereof, to their counsel, if known: (i) the Office of the United States Trustee for the District of

Delaware; (ii) counsel to the Prepetition Secured Term Loan and DIP Lender; (iii) counsel to the

Ad Hoc Noteholders Group; and (iv) counsel to the Backstop Investors. Following the first day

hearing in this case, this Motion will be served on (a) creditors holding the thirty largest

unsecured claims against the Debtors on a consolidated basis, or their legal counsel (if known)

and (b) those persons who have requested notice pursuant to Rule 2002 of the Federal Rules of

Bankruptcy Procedure. The Debtors submit that, in light of the nature of the relief requested, no

other or further notice need be given.

25

WHEREFORE, the Debtors respectfully request entry of an order (i) granting the relief requested herein and (ii) granting the Debtors such other and further relief as the Court deems just and proper.

Dated: December 19, 2011

PACHULSKI STANG ZIEHL & JONES LLP

By: _____
Richard M. Pachulski (CA Bar No. 90073)
Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Joshua M. Fried (CA Bar No. 181541)
Shirley S. Cho (CA Bar No. 192616)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
e-mail:     rpachulski@pszjlaw.com
            ljones@pszjlaw.com
            dbertenthal@pszjlaw.com
            jfried@pszjlaw.com
            scho@pszjlaw.com
            tcairns@pszjlaw.com

[Proposed] Counsel for the Debtors and Debtors in Possession