IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WILLIAM LYON HOMES, *et al.*,[1] | ) | Case No.  11-14019 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**MOTION OF DEBTORS FOR AN ORDER AUTHORIZING THE DEBTORS TO
(I) ASSUME THE RESTRUCTURING SUPPORT AGREEMENTS WITH
CERTAIN SECURED LENDERS AND NOTEHOLDERS, (II) PAY AND
REIMBURSE RELATED FEES AND EXPENSES, AND (III) INDEMNIFY THE
PARTIES TO THE RESTRUCTURING SUPPORT AGREEMENTS**

William Lyon Homes, a Delaware corporation ("DE Lyon") and its affiliated

debtors and debtors in possession (collectively, the "Debtors" or the "Company") file this motion

(the "Motion")[2] for entry of an order, substantially in the form attached hereto as Exhibit A,

seeking authority for DE Lyon and William Lyon Homes, Inc., a California Corporation ("CA

Lyon") to (i) assume the Colony RSA (defined below) and the Noteholders RSA (defined

below), (ii) pay and reimburse reasonable and documented fees and out of pocket expenses

incurred in connection with each of the Restructuring Support Agreements (as defined below),

and (iii) indemnify certain parties in accordance with the indemnification provisions set forth in

---

[1] The debtors and debtors in possession in these cases and the last four digits of their respective taxpayer identification numbers are as follows:  William Lyon Homes (4902); William Lyon Homes, Inc. (3855); Mountain Falls Golf Course, LLC (3291); Mountain Falls, LLC (9631); Circle G at the Church Farm North Joint Venture, LLC (1322); Presley CMR, Inc. (3862); William Lyon Southwest, Inc. (8474); Sycamore CC, Inc. (1307); PH-LP Ventures (9119); PH Ventures – San Jose (5089); HSP, Inc. (6045); PH Rielly Ventures (7710); Lyon Waterfront, LLC (1928); Lyon East Garrison Company I, LLC (5692); WLH Enterprises (3333); Duxford Financial, Inc. (0824); California Equity Funding, Inc. (0016); Laguna Big Horn, LLC (2590); Presley Homes (5035); Cerro Plata Associates, LLC (5090); Whitney Ranch Village 5, LLC (5256); and Duxford Insurance Services, LLC (8232). The Debtors' mailing address is 4490 Von Karman Avenue, Newport Beach, CA 92660.

[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan (as defined below), unless otherwise noted.

the Restructuring Support Agreements.  In support of this Motion,[3] the Debtors respectfully state
as follows:

**Jurisdiction**

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C.
§§ 157 and 1334.  This is a core proceeding as defined in 28 U.S.C.  § 157(b)(2).  Venue before
this Court is proper pursuant to 28 U.S.C.  §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105, 363,
365, 503 and 507 of title 11 of the United States Code, 11 U.S.C.  §§ 101-1330, as amended (the
"Bankruptcy Code").

**Background**

**A.      General Background**

3.      On the date hereof (the "Petition Date"), the Debtors commenced these
cases by filing voluntary petitions for relief under chapter 11 the Bankruptcy Code.
Concurrently with the filing of this Motion, the Debtors have requested joint administration of
the above captioned cases.

4.      The Debtors have continued in possession of their property and have
continued to operate and manage their businesses as debtors in possession pursuant to sections
1107(a) and 1108 of the Bankruptcy Code.

---

[3] The Debtors reserve the right to amend or supplement this Motion, as necessary, prior to the hearing date.

5.      As of the date hereof, no request has been made for the appointment of a

trustee or an examiner in this case, and no official committee has yet been appointed by the

Office of the United States Trustee.

6.      The Debtors have requested that the Court enter an order granting joint

administration of these Chapter 11 Cases.

7.      The factual background regarding the Debtors, including their current and

historical business operations and the events precipitating the chapter 11 filings (including the

facts and circumstances supporting this Motion, are set forth in detail in the *Declaration of*

*Matthew R. Zaist, Executive Vice President of William Lyon Homes, in Support of First Day*

*Motions* (the "Zaist Declaration") filed concurrently herewith and incorporated herein by

reference.  The Debtors are homebuilders with operations in Northern and Southern California,

Arizona and Nevada.

