IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WILLIAM LYON HOMES, *et al.*,[1] | ) | Case No. 11-14019 (____) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**MOTION OF DEBTORS FOR ENTRY OF ORDER AUTHORIZING
DEBTORS TO (I) PAY PREPETITION WAGES, SALARIES, EMPLOYEE
BENEFITS, AND OTHER COMPENSATION; (II) REMIT WITHHOLDING
OBLIGATIONS; (III) MAINTAIN EMPLOYEE COMPENSATION
AND BENEFITS PROGRAMS AND PAY RELATED ADMINISTRATIVE
OBLIGATIONS; AND (IV) HAVE APPLICABLE BANKS HONOR CERTAIN
<u>CHECKS PRESENTED FOR PAYMENT</u>**

William Lyon Homes, a Delaware corporation ("<u>DE Lyon</u>") and its affiliated debtors and

debtors in possession (collectively, the "<u>Debtors</u>" or the "<u>Company</u>") file this motion (the

"<u>Motion</u>") for entry of an order, substantially in the form attached hereto as <u>Exhibit A</u>, under

sections 105(a), 362, 363, 507(a)(4), and 507(a)(5) of title 11 of the United States Code (the

"<u>Bankruptcy Code</u>"):  authorizing, but not requiring the Debtors, to (i) pay wages, salaries,

commissions, and other compensation earned prior to the Petition Date but remaining unpaid as

of the Petition Date, (ii) continue postpetition certain of the Debtors' employee medical and

similar benefits and programs in the Debtors' discretion, (iii) pay reimbursable employee

---

[1] The debtors and debtors in possession in these cases and the last four digits of their respective taxpayer identification numbers are as follows:  William Lyon Homes (4902); William Lyon Homes, Inc. (3855); Mountain Falls Golf Course, LLC (3291); Mountain Falls, LLC (9631); Circle G at the Church Farm North Joint Venture, LLC (1322); Presley CMR, Inc. (3862); William Lyon Southwest, Inc. (8474); Sycamore CC, Inc. (1307); PH-LP Ventures (9119); PH Ventures – San Jose (5089); HSP, Inc. (6045); PH Rielly Ventures (7710); Lyon Waterfront, LLC (1928); Lyon East Garrison Company I, LLC (5692); WLH Enterprises (3333); Duxford Financial, Inc. (0824); California Equity Funding, Inc. (0016); Laguna Big Horn, LLC (2590); Presley Homes (5035); Cerro Plata Associates, LLC (5090); Whitney Ranch Village 5, LLC (5256); and Duxford Insurance Services, LLC (8232). The Debtors' mailing address is 4490 Von Karman Avenue, Newport Beach, CA 92660.

expenses incurred prior to the Petition Date but remaining unpaid as of the Petition Date; (iv)

remit and pay any and all local, state and federal withholding and payroll-related or similar taxes

relating to prepetition periods and other withholding obligations; and (v) for other related relief

as set forth herein.  In support of this Motion, the Debtors respectfully state as follows:

## Jurisdiction

1.    This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334.

Venue of these cases and this Motion are proper in this District pursuant to 28 U.S.C. §§ 1408

and 1409.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.    The statutory basis for the relief requested herein are sections 105(a), 362, 363,

507(a)(4), and 507(a)(5) of the Bankruptcy Code and Rule 6003 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules").

## Background

### A.    General Background

3.    On the date hereof (the "Petition Date"), the Debtors commenced these cases by

filing voluntary petitions for relief under chapter 11 the Bankruptcy Code.  Concurrently with the

filing of this Motion, the Debtors have requested joint administration of the above captioned

cases.

4.    The Debtors have continued in possession of their property and have continued to

operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.

DOCS_DE:176169.2 93949-001

5.      No request has been made for the appointment of a trustee or an examiner in this

case, and no official committee has yet been appointed by the Office of the United States

Trustee.

6.      The factual background regarding the Debtors, including their current and

historical business operations and the events precipitating the chapter 11 filing, are set forth in

detail in the *Declaration of Matthew R. Zaist, Executive Vice President of William Lyon Homes,*

*in Support of First Day Motions* (the "Zaist Declaration") filed concurrently herewith and

incorporated herein by reference.  The Debtors are homebuilders with operations in Northern and

Southern California, Arizona and Nevada.

7.      On the Petition Date, the Debtors filed the *Prepackaged Joint Plan of*

*Reorganization for William Lyon Homes, et al.* dated November 17, 2011 (the "Plan") and

related disclosure statement (the "Disclosure Statement").  The Plan represents a significant

milestone for the Company and embodies the agreement reached with their major debt holders.

If confirmed, the Plan will reduce the Company's leverage by approximately $182 million in

funded note indebtedness, restructure the Company's primary secured credit facility, and provide

for new equity capital investments of $85 million in the aggregate.  Based on a prepetition

solicitation of the Plan, the Plan has been overwhelmingly approved by those voting classes of

creditors who are impaired under the Plan – (i) the Prepetition Secured Term Loan Agreement[2];

and (ii) the Old Notes.  Significantly, other than the holders of Prepetition Secured Term Loan

Agreement Claims, Old Notes Claims, and equity holders of DE Lyon (whose interests are being

---

[2]Defined terms not defined herein shall have the meanings described to them in the Plan.

cancelled), the Plan provides for the Debtors' remaining creditors to be unimpaired, which may not have been possible absent the agreements reached under the Plan. The Plan will allow the Company to improve its liquidity position from its operations and be well-positioned going forward.

