IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WILLIAM LYON HOMES, *et al.*,[1] | ) | Case No. 11-14019 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**MOTION OF DEBTORS PURSUANT TO BANKRUPTCY
CODE SECTIONS 105(A) AND 363(B) APPROVING CERTAIN RIGHTS
OFFERING PROCEDURES AND FORMS IN CONNECTION THEREWITH**

William Lyon Homes, a Delaware corporation ("DE Lyon") and its affiliated

debtors and debtors in possession (collectively, the "Debtors" or the "Company") file this motion

(the "Motion") for entry of an order, substantially in the form attached hereto as Exhibit A:

(a) setting the Rights Offering Record Date as December 19, 2011; (b) authorizing the Debtors to

carry out a rights offering (the "Rights Offering") to issue and sell in a private placement to

certain accredited investors new capital stock in the reorganized William Lyon Homes (the

"Reorganized Parent") for $60 million in cash, in the manner described herein; and (c) approving

(i) the *William Lyon Homes Convertible Preferred Stock and Class C Common Stock*

*Subscription Agreement* and related subscription form (collectively, the "Subscription

Agreement"), copies of which are attached hereto as Exhibit B, (ii) a Registration Agreement,

---

[1] The debtors and debtors in possession in these cases and the last four digits of their respective taxpayer identification numbers are as follows:  William Lyon Homes (4902); William Lyon Homes, Inc. (3855); Mountain Falls Golf Course, LLC (3291); Mountain Falls, LLC (9631); Circle G at the Church Farm North Joint Venture, LLC (1322); Presley CMR, Inc. (3862); William Lyon Southwest, Inc. (8474); Sycamore CC, Inc. (1307); PH-LP Ventures (9119); PH Ventures – San Jose (5089); HSP, Inc. (6045); PH Rielly Ventures (7710); Lyon Waterfront, LLC (1928); Lyon East Garrison Company I, LLC (5692); WLH Enterprises (3333); Duxford Financial, Inc. (0824); California Equity Funding, Inc. (0016); Laguna Big Horn, LLC (2590); Presley Homes (5035); Cerro Plata Associates, LLC (5090); Whitney Ranch Village 5, LLC (5256); and Duxford Insurance Services, LLC (8232). The Debtors' mailing address is 4490 Von Karman Avenue, Newport Beach, CA 92660.

providing certain registration rights for the purchasers in the Rights Offering and other investors in new capital stock of Reorganized Parent (the "Registration Agreement"), a copy of which is attached hereto as Exhibit C; and (iii) approving the proposed procedures governing the Rights Offering described in this Motion (the "Rights Offering Procedures"); and (iv) granting related relief.  In support of this motion, the Debtors respectfully state as follows:

**Jurisdiction**

1.      This Court has jurisdiction pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105(a), 363(b), and 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

**Background**

A.      **General Background**

4.      On the date hereof (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors have requested joint administration of the above captioned cases.

5.      The Debtors have continued in possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

DOCS_DE:176138.3 93949-001

6.    No request has been made for the appointment of a trustee or an examiner in this case, and no official committee has yet been appointed by the Office of the United States Trustee.

7.    The factual background regarding the Debtors, including their current and historical business operations and the events precipitating the chapter 11 filing, are set forth in detail in the *Declaration of Matthew R. Zaist, Executive Vice President of William Lyon Homes, in Support of First Day Motions* (the "Zaist Declaration") filed concurrently herewith and incorporated herein by reference. The Debtors are homebuilders with operations in Northern and Southern California, Arizona and Nevada.

8.    On the Petition Date, the Debtors filed the *Prepackaged Joint Plan of Reorganization for William Lyon Homes, et al.* dated November 17, 2011 (the "Plan")[2] and related disclosure statement (the "Disclosure Statement"). The Plan represents a significant milestone for the Company and embodies the agreement reached with their major debt holders. If confirmed, the Plan will reduce the Company's leverage by approximately $182 million in funded note indebtedness, restructure the Company's primary secured credit facility, and provide for new equity capital investments of $85 million in the aggregate. Based on a prepetition solicitation of the Plan, the Plan has been overwhelmingly approved by those voting classes of creditors who are impaired under the Plan – (i) the Prepetition Secured Term Loan Agreement; and (ii) the Old Notes. Significantly, other than the holders of Prepetition Secured Term Loan Agreement Claims, Old Notes Claims, and equity holders of DE Lyon (whose interests are being

---

[2] Unless otherwise noted, capitalized terms used in the Motion have the meanings ascribed in the Plan.

cancelled), the Plan provides for the Debtors' remaining creditors to be unimpaired, which may not have been possible absent the agreements reached under the Plan. The Plan will allow the Company to improve its liquidity position from its operations and be well-positioned going forward.

