IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WILLIAM LYON HOMES, *et al.*,[1] | ) | Case No. 11-14019 (____) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN INTERIM POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) AND 507, (II) AUTHORIZING DEBTORS TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363, 364 AND 507, (IV) MODIFYING THE AUTOMATIC STAY, AND (V) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

William Lyon Homes, Inc. ("WLH") and its affiliated debtors and debtors in possession

(collectively, the "Debtors" or the "Company") in the above-captioned chapter 11 cases (each, a

"Chapter 11 Case" and, collectively, the "Chapter 11 Cases") hereby move this Court (the

"Motion") for the entry of an interim order substantially in the form attached hereto as **Exhibit A**

(the "Interim Order") and the Final Order (as defined below), under sections 105, 361, 362,

363(b)(1), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the

United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"),  Rules 2002, 4001 and

9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-

1(b) and 4001-2 of the Local Bankruptcy Rules for the District of Delaware (the "Delaware

---

[1] The debtors and debtors in possession in these cases and the last four digits of their respective taxpayer identification numbers are as follows: William Lyon Homes (4902); William Lyon Homes, Inc., (3855); Mountain Falls Golf Course, LLC (3291); Mountain Falls, LLC (9631); Circle G at the Church Farm North Joint Venture, LLC (1322); Presley CMR, Inc. (3862); William Lyon Southwest, Inc. (8474); Sycamore CC, Inc. (1307); PH-LP Ventures (9119); PH Ventures – San Jose (5089); HSP, Inc. (6045); PH Rielly Ventures (7710); Lyon Waterfront, LLC (1928); Lyon East Garrison Company I, LLC (5692); WLH Enterprises (3333); Duxford Financial, Inc. (0824); California Equity Funding, Inc. (0016); Laguna Big Horn, LLC (2590); Presley Homes (5035); Cerro Plata Associates, LLC (5090); Whitney Ranch Village 5, LLC (5256); and Duxford Insurance Services, LLC (8232). The Debtors' mailing address is 4490 Von Karman Avenue, Newport Beach, CA 92660.

Rules"):  (I) authorizing (A) WLH to obtain post-petition financing (the "DIP Financing") in an

aggregate principal amount of up to $30,000,000, of which up to $15,000,000 shall be available

upon entry of the Interim Order, substantially on the terms set forth in the Senior Secured, Super

Priority Debtor-in-Possession Term Loan Agreement annexed hereto as **Exhibit B** (as amended,

supplemented, or otherwise modified and in effect from time to time, the "DIP Loan Agreement"

and, together with any and all other related documents and agreements entered into in connection

with or related to the DIP Financing, the "DIP Loan Documents") from ColFin WLH Funding,

LLC, as Administrative Agent (in such capacity, the "DIP Agent), for itself and the lenders (the

"DIP Lenders") from time to time party to the DIP Loan Agreement, (B) certain of the other

Debtors[2] to guaranty WLH's obligations in connection with the DIP Financing, and (C) certain

Debtors to execute and enter into the DIP Loan Documents and to perform such other and further

acts as may be required in connection with the DIP Loan Documents; (II) authorizing the

Debtors to use Cash Collateral;[3] (III) granting adequate protection to the Prepetition Secured

Parties (as defined below) whose liens under or in connection with the Prepetition Loan

Documents (as defined below) are being primed solely by the DIP Liens (as defined below) and

the Adequate Protection Liens (as defined below), each subject to the Carve-Out (as defined

below); (IV) modifying the automatic stay imposed by Bankruptcy Code section 362 to the

extent necessary to implement and effectuate the relief requested herein; and (V) scheduling,

pursuant to Bankruptcy Rules 4001(a), (b) and (d), a hearing (the "Final Hearing") to consider

entry of a final order in (the "Final Order" and, together with the Interim Order, the "DIP

---

[2] Mountain Falls, LLC, a Nevada limited liability company ("Mountain Falls"), which is a Debtor, is not guaranteeing the DIP Financing.

[3] For purposes of this Motion, the term "Cash Collateral" shall mean and include all "cash collateral," as defined in Bankruptcy Code section 363, in which the Prepetition Secured Parties have a lien, security interest or other interest (including any adequate protection liens or security interests), in each case whether existing on the Petition Date (defined below), arising pursuant to the Interim Order, or otherwise.

Orders").

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157

and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue is proper before this Court

under 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief requested herein are

Bankruptcy Code sections 105(a), 361, 362, 363, 364, and 507, and Bankruptcy Rules 2002,

4001 and 9014.

## BACKGROUND

### A.  General Background

2.      On the date hereof (the "Petition Date"), the Debtors commenced these cases by

filing voluntary petitions for relief under chapter 11 the Bankruptcy Code. The Debtors have

continued in possession of their property and have continued to operate and manage their

businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.

3.      As of the date hereof, no request has been made for the appointment of a trustee

or an examiner in this case, and no official committee has yet been appointed by the Office of the

United States Trustee (the "U.S. Trustee").

4.      The Debtors have requested that the Court enter an order granting joint

administration of these Chapter 11 Cases.

5.      The factual background regarding the Debtors, including their current and

historical business operations and the events precipitating the chapter 11 filings, including the

facts and circumstances supporting this Motion, are set forth in detail in the *Declaration of*

*Matthew R. Zaist, Executive Vice President of William Lyon Homes, in Support of First Day*

*Motions* filed concurrently herewith and incorporated herein by reference. The Debtors are

homebuilders with operations in Northern and Southern California, Arizona and Nevada.

6.    On the Petition Date, the Debtors filed the *Prepackaged Joint Plan of Reorganization for William Lyon Homes, et al.* dated November 17, 2011 (as may be amended, modified or supplemented from time to time, the "Plan") and related disclosure statement (the "Disclosure Statement"). The Plan represents a significant milestone for the Debtors and embodies the agreement reached with their major debt holders. If confirmed, the Plan will reduce the Company's leverage by approximately $182 million in funded note indebtedness, restructure the Company's primary secured credit facility, and provide for new equity capital investments of $85 million in the aggregate. Based on a prepetition solicitation of the Plan, the Plan has been overwhelmingly approved by those voting classes of creditors who are impaired under the Plan – (i) the Prepetition Loan Agreement (defined below); and (ii) the Old Notes (defined below). Significantly, other than the holders of claims on account of the Prepetition Loan Agreement (the "Prepetition Loan Agreement Claims"), Old Notes Claims (defined below), and equity holders of William Lyon Homes, a Delaware corporation ("DE Lyon") (whose interests are being cancelled), the Plan provides for the Debtors' remaining creditors to be unimpaired, which may not have been possible absent the agreements reached under the Plan. The Plan will allow the Debtors to improve its liquidity position from its operations and be well-positioned going forward. Concurrently with their filing of the Plan and Disclosure Statement, the Debtors have requested a joint hearing on the adequacy of the Disclosure Statement and confirmation of the Plan. No hearing has yet been set.

**B.    *The Prepetition Loan Documents***

7.    On October 20, 2009, WLH entered into that certain Senior Secured Term Loan Agreement dated as of October 20, 2009 (as amended, restated, supplemented or otherwise

4

modified from time to time, the "Prepetition Loan Agreement"), among WLH, as borrower, ColFin WLH Funding, LLC, as administrative agent, initial lender and lead arranger (the "Prepetition Agent"), and the lenders from time to time party thereto (the "Prepetition Lenders" and, collectively with the Prepetition Agent, the "Prepetition Secured Parties"), pursuant to which WLH incurred indebtedness to the Prepetition Lenders. In connection with the Prepetition Loan Agreement, the Debtors are also party to the following agreements (collectively, with the Prepetition Loan Agreement, the "Prepetition Loan Documents"):

i.   the Unconditional Guaranty (as defined in the Prepetition Loan Agreement) made by each Guarantor (as defined in the Prepetition Loan Agreement)[4] in favor of the Prepetition Secured Parties, pursuant to which each Guarantor, among other things and as more fully described in such Unconditional Guaranty, unconditionally guaranteed prompt payment in full of the Obligations (as defined in the Prepetition Loan Agreement) and any and all other existing and future indebtedness and liabilities to the Prepetition Secured Parties arising under the Prepetition Loan Agreement and the other "Loan Documents" (as such term is defined in the Prepetition Loan Agreement);

ii.  the Security Agreement (as defined in the Prepetition Loan Agreement) made by and among WLH, the Guarantors and the Prepetition Agent on behalf of the Prepetition Secured Parties, pursuant to which WLH and each Guarantor, among other things and as more fully described in such Security Agreement, granted a security interest in the "Collateral" (as defined in the Security Agreement) as security for the prompt payment in full of the "Secured Obligations" (as defined in the Security Agreement);

iii. the Pledge Agreement (as defined in the Prepetition Loan Agreement) made by and among WLH, DE Lyon and the other entities from time to time identified as Pledgors on Schedule I thereto in favor of Prepetition Agent, pursuant to which WLH, Parent and each Pledgor, among other things and as more fully described in such Pledge Agreement, granted a security interest the "Pledged Collateral" (as defined in the Pledge Agreement) as security for the prompt payment in full of the Secured Obligations;

iv.  certain Deeds of Trust (as defined in the Prepetition Loan Agreement) executed by WLH, as trustor, Title Company (as defined in the Prepetition Loan Agreement), as trustee, and naming Prepetition Agent as beneficiary for itself and the Prepetition Lenders, pursuant to which WLH, among other things and as more fully described in the applicable Deed of Trust, created a first priority lien on the Borrower Real Property (as defined in the Prepetition Loan Agreement) and the Collateral situated thereon, and all rights and easements appurtenant thereto as security for the prompt

---

[4] As of the Petition Date, DE Lyon was the only Guarantor.

payment in full of the Secured Obligations; and

v.    certain other Loan Documents.

8.    As of the Petition Date, each of the Debtors was liable to the Prepetition Secured Parties in respect of obligations under the Prepetition Loan Documents for (i) the aggregate principal amount of not less than $206,000,000, (ii) subject to the reservation of rights in the proviso below, the Make Whole Amount (as defined in the Prepetition Loan Agreement), (iii) subject to the reservation of rights in the proviso below, the Exit Fee (as defined in the Prepetition Loan Agreement), (iv) any accrued and unpaid interest, and (v) any unpaid fees, costs, expenses, disbursements, indemnifications, obligations, covenants, liabilities, duties, and charges or claims of whatever nature, whether or not contingent, whenever arising, due or owing under the Prepetition Loan Documents or applicable law or otherwise (collectively, the "Prepetition Loan Obligations").  The Prepetition Secured Parties assert that the Make Whole Amount due and owing is not less than $69,000,000 and that the Exit Fee due and owing is not less than $12,900,000.  However, the Debtors are not stipulating to any such amounts and the Debtors and all parties in interest reserve any and all rights as to the Make Whole Amount (as defined in the Prepetition Loan Agreement) and the Exit Fee (as defined in the Prepetition Loan Agreement).

