# EXHIBIT B

**SENIOR SECURED, SUPER PRIORITY DEBTOR-IN-POSSESSION TERM LOAN AGREEMENT**

**Dated as of December 19, 2011**

**among**

**WILLIAM LYON HOMES, INC. as Borrower,**

**and**

**COLFIN WLH FUNDING, LLC, as Administrative Agent,**

**and**

**COLFIN WLH FUNDING, LLC, as Initial Lender and Lead Arranger,**

**and**

**The Lenders Party Hereto**

# TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINITIONS AND ACCOUNTING TERMS.......................................2
    1.01    DEFINED TERMS. ..........................................................2
    1.02    OTHER INTERPRETIVE PROVISIONS ................................34
    1.03    ACCOUNTING TERMS...................................................35
    1.04    ROUNDING ...............................................................35
    1.05    TIMES OF DAY ...........................................................35

ARTICLE II. CREDIT EXTENSION ................................................35
    2.01    LOANS. ....................................................................35
    2.02    LIBO BREAK AMOUNTS. ..............................................36
    2.03    PREPAYMENTS; COMMITMENT REDUCTIONS. ...................37
    2.04    REPAYMENT OF LOANS ...............................................38
    2.05    INTEREST. ................................................................38
    2.06    FEES. ......................................................................39
    2.07    COMPUTATION OF INTEREST AND FEES .........................39
    2.08    EVIDENCE OF DEBT ...................................................40
    2.09    PAYMENTS GENERALLY; ADMINISTRATIVE AGENT'S
             CLAWBACK. ..............................................................40
    2.10    SHARING OF PAYMENTS BY LENDERS ............................41
    2.11    SECURITY. ...............................................................41
    2.12    PAYMENT OF OBLIGATIONS. ........................................42
    2.13    NO DISCHARGE; SURVIVAL OF CLAIMS.. ........................42

ARTICLE III. TAXES, YIELD PROTECTION AND ILLEGALITY ................42
    3.01    TAXES. ....................................................................42
    3.02    PROVISIONS APPLICABLE TO THE LIBO RATE...................44
    3.03    [RESERVED]...............................................................45
    3.04    COMPENSATION FOR LOSSES ......................................45
    3.05    MITIGATION OBLIGATIONS; REPLACEMENT OF LENDERS. ....45
    3.06    SURVIVAL ................................................................46

ARTICLE IV. CONDITIONS PRECEDENT TO CREDIT EXTENSION ..............46
    4.01    CONDITIONS TO INITIAL CREDIT EXTENSION HEREUNDER ....46
    4.02    CONDITIONS TO EACH POST CLOSING CREDIT EXTENSION .....49
    4.03    [RESERVED]...............................................................50
    4.04    CONDITIONS PRECEDENT TO ADMISSION OF REAL PROPERTY
             TO THE BORROWING BASE AS UNIMPROVED LAND ............51
    4.05    CONDITIONS PRECEDENT TO ADMISSION OF REAL PROPERTY
             TO THE BORROWING BASE AS LAND UNDER DEVELOPMENT ....51
    4.06    CONDITIONS PRECEDENT TO ADMISSION OF REAL PROPERTY
             AS FINISHED LOTS TO THE BORROWING BASE ..................52
    4.07    CONDITIONS PRECEDENT TO ADMISSION OF REAL PROPERTY
             TO THE BORROWING BASE AS HOMES UNDER CONSTRUCTION ........53

201670660 v15

4.08    CONDITIONS PRECEDENT TO ADMISSION OF REAL PROPERTY
         TO THE BORROWING BASE AS MODEL HOMES..........................................54
4.09    GENERAL CONDITIONS TO REAL PROPERTY ELIGIBLE
         COLLATERAL BEING INCLUDED IN THE BORROWING BASE ...............55

ARTICLE V. REPRESENTATIONS AND WARRANTIES ........................................................57

5.01    EXISTENCE, QUALIFICATION AND POWER; COMPLIANCE WITH
         LAWS..........................................................................................................................57
5.02    AUTHORIZATION; NO CONTRAVENTION ....................................................57
5.03    GOVERNMENTAL AUTHORIZATION; OTHER CONSENTS ........................57
5.04    BINDING EFFECT .................................................................................................58
5.05    FINANCIAL STATEMENTS; NO MATERIAL ADVERSE EFFECT................58
5.06    LITIGATION ...........................................................................................................58
5.07    NO DEFAULT ..........................................................................................................58
5.08    OWNERSHIP OF PROPERTY; LIENS. .............................................................59
5.09    SECURED INDEBTEDNESS ................................................................................60
5.10    INSURANCE.............................................................................................................60
5.11    TAXES. .....................................................................................................................60
5.12    ERISA COMPLIANCE ............................................................................................61
5.13    SUBSIDIARIES; JOINT VENTURES ...................................................................61
5.14    MARGIN REGULATIONS; INVESTMENT COMPANY ACT; PUBLIC
         UTILITY HOLDING COMPANY ACT ...............................................................61
5.15    DISCLOSURE ...........................................................................................................62
5.16    COMPLIANCE..........................................................................................................62
5.17    COMPLIANCE WITH ENVIRONMENTAL LAWS. ...........................................62
5.18    LOANS AS SENIOR INDEBTEDNESS ...............................................................63
5.19    LAWS PERTAINING TO LAND SALES...............................................................63
5.20    FISCAL YEAR ..........................................................................................................64
5.21    COMMON ENTERPRISE AND CONSIDERATION .........................................64
5.22    SUBSIDIARIES OWNING REAL PROPERTY ...................................................64
5.23    [RESERVED]............................................................................................................64
5.24    ENTITLEMENTS......................................................................................................64
5.25    MATERIAL AGREEMENTS; NO MATERIAL DEFAULTS.. ...........................64
5.26    NO CONDEMNATION...........................................................................................65
5.27    CFD AND SUBDIVISION BOND .........................................................................65
5.28    [RESERVED]............................................................................................................65
5.29    [RESERVED]............................................................................................................65
5.30    [RESERVED]............................................................................................................65
5.31    [RESERVED]............................................................................................................65
5.32    [RESERVED]............................................................................................................65
5.33    AMENITIES .............................................................................................................65
5.34    [RESERVED]............................................................................................................65
5.35    BORROWING BASE ...............................................................................................65
5.36    [RESERVED]............................................................................................................65
5.37    CREATION, PERFECTION AND PRIORITY OF LIENS .................................65
5.38    EQUITY SECURITIES ...........................................................................................66
5.39    NO AGREEMENTS TO MERGE...........................................................................66

201670660 v15

5.40    LABOR MATTERS.................................................................66
5.41    BURDENSOME CONTRACTUAL OBLIGATIONS ETC ...............66
5.42    BROKERAGE COMMISSIONS ............................................66
5.43    AGREEMENTS WITH AFFILIATES AND OTHER AGREEMENTS ..............66
5.44    FOREIGN ASSETS CONTROL, ETC...............................66
5.45    INTERNAL CONTROLS..................................................67
5.46    INTERCOMPANY RECEIVABLES.................................67
5.47    EFFECTIVE DATE; MATERIALITY THRESHOLD OF CERTAIN
          REPRESENTATIONS AND WARRANTIES..............................67
5.48    REPRESENTATIONS AND WARRANTIES UPON DELIVERY OF
          FINANCIAL STATEMENTS, DOCUMENTS, AND OTHER
          INFORMATION .................................................................68
5.49    REORGANIZATION MATTERS. ......................................68

ARTICLE VI. AFFIRMATIVE COVENANTS .....................................69

6.01    FINANCIAL STATEMENTS AND OTHER REPORTS...............69
6.02    CERTIFICATES; OTHER INFORMATION ..........................71
6.03    NOTICES......................................................................73
6.04    PAYMENT OF OBLIGATIONS ..........................................74
6.05    PRESERVATION OF EXISTENCE, ETC. .............................74
6.06    MAINTENANCE OF PROPERTIES.....................................74
6.07    MAINTENANCE OF INSURANCE. .....................................74
6.08    COMPLIANCE................................................................75
6.09    BOOKS AND RECORDS ..................................................75
6.10    INSPECTION RIGHTS.....................................................76
6.11    USE OF PROCEEDS ......................................................76
6.12    NEW SUBSIDIARIES .....................................................76
6.13    INTANGIBLE, RECORDING AND STAMP TAX ....................76
6.14    FURTHER ASSURANCES.................................................76
6.15    [RESERVED]..................................................................77
6.16    SPECIAL COVENANTS RELATING TO COLLATERAL............77
6.17    PAPA OBLIGATIONS.......................................................83
6.18    TRANSFER OF CF PROPERTY AND MF PROPERTY TO
          BORROWER...................................................................83
6.19    PROPERTY TRANSFERS.................................................84
6.20    COMPLIANCE WITH BUDGET.. .......................................84

ARTICLE VII. NEGATIVE COVENANTS ........................................84

7.01    PERMITTED INDEBTEDNESS .........................................84
7.02    PERMITTED LIENS........................................................85
7.03    INVESTMENTS..............................................................86
7.04    FUNDAMENTAL CHANGES.............................................87
7.05    ACQUISITIONS.............................................................87
7.06    TRANSACTIONS WITH AFFILIATES .................................87
7.07    SENIOR UNSECURED NOTES. ........................................88
7.08    PERMITTED DISTRIBUTIONS..........................................88
7.09    CHANGE IN NATURE OF BUSINESS ................................88

7.10    USE OF PROCEEDS ..................................................................88
7.11    NO OTHER NEGATIVE PLEDGE ........................................89
7.12    INVESTMENTS IN MF OWNER and CF OWNER...................89
7.14    [RESERVED]...........................................................................89
7.15    COMPLIANCE WITH APPLICABLE 13-WEEK BUDGET AND
        OPERATING FORECAST ........................................................89
7.16    SECURED INDEBTEDNESS. ..................................................90
7.17    EXPENDITURES OUTSIDE OF CORE BUSINESSES ..........90
7.18    EMPLOYEE COMPENSATION ..............................................90
7.19    CHAPTER 11 CASES...............................................................91
7.20    CHANGES IN KEY MANAGEMENT ...................................91
7.21    EXCLUDED ASSETS ..............................................................92
7.22    IMPROVEMENTS ....................................................................92
7.23    PAPA OBLIGATION ...............................................................92
7.24    NEGATIVE PLEDGE ..............................................................92
7.25    CF PROPERTY, MF PROPERTY AND MAYFIELD PROPERTY ..................92
7.26    AMENDMENT TO DOCUMENTS...........................................92

ARTICLE VIII. RELEASES ...........................................................................93

8.01    GENERAL REQUIREMENTS FOR RELEASES......................93
8.02    STANDARD RELEASES .........................................................94
8.03    DEDICATIONS ........................................................................95
8.04    PERMITTED CONSTRUCTION INDEBTEDNESS .................95

ARTICLE IX. EVENTS OF DEFAULT AND REMEDIES .........................96

9.01    DEFAULT.................................................................................96
9.02    REMEDIES UPON EVENT OF DEFAULT ...........................102
9.03    APPLICATION OF FUNDS....................................................102
9.04    PROTECTIVE ADVANCES/CURE RIGHTS..........................103

ARTICLE X. ADMINISTRATIVE AGENT ..................................................104

10.01   APPOINTMENT AND AUTHORITY .....................................104
10.02   RIGHTS AS A LENDER ........................................................104
10.03   EXCULPATORY PROVISIONS .............................................104
10.04   RELIANCE BY ADMINISTRATIVE AGENT .........................105
10.05   DELEGATION OF DUTIES ...................................................105
10.06   RESIGNATION OF ADMINISTRATIVE AGENT ....................105
10.07   NON-RELIANCE ON ADMINISTRATIVE AGENT AND OTHER
        LENDERS...............................................................................106
10.08   NO OTHER DUTIES ETC......................................................106
10.09   [Reserved.].............................................................................106
10.10   COLLATERAL AND GUARANTY MATTERS .......................106

ARTICLE XI. MISCELLANEOUS ..............................................................107

11.01   AMENDMENTS, ETC.............................................................107
11.02   NOTICES; EFFECTIVENESS; ELECTRONIC COMMUNICATION. ............108
11.03   NO WAIVER; CUMULATIVE REMEDIES .............................109

iv

11.04   EXPENSES; INDEMNITY; DAMAGE WAIVER. ...........................................109
11.05   PAYMENTS SET ASIDE ................................................................................111
11.06   SUCCESSORS AND ASSIGNS. ....................................................................112
11.07   TREATMENT OF CERTAIN INFORMATION; CONFIDENTIALITY ...........114
11.08   RIGHT OF SETOFF .......................................................................................115
11.09   INTEREST RATE LIMITATION ...................................................................115
11.10   COUNTERPARTS; INTEGRATION; EFFECTIVENESS ................................116
11.11   SURVIVAL OF REPRESENTATIONS AND WARRANTIES...........................116
11.12   SEVERABILITY .............................................................................................116
11.13   REPLACEMENT OF LENDERS ...................................................................116
11.14   GOVERNING LAW; JURISDICTION; ETC. ................................................117
11.15   WAIVER OF JURY TRIAL.............................................................................118
11.16   ARBITRATION................................................................................................118
11.17   RELATIONSHIP OF PARTIES.....................................................................120
11.18   USA PATRIOT ACT NOTICE ......................................................................120
11.19   DISCRETION STANDARD ..........................................................................120
11.20   TIME OF THE ESSENCE...............................................................................121
11.21   PARTIES INCLUDING TRUSTEES' BANKRUPTCY COURT
        PROCEEDINGS..............................................................................................121
11.22   PRE-PETITION LOAN AGREEMENT. ........................................................121
11.23   AGENT AS A PARTY IN INTEREST.............................................................121

201670660 v15

## SENIOR SECURED, SUPER PRIORITY DEBTOR-IN-POSSESSION TERM LOAN AGREEMENT

THIS SENIOR SECURED, SUPER PRIORITY DEBTOR-IN-POSSESSION TERM LOAN AGREEMENT ("Agreement") is entered into as of December 19, 2011, among WILLIAM LYON HOMES, INC., a California corporation ("Borrower"), each lender from time to time party hereto (collectively, the "Lenders" and individually, a "Lender"), COLFIN WLH FUNDING, LLC, a Delaware limited liability company, as Initial Lender, and COLFIN WLH FUNDING, LLC, a Delaware limited liability company, as Administrative Agent, and is consented and agreed to by WILLIAM LYON HOMES, a Delaware corporation ("Parent").

