or assignment.

(b) Replacement of Lenders. If Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, Borrower may replace such Lender in accordance with Section 11.13.

3.06 SURVIVAL. All of Borrower's obligations under this Article III shall survive termination of this Agreement and repayment of all Obligations hereunder.

## ARTICLE IV.
## CONDITIONS PRECEDENT TO CREDIT EXTENSION

4.01 CONDITIONS TO INITIAL CREDIT EXTENSION HEREUNDER. The obligation of each Lender to make its initial Credit Extension hereunder is subject to satisfaction of the following conditions precedent:

(a) Administrative Agent's receipt of the following, each of which shall be originals or facsimiles (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party each dated the date hereof or the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance satisfactory to each of the Lenders:

(i) executed counterparts of this Agreement, the Fee Letter, the Unconditional Guaranty, the Security Agreement, the Pledge Agreement, the Intercompany Subordination Agreement, and each other Loan Document sufficient in number for distribution to Administrative Agent, each Lender and the Loan Parties thereto;

(ii) if requested by any Lender, a Note executed by Borrower in favor of such Lender;

(iii) a Compliance Certificate duly executed by a Responsible Officer of Borrower demonstrating Borrower's compliance with the Financial Covenants on a pro-forma basis after giving effect to the Credit Extension being made on such date;

(iv) such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as Administrative Agent may require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party;

(v) such documents and certifications as Administrative Agent may reasonably require to evidence that each Loan Party is duly organized or formed, and that each Loan Party is validly existing, in good standing and qualified to engage in business in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business require such qualification, except to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect;

(vi) a favorable opinion of Borrower's counsel, addressed to Administrative

46

Agent and each Lender, as to such matters concerning the Loan Parties and the Loan Documents as the Lenders may reasonably request;

(vii)    a certificate of a Responsible Officer of each Loan Party either (A) attaching copies of all consents, licenses and approvals required in connection with the execution, delivery and performance by such Loan Party and the validity against such Loan Party of the Loan Documents to which it is a party, and such consents, licenses and approvals shall be in full force and effect, or (B) stating that no such consents, licenses or approvals are so required;

(viii)    a certificate signed by a Responsible Officer of each Loan Party certifying (A) that there has been no event or circumstance since the Petition Date that has had or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect; (B) the representations and warranties set forth in Article V and in the other Loan Documents are true and correct in all material respects (except for such representations and warranties made as of a specified date, which shall be true and correct as of such specified date); and (C) no Default or Event of Default has occurred and is continuing as of such date or would occur after giving effect to the Credit Extension made on such date;

(ix)    evidence that all insurance required to be maintained pursuant to the Loan Documents has been obtained and is in effect and that Administrative Agent has been named loss payee,  or Administrative Agent and the Lenders have been named as additional insureds, as applicable, thereunder and Administrative Agent may direct the insurers to cause all payments of insurance proceeds to be payable to it from and after the date of a Default without further consent of Borrower or any Loan Party; and

(x)    such other assurances, certificates, documents, instruments, agreements, consents or opinions as Administrative Agent, or Majority Lenders reasonably may require, including such other documents, instruments and evidence to establish and perfect the Liens granted to Administrative Agent or any Lender under the Loan Documents.

(b)    Administrative Agent shall have received the initial Applicable 13-Week Budget and Operating Forecast, copies of which are attached hereto as Exhibit "L" and "M," respectively.

(c)    Administrative Agent shall have received Uniform Commercial Code, Lien searches and other evidence satisfactory to Lenders that the only Liens on the Collateral are Permitted Liens.

(d)    The Exhibits and Schedules hereto shall be in form and substance reasonably acceptable to the Administrative Agent and the Initial Lender.

(e)    [Reserved].

(f)    The representations and warranties of the Borrower and each other Loan Party contained in Article 5 or any other Loan Document or which are contained in any

47

document furnished in connection herewith shall be true and correct in all material respects.

(g)    No (a) "Termination Event" under and as defined in the Restructuring Support Agreement has occurred and is continuing and (b) "Termination Event" under and as defined in the Noteholder Restructuring Support Agreement (as defined in the Restructuring Support Agreement has occurred) has occurred and is continuing.

(h)    [Reserved].

(i)    [Reserved].

(j)    [Reserved].

(k)    [Reserved].

(l)    Borrower shall have delivered to Administrative Agent, the Environmental Indemnity, fully completed and duly executed by Borrower.

(m)    [Reserved].

(n)    [Reserved].

(o)    [Reserved].

(p)    Any costs, fees, expenses (including reasonable legal fees) and other compensation contemplated hereby and by the other Loan Documents to be payable to the Lenders shall have been paid to the extent due and the Loan Parties shall have complied in all material respects with all of their other obligations to the Lenders.

(q)    [Reserved].

(r)    The Interim Order Real Property shall be listed on Schedule IORP, which Schedule shall include the Real Property Classifications for the Borrower Real Property included in the Interim Order Real Property that qualifies under a Real Property Classification pursuant to the conditions set forth in Sections 4.04 through 4.08, inclusive, and such Schedule shall include all other Borrower Real Property as Unentitled Land.

(s)    All of the conditions to inclusion to of Real Property as Eligible Real Property Collateral in Section 4.09 shall have been met with respect to all of the Interim Order Real Property, other than with respect to Unentitled Land, to which all requirements under Section 4.09 other than requirements 4.09(a)(i) and 4.09(b)(v) shall have been met.

(t)    The Bankruptcy Court shall have entered the Interim Order by no later than three (3) days after the Petition Date in form and substance satisfactory to the Lenders, approving the transactions contemplated by this Agreement and granting a first priority perfected Lien in the Collateral to Administrative Agent, on behalf of the Lenders, subject only to the Carve-Out and Permitted Liens, and (i) the Interim Order shall not have been reversed, modified, amended, stayed or vacated, without the consent of the Lenders and (ii) the Loan Parties shall be

48

in compliance in all respects with the Interim Order.

(u)     A cash management order encompassing cash management arrangements, in form and substance satisfactory to the Lenders, shall have been entered in the Chapter 11 Cases.

(v)     No trustee or examiner with expanded powers shall have been appointed with respect to the Loan Parties or their respective properties.

(w)     From and including November 17, 2011 through and including the Closing Date, the Borrower shall have made no disbursements or other payments in respect of or related to: (i) land acquisitions, including the acquisition of any fee or other interest in Real Property (whether by exercise of an option or otherwise) and takedowns under the Hearthstone project option or any other option agreements (excluding payments in the amount of approximately $137,000 per month paid to Irvine Unified School District in connection with an option as to property located in Irvine California); (ii) Lyon Mayfield or the Mayfield Property; and (iii) the RMV Property or the RMV Entities, other than subject to the RMV Monetary Obligations Cap and in accordance with the RMV Purchase Agreement.

(x)     The Chapter 11 Plan and the Disclosure Statement shall have been filed with the Bankruptcy Court.

(y)     The Rights Offering Motion and the RSA Motion (each as defined in the Restructuring Support Agreement) shall have been filed with the Bankruptcy Court.

(z)     The fees and expenses incurred by the legal and financial advisors to the Pre-Petition Agent, including Akin Gump Strauss Hauer & Feld LLP, Pepper Hamilton LLP and FTI Consulting Inc., that are due and owing on the Closing Date shall have been paid in full.

4.02     CONDITIONS TO EACH POST CLOSING CREDIT EXTENSION. The occurrence of each Credit Extension (other than the initial Credit Extension) is subject to the further conditions that:

(a)     Borrower shall have satisfied all of the conditions set forth in Section 4.01.

(b)     Borrower shall have delivered to Administrative Agent and each Lender a Notice of Borrowing for such Credit Extension in accordance with this Agreement;

(c)     Borrower shall have delivered to the Administrative Agent and each Lender a Borrowing Base Report duly executed by a Responsible Officer of Borrower, demonstrating Borrower's compliance with the Borrowing Base.

(d)     Borrower shall have delivered to Administrative Agent and each Lender a Compliance Certificate duly executed by a Responsible Officer of Borrower demonstrating Borrower's compliance with the Financial Covenants;

(e)     Permitted Construction Indebtedness incurred by Borrower, when added to the Total Outstandings, Indebtedness under the Existing Secured Indebtedness (other than

49

Existing Secured Indebtedness secured by the Mayfield Property) and Indebtedness under the Pre-Petition Loan Agreement, shall not exceed the Maximum Permitted Secured Indebtedness;

(f)    Borrower shall have delivered to Administrative Agent and each Lender a certificate of a Responsible Officer that on the date such Credit Extension is to occur and after giving effect thereto, the following are true and correct:

(i)    The representations and warranties of Borrower and the other Loan Parties set forth in Article V and in the other Loan Documents are true and correct in all material respects as if made on such date (except for representations and warranties expressly made as of a specified date, which shall be true and correct as of such date);

(ii)    No Default or Event of Default has occurred and is continuing or will result from such Credit Extension;

(iii)    All of the Loan Documents remain in full force and effect;

(iv)    Such Credit Extension is in accordance with the Applicable 13-Week Budget and Operating Forecast, subject to variances permitted pursuant to Section 7.15; and

(v)    That there has been no event or circumstance since the Closing Date that has had or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect;

(g)    The Interim Order or Final Order, as applicable, shall be in full force and effect and shall not have been vacated, reversed, modified, amended, or stayed for a period of five (5) Business Days or longer and the Loan Parties are in compliance with the Interim Order or Final Order, as applicable;

(h)    The Lenders shall have received all updates to the Applicable 13-Week Budget and Variance Reports required hereunder and the Loan Parties are in compliance with the Applicable 13-Week Budget and the Operating Forecast;

(i)    All fees, costs and charges due and payable by the Loan Parties under the Loan Documents, including Section 11.04 hereof, and the Interim Order or Final Order, as applicable, including the Adequate Protection Obligations, shall have been paid; and

(j)    All other documents and legal matters in connection with the transactions contemplated by this Agreement shall have been delivered, executed or recorded and shall be in form and substance satisfactory to the Lenders.

The submission by Borrower to Administrative Agent of each Notice of Borrowing shall be deemed to be a representation and warranty by Borrower that each of the statements set forth above in Section 4.02(f) is true and correct as of the date of such notice.

4.03    [RESERVED].

201670660 v15

4.04    CONDITIONS PRECEDENT TO ADMISSION OF REAL PROPERTY TO THE BORROWING BASE AS UNIMPROVED LAND.  Borrower may, from time to time, request Administrative Agent to include a portion of the Borrower Real Property as Unimproved Land for purposes of the Borrowing Base.  In connection with each such request, and as a condition to any Borrower Real Property qualifying as Unimproved Land at any time including on the Closing Date, the following conditions precedent shall have been satisfied or waived by the Administrative Agent at the sole cost and expense of Borrower.  Upon the satisfaction of such conditions precedent, as determined by Majority Lenders, such portions of the Borrower Real Property shall be included in the Borrowing Base as Unimproved Land:

(a)    REQUEST.  Borrower shall have submitted to Administrative Agent a request in the form of Exhibit "F" to include in the Borrowing Base as Unimproved Land portions of the Borrower Real Property as set forth in such request.  Such request and all other documents and instruments described in this Section 4.04 shall be submitted with the Borrowing Base Report in which Borrower intends to include such portion of the Borrower Real Property in the Borrowing Base as Unimproved Land.  Each such request shall be deemed a renewal of all representations and warranties of Borrower set forth in the Loan Documents.

(b)    DEFAULTS.  No Default shall have occurred and be continuing on and as of the date that each portion of the Borrower Real Property is included as Unimproved Land.

(c)    ZONING APPROVALS.  To the extent requested by the Administrative Agent, Borrower shall have provided to Administrative Agent and Majority Lenders shall have approved evidence of appropriate vested zoning for the anticipated development of the Unimproved Land "for sale" single- or "for sale" multi- family residential property, which zoning shall be consistent with (i) the anticipated use of such Unimproved Land and (ii) the Core Businesses.

(d)    ELIGIBLE REAL PROPERTY COLLATERAL.  All Unimproved Land shall have met all of the requirements in this Agreement to be Eligible Real Property Collateral.

(e)    OTHER.  Borrower shall have provided such other documents and information reasonably requested by Administrative Agent.

4.05    CONDITIONS PRECEDENT TO ADMISSION OF REAL PROPERTY TO THE BORROWING BASE AS LAND UNDER DEVELOPMENT.  Borrower may, from time to time, request Administrative Agent to include a portion of the Borrower Real Property as Land Under Development for purposes of the Borrowing Base.  In connection with each such request, and as a condition to any Borrower Real Property qualifying as Land Under Development at any time including on the Closing Date, the following conditions precedent shall have been satisfied or waived by the Administrative Agent at the sole cost and expense of Borrower.  Upon the satisfaction of such conditions precedent, as determined by Majority Lenders, such portions of the Borrower Real Property shall be classified as Land Under Development:

(a)    REQUEST.  Borrower shall have submitted to Administrative Agent a request in the form of Exhibit "G" to classify as Land Under Development portions of the Borrower Real Property as set forth in such request.  Such request and all other documents and

51

instruments described in Sections 4.04 and 4.05 shall be submitted with the Borrowing Base Report in which Borrower intends to include such portion of the Borrower Real Property in the Borrowing Base as Land Under Development. Each such request shall be deemed a renewal of all representations and warranties of Borrower set forth in the Loan Documents.

(b)     DEFAULTS. No Default shall have occurred and be continuing on and as of the date that each portion of the Borrower Real Property is included as Land Under Development.

(c)     HORIZONTAL IMPROVEMENTS. To the extent requested by the Administrative Agent, Borrower shall have provided to Administrative Agent and Majority Lenders shall have approved evidence of Horizontal Improvements are ongoing on the applicable Borrower Real Property.

(d)     ELIGIBLE REAL PROPERTY COLLATERAL. All Land Under Development meets all of the requirements in this Agreement to be Eligible Real Property Collateral.

(e)     OTHER. Borrower shall have provided such other documents and information reasonably requested by Administrative Agent.

4.06     CONDITIONS PRECEDENT TO ADMISSION OF REAL PROPERTY AS FINISHED LOTS TO THE BORROWING BASE. Borrower may, from time to time, request Administrative Agent to include a portion of the Borrower Real Property as Finished Lots for purposes of the Borrowing Base. In connection with each such request, and as a condition to any Borrower Real Property qualifying as Finished Lots at any time including on the Closing Date, the following conditions precedent shall have been satisfied or waived by the Administrative Agent at the sole cost and expense of Borrower. Upon the satisfaction of such conditions precedent, as determined by Majority Lenders, such portions of the Borrower Real Property shall be included in the Borrowing Base as Finished Lots:

(a)     REQUEST. Borrower shall have submitted to Administrative Agent a request in the form of Exhibit "H" to classify as Finished Lots portions of the Borrower Real Property as set forth in such request. Such request and all other documents and instruments described in Sections 4.04, 4.05 and 4.06 shall be submitted when Borrower intends to classify such portion of the Borrower Real Property as Finished Lots. Each such request shall be deemed a renewal of all representations and warranties of Borrower set forth in the Loan Documents.

(b)     DEFAULTS. No Default shall have occurred and be continuing on and as of the date that each portion of the Borrower Real Property is classified as Finished Lots.

(c)     FINAL MAP. To the extent requested by the Administrative Agent, Borrower shall have delivered to Administrative Agent and Majority Lenders shall have approved a Final Map (a Tentative Map is not sufficient for inclusion of Borrower Real Property as Finished Lots) of the Finished Lots pursuant to the applicable subdivision map requirements, which Final Map shall have been recorded in the Official Records. Each Final Map must contain a legal description of the Finished Lots, must describe and show all boundaries of and lot lines within such Finished Lots and all streets and other dedications, and must contain such other

52

information and certifications as Administrative Agent may request.

(d)    SUBSTANTIAL COMPLETION OF HORIZONTAL IMPROVEMENTS. To the extent requested by the Administrative Agent, Borrower shall have delivered to Administrative Agent and Majority Lenders shall have approved  evidence that all Horizontal Improvements on the Borrower Real Property to be classified as Finished Lots are substantially compete.

