# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| William Lyon Homes, et al.,[1] | : | |
| | : | Case No.  11-14019 (___) |
| Debtors. | : | |
| | : | |

---

## DISCLOSURE STATEMENT FOR
## THE PREPACKAGED JOINT PLAN OF REORGANIZATION FOR
## WILLIAM LYON HOMES, et al.

Dated:  November 17, 2011

PACHULSKI STANG ZIEHL & JONES LLP
Richard M. Pachulski (CA Bar No. 90073)
Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Joshua M. Fried (CA Bar No. 181541)
Shirley S. Cho (CA Bar No. 192616)
919 North Market Street, Seventeenth Floor
P.O.  Box 8705
Wilmington, Delaware  19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:      rpachulski@pszjlaw.com
               ljones@pszjlaw.com
               dbertenthal@pszjlaw.com
               jfried@pszjlaw.com
               scho@pszjlaw.com

Proposed Counsel to Debtors and Debtors in Possession

---

[1]The debtors and debtors in possession in these cases and the last four digits of their respective taxpayer identification numbers are as follows: (1) William Lyon Homes, a Delaware Corporation (4902); (2) William Lyon Homes, Inc., a California Corporation (3855); (3) Mountain Falls Golf Course, LLC (3291); (4) Mountain Falls, LLC (9631); (5) Circle G at the Church Farm North Joint Venture, LLC (1322); (6) Presley CMR, Inc. (3862); (7) William Lyon Southwest, Inc. (8474); (8) Sycamore CC, Inc. (1307); (9) PH-LP Ventures (9119); (10) PH Ventures – San Jose (5089); (11) HSP, Inc.  (6045); (12) PH Rielly Ventures (7710); (13) Lyon Waterfront, LLC (1928); (14) Lyon East Garrison Company I, LLC (5692); (15) WLH Enterprises (3333); (16) Duxford Financial, Inc.  (0824); and (17) California Equity Funding, Inc.  (0016); (18) Laguna Big Horn, LLC (2590); (19) Duxford Title Reinsurance Co.  (7859); (20) Presley Homes (5035); (21) Cerro Plata Associates, LLC (5090); (22) Whitney Ranch Village 5, LLC (5256); and (23) Duxford Insurance, LLC (8232).  The address for each of the Debtors, with the exception of Mountain Falls Golf Course LLC and Mountain Falls, LLC (4496 South Pecos Road, Las Vegas, NV 98121), Circle G at the Church Farm North Joint Venture, LLC (8840 East Chaparral Road, #200, Scottsdale, AZ 85250), William Lyon Southwest, Inc. (2 North Central Ave., #2200, Phoenix, AZ 85004-4406), Lyon Waterfront, LLC (2711 Centerville Rd., Suite 400, Wilmington, DE 19808), and Duxford Title Reinsurance Co.  (199 Main St, P.O.  Box 190 Burlington VT, 05401) is: 4490 Von Karman Avenue, Newport Beach, CA 92660.

# TABLE OF CONTENTS

**Page**

**ARTICLE I. EXECUTIVE SUMMARY** ...........................................................................**8**

A.    AN OVERVIEW OF THE CHAPTER 11 PROCESS..................................9

B.    SUMMARY OF THE PLAN ....................................................................10

C.    PURPOSE AND EFFECT OF THE PLAN ...............................................11

    1.    Plan of Reorganization Under Chapter 11 of the Bankruptcy Code ............................................................................11

    2.    Financial Restructurings in Connection With the Plan....................11

    3.    Plan Overview ................................................................................17

    4.    Who May Vote on the Plan ..............................................................18

    5.    Summary of Solicitation Package and Voting Instructions.............18

    6.    Voting Instructions Specific to Beneficial Holders of Class 7 Old Notes Claims Entitled to Vote on the Plan. ...........................20

    7.    Tabulation of Votes ........................................................................20

    8.    Confirmation of the Plan ................................................................21

    9.    Confirming and Consummating the Plan ........................................21

    10.    Rules of Interpretation ...................................................................22

    11.    The Voting Record Date.................................................................22

    12.    Other Restructuring Documents .....................................................22

    13.    Distribution of the Solicitation Package to Holders of Claims and Equity Interests Entitled to Vote on the Plan .............22

    14.    Distribution of Notices to Holders of Claims and Equity Interests in Non-Voting Classes and Holders of Disputed Claims ..........................................................................................23

    15.    Filing of the Plan Supplement ........................................................23

    16.    The Confirmation Hearing...............................................................24

    17.    The Deadline for Objecting to Confirmation of the Plan ................24

- i -

**Page**

| | | | |
|---|---|---|---|
| | **18.** | Notice Parties | 25 |
| | **19.** | Effect of Confirmation of the Plan | 25 |
| D. | | CONSUMMATION OF THE PLAN | 26 |
| E. | | RISK FACTORS | 26 |

**ARTICLE II. BACKGROUND TO THE CHAPTER 11 CASES** ....................... 26

| | | | |
|---|---|---|---|
| A. | | THE DEBTORS' CORPORATE HISTORY | 26 |
| B. | | OVERVIEW OF THE DEBTORS' BUSINESS | 28 |
| | 1. | Business Operations and Sales | 28 |
| | 2. | Marketing and Development Strategy | 29 |
| | 3. | Competition and Risk Management | 30 |
| C. | | OVERVIEW OF THE PREPETITION CAPITAL STRUCTURE | 31 |
| | 1. | Senior Credit Facility | 31 |
| | 2. | Old Notes | 33 |
| | 3. | Other Debt Financing | 34 |
| D. | | LITIGATION CLAIMS | 35 |
| E. | | EVENTS LEADING TO THE PROPOSAL OF PLAN AND POTENTIAL CHAPTER 11 FILING | 35 |
| | 1. | Prepetition Tem Loan Agreement Waivers; Other Debt Facilities; Indenture Default | 35 |
| | 2. | Evaluation of Strategic Alternatives; Restructuring Preparations | 36 |
| F. | | RESTRUCTURING SUPPORT AGREEMENTS | 38 |
| | 1. | Noteholders RSA | 38 |
| | 2. | Colony RSA | 41 |
| | 3. | Proposed DIP Financing and Use of Cash Collateral | 45 |
| | 4. | Employment of Advisors | 46 |

DOCS_SF:78843.3 93949-001

**Page**

      5.    First-Day Motions for Relief to Enable the Debtors to Continue Operating their Businesses ................................................. 46

G.    [INTENTIONALLY OMITTED] ................................................. 48

H.    REORGANIZATION STRATEGY ............................................... 48

      1.    Enhancing the Debtors' Business Operations................................... 48

      2.    Appropriate Capital Structure, Conversion of Debt and Rights Offering ................................................................................. 48

I.    EXCLUSIVE PERIOD FOR FILING A PLAN AND SOLICITING VOTES ..................................................................... 48

J.    DEADLINE TO ASSUME OR REJECT LEASES OF NONRESIDENTIAL REAL PROPERTY ................................... 49

K.    SUMMARY OF THE RIGHTS OFFERING ............................... 49

L.    SUMMARY OF THE TERMS OF NEW SECOND LIEN NOTES .......... 51

M.    SUMMARY OF THE PREFERRED SHARES ........................... 51

N.    SUMMARY OF THE RESTRUCTURED FIRST LIEN LOAN AGREEMENT ................................................................................. 51

O.    SUMMARY OF CERTAIN EMPLOYMENT AGREEMENTS ................ 52

P.    SUMMARY OF THE EQUITY CAPITALIZATION OF REORGANIZED PARENT ......................................................... 52

**ARTICLE III. SUMMARY OF THE PLAN ................................................. 53**

A.    ADMINISTRATIVE, DIP FACILITY AND PRIORITY TAX CLAIMS ....................................................................................... 53

      1.    Administrative Claims ................................................................... 53

      2.    DIP Facility Claims ....................................................................... 54

      3.    Priority Tax Claims........................................................................ 55

B.    CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS........................................ 55

      1.    Summary....................................................................................... 55

- iii -

**Page**

| | | | |
|---|---|---|---|
| | 2. | Classification and Treatment of Claims and Equity Interests | 56 |
| | 3. | Special Provision Governing Unimpaired Claims | 61 |
| | 4. | Discharge of Claims | 61 |
| C. | | ACCEPTANCE OR REJECTION OF THE PLAN | 62 |
| | 1. | Presumed Acceptance of Plan | 62 |
| | 2. | Presumed Rejection of Plan | 62 |
| | 3. | Voting Classes | 62 |
| | 4. | Acceptance by Impaired Classes of Claims | 62 |
| | 5. | Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code | 62 |
| D. | | MEANS FOR IMPLEMENTATION OF THE PLAN | 62 |
| | 1. | General Settlement of Claims | 62 |
| | 2. | Corporate Existence | 62 |
| | 3. | Vesting of Assets in the Reorganized Debtors | 63 |
| | 4. | Restructured First Lien Loan Agreement and Sources of Cash for Plan Distributions | 63 |
| | 5. | New Second Lien Notes and Class A Common Shares Issued Under the Plan | 63 |
| | 6. | New Class B Common Shares and Warrants Issued Under the Plan | 64 |
| | 7. | Rights Offering | 64 |
| | 8. | Management Incentive Plan | 66 |
| | 9. | Issuance of New Securities and Related Documentation | 66 |
| | 10. | Substantive Consolidation for Plan Purposes | 67 |
| | 11. | Release of Liens, Claims and Equity Interests | 67 |
| | 12. | Certificate of Incorporation and Bylaws | 67 |
| | 13. | Directors and Officers of Reorganized Parent | 68 |

- iv -

**Page**

14.     Corporate Action ........................................................ 68

15.     Cancellation of Notes, Certificates and Instruments ...................... 69

16.     Plan Supplement, Other Documents and Orders and Consents Required Under Noteholders RSA, Colony RSA and the Backstop Commitment Agreement ..................................... 70

E.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................................................................. 70

1.     Assumption and Rejection of Executory Contracts and Unexpired Leases.................................................................. 70

2.     Assignment of Executory Contracts or Unexpired Leases .............. 71

3.     Rejection of Executory Contracts or Unexpired Leases.................. 71

4.     Claims on Account of the Rejection of Executory Contracts or Unexpired Leases .................................................. 71

5.     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases................................................................. 72

6.     Assumption of Director and Officer Insurance Policies.................. 72

7.     Indemnification Provisions................................................. 72

8.     Compensation and Benefit Programs ............................................ 73

9.     Workers' Compensation Benefits................................................... 73

F.    PROVISIONS GOVERNING DISTRIBUTIONS ...................................... 73

1.     Dates of Distributions ...................................................... 73

2.     Distribution Agent .......................................................... 74

3.     Cash Distributions .......................................................... 74

4.     Rounding of Payments....................................................... 74

5.     Distributions on Account of Claims Allowed After the Effective Date ................................................................. 75

6.     General Distribution Procedures........................................... 75

7.     Address for Delivery of Distributions. ............................................ 75

DOCS_SF:78843.3 93949-001

**Page**

8.    Undeliverable Distributions and Unclaimed Property.................... 75

9.    Withholding Taxes........................................................................ 76

10.   Setoffs. ....................................................................................... 76

11.   Surrender of Cancelled Instruments or Securities ......................... 76

12.   Lost, Stolen, Mutilated or Destroyed Securities............................ 76

G.   PROCEDURES FOR RESOLVING CONTINGENT,
     UNLIQUIDATED AND DISPUTED CLAIMS ........................................ 77

1.    No Filing of Proofs of Claim ........................................................ 77

2.    Disputed Claims........................................................................... 77

3.    Procedures Regarding Disputed Claims ......................................... 77

4.    Allowance of Claims .................................................................... 78

H.   CONDITIONS PRECEDENT TO CONFIRMATION AND
     CONSUMMATION OF THE PLAN ..................................................... 79

1.    Conditions Precedent to Confirmation ........................................... 79

2.    Conditions Precedent to Consummation ......................................... 79

3.    Waiver of Conditions.................................................................... 80

4.    Effect of Non Occurrence of Conditions to Consummation ........... 81

I.   DEBTORS' RELEASES ..................................................................... 81

J.   RELEASE, INJUNCTION AND RELATED PROVISIONS.................... 81

1.    General........................................................................................ 81

2.    Release ........................................................................................ 82

K.   THIRD PARTY RELEASE ................................................................ 83

1.    Discharge of Claims ..................................................................... 84

2.    Exculpation .................................................................................. 84

3.    Preservation of Rights of Action ................................................... 84

4.    Injunction .................................................................................... 85

DOCS_SF:78843.3 93949-001

**Page**

L.    BINDING NATURE OF PLAN ................................................................. 85

M.    CONFIRMATION PROCEDURES ......................................................... 86

    1.    Confirmation Hearing ...................................................................... 86

    2.    Filing Objections to the Plan .......................................................... 86

N.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ............................................................................................ 86

    1.    Best Interests of Creditors Test/Liquidation Analysis .................... 87

    2.    Feasibility ........................................................................................ 88

    3.    Valuation .......................................................................................... 89

    4.    Summary Results of Valuation Analysis ......................................... 90

    5.    Acceptance by Impaired Classes ..................................................... 91

    6.    Confirmation Without Acceptance by Impaired Classes ................. 92

    7.    No Unfair Discrimination ................................................................ 92

    8.    Fair and Equitable Test .................................................................... 93

O.    CONSUMMATION OF THE PLAN ....................................................... 93

**ARTICLE IV. RISK FACTORS ................................................................................. 94**

A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS .......................... 94

    1.    Parties in Interest May Object to the Debtors' Classification of Claims and Equity Interests ......................................................... 94

    2.    The Debtors May Fail to Satisfy the Vote Requirement. ................. 94

    3.    The Debtors May Not Be Able to Secure Confirmation of the Plan. ........................................................................................... 94

    4.    Non-Consensual Confirmation of the Plan May Be Necessary. ......................................................................................... 95

    5.    The Debtors May Object to the Amount or Classification of a Claim or Equity Interest. ............................................................. 95

DOCS_SF:78843.3 93949-001

**Page**

6.    Risks of Not Obtaining the Rights Offering Purchase Price and of the Termination of the Backstop Commitment Agreement; Risks of Not Obtaining the Class B Common Stock Purchase Price ........................................................ 96

7.    The Effective Date May Not Occur. ............................................... 96

8.    Contingencies Will Not Affect Validity of Votes of Impaired Classes to Accept or Reject the Plan. ............................... 96

9.    The Debtors May Default Under the DIP Facility ........................... 96

10.    The Restructuring Support Agreements May Terminate ................. 96

B.    RISK FACTORS THAT MAY AFFECT THE VALUE OF SECURITIES TO BE ISSUED UNDER THE PLAN AND/OR RECOVERIES UNDER THE PLAN .......................................................... 97

1.    There May Be a Lack of a Trading Market for the Class C Common Shares or the Preferred Shares. ....................................... 97

2.    To Service the Reorganized Debtors' Indebtedness and to Meet Their Operational Needs, the Reorganized Debtors Will Require a Significant Amount of Cash. Their Ability to Generate Cash Depends on Many Factors Beyond Their Control. ...................................................................................... 97

3.    The Estimated Valuation of the Reorganized Debtors and the New Capital Stock and the Estimated Recoveries to Holders of Allowed Claims and Equity Interests Are Not Intended to Represent the Private or Public Sale Values of the New Capital Stock. .................................................................. 98

4.    The Holders of the Old Notes May Control Reorganized Parent. ........................................................................................ 98

5.    The Issuance of Equity Interests to Reorganized Parent's Management May Dilute the Equity Ownership Interest of Other Holders of the New Capital Stock. ........................................ 98

6.    It is Unlikely That Reorganized Parent Will Pay Dividends in the Foreseeable Future. ............................................................ 98

