(d)    The Solicitation has not been completed by December 19, 2011, unless, prior to such date, a Liquidity Event has occurred and the Chapter 11 Cases have been commenced;

(e)    If the Solicitation has been completed prior to the Petition Date, (i) the Rights Offering Approval Order shall not have been entered by the 58th day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date), (ii) the Confirmation Hearing shall not have concluded by the 58th day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date), (iii) the Confirmation Order shall not been entered by the Bankruptcy Court by the 60th day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date), or (iv) the Effective Date shall not have occurred within 17 days after the entry of the Confirmation Order.  In the event that the Rights Offering Approval Order is not entered within 30 days after the Petition Date, the deadlines set forth in clauses (ii) and (iii) shall be extended by 30 days;

(f)    If a Liquidity Event has occurred and the Solicitation has not been completed prior to the Petition Date, (i) the entry of an order by the Bankruptcy Court approving the Consent Solicitation Materials shall not have occurred by the 60th day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date), (ii) the Confirmation Hearing shall not have concluded by to the 100th day after the Petition Date (or if such day is not a Court Date, the next succeeding Court Date), (iii) the Confirmation Order shall not have been entered by the Bankruptcy Court by the 102nd day after the Petition Date (or if such day is not a Court Date, the next succeeding Court Date), or (iv) the Effective Date shall not have occurred within 17 days after the entry of the Confirmation Order.  In the event that the Rights Offering Approval Order is not entered by the 45th day after the Petition Date, the deadlines set forth in clauses (ii) and (iii) shall be extended by 30 days;

(g)    The Company shall not have received the votes in support of the Plan from at least 66 2/3% of the principal amount of the Notes whose holders have voted, and a majority in number of the holders of Notes who have voted, by the voting deadline set forth in the Consent Solicitation Materials;

(h)    The Company fails to file the Motion to approve the Rights Offering by the first Court Date after the Petition Date;

(i)    The Company fails to use reasonable best efforts to obtain a hearing on the Motion to approve the Rights Offering before the Bankruptcy Court by the 25th day after the Petition Date;

(j)    The Company fails to file the Colony RSA Motion by the first Court Date after the Petition Date;

(k)    The Colony RSA Order shall not have been entered by the Bankruptcy Court by the 45th day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date) or the Company shall file a motion subsequent to the entry of the Colony RSA Order seeking to reject this Agreement;

- 42 -

(l)     The Backstop Commitment Agreement Assumption Order shall not have been entered by the Bankruptcy Court by the 45th day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date);

(m)     The Interim DIP Order shall not have been entered on the third Court Date after the Petition Date or the Final DIP Order shall not have been entered on or before the 30th day after the Petition Date(or, if such day is not a Court Date, the next succeeding Court Date);

(n)     The Corporate Governance Documents are not in form and substance reasonably acceptable to the Administrative Agent and the Consenting Lenders on or prior to the hearing on confirmation of the Plan;

(o)     The occurrence of an event of default under the Financing Orders, any agreement concerning the DIP Facility or any agreement concerning the use of the Administrative Agent's and Prepetition Secured Lenders' cash collateral that has not been cured (only if such breach is susceptible to cure) within the applicable time period provided for in the applicable document;

(p)     The withdrawal, amendment, modification of, or the filing of a pleading seeking to amend or modify, supplement, the Plan, the Consent Solicitation Materials or any Plan Related Documents, or any notices, exhibits, appendices and orders by the Company, which such withdrawal, amendment, modification or filing associated with the foregoing, in a manner not acceptable to the Administrative Agent (at the direction of the Consenting Lenders in their sole and absolute discretion);

(q)     The filing by the Company of any motion or other request for relief seeking (i) dismissal of any of the Chapter 11 Cases (other than the Chapter 11 Cases solely relating to Non-material Subsidiaries), (ii) conversion of any of the Chapter 11 Cases to chapter 7 of the Bankruptcy Code (other than the Chapter 11 Cases solely relating to Non-material Subsidiaries), or (iii) appointment of a trustee or an examiner pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases (other than the Chapter 11 Cases solely relating to Non-material Subsidiaries); unless such motion is made with the consent of the Administrative Agent (at the direction of the Consenting Lenders in their sole and absolute discretion);

(r)     The entry of an order by the Bankruptcy Court (i) dismissing any of the Chapter 11 Cases (other than the Chapter 11 Cases solely relating to Non-material Subsidiaries), (ii) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (other than the Chapter 11 Cases solely relating to Non-material Subsidiaries), or (iii) appointing a trustee or an examiner pursuant to section 1104 of the Bankruptcy Code with respect to DE Lyon or CA Lyon, unless such order is entered with the consent of the Administrative Agent (at the direction of the Consenting Lenders in their sole and absolute discretion); or (iv) making a finding of fraud, dishonesty, or material misconduct by any officer or director of the Company;

(s)     A breach by DE Lyon or CA Lyon of any of its obligations under this Agreement, the Colony Restructuring Term Sheet or any of the other agreements governing the Restructuring, and any such breach by DE Lyon or CA Lyon is not cured (only if such breach is susceptible to cure) by the earlier of three (3) Business Days after receipt of written notice from the Administrative Agent or the Consenting Lenders or, to the extent applicable, the cure period

- 43 -

provided for under the agreements governing the Restructuring (or, if sooner, at or immediately prior to the hearing on confirmation of the Plan or the Effective Date, as the case may be);

(t)    The Company files, propounds or otherwise supports any plan of reorganization other than the Plan, or files any motion or application seeking authority to sell substantially all of its assets, without the consent of the Administrative Agent (at the direction of the Consenting Lenders in their sole and absolute discretion);

(u)    Any court of competent jurisdiction or other competent governmental or regulatory authority shall have issued an order making illegal or otherwise restricting, preventing, enjoining or prohibiting the consummation of the Restructuring;

(v)    The entry of an order by any court of competent jurisdiction invalidating, disallowing, subordinating, or limiting, in any respect, as applicable, the enforceability, priority, or validity of the Loan Agreement or Loan Agreement Claims;

(w)    The Company fails to pay the fees and expenses incurred by the legal and financial advisors to the Administrative Agent (including Akin Gump Strauss Hauer & Feld LLP and Pepper Hamilton LLP) as they become due;

(x)    The occurrence of the Outside Date;

(y)    The exclusive right of DE Lyon or CA Lyon to file and solicit a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code shall have terminated;

(z)    Any intercreditor agreement, indenture, credit agreement or any other document relating to the implementation of the Restructuring that has been executed, filed with the Bankruptcy Court or otherwise finalized shall be in form or substance not acceptable to the Administrative Agent or the Consenting Lenders in their sole and absolute discretion;

(aa)    Any Plan Related Document that has been executed, filed with the Bankruptcy Court or otherwise finalized shall be in form or substance not acceptable to the Administrative Agent or the Consenting Lenders in their sole and absolute discretion;

(bb)    A Termination Event under the Class B Common Stock Commitment Agreement or the Backstop Commitment Agreement (as defined in such document) shall have occurred (except if such occurrence has been permanently waived) or the Class B Common Stock Commitment Agreement or the Backstop Commitment Agreement shall otherwise have been terminated, or the Class B Common Stock Commitment Agreement or the Backstop Commitment Agreement shall have been amended, modified, or supplemented in a manner not acceptable to the Administrative Agent or the Consenting Lenders in their sole and absolute discretion;

(cc)    A Termination Event under the Noteholders RSA (as defined in such document) shall have occurred (except if such occurrence has been permanently waived) or the Noteholders RSA shall otherwise have been terminated, or the Noteholders RSA shall have been amended, modified, or supplemented in a manner not acceptable to the Administrative Agent or the Consenting Lenders in their sole and absolute discretion;