8.      On the Petition Date, the Debtors filed the *Prepackaged Joint Plan of*

*Reorganization for William Lyon Homes, et al.* dated November 17, 2011 (as may be amended,

modified or supplemented from time to time, the "Plan") and related disclosure statement (the

"Disclosure Statement").  The Plan represents a significant milestone for the Company and

embodies the agreement reached with their major debt holders.  If confirmed, the Plan will

reduce the Company's leverage by approximately $182 million in funded note indebtedness,

restructure the Company's primary secured credit facility, and provide for new equity capital

investments of $85 million in the aggregate.  Based on a prepetition solicitation of the Plan, the

Plan has been overwhelmingly approved by those voting classes of creditors who are impaired

under the Plan – (i) the Prepetition Secured Term Loan Agreement; and (ii) the Old Notes.

Significantly, other than the holders of Prepetition Secured Term Loan Agreement Claims, Old

Notes Claims, and equity holders of DE Lyon (whose interests are being cancelled), the Plan

provides for the Debtors' remaining creditors to be unimpaired, which may not have been

possible absent the agreements reached under the Plan.  The Plan will allow the Company to

improve its liquidity position from its operations and be well-positioned going forward.

Concurrently with their filing of the Plan and Disclosure Statement, the Debtors have requested a

joint hearing on the adequacy of the Disclosure Statement and confirmation of the Plan.  No

hearing has yet been set.

## Factual Background

### A.    Significant Prepetition Indebtedness

9.    As of September 30, 2011, the majority of the Debtors' outstanding

funded indebtedness was on account of:  (i) $206 million of secured indebtedness owing to their

prepetition secured lenders under their Prepetition Secured Loan Agreement (discussed below);

and (ii) $283.2 million of unsecured indebtedness on account of three series of note issuances

(the "Old Notes").

### B.    The Prepetition Secured Loan

10.    CA Lyon is a borrower under the Senior Secured Term Loan Agreement,

dated October 20, 2009, as amended from time to time (the "Prepetition Secured Loan

Agreement"), by and among CA Lyon, ColFin WLH Funding, LLC, as Administrative Agent,

Initial Lender and Lead Arranger (in such capacity, the "<u>Administrative Agent</u>"), and the other

lenders party thereto (the "<u>Prepetition Secured Lenders</u>").[4]

      11.    The Prepetition Secured Loan Agreement governs a secured term loan in

the aggregate principal amount of $206,000,000, bearing interest at 14% per annum, payable

monthly.  Immediately prior to the Petition Date, the scheduled maturity date for the Prepetition

Secured Loan was October 20, 2014 and the outstanding principal amount was $206,000,000.[5]

Based on such outstanding balance of the Prepetition Secured Loan, interest payments were

approximately $28.8 million annually.

      12.    DE Lyon guaranteed absolutely, irrevocably and unconditionally, as a

guarantee of payment and not merely of collection, prompt payment in full when due, whether at

stated maturity, of any and all Obligations upon acceleration or otherwise, amounts due under the

Prepetition Secured Loan Agreement.[6]

## C.    <u>The Old Notes</u>

      13.    Also prior to the Petition Date, CA Lyon issued three series of unsecured

notes prepetition (the "<u>Old Notes</u>").  The first series was issued in an aggregate principal amount

of $150 million in 2004, bears a 7 ⅝% interest rate, and is due on December 15, 2012 (the "<u>7</u>

<u>⅝% Senior Notes</u>"); the second was issued in an aggregate principal amount of $250 million in

---

[4] At the end of this last waiver period, the Debtors and the Prepetition Secured Lenders engaged in extensive negotiation of the terms of the Debtors' proposed restructuring, but the parties did not reach an agreement on a further extension of the waiver.

[5] Pursuant to a compromise with respect to certain make whole amounts and exit fees provided in the Prepetition Secured Loan Agreement to be effected if and when the Plan is consummated, the principal amount due and owing under the Prepetition Secured Loan Agreement will be increased from $206,000,000 to $235,000,000.

[6] As discussed in greater detail in Section II.C.1 of the Disclosure Statement, the Prepetition Secured Loans are secured by senior liens on substantially all of the assets of DE Lyon and CA Lyon, but excluding specified "Excluded Property."