**B.      The Debtors' Work Force**

8.      The Debtors employ approximately 248 employees (collectively, the "Employees"), including 178 full-time salaried employees (the "Full-Time Salaried Employees"), and 70 hourly employees (the "Hourly Employees").   Two of the Debtors, William Lyon Homes, Inc., a California corporation ("CA Lyon") and Mountain Falls Golf Course ("Mountain Falls"), a Debtor before this court and a fully owned subsidiary of CA Lyon, employ all of the Employees.  CA Lyon's employees are referred to as "WLH Employees" and Mountain Falls' employees are referred to as "Mt. Falls Employees."

**RELIEF REQUESTED**

9.      To minimize the personal hardship the Employees will suffer if prepetition Employee Obligations are not paid when due, and to maintain the Employees' morale at this critical time, the Debtors, by this Motion, seek authority to pay and honor certain prepetition claims of Employees, including (a) wages, salaries, commissions, and other accrued compensation, (b) reimburse all prepetition Employee business expenses and maintain corporate credit cards, (c) make prepetition contributions and pay benefits under certain Employee benefit plans, including without limitation, certain medical, dental, vision, 401(k), flexible spending, and

(d) honor disability, life insurance, and other workers' compensation obligations (the foregoing and other similar obligations collectively referred to herein as the "Employee Obligations").

10.    All payments requested to be made under this Motion on account of Employee Obligations that accrued prior to the Petition Date shall not exceed the $11,725 priority cap imposed by section 507(a)(4) of the Bankruptcy Code (the "Priority Cap") in the aggregate.

11.    By this Motion, the Debtors request authority to pay up to the following amounts for the following categories on account of amounts that may have accrued prior to the Petition Date:

| Category | Cap |
| --- | --- |
| Unpaid Wages | $650,000 |
| Withholdings | $440,000 |
| Reimburseable Expenses | $45,000 |
| Corporate Credit Cards | $220,000 |
| Car Allowances | $17,000 |
| Sales Commissions | $20,000 |
| ADP Fees | $15,000 |
| Medical | $150,000 |
| Dental | $11,500 |
| Vision | $2,000 |
| Life, AD&D Insurance, Supplemental Life | $7,000 |
| FSA Administration (National Benefits Services) | $500 |
| 401(k) Fees | $20,000 |

| Workers' Compensation Insurance Policy | $113,385 |
|---|---|
| Supplemental Benefits Program | $176,000 |

12.     Certain of the Debtors' Employees also provide human resources, tax and other services to their Chairman in his personal capacity or to companies partially owned by the Chairman, as more fully described herein.  The Debtors request authority to continue to provide such services on the terms set forth herein.

13.     In addition to the above, the Debtors maintain a bonus program for all Employees (the "Bonus Program").  The Debtors will file a separate motion upon notice and request for hearing for authority to make any payments under the Bonus Program.  Therefore, no request to pay bonuses is being made through this Motion.

## EMPLOYEE COMPENSATION AND HEALTHCARE BENEFIT PROGRAMS

A.      **Employee Compensation**

(i)      Salaries and Wages

14.     The average bi-weekly payroll for the Employees is approximately $1,000,000. Salaried and Hourly Employees are paid on a biweekly basis and are paid five (5) days in arrears. The Employees were last paid on December 9, 2011 for the two-week period from November 21, 2011 through December 4, 2011.  The Debtors' next payroll is scheduled to be paid on December 23, 2011 for the two-week period from December 5, 2011 through December 18, 2011.  Therefore, as of the Petition Date, there will be due and owing one full payroll cycle in the amount of approximately $650,000 in earned and unpaid salary, which amounts may also include checks in float from the prior payroll made on December 9, 2011 (the "Unpaid Wages").  By this

Motion, the Debtors request authority to pay up to $650,000 of Unpaid Wages that may have accrued before the Petition Date.

15.    The Debtors pay approximately 210 of the Employees by direct deposit and approximately 38 of the Employees by computer generated check.  The Debtors also write the manual checks out of a bank account maintained by California Bank and Trust when an emergency check is necessary.  The Debtors use the services of ADP (the "Payroll Processor") to process the direct deposit transfers and administer payroll checks to Employees.  The Payroll Processor calculates the payroll, health benefit and tax obligations for each Employee and the Debtors then transfer these amounts to the payroll account 2 days in advance of the payroll, or by Wednesday, December 21, 2011 for their next regularly scheduled payroll.  On average, the Debtors' pay approximately $9,000 per month to the Payroll Processor for the services it provides to the Debtors.  As of the Petition Date, the Debtors believe that they owe $15,000 to the Payroll Processor for pre-petition services.

(ii)    Withholdings

16.    On an average monthly basis, the Debtors withhold approximately $800,000 for Payroll Taxes and Deductions (discussed below) (collectively, the "Withholdings").  The Debtors estimate that there will be due and owing $440,000 of Withholdings to remit to applicable third parties on account of amounts accrued prior to the Petition Date.  Accordingly, by this Motion, the Debtors seek authority to forward Withholdings, and to continue to forward Withholdings on a postpetition basis to the applicable third parties in the ordinary course of business up to $440,000.

a.      <u>Payroll Taxes</u>.  The Debtors are required by law to withhold from Employees' paychecks amounts related to federal, state, and local income taxes, Social Security and Medicare taxes for remittance to the appropriate federal, state or local taxing agency (the "<u>Employee Payroll Taxes</u>").  The Debtors are also required by applicable statutory authority to pay from their own funds Social Security and Medicare taxes based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (the "<u>Employer Payroll Taxes</u>"), and together with the Employee Payroll Taxes, the "<u>Payroll Taxes</u>").  On average, the Debtors withhold approximately $560,000 per month for Payroll Taxes.