### Factual Background

#### A.    Significant Prepetition Indebtedness

9.    As of September 30, 2011, the majority of the Debtors' outstanding funded indebtedness was on account of: (i) $206 million of secured indebtedness owing to their prepetition secured lenders under their Prepetition Secured Loan Agreement (discussed below); and (ii) $283.2 million of unsecured indebtedness on account of three series of note issuances (the "Old Notes").

#### B.    The Prepetition Secured Loan

10.    William Lyon Homes, Inc., a California Corporation ("CA Lyon") is a borrower under the Senior Secured Term Loan Agreement, dated October 20, 2009, as amended from time to time (the "Prepetition Secured Loan Agreement"), by and among CA Lyon, ColFin WLH Funding, LLC, as Administrative Agent, Initial Lender and Lead Arranger (in such capacity, the "Administrative Agent"), and the other lenders party thereto (the "Prepetition Secured Lenders").[3]

---

[3] At the end of this last waiver period, the Debtors and the Prepetition Secured Lenders engaged in extensive negotiation of the terms of the Debtors' proposed restructuring, but the parties did not reach an agreement on a further extension of the waiver.

- 4 -

11.     The Prepetition Secured Loan Agreement governs a secured term loan in the aggregate principal amount of $206,000,000, bearing interest at 14% per annum, payable monthly.  Immediately prior to the Petition Date, the scheduled maturity date for the Prepetition Secured Loan was October 20, 2014 and the outstanding principal amount was $206,000,000.[4] Based on such outstanding balance of the Prepetition Secured Loan, interest payments were approximately $28.8 million annually

12.     DE Lyon guaranteed absolutely, irrevocably and unconditionally, as a guarantee of payment and not merely of collection, prompt payment in full when due, whether at stated maturity, of any and all Obligations upon acceleration or otherwise, amounts due under the Prepetition Secured Loan Agreement.[5]

## C.     The Old Notes

13.     Also prior to the Petition Date, CA Lyon issued three series of unsecured notes prepetition (the "Old Notes").  The first series was issued in an aggregate principal amount of $150 million in 2004, bears a 7 ⅝% interest rate, and is due on December 15, 2012 (the "7 ⅝% Senior Notes"); the second was issued in an aggregate principal amount of $250 million in 2003, bears a 10 ¾% interest rate, and is due on April 1, 2013 (the "10 ¾% Senior Notes"); the third was issued in an aggregate principal amount of $150 million in 2004, bears a 7 ½% interest rate, and is due on February 15, 2014 (the "7 ½% Senior Notes" and, together with the 7 ⅝%

---

[4] Pursuant to a compromise with respect to certain make whole amounts and exit fees provided in the Prepetition Secured Loan Agreement to be effected if and when the Plan is consummated, the principal amount due and owing under the Prepetition Secured Loan Agreement will be increased from $206,000,000 to $235,000,000.

[5] As discussed in greater detail in Section II.C.1 of the Disclosure Statement, the Prepetition Secured Loans are secured by senior liens on substantially all of the assets of DE Lyon and CA Lyon, but excluding specified "Excluded Property."

Senior Notes and the 10 ¾% Senior Notes, the "Old Notes"). Interest on the Old Notes is payable semi-annually.

14.     The Old Notes are unconditionally guaranteed on a senior unsecured basis by the following Debtors (the "Prepetition Guarantors"): DE Lyon; California Equity Funding, Inc.; PH-LP Ventures; Duxford Financial, Inc.; Sycamore CC, Inc.; Presley CMR, Inc.; William Lyon Southwest, Inc.; PH-Reilly Ventures; HSP, Inc.; PH Ventures-San Jose; WLH Enterprises, formerly Carmel Mountain Ranch; Lyon Waterfront, LLC; and Lyon East Garrison Company I, LLC.