9.    To secure the Prepetition Loan Obligations under the Prepetition Loan Documents, WLH and DE Lyon granted the Prepetition Agent, for the benefit of the Prepetition Secured Parties, valid first priority liens (the "Prepetition Liens") upon and in substantially all of their assets (other than (I) cash, cash equivalents and deposit accounts used by WLH (a) for payroll, payroll taxes and other employee wage and benefit payments, (b) to collateralize obligations under letter of credit applications, or (c) in its Core Business (as defined in the Prepetition Loan Agreement), (II) investments in Joint Ventures and Subsidiaries (each as

defined in the Prepetition Loan Agreement), (III) certain lease, license, contract, property rights or agreements (A) to which the Guarantors are party, and their respective rights or interests thereunder if, and for so long as, granting of a lien thereon shall constitute or result in a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract, property rights or agreement or the violation of any applicable law other than to the extent that any such term would be rendered ineffective pursuant to sections 9406, 9407, 9408 or 9409 of the Uniform Commercial Code or any successor provision or provisions of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code) or principles of equity; provided, however, that the foregoing exclusion shall not apply at such time as the condition causing such breach or termination shall be remedied and to the extent severable, or (B) that is a lease for office space used in the Guarantors' business, (IV) intellectual property, (V) any licenses or permits issued by government authorities not assignable by their terms, (VI) equity interests in WLH, (VII) certain furniture, fixtures and equipment in the Guarantors' offices, and (VIII) rights to initiate, defend or prosecute legal claims and proceedings; provided that (x) the value of all assets described in (I) above do not exceed $3,500,000 in the aggregate at any one time and (y) the value of investments described in (II) above do not exceed $16,500,000 in the aggregate at any one time, and in each of clauses (I) through (VIII) as more specifically set forth in the Prepetition Loan Agreement and Prepetition Loan Documents), and all proceeds, products, offspring and profits of the foregoing (the "Prepetition Collateral"). All of the Debtors' cash, cash equivalents, negotiable instruments, documents of title, deposit accounts, investment property and securities, including the cash, cash equivalents, negotiable instruments, investment property and securities in its deposit accounts, including the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy

7

of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of the Bankruptcy Code, wherever any of the foregoing is located, constitutes the Cash Collateral (or part of the Prepetition Collateral) of the Prepetition Secured Parties (other than cash and cash equivalents, not in excess of $3,500,000, that WLH has specifically identified as an "Excluded Asset" in its most recent report delivered to the Prepetition Agent pursuant to Section 6.02(b)(vi) of the Prepetition Loan Agreement and which cash and cash equivalents are not held or on deposit in a deposit account subject to a perfected security interest in favor or the Prepetition Agent).

### C.  The Old Notes

10.     Also prior to the Petition Date, WLH issued three series of unsecured notes prepetition (the "Old Notes"). The first series was issued in an aggregate principal amount of $150 million in 2004, bears a 7 ⅝% interest rate, and is due on December 15, 2012 (the "7 ⅝% Senior Notes"); the second was issued in an aggregate principal amount of $250 million in 2003, bears a 10 ¾% interest rate, and is due on April 1, 2013 (the "10 ¾% Senior Notes"); the third was issued in an aggregate principal amount of $150 million in 2004, bears a 7 ½% interest rate, and is due on February 15, 2014 (the "7 ½% Senior Notes"). Interest on the Old Notes is payable semi-annually.

11.     The Old Notes are unconditionally guaranteed on a senior unsecured basis by the following Debtors (the "Prepetition Guarantors"): DE Lyon; California Equity Funding, Inc.; PH-LP Ventures; Duxford Financial, Inc.; Sycamore CC, Inc.; Presley CMR, Inc.; William Lyon Southwest, Inc.; PH-Reilly Ventures; HSP, Inc.; PH Ventures-San Jose; WLH Enterprises, formerly Carmel Mountain Ranch; Lyon Waterfront, LLC; and Lyon East Garrison Company I, LLC.

12.    As a result of previous redemptions in 2010, the 7 ⅝% Senior Notes have a current outstanding balance of approximately $66.7 million; the 10 ¾% Senior Notes, approximately $138.7 million; and the 7 ½% Senior Notes, approximately $77.8 million. Each of the series of Old Notes is governed by an indenture by and among WLH as issuer, DE Lyon and the other Prepetition Guarantors, and U.S. Bank National Association, as Trustee. The Old Notes now have an aggregate outstanding amount of $283.2 million in principal and approximately $299.5 million in the aggregate after including interest and fees. The outstanding balance of the Old Notes per the Company's financial statements changes monthly due to the amortization of Original Interest Discount on account of the 10 ¾% Senior Notes.

13.    In early 2011, an ad hoc group of entities holding Old Notes (the "Ad Hoc Noteholders Group") was formed. As of November 10, 2011, the members of the Ad Hoc Noteholders Group held an aggregate of approximately 63.5% of the Old Notes.

### D. The Prepetition Restructuring

14.    After several weeks of active and arm's-length negotiations, the Debtors, in consultation with their advisors, reached prepetition agreements in principle with their Prepetition Lenders and the Ad Hoc Noteholders Group holding 63.5% in principal amount of the holders of claims arising from the Old Notes (the "Old Notes Claims"), on a prepackaged restructuring plan, including the key terms of the restructured Prepetition Loan Agreement, distributions under the Plan to holders of Old Notes Claims, and the treatment of general unsecured claims.

15.    As of September 30, 2011, the Debtors had outstanding funded indebtedness in the principal amount of approximately $509.8 million. Upon emergence from chapter 11, pursuant to the Plan, the Debtors expect to have outstanding debt of approximately $327.8

million.  Accordingly, the Reorganized Debtors will have an improved balance sheet and more

appropriate capital structure.  In addition to the reduction of indebtedness of the Debtors upon

emergence from chapter 11, the Debtors also expect to benefit from an annual decrease in cash

interest obligations of approximately $24.6 million, comprised of $19.9 million annual reduction

associated with the conversion to equity of a portion of the Old Notes and $4.7 million annual

reduction resulting from the reduction in interest rate from 14% under the Prepetition Loan

Agreement to 10¼% under the Restructured First Lien Loan Agreement (as defined in the Plan).[5]

  16.  Other than the Old Notes and the Prepetition Loan Obligations that are the subject

of the proposed restructuring under the Plan, and old equity, whose interests are being cancelled

under the Plan, all of the Debtors' other creditors, including general unsecured creditors, are

unimpaired under the Plan within the meaning of section 1124 of the Bankruptcy Code, and

deemed to vote in favor of the Plan pursuant to section 1126(f) of the Bankruptcy Code.

  17.  The Debtors believe that the prepackaged restructuring Plan is the best

restructuring alternative reasonably available to the estates.  In order to effect the provisions of

the Plan, the Debtors have succeeded in securing commitments for new equity capital

investments aggregating $85 million, in two separate private placements: (a) a commitment to

backstop the entire proposed Rights Offering (as defined in the Colony RSA) in the amount of

$60 million in cash on the terms set forth in the Backstop Commitment Agreement (as defined in

the Colony RSA) should the Rights Offering not otherwise be fully subscribed, and (b) an

additional commitment for $25 million pursuant to the ECA (as defined in the Colony RSA), in

the form of cash or a combination of cash and, subject to certain conditions, membership

---

[5] Pursuant to a compromise with respect to certain make whole amounts and exit fees provided in the Prepetition Loan Agreement to be effected if and when the Plan is consummated, and subject to the Prepetition Secured Parties' rights under the Colony RSA (defined below), the principal amount due and owing under the Prepetition Loan Agreement will be increased from $206,000,000 to $235,000,000.

interests in certain limited liability companies that hold real property, to be provided by the Debtors' current equity owners. The Debtors plan to utilize the proceeds of these investments to fund their working capital requirements, and to make certain distributions under the Plan. After extensive efforts to seek new equity capital, the Debtors believe that the Rights Offering (inclusive of the Backstop Commitment Agreement) and the ECA represent the best terms for equity financing available to the Debtors in this market.

18.    The Plan represents a significant achievement for the Debtors and should greatly enhance their ability to reorganize successfully and expeditiously through the addition of $85 million of new equity capital pursuant to the Rights Offering and Class B Common Stock Purchase Commitment Agreement. The Plan will also provide an efficient restructuring through the prepackaged process, designed to minimize disruption to the Debtors' business endeavors, stabilize the Debtors' balance sheets, and provide a platform for future success. Through confirmation of the Plan implementing the terms of the pre-packaged restructuring, the Debtors will restructure and substantially deleverage their balance sheet; reduce their cash interest expense to a level that is aligned with their expected future cash flows; retain additional flexibility to invest in growth initiatives to maximize enterprise value; and maintain favorable pricing to the Debtors under the Prepetition Loan Agreement. The Debtors also will improve their liquidity position. For all of these reasons, in addition to the proposed DIP Financing, the Debtors believe that they will have sufficient liquidity during the course of the Chapter 11 Cases and will be well-positioned going forward.

### E.    The Restructuring Support Agreements

19.    In order to effectuate the transactions contemplated by the Plan, the Debtors, the Prepetition Agent, the Prepetition Lenders, and the members of the Ad Hoc Noteholders Group

have entered into the following agreements:

i.    On November 4, 2011, the Debtors entered into a restructuring support agreement (the "Colony RSA") with the Prepetition Lenders holding 100% of the principal amount of the loans outstanding under the Prepetition Loan Agreement.  Pursuant to the Colony RSA, each Prepetition Lender party thereto (each, a "Consenting Lender" and collectively, the "Consenting Lenders") agreed, subject to the terms and conditions of the Colony RSA, to exercise all votes to which it is entitled to accept the Plan.

ii.   On November 4, 2011, the Debtors entered into a noteholder restructuring support agreement (the "Noteholders RSA"), with the holders of approximately 63.5% of the principal amount of the Old Notes then outstanding (each, a "Consenting Noteholder" and collectively, the "Consenting Noteholders").  Pursuant to the Noteholders RSA, each Consenting Noteholder agreed to exercise all votes to which it is entitled with respect to the principal amount of Old Notes subject to the Noteholders RSA to accept the Plan pursuant to the terms of the Noteholders RSA.