WHEREAS, on December 19, 2011 (the "Petition Date"), the Borrower and the Guarantors (as defined below) commenced their respective bankruptcy cases (each, a "Chapter 11 Case" and collectively, the "Chapter 11 Cases") by filing separate voluntary petitions for reorganization under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code"), with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, prior to the Petition Date, the Lenders provided financing to Borrower ("Existing Borrower") pursuant to that certain Senior Secured Term Loan Agreement, dated as of October 20, 2009, by and among Existing Borrower, ColFin WLH Funding, LLC, as Initial Lender and Lead Arranger, and the lenders party thereto from time to time (the "Pre-Petition Lenders"), and ColFin WLH Funding, LLC, as administrative agent for the Pre-Petition Lenders (in such capacity, the "Pre-Petition Agent"), as amended by that certain First Amendment To Senior Secured Term Loan Agreement, dated as of March 18, 2011, and as further amended by that certain Second Amendment and Waiver No. 3 to Senior Secured Term Loan Agreement, dated as of September 16, 2011 (as so amended and as may be further amended, restated, supplemented or otherwise modified from time to time, the "Pre-Petition Loan Agreement"); and

WHEREAS, Borrower has requested that the Lenders provide a senior secured, super-priority multiple draw debtor-in-possession term loan facility to Borrower of up to Thirty Million Dollars ($30,000,000) in the aggregate to (i) provide working capital for, and for other general corporate purposes of, Borrower and the other Loan Parties, including, without limitation, adequate protection payments, (ii) pay the fees and expenses of Administrative Agent and the Lenders and (iii) fund the administration of the Chapter 11 Cases; and

WHEREAS, subject to the foregoing, the Lenders are willing to make certain loans and other extensions of credit to Borrower of up to such amount upon the terms and conditions set forth herein; and

WHEREAS, the Loan Parties have agreed to secure all of their obligations under the Loan Documents (as defined below) by granting to Administrative Agent (as defined below), for the benefit of the Lenders, a security interest in and lien upon substantially all of their existing and after-acquired personal and real property, exclusive of certain designated assets as more specifically described in terms of Collateral (as defined below).

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I.
## DEFINITIONS AND ACCOUNTING TERMS

1.01    DEFINED TERMS.

As used in this Agreement, the following terms shall have the meanings set forth below:

"13-Week Budget" means a projected budget of sources and uses of cash for the Borrower and its Subsidiaries on a weekly basis for the following 13 calendar weeks, including the anticipated uses of the Loans for each week during such period.

"Adequate Protection Obligations" has the meaning specified therefor in the Interim Order  and, when entered, the Final Order.

"AAA" has the meaning specified in Section 11.16(b).

"Administrative Agent" means ColFin WLH Funding, LLC in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"Administrative Agent's Office" means Administrative Agent's address and, as appropriate, account as set forth on Schedule 11.02, or such other address or account as Administrative Agent may from time to time notify to Borrower and the Lenders.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by Administrative Agent.

"Advisors" shall mean outside legal counsel (including local counsel), auditors, accountants, consultants, appraisers or other advisors of Administrative Agent and the Lenders.

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Aggregate Loans" means the Loans of all the Lenders.

"Aggregate Real Property" means any and all of the Borrower Real Property, the CF Property, the MF Property and the Mayfield Property.

"Agreement" means this Senior Secured, Super-Priority Debtor-in-Possession Term Loan Agreement.

"Amenities" means, collectively, the gatehouses, maintenance sheds, golf courses, marinas, clubhouses, and swimming, tennis and other recreational facilities or types of amenities,

2

and Improvements ancillary thereto, located at or used in connection with any Project or Asset by owners of Units or Lots.

"Annual Period" has the meaning specified in Section 2.03(c)(i).

"Anti-Terrorism Law" shall mean each of: (a) the Executive Order, (b) the Patriot Act, (c) the Money Laundering Control Act of 1986, 18 U.S.C. Sect. 1956, and (d) any other Law now or hereafter enacted to monitor, deter or otherwise prevent terrorism or the funding or support of terrorism.

"Apartment" means a residential apartment building consisting of single family residential units for rent.

"Applicable 13-Week Budget" means a 13-Week Budget which shall have been approved by the Lenders in accordance with Section 6.01(h), a copy of the initial Applicable 13-Week Budget is attached hereto as Exhibit "L".

"Applicable Discount Rate" means with respect to the Eligible Real Property Collateral, a discount rate determined by reference to the Real Property Classification of the Borrower Real Property included therein, as follows:

| Real Property Classification: | Applicable Discount Rate: |
|---|---|
| Unimproved Land | 25% |
| Land Under Development | 20% |
| Finished Lots | 15% |
| Homes Under Construction | 12% |
| Model Homes | 10% |

In addition, with respect to any Real Property acquired after October 20, 2009 that is subject to any PAPA Obligations, and with respect to which the Borrower has not obtained and delivered a duly executed, acknowledged, recorded subordination of the PAPA Obligations in form substantially in accordance with the respective forms which were agreed to between Borrower and Administrative Agent on or prior to October 20, 2009, the Applicable Discount Rate set forth in the chart above which is applicable to such Real Property shall be the percentage value reflected in the chart above for the applicable Real Property Classification plus 200 basis points (e.g., in such a case, the Applicable Discount Rate for Model Homes would be increased from 10% to 12%, and so on).

"Applicable Percentage" means with respect to any Lender as of any date, the percentage (carried out to the ninth decimal place) of the Aggregate Loans owed such Lender at such time.

3

The initial Applicable Percentage of each Lender is set forth opposite the name of such Lender on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"Applicable Rate" means the LIBO Rate plus eight percent (8.00%).

"Appraisal" means, with respect to (x) Eligible Real Property Collateral, each appraisal that meets the following requirements: (i) such appraisal is prepared by an appraiser selected by Majority Lenders; (ii) such appraisal satisfies all applicable requirements set forth in Section 6.16(j); (iii) the values set forth in such appraisal have been reviewed and are satisfactory to Majority Lenders; and (iv) such appraisal is otherwise in form and content satisfactory to Majority Lenders, (y) any PCI Released Property securing Permitted Construction Indebtedness, each Revolver Appraisal and (z) with respect to the CF Property, the MF Property and the Mayfield Property, each appraisal that meets the following requirements: (i) such appraisal is prepared by an appraiser selected by Majority Lenders; (ii) such appraisal satisfies all applicable requirements set forth in Section 6.16(j), (except that for purposes of this clause (z) only, any references in Section 6.16(j) with respect to any Borrower Real Property shall be deemed to be to the CF Property, the MF Property and the Mayfield Property); (iii) the values set forth in such appraisal have been reviewed and are satisfactory to Majority Lenders.

"Appraised Value" means, with respect to Eligible Real Property Collateral and PCI Released Property, the appraised value of such Borrower Real Property set forth in the most recent Appraisal received by Majority Lenders in accordance with the Loan Documents, less, to the extent not taken into account in the Appraisal, the reductive effect of any CFD Obligations, PAPA Obligations and the reasonable and customary anticipated costs of sale related to such Borrower Real Property.

"Asset" means Borrower Real Property (whether now owned or hereafter acquired) constituting a full separate product line of Units (consistent with each of the separate product lines on Schedule IORP which in the aggregate make up the Interim Order Real Property, including adequate access, ingress and egress and with access to and rights to any common areas and Amenities related to the applicable Project), but not just a Phase or portion of such a product line. (References to "asset" (using lower case "a") are not to be confused with this definition of "Asset".)

"Asset Sale" means any sale, sale-leaseback, transfer, lease, conveyance or other disposition by any member of the Consolidated Group of assets (including the Equity Securities of any Subsidiary or any Joint Venture) not in the ordinary course of such member of the Consolidated Group's Core Businesses.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 11.06(b)), and accepted by Administrative Agent, in substantially the form of Exhibit "C" attached hereto and made a part hereof or any other form approved by Administrative Agent.

"Audited Financial Statements" means the audited consolidated balance sheet of Parent and its direct and indirect Subsidiaries for the fiscal year ended December 31, 2010, and the

4

related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year of the Consolidated Group, including the notes thereto.

"Avoidance Action" means any and all claims or causes of action arising under Chapter 5 of the Bankruptcy Code or applicable non-bankruptcy law to avoid transfers, preserve or transfer liens or otherwise recover property of the estate.

"Base LIBO Rate" means the greater of (a) two percent (2.00%) per annum, and (b) the rate per annum appearing on Bloomberg Page BBAM 1 (or such other display screen as may replace Page BBAM 1 or any successor publication) on the second Business Day prior to the first day of such Interest Period at or about 11:00 a.m. (London time) (or as soon as reasonably practicable thereafter) (for delivery on the first day of such Interest Period) for a term comparable to such Interest Period. If for any reason rates are not available as provided in clause (b) of the preceding sentence, the rate to be used in clause (b) shall be (rounded upward if necessary to the nearest 1/100 of one percent) the rate per annum at which Dollar deposits are offered to Administrative Agent in the London interbank eurodollar currency market on the second Business Day prior to the commencement of such Interest Period at or about 11:00 a.m. (for delivery on the first day of such Interest Period) for a term comparable to such Interest Period and in an amount approximately equal to the amount of the Loan to be made, funded or extended by the Lenders on such date.

"Borrower" has the meaning specified in the introductory paragraph hereto.

"Borrower Real Property" means any interest in Real Property owned or acquired by Borrower from time to time.

"Borrower's Knowledge" means the best knowledge of Borrower after diligent investigation and inquiry, including inquiry of the Consolidated Group and as it relates to any Real Property, the project managers for such Real Property.

"Borrowing Base" means seventy three percent (73%) of the sum of the following, each as of the date of determination:

      (a)     Unrestricted Cash; plus

      (b)     Escrow Receivables; plus

      (c)     the Eligible Real Property Collateral Valuation;

      subject to the following:

In determining the Borrowing Base: (1) no asset shall be counted more than once in the calculation of the Borrowing Base; (2) no asset or component shall be included in the Borrowing Base unless on the relevant date of determination (x) Administrative Agent on behalf of the Lenders holds an enforceable first priority perfected Lien subject, with respect to Borrower Real Property only, to Permitted Exceptions, (y) except as set forth in the preceding clause (x), there are no Liens encumbering such asset and (z) other than the assets described in clause (a) above, such asset constitutes Real Property and is qualified as Eligible Real Property Collateral under

5

the terms of this Agreement; (3) notwithstanding anything to the contrary in this Agreement (including in Article IV), no Borrower Real Property or other asset that is subject to any lien in favor of the lenders of any Permitted Construction Indebtedness shall be included in the computation of Borrowing Base; (4) notwithstanding anything to the contrary in this Agreement (including in Article IV), neither Unentitled Land nor any Real Property other than Borrower Real Property shall be included in the computation of Borrowing Base.

"Borrowing Base Report" means a report with respect to the Borrowing Base in the form attached hereto as Exhibit "D", which form may be changed by Majority Lenders from time to time, and which shall include a certificate from a Responsible Officer of Borrower setting forth a detailed calculation of the Borrowing Base, broken down by Project, Asset or Phase and by Real Property Classification within such Project, Asset or Phase, and attaching all documentation used in calculating the Borrowing Base. The computation of the components of the Borrowing Base included in such report shall include the Certified Net Cash Flow Report and a computation of the Net Present Value of Projected Net Revenues and the Net Present Value of Projected Total Project Costs in such detail as is from time to time requested by the Administrative Agent.

"Broker's Commission" means any and all brokerage commissions, finder's fees or similar fees or payments owed in connection with the extensions of credit contemplated by this Agreement as a result of any agreement (express or implied, written or oral) entered into by Borrower or any member of the Consolidated Group.

"Building Permit" means all Entitlements (including the building permit) required under applicable Law necessary to commence Vertical Construction of the contemplated type and number of single- or multi- family "for sale" residential Units and related Amenities on the applicable Borrower Real Property.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the States of California or New York.

"Carve-Out" has the meaning specified therefor in the Interim Order  and, when entered, the Final Order.