(e)    PERMIT READY; UTILITIES.  To the extent requested by the Administrative Agent, Borrower shall have provided to Administrative Agent and Majority Lenders shall have approved evidence that all fees due to any Governmental Authority have been paid (including all fees up and to the point of pulling the final building permit necessary to commence Vertical Construction), and all conditions and requirements necessary to be met have been met unconditionally, for issuance of all Building Permits for the Finished Lots, and no conditions will exist to affect Borrower's right to connect into and have adequate use of such utilities except for the payment of a normal connection charges or tap charges and except for the payment of subsequent charges for such services to the utility supplier.

(f)    ELIGIBLE REAL PROPERTY COLLATERAL.  All Finished Lots meet all of the requirements in this Agreement to be Eligible Real Property Collateral.

(g)    OTHER.  Borrower shall have provided such other documents and information reasonably requested by Administrative Agent.

4.07    CONDITIONS PRECEDENT TO ADMISSION OF REAL PROPERTY TO THE BORROWING BASE AS HOMES UNDER CONSTRUCTION.  Borrower may, from time to time, request Administrative Agent to include a portion of the Borrower Real Property as Homes Under Construction, as applicable, for purposes of the Borrowing Base.  In connection with each such request, and as a condition to any Borrower Real Property qualifying as Homes Under Construction at any time including on the Closing Date, the following conditions precedent shall have been satisfied or waived by the Administrative Agent at the sole cost and expense of Borrower.  Upon the satisfaction of such conditions precedent, as determined by Majority Lenders, such portion of the Borrower Real Property shall be included in the Borrowing Base as Homes Under Construction, as applicable:

(a)    REQUEST.  Borrower shall have submitted to Administrative Agent a request in the form of Exhibit "I" to include in the Borrowing Base as Homes Under Construction portions of the Borrower Real Property as set forth in such request.  Such request and all other documents and instruments described in Sections 4.04, 4.05, 4.06 and 4.07 shall be submitted with the Borrowing Base Report in which Borrower intends to include such portion of the Borrower Real Property in the Borrowing Base as Homes Under Construction. Each such request shall be deemed a renewal of all representations and warranties of Borrower set forth in the Loan Documents.

(b)    DEFAULTS.  No Default shall have occurred and be continuing on and as of the date that each portion of the Borrower Real Property is included as Homes Under Construction for purposes of the Borrowing Base.

201670660 v15

(c)     DOCUMENTS AND INFORMATION.  Borrower shall have provided to Administrative Agent, and Majority Lenders shall have approved, all documents and information required pursuant to Sections 4.04, 4.05 and 4.06, with respect to the applicable portion of the Borrower Real Property included as Homes Under Construction for purposes of the Borrowing Base.

(d)     VERTICAL CONSTRUCTION.  To the extent requested by the Administrative Agent, Borrower shall have provided to Administrative Agent, and Majority Lenders shall have approved, evidence that the Building Permit has been issued and that Vertical Construction has commenced on the Finished Lots. Homes Under Construction will include Units that meet all of the requirements and conditions to be Homes Under Construction and will continue to include any such Units up until and including the point that such Units have become finished Units (i.e., through Vertical Construction, regardless of what stage of Vertical Construction is ongoing, and including upon completion of Vertical Construction) and (other than with respect to Units that meet all of the conditions and requirements under Section 4.08 below to become Model Homes) escrow has closed on the sales of such Units in accordance with Section 8.02.

(e)     ELIGIBLE REAL PROPERTY COLLATERAL.  All Homes Under Construction meet all of the requirements in this Agreement to be Eligible Real Property Collateral.

(f)     OTHER.  Borrower shall have provided such other documents and information reasonably requested by Administrative Agent.

4.08     CONDITIONS PRECEDENT TO ADMISSION OF REAL PROPERTY TO THE BORROWING BASE AS MODEL HOMES.  Borrower may, from time to time, request Administrative Agent to include a portion of the Borrower Real Property as Model Homes for purposes of the Borrowing Base.  In connection with each such request, and as a condition to any Borrower Real Property qualifying as Model Homes at any time including on the Closing Date, the following conditions precedent shall have been satisfied or waived by the Administrative Agent at the sole cost and expense of Borrower.  Upon the satisfaction of such conditions precedent, as determined by Majority Lenders, such portions of the Borrower Real Property shall be included in the Borrowing Base as Model Homes:

(a)     REQUEST.  Borrower shall have submitted to Administrative Agent a request in the form of Exhibit "J" to include in the Borrowing Base as Model Homes portions that a portion of the Borrower Real Property as set forth in such request.  Such request and all other documents and instruments described in this Sections  4.04, 4.05, 4.06, 4.07 and 4.08 shall be submitted with the Borrowing Base Report in which Borrower intends to include such portion of the Borrower Real Property in the Borrowing Base as Model Homes.  Each such request shall be deemed a renewal of all representations and warranties of Borrower set forth in the Loan Documents.

(b)     DEFAULTS.  No Default shall have occurred and be continuing on and as of the date that each portion of the Borrower Real Property is included as Model Homes for purposes of the Borrowing Base.

54

(c)    DOCUMENTS AND INFORMATION.  Borrower shall have provided to Administrative Agent, and Majority Lenders shall have approved, all documents and information required pursuant to Sections 4.04, 4.05, 4.06 and 4.07, with respect to the applicable portion of the Borrower Real Property included as Model Homes for purposes of the Borrowing Base.

(d)    UNIT CONSTRUCTION COMPLETION.  Borrower shall not be entitled to include any portion of the Borrower Real Property as Model Homes for purposes of the Borrowing Base unless and until Vertical Construction has been completed to the satisfaction of Majority Lenders and the Model Homes have been completed with such fit and finish and furnishing as Borrower reasonably believes is necessary in connection with marketing and sales of Units of the type of the Model Home in the Project in which the Model Home is located. Units that are unsold shall not be deemed to be Model Homes (but rather a Home Under Construction) unless such Unit is furnished or merchandized and used as part of marketing and sales of Units of the type of the Model Home, and located in a Model Unit complex (provided that Model Unit complexes shall not include more Units than is industry standard and is consistent with Borrower's past practice in designating Model Homes).

(e)    ELIGIBLE REAL PROPERTY COLLATERAL.  All Model Homes meet all of the requirements in this Agreement to be Eligible Real Property Collateral.

(f)    OTHER.  Borrower shall have provided such other documents and information reasonably requested by Administrative Agent.

4.09    GENERAL CONDITIONS TO REAL PROPERTY ELIGIBLE COLLATERAL BEING INCLUDED IN THE BORROWING BASE.  In addition to any other conditions to any Borrower Real Property being included in the Borrowing Base from time to time, the Borrower Real Property must be Eligible Real Property Collateral, and in order to be Eligible Real Property Collateral, Real Property must be included in a Project that shall have met the following conditions precedent as determined by Majority Lenders (an "Eligible Project"):

(a)    PROJECT DELIVERABLES.  Administrative Agent has received and approved:

(i)    A fully completed Project Eligibility Request (other than for the Interim Order Real Property, for which the other applicable conditions in this Agreement to inclusion in the Borrowing Base shall have been met), executed by Borrower, with all attachments and  enclosures;

(ii)    [Reserved];

(iii)    Fully executed collateral assignments of any material Construction Agreements for the Project; and

(iv)    For informational purposes and with no right of Lender to approve, to the extent such information is available for the Horizontal Improvements or Vertical Construction to be constructed as part of the Project as of the date entry of the Project's Borrower Real Property into the Borrowing Base, if requested by Administrative Agent or any Majority Lender:  (1) copies of the Plans, Drawings and Specifications, architects

and engineers agreements, construction contracts, and all other agreements, and Entitlements concerning the Project being submitted for approval; (2) all cost breakdowns for the Improvements to be constructed as part of the Project; and (3) Project sources and uses of funds, Project economics and feasibility, market data and other similar information concerning the Project as reasonably requested by Administrative Agent.

(b)    ADDITIONAL REQUIREMENTS. Without limitation of any other conditions to any Borrower Real Property being Eligible Real Property Collateral, the following are conditions to any Borrower Real Property being Eligible Real Property Collateral:

(i)    The Borrower Real Property is not zoned or being developed for commercial use or any other use that is inconsistent with the single- or multi- family "for sale" use intended in connection with the Core Businesses (e.g., land zoned for hotel or golf course uses);

(ii)    The Real Property (other than Amenities which may have been transferred to the Project's homeowners' association) shall be Borrower Real Property owned in fee, subject only to the Permitted Exceptions;

(iii)    Administrative Agent shall have no obligation to approve a Project as an Eligible Project if there is a Default;

(iv)    The Borrower Real Property is not (or the holder of Permitted Construction Indebtedness does not have the right to cause such Borrower Real Property to become) collateral for any Permitted Construction Indebtedness or Existing Secured Indebtedness;

(v)    The Borrower Real Property is not Unentitled Land;

(vi)    The Borrower Real Property is not zoned for, and will not be developed as, Apartments, except that the Asset identified on Schedule APT (and no other Aggregate Real Property) is zoned for Apartments and may be Eligible Real Property Collateral that is Unimproved Land, Land Under Development or Finished Lots on the Closing Date, if such Asset meets all of the conditions to be Eligible Real Property Collateral other than those conditions requiring that the Unimproved Land, Land Under Development or Finished Lots as the case may be for single- or multi- family "for sale" residential use;

(vii)    There is an enforceable first priority Lien in favor of Administrative Agent on behalf of the Lenders on the Borrower Real Property, and, except for the Permitted Exceptions, there are no Liens encumbering such Borrower Real Property; and

(viii)    Borrower shall have used commercially reasonable efforts to obtain and deliver to Administrative Agent to the extent requested: (a) a duly executed and acknowledged subordination agreement, recorded in the Official Records, from each party in interest to an agreement that includes a PAPA Obligation or Preemptive Purchase or Lease Right with respect to the Borrower Real Property, which subordination agreement shall (1) subordinate each of such PAPA Obligations and Preemptive Purchase

or Lease Right to the Lien of this Loan on the applicable Borrower Real Property, and (2) be in form and substance reasonably acceptable to Majority Lenders (provided that they should be consistent in all material respects with the forms provided by Initial Lender's counsel prior to the Closing Date); and (b) delivered to Administrative Agent a legal opinion in a form reasonably acceptable to Majority Lenders that such subordination agreement is enforceable and is in a form sufficient to be a subordination agreement.    In no event shall any Borrower Real Property be Eligible Real Property Collateral unless Administrative Agent has the right to enforce its Lien on such Borrower Real Property (including by consummation of a judicial or nonjudicial foreclosure sale) without being subject to any third party consent or approval rights, and without the requirement to obtain a waiver of any third party restrictions or prohibitions on any enforcement by Administrative Agent.

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES

In order to induce Administrative Agent and the Lenders to enter into this Agreement, Borrower represents and warrants to Administrative Agent and the Lenders for itself and each of the other members of the Consolidated Group that:

5.01    EXISTENCE, QUALIFICATION AND POWER; COMPLIANCE WITH LAWS. Each Loan Party and Property Entity (a) is duly organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) subject to entry of the Interim Order (or the Final Order when applicable) by the Bankruptcy Court, has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own its assets and carry on its business, and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and is licensed and in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license, and (d) is in compliance with all Laws.

5.02    AUTHORIZATION; NO CONTRAVENTION. Upon entry of the Interim Order (or the Final Order when applicable) by the Bankruptcy Court, the execution, delivery and performance by each Loan Party of this Agreement and each of the other Loan Document to which such Person is a party, have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) contravene the terms of any of such Person's Organization Documents, (b) conflict with or result in any breach or contravention of, or the creation of any Lien under, or require any payment to be made under (i) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or any Joint Venture in which it is a member or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject, or (c) violate any Law.

5.03    GOVERNMENTAL AUTHORIZATION; OTHER CONSENTS. Subject to entry of the Interim Order (or the Final Order when applicable) by the Bankruptcy Court, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the

201670660 v15

execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document.

5.04    BINDING EFFECT.  This Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Loan Party that is party thereto.  This Agreement constitutes, and each other Loan Document when so delivered will, subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms.

5.05    FINANCIAL STATEMENTS; NO MATERIAL ADVERSE EFFECT.

(a)    The Audited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby; and (ii) present fairly, in all material respects, the consolidated financial condition of the Consolidated Group, as determined in accordance with GAAP, as of the date thereof and their consolidated results of operations and their cash flows for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby.

(b)    The unaudited consolidated balance sheet of the Consolidated Group dated June 30, 2011, and the related consolidated statements of income or operations, shareholders' equity and cash flows for the fiscal quarter ended on that date (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, and (ii) present fairly, in all material respects, the consolidated financial condition of the Consolidated Group, as determined in accordance with GAAP, as of the date thereof and their consolidated results of operations and their cash flows for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.

(c)    Since the date hereof, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect (it being understood and agreed that the filing of the Chapter 11 Cases shall not constitute a Material Adverse Effect).

(d)    The Loan Parties have disclosed any material assumptions with respect to the Applicable 13-Week Budget and the Operating Forecast and affirm that each of the Applicable 13-Week Budget and the Operating Forecast was prepared in good faith upon assumptions believed to be reasonable at the time of preparation.

5.06    LITIGATION.  Except for the Chapter 11 Cases and the litigation described on Schedule 5.06, there are no actions, inquiries, suits, proceedings, claims or disputes pending or, to Borrower's Knowledge, threatened, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party and/or Property Entity or against any of their properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby, (b) purport to affect or pertain to any Project, Asset or portion thereof or (c) if adversely determined, would reasonably be expected to result in a Material Adverse Effect.

5.07    NO DEFAULT.  Subject to the entry of the Interim Order (or the Final Order,

201670660 v15

when applicable) and subject to the terms thereof, and except for the effect of bankruptcy (but only to the extent that the enforcement of any default, violation or other legal consequences arising out of or in connection with the effect of bankruptcy will be stayed by virtue of filing of the Chapter 11 Cases), no member of the Consolidated Group is in default under or with respect to any material Contractual Obligation (except in respect of the Indentures and the Pre-Petition Loan Agreement, the enforcement of which, will be stayed by virtue of the filing of the Chapter 11 Cases). No Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

     5.08    OWNERSHIP OF PROPERTY; LIENS.

     (a)    Borrower has good and marketable fee title to all of the Borrower Real Property and good title to the other components of the Property owned by Borrower free and clear of all Liens, subject only to Permitted Exceptions. CF Owner has good and marketable fee title to all of the CF Property free and clear of all Liens, subject only to the Existing Secured Indebtedness and Permitted Exceptions. MF Owner has good and marketable fee title to all of the MF Property free and clear of all Liens, subject only to the Existing Secured Indebtedness and Permitted Exceptions. Lyon Mayfield has good and marketable title to all of the Mayfield Property free and clear of all Liens, subject only to the Existing Secured Indebtedness and Permitted Exceptions. Borrower owns or leases all Real Property (other than the CF Property, the MF Property and the Mayfield Property) and Personal Property necessary for the use, entitlement, management, development, operation, marketing and sale of the Aggregate Real Property. To the Borrower's Knowledge, there are no outstanding Mechanics' Liens other than those set forth on Schedule 5.08(a). To the Borrower's Knowledge, there are no delinquent ground rents, assessments for Improvements or other similar outstanding charges or impositions affecting the Aggregate Real Property. No Improvements lie outside the boundaries and building restriction lines of the Aggregate Real Property or encroach onto any easements (unless affirmatively insured by a Title Policy), and no Improvements on adjoining properties encroach upon the Aggregate Real Property. Any Title Policy premium has been fully paid. Except for customary gap undertakings, neither Borrower, any Loan Parties nor any other Person has provided any title indemnities (or analogous documentation) or deposits of cash or other security to the title insurer to obtain any Title Policy. The Permitted Exceptions do not and will not materially interfere with the security intended to be provided by any Deed of Trust, the Interim Order or the Final Order or with the use, entitlement, management, development, operation, marketing and sale of the Borrower Real Property, or the marketability or value of the Borrower Real Property. Borrower and each Loan Party will preserve its right, title and interest in and to the Collateral for so long as the Obligations remain outstanding and will warrant and defend same and the validity and priority of any Deed of Trust, the Interim Order or Final Order, as applicable, and the Liens in favor of Administrative Agent arising pursuant to the Loan Documents from and against any and all Claims whatsoever other than the Permitted Exceptions.