7.    Tax Implications of the Plan. ........................................................ 99

C.    MARKET AND ECONOMIC RISKS ...................................................... 99

DOCS_SF:78843.3 93949-001

**Page**

1.      Adverse Changes in General Economic Conditions Could Reduce the Demand for Homes and, as a Result, Could Negatively Impact the Company's Results of Operations..............99

2.      Revenues and Margins May Continue to Decrease, and Results of Operations May Be Adversely Affected, as a Result of Declines in Demand for Housing and Other Changes in Economic and Business Conditions............................99

3.      Increases in the Company's Cancellation Rate Could Have a Negative Impact on the Company's Home Sales Revenue and Home Building Gross Margins. .............................................100

4.      Disruptions in the Financial and Credit Markets Could Adversely Affect Demand for the Company's Products or Access to Capital. ........................................................................100

5.      Interest Rates and the Unavailability of Mortgage Financing Can Adversely Affect Demand for Housing. ...............101

6.      Financial Condition and Results of Operations May Be Adversely Affected by any Decrease in the Value of Land Inventory, as Well as by the Associated Carrying Costs..............101

D.      RISKS RELATED TO THE COMPANY'S INDEBTEDNESS ..............102

1.      The Company's High Level of Indebtedness Could Adversely Affect its Financial Condition and Prevent it From Fulfilling its Obligations. ....................................................102

2.      Difficulty in Obtaining Sufficient Capital Could Result in Increased Costs and Delays in Completion of Projects. ................103

3.      The Restructured First Lien Loan Agreement and the New Second Lien Notes Indenture Will Impose Significant Operating and Financial Restrictions, Which May Prevent the Reorganized Debtors From Capitalizing on Business Opportunities and Taking Some Corporate Actions......................103

4.      Potential Future Downgrades of the Company's Credit Ratings Could Adversely Affect the Company's Access to Capital and Could Otherwise Have a Material Adverse Effect on the Company. ...............................................................104

E.      OPERATIONAL RISKS ........................................................................104

**Page**

1.  If Land Is Not Available at Reasonable Prices, the Company's Home Sales Revenue and Results of Operations Could Be Negatively Impacted and/or the Company Could Be Required to Scale Back the Company's Operations in a Given Market.........................................104

2.  Adverse Weather and Geological Conditions May Increase Costs, Cause Project Delays and Reduce Consumer Demand for Housing, All of Which Would Adversely Affect the Company's Results of Operations and Prospects.........105

3.  The Company's Business is Geographically Concentrated, and Sales, Results of Operations, Financial Condition and Business Would Be Negatively Impacted by a Decline in Regional Economies. ................................................105

4.  The Company May Not Be Able to Compete Effectively Against Competitors in the Homebuilding Industry......................106

5.  The Company's Operating Results are Variable. ...........................106

6.  The Company's Success Depends on Key Executive Officers and Personnel.................................................................106

7.  Construction Defect, Soil Subsidence and Other Building-Related Claims May Be Asserted Against the Company, and the Company May Be Subject to Liability for Such Claims. ............................................................................107

8.  Utility Shortages or Price Increases Could Have an Adverse Impact on Operations.................................................107

9.  The Company's Business and Results of Operations Are Dependent on the Availability and Skill of Subcontractors. .........107

10. Increased Insurance Costs and Reduced Insurance Coverages May Affect the Company's Results of Operations and Increase the Potential Exposure to Liability.........108

11. The Company Conducts Certain of its Operations Through Unconsolidated Joint Ventures With Independent Third Parties in Which the Company Does Not Have a Controlling Interest, and the Company May Be Adversely Impacted by Joint Venture Partners' Failure to Fulfill Their Obligations.................................................................108

DOCS_SF:78843.3 93949-001

**Page**

12.    The Company Is the General Partner in Partnership Joint Ventures and May Be Liable for Joint Venture Obligations. ........ 108

13.    Supply and Labor Shortages and Other Risks Could Increase Costs and Delay Completion. ........................................... 108

14.    The Company is Subject to Changes in the Demand for Construction Projects. .................................................................... 109

15.    The Timing and Funding of Contracts and Other Factors Could Lead to Unpredictable Operating Results. ........................... 109

F.    REGULATORY RISKS .......................................................................... 109

1.    Governmental Laws and Regulations May Increase the Company's Expenses, Limit the Number of Homes That the Company Can Build or Delay Completion of Projects............ 109

2.    The Company is Subject to Environmental Laws and Regulations, Which May Increase Costs, Limit the Areas in Which the Company Can Build Homes and Delay Completion of Projects. ................................................................. 109

G.    OTHER RISKS....................................................................................... 110

1.    The Company May Not Be Able to Benefit From Net Operating Loss Carry Forwards..................................................... 110

2.    Future Terrorist Attacks Against the United States or Increased Domestic or International Instability Could Have an Adverse Effect on the Company's Operations.......................... 110

H.    RISKS ASSOCIATED WITH FORWARD LOOKING STATEMENTS ...................................................................................... 110

1.    The Financial Information Contained Herein Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit was Performed. ................................................. 110

2.    Financial Projections and Other Forward Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary. ................................................................................. 110

I.    DISCLOSURE STATEMENT DISCLAIMER ...................................... 111

DOCS_SF:78843.3 93949-001

**Page**

1.  The Information Contained Herein Is for Soliciting Votes Only. .................................................................................111

2.  This Disclosure Statement was Not Approved by the Securities and Exchange Commission..............................111

3.  The Debtors Relied on Certain Exemptions From Registration Under the Securities Act. ..........................111

4.  This Disclosure Statement Contains Forward Looking Statements.......................................................................112

5.  No Legal or Tax Advice Is Provided to You by This Disclosure Statement. ................................................112

6.  No Admissions Are Made by This Disclosure Statement. ...........112

7.  No Reliance Should Be Placed on Any Failure to Identify Litigation Claims or Projected Objections. ...................113

8.  Nothing Herein Constitutes a Waiver of Any Right to Object to Claims or Equity Interests or Recover Transfers and Assets. ..........................................................................113

9.  The Information Used Herein was Provided by the Debtors and was Relied Upon by the Debtors' Advisors...........................113

10. The Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.......................................................113

11. No Representations Made Outside the Disclosure Statement Are Authorized. ..................................................113

ARTICLE V. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN.............................................114

A.  LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE ..........................................................................114

B.  FILING OF AN ALTERNATIVE PLAN OF REORGANIZATION.......................................................114

ARTICLE VI. EXEMPTIONS FROM SECURITIES ACT REGISTRATION .........................................................115

A.  SECTION 1145 OF THE BANKRUPTCY CODE AND SECTION 4(2) OF THE SECURITIES ACT ...........................115

DOCS_SF:78843.3 93949-001

**Page**

1.   Securities Issued in Reliance on Section 1145 of the
     Bankruptcy Code ...................................................................... 115

2.   Securities to be Issued in Reliance on Section 4(2) of the
     Securities Act ............................................................................ 116

3.   Resales of New Common Stock .................................................. 116

4.   Section 3(a)(9) of the Securities Act ......................................... 116

5.   Rule 144 .................................................................................... 117

**ARTICLE VII. SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX
CONSEQUENCES OF THE PLAN** ................................................................. 118

A.   DEFINITION OF U.S. PERSON AND NON-U.S. PERSON .................. 119

B.   TAX CONSEQUENCES FOR U.S. PERSONS HOLDING
     ALLOWED OLD NOTES CLAIMS ...................................................... 120

     1.   Distributions in Discharge of Accrued Interest ............................ 120

     2.   Exchange of Old Notes Claims for New Second Lien Notes
          and Class A Common Shares ...................................................... 120

     3.   The Rights Offering .................................................................... 123

     4.   Tax Consequences for U.S. Person Holding of Stock of
          Reorganized Parent .................................................................... 123

     5.   Backup Withholding .................................................................... 124

C.   TAX CONSEQUENCES FOR NON-U.S. PERSONS HOLDING
     ALLOWED OLD NOTES CLAIMS ...................................................... 125

     1.   Non-U.S. Person's Exchange of Old Notes Claims for New
          Second Lien Notes and Class A Common Shares ......................... 125

     2.   Interest ...................................................................................... 126

     3.   Non-U.S. Person's Sale, Exchange, or Redemption of New
          Second Lien Notes ...................................................................... 127

     4.   Non-U.S. Person Holding New Common Stock or
          Preferred Shares ......................................................................... 128

D.   TAX CONSEQUENCES FOR THE DEBTORS AND THE
     REORGANIZED DEBTORS .............................................................. 131

DOCS_SF:78843.3 93949-001

**Page**

**1.**   Cancellation of Debt ................................................................ 131

**2.**   Net Operating Losses ................................................................ 132

**3.**   Section 382 Limitation ............................................................ 132

**4.**   Alternative Minimum Tax ........................................................ 133

E.    GENERAL DISCLAIMER ................................................................ 133

**ARTICLE VIII. RECOMMENDATION** .................................................................**134**

DOCS_SF:78843.3 93949-001

William Lyon Homes and its debtor affiliates (collectively, the "Debtors" or the "Company")[1] are sending you this document and the accompanying materials (the "Disclosure Statement") because you are a creditor or equity interest holder entitled to vote to approve the *Prepackaged Joint Plan of Reorganization of William Lyon Homes, et al., Under Chapter 11 of the Bankruptcy Code*, dated November 17, 2011, as the same may be amended from time to time (the "Plan"). The Company is commencing this solicitation of your vote to approve the Plan (the "Solicitation") before the Company files voluntary cases under chapter 11 of the United States Bankruptcy Code, as amended (the "Bankruptcy Code").

The Debtors have not commenced reorganization cases under chapter 11 of the Bankruptcy Code as of the date of this Disclosure Statement. If, however, the Debtors receive properly completed ballots indicating acceptances of the Plan, to meet the voting requirements prescribed by section 1126 of the Bankruptcy Code, the Debtors intend to file (but hereby expressly reserve the right not to file) with a United States Bankruptcy Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"), and to seek, as promptly thereafter as practicable, confirmation of the Plan. Because the Chapter 11 Cases have not yet been commenced, this Disclosure Statement has not been approved by the Bankruptcy Court as containing "adequate information" within the meaning of section 1125(a) of the Bankruptcy Code. If the Debtors file the Chapter 11 Cases, they will seek in an order of the Bankruptcy Court (a) approving this Disclosure Statement as having contained "adequate information," (b) approving the Solicitation as having been in compliance with section 1126(b) of the Bankruptcy Code, and (c) confirming the Plan. The Bankruptcy Court may order additional disclosures. Notwithstanding anything to the contrary herein, the Debtors reserve the right to pursue Confirmation of the Plan through any alternative means.

---

THE VOTING DEADLINE IS 5:00 P.M. PREVAILING EASTERN TIME ON
DECEMBER 16, 2011
(UNLESS THE DEBTORS EXTEND THE VOTING DEADLINE).

TO BE COUNTED AS A VOTE TO ACCEPT OR REJECT THE PLAN, THE VOTING AGENT MUST ACTUALLY RECEIVE YOUR BALLOT, PRE-VALIDATED BENEFICIAL HOLDER BALLOT OR MASTER BALLOT, AS APPLICABLE, ON OR BEFORE THE VOTING DEADLINE.

BENEFICIAL HOLDERS RECEIVING BENEFICIAL HOLDER BALLOTS THAT ARE NOT PRE-VALIDATED MUST RETURN SUCH BENEFICIAL HOLDER BALLOTS TO THEIR RESPECTIVE INTERMEDIARY RECORD OWNERS AS SOON AS POSSIBLE TO ALLOW SUFFICIENT TIME FOR INTERMEDIARY RECORD OWNERS TO VALIDATE AND INCLUDE THEIR VOTES ON A MASTER BALLOT AND RETURN SUCH MASTER BALLOTS TO THE VOTING AGENT ON OR BEFORE THE VOTING DEADLINE.

---

DOCS_SF:78843.3 93949-001

---

**IMPORTANT INFORMATION FOR YOU TO READ**

---

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT HAS NOT BEEN NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS, PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE VALUE OF THE PROPERTY DISTRIBUTED TO HOLDERS OF ALLOWED CLAIMS OR EQUITY INTERESTS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016 AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED TO CREDITORS AND EQUITY INTEREST HOLDERS WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"). OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW, AND WILL INSTEAD RELY UPON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE, SECTION 4(2) OF THE SECURITIES ACT AND/OR OTHER APPLICABLE EXEMPTIONS. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY SECURITIES PURSUANT TO THE PLAN CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE TRANSFERABILITY OF ANY SUCH SECURITIES.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT.  THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURES CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

PACHULSKI STANG ZIEHL & JONES LLP ("PSZ&J") IS GENERAL INSOLVENCY COUNSEL TO THE DEBTORS AND IRELL & MANELLA LLP ("IRELL") IS SPECIAL COUNSEL TO THE DEBTORS.  PSZ&J AND IRELL HAVE RELIED UPON INFORMATION PROVIDED BY THE DEBTORS IN CONNECTION WITH PREPARATION OF THIS DISCLOSURE STATEMENT. PSZ&J HAS NOT INDEPENDENTLY VERIFIED THE INFORMATION CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER.  RATHER, THIS DISCLOSURE STATEMENT SHALL CONSTITUTE A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO POTENTIAL CONTESTED MATTERS, POTENTIAL ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM OR EQUITY INTEREST IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT.  EXCEPT AS PROVIDED UNDER THE PLAN, THE DEBTORS OR THE REORGANIZED DEBTORS MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND CAUSES OF ACTION AND MAY OBJECT TO CLAIMS OR EQUITY INTERESTS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR EQUITY INTERESTS OR OBJECTIONS TO CLAIMS OR EQUITY INTERESTS ON THE TERMS SPECIFIED IN THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.  IN THE EVENT OF ANY CONFLICT, INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN AND CONTROL FOR ALL PURPOSES. EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT

- 4 -

HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTORS' MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED (UNLESS EXPRESSLY PROVIDED HEREIN).

THE DEBTORS ARE GENERALLY MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF WHERE FEASIBLE, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DISCLOSURE STATEMENT WAS SENT. THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

HOLDERS OF CLAIMS AND EQUITY INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. IMPORTANTLY, PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST IN A VOTING CLASS SHOULD REVIEW THE PLAN IN ITS ENTIRETY AND CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS HERETO, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL IN SECTION IV HEREIN, "RISK FACTORS."

THE DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M. (EASTERN STANDARD TIME) ON DECEMBER 16, 2011, UNLESS EXTENDED BY THE DEBTORS IN THEIR DISCRETION.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF INTERESTS IN, THE DEBTORS WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

NOTWITHSTANDING ANY RIGHTS OF APPROVAL, PURSUANT TO THE NOTEHOLDERS RSA, THE COLONY RSA, THE BACKSTOP COMMITMENT AGREEMENT OR OTHERWISE, AS TO THE FORM OR

- 5 -

SUBSTANCE OF THIS DISCLOSURE STATEMENT, THE PLAN OR ANY OTHER DOCUMENT RELATING TO THE TRANSACTIONS CONTEMPLATED THEREUNDER, NEITHER THE PREPETITION SECURED LENDERS, THE PREPETITION AGENT, THE AD HOC COMMITTEE, THE BACKSTOP INVESTORS NOR THEIR RESPECTIVE REPRESENTATIVES, MEMBERS, FINANCIAL OR LEGAL ADVISORS OR AGENTS, HAS INDEPENDENTLY VERIFIED THE INFORMATION CONTAINED HEREIN OR TAKES ANY RESPONSIBILITY THEREFOR  AND NONE OF THE FOREGOING ENTITIES OR PERSONS MAKES ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER CONCERNING THE INFORMATION CONTAINED HEREIN.