- 44 -

(dd)    The Company shall (1) enter into a DIP Facility, a cash collateral use agreement or exit financing, (2) file any motion with the Bankruptcy Court seeking an order approving any DIP Facility, cash collateral use agreement or exit financing, in either case, that is in form or substance not acceptable to the Administrative Agent or the Consenting Lenders in their sole and absolute discretion, or an order or orders shall be entered by the Bankruptcy Court authorizing the use of the Administrative Agent and Prepetition Secured Lenders' cash collateral or authorizing the Company to enter into a DIP Facility, cash collateral use agreement or exit financing (the "Financing Orders") on terms and conditions that are not acceptable to the Administrative Agent or the Consenting Lenders in their sole and absolute discretion;

(ee)    Upon the occurrence of any Material Adverse Change;

(ff)    The Bankruptcy Court shall enter an order granting relief from the automatic stay to the holder or holders of any other security interest or lien (other than the Administrative Agent or Prepetition Secured Lenders) in any collateral to permit the pursuit of any judicial or non-judicial transfer or other remedy against any of the collateral or granting any form of adequate protection, including requiring cash payments by the Company to such holder or holders, in lieu of such relief;

(gg)    The filing of any motion in the Chapter 11 Cases under sections 363, 364, or 365 of the Bankruptcy Code that is not acceptable to the Administrative Agent or the Consenting Lenders in their sole and absolute discretion; or

(hh)    The occurrence of any default under the Loan Agreement (excluding the filing of voluntary petitions commencing the Chapter 11 Cases contemplated by this Agreement), including the failure to make any payment of interest or any other payment that is due and payable.

## 3.    Proposed DIP Financing and Use of Cash Collateral

A critical goal of the Debtors' business stabilization efforts was to ensure the Debtors maintain sufficient liquidity to operate their businesses during the pendency of the Chapter 11 Cases. Therefore, the Debtors are negotiating an agreement with the DIP Lenders as to the terms of proposed debtor-in-possession financing facilities and hope to reach agreement imminently. The Debtors do not believe they are able to obtain postpetition financing or other financing accommodations from any prospective lender or group of lenders on more favorable terms and conditions than those contained in the DIP Facility and described below. Specifically, the Debtors are unable to obtain debtor-in-possession financing without providing senior priming liens. The DIP Facility was negotiated in good faith and at arm's length, extensively and diligently considered by the Debtors' management and submitted to the Parent board of directors for approval. The management of the Debtors believes that the proposed terms of the DIP Facility are fair and reasonable in light of current market conditions (particularly the lack of a ready market for any financing, including debtor-in-possession financing) and will be in the best interests of the Debtors' Estates.

On the Petition Date, the Debtors intend to file a motion seeking approval of the DIP Facility. In this motion, the Debtors will seek permission from the Court to enter into the DIP Facility among Parent, the DIP Agent and the other DIP Lenders. The DIP Facility will grant super-priority administrative claim status to the Debtors' obligations under the DIP Facility, and to grant first priority priming liens on substantially all of the properties and assets of CA Lyon,

- 45 -

Parent and the other Guarantors, other than specified Excluded Assets, to secure those obligations.

The financing to be provided under the DIP Facility and the use of Cash Collateral will allow the Debtors to, among other things: (a) continue to operate their businesses in an orderly manner; (b) maintain their valuable relationships with vendors, shippers, suppliers, customers and employees; (c) pay various interest, fees and expenses under the DIP Facility; (d) satisfy adequate protection and other obligations to the Prepetition Agent and Prepetition Secured Lenders under the Prepetition Secured Loan Agreement; and (e) support the Debtors' working capital, general corporate and overall operational needs - all of which are necessary to preserve and maintain the going-concern value of the Debtors' businesses and, ultimately, help ensure a successful reorganization.

### 4.     Employment of Advisors

To assist the Debtors in carrying out their duties as debtors in possession and to otherwise represent the Debtors' interests in the potential Chapter 11 Cases, the Debtors will file applications seeking authorization to retain and employ certain advisors, whose terms of retention will be subject to approval by the Bankruptcy Court including: (a) Alvarez & Marsal North America, LLC and certain of its affiliates as financial advisors to the Debtors; (c) Pachulski, Stang, Ziehl & Jones LLP as general insolvency counsel to the Debtors; and (c) Irell & Manella LLP, as special counsel to the Debtors.

### 5.     First-Day Motions for Relief to Enable the Debtors to Continue Operating their Businesses

The Debtors intend to file the first-day motions listed below:[8]

(a)     Motion to Provide Utilities "Adequate Assurance" of Payment;

(b)     Motion for Authorization to: (1) Pay Employee Wages, (2) Reimburse Business Expenses, and (3) Honor Employee Benefits;

(c)     Motion for Authorization to Pay Lienholders;

(d)     Motion to Authorization to Maintain and Pay Surety Bonds;

(e)     Motion for Authorization to Continue Use of Cash Management System/Use of Existing Business Forms;

(f)     Motion for Authorization to Use Cash Collateral/Approve DIP Financing;

(g)     Motion to Pay Prepetition Use and Sales Tax, Regulatory Fees, and Home Owner Association Fees;

(h)     Motion to Pay Insurance Premiums and Maintain Policies;

(i)     Motion to Continue to Operate in the Ordinary Course of Business;

---

[8] This list is for illustrative purposes only. The Debtors reserve their rights not to file all of the motions listed below and/or to file additional motions and applications, in their discretion.

- 46 -

(j)     Motion to Honor Customer Programs and Prepetition Deposits;

(k)     Motion to Employ Ordinary Course Professionals;

(l)     Motion for Joint Administration of Chapter 11 Cases;

(m)     Motion to Employ Claims Agent;

(n)     Employment Applications for Professionals;

(o)     Motion to Approve Proposed Rights Offering;

(p)     Motion to Approve Restructuring Support Agreements;

(q)     Motions to Approve Backstop Commitment Agreement and Related Commitment Fee, Expense Reimbursement, and Indemnity Contemplated Thereunder;

(r)     Motion to Schedule Combined Hearing to Consider Approval of Disclosure Statement and Confirmation of Plan; and

(s)     Motion for Waiver of Requirement for Debtors to File Schedules and Statements of Financial Affairs.

These motions, if granted, will enable the Debtors, among other things, to;

- pay prepetition obligations to common carriers and contractors able to perfect mechanics' or artists', or other liens in respect of prepetition obligations so that sales may continue in the ordinary course of business;

- determine adequate assurance for future utility service and establish procedures for utility providers to object to such assurance;

- pay prepetition insurance obligations and to continue insurance coverage;

- maintain customer care programs;

- maintain existing bank accounts, continue operation of their existing cash management system;

- continue to operate in the ordinary course of business; and

- remit and pay certain prepetition taxes and fees.

Similarly, to reduce the potentially negative effects of its bankruptcy on operations, the Debtors may, in their discretion, seek Bankruptcy Court approval to pay prepetition claims of vendors entitled to administrative expense status under Section 503(b)(9) of the Bankruptcy Code. Satisfying these obligations early in their Chapter 11 Cases, rather than upon the Effective Date, will enable the Debtors to effectuate a smoother transition into chapter 11, and help alleviate some of the strain that a chapter 11 filing can place on a debtor's relationships with its vendors.

**G.**     **[INTENTIONALLY OMITTED]**

**H.**     **REORGANIZATION STRATEGY**

####  1.     Enhancing the Debtors' Business Operations

With the assistance of their advisors, the Debtors have been focused on developing and executing a reorganization strategy to (a) maximize the value of their Estates, (b) address the factors that led to the bankruptcy filing, and (c) enable the Debtors to emerge from chapter 11 a stronger, more viable company. Specifically, this reorganization strategy is primarily (though not exclusively) focused on:

- restructuring the Debtors' balance sheet and emerging from chapter 11 with a long-term capital structure conducive to future profitability; and

- managing the Debtors' business to enhance its financial and operating performance, including utilizing the unique powers and opportunities afforded to a chapter 11 debtor in possession.