2003, bears a 10 ¾% interest rate, and is due on April 1, 2013 (the "10 ¾% Senior Notes"); the

third was issued in an aggregate principal amount of $150 million in 2004, bears a 7 ½% interest

rate, and is due on February 15, 2014 (the "7 ½% Senior Notes" and, together with the 7 ⅝%

Senior Notes and the 10 ¾% Senior Notes, the "Old Notes").  Interest on the Old Notes is

payable semi-annually.

14.    The Old Notes are unconditionally guaranteed on a senior unsecured basis

by the following Debtors (the "Prepetition Guarantors"): DE Lyon; California Equity Funding,

Inc.; PH-LP Ventures; Duxford Financial, Inc.; Sycamore CC, Inc.; Presley CMR, Inc.; William

Lyon Southwest, Inc.; PH-Reilly Ventures; HSP, Inc.; PH Ventures-San Jose; WLH Enterprises,

formerly Carmel Mountain Ranch; Lyon Waterfront, LLC; and Lyon East Garrison Company I,

LLC.

15.    As a result of previous redemptions in 2010, the 7 ⅝% Senior Notes have

a current outstanding balance of approximately $66.7 million; the 10 ¾% Senior Notes,

approximately $138.7 million; and the 7 ½% Senior Notes, approximately $77.8 million.  Each

of the series of Old Notes is governed by an indenture (each, a "Prepetition Indenture," and

collectively, the "Prepetition Indentures") by and among CA Lyon as issuer, DE Lyon and the

other Prepetition Guarantors, and U.S. Bank National Association, as Trustee (the "Prepetition

Indenture Trustee").  The Old Notes now have an aggregate outstanding amount of $283.2

million in principal and approximately $299.5 million in the aggregate after including interest

and fees.  The outstanding balance of the Old Notes per the Company's financial statements

changes monthly due to the amortization of Original Interest Discount on account of the 10 ¾%

Senior Notes.

16.    In early 2011, an ad hoc group of entities holding Old Notes (the "Ad Hoc

Noteholders Group") was formed.  As of November 10, 2011, the members of the Ad Hoc

Noteholders Group who are parties to the Noteholders RSA hold an aggregate of approximately

63.5% in principal of the Old Notes.

**D.    The Prepetition Restructuring**

17.    After several weeks of active and arm's-length negotiations, the Debtors,

in consultation with their advisors, reached prepetition agreements in principle with their

Prepetition Secured Lenders and the Ad Hoc Noteholders Group holding 63.5% in principal

amount of the holders of claims arising from the Old Notes (the "Old Notes Claims"), on a

prepackaged restructuring plan, including the key terms of the restructured Prepetition Secured

Loan Agreement, distributions under the Plan to holders of Old Notes Claims, and the treatment

of general unsecured claims.

18.    As of September 30, 2011, the Debtors had outstanding total funded

indebtedness in the principal amount of approximately $509.8 million.  Upon emergence from

chapter 11, pursuant to the Plan, the Debtors expect to have outstanding debt of approximately

$327.8 million.  Accordingly, the Reorganized Debtors (as defined in the Plan) will have an

improved balance sheet and more appropriate capital structure.  In addition to the reduction of

indebtedness of the Debtors upon emergence from chapter 11, the Debtors also expect to benefit

from an annual decrease in cash interest obligations of approximately $24.7 million, comprised

of $19.9 million annual reduction associated with the conversion to equity of a portion of the Old

Notes and $4.8 million annual reduction resulting from the reduction in interest rate from 14%

under the Prepetition Secured Loan Agreement to 10¼% under the Restructured First Lien Loan

Agreement.

19.     Other than the Holders of Old Notes and the Prepetition Secured Loan

Agreement Claims whose claims are the subject of the proposed restructuring under the Plan,

and old equity, whose interests are being cancelled under the Plan, all of the Debtors' other

creditors, including general unsecured creditors, are Unimpaired under the Plan within the

meaning of section 1124 of the Bankruptcy Code, and deemed to vote in favor of the Plan

pursuant to section 1126(f) of the Bankruptcy Code.