b.      <u>Deductions</u>.  During each applicable period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation: garnishments, child support, and similar deductions, as well as other pre-tax and after-tax deductions payable pursuant to certain employee benefit plans discussed herein, such as an Employee's share of health care benefits and insurance premiums, contributions under flexible spending plans, 401(k) contributions, payments on account of 401(k) loans, legally ordered deductions and miscellaneous deductions (collectively, the "<u>Deductions</u>").  On average, the Debtors remit approximately $240,000 per month on account of the Deductions

**B.      <u>Reimbursable Business Expenses</u>**

17.      In the ordinary course of the Debtors' business, many Employees incur a variety of business expenses in the performance of their duties on behalf of the Debtors (the "<u>Reimbursable Expenses</u>").  The Reimbursable Expenses include, without limitation, business-related travel expenses, including meals, airfare, car rentals, fuel, professional certifications, and

- 8 -

purchases made for business purposes that are not incurred on the Corporate Credit Cards

discussed below.  On an average monthly basis, the Debtors pay approximately $25,000 in

Reimbursable Expenses.  The Debtors request authority, but not a requirement, to pay all

prepetition Reimbursable Expenses in the ordinary course of business up to a total cap of

$45,000 in an abundance of caution due to year-end expenses that may not have been submitted

and checks in float.

**C.**    **Corporate Credit Cards**

        18.    The Debtors maintain two types of corporate credit card accounts under which

individual credit cards are issued to their Employees for use in connection with business

expenses incurred on behalf of the Debtors, including:  (i) gas cards issued by Chevron; and (ii)

general corporate Mastercards issued by JP Morgan Chase (the "Corporate Credit Cards").  On

an average monthly basis, the Debtors incur $110,000 on account of the Corporate Credit Cards.

Without the ability to use the Corporate Credit Cards in the ordinary course of business, the

Debtors' operations would be negatively impacted.   However, because of the holiday season, the

outstanding balance on account of the Corporate Credit Cards may have exceeded the pre-

payment amount.  Therefore, in an abundance of caution, the Debtors request authority to pay up

to $220,000 on account of pre-petition expenses incurred on the Corporate Credit Cards.

**D.**    **Car Allowance**

        19.    The Debtors provide car allowances (the "Car Allowance") for approximately 82

sales and marketing, field, and management Employees.  The Car Allowances total either $350

or $400 per month per Employee (depending on the Employee's position).  The Car Allowances

are paid bi-weekly in the Employees' ordinary pay check.  The Car Allowances compensate

some of the Debtors' critical employees for the extensive driving that their position requires.  For

other Employees, the Car Allowance constitutes supplemental compensation that encourages

them to continue their employment with the Debtors.  On a monthly basis, the Debtors pay

approximately $32,000 in Car Allowances.   The Debtors request authority to pay up to $17,000

on account of Car Allowance that may have accrued, but remain unpaid, as of the Petition Date.

**E.     Closing Incentives**

20.    The Debtors offer two types of home closing incentives:  (i) Sales Commissions;

and (ii) Escrow Override Payments (collectively, the "Incentives") to certain of their Employees.

21.    The Debtors pay sales commissions (the "Sales Commissions") to their sales staff

(the "Sales Employees").  In addition to their base salary, the Sales Employees are eligible for a

Sales Commission on each house that they sell.  The Sales Commissions are designed to

encourage the Sales Employees to sell homes quickly.  The Sales Commissions vary based on

state and project. The Sales Employees receive a commission of $650 for every house that they

sell in Arizona, a commission of $500-$700 for every house that they sell in Nevada, and

$1,000-$2,900 for every house that they sell in California.  The Sales Commissions are earned

once escrow closes on the home and constitute an essential element of the Sales Employees'

compensation.  The Debtors pay the Sales Commissions in the first payroll in the month

following the close of escrow.  In anticipation of the Petition Date, the Debtors pre-paid on

December 16, 2011 the Sales Commissions owing to the Sales Employees on account of home

sales that closed through December 19, 2011.  While the Debtors do not believe that there are

any prepetition Sales Commissions owing, in the event that any Sales Commissions earned pre-

petition were not paid to Sales Employees due to oversight, the Debtors request authority in an

abundance of caution to pay up to $20,000.

22.     Escrow Override Payment:  The Debtors provide $20 to $75 per home closing

(the "Escrow Override Payments") to three of their non-insider managers responsible for closing

escrows (the "Escrow Employees").  Like the Sales Commissions, the Escrow Override Payment

is designed to incentivize escrow and sales management employees to quickly close home sales,

increasing the Debtors' revenue, and constitutes an essential element of the Escrow Employees'

compensation.  The Escrow Override Payments are paid on a monthly basis in arrears in

connection with normal payroll.  As with the Sales Commissions, the Debtors paid all Escrow

Override Payments on account of homes closed through December 19, 2011.  Therefore, the

Debtors do not believe that there are any prepetition amounts owing on account of the Escrow

Override Payment program.

**F.      Employee Health Benefit Programs**

23.     The Debtors provide eligible Employees with medical, dental, and vision plans

(collectively, the "Health Benefit Programs").  WLH's Employees working at least 32 hours per

week are eligible to participate in the Health Benefit Programs after the first month following 30

days of employment.  Mt. Falls exempt employees working at least 32 hours per week are

eligible to participate in the Health Benefit Programs after the first of the month following 30

days of employment.  Mt. Falls non-exempt employees working at least 32 hours per week are

eligible to participate in the Health Benefit Programs after the first of the month following 90 days of employment.

24.    With respect to their Health Benefit Programs, the Debtors' engage the services of Jenkins Insurance Group ("Jenkins"), a benefits, health and welfare plan broker. Jenkins negotiates the renewals and rates of the Health Benefit Programs and provides key administration support to the Debtors under the Health Benefit Programs. As part of the service agreement with Jenkins, all of the Debtors' Health Benefit Programs are paid on a "broker billed" basis under which the Debtors pay Jenkins the applicable insurance premiums, and Jenkins then remits the premiums to the Health Benefit Program providers. The Debtors do not pay Jenkins for such services, but rather Jenkins gets paid a commission from the Health Benefit Program providers directly.