15.     As a result of previous redemptions in 2010, the 7 ⅝% Senior Notes have a current outstanding balance of approximately $66.7 million; the 10 ¾% Senior Notes, approximately $139.3 million; and the 7 ½% Senior Notes, approximately $77.9 million. Each of the series of Old Notes is governed by an indenture (each, a "Prepetition Indenture," and collectively, the "Prepetition Indentures") by and among CA Lyon as issuer, DE Lyon and the other Prepetition Guarantors, and U.S. Bank National Association, as Trustee (the "Prepetition Indenture Trustee"). The Old Notes now have an aggregate outstanding amount of $283.8 million in principal and approximately $299.5 million in the aggregate after including interest and fees. The outstanding balance of the Old Notes per the Company's financial statements changes monthly due to the amortization of Original Interest Discount on account of the 10 ¾% Senior Notes.

16.     In early 2011, an ad hoc group of entities holding Old Notes (the "Ad Hoc Noteholders Group") was formed. As of November 10, 2011, the members of the Ad Hoc

Noteholders Group who are parties to the Noteholders RSA hold an aggregate of approximately 63.5% in principal of the Old Notes.

**D.    The Prepetition Restructuring**

17.    After several weeks of active and arm's-length negotiations, the Debtors, in consultation with their advisors, reached prepetition agreements in principle with their Prepetition Secured Lenders and the Ad Hoc Noteholders Group holding 63.5% in principal amount of claims arising from the Old Notes (the "Old Notes Claims"), on a prepackaged restructuring plan, including the key terms of the restructured Prepetition Secured Loan Agreement, distributions under the Plan to holders of Old Notes Claims, and the treatment of general unsecured claims.

18.    As of September 30, 2011, the Debtors had outstanding total funded indebtedness in the principal amount of approximately $509.8 million.  Upon emergence from chapter 11, pursuant to the Plan, the Debtors expect to have outstanding debt of approximately $327.8 million.  Accordingly, the Reorganized Debtors (as defined in the Plan) will have an improved balance sheet and more appropriate capital structure.  In addition to the reduction of indebtedness of the Debtors upon emergence from chapter 11, the Debtors also expect to benefit from an annual decrease in cash interest obligations of approximately $24.7 million, comprised of $19.9 million annual reduction associated with the conversion to equity of a portion of the Old Notes and $4.8 million annual reduction resulting from the reduction in interest rate from 14% under the Prepetition Secured Loan Agreement to 10¼% under the Restructured First Lien Loan Agreement.

19.     Other than the holders of Old Notes and the Prepetition Secured Loan Agreement Claims whose claims are the subject of the proposed restructuring under the Plan, and old equity, whose interests are being cancelled under the Plan, all of the Debtors' other creditors, including general unsecured creditors, are Unimpaired under the Plan within the meaning of section 1124 of the Bankruptcy Code, and deemed to vote in favor of the Plan pursuant to section 1126(f) of the Bankruptcy Code.

20.     The Company believes that the prepackaged restructuring Plan is the best restructuring alternative reasonably available to the Company.  In order to effect the provisions of the Plan, the Company has succeeded in securing commitments for new equity capital investments aggregating $85 million, in two separate private placements: (a) a commitment to backstop the entire proposed Rights Offering in the amount of $60 million in cash on the terms set forth in the Backstop Commitment Agreement should the Rights Offering not otherwise be fully subscribed, and (b) an additional commitment for $25 million pursuant to the Class B Common Stock Purchase Commitment Agreement, in the form of cash or a combination of cash and, subject to certain conditions, membership interests in certain limited liability companies that hold real property, to be provided by the Company's current equity owners.  The Company plans to utilize the proceeds of these investments to fund its working capital requirements, and to make certain distributions under the Plan.  After extensive efforts to seek new equity capital, the Company believes that the Rights Offering (inclusive of the Backstop Commitment Agreement) and the Class B Common Stock Commitment Agreement represent the best terms for equity financing available to the Company in this market.