## RELIEF REQUESTED

20.    By this Motion, the Debtors seek entry of the DIP Orders, inter alia:

(a)    under Bankruptcy Code sections 364(c), (d) and (e), authorizing the Debtors to obtain the DIP Financing, consisting of a multiple draw term loan facility in an aggregate principal amount of up to $30 million from ColFin WLH Funding, LLC, as DIP Agent, for itself and the DIP Lenders;

(b)    authorizing the Obligors (as defined below) to enter into the DIP Loan Agreement and DIP Loan Documents and to perform such other and further acts as may be necessary or appropriate in connection with the DIP Loan Documents;

(c)    authorizing, pursuant to Bankruptcy Code sections 363 and 364, the Debtors to use the proceeds of the DIP Financing for, among other things, working capital requirements and general corporate purposes, payment of costs of administration of the Chapter 11 Cases and payment of adequate protection and any other payments permitted by the Court, and subject to a budget agreed to by the DIP Lenders and the other terms, conditions and restrictions set forth in the DIP Loan Agreement and the other DIP Loan Documents;

(d)     authorizing, pursuant to Bankruptcy Code sections 364(c)(2), (c)(3) and (d), the Debtors to grant to the DIP Agent, for the benefit of itself and the other DIP Lenders, as security for the repayment of the borrowings and all other obligations arising under the DIP Loan Agreement, (i) first priority senior priming liens in all of the Debtors' pre-petition and post-petition property (other than the (A) customer deposits and other third party funds held by the Debtors in escrow that are refundable to such customers or third parties at the request of such customers or third parties under the terms of any written agreement between such customers or third parties and the Debtors governing such funds (it being understood and agreed that the Debtors' respective interests in such deposits or funds shall not constitute Excluded Assets) and products and proceeds thereof, (B) equity interests in any of the Debtors' direct foreign subsidiaries in excess of 65% of their voting equity interests, (C) assets that the Debtors may not pledge as a result of any valid, enforceable and non-avoidable contractual prohibition after giving effect to the provisions of Section 33(d) of the Interim Order, (D) estate causes of action under chapter 5 of the Bankruptcy Code or applicable state avoidance law and the proceeds thereof, except, in each case avoidance actions under section 549 of the Bankruptcy Code, and (E) the assets of Circle G at the Church Farm North Joint Venture, LLC (collectively, the "Excluded Assets")) (the "DIP Collateral"), which liens shall prime only the Prepetition Liens and any Adequate Protection Liens (as defined below), (ii) first priority liens on all unencumbered assets constituting the DIP Collateral, and (iii) liens on encumbered property constituting the DIP Collateral junior in priority to valid, enforceable and non-voidable liens and security interest held by parties in interest other than the Prepetition Secured Parties, which liens and security interests existed as of the Petition Date or as may be perfected pursuant to section 546(b) of the Bankruptcy Code after the Petition Date (the liens set forth in clauses (i), (ii) and (iii) of this subsection (c), collectively, the "DIP Liens"), in each case, subject to the Carve-Out and to any liens (as defined in section 101 of the Bankruptcy Code) and security interests expressly permitted to be senior under applicable non-bankruptcy law, the DIP Loan Documents and the terms of the DIP Orders;

(e)     granting, pursuant to Bankruptcy Code section 364(c)(1), a superpriority administrative expense claim (the "Superpriority Claim") to the DIP Agent, for the benefit of itself and the other DIP Lenders, payable from and having recourse to all pre-and post-petition property of the Debtors and all proceeds thereof, subject only to the payment of the Carve-Out; provided, however, (i) the DIP Lenders shall use their reasonable best efforts to satisfy the Superpriority Claims from DIP Collateral or the proceeds of DIP Collateral prior to seeking to utilize proceeds of avoidance actions under chapter 5 of the Bankruptcy Code (other than the proceeds of avoidance actions under section 549 of the Bankruptcy Code, which proceeds the DIP Lenders may use to satisfy their Superpriority Claims without such delay) Superpriority Claims and (ii) the DIP Lenders' ability to utilize avoidance actions and the proceeds thereof to satisfy such Superpriority Claims shall be subject to entry of the Final Order;

(f)     authorizing, pursuant to Bankruptcy Code sections 361, 363(e) and 364(d)(I), the Debtors to (i) grant Adequate Protection Liens and superiority claims to the Prepetition Secured Parties with respect to their pre-petition security interests and liens, in each case subject to the Carve-Out, (ii) pay current cash interest at the applicable non-default rates in effect on the date immediately preceding the Petition Date provided for under Prepetition Loan Documents (including any accrued and unpaid pre-petition amounts), (iii) make current cash payments of professional fees and expenses of the Prepetition Agent in accordance with the

Prepetition Loan Documents, and (iv) certain other forms of adequate protection provided in the DIP Orders;

        (g)    authorizing the Debtors to use the Cash Collateral and other Prepetition Collateral, subject to the terms of the Interim Order;

        (h)    waiving, subject to entry of the Final Order, the Debtors' right to seek to surcharge against the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code;

        (i)    authorizing the Carve-Out; and

        (j)    scheduling, pursuant to Bankruptcy Rule 4001, the Final Hearing on the Motion to be held before this Court to consider entry of the Final Order authorizing the Debtors, on a final basis, to borrow the balance of the DIP Financing and to continue to use the Cash Collateral and the other Prepetition Collateral.

## **TERMS OF THE DIP FINANCING**

    21.    The principal terms of the DIP Financing are as follows:[6]

| | |
|---|---|
| **Borrower:** | WLH (the "Borrower"). |
| **DIP Guarantors:** | The obligations of the Borrower under the DIP Financing will be unconditionally guaranteed (the "Guarantee"), on a joint and several basis, by DE Lyon, each Debtor (other than Mountain Falls) and each other guarantor of the Prepetition Loan Agreement even if such guarantor does not file as a debtor in possession in the Chapter 11 Cases (the "DIP Guarantors" and, collectively with the Borrower, the "Obligors"). |
| **DIP Lenders:** | ColFin WLH Funding, LLC. |
| **DIP Agent** | ColFin WLH Funding, LLC. |
| **DIP Loan Agreement:** | A superpriority multiple draw term loan facility in an aggregate principal amount of up to $30 million million (the "Commitments"). Amounts repaid or prepaid under the DIP Financing may not be reborrowed. |
| **Interim Availability:** | During the period commencing on the date (the "Interim Order Entry Date") of the Court's entry of the Interim Order and ending on the date the Court enters the Final Order (such period, the "Interim Period"), a portion of the Commitments shall be |

---

[6] This summary is only meant to outline the salient terms of the DIP Loan Documents. In the event of a conflict between this summary and the DIP Loan Documents or DIP Orders, the DIP Loan Documents or DIP Orders shall govern.

available to the Borrower, subject to (i) delivery by the Borrower of a Budget (as defined below), (ii) the execution and delivery of the DIP Loan Documents, which shall be in form and substance satisfactory to the Lenders in their sole discretion, and (iii) satisfaction or waiver of each of the conditions to funding included in the DIP Loan Documents (the "Initial Availability"), in an amount equal to the lesser of $15 million and such other amount as may be approved by order of the Court, to be made available during the Interim Period in accordance with the Budget (or in such greater amounts as may be necessary to satisfy the $5 million minimum draw requirement in the next sentence). During the Interim Period, each borrowing shall be in a minimum amount of $5 million or an integral multiple of $1 million in excess thereof or, if less, the remaining undrawn portion of the Initial Availability.

**Full Availability:**    Upon the Court's entry of the Final Order (the "Final Order Entry Date"), the full remaining amount of the Commitments shall be available to the Borrower. The balance of the DIP Financing may be borrowed in amounts, at intervals, and under conditions to be set forth in the DIP Loan Documents; provided that all such borrowings shall be in a minimum amount of $5 million or an integral multiple of $1 million in excess thereof.

**Maturity Date:**    The earliest of: (i) stated maturity, which shall be 180 days from entry of the Interim Order, (ii) the consummation of a sale of substantially all of the assets of the Obligors approved by the DIP Lenders, (iii) the effective date of any Chapter 11 plan of any Obligor, (iv) the date that is 30 days after the filing date if the Final Order has not been entered by such date, or (v) the acceleration of the DIP Loans (as defined below) or termination of the Commitments under the DIP Financing, including, without limitation, as a result of the occurrence of an DIP Order Event of Default (as defined below) (any such occurrence, the "Maturity Date").

**Use of Proceeds:**    The proceeds of the DIP Financing will be used (i) in accordance with the terms of the Budget (as defined below), to provide working capital for, and for other general corporate purposes of, the Borrower and its subsidiaries, including the payment of expenses of administration in the Chapter 11 Cases, (ii) to pay the fees and expenses of the DIP Agent and the DIP Lenders, and (iii) to provide Adequate Protection to the Prepetition Secured Parties. For avoidance of doubt, no portion of the DIP Financing, the DIP Collateral, the proceeds of the DIP Financing or the DIP Collateral or the Carve-Out may be used in connection with the investigation (including, without limitation, discovery

proceedings), initiation or prosecution of any claims, causes of action, objections or other litigation against the DIP Agent, any of the DIP Lenders, or the Prepetition Secured Parties, including, but not limited to, (i) with respect to raising any defense to the validity, perfection, priority, extent, or enforceability of the obligations under the DIP Loan Agreement and/or the Prepetition Loan Obligations including the liens with respect thereto and (ii) with respect to pursuing any potential claims against the DIP Lenders or Prepetition Lenders (or their respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors) asserting or alleging any claims including, but not limited to, "lender liability"-type claims or causes of action, causes of actions under chapter 5 of the Bankruptcy Code (including under section 502(d) of the Bankruptcy Code), or any other claims or causes of action under, or in any way otherwise relating to, the DIP Loan Documents or the Prepetition Loan Documents; provided that up to $50,000 in the aggregate may be used to reimburse any Committee (defined below) for fees and out-of-pocket expenses incurred in connection with the investigation of the validity, perfection and/or priority of the liens securing the Prepetition Loan Obligations.

**Front-End Fees:**   2.50% of the maximum aggregate principal amount of the Commitments.

**Exit Fee:**   0.50% of the maximum aggregate principal amount of the Commitments, payable upon any reduction or termination of the Commitments, repayment of the DIP Loans and on the Maturity Date.

**Unusued Commitment Fee:**   A non-refundable unused commitment fee will accrue at a rate of 0.50% per annum on the daily average unused portion of the DIP Financing (whether or not available), payable quarterly in arrears and on the Maturity Date.

**Interest Rates and Fees:**   Loans under the DIP Financing ("DIP Loans") will bear interest at 8.00% plus the current LIBO Rate as quoted by reference to Bloomberg Page BBAM 1, adjusted for reserve requirements, if any, and subject to customary change of circumstance provisions, for interest periods of 30 days (the "LIBO Rate"), calculated on a 360-day basis and payable at the end of each such 30 day period; provided that the LIBO Rate will at no time be less than 2.00% per annum. During the continuance of an event of default under the DIP Financing or DIP Loan Documents, DIP Loans will bear interest at an additional 5.00% *per annum*.