"Cash Equivalents" shall mean:

(a)     Direct obligations of, or obligations the principal and interest on which are unconditionally guaranteed by, the United States of America or obligations of any agency of the United States of America to the extent such obligations are backed by the full faith and credit of the United States of America, in each case maturing within one year from the date of acquisition thereof;

(b)     Certificates of deposit maturing within one year from the date of acquisition thereof issued by a commercial bank or trust company organized under the laws of the United States of America or a state thereof or that is a Lender, provided that (i) such deposits are denominated in Dollars, (ii) such bank or trust company has capital, surplus and undivided profits of not less than $100,000,000 and (iii) such bank or trust company has certificates of

6

deposit or other debt obligations rated at least A-1 (or its equivalent) by Standard and Poor's Ratings Services or P-1 (or its equivalent) by Moody's Investors Service, Inc.;

(c)     Open market commercial paper (other than commercial paper of Borrower or any other member of the Consolidated Group) maturing within 270 days from the date of acquisition thereof issued by a corporation organized under the laws of the United States of America or a state thereof, provided such commercial paper is rated at least A-1 (or its equivalent) by Standard and Poor's Ratings Services or P-1 (or its equivalent) by Moody's Investors Service, Inc.;

(d)     Any repurchase agreement entered into with a commercial bank or trust company organized under the laws of the United States of America or a state thereof, provided that (i) such bank or trust company has capital, surplus and undivided profits of not less than $100,000,000, (ii) such bank or trust company has certificates of deposit or other debt obligations rated at least A-1 (or its equivalent) by Standard and Poor's Ratings Services or P-1 (or its equivalent) by Moody's Investors Service, Inc., (iii) the repurchase obligations of such bank or trust company under such repurchase agreement are fully secured by a perfected security interest in a security or instrument of the type described in clause (a), (b) or (c) above and (iv) such security or instrument so securing the repurchase obligations has a fair market value at the time such repurchase agreement is entered into of not less than 100% of such repurchase obligations; and

(e)     Shares of money market mutual or similar funds which invest exclusively in assets satisfying the requirements of clauses (a) through (d) of this definition.

"Certified Net Cash Flow Report" means a combined schedule setting forth as of the date of determination the projected amounts and timing of Projected Net Revenues and Projected Total Project Costs for the Eligible Real Property Collateral from the date of determination through the date the last parcel of Unimproved Land (to the extent that it is not a Lot or Unit), Lot or Unit included in Eligible Real Property Collateral is projected to be sold, which report shall be prepared by the Borrower and certified by a Responsible Officer that such report has been prepared in good faith based on assumptions that such Responsible Officer believed as of the date of such report to be reasonable and to Borrower's Knowledge no information has come to the attention of Borrower from the date of such report to the date of delivery to Administrative Agent which would render such report to be untrue or misleading.

"CFD" means any means any improvement district, "Mello Roos" district, school mitigation plan or district, community facilities district, special assessment district or similar district or any other municipal utility, levee, water improvement or similar district with respect to any Real Property.

"CFD Obligations" means the obligations, with respect to any CFD, binding upon either the Real Property subject to the CFD or the owner of the Real Property subject to the CFD.

"CF/MF Appraised Value" means, with respect to the CF Property and the MF Property, the appraised value set forth in the most recent Appraisal received by Majority Lenders in accordance with the Loan Documents, less, to the extent not taken into account in the Appraisal,

the reductive effect of any CFD Obligations, PAPA Obligations and the reasonable and customary anticipated costs of sale related to such CF Property and MF Property.

"CF Property" means the Real Property located in Queen Creek, Arizona, commonly known as the Church Farms property, as more specifically described on Schedule CF.

"CF Owner" means Circle G at the Church Farm North Joint Venture, LLC, an Arizona limited liability company.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.

"Change of Control" means an event or series of events by which Parent shall cease to be the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire (such right, an "option right"), whether such right is exercisable immediately or only after the passage of time) ("Beneficial Owner") of one hundred percent (100.0%) of the Equity Securities of Borrower and the Guarantors entitled to vote for member of the board of directors or equivalent governing body of Borrower and the Guarantors; provided, however, that no Change of Control shall result from the consummation of the Chapter 11 Plan.

"Chapter 11 Cases" has the meaning set forth in the recitals to this Agreement.

"Chapter 11 Plan" means the Prepackaged Joint Plan of Reorganization of William Lyon Homes, et al., Under Chapter 11 of the Bankruptcy Code, dated November 17, 2011, as the same may be amended from time to time, a copy of which was filed with the Bankruptcy Court on December 19, 2011.

"Claims" has the meaning set forth in Section 11.04(b).

"Closing Date" means the first date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 11.01, which shall be no later than three (3) Business Days after the Interim Order is entered by the Bankruptcy Court.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" means all now owned or hereafter acquired or created Property (other than Avoidance Actions, but including Avoidance Actions under section 549 of the Bankruptcy Code) of the Loan Parties in which Administrative Agent or any Lender has a Lien to secure the Obligations or the Unconditional Guarantees.

"Collateral Certificate" shall mean a Collateral Certificate in form and substance satisfactory to Majority Lenders.

"Commitment" means, with respect to each Lender, the commitment of such Lender to make or otherwise fund a Loan hereunder. The amount of each Lender's Commitment is as set forth on Schedule 2.01 or in the applicable Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"Compliance Certificate" means a certificate substantially in the form of Exhibit "B" attached hereto and made a part hereof, which certificate shall demonstrate Borrower's compliance with the Financial Covenants and which shall be certified by the chief financial officer of Borrower.

"Consolidated Group" means, collectively, Parent, Borrower and their respective Subsidiaries.

"Construction Agreements" means construction agreements and agreements with architects, engineers, contractors or subcontractors.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Control Agreement" shall mean a control agreement among the Borrower or any Guarantor, a depository bank or securities intermediary, as the case may be, and Administrative Agent, in form and substance acceptable to Administrative Agent.

"Core Businesses" means (a) the business of developing "for sale" residential Aggregate Real Property into Lots and Units, and constructing "for sale" residential Units, and selling Lots and Units; (b) business directly related thereto as undertaken on the Closing Date; and (c) other lines of business directly related to homebuilding that are approved by the Majority Lenders. Core Businesses expressly excludes the ownership of Aggregate Real Property for investment, including ownership of rental Real Property, except for Aggregate Real Property, if any, used by the Consolidated Group as their business offices.

"Credit Extension" means a borrowing.

"Customer Deposit Liabilities" means collectively, Escrow Receivables, and down payments or earnest money deposited by purchasers pursuant to Purchase Contracts.

"Debtor" means the Loan Parties and any other Subsidiary of the Borrower or Parent that contemporaneously or subsequently files a bankruptcy petition.

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the

9

United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Dedication" means a customary transfer by Borrower, or the granting of easements, rights of way, and licenses by Borrower, to municipalities, utility providers, municipal districts, and property owners' associations (of a type, value and nature, and in form and content, as is customary under the circumstances) in connection with the development of a Project, which shall be subject to the reasonable approval of Majority Lenders, and shall only be for the purpose of providing streets, common areas, parks, water, waste water and sewage treatment facilities, hillside and other areas, and similar land and improvements.

"Deed of Trust" shall mean a Deed of Trust (or Mortgage), Security Agreement and Fixture Filing (With Assignment of Rents and Leases) in form approved by Majority Lenders from time to time with respect to each applicable jurisdiction executed by Borrower, as trustor, to Title Company, as trustee, and naming Administrative Agent as beneficiary for the benefit of itself and the Lenders, creating a first priority Lien on the Borrower Real Property and the Collateral situated thereon, and all rights and easements appurtenant thereto. Each Deed of Trust shall secure Indebtedness equal to the Total Commitment. For purposes of this Agreement, all such Deeds of Trust securing the Loan shall be referred to individually and collectively in the singular as the "Deed of Trust."

"Default" means any event or condition set forth in Section 9.01 or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means an interest rate equal to (i) the Applicable Rate plus (ii) five percent (5.0%) per annum.

"Defaulting Lender" means any Lender that (a) has failed to fund any portion its Commitment, if any, with respect to a Credit Extension when required hereunder, (b) has otherwise failed to pay over to Administrative Agent or any other Lender any other amount required to be paid by it hereunder within one (1) Business Day of the date when due, unless the subject of a good faith dispute, or (c) has been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding.

"Designated Person" shall mean any Person who (a) is named on the list of Specially Designated Nationals or Blocked Persons maintained by the U.S. Department of the Treasury's Office of Foreign Assets Control and/or any other similar lists maintained by the U.S. Department of the Treasury's Office of Foreign Assets Control pursuant to authorizing statute, executive order or regulation, (b) (i) is a Person whose property or interest in property is blocked or subject to blocking pursuant to Section 1 of the Executive Order or any related legislation or any other similar executive order(s) or (ii) engages in any dealings or transactions prohibited by Section 2 of the Executive Order or is otherwise associated with any such Person in any manner violative of Section 2 of the Executive Order or (c) (i) is an agency of the government of a country, (ii) an organization controlled by a country, or (iii) a Person resident in a country that is subject to a sanctions program identified on the list maintained by the U.S. Department of the Treasury's Office of Foreign Assets Control, or as otherwise published from time to time, as such program may be applicable to such agency, organization or Person.

10

"Disclosure Statement" means the disclosure statement in respect of the Chapter 11 Plan, dated November 17, 2011.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith, and including any condemnation of any property of such Person.

"Distribution" means any of the following:  (a) the payment by any Person of any distributions or other payments to its shareholders, partners, Affiliates, members or other equity interest holders; (b) the declaration or payment of any dividend on or in respect of shares of any class of capital stock of, or partnership, membership or other equity interest in, any Person; (c) the purchase or other retirement of any shares of any class of capital stock of, or partnership, membership or equity interest in, any Person, directly or indirectly through a Subsidiary or otherwise; (d) the return of capital by any Person to its shareholders, partners, Affiliates, members or other equity interest holders; and (e) any other payment on or in respect of any shares of any class of capital stock of, or partnership, membership or other equity interest in, any Person, including payments to members or partners of Joint Ventures.

"Dollar" and "$" mean lawful money of the United States.

"Eligible Assignee" means (a) a Lender; (b) a Related Fund; or (c) an Affiliate of a Lender or a Related Fund; and (c) any other Person (other than a natural person); provided that notwithstanding the foregoing, "Eligible Assignee" shall not include Borrower or any of Borrower's Affiliates or Subsidiaries.

"Eligible Participant" means any other Person (other than a natural person); provided that notwithstanding the foregoing, "Eligible Participant" shall not include Parent, Borrower or any of their respective Affiliates or Subsidiaries.

"Eligible Project" has the meaning set forth in Section 4.09.

"Eligible Real Property Collateral" means any Borrower Real Property that meets all of the conditions of Section 4.09 and all of the conditions in at least one of Sections 4.04, 4.05, 4.06, 4.07 or 4.08 of this Agreement for inclusion in the Borrowing Base as Eligible Real Property Collateral.  Notwithstanding anything to the contrary in this Agreement:  (i) neither the CF Property, the MF Property, the Mayfield Property nor the RMV Property may be Eligible Real Property Collateral unless, with respect to the CF Property, the MF Property, the Mayfield Property or the RMV Property, the fee interest has been conveyed to Borrower free of the Lien of any Existing Secured Indebtedness and free of all other Liens except Permitted Exceptions, and all of the conditions in this Agreement for inclusion of Borrower Real Property as Eligible Real Property Collateral have been met with respect to the Real Property constituting the CF Property, the MF Property, the Mayfield Property or the RMV Property, as applicable; and (ii) at Majority Lender's discretion, Borrower Real Property that meets all of the conditions to be Eligible Real Property Collateral, other than the condition requiring Borrower Real Property to be (or to be intended to be) developed into single- or multi- family "for sale" residential uses, that is intended

11

to be used for commercial purposes, and that is part of, adjacent to, ancillary to, or used in connection with, single- or multi- family "for sale" residential Eligible Real Property Collateral, may be Eligible Real Property Collateral, provided that such Borrower Real Property shall in no event account for more than five percent (5%) of the Eligible Real Property Collateral Valuation at any time, and the value of such Real Property Collateral shall be determined by Majority Lenders.  Notwithstanding anything to the contrary in this Agreement (including in Article IV), neither Unentitled Land nor any Real Property other than Borrower Real Property shall be Eligible Real Property Collateral.

"Eligible Real Property Collateral Valuation" means the amount derived as follows, without duplication, for any Unimproved Land (to the extent that it is not a Lot or Unit), and each Lot or Unit included in the Eligible Real Property Collateral: (i) the Net Present Value of the Projected Net Revenues of such Unimproved Land (to the extent that it is not a Lot or Unit), Lot or Unit minus (ii) the Net Present Value of Total Project Costs of such Unimproved Land (to the extent that it is not a Lot or Unit), Lot or Unit included in Eligible Real Property Collateral. Notwithstanding the foregoing, in no event will the Eligible Real Property Collateral Valuation for any Unimproved Land (to the extent that it is not a Lot or Unit), Lot or Unit included in Eligible Real Property Collateral exceed the most recent Appraised Value, if any, received by the Majority Lenders with respect to such Unimproved Land (to the extent that it is not a Lot or Unit), Lot or Unit.  Notwithstanding anything to the contrary in this Agreement (including in Article IV), neither Unentitled Land nor any Real Property other than Borrower Real Property shall be included in the computation of Eligible Real Property Collateral Valuation.