     (b)    As of the Closing Date, the Consolidated Group owns no Real Property other than the (i) Interim Order Real Property, and all Interim Order Real Property is Borrower Real Property, (ii) CF Property, (iii) MF Property and (iv) Mayfield Property. There is no Borrower Real Property that is a part of such Asset, or any related Amenities and/or common areas owned by the Consolidated Group and/or any of their Affiliates, and such legal description

is a true, correct and complete legal description of the Asset (provided that if a representation in this Section 5.08(b) is breached, Borrower will be given the opportunity to cure such breach by complying with Section 6.19 with respect to the applicable Real Property).

(c)    Neither Borrower, CF Owner, MF Owner, Lyon Mayfield nor any other member of the Consolidated Group has engaged in acts or omissions, except for the effect of bankruptcy (but only to the extent that the enforcement of any default, violation or other legal consequences arising out of or in connection with the effect of bankruptcy will be stayed by virtue of filing of the Chapter 11 Cases) which have caused a default under any PAPA Obligation or triggered any buyback, repurchase options or rights of refusal thereunder. Neither Borrower, CF Owner, MF Owner, Lyon Mayfield nor any other member of the Consolidated Group has borrowed any amount from the holder of any PAPA Obligation, nor has any advance of funds been made by the holder of any PAPA Obligation on behalf of Borrower, CF Owner  MF Owner, Lyon Mayfield  or any other member of the Consolidated Group.

(d)    All covenants, conditions, restrictions, easements and other similar matters that exist with respect to the Interim Order Real Property (other than covenants, conditions, restrictions, easements and other similar matters (i) arising in the ordinary course of the Core Businesses, (ii) first arising after October 20, 2009 and (iii) that do not individually or in the aggregate have a material adverse effect on the value, use or marketability of the Asset that they encumber), are listed as exceptions on the Title Polices for Interim Order Real Property that were delivered to the Pre-Petition Agent pursuant to the Pre-Petition Loan Agreement.

(e)    The aggregate outstanding principal balance of the Existing Secured Indebtedness secured by the CF Property is $8,999,150.  The aggregate outstanding principal balance of the Existing Secured Indebtedness secured by the MF Property is $7,000,000.  The aggregate outstanding principal balance of the Existing Secured Indebtedness secured by the Mayfield Property is $55,000,000.

5.09    SECURED INDEBTEDNESS.  No Loan Party or Property Entity has any secured Indebtedness, other than indebtedness permitted by the provisions contained in Section 7.01.

5.10    INSURANCE.  The Loan Parties maintain insurance in compliance with Section 6.07.

5.11    TAXES.

(a)    Subject to the Bankruptcy Court granting authority to pay, and, except for any nonpayment permitted by the Bankruptcy Code, the Loan Parties have filed all Federal, state and other material tax returns and reports required to be filed, and have paid all Federal, state and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP.  No Loan Party is party to any tax sharing agreement.

(b)    There is no proposed tax assessment against any Loan Party that would, if made, have a Material Adverse Effect.

201670660 v15

5.12   ERISA COMPLIANCE.

(a)   Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or state Laws. Each Plan that is intended to qualify under Section 401 (a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to Borrower's Knowledge, nothing has occurred which would prevent, or cause the loss of, such qualification. Borrower and each ERISA Affiliate have made all required contributions to each Plan subject to Section 412 of the Code, and no application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Code has been made with respect to any Plan.

(b)   There are no pending or, to the Borrower's Knowledge, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that would reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or would reasonably be expected to result in a Material Adverse Effect.

(c)   No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) neither Borrower nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) neither Borrower nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) neither Borrower nor any ERISA Affiliate has engaged in a transaction that could be subject to Sections 4069 or 4212(c) of ERISA.

5.13   SUBSIDIARIES; JOINT VENTURES.   None of Parent or Borrower has any Subsidiaries or Joint Ventures other than those disclosed in the Pledge Agreement.

5.14   MARGIN REGULATIONS; INVESTMENT COMPANY ACT; PUBLIC UTILITY HOLDING COMPANY ACT

(a)   None of the proceeds of the Loan will be used in violation of Regulations U or X of the Board of Governors of the Federal Reserve System (12 C.F.R. Part 221 and 207) (the "Margin Regulations"), for the purpose of purchasing or carrying any "margin stock" as defined in the Margin Regulations or reducing or retiring any Indebtedness which was originally incurred to purchase or carry margin stock or for any other purpose which might make this transaction a "purpose credit" within the meaning of the Margin Regulations. Neither any of the Loan Parties nor any Person acting on behalf of any of the Loan Parties have taken or will take any action which might cause any Loan Document to violate the Margin Regulations or any other regulations of the Board of Governors of the Federal Reserve System or to violate Section 7 of the Securities Exchange Act of 1934, or any rule or regulation promulgated thereunder, in each case as now in effect or as the same may hereafter be in effect.

(b)   The Loan Parties are not subject to regulation under the Public Utility

Holding Company Act of 1935, the Federal Power Act, the Investment Company Act of 1940, the Interstate Commerce Act (as any of the preceding have been amended), or any other law which regulates the incurring by any Loan Party of indebtedness, including laws relating to common or contract carriers or the sale of electricity, gas, steam, water or other public utility services.

5.15    DISCLOSURE.  No report, SEC filing, financial statement, certificate or other information furnished by or at the direction of any Loan Party to Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading in any material respect; provided that with respect to projected financial information, Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

5.16    COMPLIANCE.

(a)    The location, construction, occupancy, development, management, operation, sale, marketing and use of the Aggregate Real Property comply in all respects with the terms of the Permitted Exceptions relating to the Aggregate Real Property.

(b)    Borrower, Parent and Property Entities and all of the Aggregate Real Property is in compliance with all applicable Laws and all Entitlements.

5.17    COMPLIANCE WITH ENVIRONMENTAL LAWS.

(a)    Neither any of the Consolidated Group, nor any operator of the Aggregate Real Property or any operations thereon has violated or is in violation, or alleged violation, of any Environmental Laws.  Neither any of the Consolidated Group, nor any operator of the Aggregate Real Property or any operations thereon has failed to obtain or comply with any permit required pursuant to Environmental Laws for the occupation of any Aggregate Real Property or to conduct the operations thereon. Borrower shall take all actions necessary to comply with all compliance orders affecting the Borrower Real Property and cause the Existing Environmental Matters to comply with all Environmental Laws.  Borrower shall take all actions necessary to cause the CF Owner, the MF Owner and Lyon Mayfield to (1) comply with all compliance orders affecting the CF Property, the MF Property and the Mayfield Property, respectively and (2) cause the Existing Environmental Matters to comply with all Environmental Laws.

(b)    Except for the Existing Environmental Matters, none of the Consolidated Group has received notice from any third party including any federal, state or local Governmental Authority:  (i) regarding any actual or alleged violation of Environmental Laws or any Environmental Liabilities, including any investigatory, remedial, or corrective liabilities, relating to any of them or the Aggregate Real Property; (ii) that it has been identified by the United States Environmental Protection Agency as a potentially responsible party under the

Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, with respect to a site listed on the National Priorities List, 40 C.F.R. Part 300 Appendix B (1986); (iii) that any Hazardous Materials which any of the Consolidated Group has generated, transported or disposed of has been found at any site at which a federal, state or local Governmental Authority or other third party has conducted or has ordered that any of the Consolidated Group conduct a remedial investigation, removal or other response action pursuant to any Environmental Law; or (iv) that any of the Consolidated Group is a named party to any claim, action, cause of action, complaint, or legal or administrative proceeding (in each case, contingent or otherwise) arising out of any third party's incurrence of costs, expenses, losses or damages of any kind whatsoever in connection with the release or presence of Hazardous Materials.

(c)     Except for the Existing Environmental Matters: (i) none of the Consolidated Group or any operator of any Aggregate Real Property has handled, processed, treated, stored, disposed of, arranged for or permitted the disposal of any Hazardous Material and no portion of the Aggregate Real Property has been used for the handling, processing, treatment, storage or disposal of Hazardous Materials except in accordance with applicable Environmental Laws; (ii) no underground tank or other underground storage receptacle for Hazardous Materials, asbestos containing material in any form or condition, materials or equipment containing polychlorinated biphenyls, or landfills, surface impoundments, or disposal areas are located on any portion of the Aggregate Real Property; (iii) in the course of any activities conducted by any of the Consolidated Group or operators of its properties, no Hazardous Materials have been generated or are being used on the Aggregate Real Property except in accordance with applicable Environmental Laws; (iv) to Borrower's Knowledge, there have been no releases (i.e. any past or present releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, disposing or dumping) or threatened releases of Hazardous Materials on, upon, into or from any Aggregate Real Property of any of the Consolidated Group (and no such Aggregate Real Property is contaminated with any such substance); (v) to Borrower's Knowledge, there have been no releases on, upon, from or into any Real Property in the vicinity of any of the Aggregate Real Property which, through soil or groundwater contamination, may have come to be located on the Aggregate Real Property; and (vi) to Borrower's Knowledge, any Hazardous Materials that have been generated, accumulated or stored on any of the Aggregate Real Property have been transported offsite only by carriers having an identification number issued by the Environmental Protection Agency, treated or disposed of only by treatment or disposal facilities maintaining valid permits as required under applicable Environmental Laws, which transporters and facilities have been and are, to Borrower's Knowledge, operating in compliance with such permits and applicable Environmental Laws.

5.18    LOANS AS SENIOR INDEBTEDNESS. The Loan Parties and Property Entities have no Indebtedness that is senior or pari passu in right of payment to the Obligations of the Loan Parties to the Lenders (other than (a) Indebtedness under the Permitted Construction Indebtedness, (b) Indebtedness under the Existing Secured Indebtedness and (c) Permitted Indebtedness, but only to the extent that such Permitted Indebtedness is allowed to be senior or pari passu in right of payment to the Obligations under Section 7.01).

5.19    LAWS PERTAINING TO LAND SALES. None of the Loan Parties or Property Entities have received any notice that it is in violation of the Interstate Land Sales Full

63

Disclosure Act, or any other laws pertaining to land sales (including any laws pertaining to the sale of interests in timeshare units) in any state in which any Loan Parties or Property Entities sells, transfers, manages, operates, develops or otherwise disposes of Aggregate Real Property.

5.20    FISCAL YEAR.  The Consolidated Group has a fiscal year ending December 31 of each calendar year.

5.21    COMMON ENTERPRISE AND CONSIDERATION.  The Loan Parties are collectively engaged in a common enterprise for the furtherance of the Core Businesses. Accordingly, the Loan Parties have received good and adequate consideration for the entering into the Loan Documents to which they are parties to.  Furthermore, any advance to Borrower that is subsequently disbursed by Borrower to any other Loan Party for use by such Loan Party shall benefit all of the other Loan Parties, even if the advance is based upon a Borrowing Base which includes assets of Loan Parties that do not receive the disbursement from Borrower.  Each Loan Party will each receive good and adequate benefit from this common arrangement given the common enterprise of all of the foregoing as set forth above.

5.22    SUBSIDIARIES OWNING REAL PROPERTY.  Except for Laguna Big Horn, LLC, a Delaware limited liability company and Whitney Ranch Village 5, LLC, a Delaware limited liability company (which collectively own less than fifty (50) Units, which are all anticipated to be sold promptly after the Closing Date) CF Owner, MF Owner and Lyon Mayfield are the only Subsidiaries of Parent or Borrower that own Real Property.  Parent does not own any Real Property.

5.23    [RESERVED].

5.24    ENTITLEMENTS.  Neither the Entitlements nor any other rights relating to the use, entitlement, management, development, operation, marketing or sale the Aggregate Real Property are in any way dependent upon or related to any real estate other than the Aggregate Real Property, validly created, existing appurtenant perpetual easements or use of public rights of way.  In the event that all or any part of the Improvements are destroyed or damaged, said Improvements can be legally reconstructed to their condition prior to such damage or destruction, and thereafter exist for the same use without violating any zoning Laws or Laws applicable thereto and without the necessity of obtaining any variances or special permits.  All Entitlements necessary to operate the Aggregate Real Property as it is currently operated are in full force and effect including all water permits and approvals.  No Loan Party or Property Entity has received any written notice of any violation of any Entitlements.

5.25    MATERIAL AGREEMENTS; NO MATERIAL DEFAULTS.  Other than the defaults caused by virtue of the Chapter 11 Cases, there are no material defaults under any material contracts, equipment leases, permits, development agreements not of record, covenants not of record, restrictions not of record, option agreements not of record, purchase and sale agreements, land banking agreements, instruments and other agreements under which any Loan Party or Property Entities (or all Loan Parties and Property Entities in the aggregate) has a potential outstanding liability in excess of $1,000,000 under any one of the foregoing or under any category of the foregoing (collectively "Material Agreements").

5.26   NO CONDEMNATION.  No condemnation proceeding is pending, or to Borrower's Knowledge, threatened against any Aggregate Real Property which would impair the use, entitlement, management, development, operation, marketing and sale of such Aggregate Real Property.  If the foregoing representation and warranty shall cease to be true (subject to Section 5.47(b)) with respect to a Project or Asset or a portion thereof, such Project or Asset (or such portion thereof, as the case may be) shall cease to be part of the Borrowing Base until such time as such representation and warranty is once again true.

5.27   CFD AND SUBDIVISION BOND.  None of the Aggregate Real Property, Borrower or Property Entities are subject to any subdivision improvement bonds, except as set forth on Schedule 5.27. The information provided to Initial Lender includes the total principal amount of the subdivision improvement bonds outstanding, the improvements covered by such bonds and the status of the work, the anticipated release date of such bonds, third party guarantees of such bonds and any current or potential defaults under such bonds, there are no subdivision improvement bonds in existence with respect to any Asset.

5.28   [RESERVED].

5.29   [RESERVED].

5.30   [RESERVED].

5.31   [RESERVED].

5.32   [RESERVED].

5.33   AMENITIES.  All Amenities at or related to or used by owners of Units or Lots in each Project or Asset have been conveyed to such Project's homeowners' association or are subject to a valid and perfected first priority Lien in favor of Administrative Agent on behalf of the Lenders (except for Amenities on the CF Property, the MF Property or the Mayfield Property, which are owned by CF Owner, MF Owner and Lyon Mayfield, respectively, or the applicable homeowner's association).

5.34   [RESERVED].

5.35   BORROWING BASE.  The Real Property Classification of each and all Borrower Real Property included in the Borrowing Base is true and correct.

5.36   [RESERVED].

5.37   CREATION, PERFECTION AND PRIORITY OF LIENS.  As of the Closing Date, (i) the execution and delivery of the Security Documents by each Loan Party, together with the filing of any Uniform Commercial Code financing statements delivered to Administrative Agent for filing and recording, and the entry of the Interim Order by the Bankruptcy Court, are effective to create in favor of Administrative Agent for the benefit of itself and the Lenders, as security for the Obligations, a valid and perfected first priority Lien on all of the Collateral then in existence (subject only to (A) Permitted Exceptions in the case of Collateral consisting of Real Property and (B) Permitted Liens in the case of Collateral consisting of Personal Property), and

201670660 v15

(ii) all filings and other actions necessary or desirable to perfect and maintain the perfection and first priority status of such Liens have been duly made or taken and remain in full force and effect.

5.38    EQUITY SECURITIES.  All outstanding Equity Securities of each member of the Consolidated Group are duly authorized, validly issued, fully paid and non-assessable. All Equity Securities of each member of the Consolidated Group have been offered and sold in compliance with all federal and state securities laws and all other applicable Law, except where any failure to comply, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  None of the Equity Securities of any member of the Consolidated Group are subject to any Lien except those in favor of Administrative Agent.

5.39    NO AGREEMENTS TO MERGE.  No Loan Party has any legal obligation, absolute or contingent, to any Person to effect any merger, consolidation or other reorganization or to enter into any agreement with respect thereto, other than the "Restructuring" as defined, subject to and in accordance with the Restructuring Support Agreement and the transactions contemplated by the Chapter 11 Plan.

5.40    LABOR MATTERS.  There are no disputes presently subject to grievance procedure, arbitration or litigation under any of the collective bargaining agreements, employment contracts or employee welfare or incentive plans to which any Loan Party is a party, no Loan Party is a party to or bound by any collective bargaining agreement or other contract with a labor union or labor organization and there are no strikes, lockouts, work stoppages or slowdowns, or, to Borrower's Knowledge, jurisdictional disputes or organizing activities occurring or threatened, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

5.41    BURDENSOME CONTRACTUAL OBLIGATIONS ETC.  No Loan Party, Property Entity nor any of their respective Properties are subject to any Contractual Obligation or requirement of Law which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

5.42    BROKERAGE COMMISSIONS.  No Broker's Commission is to be paid by the Lenders with respect to the extensions of credit contemplated hereby as a result of any agreement entered into by a Loan Party.