DOCS_SF:78843.3 93949-001

## SCHEDULES

SCHEDULE 1– The Debtors

## EXHIBITS

EXHIBIT A – Plan of Reorganization

EXHIBIT B – Organizational Chart of the Debtors

EXHIBIT C – The Reorganized Debtors' Financial Projections

EXHIBIT D – Historical Financial Statements

EXHIBIT E – Liquidation Analysis

EXHIBIT F – Principal Terms of the New Second Lien Notes

| |
|---|
| THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN. |

DOCS_SF:78843.3 93949-001

# ARTICLE I.
## EXECUTIVE SUMMARY

William Lyon Homes, a Delaware corporation ("DE Lyon" or the "Parent"), William Lyon Homes, Inc., a California corporation ("CA Lyon") and a wholly-owned subsidiary of the Parent, and each of the other debtors listed on Schedule 1 hereto (collectively, the "Debtors" or the "Company"), submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code in connection with the solicitation of votes on the *Prepackaged Joint Plan of Reorganization for William Lyon Homes, et al.* dated November 17, 2011 (the "Plan"),[2] which the Debtors intend to file with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). A copy of the Plan is attached hereto as **Exhibit A**.

This Executive Summary is being provided as an overview of the material items addressed in the Disclosure Statement and the Plan, which is qualified by reference to the entire Disclosure Statement and by the actual terms of the Plan (and including all exhibits attached hereto and to the Plan), and should not be relied upon for a comprehensive discussion of the Disclosure Statement and/or the Plan. Prior to soliciting votes on a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance or rejection of the plan of reorganization. As such, this Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code. This Disclosure Statement includes, without limitation, information about:

- the Debtors' prepetition operating and financial history;

- the events leading up to the solicitation of the Plan;

- the significant events that have occurred up to the solicitation of the Plan;

- the solicitation procedures for voting on the Plan;

- the Confirmation process and the voting procedures that Holders of Claims who are entitled to vote on the Plan must follow for their votes to be counted;

- the terms and provisions of the Plan, including certain effects of Confirmation of the Plan, certain risk factors relating to the Debtors or the Reorganized Debtors, the Plan and the securities to be issued under the Plan and the manner in which distributions will be made under the Plan; and

- the proposed organization, operations and financing of the Reorganized Debtors if the Plan is confirmed and becomes effective.

The Plan contemplates deemed substantive consolidation of the Debtors for voting and Plan distribution purposes only with respect to the Claims. If, however, the Plan cannot be confirmed as to some or all of the Debtors, then, in the Debtors' sole discretion, but without

---

[2] All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan. To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan arc inconsistent, the definition included in the Plan shall control and govern.

- 8 -

prejudice to the respective parties' rights under the Colony RSA, the Noteholders RSA, or the Backstop Commitment Agreement, (a) the Plan may be revoked as to all of the Debtors, or (b) the Debtors may revoke the Plan as to any Debtor (and any such Debtor's Chapter 11 Case may be converted to a chapter 7 liquidation, continued or dismissed in the Debtors' sole discretion) and confirm the Plan as to the remaining Debtors to the extent required. The Debtors reserve the right to seek confirmation of the Plan pursuant to the "cram down" provisions contained in section 1129(b) of the Bankruptcy Code with respect to any non-accepting Class of Claims.

In connection with developing the Plan, the Company reviewed its current business operations and compared its prospects as an ongoing business enterprise with the estimated recoveries in various liquidation scenarios. As a result, the Company concluded that the Company's enterprise value would be maximized by continuing to operate as a going concern. The Company believes that its businesses and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part. Consistent with the liquidation analysis described herein, the value of the Company's assets would be considerably greater if the Company operates as a going concern instead of liquidating. Moreover, the Company believes that any alternative to Confirmation of the Plan, such as an out-of-court restructuring, liquidation, or attempts by another party in interest to file a plan of reorganization, would result in significant delays, litigation, and additional costs, and ultimately would diminish the Company's enterprise value. Accordingly, the Company strongly recommends that you vote to accept the Plan if you are entitled to vote.

## A.     AN OVERVIEW OF THE CHAPTER 11 PROCESS

Chapter 11 is the principal business reorganization Chapter of the Bankruptcy Code. Pursuant to Chapter 11 of the Bankruptcy Code, a debtor may remain in possession of its assets and business and attempt to reorganize its business for the benefit of such debtor, its creditors and other parties in interest.

The commencement of a reorganization case creates an estate comprising all the legal and equitable interests of a debtor in property as of the date the bankruptcy petition is filed. Sections 1107 and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession," unless the bankruptcy court orders the appointment of a trustee. The filing of a bankruptcy petition also triggers the automatic stay provisions of section 362 of the Bankruptcy Code which provide, among other things, for an automatic stay of all attempts to collect prepetition claims from a debtor or otherwise interfere with its property or business. Except as otherwise ordered by the bankruptcy court, the automatic stay generally remains in full force and effect until the effective date of a plan of reorganization, following confirmation of such plan of reorganization.

The Bankruptcy Code provides that upon commencement of a Chapter 11 bankruptcy case, the Office of the United States Trustee may appoint a committee of unsecured creditors and may, in its discretion, appoint additional committees of creditors or of equity interest holders if necessary to assure adequate representation.

Upon the commencement of a Chapter 11 bankruptcy case, all creditors and equity interest holders have standing to be heard on any issue in the Chapter 11 proceedings pursuant to section 1109(b) of the Bankruptcy Code.

The formulation and confirmation of a plan of reorganization is the principal objective of a Chapter 11 case. The plan of reorganization sets forth the means of satisfying the claims against and equity interests in the debtor.

- 9 -

A "prepackaged" plan of reorganization is one in which a debtor seeks approval of a plan of reorganization from affected creditors before filing for bankruptcy. Because solicitation of acceptances takes place before the bankruptcy filing, the amount of time required for the bankruptcy case is often less than in conventional bankruptcy cases. Greater certainty of results and reduced costs are other benefits generally associated with prepackaged bankruptcy cases.

**B.    SUMMARY OF THE PLAN**

After several weeks of active and arm's-length negotiations, the Company, in consultation with its advisors, reached prepetition agreements in principle with the Prepetition Secured Lenders and the Ad Hoc Noteholders Group, representing a substantial majority by principal amount of the Holders of Old Notes Claims, on a prepackaged restructuring plan, including the key terms of the Restructured First Lien Loan Agreement, distributions under the Plan to Holders of Old Notes Claims, and the treatment of general unsecured claims. The Company believes that the prepackaged restructuring plan is the best restructuring alternative reasonably available to the Company. The Company has also secured commitments for new capital investments aggregating $85 million, consisting of a commitment for an equity investment of $60 million in Cash, to be consummated pursuant to the Rights Offering, on the terms set forth in the Backstop Commitment Agreement, and an additional commitment for $25 million pursuant to the Class B Common Stock Purchase Commitment Agreement, in the form of Cash or a combination of Cash and membership interests in certain limited liability companies that hold real property to be provided by the Company's current equity owners. The Company plans to utilize to the proceeds of these investments to fund its working capital requirements. The Company believes that the Backstop Commitment Agreement and the Class B Common Stock Commitment Agreement represent the best terms for equity financing available to the Company in this market.

The Plan represents a significant achievement for the Company and should greatly enhance the Company's ability to reorganize successfully and expeditiously through the addition of $85 million of new equity capital pursuant to the Rights Offering and Class B Common Stock Purchase Commitment Agreement. The Plan will also provide an efficient restructuring through the prepackaged process, designed to minimize disruption to the Company's business endeavors, stabilize the Company's balance sheet, and provide a platform for renewed success. Through confirmation of the Plan implementing the terms of the pre-packaged restructuring, the Company will restructure and substantially deleverage its balance sheet; reduce its cash interest expense to a level that is aligned with its expected future cash flows; retain additional flexibility to invest in growth initiatives to maximize enterprise value; and maintain favorable pricing to the Company under the Prepetition Secured Loan Agreement. The Company also will improve its liquidity position from its operations during the forecasted period. For all of these reasons, the Company believes that it will have sufficient liquidity during the course of the Chapter 11 Cases and will be well-positioned going forward.

As of September 30, 2011, the Debtors had outstanding debt having a principal amount of approximately $509.8 million. Upon emergence from chapter 11, the Reorganized Debtors expect to have outstanding debt of approximately $327.8 million. Accordingly, the Reorganized Debtors will have a significantly deleveraged and improved balance sheet and a more appropriate capital structure.

Pursuant to the Noteholders RSA, subject to the terms and conditions set forth therein, the Debtors have obtained the agreement of holders of approximately 63.5% in principal amount of the Old Notes to vote in support of the Plan. Pursuant to the Colony RSA, subject to the terms and conditions set forth therein, the Debtors have obtained the agreement of 100% of the Prepetition Secured Lenders under the Prepetition Secured Loan Agreement to vote in support of the Plan. The Noteholders RSA and the Colony RSA are both conditioned on, among other

- 10 -

things, consummation of the Rights Offering as contemplated by the Backstop Commitment Agreement and the equity purchase consummated as contemplated by the Class B Common Stock Purchase Commitment Agreement. After extensive efforts through their financial advisors to seek capital in various forms from a wide variety of market segments, the Debtors had few viable alternatives for equity or subordinated debt capital and are proceeding with the Rights Offering as a funding mechanism because, among other reasons, they believe it is the most advantageous offer available. The Debtors are restricting participation in the Rights Offering as a private placement to accredited investors already familiar with the Company to comply with applicable securities laws and to facilitate an efficient transaction with sophisticated parties that will meet the Debtors' liquidity and timing concerns. Accordingly, participation in the Rights Offering is being offered only to a limited number of institutional purchasers for Cash, in compliance with applicable securities laws, and not in exchange for any outstanding securities or as a treatment on account of any Claims. The Debtors have concluded that applicable securities laws prevent them from making a general offering to Holders of Old Notes of the opportunity to participate in the Rights Offering. However, any holder of an Old Notes Claim who is an "accredited investor" and who wishes to participate in the Rights Offering, but is not eligible because it does not hold at least $500,000 in outstanding principal amount of Old Notes, may attempt to acquire additional Old Notes prior to the Rights Offering Record Date to qualify to participate in the Rights Offering. Similarly, any holder of an Old Notes Claim who would not be an Eligible Participant may attempt to sell its Old Notes prior to the Rights Offering Record Date to a purchaser that wishes to qualify as an Eligible Participant.

## C.    PURPOSE AND EFFECT OF THE PLAN

### 1.    Plan of Reorganization Under Chapter 11 of the Bankruptcy Code

The Debtors are reorganizing pursuant to Chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code. As a result, the confirmation of the Plan means that the Reorganized Debtors will continue to operate their businesses going forward and does not mean that the Debtors will be liquidated or forced to go out of business. Additionally, as discussed in greater detail in Section IV.J herein, titled "Binding Nature of the Plan," a bankruptcy court's confirmation of a plan binds the debtor, any entity acquiring property under the plan, any holder of a claim or an equity interest in a debtor and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code to the terms and conditions of the confirmed plan, whether or not such Entity voted on the plan or affirmatively voted to reject the plan.

### 2.    Financial Restructurings in Connection With the Plan

The Plan contemplates certain transactions, including, without limitation, the following transactions (described in greater detail in Section IV herein):

- Holders of CA Lyon's approximately $299.5 million of Old Notes Claims will receive in the aggregate, on account of their Class 7 Claims, (a) $75 million of new 12% (8% cash interest) second lien notes due 2017 of Reorganized CA Lyon (the "New Second Lien Notes"), and (b) shares of new Class A Common Stock of Reorganized Parent (the "Class A Common Shares") initially representing 28.5% of the New Capital Stock of Reorganized Parent (assuming the conversion of the Preferred Shares, as defined below). The New Second Lien Notes and Class A Common Shares will be distributed to the holders of Old Notes Claims on a Pro Rata basis. The percentage ownership represented by the Class A Common Shares of Reorganized Parent will be subject to dilution, including dilution for (i) exercise of the Warrants, and (ii) the issuance of shares of new Class D Common

- 11 -

Stock ("Class D Common Shares") of Reorganized Parent pursuant to the Management Incentive Plan;

- Reorganized Parent will issue new Class C Common Stock ("Class C Common Shares") and shares of convertible preferred stock ("Preferred Shares") convertible on a one to one basis into additional Class C Common Shares, together representing initially (on an as-converted basis) 49.5% of the New Capital Stock of Reorganized Parent, pursuant to the Rights Offering for an aggregate Cash purchase price of $60 million (the "Rights Offering Purchase Price"), and Class C Common Shares representing an additional 2.0% of the New Capital Stock of Reorganized Parent on an as-converted basis on account of the Backstop Fee. The percentage ownership represented by the Preferred Shares and the Class C Common Shares of Reorganized Parent will be subject to dilution, including dilution for (i) exercise of the Warrants, and (ii) the issuance of shares of Class D Common Shares pursuant to the Management Incentive Plan. As described below, the Debtors intend to offer all holders of the Old Notes who are Eligible Participants the opportunity to participate in the Rights Offering. However, it is possible that the Debtors will be unable to obtain sufficient commitments from the Eligible Participants to purchase all of the Rights Offering Securities for the full Rights Offering Purchase Price. Accordingly, to ensure the successful consummation of the Rights Offering, and the receipt by the Company of the Rights Offering Purchase Price in Cash, subject to entry of the Rights Offering Approval Order by the Bankruptcy Court, the Backstop Investors have agreed to "backstop" the Rights Offering and to purchase any and all of the Preferred Shares and Class C Common Shares that are not subscribed upon the subscription expiration date. The Backstop Investors are those certain parties signatories to the Backstop Commitment Agreement, their respective affiliates, or any permitted assignee under the Backstop Commitment Agreement;

- Class B Purchasers will also purchase in the aggregate (a) shares of the new Class B Common Stock of Reorganized Parent ("Class B Common Shares") initially representing 20.0% of the New Capital Stock of Reorganized Parent, and (b) Warrants with a five-year term exerciseable at an exercise price based on a $325 million equity value of Reorganized Parent, into Class B Common Shares initially representing 9.1% of the New Capital Stock of Reorganized Parent, for a combined purchase price (the "Class B Common Stock Purchase Price") equal to $25 million in the form of Cash or, if Class B Purchasers finance the exercise of an option to purchase of 100% of the membership interests in the limited liability company that owns the rights to certain properties in Rancho Mission Viejo, California, in the form of a combination of Cash and the membership interests purchased under such option. The percentage ownership represented by the Class B Common Shares issued pursuant to the Class B Common Stock Purchase Commitment Agreement is subject to dilution, including dilution for (i) the exercise of the Warrants, and (ii) the issuance of Class D Common Shares pursuant to the Management Incentive Plan, and the percentage ownership represented by the Warrants is subject to dilution, including dilution for the issuance of Class D Common Shares pursuant to the Management Incentive Plan;

- Reorganized Parent will adopt and implement the Management Incentive Plan, which would, subject to certain terms and conditions, provide for, the issuance of up to 8% of the New Capital Stock of the Reorganized Parent to key executives of the Company, with the first 4% subject to a split of 50% in the form of restricted Class D Common Shares and 50% in the form of stock options to purchase

- 12 -

additional Class D Common Shares to be issued on the Effective Date, and the remaining 4% to be issued at the discretion of the New Board;

- CA Lyon will restructure the Prepetition Secured Loan Agreement Claims by entering into a Restructured First Lien Loan Agreement in an initial principal amount equal to $235 million, bearing interest at the rate of 10¼% per annum, and maturing on the earlier to occur of the third anniversary of the "Closing Date" (as defined in the Colony Restructuring Term Sheet), or January 31, 2015;

- On the Effective Date, each Holder of an Allowed Prepetition Secured Loan Agreement Claim shall be a "Lender" under the Restructured First Lien Loan Agreement with all of the rights set forth therein in full satisfaction, settlement, discharge, and release of, and in exchange for, such Claim;

- each Holder of a Prepetition Project Loan Agreement claim will be satisfied in full by entering into a consensual Restructured Project Loan Agreement with the applicable Reorganized Debtors or pursuant to such alternative treatment as provided under the Plan;

- the obligations under the DIP Facility will be satisfied in full in Cash or in a manner satisfactory to the DIP Lenders on the Effective Date;

- unsecured creditors, except Class 7 Noteholders will be unimpaired and their Claims will be honored in accordance with their terms and in accordance with the terms of the Plan, subject to the Debtors' rights to contest any Claims that they dispute pursuant to the procedures in the Plan; and

- the Holders of other Claims or Equity Interests will receive the treatment summarized in Section IV.B.2 below.