####  2.     Appropriate Capital Structure, Conversion of Debt and Rights Offering

As set forth above, as of September 30, 2011, the Debtors had outstanding debt of approximately $509.8 million. Upon emergence from chapter 11, the Reorganized Debtors expect to have outstanding debt of approximately $327.8 million. Accordingly, the Reorganized Debtors will have an improved balance sheet and more appropriate capital structure. These improvements will result from (i) the conversion of approximately $299.5 million in the aggregate of Old Notes into $75 Million of New Second Lien Notes and Class A Common Shares representing initially (assuming conversion of the Preferred Shares) 28.5% of the New Capital Stock of Reorganized Parent, (ii) the issuance and sale for $60.0 million in Cash of Preferred Shares and Class C Common Shares collectively representing initially (on an as-converted basis) 49.5% of the New Capital Stock of Reorganized Parent in the Rights Offering, and the issuance of Class C Common Shares representing an additional 2.0% of the New Capital Stock of Reorganized Parent (on an as-converted basis) in payment of the Backstop Fee, and (iii) the issuance and sale of Class B Common Shares representing initially (assuming conversion of the Preferred Shares) 20.0% of the New Capital Stock of Reorganized Parent pursuant to the Class B Common Stock Purchase Agreement. In addition to the reduction of leverage of the Reorganized Debtors upon emergence from chapter 11, the Reorganized Debtors also expect to benefit from an annual decrease in cash interest obligations of approximately $24.6 million, comprised of $19.9 million annual reduction associated with the conversion to equity of a portion of the Old Notes and $4.7 million annual reduction resulting from the reduction in interest rate from 14% under the Prepetition Secured Loan Agreement to 10¼% under the Restructured First Lien Loan Agreement.

**I.**     **EXCLUSIVE PERIOD FOR FILING A PLAN AND SOLICITING VOTES**

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief. If a debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the Petition Date to solicit acceptances to the plan. During these exclusive periods, no other party in interest may file a competing plan of reorganization; however, a court may extend these periods upon request of a party in interest and "for cause."

- 48 -

**J.    DEADLINE TO ASSUME OR REJECT LEASES OF NONRESIDENTIAL REAL PROPERTY**

Pursuant to section 365(d)(4) of the Bankruptcy Code, the time within which the Debtors must assume or reject unexpired leases of nonresidential real property is 120 days from the Petition Date, unless extended by order of the Bankruptcy Court.

**K.    SUMMARY OF THE RIGHTS OFFERING**

As described below, the Debtors intend to offer all Eligible Participants the opportunity to participate in the Rights Offering. However, it is possible that the Debtors will be unable to obtain sufficient commitments from the Eligible Participants to purchase all of the Rights Offering Securities for the full Rights Offering Purchase Price. Accordingly, to ensure the successful consummation of the Rights Offering, and the receipt by the Company of the Rights Offering Purchase Price in Cash, subject to entry of the Rights Offering Approval Order by the Bankruptcy Court, the Backstop Investors have agreed to "backstop" the Rights Offering and purchase any and all of the Preferred Shares and Class C Common Shares that are not subscribed upon the subscription expiration date. The Backstop Investors are those certain parties who are signatories to the Backstop Commitment Agreement, their respective affiliates, or any permitted assignee under the Backstop Commitment Agreement.

In consideration for entry into the Backstop Commitment Agreement, the Backstop Investors are entitled to, and the Debtors are obligated to pay, the Backstop Fee in the form of Class C Common Shares; provided, that if the Backstop Investors do not purchase any Rights Offering Securities that are not otherwise purchased in the Rights Offering because of any of (1) the transactions contemplated by the Old Notes Restructuring Term Sheet are otherwise not approved by the Bankruptcy Court, (2) the transactions contemplated by the Backstop Commitment Agreement and the Old Notes Restructuring Term Sheet are otherwise not consummated by the Company (when the Backstop Investors are prepared to perform after satisfaction of all applicable conditions to their commitment under the Backstop Commitment Agreement and in the Old Notes Restructuring Term Sheet) , or (3) the "Commitment" (as defined in the Backstop Commitment Agreement) is terminated pursuant to the terms thereof, the Backstop Fee will be payable in the form of Cash in the amount of $2.5 million, subject to the limitations contained in the Backstop Commitment Agreement, including clause (vi) of Section II thereof. In addition, the Debtors have agreed to reimburse or pay, as the case may be, the reasonable expenses of the Backstop Investors (the "Backstop Transaction Expenses"), including, but not limited to, the fees and expenses of Gibson, Dunn & Crutcher LLP, as legal advisors to the Backstop Investors and reasonable fees and expenses of any other professional retained by the Backstop Investors in connection with the transaction contemplated thereby. Furthermore, pursuant to Section V of the Backstop Commitment Agreement, the Debtors have agreed to provide the Backstop Investors (and their respective affiliates and their respective officers, directors, partners, trustees, employees, shareholders, advisors, agents, representatives, attorneys and controlling persons and each of their respective heirs, successors and assigns (each, and "Indemnified Person")) with a customary indemnification form and against any losses, claims, damages, and liabilities to which any Indemnified Person may become subject arising out of or in connection with the Backstop Commitment Agreement, the restructuring contemplated by the Plan, the Rights Offering, all as more fully set forth in the Backstop Commitment Agreement. On the Effective Date, the Backstop Fee will be paid in the form of Class C Common Shares. As contemplated by the Backstop Commitment Agreement, the Class C Common Shares issued in payment of the Backstop Fee will represent 2.0% of the New Capital Stock of Reorganized Parent outstanding on a fully-diluted basis as of the Effective Date of the Plan, but prior to giving effect to (i) the issuance of Class D Common Shares under the Management Incentive Plan, or (ii) the issuance of Class B Common Shares upon issuance of the Warrants. See Section II(P) herein, titled "Summary of the Equity Capitalization of Reorganized

- 49 -

Parent." The Debtors have committed to seek approval of the Rights Offering and Backstop Commitment Agreement by filing motions to approve these transactions, on an expedited basis, after they commence their Chapter 11 Cases. The Debtors will also seek approval of the procedures described below with respect to the Rights Offering.

(i)     Rights Offering Record Date:  Such date as set forth in the Rights Offering Approval Order entered by the Bankruptcy Court as the date for determining which Holders of Old Notes Claims are Eligible Participants eligible to participate in the Rights Offering.

(ii)    Issuance of Rights:  Each Eligible Participant may subscribe to buy any number of Rights Offering Securities, up to a maximum amount of $40 million. Each Rights Offering Purchaser that pays its share of the Rights Offering Purchase Price will receive Rights Offering Securities in the proportion that such Rights' Offering Purchaser's purchase price bears to the entire Rights Offering Purchase Price.  In the event that the Rights Offering is over-subscribed, $20 million of the Rights Offering Securities will be issued to the Backstop Investors, and the remaining $40 million will be issued to all of the Rights Offering Purchasers in proportion to their respective bid amounts.

(iii)   Preferred Stock Certificate of Designation:  On the Effective Date, Reorganized Parent shall be authorized to enter into the transactions contemplated by the Certificate of Designation, and the Certificate of Designation shall become effective in accordance with its terms and conditions upon the parties thereto.  The Preferred Shares shall be subject to the terms of the Preferred Stock Certificate of Designation.