20.     The Company believes that the prepackaged restructuring Plan is the best

restructuring alternative reasonably available to the Company.  In order to effect the provisions

of the Plan, the Company has succeeded in securing commitments for new equity capital

investments aggregating $85 million, in two separate private placements: (a) a commitment to

backstop the entire proposed Rights Offering in the amount of $60 million in cash on the terms

set forth in the Backstop Commitment Agreement should the Rights Offering not otherwise be

fully subscribed, and (b) an additional commitment for $25 million pursuant to the Class B

Common Stock Purchase Commitment Agreement, in the form of cash or a combination of cash

and, subject to certain conditions, membership interests in certain limited liability companies that

hold real property, to be provided by the Company's current equity owners. The Company plans

to utilize the proceeds of these investments to fund its working capital requirements, and to make

certain distributions under the Plan.  After extensive efforts to seek new equity capital, the

Company believes that the Rights Offering (inclusive of the Backstop Commitment Agreement)

and the Class B Common Stock Commitment Agreement represent the best terms for equity

financing available to the Company in this market.

21.    The Plan represents a significant achievement for the Company and should

greatly enhance the Company's ability to reorganize successfully and expeditiously through the

addition of $85 million of new equity capital pursuant to the Rights Offering and Class B

Common Stock Purchase Commitment Agreement.  The Plan will also provide an efficient

restructuring through the prepackaged process, designed to minimize disruption to the

Company's business endeavors, stabilize the Company's balance sheet, and provide a platform

for future success.  Through confirmation of the Plan implementing the terms of the pre-

packaged restructuring, the Company will restructure and substantially deleverage its balance

sheet; reduce its cash interest expense to a level that is aligned with its expected future cash

flows; retain additional flexibility to invest in growth initiatives to maximize enterprise value;

and maintain favorable pricing to the Company under the Prepetition Secured Loan Agreement.

The Company also will improve its liquidity position.  For all of these reasons and the proposed

DIP financing (described in greater detail in the Zaist Declaration) and the concurrently filed

motion for DIP financing, the Company believes that it will have sufficient liquidity during the

course of the Chapter 11 Cases and will be well-positioned going forward.

**E.**      **Solicitation of the Prepackaged Plan**

      22.      Prior to the Petition Date, beginning on November 17, 2011 through December 16, 2011, the Debtors solicited votes to accept or reject the Plan (the "Solicitation"). Claim holders entitled to vote under the Plan (i.e., Class 4 – Prepetition Secured Loan Agreement Claims and Class 7 – Old Notes Claims) (the "Voting Classes") voted overwhelmingly to accept the Plan, thus satisfying the statutory percentages specified in section 1126(c) of the Bankruptcy Code.

      23.      The Solicitation Packages, including the ballots on the Plan, were distributed by the Debtors' voting and solicitation agent, Kurtzman Carson Consultants LLC ("KCC") on November 17, 2011 to those holders of Claims in the Voting Classes. The Voting Deadline was established as December 16, 2011, or 29 days from the start of the Solicitation period. Votes received by the Voting Deadline that complied with the voting instructions were then tabulated by KCC. A more detailed declaration of the voting tabulation is set forth in the *Declaration of Peter Walsh of Kurtzman Carson Consultants LLC Regarding the Mailing, Voting and Tabulation of Ballots Accepting and Rejecting Prepackaged Joint Chapter 11 Plan of Reorganization for William Lyon Homes, et al.* (the "Voting Declaration"), filed concurrently herewith.

**F.**      **The Restructuring Support Agreements**

      24.      In order to effectuate the transactions contemplated by the Plan, the Debtors, the Administrative Agent, the Prepetition Lenders, and the members of the Ad Hoc Noteholders Group have entered into the following agreements:

### a.   The Colony RSA

25.   On November 4, 2011, the Company entered into a restructuring support agreement (the "Colony RSA")[7] with the Prepetition Secured Lenders holding 100% of the principal amount of the loans outstanding under the Prepetition Secured Loan Agreement.  A copy of the Colony RSA is attached hereto as <u>Exhibit B</u>  Pursuant to the Colony RSA, each Prepetition Secured Lender party thereto (each, a "Consenting Lender" and collectively, the "Consenting Lenders") agreed, subject to the terms and conditions of the Colony RSA, to exercise all votes to which it is entitled to accept the Plan.

26.   While the Colony RSA is in effect, the Consenting Lenders agreed to not transfer any Claims except to a transferee who agrees to be bound by the Colony RSA.