25.    The Health Benefit Programs are as follows:

a.    *Medical Insurance.* The Debtors offer premium based medical insurance (HMO and PPO) for their eligible Employees through Anthem Blue Cross (the "Medical Plan"). Approximately 224 eligible Employees and dependents are covered under the Debtors' Medical Plan. The Debtors monthly cost to provide the Medical Plan is approximately $300,000, of which $57,000 is funded by withholdings from participating eligible Employees. The amount due on the Medical Plan is paid 40-days in arrears, with the last payment being made through December 7, 2011. Currently, the Debtors owe $150,000 in premiums that came due prior to the Petition Date but remain unpaid as of the Petition Date on account of the Medical Plan.

DOCS_DE:176169.2 93949-001

b.      *Dental Benefits*.  The Debtors offer dental insurance (DHMO and PPO) for their eligible Employees through MetLife (the "Dental Plan").  Approximately 256 eligible Employees and dependents are covered under the Dental Plan.  The Debtors' monthly cost to provide the Dental Plan is approximately $22,000, of which $5,000 is funded by withholdings from participating eligible Employees.  The amount due under the Dental Plan is paid 40-days in arrears.  Currently, the Debtors owe $11,500 in premiums that came due prior to the Petition Date but remain unpaid as of the Petition Date on account of the Dental Plan.

c.      *Vision Benefits*.  The Debtors offer vision insurance (PPO) for their eligible Employees through VSP (the "Vision Plan").  Approximately 230 eligible Employees and dependents are covered under the Debtors' Vision Plan.  The Debtors' monthly cost to provide the Vision Plan is approximately $4,000 of which $700 is funded by withholdings from participating eligible Employees.  The amount due under the Vision Plan is paid 40-days in arrears on a monthly basis.  Currently, the Debtors owe $2,000 in premiums that came due prior to the Petition Date but remain unpaid as of the Petition Date.

**G.      Employee Insurance Benefits.**

26.      In the ordinary course of business, the Debtors provide a variety of insurance benefits (collectively, the "Employee Insurance Benefits").  The eligibility requirements are the same as those set forth above for the Health Benefit Programs and are also broker-billed through Jenkins.  The Employee Insurance Benefits are as follows:

a.      *Life Insurance*.  The Debtors offer basic life and accidental death and dismemberment insurance for their eligible Employees through CIGNA.  Approximately 249

eligible Employees are covered under the Debtors' life insurance benefits. Additionally, employees have the option of purchasing additional life insurance. The life insurance policy is renewable bi-annually and the current bi-annual rates are in place until March 2013. The Debtors' annual cost to provide the insurance coverage is approximately $49,673.

        b.    *Long Term Disability Insurance.* The Debtors offer basic long term disability insurance for their eligible WLH Employees which is administered through CIGNA and which is fully insured. Approximately 189 eligible Employees are covered under the Debtors' long term disability insurance benefits. The Debtors' annual cost to provide the insurance coverage is approximately $70,560. WLH pays the full premium on the first $3,000 of monthly covered earnings and the eligible Employees pay the premium on any covered earnings over $3,000 at a rate of $.40 per $100 of covered monthly earnings. The long term disability policy is renewable bi-annually and the current bi-annual rates are in place until March 2013.

        c.    By this Motion, the Debtors seek authority to continue to provide the Employee Insurance Benefits and to pay any premiums relating to the Life Insurance and Long Term Disability Insurance to the extent they remain unpaid on the Petition Date up to $7,000 in the aggregate.

**H.**    **Other Employee Benefits.**

    27.    *Flex Accounts.* The Debtors also offer two Flexible Spending Accounts (the "Flex Accounts") programs to all WLH Employees. Under the first Flex Account (the "Medical Flex Account"), WLH Employees may contribute up to $2,400 of pre-tax dollars into an account which, may only be used for qualified healthcare related expenses. If an Employee chooses to

- 14 -

participate in the Medical Flex Account, the Debtors withhold the requisite funds from the Employee's paycheck and deposit the funds into the Medical Flex Account. The Debtors do not contribute to the Medical Flex Account or match Employee contributions.

28.     WLH Employees may also contribute up to $5,000 of pre-tax dollars into an account which may only be used for qualified dependent care related expenses (the "Dependent Flex Account"). If an Employee chooses to participate in the Dependent Flex Account, the Debtors withhold the requisite funds from the Employee's paycheck and deposit the funds into the Dependent Flex Account. The Debtors do not contribute to the Dependent Flex Account or match Employee contributions.

29.     The Medical and Dependent Flex Accounts are administered by National Benefits Services, for which the Debtors pay a monthly fee of $360 per month. The Debtors request authority to pay any prepetition amounts that may be owing to National Benefits Services up to $500.

30.     *Supplemental Benefits.* The Debtors maintain a supplemental benefit program (the "Supplemental Benefits Program") available to 23 executives holding positions as vice president and above. Under the Supplemental Benefits Program, the Debtors supplement the Health Benefits Programs insurance coverage by offering reimbursement for all IRS allowable medical expenses not paid by the Health Care Programs up to a maximum limit of $10,297 per covered member. During the prior coverage period of March 2010 through February 2011, the Debtors incurred $37,711 under the Supplemental Benefits Program. The Debtors estimate that there is up to $175,000 of remaining coverage availability under the Supplemental Benefits

- 15 -

Program for which the Debtors may be liable if all covered Employees submit claims up to the cap. The Debtors request authority to continue to honor any prepetition claims submitted on account of the Supplemental Benefits Program up to the remaining coverage availability.