- 8 -

21.    The Plan represents a significant achievement for the Company and should greatly enhance the Company's ability to reorganize successfully and expeditiously through the addition of $85 million of new equity capital pursuant to the Rights Offering and Class B Common Stock Purchase Commitment Agreement.  The Plan will also provide an efficient restructuring through the prepackaged process, designed to minimize disruption to the Company's business endeavors, stabilize the Company's balance sheet, and provide a platform for future success.  Through confirmation of the Plan implementing the terms of the pre-packaged restructuring, the Company will restructure and substantially deleverage its balance sheet; reduce its cash interest expense to a level that is aligned with its expected future cash flows; retain additional flexibility to invest in growth initiatives to maximize enterprise value; and maintain favorable pricing to the Company under the Prepetition Secured Loan Agreement. The Company also will improve its liquidity position.  For all of these reasons and the proposed DIP financing (described in greater detail in the Zaist Declaration) and the concurrently filed motion for DIP financing, the Company believes that it will have sufficient liquidity during the course of the Chapter 11 Cases and will be well-positioned going forward.

E.    **Solicitation of the Prepackaged Plan**

22.    Prior to the Petition Date, beginning on November 17, 2011 through December 16, 2011, the Debtors solicited votes to accept or reject the Plan (the "Solicitation"). Claim holders entitled to vote under the Plan (i.e., Class 4 – Prepetition Secured Loan Agreement Claims and Class 7 – Old Notes Claims) (the "Voting Classes") voted overwhelmingly to accept

- 9 -

the Plan, thus satisfying the statutory percentages specified in section 1126(c) of the Bankruptcy Code.

23.     The Solicitation Packages, including the ballots on the Plan, were distributed by the Debtors' voting and solicitation agent, Kurtzman Carson Consultants LLC ("KCC") on November 17, 2011 to those holders of Claims in the Voting Classes.  The Voting Deadline was established as December 16, 2011, or 29 days from the start of the Solicitation period.  Votes received by the Voting Deadline that complied with the voting instructions were then tabulated by KCC.  A more detailed declaration of the voting tabulation is set forth in the *Declaration of Peter Walsh of Kurtzman Carson Consultants LLC Regarding the Mailing, Voting and Tabulation of Ballots Accepting and Rejecting Prepackaged Joint Chapter 11 Plan of Reorganization for William Lyon Homes, et al.* (the "Voting Declaration"), filed concurrently herewith.

## The Rights Offering

24.     Under the Rights Offering incorporated in the Plan, holders of Class 7 Old Notes Claims that are (i) "accredited investors" as defined in Rule 501(a) of Regulation D under the Securities Act and (ii) hold at least $500,000 in outstanding principal amount of Old Notes as of the Rights Offering Record Date (the "Eligible Participants"), shall receive the right (the "Subscription Rights") to purchase a percentage of the shares of new Class C Common Stock (the "Class C Common Shares"), to be offered for an aggregate purchase price of $10 million, together with the same pro rata percentage of the shares of new Convertible Preferred Shares (the "Preferred Shares") to be offered for an aggregate purchase price of $50 million (the Class C

- 10 -

Common Shares and the Preferred Shares, collectively constitute the "Rights Offering Securities")[6] in each case, issued by Reorganized Parent.[7] The Reorganized Parent shall issue 16,110,366 Class C Common Shares, and 64,831,831 Preferred Shares. The Subscription Rights are not transferrable.

25.    Each Eligible Participant shall have the right, but not the obligation, to exercise its Subscription Rights and purchase Rights Offering Securities. If an Eligible Participant decides to exercise its Subscription Rights, the Eligible Participant must indicate the amount of the investment it desires to make up to a maximum amount of $40 million (such Eligible Participant's "Bid"). Eligible Participants may only invest in Rights Offering Securities in the proportion of one Class C Common Share for every five Preferred Shares, and may not elect any other proportional allocation. In the event that the Rights Offering is over-subscribed, (a) the Backstop Investors reserve the right to purchase up to $20 million of the Rights Offering Securities, and (b) of the remaining $40 million, each other (non-backstop) Eligible Participant shall be entitled to purchase Rights Offering Securities (in the form of one Class C Common Share for each five Preferred Shares) in an amount pro-rated on the basis of the ratio of its Bid to the aggregate Bids of all other such (non-backstop) Eligible Participants. In the event that the Rights Offering is under-subscribed, all Rights Offering Securities that are not purchased by

---

[6] The Debtors believe that the Rights Offering Securities, as provided under the Plan, will be exempt from the registration requirements of the Securities Act, pursuant to section 4(2) of the Securities Act, as transactions by an issuer not involving any public offering, and equivalent exemptions in state securities laws.