16

| | |
|---|---|
| **Budget and Operating Forecast:** | "<u>Budget</u>" means the following (each in form and substance satisfactory to the DIP Lenders in their sole discretion): |

(a) in the case of the initial Budget (delivered as a condition to the closing and initial funding of the DIP Financing and attached to the Interim Order as <u>Exhibit 1</u>), a 13-week statement of sources and uses for the next 13 weeks of the Borrower and its subsidiaries, broken down by week, including, without limitation, the anticipated uses of the DIP Financing for such period (a "<u>13-week Projection</u>"), and thereafter at the end of each week, an updated 13-week Projection for the subsequent 13 week period, which update shall not reset amounts in any prior budget; provided that at the end of the first week of each fiscal month, such updated 13-week Projection may reset budgeted amounts subject to the approval of the DIP Lenders in their sole discretion (it being understood that if the DIP Lenders do not approve such updated 13-week Projection, the previously accepted 13-week Projection shall continue to apply for purposes of the DIP Financing); and

(b) a business plan and projected operating budget for a period of one (1) year (the "<u>Operating Forecast</u>"), broken down by month, including, without limitation, income statements, balance sheets, cash flow statements, projected capital expenditures, asset sales, cost savings and headcount reductions, targeted facility and office closures, targeted facility and office idlings and other milestones, and a line item for total available liquidity, in the form previously delivered;

and which shall provide, among other things, for the payment of the fees and expenses relating to the DIP Financing, ordinary course administrative expenses, bankruptcy-related expenses and working capital and other general corporate needs. The Borrower shall also provide a weekly variance report/reconciliation to the applicable period in the current 13-week Projection on Friday of each week for the prior week (i) showing actual cash receipts and disbursements for the immediately preceding week, noting therein all variances, on a line-item basis, from values set forth for such period in the Budget, and shall include explanations for all material variances, and (ii) certified by a financial or executive officer of the Borrower.

| | |
|---|---|
| **Security and Priorities:** | All obligations of the Obligors to the DIP Lenders under the DIP Loan Documents shall at all times, in each case subject to the Carve-Out: |

17

(a) pursuant to Bankruptcy Code section 364(c)(1), be entitled to joint and several super-priority administrative expense claim status in the Chapter 11 Cases having priority over all administrative expenses of any kind specified in sections 503(b) and 507(b) of the Bankruptcy Code; provided, however, (i) the DIP Lenders shall use their reasonable best efforts to satisfy the Superpriority Claims from DIP Collateral or the proceeds of DIP Collateral prior to seeking to utilize proceeds of avoidance actions under Chapter 5 of the Bankruptcy Code (other than the proceeds of avoidance actions under section 549 of the Bankruptcy Code, which proceeds the DIP Lenders may use to satisfy their Superpriority Claims without such delay) to satisfy Superpriority Claims and (ii) the DIP Lenders' ability to utilize avoidance actions and the proceeds thereof to satisfy such Superpriority Claims shall be subject to entry of the Final Order;

(b) pursuant to Bankruptcy Code section 364(c)(2), be secured by a perfected first priority lien on all now owned or hereafter acquired assets and property of the Obligors (other than Circle G at the Church Farm North Joint Venture, LLC), including, without limitation, accounts, documents, inventory, equipment, capital stock in subsidiaries and joint ventures, investment property, instruments, chattel paper, commercial tort claims, cash, cash equivalents, securities accounts, deposit accounts, commodity accounts, real estate, leasehold interests, contracts, patents, copyrights, trademarks, causes of action (excluding avoidance actions and the proceeds thereof, except, in each case avoidance actions under section 549 of the Bankruptcy Code), and other general intangibles (including, without limitation, tax refunds), and all products and proceeds thereof, to the extent that such DIP Collateral is not subject to valid, perfected and non-avoidable liens as of the commencement of the Chapter 11 Cases;

(c) pursuant to Bankruptcy Code section 364(c)(3), be secured by a perfected junior lien on all DIP Collateral, to the extent that such DIP Collateral is subject to valid, perfected and non-avoidable liens in favor of third parties in existence at the time of the commencement of the Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code (other than property that is subject to the existing liens that secure the obligations under the

18

Prepetition Loan Agreement, which liens shall be primed by the liens securing the obligations under the DIP Loan Documents); and

(d) pursuant to Bankruptcy Code section 364(d), be secured by a perfected first-priority priming lien on all DIP Collateral, to the extent that such DIP Collateral is subject to existing valid and perfected liens securing the Prepetition Loan Obligations (the "Primed Liens"), all of which Primed Liens shall be primed by and made subject and subordinate to the perfected first priority senior liens to be granted to the DIP Agent on behalf of the DIP Lenders, which senior priming liens in favor of the DIP Agent shall also prime any liens granted after the commencement of the Chapter 11 Cases to provide adequate protection in respect of any of the Primed Liens.

**Carve-Out:** The liens and Superpriority Claims granted to the DIP Agent and the DIP Lenders with respect to the DIP Financing shall be subject and subordinate to a carve-out (the "Carve-Out") which shall be comprised of the following: (i) the unpaid fees of the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. §1930(a)(6); (ii) fees, disbursements, costs and expenses which are incurred before the Funding Termination Date (as defined below) and after the Petition Date in an amount not to exceed the amounts set forth in the Budget, on a cumulative basis for each Professional (as defined below), less any amount actually paid to each such Professional retained by the Debtors, any statutory committees appointed in the case (the "Committee") pursuant to Bankruptcy Code sections 327, 328, 330, 331, 503 or 1102 (collectively, the "Professionals") to the extent allowed at any time by the Court, whether by interim order, procedural order or otherwise, and owed pursuant to such Professionals' respective engagement letters; (iii) the fees, disbursements, costs and expenses, that are incurred but unpaid before the Funding Termination Date, of the Ad Hoc Noteholder Group and of the investors party to the Backstop Commitment Agreement (the "Backstop Investors") in an amount not to exceed $535,000 for the Ad Hoc Noteholder Group and $200,000 for the Backstop Investors, respectively, for the 30 days prior to the Funding Termination Date; and (iv) fees and expenses of the Debtors' Professionals, in an aggregate amount not to exceed $500,000 (the "Termination Carve-Out"), which are incurred after the Funding Termination Date, with respect to the Professionals, such fees and expenses are ultimately allowed by the Court, each subject to the rights of any party in interest to object to the allowance of any such fees and expenses sought by Professionals

in clauses (ii) and (iv) hereof.

The "Funding Termination Date" means the earliest to occur of (x) the expiration of the Notice Period (as defined below) if the Debtors have not filed a motion (the "Junior DIP Facility Motion") seeking approval of the Junior DIP Facility (as defined below) before the expiration of the Notice Period, (y) five (5) business days after the date of the filing of such Junior DIP Facility Motion, if the Court has not entered an order consistent in all material respects with the terms hereof authorizing the Debtors to incur indebtedness under the Junior DIP Facility in an amount sufficient to indefeasibly repay in full in cash the DIP Financing (the "Interim Junior DIP Order") and (z) two (2) business days after such entry of the Interim Junior DIP Order, if the DIP Financing has not been indefeasibly repaid in full in cash (other than contingent indemnity obligations for which no claim has been made by DIP Agent (whether on its own behalf or on behalf of the DIP Lenders) or other similar contingent obligations) arising under the DIP Financing.  For the avoidance of doubt, each of the DIP Agent, DIP Lenders and the Prepetition Secured Parties retains the right to object to the Junior DIP Facility Motion and any other motion relating to the Junior DIP Facility.

| | |
|---|---|
| **Optional Prepayments:** | The Borrower may repay the DIP Loans and/or reduce the Commitments at any time without premium or penalty (other than breakage costs, if applicable, and Exit Fees on the amount of the prepayment or reduction) upon (i) at least five (5) business days' notice; provided that in the case of repayment, each partial repayment shall be in an amount of $1.5 million or multiples of $0.5 million in excess thereof (or, if less, the outstanding amount of applicable Loans), and, in the case of reduction of the Commitments, each partial reduction shall be in an amount of $1.5 million or multiples of  $0.5 million in excess thereof (or, if less, the remaining available balance of the Commitments).  Any reduction of the Commitments shall be permanent, unless waived by the DIP Lenders in their sole discretion. |
| **Mandatory Prepayments:** | Customary for financings of this type. |
| **Adequate Protection Claims and Liens of Prepetition Secured Parties:** | Pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, the Prepetition Secured Parties shall be granted the following adequate protection (collectively, the "Adequate Protection") of their prepetition security interests for, and equal in amount to, but without duplication, the diminution in the value (each such diminution, a "Diminution in Value") of the pre-petition security interests of such Prepetition Lender, calculated in |

20

accordance with section 506(a) of the Bankruptcy Code, whether or not such Diminution in Value results from the sale, lease or use by the Debtors of the Prepetition Collateral (including, without limitation, Cash Collateral), the priming of the pre-petition security interests of such Prepetition Lender or the stay of enforcement of any prepetition security interest arising from section 362 of the Bankruptcy Code, or otherwise:

(a) <u>Adequate Protection Liens</u>. As security for and solely to the extent of any Diminution in Value of the prepetition security interests, the Prepetition Secured Parties shall be granted valid, enforceable, non-avoidable and fully perfected, as of the entry date of the Interim Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, post petition security interests in and liens on the DIP Collateral (together, the "<u>Adequate Protection Liens</u>"), subject and subordinate only to (x) the Carve-Out and (y) the liens securing the DIP Financing, which Adequate Protection Liens shall rank in the same relative priority and right as do the respective security interests and liens of the Prepetition Loan Documents as of the commencement of the Chapter 11 Cases.

(b) <u>SuperPriority Claim</u>. To the extent of any Diminution in Value of the pre-petition security interests, the Prepetition Secured Parties, shall be granted, subject to the payment of the Carve-Out, a superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code, immediately junior to the claims under section 364(c)(1) of the Bankruptcy Code held by the DIP Agent and the DIP Lenders under the DIP Financing, which superpriority claim shall rank in the same right and priority as do the respective claims thereof as of the petition date, <u>provided</u> <u>that</u> the Prepetition Secured Parties and any other lenders and/or holders under the Primed Liens shall not receive or retain any payments, property or other amounts in respect of the superpriority claims under section 507(b) of the Bankruptcy Code granted hereunder or under the Prepetition Loan Documents unless and until the obligations under the DIP Financing have indefeasibly been paid in cash in full (the "<u>Adequate Protection</u> <u>Claim</u>"). The DIP Lenders shall use their reasonable best efforts to satisfy such superpriority administrative expense claims from the DIP Collateral or the proceeds of the DIP Collateral prior to seeking to utilize proceeds of avoidance actions (other than the proceeds of avoidance actions

21

under section 549 of the Bankruptcy Code which proceeds the Prepetition Secured Parties may use to satisfy their superpriority claims without such delay) to satisfy such claims, and agree that the Prepetition Secured Parties and any other lenders' and/or holders' under the Prepetition Loan Agreement ability to utilize avoidance actions and the proceeds thereof to satisfy such superpriority administrative expense claims shall be subject to entry of the Final Order;

(c) <u>Fees and Expenses</u>. The Prepetition Agent shall receive (for the benefit of the Prepetition Lenders) from the Debtors current cash payments of all reasonable professional fees and expenses payable, without regard to whether such fees and expenses were incurred prepetition or post-petition, by the Prepetition Agent, under the Prepetition Loan Documents, without limitation, the reasonable fees and disbursements of counsel (including Akin Gump Strauss Hauer & Feld LLP and Pepper Hamilton LLP, as counsel to the Prepetition Agent) and financial and other consultants, without the Prepetition Agent having to file any further application with the Court for approval or payment of such fees, costs or expenses, provided that the Prepetition Agent Professionals shall deliver all bills to the U.S. Trustee and counsel to any Committee contemporaneously with delivery to the Debtors (which delivery may, in each such case, be accomplished by electronic mail). Any such fees, costs and expenses incurred by the Prepetition Agent Professionals within ten (10) calendar days of delivery to the parties noted above unless an objection is asserted to such payment. Any such objection shall be in writing and shall state the specific portions that are objectionable and the basis therefor and the Debtors shall be required to pay any undisputed amounts within the foregoing ten (10) calendar day period. Any disputes regarding such fees, costs and expenses that are not resolved may be brought before the Court, but, otherwise, no further court approval shall be required. The Prepetition Agent Professionals' bills shall not be required to adhere to the U.S. Trustee Guidelines or any other rules applicable to the fees of professionals retained pursuant to an order of the Court. All amounts paid as adequate protection are deemed permitted uses of Cash Collateral.