"Entitlements" means, for each Project or Asset, as the case may be, each and all approvals, authorizations, consents, certificates, entitlements, franchises, licenses, permits, registrations, qualifications, zoning classifications, variances and other actions and rights granted by or applications or filings with any Persons necessary or appropriate for the improvement and development of the Aggregate Real Property for single- or multi- family "for sale" residences or for the conduct of the Core Businesses.

"Environmental Indemnity" means that certain Environmental Indemnity executed by Borrower, which indemnity shall be in form and content acceptable to Majority Lenders.

"Environmental Laws" means any and all applicable Federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the generation, handling, use, transport, storage, disposal or release of any materials which may adversely affect the environment or public health, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Loan Parties or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the presence, generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the

201670660 v15

environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Matters" means claims, liabilities, investigations, litigation, administrative proceedings, whether pending or, to Borrower's Knowledge threatened in writing, or judgments or orders relating to any Hazardous Materials asserted or threatened in writing against any member of the Consolidated Group or any past or present tenant, operator or owner of all or any part of the Real Property owned, leased or used by any member of the Consolidated Group.

"Equity Securities" means, with respect to any Person, (a) all common stock, preferred stock, participations, shares, partnership interests, limited liability company interests or other equity interests in and of such Person (regardless of how designated and whether or not voting or non-voting) and (b) all warrants, options and other rights to acquire any of the foregoing.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; or (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon Borrower or any ERISA Affiliate.

"Escrow Receivables" means, as of any date of determination, the amounts due to Borrower and held at an escrow or title company following the sale and conveyance of title of a Lot or Unit to a buyer to the extent that such amounts are free and clear of all Liens, rights and claims of third parties and are not subject to any restriction pursuant to any Contractual Obligations.

"Event of Default" shall mean the occurrence of any Default and Administrative Agent, acting at the direction of Majority Lenders, and following applicable grace periods, if any, has declared the occurrence of such event or events an Event of Default by providing Borrower written notice thereof.

"Excluded Assets" has the meaning specified therefor in the Interim Order and, when entered, the Final Order.

13

"Excluded Subsidiaries" means any Subsidiary designated as such from time to time by Borrower and (except in the case of Subsidiaries that are Joint Ventures formed as Excluded Assets with notice to Administrative Agent) consented to by Majority Lenders, in each case, so long as such Subsidiary does not file a petition for reorganization under the Bankruptcy Code. As of the Closing Date there are no Excluded Subsidiaries.

"Excluded Taxes" means, with respect to Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of Borrower hereunder or under any other Loan Document, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located, (b) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which Borrower is located and (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by Borrower under Section 11.13), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or designates a new Lending office) or is attributable to such Foreign Lender's failure or inability (other than as a result of a Change in Law) to comply with Section 3.0l(e), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new Lending Office (or assignment), to receive additional amounts from Borrower with respect to such withholding tax pursuant to Section 3.01(a).

"Executive Order" shall mean Executive Order No. 13224 on Terrorist Financings: - Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism issued on 23rd September, 2001, as amended by Order No. 132684, as so amended.

"Existing Environmental Matters" means those Environmental Matters affecting portions of the Aggregate Real Property that have been disclosed to the Administrative Agent in writing prior to the date hereof.

"Existing Secured Indebtedness" means the outstanding Indebtedness on the date of this Agreement secured by the existing first priority deeds of trust on the CF Property, the MF Property and the Mayfield Property, as such Indebtedness may be extended, renewed, refinanced or replaced; provided that (i) the principal amount of any such refinancing does not exceed the principal amount of the Indebtedness being refinanced (other than the interest rate and fees under such refinanced Indebtedness which may be at a rate consistent with the rates and fees then prevailing in the market for similar Indebtedness for borrowers engaged in the Core Businesses and with similar credit risks as Borrower) and (ii) the material terms and provisions of any such refinancing (including redemption, prepayment, security, default and subordination provisions) are no less favorable to CF Owner, MF Owner or Lyon Mayfield, as applicable, any guarantors of such Indebtedness, and the Lenders than the Indebtedness being refinanced (other than the interest rate and fees under such refinanced Indebtedness which may be at a rate consistent with the rates and fees then prevailing in the market for similar Indebtedness for borrowers engaged in the Core Businesses and with similar credit risks as Borrower).

14

"Existing Secured Indebtedness Collateral Value" means the sum, without duplication, for the CF Property and the MF Property, of the following amounts: (i) the Net Present Value of the Projected Net Revenues of the CF Property and the MF Property (as applicable) minus (ii) the Net Present Value of Total Project Costs of such CF Property and MF Property (as applicable). Notwithstanding the foregoing, in no event will (i) the Existing Secured Indebtedness Collateral Value for the CF Property or the MF Property exceed the most recent CF/MF Appraised Value, if any, received by the Majority Lenders with respect to the CF Property or the MF Property, as applicable, and (ii) the Existing Secured Indebtedness Collateral Value of either the CF Property or the MF Property exceed the outstanding principal balance of the Existing Secured Indebtedness which is secured by such CF Property or MF Property, as applicable. For purposes of this definition of Existing Secured Indebtedness Collateral Value only, in the definitions of "Projected Net Revenues" and "Total Project Costs", the term "Eligible Real Property Collateral" shall be deemed replaced with "the CF Property and the MF Property".

"Exit Fee" means, with respect to any prepayment or repayment (whether upon acceleration, maturity or otherwise) of any Loan or any termination or permanent reduction in Total Commitment, an amount payable in cash equal to one half of one percent (0.50%) of the principal amount of the Loan(s) being prepaid or repaid or the portion of the Total Commitment being terminated, as the case may be.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published an such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1.0%) charged to Bank of America, N.A. on such day on such transactions as determined by Administrative Agent.

"Fee Letter" means the letter agreement dated the Closing Date, between Borrower and the Initial Lender.

"Final Map" means the final tract or plat map for each Project, Asset or Phase, as the case may be, which map shall be in form and content acceptable to Majority Lenders.

"Final Order" means an order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be satisfactory in form and substance to the Lenders in their sole discretion, and from which no stay has been entered and which has not been reversed, modified, vacated or overturned.

"Final Order Date" means the date on which the Final Order is entered by the Bankruptcy Court.

"Financial Covenants" means the covenants set forth in Sections 7.15 and 7.16.

201670660 v15

"Finished Lots" means those portions of the Borrower Real Property for which Borrower has satisfied the conditions set forth in Section 4.06 and with respect to which Borrower has not yet satisfied all of the conditions set forth in Section 4.07.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which Borrower is resident for tax purposes. For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Front-End Fee" shall have the meaning assigned to such term in the Fee Letter.

"Funding Termination Date" has the meaning specified therefor in the Interim Order and, when entered, the Final Order.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied or, if the financial statements required to be delivered pursuant to Section 6.01 are prepared in accordance with IFRS, IFRS.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person, any (a) obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if

16

not stated or determinable, the reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantors" means, on the Closing Date: (a) Parent; and (b) each Subsidiary of the Parent and the Borrower that files as a debtor in possession in the Chapter 11 Cases (other than Mountain Falls, LLC, a Nevada limited liability company), and, thereafter, each of the Subsidiaries of Parent or Borrower that become a party to the Unconditional Guaranty by execution of a joinder and consented to by Majority Lenders.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Homes Under Construction" means Units for which Borrower has satisfied all of the requirements and conditions set forth in Section 4.07, but less than all of the conditions and requirements set forth in Section 4.08.

"Horizontal Improvements" means (i) those certain improvements on the Borrower Real Property (or beyond the boundaries thereof to the extent required by the Entitlements) for the development of the Borrower Real Property as Units or Amenities (including curbs, grading, storm and sanitary sewers, paving, sidewalks, landscaping, hardscaping, sprinklers, electric lines, gas lines, telephone lines, cable television lines, fiber optic lines, pipelines and other utilities) necessary to make the Borrower Real Property suitable for Vertical Construction of Units or Amenities, and (ii) any common area improvements to be constructed on the Borrower Real Property (or beyond the boundaries thereof to the extent required by the Entitlements) or to obtain the Entitlements for the development of the Borrower Real Property as Units or Amenities, all built by the Borrower in compliance with and permitted under all applicable Laws and Entitlements.

"IFRS" means the International Financial Reporting Standards as in effect on the date hereof and from time to time hereafter, consistently applied.

"Improvements" means the improvements made or to be made on any Real Property from time to time, which shall include all construction and development of the Horizontal Improvements, Vertical Construction, Amenities, homes, and all other infrastructure or housing improvements and related amenities made in preparation for the development, marketing and sale of Real Property.

"Indebtedness" means, without duplication, with respect to any Person (a) indebtedness or liability for borrowed money, including subordinated indebtedness; (b) obligations evidenced by bonds, debentures, notes, or other similar instruments; (c) obligations for the deferred purchase price of property or services, provided, however, that Indebtedness shall not include obligations with respect to options to purchase Real Property that have not been exercised; (d) obligations as lessee under capital leases to the extent that the same would, in accordance with

17

GAAP, appear as liabilities in such Person's consolidated balance sheet; (e) current liabilities in respect of unfunded vested benefits under any Pension Plans and incurred withdrawal liability under any Pension Plan; (f) reimbursement obligations under letters of credit (including contingent obligations with respect to letters of credit not yet drawn upon); (g) obligations under acceptance facilities; (h) all guaranties, endorsements (other than for collection or deposit in the ordinary course of business), and other contingent obligations to purchase, to provide funds for payment, to supply funds to invest in any other Person, or otherwise to assure a creditor against loss; (i) obligations secured by any Liens on any property of such Person, whether or not the obligations have been assumed; (j) net liabilities under interest rate swap, exchange or cap agreements (valued as the termination value thereof, computed in accordance with a method approved by the International Swaps and Derivatives Association and agreed to by such Person in the applicable agreement); and (k) all Guaranties of such Person with respect to the foregoing. Indebtedness shall not include (i) trade accounts payable and accruals incurred in the ordinary course of the Core Businesses so long as such trade accounts payable or accruals are not outstanding for more than ninety (90) days from receipt of an invoice (unless such trade accounts payable or accruals (A) are being contested in good faith by appropriate proceedings or (B) are for retentions consistent with industry practice and such Person's past practices, in which case such ninety day limit shall not apply) are on terms and conditions reasonable and customary in the industry and are not owed to an Affiliate of such Person and (ii) payment and performance and surety bonds, completion guarantees, and other performance obligations and guaranties with respect thereto incurred in the ordinary course of the Core Businesses so long as such payment and performance and surety bonds, completion guarantees and other performance obligations and guaranties are on terms and conditions reasonable and customary in the industry .

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Indemnitee" has the meaning specified in Section 11.04(b).

"Indentures" means, collectively, (i) that certain Indenture, dated as of March 17, 2003, among Borrower, as issuer, the guarantors party thereto, and U.S. Bank National Association, as trustee, (ii) that certain Indenture, dated as of February 6, 2004, among Borrower, as issuer, the guarantors party thereto, and U.S. Bank National Association, as trustee, and (iii) that certain Indenture, dated as of November 22, 2004, among Borrower, as issuer, the guarantors party thereto, and U.S. Bank National Association, as trustee, in each case, as such Indenture may be extended, renewed, refinanced or replaced in accordance with Section 7.01(e) hereof.

"Initial Aggregate Commitment" has the meaning specified in Section 2.01(a).

"Initial Lender" means ColFin WLH Funding, LLC.

"Initial Mayfield Payment" means an amount not to exceed $1,500,000 to be paid by Lyon Mayfield, or upon breach of such obligation by Lyon Mayfield, the Mayfield Guarantors, as set forth in the Mayfield Loan Agreement, to fund the Cash Collateral Account (as defined in the Mayfield Loan Agreement).

"Intangible Asset" means, with respect to the Loan Parties and as of any date, all unamortized debt discount and expense, unamortized deferred charges, deferred financing costs,

18

goodwill, patents, trademarks, service marks, trade names, copyrights, write-ups of assets over their carrying value (other than write-ups which occurred prior to the Closing Date and other than, in connection with the acquisition of an asset, the write-up of the value of such asset to its fair market value in accordance with GAAP on the date of acquisition) and all other items which would be treated as intangibles on the consolidated balance sheet of the Loan Parties prepared in accordance with GAAP.

"Intercompany Subordination Agreement" means that certain subordination agreement among Administrative Agent, on behalf of the Lenders, and each member of the Consolidated Group, pursuant to which, each member of the Consolidated Group agrees to subordinate any claims it may have against another member of the Consolidated Group to the Obligations of the Borrower hereunder.

"Intercreditor Agreement" means any agreement between Administrative Agent and/or the Lenders, and the lender, agent or trustee under any Permitted Construction Indebtedness.

"Interest Payment Date" means the last day of each Interest Period applicable to each Loan during the term of this Agreement, commencing on December 30, 2011, and the Maturity Date.