5.43    AGREEMENTS WITH AFFILIATES AND OTHER AGREEMENTS.  Except as disclosed on Schedule 5.43, no Loan Party has entered into any material agreement or contract with any of its Affiliates or any Joint Venture which is required to be disclosed to the SEC and has not been disclosed to the SEC. No Loan Party is a party to or is bound by any Contractual Obligation or is subject to any restriction under its charter or formation documents, which could reasonably be expected to have a Material Adverse Effect.

5.44    FOREIGN ASSETS CONTROL, ETC.

(a)    No Loan Party (A) is, or is controlled by, a Designated Person; (B) has received funds or other property from a Designated Person; or (C) is in breach of or is the subject of any action or investigation under any Anti-Terrorism Law.  No Loan Party engages or will

66

engage in any dealings or transactions, or is or will be otherwise associated, with any Designated Person. The Borrower, Parent and each Subsidiary are in compliance, in all material respects, with the Patriot Act. Each Loan Party has taken reasonable measures to ensure compliance with the Anti-Terrorism Laws including the requirement that (1) no Person who owns any direct or indirect interest in any Loan Party is a Designated Person and (2) funds invested directly or indirectly in any Loan Party are derived from legal sources.

(b)    No portion of the proceeds of any Loan or other credit made hereunder has been or will be used, directly or indirectly for, and no fee, commission, rebate or other value has been or will be paid to, or for the benefit of, any governmental official, political party, official of a political party or any other Person acting in an official capacity in violation of any applicable law, including the U.S. Foreign Corrupt Practices Act of 1977, as amended.

5.45    INTERNAL CONTROLS. From and after a Public Offering:

(a)    The Borrower has established and maintains disclosure controls and procedures (as such term is defined in Rule 13a-14 under the Securities Exchange Act of 1934, as amended, and the rules of the SEC (the "Exchange Act"), which (A) are designed to ensure that material information relating to the Borrower, including its consolidated Subsidiaries, is made known to the Borrower's principal executive officer and its principal financial officer or persons performing similar functions by others within those entities, particularly during the periods in which the periodic reports required under the Exchange Act are being prepared; (B) have been evaluated for effectiveness as of a date within 90 days prior to the filing of the Borrower's most recent annual or quarterly report filed with the Securities Exchange Commission; and (C) are effective in all material respects to perform the functions for which they were established;

(b)    Based on the evaluation of its disclosure controls and procedures, the Borrower is not aware of (A) any significant deficiency in the design or operation of internal controls which could adversely affect the Borrower's ability to record, process, summarize and report financial data or any material weaknesses in internal controls or (B) any fraud, whether or not material, that involves management or other employees who have a significant role in the Borrower's internal controls; and

(c)    Since the date of the most recent evaluation of such disclosure controls and procedures, there have been no significant changes in internal controls or in other factors that could significantly affect internal controls, including any corrective actions with regard to significant deficiencies and material weaknesses, other than those disclosed in filings made by the Borrower under the reporting requirements of the Exchange Act.

5.46    INTERCOMPANY RECEIVABLES. No Subsidiaries of Parent and no Subsidiaries of Borrower owe any amounts to WL Southwest.

5.47    EFFECTIVE DATE; MATERIALITY THRESHOLD OF CERTAIN REPRESENTATIONS AND WARRANTIES. The breach of the representations and warranties made by Borrower to Administrative Agent and the Lenders in Sections 5.01(d), 5.06 (in excess of available insurance), 5.08(a), 5.16, 5.17, 5.19, 5.24, 5.26 and 5.33, shall not result in a Default

201670660 v15

unless any such breaches taken as an aggregate would reduce the value of, or cause liability, damage or loss to, or Claims against, the any individual Asset by or in an amount equal to $1,000,000 or more (the calculation of such reduction in value, liability, damage or Claim with respect to a specific breach shall be made without regard to any limitation or qualification as to materiality set forth in such representation or warranty). This Section 5.47 only applies to the representations and warranties listed in the first sentence of this Section 5.47, and only with respect to the aggregate of all such Claims against an Asset up to $1,000,000 (and any amount in excess of the $1,000,000 per Asset shall constitute a Default) and not to any reduction in the value of, or liability, damage or loss to, or Claims against, Borrower or any of the Consolidated Group; provided, however, whether or not a Default exists after applying such $1,000,000 limitations above, nonetheless a Default shall exist if any breach or breaches of the representations and warranties set forth in the first sentence of this Section 5.47 occur(s) that individually or in the aggregate would reduce the value of, or cause liability, damage or loss to, or Claims against, any or all of the Aggregate Real Property or any portion thereof in an amount equal to $20,000,000 or more (the calculation of such aggregate reduction in value, liability, damage or Claim with respect to any or all of the Aggregate Real Property shall be made without regard to any limitation or qualification as to materiality set forth in such representation or warranty and without the deduction of $1,000,000 for any Asset in making such computation). Nothing in this Section 5.47 shall relieve Borrower of any covenants or obligations under the Loan Documents related to the subject matter of such representations and warranties whether or not a "Default" exists under this Section 5.47.

5.48    REPRESENTATIONS AND WARRANTIES UPON DELIVERY OF FINANCIAL STATEMENTS, DOCUMENTS, AND OTHER INFORMATION. Each delivery by any Loan Party to Administrative Agent or any Lender of any schedules (including the schedules attached to this Agreement), financial statements, Borrowing Base Report, Project Eligibility Request or other documents or information on or after the date of this Agreement (including documents and information delivered in connection with any Credit Extension) shall be a representation and warranty that such schedules, financial statements, other documents and information are true, correct and complete (in accordance with GAAP) in all material respects, that there are no material omissions therefrom that would result in such financial statements, other documents or information being materially incomplete, incorrect or misleading in any material respect as of the date thereof, and that such financial statements accurately present the financial condition and results of operations of the Loan Parties as at the dates thereof in all material respects and for the periods covered thereby.

5.49    REORGANIZATION MATTERS.

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice for the hearing for the approval of the Interim Order has been given and proper notice for the hearing for the approval of the Final Order will be given, in each case, in accordance with the terms and conditions of the Restructuring Support Agreement.

(b)    Upon entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative

expense claims and unsecured claims against the Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c) (subject to entry of the Final Order), 726, 1114 or any other provision of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code, subject to the Carve-Out; provided that such administrative expense claims shall only extend to Avoidance Actions or proceeds thereof after entry of the Final Order, provided further that the Lenders shall use their reasonable best efforts to satisfy such claims from Collateral or the proceeds of Collateral prior to seeking to utilize proceeds of Avoidance actions (other than the proceeds of avoidance actions under section 549 of the Bankruptcy Code, which proceeds the DIP Lenders may use to satisfy their Superpriority Claims without such delay) to satisfy such claims.

(c)     Upon entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by a valid and perfected first priority Lien on all of the assets of the Loan Parties (excluding Avoidance Actions, Excluded Assets and Permitted Liens), subject to the Carve-Out.

(d)     The Interim Order (with respect to the period prior to the entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed, modified or amended.

(e)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, Administrative Agent and the Lenders shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court; provided, however, that Administrative Agent and the Lenders must comply with any applicable notice requirements set forth in the Interim Order or Final Order, as applicable, before enforcing the remedies provided for herein.

## ARTICLE VI.
## AFFIRMATIVE COVENANTS

So long as any Loan or other Obligation hereunder shall remain unpaid or unsatisfied, Borrower shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02, and 6.03) cause each member of the Consolidated Group to:

6.01    FINANCIAL STATEMENTS AND OTHER REPORTS.  Deliver to Administrative Agent, in form and detail satisfactory to Majority Lenders:

(a)     as soon as available, but in any event within one hundred twenty (120) days after the end of each fiscal year of Parent, a consolidated and consolidating balance sheet of the Consolidated Group, as determined in accordance with GAAP, as at the end of such fiscal year, and the related consolidated and consolidating statements of income or operations, shareholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, audited and accompanied by a report and opinion of an independent certified public

accountant of nationally recognized standing reasonably acceptable to Administrative Agent (which may be Windes and McClaughry), which report and opinion shall be prepared in accordance with GAAP;

(b)    as soon as available, but in any event within sixty (60) days after the end of each of the first three (3) fiscal quarters of each fiscal year of Parent, a consolidated and consolidating balance sheet of the Consolidated Group, as determined in accordance with GAAP, as at the end of such fiscal quarter, and the related consolidated and consolidating statements of income or operations, shareholders' equity and cash flows for such fiscal quarter and for the portion of Parent's fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail, certified by a Responsible Officer of Borrower as fairly presenting the financial condition, results of operations, shareholders' equity and cash flows of the Consolidated Group in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes;

(c)    as soon as available, and in any event no later than one hundred twenty (120) days after the end of each fiscal year of Parent, a projected balance sheet, income statement, cash flow statement and compliance with the Financial Covenants for the next fiscal year;

(d)    [Reserved];

(e)    [Reserved];

(f)    as soon as available, and in any event reasonably in advance of filing under the circumstances to permit review (and, at the option of Administrative Agent, comment) by Administrative Agent, any motions, replies, objections, memoranda or other pleadings to be filed with the Bankruptcy Court (or any other court) in, or in connection with, the Chapter 11 Cases;

(g)    contemporaneously with the delivery to any Committee or noteholder group, any financial and other non-privileged information provided to such Committee or such noteholder group, as applicable; provided that the Loan Parties shall provide (i) notice to Administrative Agent that privileged information has been delivered to any Committee or any noteholder group and (b) copies of any privileged information provided to any Committee or any noteholder group if such information is no longer privileged for any reason whatsoever (including due to any waiver resulting from delivery to any such recipient);

(h)    on the Closing Date and each Friday thereafter prior to the Maturity Date, (i) a 13-Week Budget (commencing with the calendar week then ended), provided that each 13-Week Budget delivered after the Closing Date (a "Subsequent 13-Week Budget") will not reset any budgeted amounts in the then effective Applicable 13-Week Budget other than the Subsequent 13-Week Budget delivered on the first Friday of each fiscal month, which Subsequent 13-Week Budget may reset the budgeted amounts in the then effective Applicable 13-Week Budget if such Subsequent 13-Week Budget shall be in form and substance satisfactory to the Lenders (it being understood that if the Lenders do not approve any such Subsequent 13-

70

Week Budget, the previously effective Applicable 13-Week Budget shall continue to be the Applicable 13-Week Budget for all purposes hereof and of the other Loan Documents) and (ii) a report by a Responsible Officer with respect to Asset Sales, cost savings, facility closures and other matters as the Administrative Agent or any Lender through the Administrative Agent may from time to time reasonably request in good faith;

(i)        on the second Friday after the Petition Date and on each Friday thereafter prior to the Maturity Date, a variance report in substantially the form of Exhibit "K" hereto (a "Variance Report") setting forth actual cash receipts and disbursements for the prior week, setting forth all the variances, on a line-item basis, for such period from the amounts set forth for the corresponding period in the Applicable 13-Week Budget and Operating Forecast; each such report shall include explanations for all material variances, shall be certified by a Responsible Officer as being prepared in good faith and fairly presenting in all material respects the information set forth therein; and

(j)        as soon as available, any reports required under the "first day orders."

6.02    CERTIFICATES; OTHER INFORMATION.  Deliver to Administrative Agent, in form and detail satisfactory to Majority Lenders and with sufficient copies for each Lender:

(a)        concurrently with the delivery of the financial statements referred to in Section 6.01(a), a certificate of its independent certified public accountants certifying such financial statements and stating that in making the examination necessary therefor no knowledge was obtained of any Default under the Financial Covenants set forth herein or, if any such Default shall exist, stating the nature and status of such event;

(b)        concurrently with the delivery of the financial statements referred to in Sections 6.01(a) and (b), (i) a duly completed Compliance Certificate signed by a Responsible Officer of Borrower, (ii) a report of all loans made by any Loan Party to any officers, directors, board members, employees, shareholders or Affiliates of any Loan Party during such previous fiscal quarter, (iii) a report of all Investments made any Loan Party in suppliers and customers of each of the Loan Parties during the previous fiscal quarter, (iv) a report of all of all transactions between the Loan Parties and their Affiliates during such previous fiscal quarter, (v) a report of all bonus compensation paid or awarded to any Key Manager by any member of the Consolidated Group during the previous fiscal quarter and (vi) a detailed list, by category, of all Excluded Assets;

(c)        promptly after any request by Administrative Agent or any Lender, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of Borrower or Parent by independent accountants in connection with the accounts or books of Borrower, Parent or any other member of the Consolidated Group, or any audit of any of them;

(d)        [Reserved];

(e)        promptly, and in any event within five (5) Business Days after receipt thereof by any member of the Consolidated Group, copies of each notice or other correspondence received from the SEC (or comparable agency in any applicable non-U.S.

71

jurisdiction) concerning any formal investigation or other formal inquiries not in the ordinary course by such agency regarding financial or other operational results of any Loan Party or any Subsidiary thereof;

(f)     as soon as available, but in any event no later than (i) twenty (20) days after the end of each calendar quarter, a preliminary Borrowing Base Report, which preliminary Borrowing Base Report shall include a detailed calculation of the Borrowing Base, together with copies of accounts statements during the preceding three (3) months from each depository maintaining a deposit account that is subject to a Control Agreement or is otherwise subject to a Lien in favor of Administrative Agent, and (ii) forty five (45) days after the end of each calendar quarter, a final Borrowing Base Report, which final Borrowing Base Report shall include a detailed calculation of the Borrowing Base, together with any new account statements covering deposit accounts described above;

(g)     as soon as available, but in any event no later than three (3) Business Days after the end of each week, (i) a report of all Asset Sales, and all sales and closings of Aggregate Real Property (on an asset-by-asset basis, including Units and Lots) from the previous week (including gross sales prices, deductions therefrom to reach Net Proceeds and estimated net sale prices with respect to each such transaction), (ii) a summary of the current cash balances in the deposit accounts of the Loan Parties that are subject to Control Agreements and (iii) such additional information as may be reasonably requested by Administrative Agent or otherwise agreed to by the parties hereto;

(h)     as soon as available, but in any event no later than ten (10) Business Days after the end of each calendar month, a report of (i) all construction activity, together with a report of all sales and closings of Units and Lots from the previous month, with such additional information as may be agreed to by the parties hereto, (ii) all acquisitions of any fee or other interest in Real Property during such previous calendar month, (iii) all Distributions made during such calendar month, (iv) all expenditures or series of related expenditures outside of the Core Businesses in excess of $100,000 during such previous calendar month and (v) all drawdowns or borrowings under any Permitted Construction Indebtedness during such previous calendar month;

(i)     promptly, such additional information regarding the business, financial or corporate affairs of any Loan Party, or compliance with the terms of the Loan Documents, as Administrative Agent or any Lender may from time to time reasonably request. Documents required to be delivered pursuant to Section 6.01 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date on which such documents are posted on Borrower's behalf on a secure Internet or intranet website, if any, to which each Lender and Administrative Agent have access (whether a commercial, third-party website or whether sponsored by Administrative Agent); provided that:

(i)     Borrower shall deliver paper copies of such documents to Administrative Agent or any Lender that requests Borrower to deliver such paper copies until a written request to cease delivering paper copies is given by Administrative Agent or such Lender and

(ii)    Borrower shall notify Administrative Agent and each Lender (by facsimile or electronic mail) of the posting of any such documents and provide to Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Notwithstanding anything contained herein, in every instance Borrower shall be required to provide paper copies of the Compliance Certificates required by Section 6.02(b) to Administrative Agent.  Except for such Compliance Certificates, Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by Borrower with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents;

(j)    promptly upon and in any event within five (5) days after receipt thereof, copies of all notices delivered to Borrower or any other member of the Consolidated Group under the Indentures, the Permitted Construction Indebtedness and the Existing Secured Indebtedness; and

6.03    NOTICES.  Promptly notify Administrative Agent of:

(a)    the occurrence of any Default or Event of Default;

(b)    any matter that has resulted or would reasonably be expected to result in a Material Adverse Effect, including (i) breach or non-performance of, or any default under, a Contractual Obligation of any member of the Consolidated Group (including failure to pay any amount due in respect of an Indenture or any other Permitted Indebtedness on the date scheduled for payment therefor, without giving effect to any grace period); (ii) any dispute, litigation, investigation, proceeding or suspension between any member of the Consolidated Group and any Governmental Authority; or (iii) the commencement of, or any material development in, any material litigation or proceeding affecting Parent, Borrower or any of their respective Subsidiaries, including pursuant to any applicable Environmental Laws;

(c)    the occurrence of any ERISA Event;

(d)    any material change in accounting policies or financial reporting practices by any Loan Party;

(e)    the occurrence of a default or event of default under any of the Indentures, Permitted Construction Indebtedness, Existing Secured Indebtedness or any other Indebtedness of Borrower, Parent or any Property Entity;

(f)    any change in Key Management; and

(g)    any Distribution in Excess of $250,000.