(a)    <u>Satisfaction of the Prepetition Secured Loan Facility Claims and Entry Into the Restructured First Lien Loan Agreement.</u>

On the Effective Date, the Prepetition Secured Loan Agreement will, subject to satisfaction or waiver of the conditions precedent set forth in the Restructured First Lien Loan Agreement, be amended and restated by the Restructured First Lien Loan Agreement, "Loan Documents" as defined in the Prepetition Secured Loan Agreement will, as applicable, be amended and restated by the "Loan Documents" as defined in the Restructured First Lien Loan Agreement, and certain "Security Documents" (as defined in the Prepetition Secured Loan Agreement) will be amended, supplemented or otherwise modified and will constitute and become "Security Documents" (as defined in the Restructured First Lien Loan Agreement), and will secure all the obligations under the Restructured First Lien Loan Agreement and the other "Loan Documents" (as defined in the Restructured First Lien Loan Agreement). The Restructured First Lien Loan Agreement will be secured by a first-priority lien on and security interest in substantially all of the properties and assets of the Reorganized Debtors, other than specified "Excluded Assets." The terms of the Restructured First Lien Loan Agreement are summarized in Section III.I hereof. On the Effective Date, each Holder of an Allowed Prepetition Secured Loan Agreement Claim shall be a "Lender" under the Restructured First Lien Loan Agreement with all of the rights set forth therein, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim.

- 13 -

(b)    <u>No Fractional Shares.</u>

No fractional shares or notes (including the New Second Lien Notes) shall be issued or distributed under the Plan. Each Person entitled to receive any shares or notes shall receive the total number of whole shares or notes of to which such Person is entitled. Whenever any distribution to a particular Person would otherwise call for distribution of a fraction of shares or notes, as applicable, the actual distribution of shares of such stock or notes shall be rounded down to the next lower whole number.

(c)    <u>New Second Lien Notes to Be Issued to Holders of Old Notes Under the Plan.</u>

On the Effective Date, Reorganized CA Lyon will issue the New Second Lien Notes to Holders of Allowed Old Notes Claims, pursuant to the terms set forth in the Plan, together with certain Second Lien Security Documents and other "Note Documents" (as defined in the New Second Lien Notes Indenture Agreement). The New Second Lien Notes Indenture will be secured by a second -priority lien on and security interest in substantially all of the properties and assets of the Reorganized Debtors, other than specified "Excluded Assets." The terms of the New Second Lien Notes Indenture are summarized in Exhibit F hereof. On the Effective Date, each Holder of an Old Notes Claim will receive its Pro Rata share of the New Second Lien Notes, with all of the rights set forth in the New Second Lien Notes Indenture and in the other Note Documents. The New Second Lien Notes will be issued in accordance with applicable bankruptcy law, including section 1145 of the Bankruptcy Code, and without registration under the Securities Act or any similar federal, state or local law as set forth in greater detail in Section VI herein, titled "Exemptions From Securities Act Registration." The Company will agree to register certain New Second Lien Notes pursuant to the Registration Agreement.

(d)    <u>Cancellation of Parent Equity Interests; Issuance of New Capital Stock.</u>

On the Effective Date, the Parent Equity Interests will be cancelled, and Reorganized Parent will issue the Class A Common Shares, the Class B Common Shares, the Class C Common Shares, the initial Class D Common Shares, the Preferred Shares and the Warrants as set forth below.

(e)    <u>New Class A Common Shares to Be Distributed to Holders of Old Notes Under the Plan.</u>

On the Effective Date, Reorganized Parent will contribute the Class A Common Shares, representing initially 28.5% (assuming conversion of the Preferred Shares) of the New Capital Stock of Reorganized Parent, to Reorganized CA Lyon, and Reorganized CA Lyon will distribute the Class A Common Shares to Holders of Allowed Old Notes Claims. The percentage ownership represented by the Class A Common Shares issued to Holders of Allowed Old Notes Claims under the Plan will be subject to dilution, including dilution for (i) the exercise of the Warrants, and (ii) the issuance of Class D Common Shares under the Management Incentive Plan. The Class A Common Shares will be issued in accordance with applicable bankruptcy law, including section 1145 of the Bankruptcy Code, and without registration under the Securities Act or any similar federal, state or local law as set forth in greater detail in Section VI herein, titled "Exemptions From Securities Act Registration." The Company will agree to register certain Class A Common Shares pursuant to the Registration Agreement.

(f)    <u>New Class B Common Shares to Be Issued Pursuant to the Class B Common Stock Commitment Agreement Under the Plan.</u>

On the Effective Date, Reorganized Parent will issue Class B Common Shares representing initially 20.0% (assuming conversion of the Preferred Shares) of the New Capital

- 14 -

Stock of Reorganized Parent on a fully-diluted basis to Class B Purchasers, pursuant to the terms set forth in the Class B Common Stock Commitment Agreement and the Plan. The percentage ownership represented by the Class B Common Shares will be subject to dilution, including dilution for (i) the exercise of the Warrants, and (ii) the issuance of Class D Common Shares under the Management Incentive Plan. The Class B Common Stock Purchase Price will fund Cash payments required to be made under the Plan, including, without limitation, Backstop Transaction Expenses and repayment of the DIP Facility Claims, and be used for general corporate purposes by the Reorganized Debtors after the Effective Date. The Class B Common Shares will be issued in a private placement and in accordance with applicable bankruptcy law, without registration under the Securities Act or any similar federal, state or local law as set forth in greater detail in Section VI herein, titled "Exemptions From Securities Act Registration."

(g)    New Class C Common Shares to Be Issued in the Rights Offering.

On the Effective Date, Reorganized Parent will issue the Class C Common Shares to Eligible Participants of Old Notes who pay the Rights Offering Purchase Price pursuant to the Rights Offering under the Plan. The Class C Common Shares and the Preferred Shares will collectively represent initially (on an as-converted basis) 49.5% of the New Capital Stock of Reorganized Parent in the Rights Offering, and Class C Common Shares representing an additional 2.0% of the New Capital Stock of Reorganized Parent (on an as-converted basis) in payment of the Backstop Fee. The percentage ownership represented by the Class C Common Shares issued under the Rights Offering will be subject to dilution, including dilution for (i) the exercise of the Warrants, and (ii) the issuance of Class D Common Shares under the Management Incentive Plan. The Class C Common Shares will be issued in a private placement and in accordance with applicable bankruptcy law, without registration under the Securities Act or any similar federal, state or local law as set forth in greater detail in Section VI herein, titled "Exemptions From Securities Act Registration."

(h)    New Preferred Shares and New Class C Common Shares to Be Issued in the Rights Offering.

On the Effective Date, Reorganized Parent will issue the Preferred Shares to Eligible Participants of Old Notes who pay the Rights Offering Purchase Price pursuant to the Rights Offering under the Plan. The Class C Common Shares and the Preferred Shares will collectively represent initially (on an as-converted basis, 49.5% of the New Capital Stock of Reorganized Parent in the Rights Offering, and Class C Common Shares representing an additional 2.0% of the New Capital Stock of Reorganized Parent (on an as-converted basis) in payment of the Backstop Fee. The percentage ownership represented by the Preferred Shares (on an as-converted basis) and the Class C Common Shares issued in the Rights Offering will be subject to dilution, including dilution for (i) the exercise of the Warrants, and (ii) the issuance of Class D Common Shares under the Management Incentive Plan. The Preferred Shares and the Class C Common Shares will be issued in a private placement and in accordance with applicable bankruptcy law and without registration under the Securities Act or any similar federal, state or local law as set forth in greater detail in Section VI herein, titled "Exemptions From Securities Act Registration." The Company will agree in the Registration Agreement to register the Preferred Shares and the Class C Common Shares.

(i)    New Warrants to Be Issued Under the Plan.

On the Effective Date, Reorganized Parent will issue the Warrants to Class B Purchasers. The Warrants will have a term of five years and will be exercisable initially for Class B Common Shares representing 9.1% of the New Capital Stock of Reorganized Parent on a fully-diluted, as-exercised basis, at an exercise price based on a $325 million equity value of Reorganized Parent. The Class B Common Shares issuable upon exercise of the Warrants, together with the Class B

- 15 -

Shares initially issued under the Plan would represent approximately 27.3% of the New Capital Stock of Reorganized Parent outstanding on a fully-diluted basis. The percentage ownership represented by the shares of Class B Common Shares issued to Class B Purchasers upon conversion of the Warrants is subject to dilution, including dilution for issuance of Class D Common Shares under the Management Incentive Plan. The Warrants will expire five years from the Effective Date. The Warrants will be issued in a private placement and in accordance with applicable bankruptcy law and without registration under the Securities Act or any similar federal, state or local law as set forth in greater detail in Section VI herein, titled "Exemptions From Securities Act Registration." The Company will agree in the Registration Agreement to register the Class A Common Shares into which the Class B Common Shares issuable upon exercise of the Warrants are convertible.

Class B Purchasers should be aware that the value of the Warrants is wholly dependent upon the future performance of the Debtors' business and the market price of the capital stock of Reorganized Parent. There can be no assurance that the market price of the capital stock of Reorganized Parent will ever exceed the exercise price per share of the Warrants (at any exercise price per share that falls within the range described in this Disclosure Statement), or that the Warrants will be "in the money" at any time prior to their expiration. As a result, the value of the Warrants is uncertain and highly speculative.

      (j)    <u>The Rights Offering, the Preferred Shares and the New Class C Common Shares</u>.

Upon the Bankruptcy Court's entry of the Rights Offering Approval Order, and the Backstop Commitment Agreement Assumption Order, the Debtors will commence a Rights Offering of Preferred Shares and Class C Common Shares to be offered to each Eligible Participant as of the Rights Offering Record Date. Pursuant to the Rights Offering, each Eligible Participant may subscribe for its Pro Rata share of the Preferred Shares and the Class C Common Shares. Each Rights Offering Purchaser must purchase both Preferred Shares and Class C Common Shares in the Rights Offering. Pursuant to the Backstop Commitment Agreement, the Backstop Investors have committed to purchase all Preferred Shares and Class C Common Shares offered, but not otherwise purchased, in the Rights Offering. As compensation for their commitment and subject to the entry of the Rights Offering Approval Order, the Debtors will pay the Backstop Investors, among other things, the Backstop Fee in the form of Class C Common Shares. The terms of the Rights Offering are summarized in Section III.G herein. The Debtors will also reimburse the expenses of the Backstop Investors and provide them with a customary indemnification, all as set forth in Section V of the Backstop Commitment Agreement.

On the Effective Date, the Preferred Shares issued pursuant to the Rights Offering, on an as-converted basis, together with the Class C Common Shares issued pursuant to the Rights Offering, for an aggregate Cash purchase price of $60 million, would represent 49.5% of the New Capital Stock of Reorganized Parent, and additional Class C Common Shares representing an additional 2.0% of the New Capital Stock of Reorganized Parent on an as-converted basis would be issued on account of the Backstop Fee. The percentage ownership represented by the Class C Common Shares issued upon conversion of the Preferred Shares is subject to dilution, including dilution for (i) the Warrants, and (ii) the issuance of Class D Common Shares under the Management Incentive Plan. The Rights Offering Purchase Price will fund Cash payments required to be made under the Plan, including, without limitation, Backstop Transaction Expenses and repayment of the DIP Facility Claims, and be used for general corporate purposes by the Reorganized Debtors after the Effective Date.

The terms of the Preferred Shares are summarized in Section III.H herein, and will be set forth in the Certificate of Designation to be included in the Plan Supplement.

    (k)    <u>Management Incentive Plan for Management</u>

Following the Effective Date, Reorganized Parent will adopt and implement the Management Incentive Plan, which would, subject to certain terms and conditions, provide for, the issuance of up to 8% of the New Capital Stock of the Reorganized Parent to key executives of the Company, with the first 4% subject to a split of 50% in the form of restricted Class D Common Shares and 50% in the form of stock options to purchase additional Class D Common Shares to be issued on the Effective Date, and the remaining 4% to be issued at the discretion of the New Board.

### 3.    Plan Overview

The Plan provides for the classification and treatment of Claims against and Interests in the Debtors. For classification and treatment of Claims and Interests, the Plan designates Classes of Claims and Classes of Interests. These Classes and Plan treatments take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Interests.

The following chart[3] briefly summarizes the classification and treatment of Claims and Interests under the Plan. Amounts listed below are estimated.

In accordance with section 1122 of the Bankruptcy Code, the Plan provides for ten Classes of Claims against and/or Interests in the Debtors.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS OR EQUITY INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN AND THE RISK FACTORS DESCRIBED IN SECTION IV BELOW. THE TABLE IS INTENDED FOR ILLUSTRATIVE PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR A REVIEW OF THE PLAN AND DISCLOSURE STATEMENT IN THEIR ENTIRETY. FOR CERTAIN CLASSES OF CLAIMS, THE ACTUAL AMOUNT OF ALLOWED CLAIMS OR EQUITY INTERESTS COULD BE MATERIALLY DIFFERENT THAN THE ESTIMATED AMOUNTS SHOWN IN THE TABLE BELOW.**

| Class | Type of Claim or Interest | Estimated Claim Amount | Impairment | Entitled to Vote | Estimated Recovery Under Plan |
|-------|---------------------------|------------------------|------------|------------------|-------------------------------|
| 1 | Priority Claims | $382,000 | No | No | 100% |
| 2 | Other Secured Claims | $13.1 million | No | No | 100% |
| 3 | Secured Tax Claims | $417,000 | No | No | 100% |
| 4 | Prepetition Secured Loan | $235 million[4] | Yes | Yes | 100% |

---

[3] This chart is only a summary of the classification and treatment of Claims and Interests under the Plan. Projected Recoveries are based on midpoint valuation estimates of the Debtors. References should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Interests.

| Class | Type of Claim or Interest | Estimated Claim Amount | Impairment | Entitled to Vote | Estimated Recovery Under Plan |
|---|---|---|---|---|---|
| | Agreement Claims | | | | |
| 5 | Project Loan Claims | $19.4 million | No | No | 100% |
| 6 | General Unsecured Claims | $13.0 million | No | No | 100% |
| 7 | Old Notes Claims | $299.5 million (approximately)[5] | Yes | Yes | Approximately 40% |
| 8 | Intercompany Claims | $0 | No | No | 100% |
| 9 | Parent Equity Interests | N/A | Yes | No | N/A |
| 10 | Equity Interests in Subsidiaries | N/A | No | No | N/A |

### 4. Who May Vote on the Plan

Each Holder of an Allowed Claim in Classes 4 and 7 is entitled to vote either to accept or to reject the Plan. Only those votes cast by Holders of Allowed Claims in Classes 4 and 7 shall be counted in determining whether acceptances have been received sufficient in number and amount to obtain Confirmation. An Impaired Class of Claims shall have accepted the Plan if: (a) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims or Interests actually voting in such Class have voted to accept the Plan, and (b) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims or Interests actually voting in such Class have voted to accept the Plan. Classes 1, 2, 3, 5, 6, 8 and 10 are Unimpaired under the Plan, are each deemed to accept the Plan by operation of law, and are not entitled to vote on the Plan. Class 9 is Impaired under the Plan, and deemed to reject the Plan by operation of law, and Holders of Claims in Class 9 are not entitled to vote on the Plan. Without limiting the foregoing, in the event that any Class of Claims or Interests entitled to vote on the Plan fails to accept the Plan as required by section 1129(a) of the Bankruptcy Code, the Plan may be amended and, in any event, the Debtors reserve the right to seek confirmation of the Plan over such rejection pursuant to section 1129(b) of the Bankruptcy Code.