(iv)    Rights Offering Purchase Price:  Means $60.0 million in Cash for the Rights Offering Securities, and, when used with respect to a particular Rights Offering Purchaser, an amount of Cash equal to the Rights Offering Purchase Price multiplied by such Rights Offering Purchaser's subscribed-for portion of the Rights Offering Securities (Pro Rata for the entire amount of Rights Offering Securities).

(v)     No Assignment.  The Subscription Rights cannot be assigned by the Eligible Holders.  Any assignment, or attempted assignment, will be null and void.  Once an Eligible Participant has exercised any of its Subscription Rights by properly executing and delivering a Subscription Form to the Debtors or other Entity specified in the Subscription Form, such exercise may only be revoked, rescinded or annulled in the sole discretion of the Debtors or Reorganized Debtors.

(vi)    Validity of Exercise of Subscription Rights:  All questions concerning the timeliness, validity, form, and eligibility of any exercise, or purported exercise, of Subscription Rights shall be determined by the Debtors.  The Debtors, in their discretion reasonably exercised in good faith, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any Subscription Rights.  A Subscription Form shall be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtors determine in their discretion reasonably exercised in good faith.  The Debtors will use commercially reasonable efforts to give written notice to any Eligible Participant regarding any defect or irregularity in connection with any purported exercise of Subscription Rights by such Person and may permit such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate; provided, however, that neither the Debtors, Reorganized Debtors, nor any of their Related Persons shall incur any liability for giving, or failing to give, such notification and opportunity to cure.

(vii)   Registration Agreement.  On the Effective Date, Reorganized DE Lyon will enter into the Registration Agreement with the holders of the Class C Common Shares and

- 50 -

the Preferred Shares (and certain holders of New Second Lien Notes and Class A Common Shares who are parties to the Noteholders RSA). Pursuant to the Registration Agreement, Reorganized DE Lyon will agree, subject to the terms and conditions contained therein, to register the applicable New Second Lien Notes and shares of New Capital Stock with the SEC.

**L.    SUMMARY OF THE TERMS OF NEW SECOND LIEN NOTES**

The principal terms of the New Second Lien Notes are summarized on Exhibit F hereto:

The New Second Lien Notes will be issued in reliance on the exemption provided in Section 1145 of the Bankruptcy Code from registration under the Securities Act or any similar federal, state or local law as set forth in greater detail in Section VI herein, titled "Exemptions From Securities Act Registration."

**M.    SUMMARY OF THE PREFERRED SHARES**

The Preferred Shares are shares of convertible preferred stock that will be issued by Reorganized Parent to the Eligible Participants and/or the Backstop Investors pursuant to the Rights Offering, the Backstop Commitment Agreement and the Plan. Dividends on the Preferred Shares will be payable at a rate of 6% per annum, up to 4% in Cash and the remaining 2% per annum to accrue. Holders of the Preferred Shares will have no mandatory redemption rights. Prior to conversion, the holders of the Preferred Shares will be entitled to exercise the voting rights associated with the Class C Common Shares on an as-converted basis.

The Preferred Shares will be convertible at any time at the option of the holder thereof, in part or in whole, into Class C Common Shares at a conversion rate of one Preferred Share to one Class C Common Share. The percentage ownership represented by the shares of Class C Common Shares issued upon conversion of the Preferred Shares is subject to dilution for (i) the exercise of the Warrants, and (ii) the issuance of Class D Common Shares under the Management Incentive Plan. To the extent dividends on the Preferred Shares are not paid in Cash prior to conversion, upon conversion, such accrued dividends will be paid in Cash upon conversion in connection with an initial public offering of common stock of the Reorganized Parent, but may not otherwise be paid in Cash under the terms of the Restructured First Lien Loan Agreement. Additional terms of the Preferred Shares are set forth in the Certificate of Designation, which shall be included in the Plan Supplement.

The Preferred Shares will be issued in a private placement that is exempt from registration under the Securities Act or any similar federal, state or local law as set forth in greater detail in Section VI herein, titled "Exemptions From Securities Act Registration."

**N.    SUMMARY OF THE RESTRUCTURED FIRST LIEN LOAN AGREEMENT**

The Restructured First Lien Loan Agreement will consist of Loans (as defined in the Restructured First Lien Loan Agreement) in the initial aggregate principal amount of $235 million.

The terms of the Restructured First Lien Loan Agreement will amend and restate the terms of the Prepetition Secured Loan Agreement to, among other things: (i) extend the maturity of the Prepetition Secured Loan Agreement through the earlier of the third anniversary of the "Closing Date" (as defined in the Colony Restructuring Term Sheet) and January 31, 2015, (ii) reduce the interest rate to 10¼% per annum, and (iii) eliminate or modify certain financial covenants, consistent with the Colony Restructuring Term Sheet. Loans may not be reborrowed once repaid. For additional terms of the Restructured First Lien Loan Agreement, please refer to

the Colony Restructuring Term Sheet (attached as Exhibit D to the Colony RSA (which is Exhibit C to the Plan)).

The borrower under the Restructured First Lien Loan Agreement will be Reorganized CA Lyon. The obligations of Reorganized CA Lyon under the Restructured First Lien Loan Agreement will be guaranteed by Reorganized Parent and such other guarantors as are described in the Colony Restructuring Term Sheet (the "Guarantors"). The obligations of (a) Reorganized CA Lyon under the Restructured First Lien Loan Agreement and (b) Reorganized Parent and the other Guarantors under the related guarantees will be secured by, among other things, a first-priority lien on and security interest in substantially all of the properties and assets of Reorganized CA Lyon, Reorganized Parent and the other Guarantors, other than specified "Excluded Assets".

Reorganized CA Lyon, Reorganized Parent, the other Guarantors, the Post-Emergence Agent, the New Second Lien Notes Indenture Trustee and the New Second Lien Notes Collateral Agent shall enter into the Subordination and Intercreditor Agreement, to provide for the relative rights of the Post-Emergence First Lien Lenders and the holders of the New Second Lien Notes.

In addition to the $2.35 million restructuring fee payable on the Effective Date to the Prepetition Lenders, as consideration for the Post-Emergence Agent's efforts in connection with the Restructured First Lien Loan Agreement, the Post-Emergence Agent has requested, and the Debtors have agreed to pay, certain fees to the Post-Emergence Agent for the services to be performed by the Post-Emergence Agent in connection with the Restructured First Lien Loan Agreement, in an amount equal to 0.10% per annum of the principal amount of the Restructured First Lien Loans on the Effective Date, payable quarterly in advance on the Effective Date and on each quarterly anniversary thereof occurring prior to payment in full.

## O.    SUMMARY OF CERTAIN EMPLOYMENT AGREEMENTS

The Company shall have entered into three –year employment contracts with each of General William Lyon and William H. Lyon (collectively, the "Executives"), providing for $1.5 million combined annual salary. The Executives will be eligible for performance bonuses during the three-year term, not to exceed 50% of salary in the first year, and thereafter, commensurate with position and contributions as determined by a three-member compensation committee consisting of the two independent directors and one director appointed by the holders of the Class A Common Shares. The Executives will be entitled to receive severance pay under circumstances specified in the employment agreements in an amount equal to their base salaries for the remaining contract term, but in no event less than 18 months. The Executives will be subject to a non-solicitation agreement for a period of two years after termination of employment.