27.   In exchange, CA Lyon and DE Lyon agreed to pay the fees and expenses incurred by the legal and financial advisors to the Administrative Agent (including Akin Gump Strauss Hauer & Feld LLP and Pepper Hamilton LLP) as they become due (the "Lender Transaction Expenses").  All prepetition Lender Transaction Expenses shall have been paid by the Company or paid as cure payments pursuant to this Court's approval of this Motion.  In addition, CA Lyon and DE Lyon agreed to indemnify and hold harmless (the "Lender Indemnification")[8] the Administrative Agent, the Consenting Lenders, and certain other parties (each, a "Lender Indemnified Party" and, collectively, the "Lender Indemnified Parties") from

---

[7] The description of the Colony RSA presented herein is a summary of the principal terms of the Colony RSA, and is qualified in all respects – and the parties' obligations thereunder are subject – to the actual terms and conditions of the Colony RSA.

[8] The rights and obligations with respect to the payment of Lender Transaction Expenses and Lender Indemnification obligations herein are without prejudice, and in addition to any rights and obligations provided in the Prepetition Secured Loan Agreement or any other rights of the Administrative Agent and the Prepetition Secured Lenders.

and against any and all losses, claims, damages, liabilities, and reasonable fees and expenses, joint or several, to which a Lender Indemnified Party may become subject to the extent arising out of or in connection with (i) any third party claim, challenge, litigation, investigation or proceeding with respect to the Colony RSA, the Chapter 11 Cases, or the transactions contemplated thereby, or (ii) any breach by the Company of the Colony RSA and to reimburse such Lender Indemnified Party for any reasonable legal or other reasonable out of pocket expenses as they are incurred in connection with investigating, responding to or defending any of the foregoing, all in accordance with terms of the Colony RSA.[9]

28.    The Consenting Lenders may terminate the Colony RSA upon the occurrence of certain events, including the following:[10] (i) failure to obtain an order authorizing the assumption of the Colony RSA by the 45th day after the Petition Date; (ii) a material breach or termination of the Noteholders RSA (as defined below); (iii) failure to obtain Court approval of the Rights Offering by the 58th day after the Petition Date (or, if such day is not a Court date, the next succeeding Court date); (iv) failure to pay any of the Lender Transaction Expenses as they become due; or (v) failure to obtain an order confirming the Plan by the 60th day after the Petition Date(or, if such day is not a Court Date, the next succeeding Court Date).[11]

---

[9] The Lender Indemnification does not apply to losses, claims, damages, liabilities or expenses to the extent that they are finally judicially determined to have resulted from any breach of the Colony RSA by a Lender Indemnified Party or bad faith, gross negligence, or willful misconduct of the Lender Indemnified Party seeking indemnification.

[10] A discussion of events that could trigger a termination of the Colony RSA is located at Section II.F.2 of the Disclosure Statement.

[11] In the event that an order approving the Rights Offering is not entered within 30 days after the Petition Date, this deadline shall be extended by 30 days.

a.    **The Noteholders RSA**

29.    On November 4, 2011, the Debtors entered into a noteholder restructuring

support agreement (the "Noteholders RSA"[12] and, collectively with the Colony RSA, the

"Restructuring Support Agreements"), with the holders of approximately 63.5% of the principal

amount of the Old Notes then outstanding (each, a "Consenting Noteholder" and collectively, the

"Consenting Noteholders").  A copy of the Noteholders RSA is attached hereto as Exhibit C.

Pursuant to the Noteholders RSA, each Consenting Noteholder agreed to exercise all votes to

which it is entitled with respect to the principal amount of Old Notes subject to the Noteholders

RSA to accept the Plan pursuant to the terms of the Noteholders RSA.

30.    While the Noteholders RSA is in effect, each Consenting Noteholder also

agreed not to transfer any Old Notes held by it that are subject to the Noteholders RSA, except to

a transferee who agrees to be bound by the Noteholders RSA.