31.     The Supplemental Benefits Program is administered by a third party administrator, Exec-U-Care. On an average annual basis, the Debtors pay Exec-U-Care $12,000 to administer the Supplemental Benefits Program. The Debtors request authority to pay Exec-U-Care up to $1,000 on account of unpaid prepetition fees.

32.     *401(k) Plan.* The Debtors maintain a retirement savings plan for the benefit of their Employees through John Hancock, which meets the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan"). The 401(k) Plan is administered by Strategic Pension Services (the "401(k) Administrator"). The Debtors pay the 401(k) Administrator approximately $9,000 on a yearly basis. As of the Petition Date, the Debtors estimate that one yearly invoice is due. The 401(k) Plan is also audited annually to ensure compliance with the Internal Revenue Code. On an average annual basis, the Debtors pay approximately $10,500 to their auditors, Ahlstrom & Baker, CPAs (the "401(k) Auditors"). In order to maintain the 401(k) Plan, the Debtors must pay the 401(k) Administrator and the 401(k) Auditors for the services that they provide (collectively, the "401(k) Fees"). The Debtors request authority to pay up to $20,000 on account of 401(k) Fees that may be owing as of the Petition Date.

33.     All WLH employees, after completing 30 days of employment, are eligible to participate in the 401(k) Plan. Eligible Employees under the age of 50 can contribute $16,500 per annum and eligible Employees over 50 can contribute $22,000 per annum. There is no

- 16 -

anticipated employer match for 2011. Approximately 153 eligible Employees currently

participate in the 401(k) Plan. There are currently 67 loans that Employees have taken against

their 401(k) Plans totaling approximately $596,000.

34.    *Employee Assistance Program.* The Debtors maintain an employee assistance

program for eligible Employees through the CIGNA Life Assistance Program. The program

includes counseling for alcohol and drug, depression, financial, legal and stress issues. Eligible

WLH employees are able to participate in the Employee Assistance Program. There is no annual

premium for the Employee Assistance Program as such rates are included in the long term

disability premium.

35.    By this Motion, the Debtors seek authority, but not direction, to continue to

provide the Other Employee Benefits to its Employees and in the ordinary course of business and

to honor and pay all accrued obligations related thereto.

**I.    Employee Benefits**

36.    By this Motion, the Debtors request authorization to honor their Vacation Time,

Sick Leave, Short Term Disability, and Leaves of Absence policies in the ordinary course of

business. Moreover, the Debtors anticipate that their Employees will utilize any accrued

Vacation Time, Sick Leave, Short Term Disability, Leave of Absence and Holiday Time in the

ordinary course of business, which will not create any material cash flow requirements beyond

the Debtors' normal payroll obligations.

(i)    Vacation Time

37.     The Debtors provide vacation time to all eligible Employees ("Vacation Time"). Vacation Time begins accruing on the Employees' first day of employment up to a capped amount, which varies based on length of employment.  Employees are eligible to begin using Vacation Time after either six month of employment or twelve months' of employment for Mt. Falls Employees.  Vacation Time can be carried over from year-to-year subject to the maximum caps set forth below:

(a)     WLH Vacation tier

| Tier | Time | Amount of Time | Max |
|------|------|----------------|-----|
| 1 | Start date | 80 hours | 200 hours |
| 2 | 5 Years | 120 hours | 240 hours |
| 3 | 10 years | 160 hours | 280 hours |
| 4 | 25 years | 200 hours | 280 hours |
| | | | |
| Anniversary Vacation Week | Every 5 years | 40 hours | Must be used within 1 year from grant date |

(b)     Mt Falls Vacation tier for non-exempt employees

| Tier | Time | Amount of Time | Max |
|------|------|----------------|-----|
| 1 | 0-90 days | N/A | N/A |
| 2 | 91st day | 10 hours | 200 hours |
| 3 | 1 year | 40 hours | 200 hours |
| 4 | 2-4 years | 80 hours | 200 hours |
| 5 | 5+ YEARS | 120 hours | 200 hours |

(c)     Mt Falls Vacation tier for exempt employees

| Tier | Time | Amount of Time | Max |
|------|------|----------------|-----|
| 1 | 0-30 days | N/A | N/A |
| 2 | 31st day | 3.33 hours | 200 hours |
| 3 | 1 year | 40 hours | 200 hours |
| 4 | 2-4 years | 80 hours | 200 hours |
| 5 | 5+ years | 120 hours | 200 hours |

38.    The Debtors also award WLH Employees a bonus vacation week of 40 hours for every 5 years of employment, which hours do not accrue and must be used within one year from the grant date.  As stated above, the Debtors do not anticipate paying out accrued Vacation Time during these cases and anticipate that Vacation Time will continue to be used in the ordinary course of business.  However, if an Employee leaves or is terminated, the Debtors must pay out accrued Vacation Time under applicable state law.  The Debtors estimate that the total estimated accrued liability for accrued Vacation Time as of November 25, 2011 is $872,600 with respect to WLH Employees and $29,000 with respect to Mt. Falls Employees.  The Debtors request the authority to continue to offer Vacation Time in the ordinary course of business and to pay out any accrued Vacation Time in their sole discretion as may be required under the law.

(ii)    Sick Time

39.    The Debtors provide sick time to all eligible Employees ("Sick Time").  The Employees are eligible to take Sick Time pursuant to the tables below.  Sick Time does not accrue on a year-to-year basis and is not paid out upon termination.  The Debtors request the authority to continue to offer Sick Time in the ordinary course of business.