[7] All Rights Offerings Securities shall be subject to the terms and conditions of the Amended and Restated Certificate of Incorporation Reorganized William Lyon Homes (the "Certificate of Incorporation"). A copy of the Certificate of Incorporation has been filed with the Plan and a copy is attached as Exhibit 2 to Exhibit B to this Motion.

- 11 -

Eligible Participants shall be purchased by the Backstop Investors after the Bid Remittance

Deadline but in all events, no later than the Effective Date.

### The Rights Offering Procedures

26.     As soon as practicable following the entry of the order approving this

Motion, Kurtzman Carson Consultants, LLC, as the Debtors' rights offering agent (the "Rights

Offering Agent"), will distribute the Subscription Agreements, by courier, overnight courier and

electronic mail, to brokers, dealers, commercial banks, trust companies or other nominees (each,

a "Nominee") for subsequent forwarding to Eligible Participants.

27.     The Rights Offering will commence on the date that the Subscription

Agreements are first provided to Nominees (the "Subscription Commencement Date") and will

end thirty days after the Subscription Commencement Date (the "Subscription Expiration Date").

The Subscription Commencement Date shall occur within five days of the Court entering an

Order approving this Motion.

28.     Each Eligible Holder intending to participate in the Rights Offering must

affirmatively elect to exercise its Subscription Rights on or before 5:00 pm (prevailing Eastern

Time) on the Subscription Expiration Date.  To exercise its Subscription Rights, an Eligible

Holder must return a validly signed Subscription Agreement, including the subscription form

attached to the Subscription Agreement transmitted in connection with the Rights Offering, to its

Nominee who held such Old Notes Claim as of the Rights Offering Record Date.  Nominees of

Eligible Participants must forward the completed Subscription Agreements to the Rights

- 12 -

Offering Agent along with completed master subscription forms, so that these are actually received by the Rights Offering Agent on or before the Subscription Expiration Date.

29.    After the Subscription Expiration Date passes, the Rights Offering Agent will tally all Bids to determine if the Rights Offering was oversubscribed. Within 3 business days of the Subscription Expiration Date, the Rights Offering Agent will transmit,[8] to each Eligible Holder that returned a Subscription Agreement (each, a "Purchaser"), a document (the "Bid Report Sheet") informing the Eligible Holder of the number of shares that it purchased and the amount of money that it must transmit to the Company. Simultaneously, the Rights Offering Agent will transmit to the Backstop Investors a document informing the Backstop Investors of the number of Rights Offering Securities that have not been subscribed, and the amount of money required to be transmitted by the Backstop Investors with respect to those Rights Offering Securities. Within five days of the date the Rights Offering Agent transmits the Bid Report Sheet to the Purchasers, unless such date is extended in the reasonable discretion of the Debtors (the "Bid Remittance Deadline"), each Purchaser must transmit the required funds (the "Bid Funds"), by wire transfer, to the Rights Offering Agent in accordance with the provisions and instructions set forth in the Subscription Agreement. Further, if a Participant fails to remit the Bid Funds by the Bid Remittance Deadline, the Company may sell the Rights Offering Securities subject to the Eligible Participant's Bid to the Backstop Investors without further notice to the Eligible Participant, and such Eligible Participant shall not be entitled to participate in the Rights

---

[8] The Rights Offering Agent will distribute the Bid Report Sheets, by courier, overnight courier and electronic mail.

Offering.  The exercise of Rights Offering Securities by an Eligible Participant shall be irrevocable.