(d) <u>Current Payments of Interest</u>. The Prepetition Agent, for the benefit of the Prepetition Lenders, shall receive from the Debtors current cash payments of interest on all

outstanding loans and advances under the Prepetition Loan Agreement, calculated at the rates, in the manner and at the times provided in the Prepetition Loan Agreement (provided, however, that interest shall accrue and be paid at the non-default rate of 14% per annum). The first payment to Prepetition Agent under this clause (d) shall include any and all accrued but unpaid interest as of the date of commencement of the Chapter 11 Cases plus any and all interest that would have accrued from the commencement of the Chapter 11 Cases through and including the date of such first payment.

(e) <u>Monitoring of Pre-Petition Collateral</u>. The Prepetition Agent shall be permitted to retain expert consultants and financial advisors at the expense of the Debtors (such expense to be an incremental item in the Budget), which consultants and advisors shall be given reasonable access for purposes of monitoring the business of the Debtors, the value of the Prepetition Collateral and the progress of the Chapter 11 Cases.

(f) <u>Financial Reporting</u>. The Debtors shall continue to provide the Prepetition Agent with financial and other reporting substantially in compliance with the Prepetition Loan Documents and any reporting described herein.

(g) <u>Sales Reporting</u>. The Debtors shall provide the Prepetition Agent with weekly sales reports customarily prepared by the Debtors prior to the commencement of the Chapter 11 Cases.

All intercompany/affiliate liens of the Debtors and other Obligors, if any (other than any liens securing the DIP Financing), will be contractually subordinated to the DIP Financing and to the Adequate Protection on terms satisfactory to the DIP Lenders in their sole discretion.

| **Conditions Precedent to All Borrowings:** | The conditions to all borrowings will include requirements relating to prior written notice of borrowing, the accuracy of representations and warranties, the absence of any default or DIP Order Event of Default, the other applicable conditions set forth in the Prepetition Loan Agreement and the following conditions: |
| --- | --- |

(a) As a result of such extension of credit, usage of the Commitments shall not exceed (i) the applicable Commitments then in effect, (ii) the aggregate amount authorized by the Interim Order or Final Order, as the case may be, and (iii) the maximum amount of net borrowings contemplated to be outstanding as reflected in the Budget,

subject to permitted variances;

(b) The Interim Order or Final Order, as the case may be, shall be in full force and effect, and shall not have been vacated, reversed, modified, amended, or stayed for a period of five (5) business days or longer; and

(c) The Debtors shall have paid the balance of all fees, costs and charges then due and payable as referenced herein.

**Affirmative and Negative Covenants:**

Customary covenants for financings of this type as more fully detailed in the DIP Loan Agreement.

**Events of Default:**

The DIP Financing shall be subject to the applicable events of default set forth in the DIP Loan Agreement, which include the events of default set forth in <u>Annex I</u> hereto, and those other events of default set forth in the DIP Orders (the "<u>DIP Order Event of Default</u>").

The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to exercise, (i) upon the occurrence and during the continuance of a DIP Order Event of Default, (ii) after the giving of fifteen (15) business days prior written notice (to the extent provided for in, and subject to the terms of, the DIP Loan Agreement) (the "<u>Notice Period</u>") to the Debtors and to (a) counsel to any Committee, (b) the U.S. Trustee, (c) counsel to the Ad Hoc Noteholders Group, (d) counsel to the indenture trustee (the "<u>Indenture Trustee</u>") for the Notes (as defined in the Noteholders RSA), and (e) the investors (the "<u>Backstop Investors</u>") party to the Backstop Commitment (as defined in the Colony RSA), and (iii) after occurrence of the Funding Termination Date (as defined below), all rights and remedies against the DIP Collateral provided for in the DIP Documents and the DIP Orders, including the following rights and remedies:

(a) declare the principal of and accrued interest on the outstanding borrowings, and all amounts payable under the DIP Loan Documents, to be immediately due and payable;

(b) terminate the Commitments to lend;

(c) set-off any amounts held for the account of the Debtors as cash collateral or in any accounts maintained with the DIP Agent, any other DIP Lender or their respective affiliates;

(d) take any action or exercise any right or remedy against the DIP Collateral permitted under the DIP Loan Documents,

the Interim Order, the Final Order, or by applicable law; and/or

(e) take any other action or exercise any other right or remedy permitted under the DIP Loan Documents, the Interim Order, the Final Order, or by applicable law.

After the Funding Termination Date, the automatic stay shall be vacated and modified automatically and the DIP Agent, the DIP Lenders or the Prepetition Secured Parties may pursue all rights and remedies against the DIP Collateral or the Prepetition Collateral in such manner as they shall agree upon in conformance with applicable law, this Interim Order and, if any, the Final Order. In any hearing after giving effect of the aforementioned notice regarding any exercise of rights or remedies, the only issues that may be raised by any party in opposition thereto shall be (1) whether, in fact, a DIP Order Event of Default has occurred and is continuing; or (2) whether to approve a Junior DIP Facility (as defined below), the proceeds of which are to be used to repay in full in cash all obligations (other than contingent indemnity obligations for which no claim has been made by DIP Agent (whether on its own behalf or on behalf of the DIP Lenders) or other similar contingent obligations) arising under the DIP Financing).

Unless waived by the DIP Lenders in their sole discretion, the use of cash collateral shall terminate upon the occurrence of the Funding Termination Date unless the Interim Junior DIP Order has been entered by the Court and the DIP Financing has been indefeasibly repaid in full in cash (other than contingent indemnity obligations for which no claim has been made by DIP Agent (whether on its own behalf or on behalf of the DIP Lenders) or other similar contingent obligations) arising under the DIP Financing) prior to such date; provided, that any ordinary payroll items paid in accordance with the Budget where checks have been issued but not cashed (and, for avoidance of doubt, any trust fund tax payments due and owing, the non-payment of which would give rise to personal liability of officers or directors) will be honored.

On the Funding Termination Date, the automatic stay shall be vacated and modified automatically and the DIP Agent, the DIP Lenders and the Prepetition Secured Parties may pursue all rights and remedies against the DIP Collateral or the Prepetition Collateral in such manner as they shall agree upon in conformance with applicable law, this Interim Order and, if any, the Final Order, unless, prior to the Funding Termination Date, (a)

the Court enters the Interim Junior DIP Order and (b) the DIP Financing has been indefeasibly repaid in full in cash (other than contingent indemnity obligations for which no claim has been made by DIP Agent (whether on its own behalf or on behalf of the DIP Lenders) or other similar contingent obligations) arising under the DIP Financing). Notwithstanding anything herein, all of the rights, remedies, benefits, and protections provided to the Prepetition Secured Parties under this Interim Order shall survive the Funding Termination Date.

**Junior DIP Facility:**    The term "Junior DIP Facility" shall mean a postpetition debtor in possession financing facility incurred after the commencement of the Notice Period and prior to the Funding Termination Date pursuant to section 364(c) of the Bankruptcy Code that is secured by a lien on, and security interest upon, all of the DIP Collateral (subject to the Carve-Out); provided, however, that such lien and security interest shall be junior to each and all of the liens and security interests of the Prepetition Agent in such collateral and the Adequate Protection Liens. The obligations of the Junior DIP Facility shall have superpriority administrative expense status under sections 503(b) and 507(b) of the Bankruptcy Code (the "Junior DIP Superpriority Claim") (subject to the Carve-Out); provided, however, that such Junior DIP Superpriority Claim shall be junior to the Adequate Protection Claim. Any order approving the Junior DIP Facility shall provide for, and not be inconsistent with, all the adequate protection and other benefits granted to the Prepetition Secured Parties in this Order and the Final Order and otherwise be consistent in all material respects with the description of the Junior DIP Facility in the DIP Loan Documents and the Interim Order.

If the agent (the "Junior DIP Agent") or any lender (collectively, the "Junior DIP Lender") under the Junior DIP Facility is an affiliate of the Debtors, a signatory to the Noteholders RSA or an affiliate of a signatory to the Noteholders RSA, then, in that instance, the Junior DIP Facility Motion must establish, and, subject to the Court's determination, the Court order approving the Junior DIP Facility shall be required to find that the economic terms of the Junior DIP Facility are market terms.

Upon the occurrence and during the continuance of an event of default under the Junior DIP Facility that is not waived by the Junior DIP Lender or cured within any applicable cure period and, to the extent that such event of default requires a declaration, is declared as an event of default under the Junior DIP Facility (a "Junior DIP Event of Default"), in each case prior to the

expiration of the Junior DIP Notice Period (as defined below) and, to the extent that the Junior DIP Agent or any Junior DIP Lender has provided any required notice to the Borrower regarding the exercise of remedies (the "Junior DIP Notice Period"), then upon the expiration of such notice period (unless such event of default is cured or waived prior to the expiration of such notice period), the automatic stay shall be vacated and modified automatically and the Prepetition Secured Parties, Junior DIP Agent and Junior DIP Lenders may pursue remedies against the Junior DIP Collateral or the Prepetition Collateral in conformance with applicable law and the Interim Order and, if any, Final Order; provided, that, the Prepetition Agent, on behalf of the Prepetition Lenders, shall have the exclusive right to enforce remedies against such collateral until the Prepetition Loan Agreement has been indefeasibly paid in full in cash; provided further, for the avoidance of doubt, in no event may the Junior DIP Agent or any Junior DIP Lender be granted relief from the automatic stay without the Prepetition Secured Parties receiving comparable relief.