"Interest Period" means, with respect to each Loan, a period commencing on the date of the making of such Loan (or the continuation of such Loan) and ending thirty (30) days thereafter; provided, however, that (a) if any Interest Period would end on a day that is not a Business Day, such Interest Period shall be extended (subject to clauses (c)-(e) below) to the next succeeding Business Day, (b) interest shall accrue at the Applicable Rate from and including the first day of each Interest Period to, but excluding, the day on which any Interest Period expires, (c) any Interest Period that would end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (d) with respect to an Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period), the Interest Period shall end on the last Business Day of the calendar month that is thirty (30) days after the date on which the Interest Period began, as applicable, and (e) no Interest Period will end after the Stated Maturity Date.

"Interim Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law) upon such prior notice as may be satisfactory to the Lenders, together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to the Lenders and their counsel.

"Interim Order Real Property" shall mean the Borrower Real Property existing on the Closing Date, listed on Schedule IORP and over which Administrative Agent, on behalf of the Lenders, has a valid, enforceable and perfected first priority Lien on pursuant to the entry of the Interim Order (or the Final Order, when applicable).

19

"Interim Period" means the period of time commencing on the date the Bankruptcy Court enters the Interim Order and ending on the date the Bankruptcy Court enters the Final Order.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Securities of another Person, (b) a loan, advance (other than advances with respect to accounts receivable made in the ordinary course of business on customary credit terms) or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person (including capital contributions to any Joint Ventures) and any arrangement pursuant to which the investor Guarantees Indebtedness of such other Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit.

"IRS" means the United States Internal Revenue Service.

"Joint Venture" means any Person (other than a Subsidiary) in which Parent, Borrower or any other member of the Consolidated Group holds any Equity Securities (other than Equity Securities issued by a public company and purchased on a recognized stock exchange).

"Junior DIP Facility" has the meaning specified therefor in the Interim Order and, when entered, the Final Order.

"Key Management" means William H. Lyon, President and Chief Operating Officer of Parent; Matthew R. Zaist, Vice President Business Development and Operations of Parent; Richard S. Robinson, Senior Vice President Finance of Parent; and Colin T. Severn, Vice President, Chief Financial Officer, Corporate Controller and Secretary of Parent.

"Laguna" means Laguna Big Horn, LLC, a Delaware limited liability company.

"Land Under Development" means those portions of the Borrower Real Property on which Units will be developed for which Borrower has satisfied the conditions set forth in Section 4.05 and with respect to which Borrower has not yet satisfied all of the conditions set forth in Section 4.06.

"Later Mayfield Payment" means amounts not to exceed $1,750,000 to be paid by Lyon Mayfield, or upon breach of such obligation by Lyon Mayfield, the Mayfield Guarantors, as set forth in the Mayfield Loan Agreement, to fund the Cash Collateral Account (as defined in the Mayfield Loan Agreement).

"Laws" means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directives, decrees, policies, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law, rule, regulation, ordinance, order, code

20

interpretation, judgment, decree, directive, guideline, policy or similar form of decision of any Governmental Authority.

"Lead Arranger" means ColFin WLH Funding, LLC.

"Lender" has the meaning specified in the introductory paragraph hereto and shall include the Initial Lender so long as such Initial Lender remains a Lender hereunder.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify Borrower and Administrative Agent.

"LIBO Break Amount" means an amount equal to the excess, if any, of (i) the amount of interest that otherwise would have accrued on the principal amount so paid, prepaid or not borrowed for the period from the date of such payment, prepayment or failure to borrow to the last day of the then current Interest Period for such Lender's Loan (or, in the case of a failure to borrow, the Interest Period for such Loan that would have commenced on the date specified for such borrowing) at the applicable LIBO Rate over (ii) the amount of interest that otherwise would have accrued on such principal amount at a rate per annum equal to the interest component of the amount the applicable Lender could recover by placing such amount on deposit in the London interbank market for Dollar deposits of leading banks in amounts comparable to such principal amount and with maturities comparable to such period (as reasonably determined by such Lender).

"LIBO Rate" means, for each Interest Period for each Loan, the rate per annum determined by Administrative Agent by dividing (a) the Base LIBO Rate for such Interest Period, by (b) 100% minus the Reserve Requirement. The LIBOR Rate shall be adjusted on and as of the effective day of any change in the Reserve Requirement.

"Lien" means any recorded or unrecorded, express or implied, written or oral mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, Preemptive Purchase or Lease Right, Lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any covenant, condition, restriction, lease, easement, right of way or other encumbrance on title to Real Property, and any financing lease having substantially the same economic effect as any of the foregoing).

"Loan" means an extension of credit by a Lender to Borrower under Article II or Section 9.04.

"Loan Documents" means this Agreement, each Note, if any, the Fee Letter, the Unconditional Guaranty, Environmental Indemnity, the Security Documents, the Pledge Agreement, the Collateral Certificate, any Intercreditor Agreement, the Intercompany Subordination Agreement, the Restructuring Support Agreement and all other documents, instruments, letters and agreements delivered to Administrative Agent or any Lender pursuant to Article IV and all other documents, instruments, letters and agreements delivered by any Loan Party to Administrative Agent or any Lender in connection with this Agreement or any other

21

Loan Document on or after the date of this Agreement, including any amendments, consents or waivers, as the same may be amended, restated, supplemented or modified from time to time.

"Loan Parties" means, collectively, Borrower and each Guarantor.

"Lots" means lots zoned for single- or multi- family residences for sale into which the subject Borrower Real Property is to be or has been subdivided in compliance with all Laws, as set forth on a Final Map recorded in the Official Records.

"Lyon Mayfield" means Lyon Mayfield, LLC, a Delaware limited liability company.

"Majority Lenders" means (a) prior to the Closing Date, Lenders whose Commitments then exceed fifty percent (50%) of the Total Commitment, and (b) from and after the Closing Date, the Lenders whose (A) Total Outstandings and (B) remaining Commitments then exceed fifty percent (50%) of the sum of the aggregate Total Outstandings and remaining Total Commitments; provided that the portion of the Total Outstandings held, or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Majority Lenders.

"Material Adverse Effect" means (i) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent), condition (financial or otherwise) or prospects of (a) Parent, (b) Borrower or (c) the Consolidated Group taken as a whole; (ii) a material impairment of the ability of any Loan Party to perform its obligations under any Loan Document to which it is a party; or (iii) a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party, in each case, since the Petition Date. For the avoidance of doubt, it being understood and agreed that the filing of the Chapter 11 Cases shall not constitute a Material Adverse Effect.

"Material Agreements" has the meaning specified in Section 5.25.

"Maturity Date" means the earliest of (a) one hundred eighty (180) days from the entry of the Interim Order by the Bankruptcy Court (the "Stated Maturity Date"), (b) the consummation of a sale of substantially all of the assets of the Loan Parties approved by the Lenders, (c) the effective date of any Chapter 11 plan of any Loan Party, (d) the date that is thirty (30) days after the Petition Date if the Final Order Date shall not have occurred by such date or (e) the acceleration of the Loans or termination of the Commitments hereunder.

"Maximum Permitted Secured Indebtedness" means (x) if Total Secured Debt is greater than 55% of Total Secured Debt Collateral Value but less than 67.5% of the Total Secured Debt Collateral Value on the date of determination, $300 million, or (y) if the Total Secured Debt is 55% or less of the Total Secured Debt Collateral Value on the date of determination, $340 million; provided, however, under no circumstances shall Maximum Permitted Secured Indebtedness exceed 67.5% of the Total Secured Debt Collateral Value.

"Maximum Rate" has the meaning set forth in Section 11.09.

"Mayfield Guarantors" means any guarantors of the Mayfield Loan.

22

"Mayfield Lender" means Qina, LLC, a Delaware limited liability company.

"Mayfield Loan" means the $55,000,000 loan contemplated by the Mayfield Loan Agreement.

"Mayfield Loan Agreement" means that certain Loan Agreement, dated as of October 28, 2011, between Lyon Mayfield, as borrower, Mayfield Lender, as lender, as modified by that certain Modification Agreement, dated as of December 18, 2011, by and among Lyon Mayfield, Mayfield Lender, and the Mayfield Loan guarantors party thereto.

"Mayfield Property" means the Real Property located in the cities of Mountain View and Palo Alto, Santa Clara County, California, commonly known as the Mayfield or former Hewlett-Packard property, as more specifically described in Schedule MP.

"Mechanics' Liens" means Liens of carriers, warehousemen, mechanics and materialmen and other like Liens, except to that (i) such Liens arise in the ordinary course of business, (ii) such Liens are being contested in good faith by appropriate legal proceedings, with all potential liabilities either (a) bonded in a manner satisfactory to Majority Lenders or (b) not in excess of $1,000,000 in the aggregate for Borrower at any time, (iii) Borrower has demonstrated to Majority Lenders' satisfaction that the proceedings will conclusively operate to prevent the sale of any part of the Collateral, and (iv) Borrower takes all other actions as required by Majority Lenders, to prevent the sale of any Collateral to satisfy any such Lien and to prevent impairment of the Collateral.

"MF Property" means the Real Property located in Pahrump, Nevada, commonly known as the Mountain Falls property, as more specifically described on Schedule MF.

"MF Owner" means Mountain Falls, LLC, a Nevada limited liability company and Mountain Falls Golf Course, LLC, a Nevada limited liability company.

"Model Home" means a Unit that meets all of the conditions in Section 4.08.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Net Cash Flow" means, for any Variance Measurement Period, (i) the total receipts of the Loan Parties from operations, minus (ii) operating disbursements made by the Loan Parties, excluding fees of Professionals, general and administrative expenses incurred by the Loan Parties in connection with the Chapter 11 Cases, land acquisition costs, investments in Joint Ventures, title deposits and surety deposits.

"Net Income" means, for any period, the consolidated net income (or consolidated net loss) of Parent, Borrower and their respective Subsidiaries (other than Excluded Subsidiaries), determined in accordance with GAAP.

"Net Present Value" means, with respect to any amount, the net present value as of the date of determination of such amount using a discount rate equal to the Applicable Discount Rate.

"Net Proceeds" shall mean:

(a)    With respect to any sale of Property by any Person, the aggregate gross consideration received in any form by such Person from such sale less the sum of (i) the actual amount of the customary and reasonable fees and commissions directly related to such sale that are paid by the seller to Persons other than the seller or any Affiliate or Related Parties of the seller, the reasonable legal expenses and other costs and expenses directly related to such sale that are paid by the seller and (ii) the amount of any Indebtedness (other than the Obligations) which is secured by such Property and is required to be repaid or prepaid by the Seller as a result of such sale;

(b)    With respect to any issuance or incurrence of any Indebtedness by any Person, the aggregate loan proceeds and other consideration received by such Person from such issuance or incurrence less the sum of the actual amount of the reasonable fees and commissions payable to Persons other than such Person or any Affiliate of such Person, the reasonable legal expenses and the other customary and reasonable costs and expenses directly related to such issuance or incurrence that are to be paid by such Person; and

(c)    With respect to any issuance of Equity Securities by any Person, the aggregate capital contribution and other consideration received by such Person from such issuance less the sum of the actual amount of the reasonable fees and commissions payable to Persons other than such Person or any Affiliate of such Person, the reasonable legal expenses and the other customary and reasonable costs and expenses directly related to such issuance that are to be paid by such Person.

"Net Worth" means, as of any date, the excess of Total Assets over Total Liabilities.

"Non-Material Subsidiary" means anyone or combination of Subsidiaries of Borrower and Parent that have total tangible assets of less than $1,000,000 in the aggregate for all such Subsidiaries on a combined basis.

"Note" means a promissory note made by Borrower in favor of a Lender evidencing Loans made by such Lender, substantially in the form of Exhibit "A" attached hereto and made a part hereof.

"Notice of Borrowing" has the meaning specified in Section 2.01(d).

"Notice Period" has the meaning specified therefor in the Interim Order and, when entered, the Final Order.

"Obligations" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising.

24

"Official Records" means the official real estate records of the county in which any Real Property is located.

"Operating Forecast" means a business plan and projected operating budget for the Loan Parties from the Petition Date through the one year anniversary thereof, broken down by month, including income statements, balance sheets, cash flow statements, projected capital expenditures, asset sales, cost savings and headcount reductions, targeted facility and office closures, targeted facility and office idlings and other milestones, a line item for total available liquidity for the period covered thereby and setting forth the anticipated uses of the Loans for such period, a copy of which is attached hereto as Exhibit "M".

"Organization Documents" means:  (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Taxes" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"PAPA Obligations" means any obligations affecting Real Property under any recorded or unrecorded payment, participation, development and/or performance agreements, buyback rights, bulk sale restriction agreements, repurchase options, rights of first refusal, deeds of trust securing any of the same, and /or other similar agreements, obligations or encumbrances.

"Parent" has the meaning set forth in the introductory paragraph hereto.

"Participant" has the meaning specified in Section 11.06(d).

"Patriot Act" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56 (commonly known as the USA Patriot Act).

"PBGC" means the Pension Benefit Guaranty Corporation.

"PCI Release" has the meaning set forth in Section 8.01(b).

"PCI Released Property" has the meaning set forth in Section 8.01(b).