Each notice pursuant to this Section 6.03 shall be accompanied by a statement of a Responsible Officer of Borrower setting forth details of the occurrence referred to therein and stating what action Borrower has taken and proposes to take with respect thereto.  Each notice pursuant to Section 6.03(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

73

6.04   PAYMENT OF OBLIGATIONS.   Pay and discharge as the same shall become due and payable, all its obligations and liabilities, including (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by Parent or Borrower; (b) all lawful claims which, if unpaid, would by law become a Lien upon its property; and (c) all Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness; except, in each case, to the extent the payment or performance of such obligations and liabilities are stayed pursuant to the Chapter 11 Cases, and subject to the limitations in Section 7.15(c).

6.05   PRESERVATION OF EXISTENCE, ETC.   (a) Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization except in a transaction permitted by Section 7.04(a); (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect; and (c) preserve or renew all of its registered patents, trademarks, trade names and service marks, the non-preservation of which would reasonably be expected to have a Material Adverse Effect.

6.06   MAINTENANCE OF PROPERTIES.   Preserve and maintain the Aggregate Real Property in good order, repair and condition, and shall promptly restore damage from casualty or condemnation to the condition existing immediately prior to such damage, and shall not permit or commit waste on the Aggregate Real Property or permit impairment or deterioration of the Aggregate Real Property.

6.07   MAINTENANCE OF INSURANCE.

(a)   Property.   Maintain with financially sound and reputable insurers having an A.M. Best rating of A- or better and not Affiliates of Borrower or Parent insurance with respect to its Properties and business against such casualties and contingencies, including fire, lightening and other perils, as shall be in accordance with the general practices of businesses engaged in similar activities in similar geographic areas and the Consolidated Group's past practices and consistent with the Consolidated Group's practices on the Closing Date, and in amounts, containing such terms, in such forms and for such periods as may be reasonable and prudent in accordance with sound business practices. The Consolidated Group shall at all times comply with and conform to all provisions of each such insurance policy and to all requirements of the insurers thereunder applicable to the Consolidated Group, the Properties or to the use, occupation, possession, operation, maintenance or repair of all or any portion of the Aggregate Real Property.

(b)   Liability.   Maintain with financially sound and reputable insurers having an A.M. Best rating of A- or better and not Affiliates of Borrower or Parent protecting the Consolidated Group, Administrative Agent and each Lender against loss from liability imposed by law or assumed in any agreement, document, or instrument and arising from bodily injury, death or property damage, as shall be in accordance with the general practices of businesses engaged in similar activities in similar geographic areas and the Consolidated Group's past

74

practices and consistent with the Consolidated Group's practices on the Closing Date, and in amounts, containing such terms, in such forms and for such periods as may be reasonable and prudent in accordance with sound business practices.

(c)     Additional Insurance.

(i)     Such other policies of insurance as Administrative Agent, acting at the direction of Majority Lenders, may reasonably request in writing to the extent available on commercially reasonable terms.

(d)     General. All policies for required insurance will be in form and substance satisfactory to Administrative Agent, acting at the direction of Majority Lenders in their absolute and sole discretion. All property policies evidencing required insurance will name Administrative Agent, on behalf of the Lenders, as first mortgagee and loss payee. All liability policies evidencing required insurance will name Administrative Agent and each Lender as additional insured. The policies will not be cancelable as to the interests of Administrative Agent or the Lenders due to the acts of Borrower or any other member of the Consolidated Group. The policies will provide for at least thirty (30) days prior written notice of the cancellation or modification thereof to be given to Administrative Agent. A certified copy of each insurance policy or, if acceptable to Administrative Agent and Majority Lenders, certificates of insurance evidencing that such insurance is in full force and effect, will be delivered to Administrative Agent, together with proof of the payment of the premiums thereof. Prior to the expiration of each such policy, Borrower shall furnish Administrative Agent and the Lenders evidence that such policy has been renewed or replaced in the form of the original or a certified copy of the renewal or replacement policy or, if acceptable to Administrative Agent, acting at the direction of Majority Lenders, a certificate reciting that there is in full force and effect, with a term covering at least the next succeeding calendar year, insurance of the types and in the amounts required in this Section 6.07.

(e)     Borrower will not (and will not permit any Loan Party or Property Entity to) settle any claim under any casualty insurance policies, if such claim involves any loss in excess of $1,000,000, without the prior written approval of Administrative Agent, acting at the direction of Majority Lenders, and the Borrower shall use commercially reasonable efforts to cause each such policy that is renewed or entered into after the Closing Date to contain a provision to such effect.

6.08    COMPLIANCE. Comply, and cause the Aggregate Real Property (including the location, construction, occupancy, development, management, operation, sale, marketing and use thereof) to comply in all material respects, with all Entitlements, all Permitted Exceptions and all Laws, including all Environmental Laws, applicable to it or to the Core Businesses or the Aggregate Real Property.

6.09    BOOKS AND RECORDS. Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of Borrower or each other member of the Consolidated Group, as the case may be.

6.10    INSPECTION RIGHTS.  Upon the reasonable request of Administrative Agent or any Lender, allow Administrative Agent and/or any Lender and their representatives to inspect any of their Aggregate Real Property, to review reports, files, and other records maintained in the ordinary course of the Core Businesses, from time to time, during reasonable business hours; provided that unless a Default or Event of Default has occurred and is continuing and except in the case of Administrative Agent and its representatives, Borrower shall not be responsible for the costs and expenses of such inspections more than once per fiscal year, other than in connection with inspections regarding the accuracy, truthfulness or completeness of any Borrowing Base Report.

6.11    USE OF PROCEEDS.  Use the proceeds of the Loans to provide working capital needs for the Core Businesses, in accordance with the Applicable 13-Week Budget and the Operating Forecast, and to pay the fees and expenses of Administrative Agent and the Lenders and the Adequate Protection Obligations.

6.12    NEW SUBSIDIARIES.  Promptly, and in any event within twenty (20) days after the formation or acquisition of any new direct or indirect Subsidiary of Parent or Borrower after the date hereof (a) notify Administrative Agent and each Lender of such event, (ii) cause each such Subsidiary which is not an Excluded Subsidiary to become a party to the Unconditional Guarantee, the Security Agreement  and each other applicable Security Document in accordance with the terms thereof and amend the Security Documents (and related filings) as appropriate in light of such event to pledge to Administrative Agent for the benefit of itself and the Lenders all assets of such Subsidiary, and, in each case, execute and deliver all documents or instruments required thereunder or appropriate to perfect the security interests created thereby, (iii)  cause each document (including each Uniform Commercial Code financing statement) required by applicable Laws or reasonably requested by Administrative Agent to be filed, registered or recorded in order to create in favor of Administrative Agent for the benefit of itself and the Lenders a valid, legal and perfected first priority Lien on the Collateral subject to the Security Documents to be so filed, registered or recorded and evidence thereof delivered to Administrative Agent and (iv) deliver an opinion of counsel in form and substance reasonably satisfactory to Majority Lenders with respect to each such Person and the matters set forth in this Section 6.12(a).

6.13    INTANGIBLE, RECORDING AND STAMP TAX.  Promptly pay all intangible taxes or documentary stamp taxes assessed against the Loan Parties, Property Entities, Administrative Agent or any of Lenders as a result of this Agreement, recordation of any Deed of Trust or any document related hereto, if any.

6.14    FURTHER ASSURANCES.  At any time and from time to time, execute, acknowledge and deliver such further documents, agreements and instruments and take such further action as may reasonably be requested by Administrative Agent, in each case further and more perfectly to effect the purposes of this Agreement and the other Loan Documents, including, from time to time to better assure, preserve, protect and perfect the interest of Administrative Agent in the Collateral and the rights and remedies of Administrative Agent under the Loan Documents.  Without limiting the foregoing, to the extent that Administrative Agent, acting at direction of Majority Lenders, determines from time to time that additional deeds of trust, amendments to deeds of trust, financing statements, subordinations and other

76

documents are required in order to perfect all Liens and encumbrances in favor of Administrative Agent, and cause all Collateral encumbered by any of the Deeds of Trust, the Interim Order or the Final Order, as applicable, to be subject only to Permitted Exceptions, Borrower shall execute and deliver such documents, instruments and other agreements as Administrative Agent or Majority Lenders may reasonably request.

6.15    [RESERVED].

6.16    SPECIAL COVENANTS RELATING TO COLLATERAL.

(a)    Defense of Title. Borrower shall (or shall cause the applicable Loan Party or Property Entity, as applicable, to) defend the Collateral, the title and interest therein of Borrower (or the applicable Loan Party or Property Entity) represented and warranted in the Security Documents and the legality, validity, binding nature and enforceability of each Lien and encumbrance contained in the Security Documents and the first priority of the Security Documents against all matters, including: (a) any attachment, levy, or other seizure by legal process or otherwise of any or all Collateral; (b) except for Permitted Exceptions, any Lien or encumbrance or claim thereof on any or all Collateral; (c) any attempt to foreclose, conduct a trustee's sale, or otherwise realize upon any or all Collateral under any Lien or encumbrance, regardless of whether a Permitted Lien and regardless of whether junior or senior to the Security Documents; and (d) any claim questioning the legality, validity, binding nature, enforceability or priority of the Security Documents. Borrower shall notify Administrative Agent and each Lender promptly in writing of any of the foregoing and will provide such information with respect thereto as Administrative Agent may from time to time request. During the period of time that Borrower is not able to comply with the covenants set forth herein for a Project or portion thereof for a period of thirty (30) days following written notice from Administrative Agent (provided that if Borrower cannot reasonably cure such non-compliance within such thirty (30) day period, such thirty (30) day period shall be extended for a reasonable period not in excess of thirty (30) days from the date of Administrative Agent's notice to cure such non-compliance provided that Borrower shall have commenced such cure within such thirty (30) day period and shall diligently thereafter proceed to effect such cure), then such Project (or portion thereof, as the case may be) shall cease to have any value in the computation of the Borrowing Base until Borrower shall so comply.

(b)    [Reserved].

(c)    Plats, Annexations and Approvals. For each Project or any portion thereof to be included in the Borrowing Base:

(i)    Each plat, Tentative Map or Final Map with respect to any portion of any Project shall comply with all Laws and shall be satisfactory in form and substance to Majority Lenders. Prior to evaluation by Majority Lenders of the plat or map for approval, Borrower shall deliver to Administrative Agent such certifications, maps, surveys and other documents and information as Majority Lenders requires. Prior to the recordation of any plat or map relating to any Borrower Real Property, Borrower shall deliver to Administrative Agent such evidence as may be required by Administrative Agent of the continued priority of the Administrative Agent's first priority perfected lien

77

after recording of the plat or map as Majority Lenders may require, and Borrower agrees to take such steps as Majority Lenders may require in connection therewith.

(ii) Based on the applicable stage of development, Borrower shall obtain and, upon request, provide Administrative Agent with, evidence of: (A) appropriate Entitlements for the use, entitlement, management, development, operation, marketing and sale of each Project or portion thereof and compliance therewith in all material respects; (B) all necessary approvals and permits of Governmental Authorities and other third parties necessary to permit the use, entitlement, management, development, operation, marketing and sale of each Project or portion thereof, including all applicable public reports, architectural committee approvals, public offering statements, exemptions and other approvals required pursuant to any applicable Laws or Permitted Exceptions; (C) all Entitlements necessary to commence, carry out and complete Horizontal Improvements or Vertical Construction; and (iv) evidence of payment of all fees and other required amounts for such approvals and permits.

(iii) At Administrative Agent's or any Lender's request, Borrower shall provide Administrative Agent or such Lender with true and correct copies of all documents and instruments relating to proposed easements, boundary line adjustments, covenants, conditions and restrictions and other similar matters affecting title to each Project or portion thereof in connection with the use, entitlement, management, development, operation, marketing and sale thereof, together with all surveys, plats, contracts and other information requested by Administrative Agent or such Lender in connection therewith. Such easements, boundary line adjustments, covenants, conditions and restrictions and other matters shall not be entered into by Borrower unless consented to in writing by Majority Lenders, which consent shall not be unreasonably withheld by Majority Lenders, so long as they are entered into in the ordinary course of developing each Project. If such consent is granted by Majority Lenders, Administrative Agent on behalf of itself and the Lenders will also enter into such subordinations and releases as may be appropriate in connection with such easements, boundary line adjustments and covenants, conditions and restrictions, provided that such subordinations are in form satisfactory to Majority Lenders, and, in connection with any such releases, Borrower has satisfied the conditions precedent set forth in Section 8.03.

In the event that Borrower is not able to comply with the covenants set forth herein for a Project or portion thereof for a period of ten (10) days following written notice from Administrative Agent (provided that if Borrower cannot reasonably cure such non-compliance within such ten (10) day period, such ten (10) day period shall be extended for a reasonable period not in excess of thirty (30) days from the date of Administrative Agent's notice to cure such non-compliance provided that Borrower shall have commenced such cure within such ten (10) day period and shall diligently thereafter proceed to effect such cure), then such Project (or portion thereof, as the case may be) shall cease to have any value in calculation of the Borrowing Base until Borrower shall so comply.

(d) Utilities. Borrower shall provide or cause to be provided all telephone service, electric power, storm sewer, sanitary sewer and water facilities for each Project, and such utilities will be adequate to serve such Project in all material respects. No condition will

78

exist to affect Borrower's right to connect into and have adequate use of such utilities, except for the payment of normal connection charges or tap charges and except for the payment of subsequent charges for such services to the utility supplier. In the event that Borrower is not able to comply with the covenants set forth herein for a Project or portion thereof for a period of ten(10) days following written notice from Administrative Agent (provided that if Borrower cannot reasonably cure such non-compliance within such ten (10) day period, such ten (10) day period shall be extended for a reasonable period not in excess of thirty (30) days from the date of Administrative Agent's notice to cure such non-compliance provided that Borrower shall have commenced such cure within such ten (10) day period and shall diligently thereafter proceed to effect such cure), then such Project (or portion thereof, as the case may be) shall cease to have any value in calculation of the Borrowing Base until Borrower shall so comply.

(e)    Plans, Drawings and Specifications. Borrower shall be the sole owner of all Plans, Drawings and Specifications for the Improvements for each Project or, to the extent that Borrower is not the sole owner of such Plans, Drawings and Specifications, Borrower shall have the unconditional right to use such Plans, Drawings and Specifications in connection with the construction of the Improvements for such Project. None of Administrative Agent nor any Lenders will be restricted in any way in use of such Plans, Drawings and Specifications from and after a Default in connection with the Horizontal Improvements or Vertical Construction of the Improvements and the exercise of Administrative Agent's and Lenders' other rights and remedies, and Borrower shall obtain all consents and authorizations necessary for the use of such Plans, Drawings and Specifications by Administrative Agent on behalf of itself and the Lenders. In the event that Borrower is not able to comply with the covenants set forth herein for a Project or portion thereof for a period of ten (10) days following written notice from Administrative Agent (provided that if Borrower cannot reasonably cure such non-compliance within such ten (10) day period, such ten (10) day period shall be extended for a reasonable period not in excess of thirty (30) days from the date of Administrative Agent's notice to cure such non-compliance provided that Borrower shall have commenced such cure within such ten (10) day period and shall diligently thereafter proceed to effect such cure), then such Project (or portion thereof, as the case may be) shall cease to have any value in calculation of the Borrowing Base until Borrower shall so comply.