### 5. Summary of Solicitation Package and Voting Instructions

The following materials constitute the solicitation package (the "Solicitation Package"):

- a solicitation cover letter from the Company addressed to the voting creditor;

- the appropriate form of Ballot and instructions for completing the ballot (the "Ballot")

---

[4] This amount is on account of the compromise and settlement of the "Make Whole Amount" and "Exit Fees" under the Senior Secured Loan Agreement described in section 2.C herein.

[5] The Class 7 Claims of $299.5 million (approximate) include Prepetition Indenture Trustee Fees and accrued interest through December 19, 2011.

- 18 -

- a pre-addressed, postage pre-paid return envelope;

- this Disclosure Statement with all exhibits; and

- The Plan

Classes 4 and 7 are entitled to vote to accept or reject the Plan and shall be served by email or with paper copies of this Disclosure Statement and the Plan. Any party who desires additional paper copies of these documents may request copies by writing to Kurtzman Carson Consultants LLC ("KCC") at 599 Lexington Avenue, 39th Floor, New York, NY 10022, Telephone: (877) 833-4150, International Callers: (917) 281-4800, email: lyonhomesinfo@kccllc.com (the "Voting Agent"). All parties entitled to vote to accept or reject the Plan shall receive by email, or a paper copy of, each appropriate Ballot.

The Voting Agent will, among other things, answer questions, provide additional copies of all Solicitation Package materials, and generally oversee the solicitation process.

Only the Holders of Claims in Classes 4 and 7 are entitled to vote to accept or reject the Plan. To be counted, Ballots cast by Holders must be received by the Voting Agent by 5:00 p.m. (prevailing Eastern Time) on **December 16, 2011**, the Voting Deadline. Voting instructions are attached to each Ballot.

**If you are a Beneficial Holder of Class 7 Old Notes Claims, you must deliver your Ballot to your broker, bank, dealer, agent, or other nominee (each of the foregoing, a "Nominee"). Please return your Ballot to your Nominee in order to allow for sufficient time to permit your Nominee to deliver a Master Ballot including your vote to the Debtors' Voting Agent by the Voting Deadline.**

Unless the Company, in its discretion decides otherwise, any Ballot received after the Voting Deadline shall not be counted. The Voting Agent will process and tabulate received Ballots and will File a voting report (the "Voting Report") as soon as practicable on or after the Petition Date.

For answers to any questions regarding solicitation procedures, parties may contact the Voting Agent with any questions related to the solicitation procedures applicable to their Claims and Interests.

The Plan Supplement will be Filed by the Debtors no later than 10 days (unless otherwise ordered by the Bankruptcy Court) before the date fixed by the Bankruptcy Court to consider confirmation of the Plan. When Filed, the Plan Supplement will be available in both electronic and hard copy form. Details about how to access the Plan Supplement will be provided in the notice sent to all parties in interest regarding the confirmation hearing of the Plan.

**Any Ballot that is properly executed by the Holder of a Claim, but fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection of the Plan, shall not be counted.**

**Each Holder of a Claim in Class 4 or 7 must vote all of its Claims either to accept or reject the Plan and may not split its votes. By signing and returning a Ballot, each Holder of a Claim in Class 4 or 7 will certify to the Bankruptcy Court and the Company that no other Ballots with respect to such Claim or Equity Interest have been cast or, if any other Ballots have been cast with respect to such Claim or Equity Interest, such other Ballots are revoked.**

- 19 -

All Ballots are accompanied by voting instructions.  It is important to follow the specific instructions provided with the Ballot.

The Company is relying on section 4(2) of the Securities Act and similar "blue sky" law provisions with respect to the issuance of the Rights Offering Securities, and the Class B Securities.  The Company is relying on Section 3(a)(9) of the Securities Act as well as the exemption from the Securities Act and equivalent state law registration requirements provided by section 1145(a)(1) of the Bankruptcy Code, to exempt the Solicitation and the issuance of new securities on account of treatment of Claims in connection with the Solicitation and the Plan from registration under the Securities Act and "blue sky" law.

6.      Voting Instructions Specific to Beneficial Holders of Class 7 Old Notes Claims Entitled to Vote on the Plan.

If you are a Beneficial Holder of Class 7 Old Notes Claims, you must deliver your Ballot to your broker, bank, dealer, agent, or other nominee (each of the foregoing, a "Nominee").  Please return your Ballot to your Nominee in order to allow for sufficient time to permit your Nominee to deliver a Master Ballot including your vote to the Debtors' Voting Agent by the Voting Deadline

Prior to the Solicitation Mailing Date, the Voting Agent will determine the identity of those Registered Record Owners and Intermediary Record Owners (collectively, "Record Owners") holding Old Notes on behalf of Beneficial Holders as of the applicable Voting Record Date utilizing security positions reports provided by the Depository Trust Company ("DTC") and will distribute an appropriate number of Solicitation Packages to such Record Owners to allow them to forward one to each applicable Beneficial Holder.  Intermediary Record Holders will distribute Solicitation Packages to the respective Beneficial Holders within five (5) days of receiving Solicitation Packages.

7.      Tabulation of Votes

THE FOLLOWING IS IMPORTANT INFORMATION REGARDING
VOTING THAT SHOULD BE READ CAREFULLY BY ALL
HOLDERS OF CLAIMS IN VOTING CLASSES.

- FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY EXECUTED, COMPLETED, DATED AND DELIVERED SUCH THAT IT IS **ACTUALLY RECEIVED** ON OR BEFORE THE VOTING DEADLINE BY THE VOTING AGENT (OR IN THE CASE OF BENEFICIAL BALLOT HOLDERS, TO YOUR NOMINEE PRIOR TO THE VOTING DEADLINE).

- A HOLDER OF A CLAIM MAY CAST ONLY ONE VOTE PER EACH CLAIM OR EQUITY INTEREST SO HELD.  BY SIGNING AND RETURNING A BALLOT, BENEFICIAL HOLDER BALLOT OR MASTER BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLAIM, SUCH EARLIER BALLOTS, BENEFICIAL HOLDER BALLOTS OR MASTER BALLOTS ARE THEREBY SUPERSEDED AND REVOKED.

- 20 -

- ANY BALLOT THAT IS RECEIVED <u>AFTER</u> THE VOTING DEADLINE WILL <u>NOT</u> BE COUNTED TOWARD CONFIRMATION OF THE PLAN UNLESS THE DEBTORS HAVE GRANTED AN EXTENSION OF THE VOTING DEADLINE IN WRITING WITH RESPECT TO SUCH BALLOT.

- ADDITIONALLY, THE FOLLOWING BALLOTS WILL <u>NOT</u> BE COUNTED:

  o   any Ballot that the Debtors determine is illegible or contains insufficient information to permit the identification of the Holder of the Claim;

  o   any Ballot cast by an entity that does not hold a Claim in a Class that is entitled to vote on the Plan;

  o   any Ballot that (a) is properly completed, executed and timely filed, but does not indicate an acceptance or rejection of the Plan, or (b) indicates both an acceptance and rejection of the Plan, or (c) with the exception of a Master Ballot, partially accepts and partially rejects the Plan;

  o   any Ballot sent to the Court, the Debtors, the Debtors' agents/representatives, the Prepetition Indenture Trustee or the Debtors' financial or legal advisors;

  o   any Ballot transmitted by facsimile, telecopy or electronic mail; OR

  o   any unsigned Ballot.

### 8.  Confirmation of the Plan

(a)   <u>Generally</u>

"Confirmation" is the technical term for the Bankruptcy Court's approval of a plan of reorganization or liquidation.  The timing, standards and factors considered by the Bankruptcy Court in deciding whether to confirm a plan of reorganization are discussed below.

(b)   <u>The Confirmation Hearing</u>

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

Following commencement of the Chapter 11 Cases, the Company intends to promptly schedule a Confirmation Hearing and will provide notice of the Confirmation Hearing to all necessary parties.  The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing of any adjournment thereof.

### 9.  Confirming and Consummating the Plan

It is a condition to Confirmation of the Plan that the Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to the Debtors.  Certain other conditions contained in the Plan must be satisfied or waived pursuant to the provisions of the Plan.

DOCS_SF:78843.3 93949-001

For further information, see Article IX of the Plan, entitled "Conditions Precedent to Confirmation and Consummation of the Plan."

### 10.    Rules of Interpretation

The following rules for interpretation and construction shall apply to this Disclosure Statement:  (1) capitalized terms used in the Disclosure Statement and not otherwise defined shall have the meaning ascribed to such terms in Article I.B of the Plan; (2) unless otherwise specified, any reference in this Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document shall be a reference to such document in the particular form or substantially on such terms and conditions described; (3) unless otherwise specified, any reference in this Disclosure Statement to an existing document, schedule, or exhibit, whether or not filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) any reference to an entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references in this Disclosure Statement to Sections are references to Sections of this Disclosure Statement; (6) unless otherwise specified, all references in this Disclosure Statement to exhibits are references to exhibits in this Disclosure Statement; (7) unless otherwise set forth in this Disclosure Statement, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (8) any term used in capitalized form in this Disclosure Statement that is not otherwise defined in this Disclosure Statement or the Plan but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

### 11.    The Voting Record Date

**The Voting Record Date was November 10, 2011**.  Only Holders of Allowed Claims in the Voting Classes on the Voting Record Date received the Solicitation Package and are allowed to vote to accept or reject the Plan.

### 12.    Other Restructuring Documents

Holders of Claims in the Voting Classes on the Voting Record Date will receive the Solicitation Package, which will be delivered by the Company via its Voting Agent on November 17, 2011.

In addition to the Solicitation Package, Holders of Claims in the Voting Classes on the Voting Record Date will receive, after the commencement of the Chapter 11 Cases and as ordered by the Bankruptcy Court, the following supplemental materials (the "Supplemental Materials"):

(i)    a notice of the Confirmation Hearing approved by the Bankruptcy Court for transmission to Holders of Claims and other parties in interest; and

(ii)    such other materials as the Bankruptcy Court may direct.

### 13.    Distribution of the Solicitation Package to Holders of Claims and Equity Interests Entitled to Vote on the Plan

With the assistance of the Voting Agent, the Debtors are distributing the Solicitation Package to the Record Holders on November 17, 2011 (the "Solicitation Mailing Date").  The Debtors submit that the timing of such distribution is sufficient to provide such Holders of Claims with adequate time within which to review the materials required to allow such parties to make informed decisions with respect to voting on the Plan.  The Debtors have made every

- 22 -

reasonable effort to ensure that Holders who have more than one Allowed Claim in a single voting Class received no more than one Solicitation Package.

> 14. **Distribution of Notices to Holders of Claims and Equity Interests in Non-Voting Classes and Holders of Disputed Claims**

As set forth above, certain Holders of Claims and Equity Interests are **not** entitled to vote on the Plan. As a result, such parties will not receive Solicitation Packages, will **not** receive Supplemental Materials and, instead, will receive the appropriate forms of notice, after the commencement of the Chapter 11 Cases, as follows:

- Unimpaired Claims and Equity Interests - Deemed to Accept. As noted above, Administrative Claims, DIP Facility Claims and Priority Tax Claims are unclassified and are not entitled to vote on the Plan, and Allowed Claims in Classes 1, 2, 3, 5, 6 and 8 and Equity Interests in Class 10 are Unimpaired under the Plan and, therefore, are presumed to have accepted the Plan. As such, Holders of such Claims or Equity Interests will receive, in lieu of the Restructuring Documents, a "Non-Voting Status Notice With Respect to Unimpaired Classes Deemed to Accept the Plan" after the commencement of the Company's Chapter 11 Cases, which will contain instructions, among other things, on how to obtain a copy of the Plan and this Disclosure Statement, the Confirmation Objection Deadline and the Confirmation Hearing date and time.

- Impaired Claims – Deemed to Reject. Holders of Class 9 Parent Equity Interests are Impaired and shall receive no distribution under the Plan on account of the Parent Equity Interests and are, therefore, deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. As such, Holders of Parent Equity Interests will receive, in lieu of the Restructuring Documents, a "Non-Voting Status Notice With Respect to Impaired Class Deemed to Reject the Plan" after the commencement of the Company's Chapter 11 Cases, which will contain instructions, among other things, on how to obtain a copy of the Plan and this Disclosure Statement, the Confirmation Objection Deadline and the Confirmation Hearing date and time.

- Contract and Lease Counterparties. Parties to certain of the Debtors' executory contracts and unexpired leases may not have Claims pending the disposition of their contracts or leases by assumption or rejection under the Plan. Such parties nevertheless will receive notice notifying them of the commencement of the Debtors' Chapter 11 Cases after such cases are filed, as well as notifying them of the projected disposition of their contracts and/or lease and the scheduled hearing to consider confirmation of the Plan.

> 15. **Filing of the Plan Supplement**

The Debtors will file the Plan Supplement no later than 10 days before the Confirmation Hearing. The Debtors will transmit a copy of the Plan Supplement to the "Distribution List," as defined below. Additionally, parties may request (and obtain at the Debtors' expense) a copy of the Plan Supplement by: (a) calling the Voting Agent at (877) 573-3980; or (b) writing to William Lyon Homes, c/o Williams Lyon Homes Ballot Processing Center, c/o Kurtzman Carson Consultants LLC, 599 Lexington Avenue, 39th Floor, New York, NY 10022, Telephone: (877) 833-4150, International Callers: (917) 281-4800; email: lyonhomesinfo@kccllc.com. Parties may also obtain any documents filed in the Chapter 11 Cases for a fee via PACER at https://ecf.deb.uscourts.gov/.

As used herein, the term "Distribution List" means (a) the Office of the United States Trustee, (b) counsel for the Committee, if any is appointed, (c) counsel to the DIP Agent, (d) counsel to the Prepetition Secured Lenders, (e) counsel to the Ad Hoc Noteholders Group, (f) the Securities and Exchange Commission, (g) the Internal Revenue Service, (h) all parties that, as of the filing of the Plan Supplement, have filed requests for notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002, and (i) any parties affected by an addition to Plan Schedules.

### 16.     The Confirmation Hearing

**The Bankruptcy Court has not yet scheduled a Confirmation Hearing Date.**  Once scheduled, the Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.  Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

### 17.     The Deadline for Objecting to Confirmation of the Plan

**The Bankruptcy Court has not yet scheduled a Confirmation Objection Deadline**. Subject to order of the Bankruptcy Court, any objection to confirmation of the Plan must:  (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name of the applicable Debtor, the name of the objecting party and the amount and nature of the Claim of such Entity in each applicable Chapter 11 Case or the amount of Equity Interests held by such Entity in each applicable Chapter 11 Case; (iv) state with particularity the legal and factual bases and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Confirmation Objection Deadline by the parties set forth below (the "Notice Parties").

CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.  INSTRUCTIONS WITH RESPECT TO THE CONFIRMATION HEARING AND DEADLINES WITH RESPECT TO CONFIRMATION WILL BE INCLUDED IN THE NOTICE OF CONFIRMATION HEARING TO BE APPROVED BY THE BANKRUPTCY COURT.