## P.    SUMMARY OF THE EQUITY CAPITALIZATION OF REORGANIZED PARENT

The following table sets forth the equity capitalization of Reorganized Parent on a pro forma basis, giving effect to the transactions contemplated by the Plan, including, the initial distributions of (i) New Second Lien Notes and Class A Common Shares to the Holders of Allowed Old Notes Claims, (ii) Class B Common Shares to purchasers paying the Class B Common Stock Purchase Price, (iii) the issuance of the Preferred Shares and the Class C Common Shares in the Rights Offering to purchasers paying the Rights Offering Purchase Price, (iv) the payment of the Backstop Fee in the form of Class C Common Shares, (v) the issuance and the exercise of the Warrants. The following has been prepared for illustrative purposes only and assumes that the Preferred Shares are converted into Class C Common Shares, and that the Warrants are exercised in full in Cash to acquire Class B Common Shares, in each case on the

Effective Date of the Plan. There can be no assurance as to the timing of the conversion of the Preferred Shares or the exercise of the Warrants, or whether the Preferred Shares or the Warrants will ever be converted or exercised. In addition, the calculations in the following tables do not give effect to additional dilution that is expected to occur after the Effective Date of the Plan, including dilution anticipated upon the conversion of Preferred Shares issued in payment of Additional Class C Common Shares or the issuance of Class D Common Shares under the Equity Incentive Plan. All percentages set forth in the following tables represent the applicable percentages of the total number of shares of New Common Stock of Reorganized Parent deemed to be outstanding, on a fully diluted basis, for purposes of the calculations set forth in the applicable column in the table.

Pro Forma Equity Capitalization of Reorganized Parent [1]

|  | Initial Distribution [2] | | After Exercise of Warrants | |
| --- | --- | --- | --- | --- |
|  | Number | Percent | Number | Percent |
| Purchase Class B Common Shares | 31,464,548 | 20.0% | 47,201,842 | 27.3% |
| Rights Offering - Class C Common Shares [3] | 16,110,366 | 10.2% | 16,110,366 | 9.3% |
| Rights Offering - Class C Preferred Shares | 64,831,831 | 41.2% | 64,831,831 | 37.5% |
| Old Noteholder Claims - Class A Common Shares | 44,793,255 | 28.5% | 44,793,255 | 25.9% |
| Total Equity Shares | 157,200,000 | 100.0% | 172,937,294 | 100.0% |

[1] Analysis is prior to any dilution associated with the Management Incentive Plan (MIP)

[2] Initial Share counts are based on a $1.00 per share value

[3] Includes 2% Backstop Fee

<h1 align="center">ARTICLE III.<br>SUMMARY OF THE PLAN</h1>

> **THIS SECTION III IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE MATERIAL TERMS OF THE PLAN AND IS QUALIFIED BY REFERENCE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN. TO THE EXTENT THERE ARE ANY INCONSISTENCIES OR CONFLICTS BETWEEN THIS SECTION III AND THE PLAN, THE TERMS AND CONDITIONS SET FORTH IN THE PLAN SHALL CONTROL AND GOVERN**

## A.    ADMINISTRATIVE, DIP FACILITY AND PRIORITY TAX CLAIMS

### 1.    Administrative Claims

Subject to sub-paragraph (a) below, on the later of the Effective Date or the date on which an Administrative Claim becomes an Allowed Administrative Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Claim will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) payment in full in Cash for the unpaid portion of such Allowed Administrative Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtors or Reorganized

- 53 -

Debtors, as applicable, and such Holder; provided, however, that Administrative Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtors or Reorganized Debtors in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court. All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

      (a)      <u>Professional Compensation and Reimbursement Claims</u>

*Professional Fee Claims.* Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claim; provided that the Reorganized Debtors will pay Professionals in the ordinary course of business for any work performed after the Effective Date, including those fees and expenses incurred by Professionals in connection with the implementation and consummation of the Plan, in each case without further application or notice to or order of the Bankruptcy Court; provided, further, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order. Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) 90 days after the Effective Date and (b) 30 days after the Filing of the applicable request for payment of the Professional Fee Claim. Each Holder of an Allowed Professional Fee Claim will be paid by the Reorganized Debtors in Cash within five Business Days of entry of the order approving such Allowed Professional Fee Claim.

*Ad Hoc Noteholders Group Fees and Expenses, Secured Lenders' Fees and Expenses, Backstop Transaction Expenses, Prepetition Indenture Trustee's Fees and Expenses; and Committee Members' Fees and Expenses.* The fees and expenses incurred by the Ad Hoc Noteholders Group Professionals, the DIP Agent's and the DIP Lenders' professionals, the Prepetition Agent's professionals, the Prepetition Indenture Trustee and his professionals, and the Backstop Investors (pursuant to the terms of the Backstop Commitment Agreement) will be paid in connection with any applicable orders entered by the Bankruptcy Court. Nothing herein or in the Plan shall require such professionals (or the Prepetition Indenture Trustee) to file applications with, or otherwise seek approval of, the Bankruptcy Court as a condition to the payment of such fees and expenses.

      **2.**      **DIP Facility Claims**

Unless otherwise agreed to by the DIP Lenders, the Allowed DIP Facility Claims will be indefeasibly paid and satisfied in full in Cash on the Effective Date in full satisfaction, settlement, discharge and release of, and in exchange for, such DIP Facility Claims in accordance with any applicable order entered by the Bankruptcy Court. Upon indefeasible payment and satisfaction in full of all Allowed DIP Facility Claims, the DIP Facility Secured Loan Agreement and all "Loan Documents" as defined therein, and all Liens and security interests granted to secure the DIP Facility Claims, will be immediately terminated, extinguished and released, and the DIP Agent will promptly execute and deliver to the Reorganized Debtors, at the Reorganized Debtors' sole cost and expense, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors. Notwithstanding the above, any indemnity provisions contained in the DIP Facility Secured Loan Agreement will survive such termination, release and satisfaction in the manner and to the extent set forth therein.

### 3.    Priority Tax Claims

On or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors or Reorganized Debtors:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (b) such other less favorable treatment as agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder; provided, however, that such parties may further agree for the payment of such Allowed Priority Tax Claim at a later date; or (c) pursuant to and in accordance with sections 1129(a)(9)(C) and (D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installment payments over a period ending not more than five years after the Petition Date, plus simple interest at the rate required by applicable law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.  Any installment payments to be made under clause (c) above will be made in equal quarterly Cash payments beginning on the Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Priority Tax Claim.  Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree or order converting or dismissing the Chapter 11 Cases *provided, however*, that the Debtors may prepay any or all such Claims at any time, without premium or penalty.

### B.    CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

#### 1.    Summary

All Claims and Equity Interests, except Administrative Claims, DIP Facility Claims and Priority Tax Claims, are placed in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims and Priority Tax Claims have not been classified as described in Article III.B of the Plan.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including, without limitation, voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date.

#### Summary of Classification and Treatment of Classified Claims and Equity Interests

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Secured Tax Claims | Unimpaired | Deemed to Accept |

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 4 | Prepetition Secured Loan Agreement Claims | Impaired | Entitled to Vote |
| 5 | Project Loan Claims | Unimpaired | Deemed to Accept |
| 6 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| 7 | Old Notes Claims | Impaired | Entitled to Vote |
| 8 | Intercompany Claims | Unimpaired | Deemed to Accept |
| 9 | Parent Equity Interests | Impaired | Deemed to Reject |
| 10 | Equity Interests in Subsidiaries | Unimpaired | Deemed to Accept |

**2.      Classification and Treatment of Claims and Equity Interests**

(a)      Class 1 - Priority Claims

o       *Classification*:  Class 1 consists of the Priority Claims.

o       *Treatment*:  The legal, equitable and contractual rights of the Holders of Class 1 Claims are unaltered by the Plan.  With respect to each Class 1 Claim that becomes due and payable prior to the Effective Date, on or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 1 Claim is an Allowed Class 1 Claim on the Effective Date or (ii) the date on which such Class 1 Claim becomes an Allowed Class 1 Claim, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtors or Reorganized Debtors:  (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code.

o       *Voting*:  Class 1 is an Unimpaired Class, and the Holders of Class 1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims will not be entitled to vote to accept or reject the Plan.