31.    In exchange for the various concessions and settlements agreed to in the

Noteholders RSA, and pursuant to the critical terms thereof, CA Lyon and DE Lyon agreed to

pay the reasonable and documented fees and out of pocket expenses of the legal and financial

advisors of the Ad Hoc Noteholders Group incurred in connection with the Noteholders RSA and

the Chapter 11 Cases (the "Noteholder Transaction Expenses" and, collectively with the Lender

Transaction Expenses, the "Transaction Expenses").  All prepetition Noteholder Transaction

Expenses shall have been paid by the company or paid as cure payments following this Court's

---

[12] The description of the Noteholders RSA presented herein is a summary of the principal terms of the Noteholders RSA, and is qualified in all respects – and the parties' obligations thereunder are subject – to the actual terms and conditions of the Noteholders RSA.

approval of this Motion.  In addition, CA Lyon and DE Lyon agreed to indemnify (the

"Noteholder Indemnification" and, collectively with the Lender Indemnification, the

"Indemnification") the Consenting Noteholders and certain related parties, as defined in section

28 of the Noteholders RSA (each, a "Noteholder Indemnified Person" and, collectively with the

Lender Indemnified Parties, the "Indemnified Persons") from and against any and all losses,

claims, damages, liabilities and reasonable fees and expenses, joint or several, to which any such

Noteholder Indemnified Person may become subject to the extent arising out of or in connection

with (i) any third party claim, challenge, litigation, investigation or proceeding with respect to

the Noteholders RSA, the Chapter 11 Cases or the transactions contemplated thereby, or (ii) any

breach by the Company of the Noteholders RSA and to reimburse such Noteholder Indemnified

Persons for any reasonable legal or other reasonable out of pocket expenses as they are incurred

in connection with investigating, responding to or defending any of the foregoing.[13]

      32.    The Consenting Noteholders may terminate the Noteholders RSA upon

the occurrence of certain events, including the following:[14]  (i) failure to obtain an order

authorizing the assumption of the Noteholders RSA within 45 days after the Petition Date; (ii)

the company entering into a DIP Facility that is materially inconsistent with the Noteholders

RSA in a manner that is not reasonably acceptable to the Requisite Noteholders (as defined in the

Noteholders RSA); (iii) a material breach or termination of the Colony RSA by the 58th day after

---

[13] The Noteholder Indemnification does not apply to losses, claims, damages, liabilities or expenses to the extent that they are finally judicially determined to have resulted from any breach of the Noteholders RSA by such Noteholder Indemnified Persons or bad faith, gross negligence or willful misconduct on the part of such Noteholder Indemnified Person.

[14] A complete discussion of events that could trigger a termination of the Noteholders RSA is located at Section II.F.1 of the Disclosure Statement.

the Petition Date (or, if such day is not a Court date, the next succeeding Court date); (iv) the

Rights Offering Order shall not have been entered; (v) failure to pay the Noteholder Transaction

Expenses; or (vi) failure to obtain an order confirming the Plan by the 60th day after the Petition

Date (or, if such day is not a Court Date, the next succeeding Court Date).[15]

### Relief Requested

33.      The Debtors seek authority to (i) assume the Restructuring Support

Agreements, (ii) pay and reimburse the Transaction Expenses in accordance with the terms of the

Restructuring Agreements, and (iii) indemnify the Indemnified Persons (including the

Administrative Agent, the Consenting Lenders, and the Consenting Noteholders) in accordance

with the terms of the Restructuring Support Agreements.

### Basis For Relief

**G.      The Debtors Should be Authorized to Assume the Restructuring Support Agreements**

34.      Section 363(b)(1) of the Bankruptcy Code provides that a debtor-in-

possession "after notice and a hearing, may use, sell, or lease, other than in the ordinary course

of business, property of the estate." 11 U.S.C. § 363(b)(1). A court can authorize a debtor to

use property of the estate pursuant to Section 363(b)(1) of the Bankruptcy Code when such use

in an exercise of the debtor's sound business judgment and when the use of the property is

proposed in good faith. *In re Delaware & Hudson R.R. Co.*, 124 B.R. 169, 176 (D. Del. 1991).

The debtor has the burden to establish that a valid business purpose exists for the use of estate

---

[15] In the event that an order approving the Rights Offering is not entered within 30 days after the Petition Date, this deadline shall be extended by 30 days.

property in a manner that is not in the ordinary course of business. *See In re Lionel Corp.*, 722 F.2d 1063, 1070-71 (2d Cir. 1983). Once the debtor articulates a valid business justification, a presumption arises that the debtor's decision was made on an informed basis, in good faith, and in the honest belief the action was in the best interest of the company. *See In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992). The business judgment rule has vitality in chapter 11 cases and shields a debtor's management from judicial second-guessing. *Id. See In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a Debtor's management decisions").