(a)    WLH Sick Time Tier

| Tier | Time | Amount of Time | Max |
|------|------|----------------|-----|
| 1 | After 90 days | 5 days per illness | 5 days |

(b)    Mt. Falls Sick Time Tier for Non Exempt Full-Time Employees

| Tier | Time | Amount of Time | Max |
|------|------|----------------|-----|
| 1 | 0-90 days | N/A | 96 |
| 2 | 91st day | 12 hours | 96 |
| 3 | 0-2 years | 48 hours | 96 |
| 4 | 2+ years | 96 hours | 96 |

(c)    Mt. Falls Sick Time tier for Exempt Full-Time Employees

| Tier | Time | Amount of Time | Max |
|---|---|---|---|
| 1 | 0-30 days | N/A | 96 |
| 2 | 31st day | 4 hours | 96 |
| 3 | 0-2 years | 48 hours | 96 |
| 4 | 2+ years | 96 hours | 96 |

40.    *Short Term Disability*.  The Debtors offer their eligible WLH Employees short term disability ("Short Term Disability").  The Short Term Disability pays for the difference between the state disability insurance or workers' compensation disability and the Employee's basic weekly earnings for up to 3 months of a medical disability, including maternity leave, depending on the length of the Employees' service as follows:

| Minimum Length of Service | Length of Short Term Disability Per 12-Month Period (including Initial 5 Days of Sick Pay) |
|---|---|
| Under 1 Year | Not Available |
| 1 Year | 1 Month |
| 2 Years | 2 Months |
| 3 Years or More | 3 Months |

41.    As of the Petition Date, there are 3 WLH Employees receiving payments under the Short Term Disability program, which amounts are included in the Unpaid Wages amount set forth above.

42.    In addition, the Debtors allow their full-time Employees to take paid bereavement absences for up to three (3) days in state and up to five (5) days out of state.  The Debtors also offer full time employees leave to serve on juries, 10 days per trial and up to 11 routine paid holidays off per year.

DOCS_DE:176169.2 93949-001

J.      **Workers' Compensation**

43.     Under the laws of the various jurisdictions in which they operate, the Debtors are required to maintain workers' compensation policies and programs to provide Employees with workers' compensation coverage for claims arising from or related to their employment with the Debtors.

44.     Accordingly, the Debtors maintain workers' compensation coverage at the statutorily-required level for each state in which they have Employees, through a workers' compensation policy issued by SeaBright Insurance Company and administered by Marsh Risk & Insurance Services (the "Workers' Compensation Insurance Policy"). The Workers' Compensation Insurance Policy provides statutory benefits to employees resulting from bodily injury by accident or bodily injury by disease in the course and scope of employment on a no-deductible, no run-off basis. The current term of the Workers' Compensation Insurance Policy commenced on July 1, 2011 and expires on July 1, 2012. The Debtors' annual premium is $266,268 for this coverage, which is payable in 10 progressive installments. To date, the Debtors have paid $152,883 of the premium, and $113,385 remains to be paid.

45.     The Debtors average approximately five to ten workers compensation claims per year. Currently, there are seven Employees or former Employees collecting workers' compensation under the Workers' Compensation Insurance Policy. The Debtors expect that all expenses related to workers compensation will be covered by the Workers' Compensation Insurance Policy described above.

46.    By this Motion, the Debtors seek authority to (a) continue to maintain the

Workers' Compensation Insurance Policy in the ordinary course of business; and (b) pay up to

$113,385 in unpaid premiums under the Workers' Compensation Insurance Policy.


**K.    Non-Debtor Services**

47.    The Debtors' Employees provide certain services to their Chairman and his third-

party companies in the ordinary course of business, which the Debtors request they be allowed to

continue in the ordinary course of business on the terms set forth below.

48.    Pursuant to the terms of a Human Resources and Payroll Services Agreement, the

Debtors provide human resource services to Lyon Management Group, Inc. ("LMGI") to

administer payroll and related human resources services for LMGI employees.  LMGI is partially

owned by the Debtors' Chairman, General William Lyon.  On a monthly basis, LMGI

reimburses the Debtors with a flat fee and a $23 dollar per month fee per covered LMGI

employee.  On an average monthly basis, the Debtors bill LMGI approximately $30,000 a

month.  As of the Petition Date, LMGI has reimbursed the Debtors for all invoices that that have

been billed.  The LMGI contract is a net positive contract for the Debtors.

49.    Two of the Debtors' Employees (the "Personal Employees") provide services to

General Lyon for his own personal services or to other entities that may be owned by General

Lyon that are unaffiliated with LMGI.  The Debtors pay these Employees and General Lyon

reimburses the Debtors for the full amount of the Personal Employees' salary plus a 30%

premium to cover benefits and employer taxes for the Personal Employees.  This is a net-neutral arrangement for the Debtors.

50.     Finally, the Debtors' tax staff have helped General Lyon and/or companies owned by him in the preparation of their tax returns each year.  General Lyon reimburses the Debtors at the Debtors' cost for the time spent by their Employees plus a premium to cover overhead, benefits and employer taxes for the Employees who work on his matters.  As of the Petition Date, General Lyon has reimbursed the Debtors for all outstanding invoices on account of the tax work.  This tax arrangement is a net-neutral arrangement for the Debtors.

## BASIS FOR REQUESTED

51.     The relief requested in this Motion is authorized pursuant to sections 105(a), 363(b)(1) and (c)(1), and 507(a) of the Bankruptcy Code and the "necessity of payment" doctrine (discussed *infra*).  Bankruptcy Code section 363(b)(1) authorizes a debtor in possession to use property of the estate other than in the ordinary course of business after notice and a hearing.  Bankruptcy Code section 363(c) authorizes a debtor in possession to enter into transactions in the ordinary course of business without notice and a hearing.  Bankruptcy Code section 105(a) further provides, in pertinent part, that this Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code.