30.     Within five days of the Bid Remittance Deadline, the Rights Offering Agent will transmit to the Backstop Investors a document informing the Backstop Investors of the amount of Bid Funds that were not received by the Bid Remittance Deadline, and the number of Rights Offering Securities associated with those Bid Funds.  Any Rights Offering Securities that are not purchased by Eligible Participants, either because such Rights Offering Securities were not subscribed or due to the failure of an Eligible Participant to deliver its Bid Funds, shall be purchased by the Backstop Investors after the Bid Remittance Deadline but in all events, no later than the Effective Date.

31.     The payments received by the Debtors in connection with the Rights Offering shall be deposited and held by the Rights Offering Agent in a trust account or similarly segregated account or accounts for the purpose of holding such money for the benefit of the Reorganized Parent upon the closing of the Rights Offering until the Effective Date.  The Rights Offering Agent shall not remit the Bid Funds to Debtors prior to the Effective Date and the Bid Funds shall not be encumbered with any liens or encumbrances.

32.     Upon the occurrence of the Effective Date, the Rights Offering Agent shall immediately distribute the Bid Funds to the Reorganized Parent pursuant to the terms of the Plan.  As soon as practicable after the Reorganized Parent receives the Bid Funds, the Reorganized Parent will issue the Rights Offering Securities to the Eligible Participants and contribute the Bid Funds to the capital of CA Lyon.

- 14 -

33.     All questions concerning the timeliness, validity, form, and eligibility of any exercise, or purported exercise, of Subscription Rights shall be determined by the Debtors. The Debtors, in their discretion, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any Subscription Rights. A Subscription Agreement shall be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtors determine in their discretion. The Debtors will use commercially reasonable efforts to give written notice to any Eligible Participant regarding any defect or irregularity in connection with any purported exercise of Subscription Rights by such Person and may permit such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate; provided, however, that neither the Debtors nor the Reorganized Debtors shall incur any liability for giving, or failing to give, such notification and opportunity to cure.

34.     If the Rights Offering Agent does not receive a validly completed Subscription Agreement in accordance with the instructions set forth therein prior to the Subscription Expiration Date from an Eligible Participant, such Eligible Participant will be deemed to have relinquished and waived its right to participate in the Rights Offering. The Company will not be obligated to honor any purported exercise of Subscription Rights received after the Subscription Expiration Date, regardless of when the documents relating to such exercise were sent.

35.     Further, if an Eligible Participant fails to remit the Bid Funds by the Bid Remittance Deadline, the Company may sell the Rights Offering Securities subject to the

Eligible Participant's Bid to the Backstop Investors without further notice to the Eligible Participant.

36.     These above-stated procedures (the "Rights Offering Procedures") have been designed to efficiently transmit all materials necessary for participation in the Rights Offering and to allow the Eligible Participants an adequate opportunity to participate in the Rights Offering.

### Relief Requested

37.     By this motion, the Debtors seek entry of an order: (a) setting the Rights Offering Record Date as December 19, 2011; (b) authorizing the Debtors to carry out the Rights Offering to issue and sell in a private placement to certain accredited investors new capital stock in the Reorganized Parent in the manner described herein; and (c) approving (i) the Subscription Agreement, and (ii) the Registration Agreement.

### Basis For Relief

38.     Section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  In the Third Circuit, courts have authorized the use or sale of property of the estate outside the ordinary course of business when such use or sale is grounded upon a "sound business purpose" and is proposed in good faith.  *See In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999);

- 16 -

*In re Decora Indus., Inc.*, No. 00-4459, 2002 WL 32332749, at * 7 (D. Del. May 20, 2002); *In re Exaeris, Inc.*, 380 B.R. 741 (Bankr. D. Del. 2008).

39.     Once a debtor articulates a valid business justification under section 363, a presumption arises that the debtor's decision was made on an informed basis, in good faith, and in the honest belief the action was in the best interest of the company. *See In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 567 (Bankr. D. Del. 2008). Further, once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp., (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). The business judgment rule has vitality in chapter 11 cases and shields a debtor's management from judicial second-guessing. *See Integrated Res.*, 147 B.R. at 656; *Johns-Manville*, 60 B.R. at 615-16 ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions"). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

40.     As described above, the fully backstopped Rights Offering is a key component of the new equity funding required to pay creditors and fund the Plan, which has the full support of the Ad Hoc Noteholders Committee, the Prepetition Secured Lenders, and which provides for unimpaired treatment to all other creditor classes. Indeed, the Plan represents the

- 17 -

Debtors' best hope at expeditiously exiting from chapter 11 and completing the restructuring process. If the Debtors cannot complete the Rights Offering, the Plan cannot become effective and the Debtors will not have adequate operating capital to successfully implement the Plan. This likely would damage the Debtors' business and could possibly cause the Debtors to cease operations and liquidate their assets.