If (a) an event of default under the Junior DIP Facility has occurred and is continuing, (b) the Junior DIP Agent or the Junior DIP Lender has failed or refused to declare a Junior DIP Event of Default, (c) there remains borrowing availability under the Junior DIP Facility, (d) WLH has failed or refused to make a borrowing request under the Junior DIP Facility and (e) the Debtors have failed to make material expenditures contemplated in the Budget or consistent with past practice during the Chapter 11 Cases, then, upon five (5) business days advance written notice from the Prepetition Agent to WLH, the automatic stay shall be vacated and modified automatically and the Prepetition Secured Parties may pursue remedies against any of the Junior DIP Collateral or the Prepetition Collateral in conformance with applicable law, the Interim Order and, if any, the Final Order.

In addition to the foregoing, if after the approval of the Junior DIP Facility, the Debtors fail to make payment in respect of or otherwise perform any adequate protection, including any obligation to provide Adequate Protection, to the Prepetition Secured Parties and such failure continues for five (5) business days after written notice thereof from the Prepetition Agent to the Debtors, then the automatic stay shall be vacated and modified automatically and the Prepetition Secured Parties may pursue remedies against any of the Junior DIP Collateral or the Prepetition Collateral in conformance with applicable law, and the Interim Order and, if any, the Final Order.

## DISCLOSURES PURSUANT TO LOCAL RULE 4001-2

22.     In accordance with Delaware Rule 4001-2, the Debtors note the following:

- <u>No Cross-Collateralization</u>:  The DIP Orders do not provide for the granting of cross-collateralization protection to any prepetition secured creditors, other than replacement liens with the same validity and priority as the Debtors' Prepetition Lenders' prepetition security interests.  In certain circumstances, however, the Interim Order provides the Prepetition Secured Parties with relief from the automatic stay with respect to the DIP Collateral and the Prepetition Collateral.  <u>See</u> Interim Order ¶¶ 15(b), 18(c), 18(d), 18(e) and 20(b).

- <u>Validity of Prepetition Loan Obligations and Related Liens</u>: The DIP Orders contemplate, subject to certain challenge rights set forth in Paragraph 36 of the Interim Order, findings that would bind the Debtors with respect to the validity, perfection and amount due and owing on account of the Prepetition Loan Obligations and granting general releases and indemnities in favor of the Prepetition Lenders, the DIP Agent and the DIP Lenders, but reserving all rights of the Debtors and any parties in interest to the Make Whole Amount and the Exit Fee under the Prepetition Loan Agreement.  <u>See</u> <u>id.</u> ¶¶ 6(a), 6(b), 6(c), 6(d) and 23.

- <u>Waiver of Section 506(c) Rights</u>: The Interim Order contemplates the waiver of Bankruptcy Code section 506(c) rights as part of the Final Order.  <u>See</u> <u>id.</u> ¶ 8(c).

- <u>Prepetition Secured Lien on Avoidance Actions</u>:  The DIP Orders do not contemplate providing the Prepetition Secured Parties with a lien on causes of action arising under chapter 5 of the Bankruptcy Code.  Although not technically a lien as contemplated by Delaware Rule 4001-2(a)(1)(D), the Interim Order contemplates that avoidance action proceeds, subject to certain conditions, may be used to satisfy the Prepetition Secured Parties' Superpriority Claims subject to entry of the Final Order.  <u>See</u> <u>id.</u> ¶ 13(a).

- <u>Adequate Protection</u>:  The DIP Orders contemplate providing adequate protection to the Prepetition Lenders.  <u>See</u> <u>id.</u> ¶ 20.

- <u>Treatment of Committee Professionals</u>:  The DIP Orders do not propose disparate treatment for professionals retained by a Committee from professionals retained by the Debtors, except with reference to the amounts set forth in the Budget.  See <u>id.</u> ¶ 22 and the Budget.

- <u>Waiver or Modification of the Automatic Stay</u>:  The DIP Orders contemplate, as to the DIP Agent, DIP Lenders and Prepetition Secured Parties, waiver or modification of the automatic stay upon the occurrence of an event of default, subject to certain notice and cure periods.  <u>See</u> <u>id.</u> ¶ 15(b).

- **Applicability of Non-Bankruptcy Law Relating to Perfection:** The DIP Orders include provisions that provide for the automatic perfection and validity of the liens, security interests and adequate protection provided in the DIP Agreement, the Interim Order and the Final Order without the necessity of any further filing or recording under the laws of any jurisdiction. See id. ¶ 32.

## STANDARDS FOR APPROVAL

### A.    Standard for Obtaining Credit under Section 364(c) of the Bankruptcy Code

23.    Section 364(c) of the Bankruptcy Code allows the obtaining of credit or incurrence of debt on an unsecured superpriority basis, or secured by liens on unencumbered property and junior liens on encumbered property. See 11 U.S.C. § 364(c). The statutory requirement for obtaining post-petition credit under section 364(c) is a finding, made after notice and hearing, that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(l) of [the Bankruptcy Code]." 11 U.S.C. § 364(c); see In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); In re Crouse Grp. Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and a hearing, upon showing that unsecured credit cannot be obtained). Courts have applied the following three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code:

(a)    the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;

(b)    the credit transaction is necessary to preserve the assets of the estate; and

(c)    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Crouse Grp., Inc., 71 B.R. at 549. As discussed below, each of these elements is satisfied.

**B.    Standards for Obtaining Credit Under
Section 364(d) of the Bankruptcy Code**

24.    If a debtor is unable to obtain credit under the provisions of section 364(c) of the

Bankruptcy Code, the debtor may obtain credit secured by a "priming" senior or equal lien on

property of the estate that is already subject to a lien under section 364(d) of the Bankruptcy

Code.  Specifically, section 364(d)(l) of the Bankruptcy Code provides that a court may, after

notice and a hearing, authorize the obtaining or the incurring of debt secured by a senior or equal

lien on property of the estate that is subject to a lien only if—

(a)    the trustee is unable to obtain such credit otherwise; and

(b)    there is adequate protection of the interest of the holder of the lien
on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1); see also In re 495 Cen. Park Ave. Corp., 136 B.R. 626, 631-32 (Bankr.

S.D.N.Y. 1992) (allowing post-petition lenders' liens to prime existing security interests because

(i) debtor was unable to obtain financing otherwise and (ii) debtor's use of proceeds would

provide adequate protection to existing secured creditors by increasing value of property

securing their claims).  As set forth below, unsecured credit was not available to the Debtors, and

the Prepetition Secured Parties consent to the Adequate Protection provided pursuant to this

Motion and the DIP Orders.

**C.    Standards for Use of Cash Collateral**

25.    The Bankruptcy Code also requires that the Prepetition Secured Parties be

provided adequate protection for the use of their Cash Collateral.  Section 363(c)(2) of the

Bankruptcy Code sets forth the requirements for a debtor's proposed use of Cash Collateral, and

provides, in pertinent part that:

[t]he trustee [or debtor in possession] may not use, sell, or lease cash
collateral . . . unless—(A) each entity that has an interest in such cash

collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

26.     11 U.S.C. § 363(c)(2).[7] Section 363(e) provides that: "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee [or debtor in possession], the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e) (emphasis added); see also Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortg. Corp. (In re Blackwood Assocs., L.P.), 153 F.3d 61, 67 (2d Cir. 1998) (noting the secured lender's "absolute right to receive adequate protection payments before any [non-consensual] use of [its] cash collateral by" the debtor).

### D.     Adequate Protection Standards

27.     What constitutes sufficient adequate protection, whether for a priming lien under section 364(d) or for the use of cash collateral under section 363, is fact-specific and is determined on a case-by-case basis. See In re Mosello, 195 B.R. 277, 288-89 (Bankr. S.D.N.Y. 1996). "'Its application is left to the vagaries of each case.'" Id. at 289 (quoting In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)). Examples of adequate protection are provided in section 361 of the Bankruptcy Code and include, but are not limited to: (1) "periodic cash payments" to the extent that such use "results in a decrease in value of such entity's interest in such property;" (2) "additional or replacement lien[s] to the extent that [the use of cash collateral] results in a decrease in the value of such entity's interest in such property;" and (3) "granting such other relief . . . as will result in the realization by such entity of the indubitable

---

[7] Section 363(a) of the Bankruptcy Code defines "cash collateral" as:

cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property ... subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.
11 U.S.C. § 363(a).

equivalent of such entity's interest in such property." 11 U.S.C. § 361. Bankruptcy courts have

broad flexibility under section 361 in deciding what constitutes adequate protection:

> This section specifies the means by which adequate protection may
> be provided. It does not require the court to provide it. To do so
> would place the court in an administrative role. Instead, the trustee
> or debtor in possession will provide or propose a protection
> method. If the party that is affected by the proposed action objects,
> the court will determine whether the protection provided is
> adequate. The purpose of this section is to illustrate means by
> which it may be provided and to define the contours of the
> concept.

H.R. Rep. No. 95-595, at 303, (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6295; see also

Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.), 16

F.3d 552, 564 (3d Cir. 1994) (Although section 361 provides examples of adequate protection, it

allows "courts discretion in fashioning the protection provided to a secured party. Therefore, a

determination of whether there is adequate protection is made on a case by case basis.") (citation

omitted); In re 495 Cent. Park Ave. Corp., 136 B.R. at 631 ("The statute confers upon 'the parties

and the courts flexibility by allowing such other relief as will result in the realization by the

protected entity of the value of its interest in the property involved.'") (quoting H.R. Rep. No.

95-595, at 340 (1978)).

28.    The "Court is not obligated to protect the creditor better than it did itself when

making the loan and obtaining security." In re Heatron, Inc., 6 B.R. 493, 496 (Bankr. W.D. Mo.

1980). The interest to be protected by virtue of the adequate protection requirement is the lesser

of the amount of the debt or the value of assets securing the debt as of the Petition Date. See

Bankers Life Ins. Co. of Neb. v. Alyucan Interstate Corp. (In re Alyucan Interstate Corp.), 12

B.R. 803, 808 (Bankr. D. Utah 1981) ("[T]he 'interest in property' entitled to protection is not

measured by the amount of the debt but by the value of the lien."). Here, the Prepetition Secured

Parties consent to the Adequate Protection proposed under the DIP Orders for the use of cash

collateral, subject to the terms of the DIP Orders.

## THE DIP FINANCING AND USE OF
## CASH COLLATERAL SHOULD BE APPROVED

### A.     The DIP Financing Should Be Approved

29.      The Debtors require additional working capital financing – beyond that which

would be generated as "Cash Collateral" – in order to preserve and maintain their businesses

during the Chapter 11 Cases.  In making their decision to seek financing from the DIP Lenders,

the Debtors considered many factors.  First, the Prepetition Secured Parties already hold liens on

substantially all of the Debtors' assets.  Second, the Debtors were unable to obtain alternative

postpetition financing from other lenders on terms more favorable to these estates than the

proposed DIP Financing through credit allowable as an administrative expense under section

503(b)(1) of the Bankruptcy Code, unsecured credit allowable under sections 364(a) and 364(b)

of the Bankruptcy Code, or credit secured by liens on the Debtors' assets junior to the liens

securing the Prepetition Loan Agreement, as is contemplated by section 364(c)(3) of the

Bankruptcy Code.