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA

and is sponsored or maintained by Borrower or any ERISA Affiliate or to which Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"Permitted Construction Indebtedness" means Indebtedness incurred by Borrower from a Revolver Lender in accordance with Section 8.04 and provided that such Indebtedness (i) shall be on terms and conditions reasonably satisfactory to the Majority Lenders, (ii) shall be secured solely by the applicable PCI Released Property which constitutes Finished Lots, Homes Under Construction and/or Model Homes (with ownership of the PCI Released Property required to be retained by Borrower throughout construction and marketing and until ultimate sale), (iii) is not for (A) any acquisition costs of any Real Property, including the PCI Released Property or other land that would become part of the Phase, Asset or Project that includes the PCI Released Property (except that reasonable land draws are permitted for use in Vertical Construction of the PCI Released Property), (B) Horizontal Improvements or (C) payment of any of the fees or other amounts required to be paid in connection with obtaining any Entitlements necessary for any of the PCI Released Property to become Finished Lots, (iv) complies with the limitations in this Agreement on Maximum Secured Indebtedness, and (v) does not (a) contain provisions (including financial covenants, coverage ratios and restrictions on debt, transfers and encumbrances which are not complied with as a result of the existence of (or Borrower's compliance with) any Loan or Loan Document or (b) prohibit any Net Proceeds of such Indebtedness (and the Net Proceeds of any sales of the PCI Released Property after any required payments on such Indebtedness) from being held in an account which is pledged to Lenders and is subject to a Control Agreement in favor of Lenders.

"Permitted Construction Indebtedness Collateral Value" means, as of any date, the sum of the Appraised Values of the PCI Released Property owned by Borrower on the date of determination as reflected in the Revolver Appraisals.

"Permitted Exceptions" means (i) all items shown in Schedule B Part 1 of any title policy delivered by the Existing Borrower to the Pre-Petition Agent under and pursuant to the Pre-Petition Loan Agreement and which items were consented to by the Pre-Petition Agent; (ii) Liens granted to Administrative Agent to secure the Obligations; (iii) Liens granted to the Pre-Petition Agent to secure the Pre-Petition Obligations; and (iv) all other exceptions approved in writing by Majority Lenders.

"Permitted Holders" means General William Lyon, his wife, his lineal descendants and his other close family members, any corporation, limited liability company or partnership in which any of the foregoing has voting control and is the direct and beneficial owner of a majority of the Equity Interests and any trust or estate planning device for the benefit of him, his wife, his lineal descendants or his other close family members.

"Permitted Indebtedness" has the meaning specified in Section 7.01.

"Permitted Liens" has the meaning specified in Section 7.02.

26

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Personal Property" means any personal property or asset, whether tangible or intangible.

"Phase" means the Aggregate Real Property consisting of portions of Assets that consist of a group of Lots or Units commonly marketed with a marketing scheme, or portions of Assets including more than one such group.

"Plan" means any Pension Plan, any "employee pension plan" (as such term is defined in Section 3(2) of ERISA) that is subject to Section 412 of the Code (other than a Multiemployer Plan) and that is established by Borrower or any ERISA Affiliate, or any "employee welfare plan" (as such term is defined in Section 3(1) of ERISA) established by Borrower that provides for post-employment health benefits other than as required by Sections 601 et seq. of ERISA (commonly known as COBRA) or as required by any similar Laws.

"Plan Confirmation Date" means the date the Bankruptcy Court enters an order confirming the Chapter 11 Plan.

"Plans, Drawings and Specifications" means the plans, drawings and specifications for the construction of the Horizontal Improvements, Vertical Construction and/or Units, as applicable, that have been approved by Majority Lenders pursuant to this Agreement.

"Pledge Agreement" means a Pledge Agreement among Parent, Borrower and Administrative Agent.

"Preemptive Purchase or Lease Right" means any option, put, right of first or last refusal, right of first or last offer, right of first or last negotiation, or any other preemptive rights to purchase, sell or lease any Real Property.

"Petition Date" has the meaning set forth in the recitals to this Agreement.

"Pre-Petition" means the time period ending immediately prior to the filing of the Chapter 11 Cases.

"Pre-Petition Agent" has the meaning set forth in the recitals to this Agreement.

"Pre-Petition Loan Agreement" has the meaning set forth in the recitals to this Agreement.

"Pre-Petition Lenders" has the meaning set forth in the recitals to this Agreement.

"Pre-Petition Obligations" means the "Obligations" as defined in the Pre-Petition Loan Agreement.

"Pre-Petition Total Outstandings" means the "Total Outstandings" as defined in the Pre-Petition Loan Agreement.

27

"<u>Professional</u>" means professionals or professional firms retained by (a) the Loan Parties pursuant to Bankruptcy Code section 327 and (y) any statutory committee appointed in the Chapter 11 Cases pursuant to Bankruptcy Code section 1102.

"<u>Project</u>" means (a) an Asset which is not part of a group in clause "(b)" of this sentence or (b) a group of two (2) or more Assets in the same geographic area (which in the case of either (a) or (b) share(s) common areas and Amenities).

"<u>Project Eligibility Request</u>" means each and every request by Borrower for the Borrower Real Property in a Project to be Eligible Real Property Collateral for inclusion in the Borrowing Base, which request shall be in the form attached hereto as Exhibit "E".

"<u>Projected Net Revenues</u>" means, with respect to any Eligible Real Property Collateral, the Net Proceeds estimated by the Borrower in good faith to be received by the Borrower after the date of determination from the sale of the Eligible Real Property Collateral or interests therein. In determining Projected Net Revenues, (i) Net Proceeds from the sale of Eligible Real Property Collateral subject to a Purchase Contract shall not exceed the contracted sales price (net of customary costs and expenses), (ii) Net Proceeds from the sale of Eligible Real Property Collateral that are being offered for sale by the Borrower shall not exceed the current offer price (net of customary costs and expenses), (iii) Net Proceeds shall be adjusted to take into account as a deduction from estimated Net Proceeds any projected CFD Obligations, PAPA Obligations, and reasonable and customary anticipated costs of sale related to sales of any Real Property, (iv) Model Homes included as part of the Eligible Real Property shall be assumed to be held until substantially all other Units of the same type as the Model Home in the Asset are projected to be sold, (v) the amount and timing of receipt of Projected Net Revenues shall be prepared by Borrower in good faith based on assumptions that it believes to be reasonable on the date of determination, and (vi) the amount and timing of receipt of Projected Net Revenues shall be consistent with the most recent Certified Net Cash Flow Report delivered by Borrower to Administrative Agent under the Loan Documents with such adjustments necessary to reflect subsequent changes in actual sales prices and absorption rates achieved at the various Assets with Eligible Real Property Collateral. Projected Net Revenues as of the date of any Borrowing Base Report shall be reflected on the Certified Net Cash Flow Report for the Eligible Real Property Collateral.

"<u>Projected Total Project Cost</u>" means, with respect to any Eligible Real Property Collateral, the Total Project Cost estimated by the Borrower in good faith to be paid after the date of determination with respect to the Eligible Real Property Collateral. In determining Projected Total Project Costs, (i) the amount and timing of the payment of Total Project Costs shall be prepared by Borrower in good faith based on assumptions that it believes to be reasonable at the date of determination, (ii) the amount and timing of the payment of Total Project Costs shall be consistent with the most recent Certified Net Cash Flow Report delivered by Borrower to Administrative Agent under the Loan Documents with such adjustments necessary to reflect changes in the actual cost of materials and workmanship and absorption rates achieved at the various Projects or Assets as the case may be with Eligible Real Property Collateral. Projected Total Project Costs as of the date of any Borrowing Base Report shall be reflected on the Certified Net Cash Flow Report for the Eligible Real Property Collateral.

201670660 v15

"Property" means Real Property and Personal Property.

"Property Entity" means CF Owner, MF Owner and Lyon Mayfield.

"Purchase Contract" means any purchase and sale agreement or other agreement entered into by Borrower, as seller, and a purchaser for the purchase and sale of any Borrower Real Property.

"Qina" means Qina, LLC, a Delaware limited liability company.

"Real Property" means any interest in land including any Improvements situated thereon.

"Real Property Classifications" means Unimproved Land, Land Under Development, Finished Lots, Homes Under Construction, and Model Homes.

"Refinanced CBT, CNB and JPM Revolving Credit Agreements" means the Refinanced Revolving Credit Agreements between Borrower and each of California Bank & Trust, California National Bank and JPMorgan Chase.

"Refinanced Revolving Credit Agreements" means those six (6) revolving credit agreements of Borrower (one (1) with each of California Bank & Trust, California National Bank, Comerica Bank, Guaranty Bank, JPMorgan Chase (as successor-in-interest to Bank One) and Wachovia Bank) that were refinanced with the proceeds of the Pre-Petition Loan Agreement.

"Refinanced Wachovia Revolving Credit Agreement" means the Refinanced Revolving Credit Agreement between Borrower and Wachovia Bank.

"Related Fund" means with respect to any Lender which is a fund (or in which a fund has a beneficial ownership interest of at least twenty percent (20%)) that is allowed or permitted under its Organizational Documents to make or invest in loans, any other fund that is allowed or permitted by its Organizational Documents to make or invest in loans and that is managed by the same investment advisor as such Lender or by an Affiliate of such Lender or such investment advisor.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the thirty (30) day notice period has been waived.

"Reserve Requirement" means, on any day, for any Lender, the maximum percentage prescribed by the Board of Governors of the Federal Reserve System (or any successor Governmental Authority) for determining the reserve requirements (including any basic, supplemental, marginal, or emergency reserves) that are in effect on such date with respect to eurocurrency funding (currently referred to as "eurocurrency liabilities") of that Lender, but so long as such Lender is not required or directed under applicable regulations to maintain such reserves, the Reserve Percentage shall be zero.

201670660 v15

"Responsible Officer" means the chief executive officer, president, chief financial officer, treasurer or the general counsel of a Loan Party or any Person designated by a Responsible Officer to act on behalf of a Responsible Officer; provided that such designated Person may not designate any other Person to be a Responsible Officer. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Cash" means all cash and Cash Equivalents of the Loan Parties allocated for expenditure or Distribution held as reserves for the Permitted Indebtedness described in Section 7.01(b) or the Permitted Liens described in Sections 7.02(a), (b) and (c), held as reserves against any other claim, judgment and good faith contests or held as Customer Deposit Liabilities or otherwise characterized as a deposit.

"Restructuring Support Agreement" means that certain Restructuring Support Agreement dated as of November 4, 2011 by and among (a) Parent and Borrower, on behalf of themselves and their respective Subsidiaries listed on Schedule 1 thereto and their respective successors, (b) ColFin WLH Funding, LLC, as Administrative Agent, Initial Lender and Lead Arranger under the Pre-Petition Loan Agreement, and (c) the Lenders, as amended, restated, supplemented or otherwise modified from time to time through the date hereof including any schedules or term sheets attached thereto or delivered in connection therewith.

"Revolver Appraisal" means an appraisal of PCI Released Property as described in the definition of "Revolver Lender."

"Revolver Lender" means one or more banks with FDIC-insured deposits, that are making a loan to Borrower constituting Permitted Construction Indebtedness pursuant to loan documents substantially similar to Borrower's Refinanced CBT, CNB and JPM Revolving Credit Agreements as of the date of this Agreement (other than the changes thereto requested by the Lenders as provided for in this Agreement) pursuant to which: (i) appraisals of the PCI Released Property securing the loan are required at least annually which meet the requirements of Section 6.16(j)(i) and which take into account the reductive effect of any CFD Obligations, PAPA Obligations and the reasonable and customary anticipated costs of sale related to the PCI Released Property, and any impairment of such PCI Released Property and (ii) PAPA Obligations are covered by a subordination agreement in the Revolver Lender's favor reasonably acceptable to Majority Lenders. (For avoidance of doubt, the relevant appraisals shall be (and under appraisal procedures) in form and substance satisfactory to the Revolver Lender in its sole and absolute discretion (instead of the Majority Lenders) and the classifications of Borrower Real Property and methods of valuation in Section 6.16(j) shall be used without regard to the fact that the PCI Released Property does not technically constitute Eligible Real Property Collateral under the requirements of Article IV for such Real Property Classifications).

"RMV Entities" means collectively Lyon Rancho, LLC, and Lyon RMV, LLC, each Delaware limited liability companies.

201670660 v15

"RMV Monetary Obligation Cap" has the meaning specified in Section 3(a) of the RMV Purchase Agreement.

"RMV Property" means the Option Property as such term is defined in the recitals to the RMV Purchase Agreement.

"RMV Purchase Agreement" means that certain Purchase and Sale, and Security Agreement, dated November 15, 2011, by and between Borrower, as purchaser, and Lyon Rancho, LLC, a Delaware limited liability company, as seller.

"Rules" has the meaning specified in Section 11.16(b).

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Secured Debt" means, as of any date, the Indebtedness hereunder and under the Loan Documents, the Indebtedness outstanding under the Pre-Petition Loan Agreement and the other documents and agreements executed or delivered in connection therewith, the Permitted Construction Indebtedness outstanding as of December 16, 2011 and the Existing Secured Indebtedness (other than the Indebtedness secured by existing first priority deeds of trust on the Mayfield Property).

"Security Agreement" means a Security Agreement among Borrower, Parent, the other Guarantors party thereto and Administrative Agent, on behalf of the Lenders, together with any documents, supplements or agreements contemplated thereby, and any amendment or supplement thereto.