(f)    Compliance with Permitted Exceptions. Borrower shall keep and maintain in full force and effect all restrictive covenants, development agreements, easements and other similar agreements with Governmental Authorities and other Persons that are necessary or desirable for the use, entitlement, management, development, operation, marketing and sale of each Project. Borrower shall not default in any material respect under any such covenants, development agreements, easements and other agreements and will diligently enforce its rights thereunder. In the event that Borrower is not able to comply with the covenants set forth herein for a Project or portion thereof for a period of ten (10) days following written notice from Administrative Agent (provided that if Borrower cannot reasonably cure such non-compliance within such ten (10) day period, such ten (10) day period shall be extended for a reasonable period not in excess of thirty (30) days from the date of Administrative Agent's notice to cure such non-compliance provided that Borrower shall have commenced such cure within such ten (10) day period and shall diligently thereafter proceed to effect such cure), then such Project (or portion thereof, as the case may be) shall cease to have any value in calculation of the Borrowing Base until Borrower shall so comply.

(g)    Project Development.  For each Project:

(i)    Borrower shall at all times, in all material respects, develop, maintain and operate the Projects and use its best efforts to market and sell Units in each Project. Borrower shall pay all costs and expenses arising in connection with the management, use, entitlement, development, operation, marketing and sale of each Project.  The Improvements for each Project shall be constructed and developed in conformity in all material respects with the Plans, Drawings and Specifications therefor, and shall be contained wholly within the lot lines of the land included within the Project and will not encroach in any material respect on any other real estate, easements, building lines or setback requirements.  Within ten (10) days after Borrower receives notice or knowledge thereof, Borrower shall proceed with diligence to correct any material departure from applicable Plans, Drawings and Specifications and any departure from applicable laws, rules and regulations of any Governmental Authority with jurisdiction over such Project.

(ii)    With respect to those portions of each Project which are to be "open space" or otherwise constitute streets and other common areas to be Dedications to homeowners' associations or other Governmental Authorities with jurisdiction over such Project and are not otherwise included within the portions of the Borrower Real Property to be developed by Borrower, Borrower shall take such actions as may be necessary to cause such Dedications to be made promptly and in accordance with applicable covenants, conditions and restrictions and Law.  Majority Lenders' may notify Borrower that such Dedications are required, in which case Borrower shall cause such Dedications to occur within thirty (30) days after such notification.

In the event that Borrower is not able to comply with the covenants set forth herein for a Project or portion thereof for a period of ten (10) days following written notice from Administrative Agent (provided that if Borrower cannot reasonably cure such non-compliance within such ten (10) day period, such ten (10) day period shall be extended for a reasonable period not in excess of thirty (30) days from the date of Administrative Agent's notice to cure such non-compliance provided that Borrower shall have commenced such cure within such ten (10) day period and shall diligently thereafter proceed to effect such cure), then such Project (or portion thereof, as the case may be) shall cease to be included in the Borrowing Base until Borrower shall so comply.

(h)    [Reserved].

(i)    Improvement Districts.  For any Project, without obtaining the prior written consent of Majority Lenders, Borrower shall not consent to, or vote in favor of, the inclusion of all or any part of the Collateral in any improvement district, any "Mello Roos" district (for Projects in California), special assessment district or similar district.  Borrower shall give immediate notice to Administrative Agent and each Lender of any notification or advice that Borrower may receive from any municipality or other third party of any intent or proposal to include all or any part of the Collateral in an improvement, assessment or other district.  Upon prior written notice to Borrower, Administrative Agent, acting at the direction of Majority Lenders, shall have the right to file a written objection to the inclusion of all or any part of the Collateral in an improvement, assessment or other district, either in its own name or in the name

80

of Borrower or any Lender, and to appear at, and participate in, any hearing with respect to the formation of any such district. In the event that Borrower is not able to comply with the covenants set forth herein for a Project or portion thereof for a period of ten (10) days following written notice from Administrative Agent (provided that if Borrower cannot reasonably cure such non-compliance within such ten (10) day period, such ten (10) day period shall be extended for a reasonable period not in excess of thirty (30) days from the date of Administrative Agent's notice to cure such non-compliance provided that Borrower shall have commenced such cure within such ten (10) day period and shall diligently thereafter proceed to effect such cure), then such Project shall cease to have any value in calculation of the Borrowing Base until Borrower shall so comply.

(j)     Appraisals.

(i)     <u>Appraisal Requirements</u>. The form and substance of each Appraisal must be reasonably satisfactory to Majority Lenders, provided that in reviewing Appraisals, Majority Lenders shall apply the policies and procedures generally used by Majority Lenders in their real estate lending activities. Each Appraisal of Borrower Real Property that is Unimproved Land, Land Under Development or Finished Lots shall be based upon the "bulk finished appraised value" of such Borrower Real Property. Each Appraisal of Borrower Real Property that are Homes Under Construction or Model Homes will be at least a "FNMA plan type appraisal". Each Appraisal must include, without limitation, the following information: (i) a narrative economic and demographic feasibility analysis of the market, including a supply and demand comparison; (ii) a narrative comparison of each subject Asset to competing projects in the same metropolitan area; (iii) a base plan type value for each type of Unit in each Asset; and (iv) a market and absorption study for each Asset. All Appraisals must comply with the appraisal policies and procedures of Majority Lenders and with all applicable laws, rules, and regulations, including the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, as amended. All Appraisals shall be addressed to each Lender and their respective successors and assigns for their reliance.

(ii)     <u>Appraiser Engagement</u>. Each Appraisal must be prepared by either (1) an M.A.I.-certified appraiser selected by Majority Lenders and reasonably approved by Borrower, or (2) by the an M.A.I.- certified appraiser employed in the real property appraisal department of Majority Lenders' selection of either Ernst & Young, PriceWaterhouse Coopers, KPMG or Deloitte, and which appraiser shall be engaged by Majority Lenders. Upon request by Majority Lenders, Borrower will provide to Majority Lenders all information (including Lot and Unit premiums and upgrades, if applicable) necessary to allow an Appraisal to be ordered by Majority Lenders. Majority Lenders will engage an appraiser to perform an Appraisal only when it receives all information deemed necessary by the Majority Lenders and the appraiser for preparation of such Appraisal. Majority Lenders will not have any liability to Borrower or any other Person with respect to delays in the Appraisal process. Borrower and its Affiliates will not employ any appraiser that prepares an Appraisal for any of the Borrower Real Property unless specifically requested to do so by Majority Lenders. Majority Lenders may employ a staff appraiser or a fee appraiser and Borrower will reimburse Majority Lenders at Majority Lenders' reasonable cost therefor.

81

(iii)   _Appraisal Evaluation_. Upon receipt of an Appraisal, Majority Lenders will review the Appraisal in accordance with the appraisal policies and procedures of Majority Lenders and establish an Appraised Value.  Majority Lenders will notify Borrower of such Appraised Value.

(iv)   _Appraisals_. Notwithstanding anything in this Section 6.16(j) to the contrary, Majority Lenders may order Appraisals or updated Appraisals as set forth below.

(A)   Majority Lenders may order Appraisals or updated Appraisals at any time and from time to time if required by any Law;

(B)   Majority Lenders may order Appraisals for up to one-third of all Eligible Real Property Collateral as it elects each calendar year;

(C)   Within 45 days following the receipt of any Borrowing Base Report, Majority Lenders may order an Appraisal on any Borrower Real Property that was first added to Eligible Real Property Collateral during the quarter ending on the date of such Borrowing Base Report if the Majority Lenders do not approve the Net Present Value of Projected Revenues and Net Present Value of Projected Total Project Costs included in the Certified Net Cash Flow Report included as part of such Borrowing Base Report;

(D)   Within 90 days following the receipt of Financial Statement that reflects an impairment or write down of the carrying or book value of any Eligible Real Property Collateral, the Majority Lenders may order an Appraisal on the Eligible Real Property Collateral with respect to which such impairment or write down was recorded in the books and records of the Borrower for financial statement purposes;

(E)   In the event that Borrower reasonably believes that there has been a material increase in the value of any Borrower Real Property since the previous Appraisal of such Borrower Real Property, then not less than six (6) months after the date of such previous Appraisal, Borrow may request that Majority Lenders order a new Appraisal of such Borrower Real Property from the appraiser that prepared the previous Appraisal;

(F)   Not more than once every six (6) months on any Asset where the existing Appraised Value is lower than the amount determined in the first sentence of the definition of "Eligible Real Property Collateral Valuation", Borrower may request that Lender order a new Appraisal; and

(G)   Majority Lenders may order updated or new Appraisals at any time and from time to time.

(v)   Expenses. Borrower shall pay the cost and expense of all Appraisals obtained by Majority Lenders in connection with the Loan; provided, however, that, except with respect to Appraisals ordered after the occurrence of a Default, or pursuant to

Sections 6.16 (j)(ii), or 6.16(j)(iv)(A), (B), (C), (D), (E) or (F) with respect to any particular Asset, Lots or Units. Unless Borrower is required to pay the cost and expense of an Appraisal under the previous sentence, Lender shall pay for an Appraisal ordered under 6.16(j)(iv)(G). Other than as set forth in the immediately preceding sentence, Borrower will reimburse Majority Lenders for all costs and expenses incurred in the appraisal process and in establishing and monitoring Appraised Values. All reimbursements by Borrower to Majority Lenders required by this Section 6.16(j)(v) will be paid to Majority Lenders within fifteen (15) days after notice from Majority Lenders to Borrower.

(vi)    No ordering of any Appraisal under any of Sections 6.16(j)(iv)(A) through (G), inclusive, shall limit Lender's right to order Appraisals under any of such sections (for example, an Appraisal ordered under Section 6.16(j)(iv)(F) will not count against Lenders' rights under Section 6.16(j)(iv)(B)).

6.17    PAPA OBLIGATIONS. Without limitation of the other provisions of this Agreement, it is acknowledged and agreed by Borrower (a) that a portion of the proceeds of the Loan will be used for acquisitions and development of Real Property which is Eligible Real Property Collateral as to which the PAPA Obligations exist, including toward fulfilling certain development obligations to the parties owed such PAPA Obligations and performance and payment of PAPA Obligations when due, (b) that Borrower shall not engage in acts or omissions which would cause a default under any PAPA Obligations (or trigger any buyback, repurchase options or rights of first refusal, and in no event shall any sale pursuant to those matters constitute a sale in the ordinary course of the Core Businesses), (c) that Borrower shall promptly provide evidence of compliance with all PAPA Obligations upon Administrative Agent's request and without request to promptly provide notice of any default or asserted default with respect to any PAPA Obligations, (d) that upon Administrative Agent's request, Borrower will promptly provide evidence of compliance with any options held by the Consolidated Group to acquire Real Property and without request promptly provide notice of any exercise, pending expiration or default or asserted default under any such options, and (e) except to the extent that Borrower is required by the Entitlements to improve areas adjacent to the Boundaries of the Borrower Real Property, in no event shall Borrower use (or allow any other Person to use) any proceeds of the Loan to improve any Real Property which is not actually owned by Borrower (whether or not an option is held thereon).

6.18    TRANSFER OF CF PROPERTY AND MF PROPERTY TO BORROWER. Concurrently with the repayment of the Existing Secured Indebtedness secured by the MF Property and/or CF Property, or any portion thereof, Borrower shall (a) cause the MF Property Owner or the CF Property Owner, or the applicable portion thereof, as applicable, to transfer fee title of the MF Property or CF Property, as applicable, to Borrower and (b) cause such Real Property (together with all appurtenant Personal Property) to become Collateral hereunder and under the Security Documents. Concurrently with the repayment and satisfaction of the Existing Secured Indebtedness (other than in connection with repayment and reconveyance of portions of the Existing Secured Indebtedness to allow closings of retail sales of lots or units in the ordinary course of business at arm's length to Persons other than Related Parties), with respect to the: (a) CF Property, or any portion thereof, (i) cause the Lien of the deed(s) of trust securing the Existing Secured Indebtedness to be fully reconveyed, and (ii) convey fee title of the CF

83

Property, or applicable portion thereof, to Borrower; and (b) MF Property, or any portion thereof, (i) cause the Lien of the deed(s) of trust securing the Existing Secured Indebtedness to be fully reconveyed, and (ii) convey fee title of the MF Property, or applicable portion thereof, to Borrower.

6.19    PROPERTY TRANSFERS.  If at any time Borrower owns any Real Property (that is not released pursuant to Article VIII) that is not subject to the Lien of a Deed of Trust, the Liens granted under the Interim Order, or the Liens granted under the Final Order, Borrower shall upon request of Majority Lenders, as soon as reasonably practicable execute, acknowledge and record in the Official Records: (i) the Interim Order or the Final Order, as applicable, subject only to Permitted Exceptions, as a Lien on such Real Property; and (ii) if required by Administrative Agent, a Deed of Trust, subject only to Permitted Exceptions, as a Lien on such Real Property, and cause a Title Policy to be issued for such Deed of Trust.  Further, notwithstanding anything to the contrary in this Agreement, in no event shall any Real Property or any such option to acquire Real Property be transferred by Borrower to any Affiliate or Related Party or any member of the Consolidated Group including that no such transfer shall be permitted in connection with any transaction contemplated with respect to Article VIII.

6.20    COMPLIANCE WITH BUDGET.  Comply with the Applicable 13-Week Budget and Operating Forecast in all respects except for variances permitted pursuant to Section 7.15.

**ARTICLE VII.**
**NEGATIVE COVENANTS**

So long as any Loan or other Obligation hereunder shall remain unpaid or unsatisfied, Borrower shall not, nor shall it permit any member of the Consolidated Group to, directly or indirectly:

7.01    PERMITTED INDEBTEDNESS.  Incur or permit to exist or remain outstanding any Indebtedness; provided, however, that the Loan Parties may incur or permit to exist or remain outstanding the following Indebtedness ("Permitted Indebtedness"):

(a)    Indebtedness of any Loan Party arising under this Agreement or the other Loan Documents;

(b)    Indebtedness in respect of taxes, assessments, governmental charges, and claims for labor, materials or supplies, to the extent that payment thereof is not yet due or is being contested in good faith by appropriate proceedings, and an adequate reserve has been established therefor and is maintained in accordance with GAAP;

(c)    [Reserved];

(d)    Indebtedness incurred to finance the purchase of equipment used in the ordinary course of the Core Businesses in an aggregate amount not to exceed $5,000,000;

(e)    Indebtedness of any Loan Party arising under the Indentures in an aggregate principal amount not to exceed approximately $283,849,000, which Indebtedness will be restructured in accordance with the terms and conditions of the Restructuring Support

84

Agreement;

(f)      Secured Debt in an aggregate amount not to exceed at any time the Maximum Permitted Secured Indebtedness;

(g)      Indebtedness of MF Owner or CF Owner incurred in accordance with Section 7.12 hereof;

(h)      [Reserved];

(i)      Indebtedness not to exceed the amount of the RMV Monetary Obligation Cap (and notwithstanding anything to the contrary in this Section 7.01 or otherwise, no Loan Party shall incur any other Indebtedness related to or in connection with the RMV Property); and

(j)      Indebtedness arising under or in connection with the Pre-Petition Loan Agreement.