18.    **Notice Parties**

    (a)    <u>The Debtors,</u> William Lyon Homes, Corporate Office, 4490 Von Karman Avenue, Newport Beach, California 92660 (Attn: Matthew Zaist, Executive Vice President);

    (b)    <u>Counsel to the Debtors,</u> Pachulski Stang Ziehl & Jones, 10100 Santa Monica Boulevard, 13th Floor, Los Angeles, CA 90067-4100 (Attn:  Richard M. Pachulski), and 919 N. Market Street, 17th Floor, Wilmington, DE 19801 (Attn: Laura Davis Jones);

    (c)    <u>Special Counsel to the Debtors,</u> Irell & Manella LLP, 840 Newport Center Drive, Suite 400, Newport Beach, CA 92660-6324 (Attn: Jeffrey M.  Reisner);

    (d)    <u>Counsel to the Backstop Parties,</u> Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166-0193 (Attn:  Matthew K.  Kelsey and J. Eric Wise);

    (e)    <u>Counsel to the Ad Hoc Noteholders Group,</u> Milbank, Tweed, Hadley & McCloy LLP, 601 South Figueroa Street, Los Angeles, California 90017 (Attn:  Mark Shinderman and Neil Wertlieb);

    (f)    <u>Delaware Counsel to the Ad Hoc Noteholders Group,</u> Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 18th Floor, P.O. Box 1347, Wilmington, DE 19899-1347 (Deliveries 19801) (Attn: Robert J.  Dehney);

    (g)    <u>Counsel to the Prepetition Agent and the Prepetition Secured Lenders,</u> Akin Gump Strauss Hauer & Feld LLP, 2029 Century Park East, Suite 2400, Los Angeles, CA 90067-3010 (Attn: David P.  Simonds) and Pepper Hamilton LLP, Hercules Plaza, Suite 5100, 13013 Market Street, P.O. Box 1790, Wilmington DE 19801-1151 (Attn: David Stratton); and

    (h)    <u>The Office of the United States Trustee for the District of Delaware,</u> 844 King Street, Suite 2207, Wilmington, Delaware 19801;

19.    **Effect of Confirmation of the Plan**

    The Plan contains certain provisions relating to (a) the compromise and settlement of Claims and Equity Interests, (b) the release of the Released Parties by the Debtors and the Holders of Claims or Equity Interests, and each of their respective Related Persons, and (c) exculpation of certain parties.

---

THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (B) HAS FILED A PROOF OF CLAIM IN THE CHAPTER 11 CASES (IF ANY ARE FILED), OR (C) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

---

**D.      CONSUMMATION OF THE PLAN**

It will be a condition to confirmation of the Plan that all provisions, terms and conditions of the Plan are approved in the Confirmation Order unless otherwise satisfied or waived pursuant to the provisions of Article IX of the Plan.  Following confirmation, the Plan will be consummated on the Effective Date.

**E.      RISK FACTORS**

**PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST IN A VOTING CLASS HAS BEEN URGED TO CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN SECTION IV HEREIN TITLED, "RISK FACTORS."**

**ARTICLE II.**
**BACKGROUND TO THE CHAPTER 11 CASES**

**A.      THE DEBTORS' CORPORATE HISTORY**

The predecessor to DE Lyon, The Presley Companies, was formed in 1956.  In 1987, General William Lyon purchased 100% of the stock of The Presley Companies, which subsequently went public in 1991 and listed on the New York Stock Exchange under the symbol "PDC".  William Lyon Homes, a Delaware corporation, ("DE Lyon"), currently the parent corporation of the Company, was formed in 1999.  Also in 1999, The Presley Companies acquired William Lyon Homes, Inc., a California corporation ("CA Lyon"), and The Presley Companies changed its name to William Lyon Homes and its ticker symbol to "WLS".  DE Lyon was subsequently taken private in 2006 by way of a tender offer by General William Lyon for the shares of DE Lyon that were then publicly owned.  DE Lyon currently has one class of stock of which 1,000 shares are outstanding.  94.6% of the shares of DE Lyon (946 shares) are owned by General William Lyon individually and 5.4% of the shares of DE Lyon (54 shares) are owned by The William Harwell Lyon Separate Property Trust.

DE Lyon owns directly or indirectly thirty-nine operating entities.  Specifically, DE Lyon directly and wholly owns three subsidiaries:

- CA Lyon, a California corporation and the Company's main operating entity;

- California Equity Funding, Inc., a California corporation; and

- Duxford Financial, Inc., a California corporation.

Duxford Financial, Inc. has direct ownership interests in three entities.  These are:

- Duxford Escrow, Inc., a California corporation;

- Duxford Insurance Services, LLC, a California limited liability company; and

- Bayport Mortgage, L.P., a California limited partnership.

CA Lyon has a number of direct and indirect wholly-owned subsidiaries.  These are:

- Circle G at the Church Farm North Joint Venture, LLC, an Arizona limited liability company;

- 26 -

- PH - LP Ventures, a California corporation;

- PH Ventures – San Jose, a California corporation;

- HSP, Inc., a California corporation;

- Whitney Ranch Village 5, LLC, a Delaware limited liability company;

- Cerro Plata Associates, LLC, a Delaware limited liability company;

- Laguna Big Horn, LLC, a Delaware limited liability company;

- Duxford Title Reinsurance Co., a Vermont corporation;

- Sycamore CC, Inc., a California corporation;

- Presley CMR, Inc., a California corporation (which has a 50% interest in WLH Enterprises, a California general partnership);

- Mountain Falls, LLC, a Nevada limited liability company;

- William Lyon Southwest, Inc., an Arizona corporation;

- PH-Rielly Ventures, a California corporation;

- Presley Homes, a California corporation;

- Lyon Mayfield, Inc., a Delaware corporation (which has a 100% interest in Lyon Mayfield, LLC, a Delaware limited liability company);

- Lyon Waterfront, LLC, a Delaware limited liability company (which has a 50% interest in PLC/Lyon Waterfront Residential, LLC, a Delaware limited liability company);

- Nobar Water Company, a California corporation;

- Silver Creek Preserve, a California nonprofit corporation; and

- Lyon East Garrison Company I, LLC, a California limited liability company (which has a 100% interest in East Garrison Partners I, LLC, a California limited liability company).

CA Lyon also has a partial interest in a number of entities.  Following is a list of these entities with the percentage owned by CA Lyon:

- Queen Creek Joint Venture, LLC, an Arizona limited liability company (50%);

- William Lyon Mortgage, LLC, a California limited liability company (50%);

- Horsethief Canyon Partners, a California general partnership (50%) (which is also owned 50% by HSP, Inc. and therefore 100% indirectly by CA Lyon); and

- 27 -

    o    WLH Enterprises, a California general partnership (50%) (which is also owned 50% by Presley CMR, Inc. and therefore 100% indirectly by CA Lyon, and which has a 100% interest in Mountain Falls Golf Course, LLC, a Nevada limited liability company);

Lastly, CA Lyon owns interests of changing percentages (due to waterfall provisions in the entities' operating agreements) in the following joint ventures:

- Henry Ranch, LLC, a Delaware limited liability company;

- Spectrum 90 Investors, LLC, a Delaware limited liability company;

- 4S Ranch Planning Area 38, LLC, a Delaware limited liability company;

- San Miguel Village, LLC, a Delaware limited liability company;

- Lyon Treviso, LLC, a Delaware limited liability company; and

- Lyon Vista Del Mar 533, LLC, a Delaware limited liability company.

## B.    OVERVIEW OF THE DEBTORS' BUSINESS

The Company is primarily engaged in the design, construction and sale of single family detached and attached homes in California, Arizona and Nevada.

### 1.    Business Operations and Sales

The Company conducts its homebuilding operations through four reportable operating segments: Southern California, Northern California, Arizona and Nevada. Each of the segments has responsibility for the management of the Company's homebuilding and development operations within its geographic boundaries. The Company is most active in California; in 2010, approximately 78% of the home closings of the Company and its joint ventures were derived from the Northern California and Southern California segments, and 88% of the Company's homes sales revenue was derived from these segments. For the six-,month period ending June 30, 2011, the Company marketed its homes through nineteen (19) sales locations.

The prices of the Company's homes vary widely, but the Company targets mostly entry-level and first time move-up homebuyers. The Company utilizes a variety of product lines in its various markets but largely standardizes its home designs to encourage efficiency in the construction process. The Company hires subcontractors to perform virtually all of the construction necessary to develop its various projects.

During the year ended December 31, 2010, the Company had consolidated revenues from home sales of $266.9 million and delivered 760 homes. The Company had total consolidated operating revenues of $294.7 million, $309.2 million and $526.1 million for the years ended December 31, 2010, 2009 and 2008, respectively. On a consolidated basis, the Company delivered 915 homes in 2009 and 1,260 homes in 2008. The Company's dollar amount of backlog of homes sold but not closed as of December 31, 2010 was $30.1 million, down 47% from $56.5 million as of December 31, 2009. The cancellation rate of buyers who contracted to buy a home but did not close escrow was approximately 19% in 2010, down slightly from 21% in 2009. The Company had consolidated net loss of $136.8 million, $20.5 million, $111.6 million and $349.4 million during the years ended December 31, 2010, 2009, 2008 and 2007, respectively.

Due to the Company's product and geographic diversification strategy, the prices of the Company's homes vary substantially. During 2010, base sales prices for the Company's attached housing ranged from approximately $120,000 to $575,000, and base sales prices for detached housing ranged from approximately $118,000 to $700,000. On a consolidated basis, the average sales price of homes closed for the year ended December 31, 2010 was $351,100.

In addition to developing and selling properties that it owns, the Company is party to certain construction management agreements with Resmark Equity Partners, LLC and its affiliate, Olympic Realty Advisors (together, "Resmark") under which the Company sells and markets land owned by Resmark in three separate communities. For such services, the Company receives fees and commissions upon each of the home sales and upon completion of the developments under such agreements (generally 3 to 5 percent of the sales price). The Company may also, under certain circumstances, be entitled to receive additional compensation if certain financial thresholds are achieved.

The Company's corporate headquarters are located at 4490 Von Karman Avenue, Newport Beach, California. As of December 31, 2010, the Company employed 212 full-time and 7 part-time employees, including corporate staff, supervisory personnel of construction projects, maintenance crews to service completed projects, as well as persons engaged in administrative, finance and accounting, engineering, golf course operations, sales and marketing activities.

## 2.    Marketing and Development Strategy

The Company designs, constructs and sells a wide range of homes designed to meet the specific needs of each of its markets, although it primarily emphasizes sales to the entry-level and first time move-up home buyer markets. The Company currently has a wide variety of product lines in sixteen sales locations, which enables it to meet the specific needs of each of its markets. Because the decision as to which product to develop is based on the Company's assessment of market conditions and the restrictions imposed by government regulations, home styles and sizes vary from project to project. The Company's attached housing ranges in size from 957 to 2,452 square feet, and the detached housing ranges from 1,157 to 3,245 square feet.

The Company generally standardizes and limits the number of home designs within any given product line. This standardization permits on-site mass production techniques and bulk purchasing of materials and components, thus enabling the Company to better control and reduce construction costs and home construction cycles.

The Company normally builds, decorates, furnishes and landscapes three to eight model homes for each product line and maintains on-site sales offices, which typically are open seven days a week. Interior decorations vary among the Company's models and are carefully selected based upon the lifestyles of targeted buyers. Structural changes in design from the model homes are not generally permitted, but home buyers may select various other optional construction and design amenities.

The management team responsible for any given project develops marketing objectives, formulates pricing and sales strategies, and develops advertising and public relations programs for approval of senior management. The Company makes extensive use of advertising and other promotional activities, including on-line media, newspaper advertisements, brochures, direct mail and the placement of strategically located sign boards in the immediate areas of its developments. In addition, the Company markets all of its products through the internet via email lists and interest lists, as well as its website at www.lyonhomes.com. In general, the Company's advertising emphasizes each project's strengths, the quality and value of its products and its reputation in the marketplace.

- 29 -

The Company employs in-house commissioned sales personnel to sell its homes. In some cases, outside brokers are also involved in the selling of the Company's homes, particularly in the Arizona and Nevada markets. The Company typically engages its sales personnel on a long-term, rather than a project-by-project basis. Sales personnel are trained by the Company and attend weekly meetings to be updated on the availability of financing, construction schedules and marketing and advertising plans.

The Company contracts with a number of architects and other consultants who are involved in the design process of the Company's homes. Designs are constrained by zoning requirements, building codes, energy efficiency laws and local architectural guidelines, among other factors. Engineering, landscaping, master-planning and environmental impact analysis work are subcontracted to independent firms that are familiar with local requirements.

Substantially all construction work is done by subcontractors, with the Company acting as the general contractor. The Company manages subcontractor activities with on-site supervisory employees and management control systems. The Company does not have long-term contractual commitments with its subcontractors or suppliers; instead, it contracts development work by project and, where possible, by phase size.

### 3.    Competition and Risk Management

The homebuilding industry is highly competitive, particularly in the low- and medium-price range where the Company currently concentrates its activities. The Company does not have a significant market position in any geographic area that it serves due to the fragmented nature of the market. A number of the Company's competitors have larger staffs, larger marketing organizations, and substantially greater financial resources than those of the Company. However, the Company competes effectively in its existing markets as a result of its product and geographic diversity, substantial development expertise, and reputation as a low-cost producer of quality homes. Further, the Company sometimes gains a competitive advantage in locations where changing regulations make it difficult for competitors to obtain entitlements or government approvals that the Company has already obtained.

The Company uses a land acquisition team, which includes members of its senior management, to manage the risks associated with land ownership and development. The Company's land acquisition strategy has been to undertake projects with shorter life-cycles in order to reduce development and market risk, while maintaining an inventory of owned lots sufficient for construction of homes over a two-year period. Currently, the Company has eight projects, all of the homes of which the Company owns.

The Company enters purchase agreements with various land sellers. As a method of acquiring land in staged takedowns, thereby minimizing the use of funds from the Company's available cash or other corporate financing sources and limiting the Company's financial and market risk associated with land holdings, the Company often transfers its right in certain land purchase agreements to entities owned by third parties in "land banking arrangements." These entities use equity contributions or incur debt to finance the acquisition and development of the land being purchased. These entities grant the Company an option to acquire lots in staged takedowns. In consideration for this option, the Company makes a non-refundable deposit of 15% to 25% of the total purchase price. The Company has no obligation to purchase the balance of these lots, but would forfeit remaining deposits and could be subject to penalties if the lots were not purchased. The Company does not have legal title to these entities or their assets and does not guarantee their liabilities.

Currently, the Company has one land banking arrangement under which the seller (Hearthstone) initially offered options to purchase 625 lots for a total purchase price of

- 30 -

approximately $162.3 million. As of June 30, 2011, the Company had purchased 400 of those lots; the rest remain under option. The Debtors are in negotiations with the seller to amend the current agreements. Proposed amendments would include deferring the takedowns of property for approximately one year and eliminating any change in control trigger under the current documents. If successful, these proposed amendments would reduce the Debtors cash outlay by approximately $11.2 million through December of 2012, and reduce the associated draws on its DIP loan by approximately $4.7 million through assumed effective date of 2/28/2012.

## C.    OVERVIEW OF THE PREPETITION CAPITAL STRUCTURE

### 1.    Senior Credit Facility

CA Lyon is a borrower under the *Senior Secured Term Loan Agreement*, dated October 20, 2009, by and among CA Lyon, and the Prepetition Secured Lenders and the Prepetition Agent, as amended by the *First Amendment to Senior Secured Loan Agreement*, dated March 18, 2011 ("Colony First Amendment"), *Waiver No. 1 to Senior Secured Term Loan Agreement*, dated April 20, 2011 ("Colony Waiver No. 1"), *Waiver No. 2 to Senior Secured Term Loan Agreement*, dated July 18, 2011 ("Colony Waiver No. 2"), *Second Amendment and Waiver No. 3 to Senior Secured Term Loan Agreement* dated September 16, 2011 ("Colony Waiver No. 3") and *Amendment to Waiver No. 3 to Senior Secured Term Loan Agreement* dated October 7, 2011 ("Amendment to Colony Waiver No. 3"). At the end of this last waiver period, the Company and its Prepetition Secured Lenders engaged in extensive negotiation of the terms of the Debtors' proposed restructuring, but the parties did not reach an agreement that would result in a further extension of the forbearance and waiver agreement.