(b)      Class 2 - Other Secured Claims

o       *Classification*:  Each Class 2 Claim is an Other Secured Claim against the applicable Debtors.  With respect to each applicable Debtors this Class will be further divided into subclasses designated by letters of the alphabet (Class 2A, Class 2B and so on), so that each holder of any Other Secured Claim against such Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class, and except for a precautionary class of otherwise unclassified Other Secured Claims.

o       *Treatment*:  The legal, equitable and contractual rights of the Holders of Class 2 Claims are unaltered by the Plan.  With respect to each Class 2 Claim that becomes due and payable prior to the Effective Date, on or as soon as reasonably practicable after the later of (i) the Initial Distribution

- 56 -

Date if such Class 2 Claim is an Allowed Class 2 Claim on the Effective Date or (ii) the date on which such Class 2 Claim becomes an Allowed Class 2 Claim, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim, at the election of the Debtors or Reorganized Debtors: (A) Cash equal to the amount of such Allowed Class 2 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors and the Holder of such Allowed Class 2 Claim will have agreed upon in writing; (C) any defaults shall be cured and shall be paid or satisfied in accordance with and pursuant to the terms of the applicable agreement between the Debtors and the Holder of the Allowed Class 2 Claim; or (D) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code. Each Holder of an Allowed Other Secured Claim will retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final payment of such Allowed Other Secured Claim is made as provided herein. On the full payment or other satisfaction of such obligations, the Liens securing such Allowed Other Secured Claim will be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

o    *Voting*: Class 2 is an Unimpaired Class, and the Holders of Class 2 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 2 Claims will not be entitled to vote to accept or reject the Plan.

(c)    Class 3 - Secured Tax Claims

o    *Classification*: Each Class 3 Claim is a Secured Tax Claim against the applicable Debtors. With respect to each applicable Debtor, this Class will be further divided into subclasses designated by letters of the alphabet (Class 3A, Class 3B and so on), so that each holder of any Secured Tax Claim against such Debtor is in a Class by itself, except to the extent that there are Secured Tax Claims that are substantially similar to each other and may be included within a single Class, and except for a precautionary class of otherwise unclassified Secured Tax Claims.

o    *Treatment*: The legal, equitable and contractual rights of the Holders of Class 3 Claims are unaltered by the Plan. On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is an Allowed Class 3 Claim as of the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 3 Claim, at the election of the Debtors or Reorganized Debtors: (a) Cash in an amount equal to the amount of such Allowed Class 3 Claim; (b) such other less favorable treatment as agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder; provided, however, that such parties may further agree for the payment of such Allowed Class 3 Claim at a later date; or (c) pursuant to and in accordance with sections 1129(a)(9)(C) and (D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Class 3 Claim payable in regular installment payments over a period ending not more than five

- 57 -

years after the Petition Date, plus simple interest at the rate required by applicable law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; provided, further, that Class 3 Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto in the discretion of the Debtors or Reorganized Debtors without further notice to or order of the Bankruptcy Court. Each Holder of an Allowed Class 3 Claim will retain the Liens securing its Allowed Class 3 Claim as of the Effective Date until full and final payment of such Allowed Class 3 Claim is made as provided herein. On the full payment or other satisfaction of such obligations, the Liens securing such Allowed Class 3 Claim will be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule on the vote, consent, authorization or approval of any Entity. Any installment payments to be made under clause (c) above will be made in equal quarterly Cash payments beginning on the first Subsequent Distribution Date following the Effective Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Secured Tax Claim.

o    *Voting*: Class 3 is an Unimpaired Class, and the Holders of Class 3 Claims will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 3 Claims will not be entitled to vote to accept or reject the Plan.

(d)    Class 4 - Prepetition Secured Loan Agreement Claims

o    *Classification*: Class 4 consists of the Prepetition Secured Loan Agreement Claims.

o    *Allowance*: On the Effective Date, the Prepetition Secured Loan Agreement Claims will be deemed Allowed in an aggregate amount equal to $235 million.

o    *Treatment*: On the Effective Date, the Prepetition Secured Loan Agreement will, subject to satisfaction or waiver of the conditions precedent set forth in the Restructured First Lien Loan Agreement, be amended and restated by the Restructured First Lien Loan Agreement, "Loan Documents" as defined in the Prepetition Secured Loan Agreement will, as applicable, be amended and restated by the "Loan Documents" as defined in the Restructured First Lien Loan Agreement, and certain "Security Documents" (as defined in the Prepetition Secured Loan Agreement) will be amended, supplemented or otherwise modified and will constitute and become "Security Documents" (as defined in the Restructured First Lien Loan Agreement), and will secure all the obligations under the Restructured First Lien Loan Agreement and the other "Loan Documents" (as defined in the Restructured First Lien Loan Agreement). On the Effective Date, each Holder of an Allowed Prepetition Secured Loan Agreement Claim shall be a "Lender" under the Restructured First Lien Loan Agreement with all of the rights set forth

- 58 -

therein, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim.

  o *Voting*: Class 4 is Impaired, and Holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

(e) <u>Class 5 – Project Loan Agreements</u>

  o *Classification*: Each Class 5 Claim is an Project Loan Claim against the applicable Debtors.  With respect to each applicable Debtors this Class will be further divided into subclasses designated by letters of the alphabet (Class 5A, Class 5B and so on), so that each holder of any Project Loan Claim against such Debtor is in a Class by itself.

  o *Treatment*: The legal, equitable and contractual rights of the Holders of Class 5 Claims are unaltered by the Plan.  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 5 Claim is an Allowed Class 5 Claim on the Effective Date or (ii) the date on which such Class 5 Claim becomes an Allowed Class 5 Claim, each Holder of an Allowed Class 5 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 5 Claim, at the election of the Debtors or Reorganized Debtors:  (A) Cash equal to the amount of such Allowed Class 5 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors and the Holder of such Allowed Class 5 Claim will have agreed upon in writing; (C) any defaults shall be cured or otherwise satisfied shall be paid in accordance with and pursuant to the terms of the applicable agreement between the Debtors and the Holder of the Allowed Class 5 Claim; or (D) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code.  Each Holder of an Allowed Project Loan Claim will retain the Liens securing its Allowed Project Loan Claim as of the Effective Date until full and final payment of such Allowed Project Loan Claim is made as provided herein.  On the full payment or other satisfaction of such obligations, the Liens securing such Allowed Project Loan Claim will be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

  o *Voting*: Class 5 is an Unimpaired Class, and the Holders of Class 5 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 5 Claims will not be entitled to vote to accept or reject the Plan.

(f) <u>Class 6 – General  Unsecured Claims</u>

  o *Classification*: Class 6 consists of the General Unsecured Claims.

  o *Treatment*: With respect to each Class 6 Claim that becomes due and payable prior to the Effective Date, on or as soon as reasonably practicable after the Effective Date, solely to the extent that any of the legal, equitable and contractual rights in respect of any Class 6 Claim under applicable non-bankruptcy law, each Allowed Class 6 Claim will be, at the Debtors' option: (i) Reinstated, and paid, subject to the terms and conditions

- 59 -

thereof, in Cash on the later to occur of the Effective Date or when such Claims become due in the ordinary course of the Debtors' business operations; or (ii) otherwise rendered not impaired pursuant to section 1124 of the Bankruptcy Code, including with respect to payment on the Effective Date or as soon as practicable thereafter, except to the extent that the Reorganized Debtors and such Holder agree to other less favorable treatment in writing.

o   *Voting*: Class 6 is an Unimpaired Class, and the Holders of Class 6 Claims will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, Therefore, Holders of Class 6 Claims are not entitled to vote to accept or reject the Plan.