35.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the Court's approval, may . . . assume any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The standard to be applied by a court in determining whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which is premised upon the debtor's business judgment that assumption would be beneficial to its estate. *See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures)*, 4 F.3d 1095, 1099 (2nd Cir. 1993). "More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *Richmond Leasing Co. v. Capital Bank. N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

36.     Upon finding that a debtor has exercised its sound business judgment in determining that assumption of an agreement is in the best interests of its estate, the Court should approve the assumption under section 365(a) of the Bankruptcy Code. *See e.g., In re Bankvest Capital Corp.*, 360 F.3d 291 (1st Cir. 2004) ("If a debtor wants to assume a contract in its business judgment . . . the debtor should be allowed to do so."); *In re Child World, Inc.*, 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992); *In re TS Indus., Inc.*, 117 B.R. 682, 685 (Bankr. D. Utah 1990); *In re Del Grosso*, 115 B.R. 136, 138 (Bankr. N.D. Ill. 1990).

37.     Additionally, section 105(a) provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Pursuant to section 105(a), orders are appropriate where they are essential to the debtor's reorganization efforts and do not pose a burden on the debtor's creditors. *See U.S. Lines, Inc. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n (In re U.S. Lines, Inc.)*, 197 F.3d 631, 640 (2d Cir. 1999); *Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994) ("It is well settled that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process.").

38.     Courts in this district and other districts have approved similar relief. *See e.g., In re Nebraska Book Company, Inc.* Case No. 11-12005 (PW) (Bankr. D. Del. Sept. 7, 2011); *In re Appleseed's Intermediate Holdings, LLC, et al.* Case No. (KG) (Bankr. D. Del. March 1, 2011); *In re Loehmann's Holdings, Inc.* Case No. 10-16077 (REG) (Bankr. S.D.N.Y.

Dec. 15, 2010); *In re American Media, Inc.* Case No. 10-16140 (MG) (Bankr. S.D.N.Y. Nov. 29, 2010.

39.    The Debtors have determined, in the exercise of their business judgment, that it is critical to the execution of the Plan to assume the Restructuring Support Agreements. The Restructuring Support Agreements, among other things, provide that a majority of the holders of the Old Notes and the Prepetition Secured Lenders – the only two classes of impaired claims – will, subject to the terms and conditions of the Restructuring Support Agreements, support the Plan. Indeed, without the Restructuring Support Agreements and the support of the Consenting Lenders and the Consenting Noteholders, it would be far more expensive and difficult for the Debtors to successfully reorganize. The Noteholders RSA is of particular importance because the Consenting Noteholders have agreed to reduce their claims – and the Old Notes Class is the only class of general unsecured creditors that will not have its Allowed Claims paid in full. It is the Noteholders Agreement to receive less than 100% of their claims that enables the Debtors to pay trade claims and other general unsecured claims in full.

40.    The terms of the Restructuring Support Agreements are the product of extensive arm's length negotiations among the Debtors, the Administrative Agent, the Consenting Lenders, the Consenting Noteholders, the Ad Hoc Noteholders Group, the Prepetition Indenture Trustee, the parties to the Backstop Commitment Agreement (the "Backstop Parties"), and the current holders of DE Lyon's equity interests, as well as their respective counsel and financial advisors. As more thoroughly described in the Disclosure Statement and the Zaist Declaration, the terms of the Restructuring Support Agreements are the

culmination of a months long collaborative restructuring process in which all of the above-mentioned parties were represented. Given the significance of the support of the Consenting Lenders and Consenting Noteholders to confirmation of the Plan (and that approval of the Restructuring Support Agreements within 45 days of the Petition Date is a condition to these parties' support for the Plan), the Debtors have determined that obtaining Court approval to assume the Restructuring Support Agreements is in their best interests and in the best interests of their estates. The Debtors believe that, in light of all of the facts and circumstances of the Chapter 11 Cases, the terms of the Restructuring Support Agreements are fair, reasonable and appropriate and are integral to assuring that the Debtors' estates can maximize their value for all of their stakeholders.