52.     The relief requested in this Motion is supported by the well-established "necessity of payment" doctrine.[3]  The "necessity of payment" doctrine, which has been embraced by the

---

[3]The doctrine was first articulated by the Supreme Court in railroad reorganization cases, *see Miltenberger v. Logansport Ry.*, 106 U.S.  286 (1882), and it has been held to be equally applicable to non-railroad debtor cases. *See, e.g., Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir.  1945) (hotel); *In re Gulf Air, Inc.*, 112 B.R.  152, 153 (Bankr.  W.D.  La.  1989) (airline).

Third Circuit, "teaches no more than, if payment of a claim which arose prior to reorganization is

essential to the continued operation of the [business] during reorganization, payment may be

authorized even if it is made out of corpus." *In re Lehigh & New England Ry. Co.*, 657 F.2d 570,

581 (3rd Cir. 1981). *See also In re Sharon Steel Corp.*, 159 B.R. 730, 737 (Bankr. W.D. Pa.

1993) (embracing "necessity of payment" doctrine and citing *Lehigh & New England Ry. Co.*

with approval).  Similarly, the court in *In re Ionosphere Clubs, Inc.*, 98 B.R. 174 (Bankr.

S.D.N.Y. 1989), stated that the "necessity of payment" doctrine "recognizes the existence of the

judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such

payment is essential to the continued operation of the debtor." *Id.* at 176.  In that case, the court

permitted Eastern Air Lines, Inc., to pay its current employees' prepetition wages, salaries,

medical benefits, and business expense claims.  Judge Lifland relied on his equitable powers

under Bankruptcy Code section 105(a) and, in particular, the "necessity of payment" doctrine to

authorize such payments, recognizing that the debtor had to make the payments in order to retain

its current employees and maintain positive employee morale—two factors that he deemed

critical to the rehabilitation of an operating debtor.  *Id.* at 176-77 (*citing* H.R. Rep. No. 595 95th

Cong. 1st Sess. 16 (1977)).  Other courts also have found that the "necessity of payment"

doctrine applies to the payment of prepetition employee compensation and benefits.  *See In re*

*Chateaugay Corp.*, 80 B.R. 279, 281 (Bankr. S.D.N.Y. 1987) (under the "necessity of payment"

doctrine, bankruptcy court should defer to the debtor's business judgment in permitting payment

of certain workers' compensation claims).

53.     This Court similarly has approved the payment of prepetition claims of employees for wages, salaries, independent contractor obligations, expenses, and benefits on the grounds that the payment of such claims was necessary to effectuate a successful reorganization or liquidation. *See, e.g., In re PTL Holdings LLC, et al.* Case No. 11-12676 (BLS) (Bankr. D. Del. Aug. 25, 2009); *In re Point Blank Systems, Inc., et al.,* Case No. 10-11255 (PJW) (Bankr. D. Del. April 14, 2010); *In re DHP Holdings II Corp., Case No. 08-183422* (Bankr. D. Del. Jan. 5, 2009); *In re EZ Lube, LLC., Case No. 08-13256 (CSS)* (Bankr. D. Del. Dec. 10, 2008); *In re Filene's Basement, Inc.,,* Case No. 09-11525 (MFW) (Bankr. D. Del. May 5, 2009); *In re NetEffect, Inc.,* Case No. 08-12008 (KJC) (Bankr. D. Del. Aug. 28, 2008); *In re Western Nonwovens Inc.,* Case No. 08-11435 (PJW) (Bankr. D. Del. Jul. 15, 2008); *In re Global Motorsport Group, Inc.,* Case No. 08-10192 (KJC) (Bankr. D. Del. February 1, 2008); *In re Answer Financial Inc.,* Case No. 08-10140 (MFW) (Bankr. D. Del. Jan. 23, 2008); *In re Aegis Mortgage Corporation,* Case No. 07-11119 (BLS) (Bankr. D. Del. Aug. 15, 2007); *In re Mortgage Lenders Network USA, Inc.,* Case No. 07-10146 (Bankr. D. Del. Feb. 7, 2007) (PJW); *In re Global Home Products LLC, et al.,* Case No. 06-10340 (Bankr. D. Del. April 11, 2006)(KG); *In re Proxim Corp.,* Case No. 05-11639 (PJW) (Bankr. D. Del. June 15, 2005); *In re Maxide Acquisition, Inc.,* Case No. 05-10429 (MFW) (Bankr. D. Del. Feb. 15, 2005); *In re Redback Networks, Inc.,* Case No. 03-13359 (MFW) (Bankr. D. Del. Nov. 5, 2003).

54.     The "necessity of payment" doctrine authorizes the Debtors to pay the amounts they seek authority to pay pursuant to this Motion because the Debtors' Employees are critical

assets necessary both to the Debtors' operations and the successful prosecution of these Chapter

11 Cases.

55.    Pursuant to section 507(a)(4) of the Bankruptcy Code, claims of Employees of the

Debtors for "wages, salaries, or commissions, including vacation, severance, and sick leave pay"

earned within 180 days before the Commencement Date are afforded priority unsecured status to

the extent of $11,725 per Employee.  The Debtors believe that most of the Wages relating to the

period prior to the Petition Date constitute priority claims under sections 507(a)(4) of the

Bankruptcy Code.  As priority claims, the Wages must be paid in full before any general

unsecured obligations of the Debtors may be satisfied.  Accordingly, the relief requested may

affect only the timing of the payment of these priority obligations, and will not prejudice the

rights of general unsecured creditors or other parties in interest.