      41.    Further, entry of an order granting this Motion is a condition to certain Restructuring Support Agreements (the "RSAs") that the Debtors executed with the Prepetition Secured Lenders and the Ad Hoc Noteholders Committee, respectively. The respective RSAs may become subject to termination if the relief requested in this Motion is not granted expeditiously. If the RSAs terminate, the Debtors would need to re-solicit the Plan or renegotiate with the Ad Hoc Noteholders Committee and the Pre-Petition Secured Lenders.

      42.    Moreover, under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). In essence, the Court may enter an order that safeguards the value of the debtor's estate if doing so is consistent with the Bankruptcy Code. *See e.g.*, *Chinichian v. Campolongo (In re Chinichian)* 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.,* 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (acknowledging that "the [b]ankruptcy [c]ourt is one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws."). To

- 18 -

the extent that approval of the Rights Offering materials are necessary to effectuate consummation of the Plan—which represents Debtors' best means of protecting the value of their estate—the Debtors' believe that the Court's application of section 105(a) of the Bankruptcy Code here is appropriate.

43.     Courts in this District have approved similar relief in: *In re Satelites Mexicanos, S.A. de C.V.*, Case No. 11-11035 (Bankr. D. Del. April 13, 2011) (CSS); *In re Visteon, Corporation., et al.*, Case No. 09-11786 (Bankr. D.Del. June 28, 2010) (CSS).

## Federal Rule Of Bankruptcy Procedure 6003(b)

44.     Bankruptcy Rule 6003 provides:

> Except to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding the following:   . . . (b) a motion to use, sell, lease or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition, but not a motion under Rule 4001.

45.     Pursuant to Bankruptcy Rule 6003 ,the Court may grant relief regarding a motion to use, sell, lease or otherwise incur an obligation within twenty-one (21) days after the Petition Date if the relief is necessary to avoid immediate and irreparable harm. Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern. *See In re Ames Dept. Stores, Inc.* 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

46.     As discussed above, an order immediately approving the Rights Offering is critical to the Debtors' ability to reorganize. If the Rights Offering is not approved quickly,

- 19 -

the Debtors may become in breach of the RSAs, jeopardizing their ability to confirm the Plan and efficiently reorganize. If the Debtors cannot reorganize under the Plan, the Debtors may be unable to continue as a going concern. Further, completing the Rights Offering is a critical step that must be completed to Plan confirmation. If the Debtors are the Debtors submit that Bankruptcy Rule 6003's requirements are satisfied and that the Rights Offering may be approved immediately.

### Notice

47.     Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the Prepetition Secured Term Loan and DIP Lender; (iii) counsel to the Ad Hoc Noteholders Group; and (iv) counsel to the Backstop Investors. Following the first day hearing in this case, this Motion will be served on (a) creditors holding the thirty largest unsecured claims against the Debtors on a consolidated basis, or their legal counsel (if known) and (b) those persons who have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request entry of an order (i) granting the

relief requested herein and (ii) granting the Debtors such other and further relief as the Court

deems just and proper.

Dated:  December 18, 2011

PACHULSKI STANG ZIEHL & JONES LLP

By: _____
Richard M. Pachulski (CA Bar No. 90073)
Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Joshua M. Fried (CA Bar No. 181541)
Shirley S. Cho (CA Bar No. 192616)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
Telephone:  (302) 652-4100
Facsimile: (302) 652-4400
e-mail:      rpachulski@pszjlaw.com
             ljones@pszjlaw.com
             dbertenthal@pszjlaw.com
             jfried@pszjlaw.com
             scho@pszjlaw.com
             tcairns@pszjlaw.com

[Proposed] Counsel for the Debtors and Debtors in
Possession

- 21 -