30.      In an effort to obtain alternative financing, the Debtors approached fifteen

different financial institutions, including banks, credit funds and hedge funds.  In particular, the

Debtors solicited these parties' interest in providing funding on either a priming or junior basis to

the Prepetition Secured Parties.  Several parties indicated an interest in providing financing to the

Debtors and the Debtors ultimately received four offers for post petition financing in addition to

a proposal by the Prepetition Secured Parties.  Three of these offers contemplated financing on a

priming basis to the Prepetition Secured Parties.  One party was interested in lending on a non-

priming basis, but such proposal was on terms materially more costly to the Debtors.  Hence, in

light of the terms of the proposed DIP Financing and the fact that such financing is provided in

the context of a global restructuring under the Plan, the Debtors determined that the financing with the DIP Lenders constituted the most advantageous to these estates.

31.     Moreover, the terms of the DIP Financing are fair and reasonable under the circumstances (particularly given the current economic and lending environment), reflect the Debtors' prudent exercise of their business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration for the obligations and liens and security interests granted in exchange.

32.     Without access to postpetition financing and the ability to use the Cash Collateral, the Debtors would be unable to operate their business as a going concern, which would significantly impair the value of the Debtors' assets, to the detriment of all creditor constituencies.  By obtaining the DIP Financing and being able to use the Prepetition Collateral and Cash Collateral, the Debtors will be in a position to preserve the value of their assets during the Chapter 11 Cases for the benefit of all creditors.  The DIP Financing and the continued use of Prepetition Collateral and Cash Collateral will provide the Debtors with necessary liquidity to maintain the value of the Debtors' assets and businesses and facilitate the Debtors' successful reorganization.  It is vital that the Debtors obtain approval to access immediately the Prepetition Collateral and Cash Collateral generated postpetition, as well as the postpetition financing contemplated by the DIP Loan Agreement in order to preserve the value of the Debtors' assets and facilitate their successful reorganization.  Absent approval of the relief sought herein, the Debtors face a substantial risk of severe disruption to their business and irreparable damage to the value of their assets.

### 1. No Adequate Alternative to the DIP Credit Facility is Currently Available

33.     A debtor need only demonstrate that, notwithstanding its good faith efforts, credit was unavailable without the protections afforded to potential lenders by sections 364(c) and (d) of the Bankruptcy Code. See Bray v. Shenandoah Fed. Savs. & Loan Assoc. (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) (affirming district court's grant of a priming lien, where "the trustee had demonstrated by a good faith effort that credit was not available without the senior lien."); In re 495 Cent. Park Ave, Corp., 136 at 630-31 (noting that, although "the debtor must make an effort to obtain credit without priming a senior lien," it does not need "to seek alternate financing from every possible lender."). As discussed above, substantially all of the Debtors' assets are subject to the liens of the Prepetition Secured Parties. Because of the substantial amount of Prepetition Loan Obligations, obtaining the financing needed by the Debtors as unsecured debt on an administrative priority basis, or as debt which would be secured solely by liens junior to the liens of the Prepetition Secured Parties, did not yield any alternative financing proposals on terms more advantageous to the estates than the proposed DIP Financing. Moreover, the Prepetition Secured Parties would not have consented to the granting of senior or pari passu liens to a new third party postpetition lender. Absent such consent, costly and distracting litigation over the propriety of such third party debtor in possession financing would likely have ensued, with potentially severe consequences for the Debtors and their estates.

34.     In short, the Debtors concluded that adequate alternative financing terms more favorable than those to be provided by the DIP Lenders under the DIP Financing are currently unavailable. Accordingly, the Debtors have satisfied the requirements of section 364(c) and (d) of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtors.

## 2. The DIP Financing Is Necessary to Preserve the Assets of the Estates

35.     As discussed more fully above, the proceeds of the DIP Financing and the use of

Cash Collateral are necessary to preserve and maintain the value of the Prepetition Collateral and

the interests therein of the Prepetition Secured Parties.  In short, the Debtors need sufficient

liquidity to avoid a forced liquidation of their assets on a "fire-sale" basis to the detriment of all

creditors.  See In re Sun Healthcare Grp., Inc., 245 B.R. 779, 781 (Bankr. D. Del. 2000), aff'd,

2002 WL 31155179 (D. Del. Sept. 27, 2002) (noting that the court had approved debtor-in-

possession financing to "permit the Debtors to continue to operate to preserve their estates").

## 3. The DIP Financing Terms Are Fair, Reasonable and Appropriate

36.     The proposed terms of the DIP Financing are fair and reasonable under the

circumstances.  As discussed more fully above, the Debtors made concerted efforts to obtain

credit on the most favorable terms available.  Although the Debtors contacted various alternate

lending institutions and other potential lenders, no other lender was willing to provide an

adequate stand-alone financing facility on terms more favorable than the proposed DIP

Financing.  Against this backdrop, the Debtors carefully evaluated the proposed financing

structure from the DIP Lenders, engaged in extensive negotiations with the DIP Lenders

regarding the proposed terms, worked with their various advisors to obtain the best possible

pricing from the DIP Lenders, and, eventually, agreed to the DIP Lenders' proposal as the

proposal best suited to the Debtors' needs.  The terms and conditions of the DIP Financing were

negotiated by the parties in good faith and at arm's length and, as outlined above, were instituted

for the purpose of enabling the Debtors to meet ongoing operational expenses while in chapter 11

and preserving the going concern status of the Debtors as well as the value of the Prepetition

Collateral.  In addition, it is also a termination event under the Noteholders RSA if the Debtors

enter into any debtor in possession financing agreement, or seek approval of such agreement, that

is not reasonably acceptable to the Ad Hoc Noteholders Group. As a result, the Debtors permitted the Ad Hoc Noteholders Group to participate directly and actively in the negotiations concerning the DIP Financing. Moreover, the terms of the DIP Financing are particularly reasonable given the current economic climate and lending market. The Ad Hoc Noteholders Group has reviewed the terms of the DIP Financing and has advised the Debtors that the DIP Loan Agreement and DIP Orders are reasonably acceptable to the Ad Hoc Noteholders Group.

> **B.      The Use of Cash Collateral is Necessary and Appropriate**

37.      Pursuant to section 363(e) of the Bankruptcy Code, the Debtors' use of Cash Collateral is conditioned upon adequate protection being provided to the Prepetition Secured Parties. <u>See</u> 11 U.S.C. § 363(e). The Debtors respectfully submit that the proposed use of Cash Collateral, in conjunction with the DIP Financing, is necessary for the Debtors to have sufficient liquidity during the chapter 11 process to preserve their assets and property (including the Prepetition Collateral). The Debtors' proposed use of Cash Collateral thus prejudices no one; it affirmatively and directly benefits the Debtors' estates and creditors, including the Prepetition Secured Parties, and enhances the prospects of a successful outcome of these cases.

> **C.      The Proposed Adequate Protection for the**
> **Prepetition Secured Parties Should Be Approved**

38.      To the extent that their interests in the Prepetition Collateral constitute valid and perfected security interests and liens as of the Petition Date, absent consent, the Prepetition Secured Parties are entitled, pursuant to sections 361, 363(e) and 364(d)(l) of the Bankruptcy Code, to adequate protection of their interest in the Prepetition Collateral, including the Cash Collateral. The Debtors are requesting by this Motion to provide adequate protection in the form of replacement liens to the Prepetition Secured Parties, claims under section 507(b) of the Bankruptcy Code, payment of reasonable fees and expenses of certain of the Prepetition Agent's

Professionals and otherwise in accordance with the DIP Orders, and certain other benefits as more fully set forth in the proposed DIP Orders. The Prepetition Secured Parties have consented to the proposed Adequate Protection.

## INTERIM APPROVAL SHOULD BE GRANTED

39.     The Debtors request that the Court conduct an expedited preliminary hearing on the Motion and authorize the Debtors from and after the entry of the Interim Order until the Final Hearing to obtain credit under the DIP Financing in the amount of not more than $15,000,000, which the Debtors shall, among other things, use as critical working capital. Such authority will ensure that the Debtors maintain ongoing operations and avoid immediate and irreparable harm and prejudice to their estates and all parties in interest pending the Final Hearing.

40.     Absent this Court's approval of the interim relief sought by this Motion, the Debtors face a substantial risk of severe disruption to their business operations and irreparable damage to their relationships with lenders and service providers. Simply put, the relief sought herein will allow the Debtors to continue meeting their financial obligations to employees, vendors, and service providers, among others.

41.     Bankruptcy Rule 4001(c) permits a court to approve a debtor's request for financing during the 15-day period following the filing of a motion requesting authorization to obtain postpetition financing "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(c)(2). In examining requests under this Rule, courts apply the same business judgment standard as is applicable to other business decisions. See, e.g., Ames, 115 B.R. at 38. After the 15-day period, the Bankruptcy Rules do not limit the request to those amounts necessary to prevent the destruction of the debtor's business, and the debtor can borrow those amounts it views as prudent to the operation of its business. Id. at 36. The Debtors submit that, for the reasons set forth herein, the

38

immediate obtaining of credit up to $30,000,000 of which up to $15,000,000 shall be available

upon entry of the Interim Order and the use of Cash Collateral on an interim basis as requested in

this Motion is necessary to avert immediate and irreparable harm to the Debtors' businesses.

**REQUEST FOR FINAL HEARING**

42.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that

the Court schedule the Final Hearing.

43.    The Debtors request that they be authorized to serve a copy of the signed Interim

Order, which fixes the time and date for the filing of objections, if any, by first-class mail upon

the notice parties listed below.  The Debtors further request that the Court consider such notice of

the Final Hearing to be sufficient notice under Bankruptcy Rule 4001.

**WAIVER OF BANKRUPTCY RULES 6004(A) AND (H)**

44.    Should the Court grant the Motion and enter the Interim Order and the Final

Order, to implement the DIP Financing successfully, the Debtors seek a waiver of the notice

requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing the

use, sale or lease of property under Bankruptcy Rule 6004(h).

**NOTICE**

45.    Notice of the this Motion has been provided to: (i) the U.S. Trustee, (ii) counsel,

to the extent known to the Debtors, to any known secured creditors of record, (iii) counsel to the

Prepetition Agent, (iv) the Prepetition Lenders, (v) counsel to the Ad Hoc Noteholders Group;

(vi) counsel to the indenture trustee for the Old Notes; (vii) the thirty (30) largest unsecured

creditors of each of the Debtors, (viii) any known party asserting a lien against, or other interests

in, any of the Debtors' assets, and, to the extent known by the Debtors, its counsel, and (ix) the

Internal Revenue Service.  In light of the nature of the relief requested herein, the Debtors submit

that no other or further notice is required.