"Security Documents" shall mean and include the Security Agreement, the Pledge Agreement, the Interim Order, the Final Order, each Deed of Trust, if any, each Control Agreement and all other instruments, agreements, certificates, opinions and documents (including Uniform Commercial Code financing statements, fixture filings and landlord waivers) delivered to Administrative Agent or any Lender in connection with any Collateral or to secure the Obligations or the obligations of Guarantor under the Loan Documents.

"Senior Unsecured Notes" means, collectively, the notes issued pursuant to the Indentures, as such Indentures may be extended, renewed, refinanced or replaced.

"Standard Retail Sale" has the meaning set forth in Section 8.01(b).

"Subsequent 13-Week Budget" has the meaning set forth in Section 6.01(h).

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise

201670660 v15

specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of Borrower.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Tentative Map" means the tentative tract map for each Project, Asset or Phase, as the case may be.

"Title Company" means Fidelity National Title Insurance Company or Chicago Title Insurance Company.

"Title Policy" means Extended Coverage American Land Title Association loan policies of title insurance (2006 form with the creditors' rights exception and arbitration provisions deleted and with the endorsements listed on Schedule TP and such other endorsements as may be reasonably required by Majority Lenders) for each Deed of Trust, if any, the Interim Order or the Final Order and which shall provide coverage (including mechanics' lien coverage) satisfactory to Majority Lenders and insure the Deed of Trust as a first Lien on the Project, subject only to Permitted Exceptions.

"Total Assets" means, as of any date, all assets of the Loan Parties, determined in accordance with GAAP less (without duplication) (1) any assets attributable Equity Securities of the Excluded Subsidiaries held by the Loan Parties and (2) all write-ups subsequent to the Closing Date in the book value of any asset owned by the Loan Parties.

"Total Commitment" shall mean, at any time, Thirty Million Dollars ($30,000,000) or such lesser amount to which the same is so reduced, in accordance with the terms hereof, and in effect at such time.

"Total Liabilities" means, as of any date, all consolidated liabilities of the Loan Parties, as determined in accordance with GAAP.

"Total Outstandings" means, as of any date, the aggregate outstanding amount of all Loans, including accrued but unpaid interest and fees and any Exit Fee, to the extent that any Exit Fee is due and owing on such date, under the Loan Documents.

"Total Project Costs" with respect to each parcel of Unimproved Land (to the extent that it is not a Lot or Unit), Lot or Unit included as part of Eligible Real Property Collateral as of any date means the sum of the following costs and expenses to be paid following the date of determination: (x) all acquisition and other land costs incurred to acquire or upgrade the land constituting part of such parcel of Unimproved Land (to the extent that it is not a Lot or Unit), Lot or Unit and (y) all costs to be incurred for the construction, marketing and sale of any Improvements on such parcel of Unimproved Land (to the extent that it is not a Lot or Unit), Lot or Unit, including those costs and expenses incurred for direct construction, house fees, landscape, consultants, indirect construction, warranty costs, property taxes, miscellaneous financing costs, common area costs, model upgrades, miscellaneous capitalized costs, model operations and advertising, direct selling expense, general and administrative expenses, design

center income and other, but excluding interest expense. Total Project Costs shall be estimated and categorized in a manner consistent with the Asset cash flow schedules provided in connection with the Pre-Petition Loan Agreement.

"Total Secured Debt" means, as of any date, the sum of all Indebtedness of each Loan Party and the Property Entities (other than Lyon Mayfield) constituting Secured Debt.

"Total Secured Debt Collateral Value" means, as of any date, the sum of (x) the Eligible Real Property Collateral Valuation, (y) the Permitted Construction Indebtedness Collateral Value plus (z) the Existing Secured Indebtedness Collateral Value.

"Unconditional Guaranty" means the Unconditional Guaranty made by the Guarantors in favor of Administrative Agent and the Lenders.

"Unentitled Land" means Real Property (i) with respect to which all conditions set forth in Section 4.04 for inclusion in the Borrowing Base have not been satisfied, (ii) which are not designated for development into residences for sale to the public but are reserved as open space or as streets and common areas to be dedicated to homeowners' associations and other Governmental Authorities, or (iii) that are Amenities (including golf courses).

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"Uniform Commercial Code" shall mean the Uniform Commercial Code as the same may, from time to time, be in effect in the State of California; provided, however, in the event that, by reason of mandatory provisions of applicable Law, any or all of the attachment, perfection or priority of Administrative Agent's security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of California, the term "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of definitions related to such provisions.

"Unimproved Land" means those portions of the Borrower Real Property on which Units will be developed for which Borrower has satisfied the conditions set forth in Section 4.04 and with respect to which Borrower has not yet satisfied all of the conditions set forth in Section 4.05.

"United States" and "U.S." mean the United States of America.

"U.S. Trustee" means the United States Trustee appointed in the Chapter 11 Cases.

"Units" means single- or multi- family "for sale" residences whether Vertical Construction thereof has commenced or been completed, wholly owned held by Borrower for sale in the ordinary course of business, and in which the rights of ownership and occupancy are to be sold by Borrower other than on a time-sharing or periodic basis, and each Unit shall include the Lot that the Unit has been or will be built upon.

33

"Unrestricted Cash" means all cash and Cash Equivalents of the Loan Parties which is not Restricted Cash.

"Unused Commitment" shall mean, at any time, the remainder of (a) the Total Commitment at such time minus (b) the Total Outstandings at such time.

"Unused Commitment Fee" means an amount equal to one half of one percent (0.50%) per annum of the daily average Unused Commitment (regardless of whether such amount is fully available) for the period beginning on the Closing Date and ending on the Maturity Date.

"Variance Measurement Period" has the meaning set forth in Section 7.15(a).

"Variance Report" has the meaning set forth in Section 6.01(i).

"Vertical Construction" means the vertical construction, after all Entitlements for such construction including the Building Permit has been obtained, of Units or Amenities on the Borrower Real Property by Borrower in compliance with and permitted under all applicable Laws and Entitlements.

"Whitney Ranch" means Whitney Ranch Village 5, LLC, a Delaware limited liability company.

"WL Southwest" means William Lyon Southwest, Inc., an Arizona corporation.

1.02    OTHER INTERPRETIVE PROVISIONS.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any organization document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities,

34

accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

1.03    ACCOUNTING TERMS.

(a)    Generally.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein.

(b)    Changes in GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either Borrower or Majority Lenders shall so request, Administrative Agent, the Lenders and Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of Majority Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) Borrower shall provide to Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

1.04    ROUNDING.  Any financial ratios required to be maintained by Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

1.05    TIMES OF DAY.  Unless otherwise specified, all references herein to times of day shall be references to Pacific time (daylight or standard, as applicable).

## ARTICLE II.
## CREDIT EXTENSION

2.01    LOANS.

(a)    Commitment.  Subject to the terms and conditions set forth herein, including the terms and conditions of Sections 4.01 and 4.02, and prior to the Maturity Date, each Lender severally agrees to make Loans to the Borrower from time to time in a maximum principal amount not to exceed such Lender's Commitment; provided, that, (i) each credit

201670660 v15

advance shall be in (A) a minimum principal amount of Five Million Dollars ($5,000,000) or an integral multiple of One Million Dollars ($1,000,000) in excess thereof or, if less, the remaining undrawn portion of the Initial Aggregate Commitment and (B) accordance with the projected borrowing needs reflected in the Applicable 13-Week Budget and the Operating Forecast or in such greater amounts as may be necessary to satisfy the Five Million Dollars ($5,000,000) minimum borrowing requirement set forth above (subject to any variances otherwise permitted herein) and (ii) until the Final Order Date, the aggregate amount of all Loans that have been advanced shall not exceed the lesser of Fifteen Million Dollars ($15,000,000) and such other amount as may be approved by the Bankruptcy Court in the Interim Order for the Interim Period (such amount, the "Initial Aggregate Commitment"). Proceeds of the Loans shall be used solely for the purposes set forth in Section 2.01(e). The Loans are not revolving commitments and Borrower shall have no right to re-borrow amounts repaid hereunder unless agreed to by the Lenders in their sole discretion.

(b)  [Reserved]

(c)  [Reserved].

(d)  Borrowing Mechanics.  For each Credit Extension requested by Borrower hereunder, Borrower shall provide written notice to Administrative Agent ("Notice of Borrowing") no less than five (5) Business Days before the requested funding date of such Credit Extension (received by Administrative Agent by 9:00 a.m.), provided that with respect to the initial Credit Extension on the Closing Date the Borrower may provide three (3) Business Days advance written notice.  Each Notice of Borrowing shall be signed by a Responsible Officer of the Borrower.

(e)  Purpose.  The Borrower may use the proceeds of the Loans (i) for working capital and general corporate purposes of the Borrower, Parent and their Subsidiaries, including, without limitation, adequate protection payments and payment of fees and expenses related to the administration of the Chapter 11 Cases, and shall use such proceeds and all other cash, in each case, in accordance with the Operating Forecast and the most recently delivered Applicable 13-Week Budget, subject to variances permitted in accordance with Section 7.15 and in compliance with this Agreement, and (ii) to pay the fees and expenses of Administrative Agent and the Lenders, including their Advisors, and the Adequate Protection Obligations.

2.02  LIBO BREAK AMOUNTS.  The Borrower shall compensate each Lender, upon written request by that Lender (which written request shall set forth in reasonable detail the basis for requesting such amount), for all LIBO Break Amount incurred by such Lender as a result of:

(a)  funding, or making arrangements to fund, its participation in any Loan requested by the Borrower in a Notice of Borrowing but not made for any reason (other than by reason of default by that Lender alone);

(b)  any Loan (or part of any Loan) being repaid on a date other than an Interest Payment Date; or

(c)  any Loan (or part of any Loan) not being prepaid in accordance with a notice of prepayment given by the Borrower.

201670660 v15

2.03    PREPAYMENTS; COMMITMENT REDUCTIONS.

(a)    Prepayments Generally. Notwithstanding anything to the contrary, express or implied, in this Agreement or otherwise, upon the prepayment of any Loan (whether such prepayment is an optional prepayment or a mandatory prepayment, including a prepayment upon acceleration), the Borrower shall pay to Administrative Agent for the benefit of the Lender that made such Loan all accrued but unpaid interest and fees to the date of such prepayment on the amount prepaid, the Exit Fee with respect thereto, LIBO Break Amount, if any, and any and all other amounts which may be payable hereunder and under the other Loan Documents.

(b)    Voluntary Prepayments. The Borrower may, upon notice to Administrative Agent, at any time or from time to time voluntarily prepay Loans in whole or in part; provided that (i) such notice must be received by Administrative Agent not later than 12:00 noon five (5) Business Days prior to any date of prepayment; and (ii) any prepayment of Loans shall be in a minimum principal amount of One Million Five Hundred Thousand Dollars ($1,500,000) or a whole multiple of Five Hundred Thousand Dollars ($500,000) in excess thereof or, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment. Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Applicable Percentage of such prepayment. If such notice is given by Borrower, Borrower shall make such prepayment and the payment amount specified in such notice, together with the Exit Fee as described in Section 2.03(e) and LIBO Break Amount as described in Section 2.02, if any, shall be due and payable on the date specified therein. Each such prepayment shall be applied to the Loans of the Lenders in accordance with their respective Applicable Percentages.

(c)    Mandatory Prepayments. Borrower shall prepay the Loans as follows:

(i)    if any member of the Consolidated Group engages in an Asset Sale, Borrower and/or Parent shall, or shall cause such member of the Consolidated Group to, no later than five (5) Business Days following the consummation thereof, apply or cause to be applied an amount equal to 100% of all Net Proceeds received by the Borrower or such member of the Consolidated Group to the prepayment of the Loans;

(ii)    if any casualty, condemnation, or similar event with respect to the Collateral occurs, Borrower and/or Parent shall, or shall cause the applicable member of the Consolidated Group to, no later than three (3) Business Days following the receipt of any cash insurance proceeds, cash condemnation award, or similar cash payment in respect thereof (net of any actual and reasonable documented costs incurred by Borrower, Parent or any Subsidiary in respect thereof), apply or cause to be applied an amount equal to 100% of all such net insurance proceeds, net condemnation awards, or similar net payments received by the Borrower or such member of the Consolidated Group to the prepayment of the Loans;

(iii)    if (A) on any date the Total Outstandings exceed the Borrowing Base, (B) on any date prior to the Final Order Date the Total Outstandings exceed the Initial Aggregate Commitment or (C) thereafter the Total Outstandings exceed the Total Commitment, then, in either case, Borrower shall make a mandatory prepayment of the

Loans in the amount of such excess within five (5) Business Days; and

(iv)    if on any date, the Total Secured Debt exceeds the Maximum Permitted Secured Indebtedness, Borrower shall make a mandatory prepayment of the Loans in the amount of such excess within five (5) calendar days.

Any prepayment of the Loans in accordance with this Section 2.03(c) shall concurrently reduce each Lender's obligation to fund any further Loans hereunder on a dollar for dollar basis.

(d)    Termination of Commitments.