7.02      PERMITTED LIENS.  Create or permit to exist any Lien on any Property of Borrower or any member of the Consolidated Group, including Parent, whether now or hereafter acquired, except for the following (the "Permitted Liens"):

(a)      Liens and other encumbrances arising from attachments or similar proceedings, pending litigation, judgments or taxes or assessments or government charges in any such event whose validity or amount is being contested in good faith by appropriate proceedings and for which adequate cash reserves have been established and are maintained in accordance with GAAP, or taxes and assessments which are not due and delinquent;

(b)      Mechanics' Liens;

(c)      pledges or deposits made in connection with workmen's compensation, employee benefit plans, unemployment or other insurance, old age pensions, or other Social Security benefits;

(d)      Liens securing Indebtedness permitted under Sections 7.01(d), (f), (g), (h) and (j); provided that in the case of in the case of Liens securing Indebtedness permitted under Section 7.01(d), such Liens exist at the time such equipment was acquired and in any event such Liens extend only to the property acquired;

(e)      precautionary Uniform Commercial Code financing statements related to equipment leases or other operating leases in the ordinary course of business;

(f)      easements, rights-of-way and other such restrictions of record customary in any of the Core Businesses and which do not diminish the value of the subject Collateral;

(g)      Liens in favor of Administrative Agent and the Lenders under or pursuant to this Agreement and the other Loan Documents;

(h)      Liens on Excluded Assets;

85

(i)      Permitted Exceptions;

(j)      rights of setoff or bankers' Liens upon deposits of cash in favor of banks or other depository institutions whether arising by contract or operation of law, incurred in the ordinary course of business so long as such deposits are not intended to be collateral for any obligations;

(k)      Liens in favor of the trustees under Section 7.07 of the Indentures;

7.03    INVESTMENTS.  Subject to Section 7.15(c), make any Investments (other than by the Borrower in Borrower Real Property as necessary for the Core Businesses and subject to Section 7.05), except:

(a)      Cash Equivalents subject to a first priority perfected Lien in favor of Administrative Agent for the benefit of itself and the Lenders;

(b)      deposit accounts which are subject to Control Agreements;

(c)      [Reserved];

(d)      Investments in suppliers and customers of Borrower made in the ordinary course of such Loan Party's business on such terms as are customary and reasonable for similarly situated companies, and in an aggregate amount outstanding during any rolling twelve (12) month period not in excess of $100,000;

(e)      Investments existing on the date hereof and set forth on Schedule 7.03(e) hereto;

(f)      Investments by Borrower in WL Southwest; provided that such Investments (i) consist solely of Units, (ii) at the time any such Unit is transferred, WL Southwest has entered into a binding purchase and sale agreement with a bona fide arm's length (other than a sale to an employee in accordance with the provisions of Section 8.01(b)(ii)) all cash purchaser retail end-user for such Unit, (iii) immediately after the transfer of title to such Unit to WL Southwest such Unit shall be transferred, through the same escrow as part of the same transaction, to such purchaser and (iv) the Net Proceeds from such sale are paid directly to Borrower;

(g)      Investments in accordance with Sections 7.12 or 7.13;

(h)      (i) Investments in Mayfield Lyon existing on the date hereof, (ii) on January 31, 2012, the Initial Mayfield Payment, and (iii) after the Plan Confirmation Date, the Later Mayfield Payment; and

(i)      Investments in RMV not to exceed $500,000 in the aggregate on such dates and in such amounts as set forth in the RMV Purchase Agreement.

201670660 v15

7.04    FUNDAMENTAL CHANGES.  Do any of the following:

(a)    merge or consolidate with or into any Person, except that Subsidiaries of Borrower may merge into a Loan Party; provided that such Loan Party must be the survivor;

(b)    dispose of any Property other than (i) Asset Sales in compliance with Section 2.03(c)(i) (provided that no Asset Sale of all or substantially all of the property of a Loan Party or Equity Securities of any Loan Party may be made), (ii) Asset Sales permitted under and in compliance with Article VIII or (iii) Asset Sales if the aggregate value of all assets sold during the pendency of the Chapter 11 Cases outside the ordinary course of business, after giving effect to the proposed Asset Sale, is less than $1,000,000; and

(c)    commence Vertical Construction on the Project listed on Schedule APT.

7.05    ACQUISITIONS.  Subject to Section 7.15(c), acquire any fee or other interest in Real Property (whether by exercise of an option or otherwise) unless (i) the member of the Consolidated Group acquiring such Real Property is Borrower, (ii) Administrative Agent, on behalf of itself and the Lenders, is granted a first priority perfected Lien on such Real Property, (iii) an Appraisal if required under Section 6.16(j)(iv)(C) (obtained at Borrower's sole cost and expense) of such Real Property showing the Appraised Value of the Real Property at least equal to the gross purchase price of the Real Property being acquired has been delivered to Administrative Agent, (iv) such Real Property is used in the Core Businesses, (v) the Real Property does not constitute Unentitled Land and (vi) such acquisition is set forth in the Applicable 13-Week Budget and Operating Forecast and (vii) the gross purchase price of the Real Property being acquired does not exceed the amount set forth therefor in the Applicable 13-Week Budget and the Operating Forecast.  In furtherance of the foregoing, Borrower shall, or shall cause the applicable Loan Party, to execute and deliver such financing statements, subordinations and other documents requested by Administrative Agent, acting at the direction of Majority Lenders, necessary or advisable to grant and convey a first priority perfected Lien in the Real Property.   Notwithstanding anything to the contrary in this Agreement or any other agreement, consent or instrument executed by Administrative Agent, the Lien required to be granted under clause (ii) of this Section 7.05 or otherwise required to be granted to Administrative Agent shall be enforceable by Administrative Agent, without any requirement to receive or obtain any waiver, consent or approval from any third party.

7.06    TRANSACTIONS WITH AFFILIATES.  Enter into any agreement to pay any fees, wages, salary, bonus, commission, contributions to benefit plans or any other compensation for goods or services or otherwise enter into any other agreement or arrangement, including for the transfer of assets, with its Affiliates or to or for the benefit of any Person who is a director or officer of the Consolidated Group or any of its Affiliates or who has, or any of whose Affiliates has, a beneficial interest in the capital stock or partnership interests of any of the Consolidated Group or any of its Affiliates, except in the ordinary course of and pursuant to the reasonable requirements of such member's business and upon terms and conditions materially no more favorable than those such member would be willing to enter into with an unaffiliated third party. At the request of Administrative Agent, Borrower shall provide computations and evidence of compliance with this Section 7.06.  Borrower shall not sell, convey, grant, quitclaim, lease or otherwise transfer any Borrower Real Property to CF Owner, MF Owner, Lyon Mayfield, any

Joint Venture, or any Related Parties, Subsidiaries or Affiliates of Borrower. Borrower shall not permit: (i) CF Owner to sell, convey, grant, quitclaim, lease or otherwise transfer any CF Property to any of MF Owner, Lyon Mayfield, any Joint Venture, or any Related Parties, Subsidiaries or Affiliates of CF Owner or Borrower, other than Borrower; (ii) MF Owner to sell, convey, grant, quitclaim, lease or otherwise transfer any MF Property to any of CF Owner, Lyon Mayfield, any Joint Venture, or any Related Parties, Subsidiaries or Affiliates of MF Owner or Borrower, other than Borrower; and (iii) Lyon Mayfield to sell, convey, grant, quitclaim, lease or otherwise transfer any Mayfield Property to any of CF Owner, MF Owner, any Joint Venture, or any Related Parties, Subsidiaries or Affiliates of Lyon Mayfield or Borrower, other than Borrower. No amendment, modification, renewal or extension (other than renewals or extensions on arm's length market terms) shall be entered into in connection with any existing documents or agreements between the Borrower, Parent or any of their Affiliates, on the one hand, and any of their Affiliates on the other hand, including the lease agreement referenced in Section 7.08(c).

7.07    SENIOR UNSECURED NOTES.

(a)    Issue additional Senior Unsecured Notes.

(b)    prepay, purchase, redeem or otherwise acquire any Senior Unsecured Notes, except in connection with the restructuring pursuant to and in accordance with the Restructuring Support Agreement and the Chapter 11 Plan; or

(c)    permit the modification, waiver or amendment of any of the terms of the Indentures, except for modifications, waivers or amendments pursuant to and in accordance with the Restructuring Support Agreement and the Chapter 11 Plan.

7.08    PERMITTED DISTRIBUTIONS. Make any Distributions; provided that:

(a)    Subsidiaries may make Distributions to Borrower;

(b)    [Reserved];

(c)    Payments of rent under the that certain Lease Agreement dated and in effect on April 1, 2003, between WHL 1976 T, LLC by: William Harwell Lyon 1976 Trust (its managing member) and William Lyon Homes, Inc., relating to the headquarters of Borrower, as in effect from April 1, 2003;

(d)    Distributions by Joint Ventures; and

(e)    Investments permitted by Sections 7.03(f) and 7.13 to the extent such Investments would also constitute a Distribution.

7.09    CHANGE IN NATURE OF BUSINESS. Engage in any material line of business different from any of the Core Businesses.

7.10    USE OF PROCEEDS. Use the proceeds of the Loans, (a) in violation of the Margin Regulations, or for the purpose of purchasing or carrying any "margin stock" as defined

88

in the Margin Regulations or reducing or retiring any Indebtedness which was originally incurred to purchase or carry "margin stock" or for any other purpose which might make this transaction a "purpose credit" within the meaning of the Margin Regulations and/or (b) in connection with the investigation (including, without limitation, discovery proceedings), initiation or prosecution of any claims, causes of action, objections or other litigation against Administrative Agent or, any of the Lenders, the Pre-Petition Agent or the Pre-Petition Lenders, including, but not limited to, (i) with respect to raising any defense to the validity, perfection, priority, extent, or enforceability of the obligations under this Agreement and the Loan Documents and/or the Pre-Petition Loan Agreement and the other documents and agreements entered into in connection therewith, including the Liens with respect thereto, and (ii) with respect to pursuing any potential claims against the Lenders or Pre-Petition Lenders (or their respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors) asserting or alleging any claims including, but not limited to, "lender liability"-type claims or causes of action, causes of actions under chapter 5 of the Bankruptcy Code or applicable non-bankruptcy law (including under section 502(d) of the Bankruptcy Code), or any other claims or causes of action under, or in any way otherwise relating to, this Agreement, the Loan Documents, or the Pre-Petition Loan Agreement and the other documents and agreements entered into in connection therewith; provided that up to $50,000 in the aggregate may be used to reimburse any statutory committees appointed in the Chapter 11 Cases for fees and out-of-pocket expenses incurred in connection with the investigation of the validity, perfection and/or priority of the Liens securing the Pre-Petition Loan Agreement.

7.11    NO OTHER NEGATIVE PLEDGE. Covenant or otherwise agree with any Person (other than (a) the Lenders and Administrative Agent pursuant to this Agreement, (b) the Pre-Petition Agent and the Pre-Petition Lenders and (c) with respect to the assets securing Permitted Construction Indebtedness, the lenders of such Permitted Construction Indebtedness), whether in connection with obtaining or modifying credit accommodations from such Person, or incurring other Indebtedness, or otherwise, to keep its unencumbered assets free of any or all Liens.

7.12    INVESTMENTS IN MF OWNER and CF OWNER. Make any Investments in MF Owner or CF Owner except as approved by the Bankruptcy Court and expressly set forth in the 13-Week Budget and Operating Forecast.

7.13    INVESTMENTS IN LAGUNA AND WHITNEY RANCH. Make any Investments in Laguna or Whitney Ranch except as approved by the Bankruptcy Court and expressly set forth in the 13-Week Budget and Operating Forecast.

7.14    [RESERVED].

7.15    COMPLIANCE WITH APPLICABLE 13-WEEK BUDGET AND OPERATING FORECAST.

(a)    Net Cash Flow. Permit, when measured on Friday of each week during the term hereof commencing with the third Friday after the Petition Date, cumulative Net Cash Flow for the period commencing on the Petition Date and ending on the date of measurement (the "Variance Measurement Period") to be less than the amount set forth in the Applicable 13-

201670660 v15

Week Budget for such Variance Measurement Period by more than the greater of twenty percent (20%) and $1,500,000.

       (b)    Professionals and Administrative Expenses. Permit, when measured on Friday of each week during the term hereof commencing with the third Friday after the Petition Date, fees and expenses of Professionals and general and administrative expenses incurred by the Loan Parties in connection with the Chapter 11 Cases (excluding the fees and expenses of Administrative Agent and the Lenders and the Adequate Protection Obligations) for the Variance Measurement Period to exceed, by more than the greater of 20% and $750,000, the amounts set forth in the Applicable 13-Week Budget. For the avoidance of doubt, to the extent that the fees and expenses of Administrative Agent and the Lenders and the Adequate Protection Obligations are included in the Applicable 13-Week Budget such amounts shall be excluded therefrom when whether the fees and expenses of Professionals and general and administrative expenses incurred by the Loan Parties in connection with the Chapter 11 Cases for the Variance Measurement Period exceed, by more than the greater of 20% and $750,000, the amounts set forth in the Applicable 13-Week Budget.

       (c)    Real Property Related Disbursements. Permit at any time cumulative land acquisition and/or land option costs, including the cost of acquiring any fee or other interest in Real Property (whether by performance, maintenance or exercise of an option or otherwise), and cumulative Investments in Joint Ventures from the Petition Date to exceed the amounts set forth in the Applicable 13-Week Budget for such period.

       (d)    Title Deposits and Surety Deposits. Permit title deposits and surety deposits to exceed $5,000,000 in the aggregate.

    7.16    SECURED INDEBTEDNESS.

       (a)    Permit at any time the sum of Total Outstandings plus Pre-Petition Total Outstandings to exceed the Borrowing Base.

       (b)    Permit at any time Total Secured Debt to exceed Maximum Permitted Secured Indebtedness.

       (c)    Permit at any time the aggregate principal amount at any time outstanding of all Existing Secured Indebtedness to exceed $70,999,150.

    7.17    EXPENDITURES OUTSIDE OF CORE BUSINESSES. Permit expenditures (other than expenditures incurred in the acquisition, development, construction or sale of Aggregate Real Property as part of the Core Businesses or otherwise in furtherance of the Core Business) except as approved by the Bankruptcy Court and expressly set forth in the 13-Week Budget and Operating Forecast. In no event shall payments relating to or for the benefit of the RMV Property or the RMV Entities be permitted to exceed the RMV Monetary Obligation Cap.

    7.18    EMPLOYEE COMPENSATION. Permit bonus compensation to be paid to employees of Borrower to exceed the greater of (a) eighteen percent (18%) of pre-tax, pre-bonus Net Income of Consolidated Group, from which bonus compensation paid to each of General William Lyon and William H. Lyon shall not exceed, in each case, three percent (3%) of the pre-

201670660 v15

tax, pre-bonus Net Income of Consolidated Group, or (b) twenty five percent (25%) of the aggregate consolidated annual pre-bonus payroll of Borrower.

7.19    CHAPTER 11 CASES.

(a)    File, support or endorse any plan of reorganization or, except as otherwise permitted pursuant to Section 7.04(b)(iii), propose any sale of assets outside the ordinary course of business that has not been approved by the Lenders (unless such plan or sale is determined by the Lenders to result in the indefeasible payment in full in cash of all Obligations and all of the Pre-Petition Obligations) (other than contingent indemnity obligations for which no claims have been made by the Administrative Agent or the Pre-Petition Agent, as applicable (whether on its own behalf or on behalf of the Lenders or the Pre-Petition Lenders, as applicable), or other similar contingent obligations);

(b)    File an application for the approval of any superpriority claim or any Lien in any of the Chapter 11 Cases that is *pari passu* with or senior to the Liens securing the Obligations, Liens securing the Pre-Petition Obligations, or any Liens granted by the Bankruptcy Court to the Pre-Petition Agent on behalf of itself and the Pre-Petition Lenders as adequate protection for the Pre-Petition Agent's pre-petition Liens, including the Adequate Protection Obligations, without the consent of Administrative Agent and the Pre-Petition Agent; and

(c)    commence any adversary proceeding, contested matter or other action asserting any claims or defenses or otherwise against Administrative Agent, any Lender, the Pre-Petition Agent or any Pre-Petition Lender with respect to this Agreement, the other Loan Documents or the transactions contemplated hereby or thereby, or the Pre-Petition Loan Agreement, the other documents or agreements executed or delivered in connection therewith or the transactions contemplated thereby.

7.20    CHANGES IN KEY MANAGEMENT. Permit, at any time prior to the Maturity Date, (a) Matthew R. Zaist (or any other individual approved by Majority Lenders as a substitute for him in accordance with the terms of this Section 7.21) to cease whether voluntarily or involuntarily to devote substantially all of his business time to the management or operations of Parent or Borrower nor (b) any two of the existing members of Key Management (or any other individuals approved by Majority Lenders as a substitute for such individuals in accordance with the terms of this Section 7.21) to cease whether voluntarily or involuntarily to devote substantially all of their business time to the management or operations of Parent or Borrower unless, in each case, a substitute or substitutes acceptable to Majority Lenders is found for such individual or individuals within one hundred eighty (180) days of the date such individual announces his resignation or departure or is removed from his position (each, a "Departure"); provided, however, that if a substitute or substitutes acceptable to Majority Lenders has not been appointed within such period but Borrower is diligently attempting to recruit such substitute or substitutes, this covenant shall not be deemed in breach until the two hundred seventieth (270th) day from the date of the relevant Departure.

201670660 v15

7.21    EXCLUDED ASSETS.  Permit the aggregate fair market value of all Excluded Assets to exceed the amounts set forth in the definition of Excluded Assets at any time.