The Prepetition Secured Loan Agreement governs a secured term loan in the aggregate principal amount of $206,000,000, bearing interest at 14% per annum, payable monthly. The scheduled maturity date for the Prepetition Secured Loans is October 20, 2014. The outstanding principal amount is $206,000,000. Based on the current outstanding balance of the Prepetition Secured Loan, interest payments are approximately $28.8 million annually.

DE Lyon guaranteed absolutely, irrevocably and unconditionally, as a guarantee of payment and not merely of collection, prompt payment in full when due, whether at stated maturity, upon acceleration or otherwise, under the Prepetition Secured Loan Agreement.

The Prepetition Secured Loans are secured by senior liens on substantially all of the assets of DE Lyon and CA Lyon, but excluding specified "Excluded Property" (the "Colony Collateral"). The Colony Collateral specifically includes all right, title and interest of DE Lyon and CA Lyon in and to all real property assets (other than certain assets released in accordance with the terms thereof) and in and to the following personal property assets (other than Excluded Property): (a) all inventory and equipment; (b) all instruments; (c) all documents and all present and future books of account of every kind or nature, purchase and sale agreements, invoices, ledger cards, bills of lading and other shipping evidence, statements, correspondence, memoranda, credit files and other data relating to the such collateral; (d) all accounts; (e) all chattel paper; (f) all deposit accounts; (g) all letters of credit and letter-of-credit rights; (h) certain commercial tort claims; (i) all securities and all other investment property; (j) all rights under all leases, contracts and agreements to which CA Lyon and DE Lyon are party; (k) all rights to the payment of money, insurance claims and proceeds and all general intangibles; (l) all other personal property and fixtures of every kind and nature; and (m) all proceeds, products, rents and profits of or from any and all of the foregoing, any accessions, accessories, additions, attachments, improvements, modifications and upgrades to, replacements of and substitutions thereto or thereof.

- 31 -

The Prepetition Secured Loan Agreement contains covenants that limit the ability of CA Lyon and DE Lyon to, without prior approval from the Prepetition Secured Lenders, *inter alia*: incur liens; incur additional indebtedness; transfer or dispose of assets; merge, consolidate or alter their line of business; guarantee obligations; engage in affiliated party transactions; declare or pay dividends or make other distributions or repurchase stock; make advances, loans or investments; repurchase debt (including under the Prepetition Indentures); and engage in change-of-control transactions. In addition, the Prepetition Secured Loan Agreement requires that the tangible net worth of DE Lyon not fall below $75.0 million at the end of any two consecutive fiscal quarters.

The outstanding principal amount of the Prepetition Secured Loans is $206 million, and the initial outstanding principal balance under the Restructured First Lien Loan Agreement will be $235 million. The increase in principal amount arises from a compromise and settlement of the "Make Whole Amount" and the "Exit Fees" under the Senior Secured Loan Agreement. This "Make Whole Amount" is a prepayment premium that is payable upon any prepayment of any portion of the Prepetition Secured Loans prior to its scheduled maturity (other than any prepayment required in connection with a payment of any portion of the outstanding principal balance of any of the Old Notes). The Make Whole Amount is calculated as the present value of all interest payments that would become due with respect to such prepaid amount from the date of prepayment through the maturity date of the loan, discounted at 14%. The Exit Fees are calculated under the terms of the Senior Secured Loan Agreement. If required to be paid, the Make Whole Amount and the Exit Fees would currently be estimated as approximately $70 million. The Company believes that the Make Whole Amount would not be payable except in connection with an actual prepayment, rather than a restructuring of the kind contemplated by the Plan. The Prepetition Secured Lenders assert, however, that the Make Whole Amount and Exit Fees would be payable, among other things, upon acceleration of the Prepetition Secured Loan Agreement. After significant efforts to raise capital from other sources, and extensive negotiations with the Prepetition Secured Lenders and other creditors, the Company believes that the restructuring of the Prepetition Secured Loan Agreement taken as a whole, including the settlement of the Make Whole Amount, all "Exit Fees" as defined in the Prepetition Secured Loan Agreement and all other fees at $29 million of additional principal, together with the reduction of the interest rate from 14% per annum to 10 1/4% per annum, the increased advance rate under the borrowing base, the extension of the maturity, and the relief from the consolidated tangible net worth covenant and increased flexibility under the investment, indebtedness and certain other covenants, represents the most favorable financing arrangement available to the Company. The agreement also provides that upon any repayment of any portion of the principal amount under the loan (whether or not at maturity), CA Lyon shall pay a formulaic exit fee. In the event that any portion of the outstanding principal amounts of the Old Notes (defined below) is repaid (whether or not at maturity), the Prepetition Secured Lenders may also elect to require CA Lyon to repay a certain portion of the outstanding loans.

The Prepetition Secured Loan Agreement contains customary events of default, including failure to pay when due amounts in respect of the loan or otherwise, failure to comply with certain agreements or covenants, and certain insolvency and bankruptcy events. The Prepetition Secured Loan Agreement also contains a cross-default to any failure to make any payment when due, after any applicable grace period, in respect of any indebtedness or guarantee having an aggregate principal amount of more than $10,000,000, and to any failure to observe any covenant or agreement relating to any such indebtedness or guarantee if such failure results or could result in acceleration. Upon the occurrence and unremedied continuance of a default, the Prepetition Secured Lenders may accelerate CA Lyon's repayment obligation.

2.    **Old Notes**

CA Lyon has also issued three series of senior unsecured notes.  The first series was issued in an aggregate principal amount of $150 million in 2004, bears a 7 ⅝% interest rate, and is due on December 15, 2012 (the "7 ⅝% Senior Notes"); the second was issued in an aggregate principal amount of $250 million in 2003, bears a 10 ¾% interest rate, and is due on April 1, 2013 (the "10 ¾% Senior Notes"); the third was issued in an aggregate principal amount of $150 million in 2004, bears a 7 ½% interest rate, and is due on February 15, 2014 (the "7 ½% Senior Notes" and, together with the 7 ⅝% Senior Notes and the 10 ¾% Senior Notes, the "Old Notes"). Interest on the Old Notes is payable semi-annually.  As a result of previous redemptions in 2010, the 7 ⅝% Senior Notes have a current outstanding balance of approximately $66.7 million; the 10 ¾% Senior Notes, approximately $138.7 million; and the 7 ½% Senior Notes, approximately $77.8 million.  Each of the series of Old Notes is governed by an indenture (each, a "Prepetition Indenture," and collectively, the "Prepetition Indentures") by and among CA Lyon as issuer, DE Lyon and the other Prepetition Guarantors named therein, and U.S. Bank National Association, as Trustee (the "Prepetition Indenture Trustee").

The Old Notes are unconditionally guaranteed on a senior unsecured basis by the following Debtors:  DE Lyon; California Equity Funding, Inc.; PH-LP Ventures; Duxford Financial, Inc.; Sycamore CC, Inc.; Presley CMR, Inc.; William Lyon Southwest, Inc.; PH-Reilly Ventures; HSP, Inc.; PH Ventures-San Jose; WLH Enterprises, formerly Carmel Mountain Ranch; Lyon Waterfront, LLC; and Lyon East Garrison Company I, LLC.

The Prepetition Indentures contain covenants that limit the ability of CA Lyon and the Guarantors to, *inter alia*: incur additional indebtedness; pay dividends, make other distributions and repurchase stock; make investments; sell assets; incur liens; enter into agreements restricting the ability of the Guarantors to pay dividends; enter into transactions with affiliates; and consolidate, merge or sell all or substantially all of DE Lyon's and CA Lyon's assets.  More specifically, upon a change of control as described in the Prepetition Indentures, CA Lyon is required to offer to purchase the Old Notes at a purchase price equal to 101% of the principal amount, plus accrued and unpaid interest, if any.  In addition, the Prepetition Indentures contain consolidated minimum tangible net worth covenants under which, if the consolidated tangible net worth of DE Lyon falls below $75 million for any two consecutive fiscal quarters, CA Lyon is required to make an offer to purchase up to 10% of each class of Old Notes at a purchase price equal to 100% of the principal amount, plus accrued and unpaid interest, if any.  However, CA Lyon may reduce the principal amount of the notes to be purchased by the aggregate principal amount of all notes previously redeemed.  During 2008, 2009 and 2010, CA Lyon redeemed a total of  approximately $266 million in principal amount of the Old Notes.

After giving effect to these repurchases, the Old Notes now have a current aggregate outstanding amount of approximately $299.5 million.  Pursuant to the Noteholders RSA, holders of Old Notes Claims, representing approximately 63.5% in principal amount of the outstanding Old Notes, agreed, subject to the terms and conditions set forth in the Noteholders RSA, to vote in favor of the Plan and otherwise support the Plan.  The Prepetition Indentures contain typical events of default such as the failure to pay interest or principal when due, failure to comply with any covenant, and the commencement of insolvency proceedings, etc.  In addition, the Prepetition Indentures provide a cross-default to other agreements evidencing indebtedness in excess of $10 million if, under such agreement, DE Lyon, CA Lyon or any Guarantor defaults, and such default: (i) is caused by a failure to pay principal when due within the applicable grace period; (ii) results in acceleration of such indebtedness; or (iii) results in foreclosure upon the assets securing such indebtedness.  In an event of default (other than defaults related to bankruptcy proceedings), the trustee for the Old Notes or holders of at least 25% thereof may accelerate CA Lyon's repayment obligations by providing written notice of acceleration.

- 33 -

The Prepetition Indentures contain typical events of default such as the failure to pay interest or principal when due, failure to comply with any covenant, and the commencement of insolvency proceedings, etc. In addition, the Prepetition Indentures provide a cross-default to other agreements evidencing indebtedness in excess of $10 million if, under such agreement, DE Lyon, CA Lyon or any Guarantor defaults, and such default: (i) is caused by a failure to pay principal when due within the applicable grace period; (ii) results in acceleration of such indebtedness; or (iii) results in foreclosure upon the assets securing such indebtedness. In an event of default (other than defaults related to bankruptcy proceedings), the trustee for the Old Notes or holders of at least 25% thereof may accelerate CA Lyon's repayment obligations by providing written notice of acceleration.

### 3. Other Debt Financing

The Company has outstanding loans of lesser amounts that finance specific development projects.

Circle G at the Church Farm North Joint Venture, LLC ("Circle G"), a direct subsidiary of CA Lyon, is the borrower under the Loan Agreement by and between Circle G and U.S. Bank N.A., successor to California National Bank, N.A., dated February 14, 2006, as amended by the *Extension and Modification Agreement* dated April 6, 2007, the *Second Extension and Modification Agreement* dated June 20, 2007, the *Third Extension and Modification Agreement* dated May 19, 2008, the *Fourth Extension and Modification Agreement* dated December 31, 2008, the *Amendment and Waiver of Default* dated April 14, 2011 (the "U.S. Bank Amendment and Waiver"), and the *Fifth Extension and Modification Agreement* dated July 11, 2011 (the "U.S. Bank Fifth Extension"), collectively, the "U.S. Bank Loan Agreement"). The loan under this agreement bears interest at a floating rate of 0.25% per annum in excess of the WSJ prime rate (never less than 6.5%), payable monthly, and matures on January 1, 2012. The loan's original principal amount was $39,500,000, and the outstanding balance as of September 30, 2011 was approximately $9 million. The loan is guaranteed by CA Lyon and DE Lyon and secured by certain real property of Circle G in Maricopa and Pinal Counties, Arizona and the personal property located thereon.

Mountain Falls, LLC and Mountain Falls Golf Course, LLC (the "Mountain Falls Entities"), direct and indirect subsidiaries of CA Lyon, respectively, are borrowers under the *Amended and Restated Loan Agreement* by and between the Mountain Falls Entities and Bank of the West. The loan under this agreement bears interest currently at 12.5% per annum until the outstanding principal balance is reduced to $7.5 million or less, at which point the interest rate will be reduced to 10% per annum, payable monthly. The loan matures on May 5, 2015. The loan's original principal amount was approximately $39.8 million, and the outstanding balance as of October 1, 2011 was $7 million. Principal payments of $500,000 are made quarterly. The loan is guaranteed by CA Lyon and secured by certain real property of the Mountain Falls Entities in Nye County, Nevada and the personal property located thereon.

CA Lyon is the borrower under the *Builder Agreement* by and between CA Lyon and Irvine Community Development Company LLC dated January 26, 2010. The purchase money promissory note under this agreement bears interest at 7% per annum, payable upon certain specified dates and events, and matures in May, 2015. The loan's original principal amount was approximately $10.7 million and the outstanding balance as of September 30, 2011 was approximately $3.9 million. The loan is secured by certain real property of CA Lyon in Orange County, California.

## D.    LITIGATION CLAIMS

The Company is involved in various claims and litigation arising principally in the ordinary course of business.  For the most part, these claims involve alleged construction defects, in which cases the Debtors usually file claims against the other parties involved, including trade vendors that are legally responsible.  In addition, the Company is occasionally involved in employer related litigation, contract, insurance and personal injury matters.  The Debtors' pending litigation is set forth in Plan Schedule 2.

## E.    EVENTS LEADING TO THE PROPOSAL OF PLAN AND POTENTIAL CHAPTER 11 FILING

In late 2010, DE Lyon realized that the decrease in its tangible net worth, due primarily to its non-cash impairment losses, could result in violations of tangible net worth covenants in the Prepetition Secured Loan Agreement and the U.S. Bank Loan Agreement.  In addition, the Company became uncertain of its future ability to repay the 7 ⅝% Senior Notes on December 15, 2012.  In order to avoid breaching these covenants and obligations, and thereby causing defaults and cross-defaults, the Company completed a series of transactions to provide for financial covenant relief (the "Prepetition Transactions").  To guide it through the restructuring process and help identify options and funding sources, the Company hired financial advisors, Alvarez & Marsal LLC ("A&M"), in January, 2011.

Subsequent to first reaching out to its creditors, with the passage of two fiscal quarters at the end of which DE Lyon's tangible net worth fell below $75 million, CA Lyon obtained the Colony Waiver No. 1 on April 20, 2011, which waived Prepetition Secured Lenders' rights to enforce their remedies for breach of the modified tangible net worth covenant until July 19, 2011.  CA Lyon then obtained a similar waiver by entering the Colony Waiver No. 2 on July 18, 2011.  Such waiver terminated September 16, 2011.  CA Lyon then obtained a similar waiver and CA Lyon and the Lenders amended the Prepetition Secured Loan Agreement by entering into Colony Waiver No. 3 on September 15, 2011.  Such waiver was extended pursuant to the Amendment to Colony Waiver No. 3 on October 7, 2011.  Such waiver terminated on October 27, 2011.

### 1.    Prepetition Tem Loan Agreement Waivers; Other Debt Facilities; Indenture Default

(a)    Credit Agreement Waivers

CA Lyon entered the Colony First Amendment on March 18, 2011 with the lenders of the Prepetition Secured Loans, which modified the tangible net worth covenant in the Prepetition Secured Loan Agreement to require the borrower thereunder to prevent DE Lyon's tangible net worth from falling below $75 million for two consecutive quarters (whereas the original covenant had required the same for any quarter) until December 31, 2011, when the terms of the original covenant will again apply.

The Company also reached out both to Colony in the first quarter of 2011 to discuss a possible renegotiation of the Prepetition Secured Loans, and to entities then holding, collectively, approximately 59% of the Old Notes (the "Ad Hoc Noteholders Group") in March, 2011 to discuss a possible renegotiation of the Prepetition Indentures.  The Company held numerous discussions over email, telephone and in meetings, with all of the Company's creditors.  Over several months, the Company initiated and participated in exchanges of information and negotiations in an effort to reach a resolution of its impending debt obligations.  Among other things, the Company agreed to pay the fees and expenses for the Ad Hoc Noteholders Group in connection with the negotiations of the Old Notes.  Since the Company first realized the need to

- 35 -

refinance its debt obligations or otherwise reorganize its capital structure, the Company has made, and continues to make, great efforts to reach a solution acceptable to all of its constituencies.