(g)   Class 7 - Old Notes Claims

o   *Classification*: Class 7 consists of the Old Notes Claims.

o   *Allowance*: Notwithstanding any provisions of Article VIII to the contrary, the Old Notes Claims will be deemed Allowed, without offset, counterclaim or defense of any kind, in the aggregate approximate amount of $299,541,611.62.

o   *Treatment*: On the Effective Date, the Distribution Agent will receive for and on behalf of each and every Holder of an Allowed Old Notes Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim, $75 million in initial principal amount of New Second Lien Notes of CA Lyon and Class A Common Shares representing initially in the aggregate 28.5% of the New Capital Stock of Reorganized Parent. Notwithstanding any provisions in Article VII to the contrary, unless the Prepetition Indenture Trustee consents to the direct distribution via DTC, the Distribution Agent will promptly distribute the New Second Lien Notes and the Class A Common Shares to the Prepetition Indenture Trustee. For the avoidance of doubt, the Debtors will take all reasonable steps to ensure that all New Second Lien Notes and Class A Common Shares will be in a form that is DTC eligible. Notwithstanding any provision in the Plan to the contrary, the distribution on account of Allowed Old Notes Claims will not be dependent on the surrender or cancellation of the Old Notes. The Prepetition Indenture Trustee will send such notices and take such other actions as are reasonably requested by the Debtors to effect the cancellation of the Old Notes held by Cede & Co.

o   *Voting*: Class 7 is Impaired, and Holders of Class 7 Claims are entitled to vote to accept or reject the Plan.

(h)   Class 8 - Intercompany Claims

o   *Classification*: Class 8 consists of the Intercompany Claims.

o   *Treatment*: On the Effective Date, all Class 8 Intercompany Claims will be Reinstated.

o   *Voting*: Class 8 is an Unimpaired Class, and the Holders of Class 8 Claims will be conclusively deemed to have accepted the Plan. Therefore,

- 60 -

Holders of Class 8 Claims will not be entitled to vote to accept or reject the Plan.

(i)    Class 9 - Parent Equity Interests

   o    *Classification*:  Class 9 consists of the Parent Equity Interests.

   o    *Treatment*:  On the Effective Date, all Class 9 Parent Equity Interests will be deemed canceled and will be of no further force and effect, whether surrendered for cancellation or otherwise.  Holders of Class 9 Parent Equity Interests will not receive any distribution on account of their Parent Equity Interests.

   o    *Voting*:  Class 9 is Impaired, and the Holders of Class 9 Equity Interests are deemed to reject the Plan.

(j)    Class 10 -- Equity Interests in Subsidiaries

   o    *Classification*:  Class 10 consists of the Equity Interests in the Subsidiaries.

   o    *Treatment*:  On the Effective Date, Reorganized Parent or CA Lyon, as applicable, will own 100% of the Equity Interests in the Subsidiaries.

   o    *Voting*:  Class 10 is an Unimpaired Class, and the Holders of Class 10 Equity Interests will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 10 Equity Interests are not entitled to vote to accept or reject the Plan.

## 3.    Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtors' rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims, including the right to cure any arrears or defaults that may exist with respect to contracts to be assumed under the Plan.

## 4.    Discharge of Claims

Except as otherwise provided in the Plan and effective as of the Effective Date: (i) the rights afforded herein and the treatment of all Claims and Equity Interests will be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including (except in the case of postpetition interest comprising part of the Prepetition Secured Loan Agreement Claim or the DIP Facility Claim) any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property, or Estates; (ii) the Plan will bind all Holders of Claims and Equity Interests, notwithstanding whether any such Holders abstained from voting to accept or reject the Plan or voted to reject the Plan; (iii) all Claims and Equity Interests will be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto will be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (iv) all Entities will be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, each of their successors and assigns, and each of their assets and properties, any other Claims or Equity Interests based upon any documents, instruments or any

- 61 -

act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

## C.    ACCEPTANCE OR REJECTION OF THE PLAN

### 1.    Presumed Acceptance of Plan

Classes 1, 2, 3, 5, 6, 8, and 10 are Unimpaired under the Plan, and are, therefore, presumed to have accepted the Plan pursuant to section 1126 of the Bankruptcy Code.

### 2.    Presumed Rejection of Plan

Class 9 is Impaired and Holders of Parent Equity Interests shall receive no distribution under the Plan on account of the Parent Equity Interests and are, therefore, deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

### 3.    Voting Classes

Each Holder of an Allowed Claim as of the applicable Voting Record Date in each of the Voting Classes (Classes 4 and 7) will be entitled to vote to accept or reject the Plan.

### 4.    Acceptance by Impaired Classes of Claims

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

### 5.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code

The Debtors request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Debtors (subject to any consents that may be required under the Colony RSA, the Noteholders RSA, or the Backstop Commitment Agreement) reserve the right to modify the Plan or any Exhibit thereto or Plan Schedule in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

## D.    MEANS FOR IMPLEMENTATION OF THE PLAN

### 1.    General Settlement of Claims

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan.

### 2.    Corporate Existence

The Debtors will continue to exist after the Effective Date as a separate legal entities, with all the powers of corporations, limited liability companies, memberships and partnerships pursuant to the applicable law in their states of incorporation or organization and pursuant to the Amended Organizational Documents.

3.      **Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan or the Confirmation Order, on or after the Effective Date, all property and assets of the Estates (including, without limitation, Causes of Action and, unless otherwise waived or released pursuant to an order of the Bankruptcy Court or the Plan, Avoidance Actions) and any property and assets acquired by the Debtors pursuant to the Plan will vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges or other encumbrances except for the Liens of the Prepetition Indenture Trustee on distributions to Holders of Class 7 Claims as provided in the Prepetition Indentures. Except as may be otherwise provided in the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors will pay the charges that they incur after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

4.      **Restructured First Lien Loan Agreement and Sources of Cash for Plan Distributions**

On the Effective Date, the applicable Reorganized Debtors will be authorized to execute and deliver the Restructured First Lien Loan Agreement and the related "Loan Documents," as defined therein, and will be authorized to execute, deliver, file, record and issue any other notes, guarantees, deeds of trust, documents (including UCC financing statements), amendments to the foregoing, or agreements in connection therewith, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than expressly required by the Restructured First Lien Loan Agreement).

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments required pursuant to the Plan will be obtained from the Reorganized Debtors' Cash balances, including Cash from operations, the Rights Offering Purchase Price and the Class B Common Stock Purchase Price. Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors.

5.      **New Second Lien Notes and Class A Common Shares Issued Under the Plan**

On the Effective Date, the applicable Reorganized Debtors will be authorized to execute and deliver the Restructured New Second Lien Notes Indenture and the related "Note Documents," as defined therein, and will be authorized to execute, deliver, file, record and issue any other notes, guarantees, deeds of trust, documents (including UCC financing statements), or agreements in connection therewith, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than expressly required by the Restructured First Lien Loan Agreement).

On the Effective Date, Reorganized Parent will contribute the Class A Common Shares to Reorganized CA Lyon, and Reorganized CA Lyon will distribute the Class A Common Shares to Holders of Allowed Old Notes Claims pursuant to the terms set forth in the Plan and herein.

6. **New Class B Common Shares and Warrants Issued Under the Plan**

On the Effective Date, Reorganized Parent will issue Class B Common Shares and Warrants to Class B Purchasers, pursuant to the terms set forth herein.

7. **Rights Offering**

(a)    Issuance of Subscription Rights.