41.     Moreover, the Debtors believe that the provisions of the Restructuring Support Agreements providing for the reimbursement of the Transaction Expenses and the Indemnification (if an indemnification event occurs) are fair and reasonable and should be awarded on an administrative expense basis in accordance with the terms and conditions of the Restructuring Support Agreements. The ongoing commitments of the Administrative Agent, the Consenting Lenders, the Consenting Noteholders, and the Ad Hoc Noteholders Group under the Restructuring Support Agreements have been, and will be, of direct benefit to the Debtors, their estates and the future success of the Chapter 11 Cases. The foregoing parties have been integrally involved in the negotiation and formulation of the proposed Plan and its key terms and, absent their support, it would be difficult (if not impossible) for the Debtors to successfully reorganize. These reimbursement provisions are designed to compensate the Administrative

Agent and the Ad Hoc Noteholders Group for the financial risk they are undertaking to aid the Debtors in their restructuring efforts.   The Debtors believe that the terms and conditions set forth in the Restructuring Support Agreements are well within the range of "market" fees, protections and other terms typically received by parties entering into similar agreements and reflect an exercise of their sound business judgment.

42.    Accordingly, after careful analysis and in the exercise of their business judgment, the Debtors have determined, and respectfully submit that, for all of the foregoing reasons, the relief requested in this Motion is in the best interests of their estates and creditors.

### Waiver of the Stay Provided By Bankruptcy Rule 6004

43.    The Debtors further seek a waiver of any stay of the effectiveness of the Order.  Pursuant to Bankruptcy Rule 6004(h), "[an] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Based upon the facts and circumstances set forth herein, the Debtors submit that ample cause exists to justify a waiver of any stay imposed by Bankruptcy Rules 6004(h), 7062 or 9014 to the extent they apply.  As discussed above, subject to the terms and conditions of the Restructuring Support Agreements, a majority of the only two classes of impaired claims – holders of the Old Notes and the Prepetition Lenders – will support the Plan.  Without the Restructuring Support Agreements and the support of the Consenting Lenders and the Consenting Noteholders it would be far more expensive and difficult for the Debtors to successfully reorganize.  Thus, by approving this

motion, this Court will be approving a motion integral to confirmation of the Plan and the

Debtors' successful reorganization.

44.      The Debtors submit that the waiver of the stay under Bankruptcy Rule

6004 is appropriate here to facilitate acceptance of the Plan by all Voting Classes and, subject to

the approval of this Court, confirmation of the Plan.  Accordingly, the Debtors submit that a

waiver of the stay under Bankruptcy Rule 6004 is appropriate and necessary.

### Notice

45.      Notice of this Motion has been given to the following parties or, in lieu

thereof, to their counsel, if known:  (i) the Office of the United States Trustee for the District of

Delaware; (ii) counsel to the Prepetition Secured Term Loan and DIP Lender; (iii) counsel to the

Ad Hoc Noteholders Group; and (iv) counsel to the Backstop Investors.  Following the first day

hearing in this case, this Motion will be served on (a) creditors holding the thirty largest

unsecured claims against the Debtors on a consolidated basis, or their legal counsel (if known)

and (b) those persons who have requested notice pursuant to Rule 2002 of the Federal Rules of

Bankruptcy Procedure.  The Debtors submit that, in light of the nature of the relief requested, no

other or further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as Exhibit A, authorizing the Debtors to (a) assume each of the Restructuring Support Agreements, (b) pay all the Transaction Expenses, pursuant to the terms of each of the Restructuring Support Agreements, and (c) indemnify certain parties pursuant to the terms of each of the Restructuring Support Agreements.

Dated: December 19, 2011

PACHULSKI STANG ZIEHL & JONES LLP

By: _____
Richard M. Pachulski (CA Bar No. 90073)
Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Joshua M. Fried (CA Bar No. 181541)
Shirley S. Cho (CA Bar No. 192616)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
e-mail:    rpachulski@pszjlaw.com
          ljones@pszjlaw.com
          dbertenthal@pszjlaw.com
          jfried@pszjlaw.com
          scho@pszjlaw.com
          tcairns@pszjlaw.com

[Proposed] Counsel for the Debtors and Debtors in Possession