56.    Pursuant to the relief requested herein, the Debtors request authority only to pay

up to the $11,725 statutory cap under Bankruptcy Code section 507(a)(4) to each Employee on

account of all unpaid Wages collectively owing to such Employee.[4]

57.    Many Employees live from paycheck to paycheck and rely exclusively on

receiving their full compensation or reimbursement of their expenses in order to continue to pay

their daily living expenses.  These Continuing Employees may be exposed to significant

financial and healthcare related problems if the Debtors are not permitted to pay and/or honor the

Wages and Benefits, and the expenses associated therewith, in the ordinary course of the

Debtors' business.  Moreover, the Debtors believe that if they are unable to honor accrued

---

[4] In the event any unpaid amounts owing to any Employee on account of unpaid Wages exceed the $11,725 statutory cap, the Debtors reserve the right to petition the Court for authority to pay such amounts.

DOCS_DE:176169.2 93949-001

Wages and the Benefits described above, employee morale and loyalty will be jeopardized at a time when employee support is critical.

58.    Additionally, the Withholding do not constitute property of the Debtors' estates and principally represent Employee earnings that governments (in the case of the Payroll Taxes), or Employees (in the case of voluntary Deductions) have designated for deduction from Employee paychecks. The failure to transfer these withheld funds could result in hardship to certain Employees.

59.    Finally, the Debtors submit that, with respect to the wage-related taxes that constitute "trust fund" taxes, the payment of such taxes will not prejudice other creditors of the Debtors' estates given that the relevant taxing authorities would have priority claims under section 507(a)(8) of the Bankruptcy Code in respect of such obligations. Moreover, the monies payable for trust fund taxes, as well as the other funds that are held in trust for the benefit of third parties, such as withheld funds with respect to the 401(k) Plan, are not property of the Debtors' estates. *See, e.g., Begier v. IRS*, 496 U.S. 53 (1990) (withholding taxes are property held by a debtor in trust for another and, as such, are not property of the debtor's estates).

60.    The Employees have an intimate knowledge of the operation of the Debtors' business and are critical components to the success of these Chapter 11 Cases. Deterioration in the morale and welfare of the Employees at this critical time undoubtedly would adversely impact the Debtors and their ability to maximize the value of their assets. Satisfaction of the Wages and Benefits, as described herein, is necessary to maintain the Employees' morale during

these cases and to insure continued, efficient operation in order to maximize value for all

creditors.

**Request for Authority for Banks and Other Financial Institutions
to Honor Checks Issued to Pay Wages and Benefits, to Honor All
Fund Transfer Requests Relating to the Foregoing, and to Pay All
Processing Fees Associated with Payment of Employee Wages and Benefits**

61.    The Debtors request that all applicable banks and other financial institutions be

authorized to receive, process, honor, and pay all checks presented for payment and to honor all

fund transfer requests made by the Debtors to Employees, whether such checks were presented

or fund transfer requests were submitted prior to, on, or after the Petition Date.  The Debtors

represent that they have (or will have) sufficient postpetition funding to pay promptly all Unpaid

Wages and other Employee Obligations to the extent described herein, on an ongoing basis.

Further, the Debtors seek to retain the discretion to decide which Employee Obligations they will

pay and honor, and nothing in this Motion shall be deemed an admission by the Debtors that any

Employee Obligations will in fact be paid or honored.

62.    Pursuant to Rule 6003(b) of the Federal Rules of Bankruptcy Procedure, which

became effective December 1, 2007, "a motion to pay all or part of a claim that arose before the

filing of the petition" shall not be granted by the Court within 20 days of the Petition Date

"[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm . . . ."

Fed. R. Bankr. P. 6003(b).  For the reasons described more fully above and as supported by the

Zaist Declaration, the Debtors submit that the requirements of Rule 6003 have been met and that

the relief requested in this Motion is necessary to avoid immediate and irreparable harm.

63.     For the same reasons stated above, the Debtors request that the Court waive

Bankruptcy Rule 6004(h), which provides that an "order authorizing the use, sale, or lease of

property . . . is stayed until the expiration of 14 days after entry of the order, unless the court

orders otherwise." *Id.* (emphasis added).  As described above, the ability to pay the Employees

in the ordinary course of business is critical to the Debtors' ability to continue to build homes

and deliver homes.  Any failure by the Debtors to pay the Employees in the ordinary course of

business during the first fourteen days of these cases will jeopardize the Debtors' ability to

reorganize and cause undue and unnecessary hardship to the Employees.

64.     Nothing in this Motion shall be construed as a request for authority to assume any

executory contract under Section 365 of the Bankruptcy Code.

### Notice

65.     Notice of this Motion has been given to the following parties or, in lieu thereof, to

their counsel, if known:  (i) the Office of the United States Trustee for the District of Delaware;

(ii) counsel to the Prepetition Secured Lenders and proposed DIP Lender; (iii) counsel to the Ad

Hoc Noteholders Group; and (iv) counsel to the Backstop Investors.

66.     As the Motion is seeking "first day" relief, within two business days of the

hearing on the Motion, the Debtors will serve copies of the Motion and any order entered

respecting the Motion as required by Del. Bankr. LR 9013-1(m).  The Debtors submit that, in

light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request entry of an order (i) granting the relief

requested herein and (ii) granting the Debtors such other and further relief as the Court deems

just and proper.

Dated:  December 19, 2011

PACHULSKI STANG ZIEHL & JONES LLP

By: _____
Richard M. Pachulski (CA Bar No. 90073)
Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Joshua M. Fried (CA Bar No. 181541)
Shirley S. Cho (CA Bar No. 192616)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
e-mail:      rpachulski@pszjlaw.com
             ljones@pszjlaw.com
             dbertenthal@pszjlaw.com
             jfried@pszjlaw.com
             scho@pszjlaw.com
             tcairns@pszjlaw.com

[Proposed] Counsel for the Debtors and Debtors in Possession