39

**NO PREVIOUS REQUEST**

46.     No previous request for the relief sought herein has been made to this or any other

Court.

**WHEREFORE** the Debtors respectfully request entry of the Interim Order and

the Final Order granting the relief requested herein, and such other and further relief as the Court

may deem just and appropriate.

Dated:  12/19 , 2011                    PACHULSKI STANG ZIEHL & JONES LLP

                                        _____
                                        Richard M. Pachulski (CA Bar No. 90073)
                                        Laura Davis Jones (DE Bar No. 2436)
                                        David M. Bertenthal (CA Bar No. 167624)
                                        Joshua M. Fried (CA Bar No. 181541)
                                        Shirley S. Cho (CA Bar No. 192616)
                                        919 North Market Street, Seventeenth Floor
                                        P.O. Box 8705
                                        Wilmington, Delaware 19899-8705
                                        Telephone:  (302) 652-4100
                                        Facsimile:  (302) 652-4400
                                        E-mail:  rpachulski@pszjlaw.com
                                                 ljones@pszjlaw.com
                                                 dbertenthal@pszjlaw.com
                                                 jfried@pszjlaw.com
                                                 scho@pszjlaw.com

                                        Proposed Counsel for the Debtors and
                                        Debtors in Possession

# ANNEX I[8]

**Events of Default Include:**

1. The failure of the Obligors to make any payments to the Prepetition Lenders as provided in the Interim Order or the Final Order, as applicable.

2. Conversion of any of the Chapter 11 Cases (other than the Chapter 11 Cases solely relating to Non-Material Subsidiaries (as defined in the Colony RSA) to a case under chapter 7 of the Bankruptcy Code;

3. The appointment of a trustee in any of the Chapter 11 Cases (other than the Chapter 11 Cases solely relating to Non-Material Subsidiaries) without the consent of the Prepetition Lenders;

4. The appointment of an examiner with expanded powers in any of the Chapter 11 Cases (other than the Chapter 11 Cases solely relating to Non-Material Subsidiaries) without the consent of the DIP Agent and the Prepetition Lenders;

5. The dismissal of any of the Chapter 11 Cases (other than the Chapter 11 Cases solely relating to Non-Material Subsidiaries);

6. The entry of any order (a) modifying, reversing, staying or amending, in any material respect, or (b) revoking, rescinding or vacating the Interim Order or the Final Order without the express prior written consent of the DIP Lenders;

7. The Interim Order shall not have been replaced by a Final Order acceptable to the DIP Lenders in their sole discretion within 30 days of the filing date;

8. A plan of reorganization or liquidation is filed in any of the Chapter 11 Cases, other than the Plan, unless (i) such plan will result in the indefeasible payment in full in cash of all DIP Loan Obligations and the Prepetition Loan Obligations (other than contingent indemnity obligations for which no claims have been made by the DIP Agent or the Prepetition Agent, as applicable (whether on its own behalf or on behalf of the DIP Lenders or the Prepetition Lenders, as applicable), or other similar contingent obligations) or (ii) the DIP Lenders have approved the terms of such plan;

9. Any Debtor shall attempt to vacate or modify the Interim Order or the Final Order over the objection of the DIP Lenders;

10. Other than in connection with granting the first day relief as proposed by the Debtors with the consent of the DIP Lenders in their sole discretion, the Court shall enter an order granting relief from the automatic stay to the holder or holders of any other security interest or lien (other than the DIP Lenders) in any Collateral to permit the pursuit of any judicial or non-judicial transfer or other remedy against any of the Collateral with a value in excess of $1 million in the aggregate for all Collateral subject to any such relief from the automatic stay, or granting any form of adequate protection, including, without limitation, requiring cash payments by such Debtor to such holder or holders, in lieu of such relief;

---

[8] This summary of terms is qualified in its entirety by the DIP Loan Documents. In the event of a conflict between this summary and the DIP Loan Documents or DIP Orders, the DIP Loan Documents or DIP Orders shall govern.

11. Any Debtor shall bring or consent to any motion or application in the Chapter 11 Cases: (i) to obtain working capital financing from any person other than the DIP Lenders under section 364(d) of the Bankruptcy Code; or (ii) to obtain financing from any person other than the DIP Lenders under section 364(c) of the Bankruptcy Code, except for a Junior DIP Facility that refinances the DIP Financing (other than contingent indemnity obligations for which no claims have been made by the DIP Agent (whether on its own behalf or on behalf of the DIP Lenders) or other similar contingent obligations) in full in cash after the commencement of the Notice Period and prior to the Funding Termination Date; or (iii) to grant any lien that is *pari passu* or senior to any lien granted to the DIP Agent under the DIP Loan Documents, the Interim Order or the Final Order, except as permitted therein; or (iv) subject to entry of the Final Order, to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under section 506(c) of the Bankruptcy Code; or (v) to grant a super-priority claim, other than that granted in the Interim Order or Final Order (and other than with respect to the Carve-Out), which is *pari passu* with or senior to any of the claims of the DIP Agent and the DIP Lenders against the Borrower or any other Guarantor hereunder, under the Interim Order or under the Final Order (or there shall arise or be granted any super-priority claim *pari passu* or senior to any such claims);

12. Subject to entry of the Final Order, any other party shall both seek and obtain allowance of any order in the Chapter 11 Cases to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under section 506(c) of the Bankruptcy Code;

13. An order shall be entered by the Court confirming a plan of reorganization or liquidation in any of the Chapter 11 Cases, other than the Chapter 11 Cases solely relating to Non-Material Subsidiaries, or the Plan that does not provide for payment of all of the obligations due under the DIP Financing and the Prepetition Loan Agreement (other than contingent indemnity obligations for which no claims have been made by the DIP Agent or the Prepetition Agent, as applicable (whether on its own behalf or on behalf of the DIP Lenders or the Prepetition Lenders, as applicable), or other similar contingent obligations) by an indefeasible payment in full in cash of such obligations on or before the effective date of such plan), unless the DIP Lenders shall have approved the terms of such plan;

14. An order shall be entered by the Court, or any Debtor shall make a motion for an order of the Court, dismissing any of the Chapter 11 Cases (other than the Chapter 11 Cases solely relating to Non-Material Subsidiaries) that does not contain a provision for payment of all of the obligations due under the DIP Financing and the Prepetition Loan Agreement (other than contingent indemnity obligations for which no claims have been made by the DIP Agent or the Prepetition Agent, as applicable (whether on its own behalf or on behalf of the DIP Lenders or the Prepetition Lenders, as applicable), or other similar contingent obligations) by an indefeasible payment in full in cash of such obligations;

15. There shall occur a variance from the Budget in excess of any permitted variance therefrom unless waived by the DIP Lenders;

16. Other than in connection with a Junior DIP Facility that refinances the DIP Financing (other than contingent indemnity obligations for which no claims have been made by the DIP Agent (whether on its own behalf or on behalf of the DIP Lenders) or other similar contingent obligations) in full in cash after the commencement of the Notice Period and

2

prior to the Funding Termination Date, any Debtor shall seek approval of, or the Court shall approve, any order permitting the use of cash collateral of any Debtor in the Chapter 11 Cases, without the consent of the DIP Lenders, that in any way is inconsistent with any of the provisions of this DIP Loan Documents, the Interim Order or the Final Order or otherwise adversely affects the rights, remedies, claims, liens or bankruptcy priorities of the DIP Lenders as established by the DIP Loan Documents, the Interim Order or the Final Order;

17. At any time after the thirteen-week anniversary of the date of commencement of the Chapter 11 Cases, a Budget that has been approved by the DIP Lenders in accordance with the DIP Loan Documents is not then in full force and effect;

18. The Borrower shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition indebtedness, unless (a) authorized by the "first day orders" and related pleadings approved by the DIP Lenders, (b) approved by the DIP Lenders and the Court, in each case subject to the Budget or (c) set forth in the Budget approved by the DIP Lenders;

19. The date (a) of commencement of any adversary proceeding, contested matter or other action by any Debtor or (b) the Ad Hoc Noteholders Group or any of the noteholders party to the Noteholder RSA is granted standing by the Court to commence or prosecute any such adversary proceedings, contested matters or other actions, in any such case asserting any claims and defenses or otherwise against any of the Prepetition Secured Parties with respect to the Prepetition Loan Agreement, the obligations of any Debtor thereunder or the liens granted to the Prepetition Agent to secure the obligations under the Prepetition Loan Agreement;

20. A "Termination Event" under and as defined in: (i) the second portion of section 5(n) of the Colony RSA; (ii) section 5(s) of the Colony RSA, but only with respect to the Plan Related Documents (as defined in the Colony RSA); (iii) section 5(cc), (dd), (ee) or (ff) of the Colony RSA; provided that for purposes hereof, the discretion standard set forth therein for the Prepetition Agent and the Consenting Lenders (as defined in the Colony RSA) shall be a reasonable discretion standard (and not their sole and absolute discretion); or (iv) section 5(v) or (gg) of the Colony RSA shall have occurred or, with respect to section 5(h) or (i) of the Colony RSA, as applicable, a deadline contained therein has been missed which would, as a practical matter, preclude entry of the Confirmation Order (as defined in the Colony RSA) by the applicable deadline set forth therein, and the Prepetition Agent or any Prepetition Lender shall have terminated the Colony RSA as a result thereof and in accordance with the terms thereof;

21. Any Obligor shall have accepted an offer or bid for the purchase of all or substantially all of the assets of such Obligor or all of the equity of a reorganized Obligor which is unacceptable to the Lenders in their sole discretion unless the proceeds of such offer or bid are sufficient to indefeasibly pay in full in cash all of the obligations due under the DIP Financing and the Prepetition Loan Agreement (other than contingent indemnity obligations for which no claims have been made by the administrative agent or the Prepetition Agent, as applicable (whether on its own behalf or on behalf of the DIP Lenders or the Prepetition Lenders, as applicable), or other similar contingent obligations); provided, however, in accordance with Section 7.04(b)(iii) of the DIP Loan Agreement, the Obligors may sell assets outside of the ordinary course of business having

3

a value of up to $1 million in the aggregate during the course of the Chapter 11 Cases without the need for approval from the DIP Lenders; or

22. Any Debtor shall file a motion with the Court for authority to proceed with the sale or liquidation of a Debtor (or any material portion of the assets of a Debtor) unless the proceeds of such sale or liquidation are sufficient to indefeasibly pay in full in cash all of the obligations due under the DIP Financing and the Prepetition Loan Agreement (other than contingent indemnity obligations for which no claims have been made by the DIP Agent or the Prepetition Agent, as applicable (whether on its own behalf or on behalf of the DIP Lenders or the Prepetition Lenders, as applicable), or other similar contingent obligations).