(i)    The Borrower may, upon notice to the Administrative Agent, voluntarily terminate the Commitments in whole or in part; provided that (i) such notice must be received by Administrative Agent not later than 12:00 noon five (5) Business Days prior to any date of reduction; and (ii) any reduction of the Commitments shall be in a minimum principal amount of One Million Five Hundred Thousand Dollars ($1,500,000) or a whole multiple of Five Hundred Thousand Dollars ($500,000) in excess thereof or, if less, the entire unused portion of the Commitment at such time. Each such notice shall specify the date and amount of such reduction. Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Applicable Percentage of such reduction. If such notice is given by Borrower, the Exit Fee in respect of such reduction as described in Section 2.03(e), shall be due and payable on the date specified therein. Each such reduction shall be applied to the Commitments of the Lenders in accordance with their respective Applicable Percentages. Any reduction of the Commitments in accordance with this clause (i) shall be permanent unless waived by the Lenders.

(ii)    The Commitments of each Lender shall be automatically and permanently be reduced to zero on the Maturity Date.

(e)    Exit Fee. In the event of any repayment or prepayment of the Loans, whether in whole or in part and whether voluntary or involuntary due to a default or otherwise, or upon acceleration, Borrower shall pay to Administrative Agent for the pro rata account of the Lenders, the Exit Fee. The Exit Fee shall be applicable to all prepayments including any amounts paid if an Event of Default exists. The Exit Fee shall be in addition to all other amounts due and payable hereunder.

2.04    REPAYMENT OF LOANS. Borrower shall repay to the Lenders on the Maturity Date the aggregate principal amount of Loans outstanding on such date, together with all accrued and unpaid interest and all other amounts due and payable hereunder and under the other Loan Documents, including the Exit Fee and LIBO Break Amount, if any.

2.05    INTEREST.

(a)    Subject to the provisions of subsection (b) below, each Loan shall bear interest on the outstanding principal amount thereof for each day during each Interest Period with respect thereto at a rate per annum equal to the Applicable Rate for such Interest Period. Other than with respect to any Interest Period that ends on the Maturity Date, any Loan that remains

38

outstanding on the last day of an Interest Period applicable thereto shall automatically be continued for an additional Interest Period.

(b)    (i)    If any amount of principal or interest of any Loan is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a rate per annum at all times equal to the Default Rate and Borrower shall pay a late fee equal to five percent (5.0%) of such late payment of principal or interest, in each case, to the fullest extent permitted by applicable Laws.

(ii)    If any amount (other than principal or interest of any Loan) payable by Borrower under any Loan Document is not paid when due, whether at stated maturity, by acceleration or otherwise, then upon the request of Majority Lenders, such amount shall thereafter bear interest at a rate per annum at all times equal to the Default Rate and, if requested by Majority Lenders, Borrower shall pay a late fee equal to five percent (5.0%) of such late payment, in each case, to the fullest extent permitted by applicable Laws.

(iii)    Upon the request of Majority Lenders, while any Event of Default exists, Borrower shall pay interest on the principal amount of all outstanding Obligations hereunder at a rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(iv)    Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)    Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment.

2.06    FEES.

(a)    Borrower shall pay (i) to the Initial Lender the fees, including the Front-End Fee, in the amount and at the times designated in the Fee Letter,  and (ii) to the Lenders, pro rata based on each Lender's Applicable Percentage, the Unused Commitment Fee payable in arrears on each three (3) month anniversary of the Closing Date and on the Maturity Date (or if the Commitments are terminated or reduced on a date prior to the Maturity Date, on such prior date).  On the Closing Date, such fees shall be fully earned and, once paid, shall not be refundable for any reason whatsoever.

(b)    Borrower shall pay to the Lenders such fees as shall have been separately agreed upon in writing in the amounts and at the times so specified.  Once paid, such fees shall not be refundable for any reason whatsoever.

2.07    COMPUTATION OF INTEREST AND FEES.  For all Loans, all computations of fees and interest shall be made on the basis of a 360-day year, and actual days elapsed. Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid.  Each

39

determination by Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

2.08    EVIDENCE OF DEBT.  The Credit Extension made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by Administrative Agent in the ordinary course of business.  The accounts or records maintained by Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of Administrative Agent in respect of such matters, the accounts and records of Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender made through Administrative Agent, Borrower shall execute and deliver to such Lender (through Administrative Agent) a Note, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, amount and maturity of its Loans and payments with respect thereto.

2.09    PAYMENTS GENERALLY; ADMINISTRATIVE AGENT'S CLAWBACK.

(a)    General.  All payments to be made by Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by Borrower hereunder shall be made to Administrative Agent, for the account of the respective Lenders to which such payment is owed, at Administrative Agent's Office in Dollars and in immediately available funds not later than 1:00 p.m. on the date specified herein.  Administrative Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.  All payments received by Administrative Agent after 1:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  If any payment to be made by Borrower, other than an interest payment which shall be made on each Interest Payment Date, shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)    Payments by Borrower; Presumptions by Administrative Agent.  Unless Administrative Agent shall have received notice from Borrower prior to the date on which any payment is due to Administrative Agent for the account of the Lenders that Borrower will not make such payment, Administrative Agent may assume that Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to Administrative Agent forthwith on demand the amount so distributed to such Lender, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to Administrative Agent, at the Federal Funds Rate.

A notice of Administrative Agent to any Lender or Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

2.10    SHARING OF PAYMENTS BY LENDERS.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise obtain payment in respect of any principal of or interest on any of the Loans made by it, resulting in such Lender receiving payment of a proportion of the aggregate amount of such Loans or participations and accrued interest thereon greater than its pro rata share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the Loans of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them, provided that:

(i)    if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)    the provisions of this Section 2.10 shall not be construed to apply to (x) any payment made by Borrower pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to Borrower or any Subsidiary thereof (as to which the provisions of this Section shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

2.11    SECURITY.

(a)    Security Documents.  Without limiting, and in furtherance of the Interim Order (and the Final Order when entered), the Loans, together with all other Obligations, shall be secured by the Liens granted by the Borrower and the Guarantors under the Security Documents. All obligations of a Guarantor under the Loan Documents shall be secured by the Liens granted by such Guarantor under the Security Documents.

(b)    Further Assurances.  The Borrower shall deliver, and shall cause each Guarantor to deliver, to Administrative Agent such additional Deeds of Trust (together with a Title Policy for any such Deed of Trust), security agreements, lessor consents and estoppels (containing appropriate mortgagee and lender protection language) and other instruments, agreements, certificates, opinions and documents (including Uniform Commercial Code financing statements, fixture filings and landlord waivers) as Administrative Agent or Majority Lenders may reasonably request to:

41

(i)     grant, perfect, maintain, protect and evidence security interests in favor of Administrative Agent (which may be foreclosed judicially or by power of sale, and to the extent required at any time by Administrative Agent to ensure that Administrative Agent's Lien on the Interim Order Real Property can be foreclosed by power of sale, Borrower shall deliver to Administrative Agent for recordation in the appropriate Official Records Deeds of Trust for the Interim Order Real Property, and Borrower shall cause Title Policies to be issued for such Deeds of Trust), for the benefit of Administrative Agent and the Lenders, in any or all present and future Real Property and Personal Property of the Borrower and the Guarantors (other than (x) Excluded Assets and (y) "Excluded Property," as defined in the Security Agreement) prior to the Liens or other interests of any Person, except for Permitted Liens; and

(ii)     Otherwise establish, maintain, protect and evidence the rights provided to Administrative Agent, for the benefit of Administrative Agent and the Lenders, pursuant to the Security Documents.

(c)     Borrower shall fully cooperate with Administrative Agent and the Lenders and perform all additional acts reasonably requested by Administrative Agent or any Lender to effect the purposes of this Section 2.11.

2.12     PAYMENT OF OBLIGATIONS.  Upon the Maturity Date (or, if earlier, on the date on which the Obligations become due and payable pursuant to the terms this Agreement), Lenders shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court.

2.13     NO DISCHARGE; SURVIVAL OF CLAIMS.  Borrower agrees that (a) (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Chapter 11 Cases, terminating the joint administration of the Chapter 11 Cases or by any other act or omission or (ii) the entry of an order confirming a plan of reorganization in any of the Chapter 11 Cases (and Borrower, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) shall not discharge the Obligations and (b) the superpriority administrative claim granted to Administrative Agent and Lenders pursuant to the Interim Order and Final Order shall not be affected in any manner by the entry of an order confirming a plan of reorganization in any Chapter 11 Case.

### ARTICLE III.
### TAXES, YIELD PROTECTION AND ILLEGALITY

3.01     TAXES.

(a)     Payments Free of Taxes.  Any and all payments by or on account of any obligation of Borrower hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, provided that if Borrower shall be required by applicable law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 3.01(a)) Administrative Agent or Lender, as the case

42

may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) Borrower shall make such deductions and (iii) Borrower shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)    Payment of Other Taxes by Borrower.  Without limiting the provisions of subsection (a) above, Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)    Indemnification by Borrower.  Borrower shall indemnify Administrative Agent and each Lender, within five (5) days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) paid by Administrative Agent or such Lender, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to Borrower or by a Lender (with a copy to Administrative Agent), or by Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)    Evidence of Payments.  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by Borrower to a Governmental Authority, Borrower shall deliver to Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Administrative Agent.

(e)    Status of Lenders.  Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which Borrower is resident for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Loan Document shall deliver to Borrower (with a copy to Administrative Agent), at the time or times prescribed by applicable law or reasonably requested by Borrower or Administrative Agent, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if requested by Borrower or Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by Borrower or Administrative Agent as will enable Borrower or Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

Without limiting the generality of the foregoing, in the event that Borrower is resident for tax purposes in the United States, any Foreign Lender shall deliver to Borrower and Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of Borrower or Administrative Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(i)    duly completed copies of Internal Revenue Service Form W-8BEN claiming eligibility for benefits of an income tax treaty to which the United States is a

party,

      (ii)     duly completed copies of Internal Revenue Service Form W-8ECI,

      (iii)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of Borrower within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881 (c) (3)(C) of the Code and (y) duly completed copies of Internal Revenue Service Form W-8BEN, or

      (iv)    any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States Federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit Borrower to determine the withholding or deduction required to be made.

      (f)     Treatment of Certain Refunds. If Administrative Agent, or any Lender determines, in its sole discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by Borrower or with respect to which Borrower has paid additional amounts pursuant to this Section, it shall pay to Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by Borrower under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of Administrative Agent, and such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that Borrower, upon the request of Administrative Agent, or such Lender, agrees to repay the amount paid over to Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to Administrative Agent or such Lender in the event Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. This subsection shall not be construed to require Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to Borrower or any other Person.

    3.02    PROVISIONS APPLICABLE TO THE LIBO RATE.

      (a)    The LIBO Rate may be adjusted by Administrative Agent with respect to any Lender on a prospective basis to take into account any additional or increased costs to such Lender of maintaining or obtaining any eurodollar deposits, increased costs or otherwise obtaining funding to fund its obligations hereunder, in each case, due to changes in applicable law occurring subsequent to the commencement of the then applicable Interest Period, including changes in tax laws (except changes of general applicability in corporate income tax laws) and changes in the reserve requirements imposed by the Board of Governors of the Federal Reserve System (or any successor), excluding the Reserve Requirement, which additional or increased costs would increase the cost of funding or maintaining loans bearing interest at the LIBO Rate. In any such event, the affected Lender shall give Borrower and Administrative Agent notice of such a determination and adjustment and Administrative Agent promptly shall transmit the notice to each other Lender and, upon its receipt of the notice from the affected Lender, Borrower may,

44

by notice to such affected Lender (y) require such Lender to furnish to Borrower a statement setting forth the basis for adjusting such LIBO Rate and the method for determining the amount of such adjustment, or (z) repay the Loans with respect to which such adjustment is made (together with any LIBO Break Amount).

(b)    In the event that any change in market conditions (including an increase cost in any Lender's cost of funds) or any law, regulation, treaty, or directive, or any change therein or in the interpretation or application thereof, shall at any time after the date hereof, in the reasonable opinion of any Lender, make it unlawful or impractical for such Lender to fund or maintain the Loans or to continue such funding or maintaining, or to determine or charge interest rates at the Applicable Rate, such Lender shall give notice of such changed circumstances to Administrative Agent and Borrower and Administrative Agent promptly shall transmit the notice to each other Lender and in the case of any Loans of such Lender that are outstanding, the date specified in such Lender's notice shall be deemed to be the last day of the Interest Period of such Loans, and interest upon the Loans of such Lender thereafter shall accrue interest at the rate notified by such Lender to Administrative Agent and Borrower as such Lender's cost of funding such Loans for such Interest Period, expressed as a percentage rate per annum.

(c)    No Requirement of Matched Funding. Anything to the contrary contained herein notwithstanding, neither Administrative Agent, nor any Lender, nor any of their Eligible Participants, is required actually to acquire eurodollar deposits to fund or otherwise match fund any Loans hereunder.

3.03    [RESERVED].

3.04    COMPENSATION FOR LOSSES. Upon demand of any Lender (with a copy to Administrative Agent) from time to time, Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense, including LIBO Break Amount, incurred by it as a result of any failure by Borrower (other than the failure of such Lender to make a Loan) to borrow on the date or in the amount notified by Borrower, including any loss of anticipated profits and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan. Borrower shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.

3.05    MITIGATION OBLIGATIONS; REPLACEMENT OF LENDERS.

(a)    Designation of a Different Lending Office. If Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, then such Lender (x) shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01, as the case may be, in the future, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender, and (y) shall deliver to Administrative Agent and Borrower a calculation of any such compensation or additional amount, in reasonable detail. Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation

45