7.22    IMPROVEMENTS.  Without limitation of any other provisions of this Agreement regarding the Core Businesses or use of the Aggregate Real Property, other than in the ordinary course of the Core Businesses (subject to the limitations set forth in Section 7.15(c)), no portion of the Aggregate Real Property shall be removed, demolished or altered in any manner, if it diminishes the value of any Project by at least $1,000,000, without the prior written consent of Majority Lenders.  Further, if any Borrower Real Property or any portion thereof that is condemned, destroyed, removed, demolished or altered in any manner which diminishes the value of any Project, then the Majority Lenders may exclude such Borrower Real Property from the Borrowing Base.

7.23    PAPA OBLIGATION.  Neither Borrower nor any other member of the Consolidated Group will borrow any amount from the holder of any PAPA Obligation, nor permit any advance of funds by the holder of any PAPA Obligation on behalf of Borrower or any member of the Consolidated Group without prompt repayment of such advance in full.

7.24    NEGATIVE PLEDGE.  Neither Borrower or any other Loan Party shall permit or suffer to exist any Lien on or pledge of the Equity Securities of any member of the Consolidated Group.

7.25    CF PROPERTY, MF PROPERTY AND MAYFIELD PROPERTY.  Except for individual retail sales of lots or units to end users in the ordinary course of business at arm's length to Persons other than Related Parties, subject to the terms of the Existing Secured Indebtedness, Borrower shall not permit the CF Owner to, and the CF Owner shall not, transfer, convey, grant, pledge, encumber sell, lease or assign the CF Property, or any portion thereof or interest therein, to any Person except Borrower.  Except for individual retail sales of lots or units to end users in the ordinary course of business at arm's length to Persons other than Related Parties, subject to the terms of the Existing Secured Indebtedness, Borrower shall not permit the MF Owner to, and the MF Owner shall not, transfer, convey, grant, pledge, encumber sell, lease or assign the MF Property, or any portion thereof or interest therein, to any Person except Borrower.  Except for individual retail sales of lots or units to end users in the ordinary course of business at arm's length to Persons other than Related Parties, subject to the terms of the Existing Secured Indebtedness, Borrower shall not permit Lyon Mayfield to, and Lyon Mayfield shall not, transfer, convey, grant, pledge, encumber sell, lease or assign the Mayfield Property, or any portion thereof or interest therein, to any Person except Borrower.

7.26    AMENDMENT TO DOCUMENTS.  Amend, modify, supplement, waive or replace any document, instrument or agreement (or any terms or conditions thereof) entered into in connection with or evidencing the Existing Secured Indebtedness (except to the extent otherwise permitted by the terms hereof) unless such amendment, modification, supplement, waiver or replacement is consented to in writing by Administrative Agent acting at the direction of Majority Lenders.

## ARTICLE VIII.
## RELEASES

8.01    GENERAL REQUIREMENTS FOR RELEASES.  Administrative Agent shall release the relevant property described below from the Lien granted pursuant to the Interim Order (or the Final Order, when applicable) entered by the Bankruptcy Court (through an escrow arrangement acceptable to Majority Lenders, concurrent with the closing of the relevant transaction) upon satisfaction of the following conditions precedent, provided that Borrower requests such release in writing by way of written notice of the request to Administrative Agent not less than ten (10) days prior to the date of the applicable transfer, which request shall be accompanied by a common and legal description of the relevant property to be released reasonably satisfactory to Majority Lenders and provided that the release shall not violate any requirements of any document of record or any applicable Law including those regarding subdivisions, tract maps, parcel maps and the division of land into lots or parcels; and the Collateral remaining after giving effect to the release shall be in compliance with all applicable laws, rules, regulations and ordinances, the un-released Collateral remaining after giving effect to the release shall not be impaired with respect to Borrower's ability to diligently proceed with any Improvements, and that Borrower has concurrently submitted to Administrative Agent all documents and instruments necessary to release the relevant Borrower Real Property from the Liens of the applicable Loan Documents, and in the case of any released property as to which construction has not been fully completed, the Person acquiring the property shall have agreed, to the reasonable satisfaction of Administrative Agent, to complete the construction and development thereof (and any related Amenities) in accordance with the plans and specifications reasonably approved in writing by Majority Lenders:

(a)    At the time of such release no Default or Event of Default shall have occurred and be continuing.  It shall be an additional condition that no Default or Event of Default shall occur as a result of the transaction that is the subject of the release.

(b)    Such release shall be either in connection with (i) a bona fide arm's length all-cash sale in the ordinary course of Borrower's Core Businesses (or in the case of a Dedication, a transfer or donation, in the ordinary course of Borrower's Core Businesses, of a portion of a Project) to an unrelated Person who is either (x) a member of the general home-buying public purchasing a Unit or (y) a merchant builder purchasing single or multiple Finished Lots or Homes Under Construction in Nevada or Arizona in a transaction of a type which Borrower has customarily done historically and is consistent with its business plan for such Project, and in the case of either (x) or (y), who is not an Affiliate or Related Party of the Consolidated Group (a "Standard Retail Sale"), (ii) in not more than ten (10) instances in any calendar year, a sale to an employee of any member of the Consolidated Group for use by such employee as their primary residence, with a discount of not more than three percent (3%) of the purchase price that would be charged for the applicable Lot or Unit in a Standard Retail Sale (a release in connection with (i) or (ii) is a "Standard Release") or (iii) Borrower obtaining Permitted Construction Indebtedness secured solely by such Borrower Real Property (in the case of this clause "(iii)," a "PCI Release", and the Borrower Real Property so transferred in connection therewith is the "PCI Released Property").

(c)    Unless the portion of the Borrower Real Property to be released is an

entire parcel with respect to which Administrative Agent has previously approved the Final Map or is a Lot or Lots (or a Unit or Units) within a subdivision with respect to which Administrative Agent has previously approved a Final Map, Borrower shall have delivered to Administrative Agent (i) a legal description of the portion of the Borrower Real Property to be released, (ii) a map or plat of the portion of the Borrower Real Property to be released, and (iii) copies of any easements for ingress, egress or otherwise to be granted or retained in connection with such release.

(d)    With respect to any Standard Release (but not PCI Releases), unless the portion of the Borrower Real Property to be released is an entire parcel with respect to which Administrative Agent has previously approved Final Map or is a lot or lots within a subdivision with respect to which Administrative Agent has previously approved a Final Map, prior to such release, (i) the remaining unreleased portion of the Borrower Real Property will, after giving effect to such release, have adequate access ingress and egress and will have access to and rights to any Amenities related to the applicable Project, in the reasonable opinion of Majority Lenders, and (ii) the value of the unreleased portion of the Project will, after giving effect to such release, not otherwise be materially impaired in the reasonable opinion of Majority Lenders. Majority Lenders shall have the right to approve any Standard Release, which approval will not be unreasonably withheld, provided however, that unless Majority Lenders have notified Borrower that Majority Lender's approval will be required prior to any Standard Release, Borrower shall proceed with Standard Releases without receiving Majority Lender's prior consent.

(e)    [Reserved].

(f)    Borrower shall pay all of Administrative Agent's reasonable costs and expenses, including reasonable attorneys' fees, arising in connection with each release.

(g)    Each release shall be made by Administrative Agent by delivery of the release documents to a title company or other escrow agent satisfactory to Majority Lenders upon such conditions as shall assure Administrative Agent that all conditions precedent to such release have been satisfied and that the applicable transaction will be completed.

(h)    In no event shall any transfer or conveyance be made of any Amenities (or land slated therefor) except a customary transfer to the homeowners association for the applicable Project, subject to Administrative Agent's reasonable approval.

8.02    STANDARD RELEASES.  In connection with and as conditions to any Standard Releases of any Borrower Real Property:

(a)    Borrower shall satisfy each of the conditions set forth in 8.01.

(b)    If requested by Administrative Agent, Borrower shall deliver to Administrative Agent a true and correct copy of the applicable Purchase Contracts.

(c)    The sale shall be made in the ordinary course of the development and marketing of the applicable Project, and shall be accompanied by such development covenants, conditions and restrictions, deeds of trust, and other documents, consistent with Borrower's past practices, as shall be necessary to assure that development of the Project occurs in accordance

94

with Borrower's development plans and existing Entitlements.

(d)    The transaction occurs through an escrow account over which Lender has a Control Agreement and Borrower then causes the net proceeds of such transfer to be placed in an account over which Lender has a Control Agreement or otherwise has a perfected first priority Lien on pursuant to the Interim Order (or the Final Order, when applicable) entered by the Bankruptcy Court.

8.03    DEDICATIONS. In connection with and as conditions to release of any Borrower Real Property as a Dedication:

(a)    Borrower shall satisfy each of the conditions set forth in Section 8.01.

(b)    At least ten (10) days prior to a release, Borrower shall have delivered to Administrative Agent all the terms, conditions and details of such release, including the purpose of such release, evidence of the conformity of such release to the overall development plan for the Project and all Entitlements required in connection therewith, all of which shall be in form and content reasonably satisfactory to Majority Lenders.

8.04    PERMITTED CONSTRUCTION INDEBTEDNESS. In connection with and as conditions to any PCI Release, the PCI Released Property must, concurrent with the release, become immediately subject to a deed of trust as security in favor of the Revolver Lender for Permitted Construction Indebtedness and:

(a)    Borrower shall satisfy the conditions set forth in Section 8.01.

(b)    Any PCI Released Property must consist only of (i) Finished Lots or Homes Under Construction (for which, all necessary Entitlements have been obtained and a Final Map has been recorded, so that Vertical Construction may commence or continue upon funding of the Permitted Construction Indebtedness), or (ii) Model Units in the same Phase or Project, and such Permitted Construction Indebtedness shall only encumber the relevant Finished Lots, Homes Under Construction or Model Units.

(c)    Borrower must concurrently with such release close and receive Permitted Construction Indebtedness as contemplated herein and the proceeds thereof, in accordance with the terms thereof shall be deposited directly into an account as to which Lenders have a Control Agreement in effect or otherwise has a perfected first priority Lien on pursuant to the Interim Order (or the Final Order, when applicable) entered by the Bankruptcy Court.

(d)    Borrower shall demonstrate its compliance with the Borrowing Base and all other Financial Covenants and Maximum Secured Indebtedness tests measured both before and after the release to the satisfaction of Administrative Agent.

(e)    At least 30 days before the PCI Release, Borrower has submitted a business plan for the development, construction, marketing and sale (including details of the proposed timing and amounts for construction, costs, expenditures, sales and revenues) for the PCI Released Property for review (but not approval) by the Lenders and any conditions and requirements of such Permitted Construction Indebtedness have been met (as of the time of the

95

requested PCI Release), and the loan documents evidencing such Permitted Construction Indebtedness (including minimum sales price) also shall have been so provided for review (but not approval) by the Lenders (within a reasonable time before the requested release).

(f)    If at any time all or any part of the PCI Released Property is released from the Lien of the Permitted Construction Indebtedness (other than in connection with a sale permitted under this Agreement and permitted under the Permitted Construction Indebtedness), Borrower shall in no event sell, transfer or further encumber the PCI Released Property, except with other Permitted Construction Indebtedness in compliance with this Section 8.04, the Borrower shall (i) ensure that all such remaining PCI Released Property is subject to a first priority security interest whether pursuant to the Interim Order (or the Final Order, when applicable) entered by the Bankruptcy Court or the Delivery of a Deed of Trust (together with a Title Policy insuring a first priority Lien in Administrative Agent in such PCI Released Property) for the benefit of Administrative Agent and the Lenders to secure the Loan Parties' Indebtedness and (ii) deliver such other documents, agreements, reports and instruments as may be reasonably required by Majority Lenders (which shall include a subordination agreement acceptable to them with respect to any PAPA Obligations).

(g)    Borrower shall have entered into binding documentation, for the Permitted Construction Indebtedness with the Revolver Lender, which Permitted Construction Indebtedness is secured solely by the PCI Released Property.

(h)    Borrower shall have used commercially reasonable efforts to cause the Revolver Lender of the applicable Permitted Construction Indebtedness to enter into an Intercreditor Agreement providing the Lenders with notice of any default (and opportunity to cure any default) by Borrower before any acceleration and/or to permit Lenders to purchase such loan from the Revolver Lender at par in such events in form and content reasonably acceptable to Majority Lenders.

## ARTICLE IX.
## EVENTS OF DEFAULT AND REMEDIES

9.01    DEFAULT.  Notwithstanding the provisions of section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court or any notice to Parent, Borrower or any of their respective Subsidiaries, but subject to the terms of the Interim Order and the Final Order, as applicable, any of the following shall constitute a Default:

(a)    Non-Payment.  Any Loan Party shall fail to pay (i) any principal of any Loan when the same becomes due or, (ii) any interest, fees or other amounts payable under the terms of this Agreement or any of the other Loan Documents within three (3) Business Days after the same becomes due; or

(b)    Specific Covenants. (i) Borrower fails to perform or observe any term, covenant or agreement contained in any of Section 6.05(a) and 6.17(b), Sections 7.07, 7.08, 7.10, 7.12, 7.15, 7.16, 7.17, 7.19, 7.20, 7.21, 7.23 or 7.25 or Article 8, or (ii) any Guarantor fails to perform or observe any term, covenant or agreement contained in Section 1 of the Unconditional Guaranty; or

(c)     Other Defaults. Any Loan Party fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after the earlier of the date a Responsible Officer of Borrower has knowledge of such failure or written notice thereof to Borrower from Administrative Agent or any Lender; or

(d)     Representations and Warranties. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(e)     [Reserved]; or

(f)     [Reserved]; or

(g)     [Reserved]; or

(h)     Judgments. There is entered against any member of the Consolidated Group (i) a final judgment or order for the payment of money in an aggregate amount exceeding the $10,000,000 (to the extent not covered by independent third-party insurance as to which the insurer does not dispute coverage), or (ii) any one or more non-monetary final judgments that have, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of thirty (30) consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect; or

(i)     ERISA. (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of Borrower or another member of the Consolidated Group under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $3,000,000, or (ii) Borrower or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $3,000,000; or

(j)     Invalidity of Loan Documents. Any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document;

(k)     Security Documents. Any Lien intended to be created by any Security Document shall at any time be invalidated, subordinated or otherwise cease to be in full force and effect, for whatever reason (except for Liens on Collateral not constituting Real Property to the extent that such non-Real Property Collateral has a fair market value of less than $100,000),

97

or any security interest purported to be created by any Security Document shall cease to be, or shall be asserted by any Loan Party in writing not to be, a valid, first priority (except as expressly otherwise provided in this Agreement or such Security Document) perfected Lien in the Collateral covered thereby (except for immaterial items of Collateral); or

(l)    [Reserved]; or

(m)    Indictment.  Borrower or any member of Key Management shall be indicted for a federal crime, a punishment for which could include the forfeiture of any of its assets which could reasonably be expected to result in a Material Adverse Effect; or

(n)    Guarantors.  Any Guarantor shall repudiate or purport to revoke the Unconditional Guaranty; or

(o)    Designated Person.  Any Loan Party shall become a Designated Person; or

(p)    [Reserved]; or

(q)    Prohibited Transfers.  The occurrence of any transfer, assignment or encumbrance in violation of the terms of the Interim Order or the Final Order, as applicable, or any provision of this Agreement (including Sections 6.17 or 7.06); or

(r)    [Reserved]; or

(s)    Applicable Budget.  At any time after the 13-week anniversary of the commencement of the Chapter 11 Cases, there is no Applicable 13-Week Budget that has been approved by the Lenders in accordance with Section 6.01(h) that is effective at such time; or

(t)    Change of Control.  There occurs any Change of Control; or

(u)    [Reserved]; or

(v)    Mandatory Transfers.  Failure of Borrower to cause any transfer of Real Property required under the terms of this Agreement to occur on the required date, including as set forth in Section 6.18 or 6.19; or

(w)    Pre-Petition Lenders.  The failure of the Loan Parties to make any payments to the Pre-Petition Lenders as provided in the Interim Order or the Final Order, as applicable; or

(x)    Conversion.  Conversion of any of the Chapter 11 Cases (other than the Chapter 11 Cases solely relating to a Non-Material Subsidiary) to a case under chapter 7 of the Bankruptcy Code; or

(y)    Trustee.  The appointment of a trustee in any of the Chapter 11 Cases (other than the Chapter 11 Cases solely relating to a Non-Material Subsidiary) without the consent of the Lenders; or

201670660 v15