     (b)    <u>10¾% Senior Notes Indenture Interest Payment Default</u>

In June, 2011, the Company began the negotiation of the Old Notes Restructuring Term Sheet. Those negotiations continued throughout the third quarter. On October 31, 2011, CA Lyon failed to make the scheduled interest payment on the 10 ¾% Senior Notes within the 30-day grace period specified in the 10 ¾% Senior Notes Indenture, resulting in an event of default under the 10 ¾% Senior Notes Indenture, and a cross-default under the Prepetition Secured Loan Agreement. In the event that Holders of the 10 ¾% Senior Notes exercised their right to accelerate the 10 ¾% Senior Notes, a cross-default under the other Prepetition Indentures would also result.

     (c)    <u>Other Debt Facilities</u>

Circle G entered into an *Amendment and Waiver* on April 14, 2011 with U.S. Bank to obtain a waiver of the lender's right to enforce its remedies for any past breach of the tangible net worth covenant, and to eliminate the covenant going forward. That covenant had required DE Lyon to maintain a tangible net worth of at least $90 million and available liquidity of at least $30 million. Subsequently, Circle G entered into a *Fifth Extension* with U.S. Bank on July 11, 2011 that extended the maturity of the loan until January 1, 2012.

     (d)    <u>Mayfield Property Acquisition</u>

During the course of its negotiations with its principal debt holders, the Company was able to close the purchase of certain real property located in Mountain View and Palo Alto, California (the "Mayfield Property") on terms favorable to the Company. The acquisition was consummated on October 28, 2011 pursuant to the terms of an agreement for purchase and sale that CA Lyon had entered into on July 19, 2010, which required the Company to either close the transaction or forfeit its deposit of $1 million by the end of October, 2011. The acquisition was financed with a $55 million loan to Lyon Mayfield, LLC (a wholly-owned, special purpose subsidiary of CA Lyon, which is not a Debtor, to which CA Lyon assigned its rights under the purchase and sale agreement) by Qina, LLC, an affiliate of the largest holder of the Company's Old Notes. The loan required, among other things, the grant of a security interest in the property to Qina, LLC, an environmental indemnification, certain payment and performance guaranties by CA Lyon and certain guarantors of the Old Notes. Prior to the acquisition, the Company obtained the consent of the Prepetition Secured Lenders, to whom the Company also pledged its membership interest in Lyon Mayfield, Inc., the sole member of Lyon Mayfield, LLC, in connection with the acquisition. The Company believes that the acquisition was made at a very favorable price and that the Mayfield Property will facilitate the Company's restructuring and post-Effective Date operations.

    **2.**    **Evaluation of Strategic Alternatives; Restructuring Preparations**

Since January, 2011, the Company, with the assistance of its advisors, has been proactively evaluating strategic alternatives to address ongoing liquidity and financing concerns, including the sale of non-core assets and/or alternative debt structures, such as debt-for-debt or debt-for-equity agreements.

During the course of the review of strategic alternatives, it became apparent that a significant new capital investment would be required in order for the Company to satisfy its working capital and liquidity requirements, whether in the context of an out-of-court or in-court

restructuring. As part of this process, the Company's financial advisor contacted approximately 25 parties in an attempt to solicit proposals for new capital financing for the Company. The Company's financial advisor indicated that the available capital-raising alternatives to the Rights Offering (if any) were either more expensive or less feasible than the Rights Offering. The Company believes the process of exploring financing alternatives was comprehensive and exhaustive.

After several weeks of active and arm's-length negotiations, the Company, in consultation with its advisors, reached prepetition agreements in principle with the Prepetition Secured Lenders and the Ad Hoc Noteholders Group, representing a substantial majority of the Prepetition Noteholders, on a prepackaged restructuring plan, including the key terms of the Restructured First Lien Loan Agreement, the distributions under the Plan to Holders of Old Notes Claims and Equity Interests in Parent, and the treatment of general unsecured claims. The Company believes that the prearranged prepackaged restructuring plan is the best restructuring alternative reasonably available to the Company. The Company also secured commitments for a new capital investment of $60 million, to be consummated pursuant to the Rights Offering, and an additional $25 million in the form of Cash or, the holders of existing Parent Equity Interests finance the exercise of an option to purchase of 100% of the membership interests in the limited liability company that owns the rights to the certain properties in Rancho Mission Viejo, California, in the form of a combination of Cash and the membership interests purchased under such option, to be consummated pursuant to the Class B Common Stock Purchase Agreement, that the Company plans to utilize to fund its working capital requirements. The Company believes that the Backstop Commitment Agreement and the Class B Common Stock Commitment Agreement represent the best terms for financing available to the Company in this market.

The Plan represents a significant achievement for the Company and should greatly enhance the Company's ability to reorganize successfully and expeditiously. Through confirmation of the Plan implementing the terms of the pre-packaged restructuring, the Company will restructure and substantially deleverage its balance sheet; reduce its cash interest expense to a level that is aligned with its expected future cash flows; retain additional flexibility to invest in growth initiatives to maximize enterprise value; and maintain very favorable pricing to the Company under the Prepetition Secured Loan Agreement. The Company also expects that it will generate additional liquidity from its operations, during the pendency of the Chapter 11 Cases and afterwards. For all of these reasons, the Company believes that it will have sufficient liquidity during the course of the Chapter 11 Cases and will be well-positioned going forward.

Notwithstanding the global economic circumstances that contributed to the Company's current liquidity challenges, the Company has managed its business to reduce costs, protect margins, maintain relationships and competitive advantages, and increase its operational flexibility. The Company's senior management team has significant experience in managing through adverse business cycles.

Confirmation of the Plan will afford the Debtors the opportunity to adjust their debt levels and capital structure in a manner that is commensurate with its projected cash flows. The Debtors expect to accomplish this goal through a process that will be consensual and that has the support of its key constituents.

The Debtors' restructuring efforts are designed to result in greater profitability for the Company and to solidify their position as the market leader in their product categories. The Debtors expect to expeditiously emerge from chapter 11 having rationalized their capital structure by reducing debt to levels commensurate with their cash flow generating capacity and industry norms. Reducing leverage should create financial flexibility for future operating requirements and capital expenditures and improve liquidity. The Debtors believe that the

- 37 -

efforts they have taken, and those they expect to take, will return the most value to the Debtor's stakeholders.

The Board of Directors of each Debtor approved the Solicitation of the Plan on November 1, 2011.

## F.    RESTRUCTURING SUPPORT AGREEMENTS

### 1.    Noteholders RSA[6]

On November 4, 2011, the Company entered into the Noteholders RSA with the holders of approximately 63.5% of the principal amount of the Old Notes then outstanding (each, a "Consenting Noteholder" and collectively, the "Consenting Noteholders"). Pursuant to the Noteholders RSA, each Consenting Noteholder agreed to exercise all votes to which it is entitled with respect to the principal amount of Old Notes subject to the Noteholders RSA to accept the Plan.

While the Noteholders RSA is in effect, each Consenting Noteholder also agreed not to transfer any Old Notes held by it that are subject to the Noteholders RSA, except to a transferee who agrees to be bound by the Noteholders RSA.

The Requisite Holders may also terminate the Noteholders RSA upon the occurrence of certain events, including the following:

(a)    There shall have occurred a material breach under the Class B Common Stock Commitment Agreement, the Colony RSA, the Backstop Commitment Agreement or the DIP Facility, or the Class B Common Stock Commitment Agreement, the Colony RSA, the Backstop Commitment Agreement or the DIP Facility shall have been terminated;

(b)    The Petition Date shall not have occurred on or before December 19, 2011;

(c)    The Company fails to file the Plan and the Disclosure Statement on the Petition Date, unless both a Liquidity Event has occurred and the Chapter 11 Cases have been commenced by November 17, 2011, in which case the Company fails to file the Plan and Disclosure Statement by November 17, 2011;

(d)    The Solicitation has not been completed by December 19, 2011, unless prior to such date, a Liquidity Event has occurred and the Chapter 11 Cases have been commenced;

(e)    If the Solicitation has been completed prior to the Petition Date, (i) the Rights Offering Approval Order shall not have been entered by the 58th day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date), (ii) the Confirmation Hearing shall not have concluded by the 58th day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date), (iii) the Confirmation Order shall not been entered by the Bankruptcy Court by the 60th day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date), or (iv) the Effective Date shall not have occurred within 17 days after the entry of the Confirmation Order. In the event that the Rights Offering Approval Order

---

[6] Capitalized terms used in this Article II.F.1 without other definitions have the meanings assigned to those terms in the Noteholders RSA.

is not entered within 30 days after the Petition Date, the deadlines set forth in clauses (ii) and (iii) shall be extended by 30 days;

(f)    If a Liquidity Event has occurred and the Solicitation has not been completed prior to the Petition Date, (i) the entry of an order by the Bankruptcy Court approving the Consent Solicitation Materials shall not have occurred by the 60th day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date), (ii) the Confirmation Hearing shall not have concluded by to the 100th day after the Petition Date (or if such day is not a Court Date, the next succeeding Court Date), (iii) the Confirmation Order shall not have been entered by the Bankruptcy Court by the 102nd day after the Petition Date (or if such day is not a Court Date, the next succeeding Court Date), or (iv) the Effective Date shall not have occurred within 17 days after the entry of the Confirmation Order. In the event that the Rights Offering Approval Order is not entered by the 45th day after the Petition Date, the deadlines set forth in clauses (ii) and (iii) shall be extended by 30 days;

(g)    The Company shall not have received the votes in support of the Plan from at least 66 2/3% of the principal amount of the Notes whose holders have voted, and a majority in number of the holders of Notes who have voted by any applicable voting deadline.

(h)    The Corporate Governance Documents and the indenture governing the second lien notes are not in form and substance reasonably acceptable to the Requisite Noteholders on or prior to the Petition Date;

(i)    The Company shall have failed to file the Noteholders RSA Motion by the first Court Date after the Petition Date;

(j)    The Noteholders RSA Order shall not have been entered by the Bankruptcy Court by the 45th day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date);

(k)    The Company shall have failed to file the DIP Facility Motion on or before the first Court Date after the Petition Date;

(l)    The Interim DIP Order shall not have been entered on the first Court Date after the Petition Date or the Final DIP Order shall not have been entered on or before the 45th day after the Petition Date;

(m)    The Company shall have failed to file the Motion to approve the Rights Offering by the first Court Date after the Petition Date;

(n)    The Company shall have failed to use reasonable best efforts to obtain a hearing on the Motion to approve the Rights Offering before the Bankruptcy Court by the 25th day after the Petition Date;

(o)    The Backstop Commitment Agreement Assumption Order shall not have been entered by the Bankruptcy Court by the 45th day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date);

- 39 -

(p)     The documents related to the New Second Lien Notes (other than the New Second Lien Notes Indenture) shall not be in form and substance reasonably acceptable to the Requisite Noteholders prior to or on the 30th day after the Petition Date;

(q)     The Company shall have withdrawn the Plan without the consent of the Requisite Noteholders;

(r)     The amendment or modification of, or the filing of a pleading seeking to amend or modify, the Plan, the Disclosure Statement or any Plan-related documents, notices, exhibits, appendices and orders by the Debtors, which amendment, modification or filing is materially inconsistent with the Noteholders RSA or the Old Notes Restructuring Term Sheet in an manner that is not reasonably acceptable to the Consenting Noteholders;

(s)     The filing by the Company of any motion or other request for relief seeking (i) voluntary dismissal of any of the Chapter 11 Cases (other than the Chapter 11 Cases solely relating to "Non-material Subsidiaries" (as that term is used in the Noteholders RSA)), (ii) conversion of any of the Chapter 11 Cases (other than the Chapter 11 Cases solely relating to Non-material Subsidiaries) to chapter 7 of the Bankruptcy Code, or (iii) appointment of a trustee or an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases (other than the Chapter 11 Cases solely relating to Non-material Subsidiaries);

(t)     The entry of an order by the Bankruptcy Court (i) dismissing any of the Chapter 11 Cases (other than the Chapter 11 Cases solely relating to Non-material Subsidiaries), (ii) converting any of the Chapter 11 Cases (other than the Chapter 11 Cases solely relating to Non-material Subsidiaries) to a case under chapter 7 of the Bankruptcy Code, (iii) appointing a trustee or an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code with respect to any of the Chapter 11 Cases (other than the Chapter 11 Cases solely relating to Non-material Subsidiaries); or (iv) making a finding of fraud, dishonesty, or material misconduct by any officer or director of the Company;

(u)     A material breach by DE Lyon or CA Lyon of any of its obligations under this Agreement or the agreements governing the Restructuring, and any such breach by DE Lyon or CA Lyon is not cured by 10 days after receipt of written notice and opportunity to cure, if such breach is curable, from the Consenting Noteholders or;

(v)     Any court of competent jurisdiction or other competent governmental or regulatory authority shall have issued an order making illegal or otherwise restricting, preventing, or prohibiting the Restructuring in a manner that cannot be reasonably remedied by the Company or the Consenting Noteholders;

(w)     The Effective Date shall not have occurred by the 17th day after Confirmation of the Plan;

(x)     The exclusive right of DE Lyon or CA Lyon to file and solicit a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code shall have terminated;

- 40 -

(y)      Any material adverse change (as defined or otherwise referenced in the Class B Common Stock Commitment Agreement, the Colony RSA, the Backstop Commitment Agreement or the DIP Facility, as applicable, or any similar event giving rise to a right of termination under the Class B Common Stock Commitment Agreement, the Colony RSA, the Backstop Commitment Agreement or the DIP Facility, as applicable) as a result of which, the non-Company parties to the Class B Common Stock Commitment Agreement, the Colony RSA, the Backstop Commitment Agreement or the DIP Facility, as the case may be, shall have the right to terminate their respective commitments, shall have occurred;

(z)      The Company shall either (1) enter into a DIP Facility, a cash collateral use agreement or exit financing, or (2) file any motion with the Bankruptcy Court seeking an order approving a DIP Facility, cash collateral use agreement or exit financing, in either case, that is materially inconsistent with this Agreement and the Old Notes Restructuring Term Sheet in a manner that is not reasonably acceptable to the Requisite Noteholders;

(aa)      The filing of any motion in the Chapter 11 Cases under sections 363, 364, or 365 of the Bankruptcy Code that is materially inconsistent with the terms and conditions of the Old Notes Restructuring Term Sheet or the Noteholders RSA in a manner that is not reasonably acceptable to the Requisite Noteholders; or

(bb)      The Company fails to pay any of the Transaction Fees as they become due.

## 2.      Colony RSA[7]

On November 4, 2011, the Company entered into the Colony RSA with the Prepetition Secured Lenders holding 100% of the principal amount of the loans outstanding under the Prepetition Secured Loan Agreement.  Pursuant to the Colony RSA, each Prepetition Secured Lender party thereto (each, a "Consenting Lender" and collectively, the "Consenting Lenders") agreed, subject to the terms and conditions of the Colony RSA, to exercise all votes to which it is entitled to accept the Plan.

While the Colony RSA is in effect, the Consenting Lenders agreed to not transfer any Claims except to a transferee who agrees to be bound by the Colony RSA.

The Consenting Lenders may terminate the Colony RSA upon the occurrence of certain events, including the following:

(a)      There shall have occurred a material breach under the Class B Common Stock Commitment Agreement, the Noteholders RSA, or the Backstop Commitment Agreement;

(b)      The Petition Date shall not have occurred by December 19, 2011;

(c)      the Company shall have failed to file the Plan and Disclosure Statement on the Petition Date, unless both a Liquidity Event has occurred and the Chapter 11 Cases have been commenced by November 17, 2011, in which case the Company fails to file the Plan and Disclosure Statement by November 17, 2011;

---

[7] Capitalized terms used in this Article II.F.2 without other definitions have the meanings assigned to those terms in the Colony RSA