On the Petition Date, the Debtors expect to file a motion seeking Bankruptcy Court approval of the Rights Offering. Approval of the procedures governing the Rights Offering (which are summarized below) are subject to entry of an order by the Bankruptcy Court. Each Eligible Participant will receive Subscription Rights to subscribe for its Pro Rata Share of the Rights Offering Securities for an aggregate purchase price in Cash equal to the Rights Offering Purchase Price. In accordance with the terms and conditions of the Backstop Commitment Agreement, the Backstop Investors have committed to purchase all Remaining Rights Offering Securities. The Rights Offering Securities, including the Remaining Rights Offering Securities, will be issued to the Eligible Participants (including the Backstop Investors), for the Rights Offering Purchase Price. The Preferred Shares will be subject to the terms of the Certificate of Designation. On the Effective Date, Reorganized Parent will be authorized to enter into and consummate the transactions contemplated by the Amended Organizational Documents, including the Certificate of Designation, and such Amended Organizational Documents, and the Rights Offering Securities, will become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by the Amended Organizational Documents).

(b)    Subscription Period.

The Rights Offering will commence on the Subscription Commencement Date and expire on the Subscription Deadline. Each Eligible Participant that wishes to participate in the Rights Offering will be required to affirmatively elect to exercise its Subscription Rights, and provide written notice thereof to the Entities specified in the Subscription Form, on or prior to the Subscription Deadline in accordance with the terms of the Plan and the Subscription Form. All Remaining Rights Offering Securities will be allocated to the Backstop Investors on the Subscription Deadline, and will be purchased by the Backstop Investors on the Effective Date, all in accordance with the terms and conditions of the Backstop Commitment Agreement.

(c)    Exercise of Subscription Rights and Payment of Rights Offering Purchase Price.

On the Subscription Commencement Date, the Distribution Agent will mail the Subscription Form to each Eligible Participant known as of the Rights Offering Record Date, together with appropriate instructions for the proper completion, due execution, and timely delivery of the Subscription Form, as well as instructions for the payment of the eventual Rights Offering Purchase Price for that portion of the Subscription Rights sought to be exercised by such Person. The Debtors may adopt such additional detailed procedures consistent with the provisions of the Plan as the Debtors may deem necessary to effectuate, or desirable to more efficiently administer the exercise of the Subscription Rights and ascertain payment of the Rights Offering Purchase Price, to the extent authorized by the Bankruptcy Court.

DOCS_SF:78843.3 93949-001

(d)     No Assignment; No Revocation.

The Subscription Rights will not be assignable, and cannot be assigned by the Eligible Participants. Any assignment, or attempted assignment, will be null and void. Once an Eligible Participant has exercised any of its Subscription Rights by properly executing and delivering the Subscription Form to the Debtors or other Entity specified in the Subscription Form, such exercise may only be revoked, rescinded or annulled in the sole discretion of the Debtors or Reorganized Debtors.

(e)     Distribution of Rights Offering Securities.

On, or as soon as reasonably practicable after, the Effective Date, Reorganized Parent or another applicable Distribution Agent will distribute the Rights Offering Securities purchased by each Rights Offering Purchaser or Backstop Investor to such Rights Offering Purchaser or Backstop Investor.

(f)     Validity of Exercise of Subscription Rights.

All questions concerning the timeliness, validity, form, and eligibility of any exercise, or purported exercise, of Subscription Rights will be determined by the Debtors or Reorganized Debtors. The Debtors, in their discretion reasonably exercised in good faith, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any Subscription Rights. A Subscription Form will be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtors determine in their discretion reasonably exercised in good faith. The Debtors will use commercially reasonable efforts to give written notice to any Eligible Participant regarding any defect or irregularity in connection with any purported exercise of Subscription Rights by such Person and may permit such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate; provided, however, that neither the Debtors and Reorganized Debtors nor any of their Related Persons will incur any liability for giving, or failing to give, such notification and opportunity to cure.

(g)     Rights Offering Proceeds.

The proceeds of the Rights Offering will fund Cash payments required to be made under the Plan, including, without limitation, payments in respect of Allowed Claims, Chapter 11 Transaction Expenses and repayment of the DIP Facility Claims, and be used for general corporate purposes by the Debtors to the extent approved by the Bankruptcy Court in the First Day Motions or otherwise, and by the Reorganized Debtors after the Effective Date.

(h)     Registration Agreement.

On the Effective Date, Reorganized Parent will be authorized to enter into and consummate the transactions contemplated by the Registration Agreement and such documents, and any agreement or document entered into in connection therewith, will become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by the Registration Agreement).

DOCS_SF:78843.3 93949-001

## 8.    Management Incentive Plan

Following the Effective Date, Reorganized Parent will adopt and implement the Management Incentive Plan, which would, subject to certain terms and conditions, provide for, the issuance of up to 8% of the New Capital Stock of the Reorganized Parent to key executives of the Company, with the first 4% subject to a split of 50% in the form of restricted Class D Common Shares and 50% in the form of stock options to purchase additional Class D Common Shares to be issued on the Effective Date, and the remaining 4% to be issued at the discretion of the New Board.

## 9.    Issuance of New Securities and Related Documentation

On the Effective Date, each of Reorganized DE Lyon and Reorganized CA Lyon will be authorized to and will issue, the applicable New Securities and Documents, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  The issuance, distribution and exercise of the Subscription Rights, the issuance and distribution of the Class C Common Shares, the issuance and distribution of the Preferred Shares,  the issuance and distribution of Class C Common Shares upon conversion of the Preferred Shares, the issuance and distribution of the Class B Common Shares, the issuance and distribution of the Warrants, and the issuance and distribution of Class B Common Shares upon exercise of the Warrants will be exempt from registration under applicable securities laws, pursuant to section 4(2) of the Securities Act and/or other applicable exemptions.  The Rights Offering and issuance of the Rights Offering Securities, the Class B Common Shares, the Warrants, and the additional Class B Common Shares issuable upon exercise of the Warrants are not being made pursuant to section 1145(a) of the Bankruptcy Code and are not on account of the Claims and/or Equity Interests. The Class A Common Shares and the New Second Lien Notes will be issued in reliance on the exemption from registration provided by Section 1145(a) of the Bankruptcy Code.  Without limiting the effect of section 1145 of the Bankruptcy Code, all financing documents, agreements, and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Plan, including, without limitation, the Restructured First Lien Loan Agreement, the Restructured Project Loan Agreements, the New Second Lien Notes Indenture, the New Second Lien Notes, the Preferred Shares, the New Common Stock, the Registration Agreement and any other agreement or document related to or entered into in connection with any of the foregoing, will become, and the Backstop Commitment Agreement and the Class B Common Stock Purchase Commitment will remain, effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement).  The aggregate number of shares of New Capital Stock of Reorganized Parent to be authorized on the Effective Date will be 157,200,000 shares consisting of (a) 44,793,255 Class A Common Shares, (b) 31,464,548 Class B Common Shares, (c) 16,110,366 Class C Common Shares, and (d) 64,831,831 Preferred Shares (exclusive of dilutive impact associated with the Management Incentive Plan)

Upon the Effective Date, after giving effect to the transactions contemplated hereby, the authorized capital stock or other equity securities of the Reorganized Debtors will be that number of shares of New Capital Stock as may be designated in the Amended Organizational Documents.  Without limiting the effect of section 1145 of the Bankruptcy Code, on the Effective Date, Reorganized Parent will enter into the Registration Agreement with each holder of Class B Common Shares, Preferred Shares and Class C Common Shares, and each other Person (a) who by virtue of the issuance by Parent to such Person on the Effective Date of the New Capital Stock and/or its relationship with Parent (i) holds shares of New Capital Stock or New Second Lien Notes that are "restricted" (as such term is used within the meaning of the

- 66 -