met or if the conditions precedent to the respective parties obligation to support the Plan or to confirm the Plan are not satisfied in accordance with the terms of such Agreements. If the Noteholders RSA and the Colony RSA terminate, Parent may not be able to obtain the support of the Prepetition Noteholders and Prepetition Secured Lenders required to adopt the Plan. In addition, termination of either the Noteholders RSA or the Colony RSA constitutes a default under the DIP Credit Facility Agreement as well as the Backstop Commitment Agreement. If the DIP Credit Facility Agreement and Backstop Commitment Agreement terminate, Parent would not be able to consummate the Plan in its current form.

## B.    RISK FACTORS THAT MAY AFFECT THE VALUE OF SECURITIES TO BE ISSUED UNDER THE PLAN AND/OR RECOVERIES UNDER THE PLAN

### 1.    There May Be a Lack of a Trading Market for the Class C Common Shares or the Preferred Shares.

The New Second Lien Notes and Class A Common Shares issued to the Holders of Allowed Old Notes Claims will be freely transferable upon issuance, unless issued to an affiliate or unless other restrictions apply. Reorganized Parent has committed to register the Preferred Shares, and, under certain circumstances, the Class A Common Shares and the New Second Lien Notes held by parties to the Noteholders RSA, and the Class C Common Shares issuable upon conversion of the Preferred Shares under the Securities Act to the extent the holders of these securities enter into the Registration Agreement with Reorganized Parent on the Effective Date. There can be no assurance, however, that any market will develop or as to the liquidity of any market that may develop for any such securities.

### 2.    To Service the Reorganized Debtors' Indebtedness and to Meet Their Operational Needs, the Reorganized Debtors Will Require a Significant Amount of Cash. Their Ability to Generate Cash Depends on Many Factors Beyond Their Control.

The Reorganized Debtors' ability to make payments on and to refinance their indebtedness and to fund planned capital expenditures and research and development efforts will depend on their ability to generate cash in the future. This, to a certain extent, is subject to general economic, financial, competitive, legislative, regulatory, and other factors that are beyond their control.

The Reorganized Debtors' businesses may not generate sufficient cash flow from operations. Although the Financial Projections represent management's view based on current known facts and assumptions about the future operations of the Reorganized Debtors, there is no guarantee that the Financial Projections will be realized. The Reorganized Debtors may not be able to meet their projected financial results or achieve projected revenues and cash flows assumed in projecting future business prospects. To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and cash flows, The Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due or may not be able to meet its operational needs. A failure of the Reorganized Debtors to meet their projected financial results or achieve projected revenues and cash flows could lead to cash flow and working capital constraints, which constraints may require the Reorganized Debtors to seek additional working capital. The Reorganized Debtors may not be able to obtain such working capital when it is required.

In addition, if the Reorganized Debtors' cash flows and capital resources are insufficient to fund their debt service obligations, they may be forced to reduce or delay capital expenditures, sell material assets or operations, obtain additional equity capital or refinance all or a portion of

their indebtedness. In the absence of such operating results and resources, the Reorganized Debtors could face substantial cash flow problems and might be required to sell material assets or operations to meet their debt service and other obligations. The Reorganized Debtors will be unable to predict the timing of such asset sales or the proceeds which they could realize from such sales and that they will be able to refinance any of their indebtedness, including the Restructured First Lien Loan Agreement and the Restructured Project Loan Agreements, on commercially reasonable terms or at all.

3.    **The Estimated Valuation of the Reorganized Debtors and the New Capital Stock and the Estimated Recoveries to Holders of Allowed Claims and Equity Interests Are Not Intended to Represent the Private or Public Sale Values of the New Capital Stock.**

The Debtors' estimated recoveries to Holders of Allowed Claims and Equity Interests are not intended to represent the private or public sale values of Reorganized Parent's securities. The estimated recoveries are based on numerous assumptions (the realization of many of which is beyond the control of the Reorganized Debtors), including, without limitation: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; and (d) the Debtors' ability to maintain adequate liquidity to fund operations.

4.    **The Holders of the Old Notes May Control Reorganized Parent.**

Implementation of the proposed Rights Offering under the Plan will result in a small number of holders or their assignees owning a significant percentage of the shares of outstanding New Capital Stock. A small number of holders of the Old Notes or their assignees could hold a controlling percentage of the New Capital Stock. These holders or their assignees could, among other things, exercise a controlling influence over the business and affairs of Reorganized Parent and the other Reorganized Debtors.

5.    **The Issuance of Equity Interests to Reorganized Parent's Management May Dilute the Equity Ownership Interest of Other Holders of the New Capital Stock.**

It is anticipated that the New Board will adopt a Management Incentive Plan for directors and management, consisting of issuances from time to time of shares of the New Capital Stock of Reorganized Parent, including the grant of incentive stock options within the meaning of section 422 of the Internal Revenue Code of 1986, as amended. If the New Board distributes equity interests, or options to acquire such equity interests, to directors, management or employees, it is contemplated that such distributions will dilute the New Capital Stock issued on account of Claims and Equity Interests under the Plan and the ownership percentage represented by the New Capital Stock distributed under the Plan.

6.    **It is Unlikely That Reorganized Parent Will Pay Dividends in the Foreseeable Future.**

All the of the Reorganized Debtors' cash flow will be required to be used in the foreseeable future (a) to make payments under the Restructured First Lien Loan Agreement, the Restructured Project Loan Agreements and the New Second Lien Notes, (b) to fund Reorganized Parent's other obligations under the Plan, and (c) for working capital and capital expenditure purposes. In addition, the Restructured First Lien Loan Agreement, the Restructured Project Loan Agreements and New Second Lien Notes Indenture will contain certain restrictions on Reorganized Parent's ability to pay dividends. Accordingly, Reorganized Parent does not anticipate paying cash dividends on the New Common Stock in the foreseeable future.

7.    **Tax Implications of the Plan.**

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors currently do not intend to seek any ruling from the IRS on the tax consequences of the Plan. Even if the Debtors decide to request a ruling, there would be no assurance that the IRS would rule favorably or that any ruling would be issued before the Effective Date. In addition, in such case, there would still be issues with significant uncertainties, which would not be the subject of any ruling request. Thus, there can be no assurance that the IRS will not challenge the various positions the Debtors have taken, or intend to take, with respect to the tax treatment in the Plan, or that a court would not sustain such a challenge. See "Summary of Certain U.S. Federal Income Tax Consequences of the Plan."

## C.    MARKET AND ECONOMIC RISKS

1.    **Adverse Changes in General Economic Conditions Could Reduce the Demand for Homes and, as a Result, Could Negatively Impact the Company's Results of Operations.**

The homebuilding industry continues to experience uncertainty and reduced demand for new homes in certain markets, which negatively impacted the Company's financial and operating results during the year ending December 31, 2010. Increased instability in the credit markets has contributed to the decline in demand for new housing. The conditions experienced during 2010 include, among other things, the subdued emergence from a national recession, increases in unemployment levels, continuing concerns over the effects of asset valuations on the banking system and credit markets, reduced availability of mortgage loan financing, reduced consumer confidence, the absence of home price stability, and continued declines in the value of new homes in certain markets. For the year ending December 31, 2010, net new home orders decreased 25% to 650 from 869 in the 2009 period. The Company experienced a decrease of 29% in net new home orders of 869 in the 2009 period compared to 1,221 in 2008.

If the downturn in the homebuilding and mortgage lending industries continues or intensifies, or if the national economy weakens further and the recession continues or intensifies, the Company could continue to experience declines in the market value of the Company's inventory and demand for the Company's homes, which could have a significant negative impact on the Company's gross margins and financial and operating results. Additionally, if energy costs should increase, demand for the Company's homes could be adversely impacted, and the cost of building homes may increase, both of which could have a significant negative impact on the Company's results of operations.

2.    **Revenues and Margins May Continue to Decrease, and Results of Operations May Be Adversely Affected, as a Result of Declines in Demand for Housing and Other Changes in Economic and Business Conditions.**

The residential homebuilding industry is cyclical and is highly sensitive to changes in general economic conditions such as levels of employment, consumer confidence and income, availability of financing for acquisitions, construction and permanent mortgages, interest rate levels, inflation, immigration trends and demand for housing. An important segment of the Company's customer base consists of move-up buyers, who often purchase homes subject to contingencies related to the sale of their existing homes. The difficulties facing these buyers in selling their homes during recessionary periods may adversely affect home sales. Moreover, during such periods, the Company may need to reduce sales prices and offer greater incentives to buyers to compete for sales that may result in reduced margins. Increases in the rate of inflation could adversely affect gross margins by increasing costs and expenses. In times of high

- 99 -

inflation, demand for housing may decline and the Company may be unable to recover increased costs through higher sales.

Since early 2006, the U.S. housing market has been negatively impacted by declining consumer confidence, restrictive mortgage standards, and large supplies of foreclosure, resale and new homes, among other factors. When combined with a prolonged economic downturn, high unemployment levels, and uncertainty in the U.S. economy, these conditions have contributed to decreased demand for housing, declining sales prices, and increasing pricing pressure, which hinders the Company's ability to attract new home buyers. As a result, the Company has experienced operating losses each year, beginning in 2007. Such losses resulted from a combination of reduced homebuilding gross margins, losses on land sales to generate cash flow and significant non-cash impairment losses on real estate inventories. On November 6, 2009, the Worker, Homeownership, and Business Assistance Act of 2009 was enacted into law, which extended and expanded the homebuyer federal tax credit until April 30, 2010. The Act, which was applicable to net new home orders under contract by April 30, 2010 and closed by September 30, 2010, favorably impacted the Company's home sales during the early part of 2010, but also contributed to an industry-wide decline in net new home orders in the latter part of 2010.

     3.     **Increases in the Company's Cancellation Rate Could Have a Negative Impact on the Company's Home Sales Revenue and Home Building Gross Margins.**

During the years ended December 31, 2010, 2009 and 2008, the Company's cancellation rates were 19%, 21% and 28%, respectively, which can negatively impact the number of closed homes, net new home orders, home sales revenue and the Company's results of operations, as well as the number of homes in backlog. Home order cancellations can result from a number of factors, including declines, and/or slow appreciation in the market value of homes, increases in the supply of homes available to be purchased, increased competition, higher mortgage interest rates, homebuyers' inability to sell their existing homes, homebuyers' inability to obtain suitable financing, including providing sufficient down payments, and adverse changes in economic conditions. High levels of home order cancellations would have a negative impact on the Company's home sales revenue and financial and operating results.

     4.     **Disruptions in the Financial and Credit Markets Could Adversely Affect Demand for the Company's Products or Access to Capital.**

The homebuilding industry can be greatly affected by macro economic factors, including changes in national, regional, and local economic conditions, as well as potential homebuyers' perceptions of such economic factors. These factors, including employment levels, income, prices, and credit availability and interest rates affecting homeowners, can adversely affect the residential real estate market. As discussed in this and prior reports, the residential real estate market has been particularly challenging over the last several quarters. The recent disruptions in the overall economy and, in particular, the credit and financial markets, have further deteriorated this environment and could further reduce consumer income, liquidity, credit and confidence in the economy, and result in further reductions in new and existing home sales. Continuing softness or deterioration of the credit markets or the residential real estate market could be severely harmful to the Company's financial position and results of operations and could adversely affect the Company's and/or CA Lyon's liquidity or its ability to comply with the covenants under the Restructured First Lien Loan Agreement, the New Second Lien Notes Indenture, the Restructured Project Loan Agreements and/or other credit facilities. If CA Lyon is unable to comply with the terms of its credit facilities and/or indentures, the holders of the indebtedness under the credit facilities and/or the indentures could accelerate that indebtedness and exercise other rights and remedies against CA Lyon, DE Lyon, the other Guarantors and/or

- 100 -

the guarantors of other indebtedness. There can be no assurances that recent or future government responses to the disruptions in the financial markets will restore consumer confidence, stabilize such markets or increase liquidity and the availability of credit to consumers and businesses.

> **5.    Interest Rates and the Unavailability of Mortgage Financing Can Adversely Affect Demand for Housing.**

In general, housing demand is negatively impacted by increases in interest rates and housing costs and the unavailability of mortgage financing as a result of declining customer credit quality, tightening of mortgage loan underwriting standards, or other factors. Most buyers finance their home purchases through third-party lenders providing mortgage financing. Over the last several years, many third-party lenders have significantly increased underwriting standards, and many subprime and other alternate mortgage products are no longer available in the marketplace in spite of a decrease in mortgage rates. If these trends continue and mortgage loans continue to be difficult to obtain, the ability and willingness of prospective buyers to finance home purchases or to sell their existing homes will be adversely affected, which will adversely affect the Company's results of operations through reduced home sales revenue, gross margin and cash flow.

Changes in federal income tax laws may also affect demand for new homes. Various proposals have been publicly discussed to limit mortgage interest deductions and to limit the exclusion of gain from the sale of a principal residence. Enactment of such proposals may have an adverse effect on the homebuilding industry in general. No meaningful prediction can be made as to whether any such proposals will be enacted and, if enacted, the particular form such laws would take.

> **6.    Financial Condition and Results of Operations May Be Adversely Affected by any Decrease in the Value of Land Inventory, as Well as by the Associated Carrying Costs.**

The Company continuously acquires land for replacement and expansion of land inventory within the markets in which it builds. The risks inherent in purchasing and developing land increase as consumer demand for housing decreases. Thus, the Company may have bought and developed land on which homes cannot be profitably built and sold. The market value of land, building lots and housing inventories can fluctuate significantly as a result of changing market conditions. The Company employs measures to manage inventory risks which may not be successful. In addition, inventory carrying costs can be significant and can result in losses in a poorly performing project or market. In the event of significant changes in economic or market conditions, the Company may have to sell homes at significantly lower margins or at a loss. Further, the Company may be required to write-down the book value of certain real estate assets in accordance with U.S. generally accepted accounting principles, and some of those write-downs could be material.

During 2010, the Company incurred non-cash impairment losses on real estate assets amounting to $111.9 million. In addition, the Company incurred non-cash impairment losses on real estate assets of $45.3 million and $135.3 million, respectively, for the years ended December 31, 2009 and 2008. The Company assesses its projects on a quarterly basis, when indicators of impairment exist. Indicators of impairment include a decrease in demand for housing due to soft market conditions, competitive pricing pressures which reduce the average sales price of homes, which includes sales incentives for home buyers, slow sales absorption rates, a decrease in the value of the underlying land and a decrease in project cash flows for a particular project. The Company was required to write down the book value of its impaired real estate assets in accordance with FASB ASC 360, as defined in Note 5 of "Notes to Consolidated Financial

- 101 -

Statements." A continued slump in the housing market could result in additional write-downs, which could have a material adverse effect on the Company's financial condition and earnings.

## D.    RISKS RELATED TO THE COMPANY'S INDEBTEDNESS

### 1.    The Company's High Level of Indebtedness Could Adversely Affect its Financial Condition and Prevent it From Fulfilling its Obligations.

the Company is highly leveraged and, subject to restrictions, the Company, CA Lyon and their subsidiaries may incur substantial additional indebtedness. The Company's high level of indebtedness could have detrimental consequences, including the following:

- after giving effect to the Plan, a significant portion of the indebtedness of CA Lyon will be scheduled to mature prior to or during 2015, and CA Lyon may not have the ability to repay its indebtedness as it matures;

- the ability to obtain additional financing as needed for working capital, land acquisition costs, building costs, other capital expenditures, or general corporate purposes, or to refinance existing indebtedness before its scheduled maturity, may be limited;

- the Company will need to use a substantial portion of cash flow from operations to pay interest and principal on post Effective Date indebtedness, which will reduce the funds available for other purposes;

- if the Debtors are unable to comply with the terms of the agreements governing their indebtedness, the holders of that indebtedness could accelerate that indebtedness and exercise other rights and remedies against the applicable Debtors;

- the Company has a higher level of indebtedness than some of its competitors, which may put the Company at a competitive disadvantage and reduce the Company's flexibility in planning for, or responding to, changing conditions in the industry, including increased competition;

- substantially all of the Debtors' actively selling projects are pledged as security for the Prepetition Secured Loan Agreement or, as the case may be, the Project Loan Agreements, and will be pledged as security for the Restructured Secured Loan Agreement and the New Second Liens Notes, or, as the case may be, the Project Loan Agreements and a default on the debt could result in foreclosure on the Debtors' assets which could, under certain circumstances, limit or prohibit the ability to operate as a going concern; and

- the Company is vulnerable to economic downturns and adverse developments in the business.

The Company's ability to meet expenses depends on future performance, which will be affected by financial, business, economic and other factors. The Company will not be able to control many of these factors, such as economic conditions in the markets where the Company operates and pressure from competitors. The Company cannot be certain that the cash flow will be sufficient to allow the Company to pay principal and interest on debt, support operations, and meet other obligations. If the Company does not have the resources to meet these and other obligations, CA Lyon may be required to refinance all or part of the existing or restructured debt, sell assets or borrow more money. The Company may not be able to do so on acceptable terms,

DOCS_SF:78843.3 93949-001

in a timely manner, or at all.  In addition, the terms of existing or future debt instruments limit the ability of the Company to pursue any of these alternatives.

**2.    Difficulty in Obtaining Sufficient Capital Could Result in Increased Costs and Delays in Completion of Projects.**

The homebuilding industry is capital-intensive and requires significant up-front expenditures to acquire land and begin development.  Land acquisition, development and construction activities may be adversely affected by any shortage or increased cost of financing or the unwillingness of third parties to engage in joint ventures.  The Company's current financial position may make it more difficult for the Company to obtain capital for development projects, particularly if the Company has difficulty meeting its current financial covenants.  Any difficulty in obtaining sufficient capital for planned development expenditures could cause project delays and any such delay could result in cost increases and may adversely affect the Company's sales and future results of operations and cash flows.

**3.    The Restructured First Lien Loan Agreement and the New Second Lien Notes Indenture Will Impose Significant Operating and Financial Restrictions, Which May Prevent the Reorganized Debtors From Capitalizing on Business Opportunities and Taking Some Corporate Actions.**

The Restructured First Lien Loan and the New Second Lien Note Indentures will impose significant operating and financial restrictions.  These restrictions will limit the ability of the Reorganized Debtors,  among other things, to:

- incur additional indebtedness;

- pay dividends or make other distributions;

- make investments;

- sell assets;

- incur liens;

- enter into agreements restricting the Company's subsidiaries' ability to pay dividends;

- enter into transactions with affiliates; and

- consolidate, merge or sell all or substantially all of Debtor's assets.

The Restructured Project Loan Agreements contain additional restrictions, and the Debtors may enter into additional indebtedness arrangements that may impose further restrictions.  In addition, the Debtors may in the future enter into other agreements refinancing or otherwise governing indebtedness which impose yet additional restrictions.  These restrictions may adversely affect the Debtors' ability to finance future operations or capital needs or to pursue available business opportunities.  A breach of any of these covenants could result in a default in respect of the related indebtedness.  If a default occurs, the relevant lenders or holders could elect to declare the indebtedness, together with accrued interest and other fees, to be immediately due and payable and proceed against any collateral securing that indebtedness.

In addition, the Restructured First Lien Loan Agreement may also require the Reorganized Debtors on a consolidated basis to maintain compliance with specified certain

- 103 -

minimum financial covenant tests, the Reorganized Debtors' ability to comply with these tests may be affected by events beyond their control.

If the Reorganized Debtors are unable to achieve the projected results from its operations for whatever reason, the Reorganized Debtors may be unable to comply with the restrictions contained in the Restructured First Lien Loan Agreement and the New Second Lien Notes Indenture, and the lenders under the Restructured First Lien Loan Agreement could:

- declare all borrowings outstanding, together with accrued and unpaid interest, to be immediately due and payable; or

- require the Reorganized Debtors to apply all of their available cash to repay the borrowings.

If the Reorganized Debtors were unable to repay or otherwise refinance these borrowings when due, the lenders under the Restructured First Lien Loan Agreement and, subject to the Subordination and Intercreditor Agreement, the Holders of the New Second Lien Notes could sell the collateral securing the Restructured First Lien Loan Agreement, which constitutes substantially all of the Reorganized Debtors' assets.

4. **Potential Future Downgrades of the Company's Credit Ratings Could Adversely Affect the Company's Access to Capital and Could Otherwise Have a Material Adverse Effect on the Company.**

Over the past few years, the rating agencies had downgraded the Company's corporate credit rating and ratings on the Old Notes due to the deterioration in the Company's homebuilding operations, credit metrics, other earnings-based metrics and the significant decrease in the Company's tangible net worth. These ratings and the Company's current credit condition affect, among other things, ability to access new capital, especially debt, and negative changes in these ratings may result in more stringent covenants and higher interest rates under the terms of any new debt. The Company's credit ratings could be further lowered or rating agencies could issue adverse commentaries in the future, which could have a material adverse effect on the Company's business, results of operations, financial condition and liquidity. In particular, a weakening of the Company's financial condition, including a significant increase in the Company's leverage or decrease in the Company's profitability or cash flows, could adversely affect the Company's ability to obtain necessary funds, result in a credit rating downgrade or change in outlook, or otherwise increase the Company's cost of borrowing.

E. **OPERATIONAL RISKS**

1. **If Land Is Not Available at Reasonable Prices, the Company's Home Sales Revenue and Results of Operations Could Be Negatively Impacted and/or the Company Could Be Required to Scale Back the Company's Operations in a Given Market.**

The Company's operations depend on the Company's ability to obtain land for the development of the Company's residential communities at reasonable prices and with terms that meet the Company's underwriting criteria. The Company's ability to obtain land for new residential communities may be adversely affected by changes in the general availability of land, the willingness of land sellers to sell land at reasonable prices given the deterioration in market conditions, competition for available land, availability of financing to acquire land, zoning, regulations that limit housing density, and other market conditions. If the supply of land appropriate for development of residential communities continues to be limited because of these factors, or for any other reason, the number of homes that the Company's homebuilding

- 104 -

subsidiaries build and sell may continue to decline. Additionally, the ability of the Company to open new projects could be impacted if the Company elects not to purchase lots under option contracts. To the extent that the Company is unable to purchase land timely or enter into new contracts for the purchase of land at reasonable prices, due to the lag time between the time the Company acquires land and the time the Company begins selling homes, the Company's home sales revenue and results of operations could be negatively impacted and/or the Company could be required to scale back the Company's operations in a given market.

2.    **Adverse Weather and Geological Conditions May Increase Costs, Cause Project Delays and Reduce Consumer Demand for Housing, All of Which Would Adversely Affect the Company's Results of Operations and Prospects.**

As a homebuilder, the Company is subject to numerous risks, many of which are beyond management's control, including: adverse weather conditions such as droughts, floods, or wildfires, which could damage projects, cause delays in completion of projects, or reduce consumer demand for housing; shortages in labor or materials, which could delay project completion and cause increases in the prices for labor or materials, thereby affecting the Company's sales and profitability; and landslides, soil subsidence, earthquakes and other geologic events, which could damage projects, cause delays in the completion of projects or reduce consumer demand for the Company's projects. Many of the Company's projects are located in California, which has experienced significant earthquake activity and seasonal wildfires. In addition to directly damaging the Company's projects, earthquakes or other geologic events could damage roads and highways providing access to those projects, thereby adversely affecting the Company's ability to market homes in those areas and possibly increasing the costs of completion.

There are some risks of loss for which the Company may be unable to purchase insurance coverage. For example, losses associated with landslides, earthquakes and other geologic events may not be insurable and other losses, such as those arising from terrorism, may not be economically insurable. A sizeable uninsured loss could adversely affect the Company's business, results of operations and financial condition.

3.    **The Company's Business is Geographically Concentrated, and Sales, Results of Operations, Financial Condition and Business Would Be Negatively Impacted by a Decline in Regional Economies.**

The Company presently conducts all of its business in four geographic regions: Southern California, Northern California, Arizona and Nevada. Because the Company's operations are concentrated in these geographic areas, the economic downturn in these markets has caused housing prices and sales to decline, which has caused a material adverse effect on the Company's business, results of operations, and financial condition.

The Company generates over 85% it its revenue and a significant amount of its profits from, and holds approximately one-half of the dollar value of real estate inventory in, California. Over the last several years, land values, the demand for new homes and home prices have declined substantially in the state, negatively impacting the Company's profitability and financial position. In addition, the state of California is experiencing severe budget shortfalls and is considering raising taxes and increasing fees to offset the deficit. There can be no assurance that the profitability and financial position of the Company will not be further impacted if the challenging conditions in California continue or worsen.

- 105 -

### 4.    The Company May Not Be Able to Compete Effectively Against Competitors in the Homebuilding Industry.

The homebuilding industry is highly competitive. Homebuilders compete for, among other things, homebuying customers, desirable properties, financing, raw materials and skilled labor. The Company competes both with large homebuilding companies, some of which have greater financial, marketing and sales resources than the Company, and with smaller local builders. Our competitors may independently develop land and construct housing units that are substantially similar to the Company's products. Many of these competitors also have longstanding relationships with subcontractors and suppliers in the markets in which the Company operates. The Company currently builds in several of the top markets in the nation and, therefore, the Company expects to continue to face additional competition from new entrants into the Company's markets. The Company also competes for sales with individual resales of existing homes and with available rental housing.

### 5.    The Company's Operating Results are Variable.

The Company has historically experienced, and in the future expects to continue to experience, variability in operating results on a quarterly and an annual basis. Factors expected to contribute to this variability include, among other things:

- the timing of land acquisitions, zoning and other regulatory approvals;

- the timing of home closings, land sales and level of sales;

- product mix;

- the ability to continue to acquire additional land or options thereon at acceptable terms;

- inventory impairment charges due to market impact on sales prices;

- the condition of the real estate market and the general economy;

- delays in construction due to acts of God, adverse weather, reduced subcontractor availability, and strikes;

- changes in prevailing interests rates and the availability of mortgage financing; and

- costs of material and labor.

Many of the factors affecting the Company's results are beyond the Company's control and may be difficult to predict.

### 6.    The Company's Success Depends on Key Executive Officers and Personnel.

The Company's success is dependent upon the efforts and abilities of its executive officers and other key employees, many of whom have significant experience in the homebuilding industry and in the Company's divisional markets. In particular, the Company is dependent upon the services of General William Lyon, Chairman of the Board and Chief Executive Officer, William H. Lyon, President and Chief Operating Officer, and Matthew R. Zaist, Executive Vice President, as well as the services of the division presidents and division management teams and personnel in the corporate office. The loss of the services of any of these

- 106 -

executives or key personnel, for any reason, could have a material adverse effect upon the Company's business, operating results and financial condition.

7.    **Construction Defect, Soil Subsidence and Other Building-Related Claims May Be Asserted Against the Company, and the Company May Be Subject to Liability for Such Claims.**

As a homebuilder, the Company has been, and continues to be, subject to construction defect, product liability and home warranty claims, including moisture intrusion and related claims, arising in the ordinary course of business. These claims are common to the homebuilding industry and can be costly.

California law provides that consumers can seek redress for patent (*i.e.*, observable) defects in new homes within three or four years (depending on the type of claim asserted) from when the defect is discovered or should have been discovered. If the defect is latent (*i.e.*, non-observable), consumers must still seek redress within three or four years from the date when the defect is discovered or should have been discovered, but in no event later than ten years after the date of substantial completion of the work on the construction. Consumers purchasing homes in Arizona and Nevada may also be able to obtain redress under state laws for either patent or latent defects in their new homes.

With respect to certain general liability exposures, including construction defect claims, product liability claims and related claims, assessment of claims and the related liability and reserve estimation process is highly judgmental due to the complex nature of these exposures, with each exposure exhibiting unique circumstances. Furthermore, once claims are asserted for construction defects, it can be difficult to determine the extent to which the assertion of these claims will expand. Although the Company has obtained insurance for construction defect claims subject to applicable self-insurance retentions, such policies may not be available or adequate to cover liability for damages, the cost of repairs, and/or the expense of litigation surrounding current claims, and future claims may arise out of events or circumstances not covered by insurance and not subject to effective indemnification agreements with the Company's subcontractors.

8.    **Utility Shortages or Price Increases Could Have an Adverse Impact on Operations.**

In prior years, certain areas in Northern and Southern California have experienced power shortages, including mandatory periods without electrical power, as well as significant increases in utility costs. The Company may incur additional costs and may not be able to complete construction on a timely basis if such power shortages and utility rate increases continue. Furthermore, power shortages and rate increases may adversely affect the regional economies in which the Company operates, which may reduce demand for housing. The Company's operations may be adversely impacted if further rate increases and/or power shortages occur.

9.    **The Company's Business and Results of Operations Are Dependent on the Availability and Skill of Subcontractors.**

Substantially all construction work is done by subcontractors with the Company acting as the general contractor. Accordingly, the timing and quality of construction depends on the availability and skill of the Company's subcontractors. While the Company has been able to obtain sufficient materials and subcontractors during times of material shortages and believes that its relationships with suppliers and subcontractors are good, the Company does not have long-term contractual commitments with any subcontractors or suppliers. The inability to

- 107 -

contract with skilled subcontractors at reasonable costs on a timely basis could have a material adverse effect on the Company's business and results of operations.

**10.    Increased Insurance Costs and Reduced Insurance Coverages May Affect the Company's Results of Operations and Increase the Potential Exposure to Liability.**

Recently, lawsuits have been filed against builders asserting claims of personal injury and property damage caused by the presence of mold in residential dwellings. Some of these lawsuits have resulted in substantial monetary judgments or settlements against these builders. The Company's insurance may not cover all of the potential claims, including personal injury claims, arising from the presence of mold or such coverage may become prohibitively expensive. If the Company is unable to obtain adequate insurance coverage, a material adverse effect on business, financial condition and results of operations could result if the Company is exposed to claims arising from the presence of mold.

The cost of insurance for the Company's operations has risen, deductibles and retentions have increased and the availability of insurance has diminished. Significant increases in the cost of insurance coverage or significant limitations on coverage could have a material adverse effect on the Company's business, financial condition and results of operations from such increased costs or from liability for significant uninsurable or underinsured claims.

**11.    The Company Conducts Certain of its Operations Through Unconsolidated Joint Ventures With Independent Third Parties in Which the Company Does Not Have a Controlling Interest, and the Company May Be Adversely Impacted by Joint Venture Partners' Failure to Fulfill Their Obligations.**

The Company participates in land development joint ventures ("JVs") in which the Company has less than a controlling interest. The Company has entered into JVs in order to acquire attractive land positions, to manage its risk profile and to leverage its capital base. The Company's JVs are typically entered into with developers, other homebuilders and financial partners to develop finished lots for sale to the joint venture's members and other third parties.

The Company's joint venture investments are generally very illiquid, due to a lack a controlling interest in the JVs. The Company's lack of a controlling interest also results in the risk that the JV will take actions that the Company disagrees with, or fail to take actions that the Company desires, including actions regarding the sale of the underlying property.

**12.    The Company Is the General Partner in Partnership Joint Ventures and May Be Liable for Joint Venture Obligations.**

Certain of the Company's active joint ventures are organized as limited partnerships. The Company is the general partner in some of these and may serve as the general partner in future joint ventures. As a general partner, the Company may be liable for a joint venture's liabilities and obligations should the joint venture fail or be unable to pay these liabilities or obligations.

**13.    Supply and Labor Shortages and Other Risks Could Increase Costs and Delay Completion.**

Construction services operations could be adversely affected by fluctuating prices and limited supplies of building materials as well as the cost and availability of trades personnel. These prices and supplies may be adversely affected by natural disasters and adverse weather conditions, which could cause increased costs and delays in construction that could have an adverse effect upon the Company's construction services operations.

- 108 -

**14.    The Company is Subject to Changes in the Demand for Construction Projects.**

Individual markets can be sensitive to overall capital spending trends in the economy, financing and capital availability for real estate and competitive pressures on the availability and pricing of construction projects. These factors can result in a reduction in the supply of suitable projects, increased competition and reduced margins on construction contracts.

**15.    The Timing and Funding of Contracts and Other Factors Could Lead to Unpredictable Operating Results.**

Construction services operations are also subject to other risks and uncertainties, including the timing of new contracts and the funding of such awards; the length of time over which construction contracts are to be performed; cancellations of, or changes in the scope of, existing contracts; and the ability to meet performance or schedule guarantees and cost overruns.

## F.    REGULATORY RISKS

**1.    Governmental Laws and Regulations May Increase the Company's Expenses, Limit the Number of Homes That the Company Can Build or Delay Completion of Projects.**

The Company is subject to numerous local, state, federal and other statutes, ordinances, rules and regulations concerning zoning, development, building design, construction and similar matters which impose restrictive zoning and density requirements in order to limit the number of homes that can eventually be built within the boundaries of a particular area. Projects that are not entitled may be subjected to periodic delays, changes in use, less intensive development or elimination of development in certain specific areas due to government regulations. The Company may also be subject to periodic delays or may be precluded entirely from developing in certain communities due to building moratoriums or "slow-growth" or "no-growth" initiatives that could be implemented in the future in the states in which the Company operates. Local and state governments also have broad discretion regarding the imposition of development fees for projects in their jurisdiction. Projects for which the Company has received land use and development entitlements or approvals may still require a variety of other governmental approvals and permits during the development process and can also be impacted adversely by unforeseen health, safety, and welfare issues, which can further delay these projects or prevent their development. As a result, home sales could decline and costs increase, which could negatively affect the Company's results of operations.

**2.    The Company is Subject to Environmental Laws and Regulations, Which May Increase Costs, Limit the Areas in Which the Company Can Build Homes and Delay Completion of Projects.**

The Company is also subject to a variety of local, state, federal and other statutes, ordinances, rules and regulations concerning the environment. The particular environmental laws which apply to any given homebuilding site vary according to the site's location, its environmental conditions and the present and former uses of the site, as well as adjoining properties. Environmental laws and conditions may result in delays, may cause the Company to incur substantial compliance and other costs, and can prohibit or severely restrict homebuilding activity in environmentally sensitive regions or areas, which could negatively affect the Company's results of operations. Under various environmental laws, current or former owners of real estate, as well as certain other categories of parties, may be required to investigate and clean up hazardous or toxic substances or petroleum product releases, and may be held liable to a governmental entity or to third parties for property damage and for investigation and clean up

- 109 -

costs incurred by such parties in connection with the contamination. In addition, in those cases where an endangered species is involved, environmental rules and regulations can result in the elimination of development in identified environmentally sensitive areas.

## G.    OTHER RISKS

### 1.    The Company May Not Be Able to Benefit From Net Operating Loss Carry Forwards.

At December 31, 2010, the Company had gross federal and state net operating loss carry forwards totaling approximately $115.5 million and $386.3 million, respectively. Federal net operating loss carry forwards begin to expire in 2028; state net operating loss carry forwards begin to expire in 2013. As a result of the Plan, however, the Company's net operating loss carry forwards will be limited under Tax Code section 382. The Company will only receive tax benefits for the net operating loss carry forwards if there is future taxable income before the applicable net operating loss expiration period. The Company has fully reserved against all of its deferred tax assets, including the net operating loss carry forward that was carried on the Company's financial statements, due to the change of ownership under Tax Code Section 382 resulting from the transactions contemplated by the Plan and the possibility that the Company may not have taxable income. However, these deferred tax assets will be available to the Company if there is sufficient future taxable income. See "Certain U.S. Federal Income Tax Consequences of the Plan."

### 2.    Future Terrorist Attacks Against the United States or Increased Domestic or International Instability Could Have an Adverse Effect on the Company's Operations.

Adverse developments in the war on terrorism, future terrorist attacks against the United States, or any outbreak or escalation of hostilities between the United States and any foreign power, including the armed conflicts in Iraq and Afghanistan, may cause disruption to the economy, the Company, the Company's employees and the Company's customers, which could adversely affect the Company's revenues, operating expenses, and financial condition.

## H.    RISKS ASSOCIATED WITH FORWARD LOOKING STATEMENTS

### 1.    The Financial Information Contained Herein Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit was Performed.

**The financial information contained in this Disclosure Statement has not been audited**. In preparing this Disclosure Statement, the Debtors relied on financial data derived from its books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

### 2.    Financial Projections and Other Forward Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary.

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtor's operations, including the Financial Projections, that are, by their

- 110 -

nature, forward looking, and which projections are necessarily based on certain assumptions and estimates. Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Reorganized Debtors may turn out to be different from the financial projections.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize, including, without limitation, assumptions concerning: (a) the timing of confirmation and Consummation of the Plan in accordance with its terms; (b) the anticipated future performance of the Reorganized Debtors, including, without limitation, the Debtors' ability to maintain or increase revenue and gross margins, control future operating expenses or make necessary capital expenditures; (c) general business and economic conditions; (d) overall industry performance and trends; (e) the Debtors' ability to maintain market strength and receive vendor support by way of favorable purchasing terms; and (f) consumer preferences continuing to support the Debtors' business plan.

DUE TO THE INHERENT UNCERTAINTIES ASSOCIATED WITH PROJECTING FINANCIAL RESULTS GENERALLY, THE PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSIDERED ASSURANCES OR GUARANTEES OF THE AMOUNT OF FUNDS OR THE AMOUNT OF CLAIMS THAT MAY BE ALLOWED IN THE VARIOUS CLASSES. WHILE THE DEBTORS BELIEVE THAT THE FINANCIAL PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT ARE REASONABLE, THERE CAN BE NO ASSURANCE THAT THEY WILL BE REALIZED.

I.      **DISCLOSURE STATEMENT DISCLAIMER**

1.      **The Information Contained Herein Is for Soliciting Votes Only.**

The information contained in this Disclosure Statement is for purposes of soliciting votes on the Plan and may not be relied upon for any other purposes.

2.      **This Disclosure Statement was Not Approved by the Securities and Exchange Commission.**

This Disclosure Statement has not been filed with the SEC or any state regulatory authority. Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

3.      **The Debtors Relied on Certain Exemptions From Registration Under the Securities Act.**

This Disclosure Statement has been prepared pursuant to sections 1125 and 1126, as applicable, of the Bankruptcy Code and Rule 3016(b) of the Bankruptcy Rules and is not necessarily in accordance with the requirements of federal or state securities laws or other similar laws. The offer and issuance of New Second Lien Notes and Class A Common Shares to Holders of Claims in Class 7 have not been registered under the Securities Act or similar state securities or "blue sky" laws. The Rights Offering and the issuance of New Class B Common Shares pursuant to the Class B Common Stock Commitment Agreement [and the issuance of Warrants, or Class B Common Shares issuable upon exercise of the Warrants] have also not been registered under the Securities Act or similar state securities or "blue sky" laws. To the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act and other applicable nonbankruptcy law, the Solicitation, the issuance of the New Second Lien Notes,

- 111 -

Class A Common Shares, Class B Common Shares, Class C Common Shares, the Preferred Shares and the Warrants, and any shares of New Capital Stock reserved for issuance upon conversion of the Preferred Shares, exercise of the Warrants, or under the Management Incentive Plan, will be exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code, section 3(a)(9) of the Securities Act, section 4(2) of the Securities Act and/or Rule 701 promulgated under the Securities Act.

4.    **This Disclosure Statement Contains Forward Looking Statements.**

This Disclosure Statement contains "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may,""expect,""anticipate,""estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims and Equity Interests may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

5.    **No Legal or Tax Advice Is Provided to You by This Disclosure Statement.**

**This Disclosure Statement is not legal or tax advice to You**. The contents of this Disclosure Statement should not be construed as legal, business or tax advice, and are not personal to any person or entity. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than as a disclosure of certain information to determine how to vote on the Plan or object to confirmation of the Plan.

6.    **No Admissions Are Made by This Disclosure Statement.**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors, the Backstop Investors, the Ad Hoc Noteholders Group, Prepetition Agent, Prepetition Secured Lenders, the Ad Hoc Noteholders Group, Consenting Noteholders, Prepetition Agent, Prepetition Indenture Trustee, or Backstop Investors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Equity Interests or any other parties in interest.

Notwithstanding any rights of approval, pursuant to the Noteholders RSA, the Colony RSA, the Backstop Commitment Agreement or otherwise, as to the form of substance of this Disclosure Statement, the Plan or any other document relating to the transactions contemplated thereunder, neither the Prepetition Secured Lenders, the Prepetition Agent, the Ad Hoc Noteholders Group, the Backstop Investors, nor their respective representatives, members, financial or legal advisors or agents, has independently verified the information contained herein or takes any responsibility therefor and none of the foregoing entities or persons makes any representations or warranties whatsoever concerning the information contained herein.

- 112 -

7.     **No Reliance Should Be Placed on Any Failure to Identify Litigation Claims or Projected Objections.**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Reorganized Debtors may seek to investigate, File and prosecute Claims and Equity Interests and may object to Claims after the confirmation Date or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies such Claims or Equity Interests or objections to Claims or Equity Interests.

8.     **Nothing Herein Constitutes a Waiver of Any Right to Object to Claims or Equity Interests or Recover Transfers and Assets.**

The vote by a Holder of an Allowed Claim or Equity Interest for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or the Reorganized Debtors (or any party in interest, as the case may be) to object to that Holder's Allowed Claim or Equity Interest regardless of whether any Claims or Causes of Action of the Debtors or their Estate are specifically or generally identified herein.

9.     **The Information Used Herein was Provided by the Debtors and was Relied Upon by the Debtors' Advisors.**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

10.    **The Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used its reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

11.    **No Representations Made Outside the Disclosure Statement Are Authorized.**

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the United States Trustee.

## ARTICLE V.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

**A.    LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE**

If no chapter 11 plan can be confirmed, some or all of the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which case, a trustee would be elected or appointed to liquidate the Debtors' assets.  A discussion of the effect that a chapter 7 liquidation would have on the recovery of Holders of Claims and Equity Interests is set forth in Section III.N herein, titled "Statutory Requirements for Confirmation of the Plan."  In performing the liquidation analysis, the Debtors have assumed that all Holders of Claims and Equity Interests will be determined to have "claims" that are entitled to share in the proceeds from any such liquidation.  The Debtors believe that liquidation under chapter 7 would result in (i) smaller distributions being made to creditors and equity interests holders than those provided for in the Plan because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of unexpired leases and executory contracts in connection with the cessation of the Debtors' operations, and (iii) the failure to realize the greater, going-concern value of all of the Debtors' assets.

**B.    FILING OF AN ALTERNATIVE PLAN OF REORGANIZATION**

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different plan of reorganization.  Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of the Debtors' assets.  During the negotiations prior to the filing of the Plan, the Debtors explored various alternatives to the Plan.

The Debtors believe that the Plan will enable the Debtors to emerge from chapter 11 successfully and expeditiously, preserves its business and allows creditors to realize the highest recoveries under the circumstances.  In a liquidation under chapter 11 of the Bankruptcy Code, the assets of the Debtors would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, and a trustee need not be appointed.  Accordingly, creditors would receive greater recoveries than in a chapter 7 liquidation.  Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, the Debtors believe that a liquidation under chapter 11 is a much less attractive alternative to creditors and interest holders than the Plan because the Plan provides for a greater return to creditors and interest holders.

Moreover, the prolonged continuation of the Chapter 11 Cases is likely to adversely affect the Debtors' business and operations.  So long as the Chapter 11 Cases continue, senior management of the Debtors will be required to spend a significant amount of time and effort dealing with the Debtors' reorganization instead of focusing exclusively on business operations.  Prolonged continuation of the Chapter 11 Cases will also make it more difficult to attract and retain management and other key personnel necessary to the success and growth of the Debtors' business.  In addition, the longer the Chapter 11 Cases continue, the more likely it is that the Debtors' customers, suppliers, distributors, and agents will lose confidence in the Debtors' ability to reorganize their business successfully and will seek to establish alternative commercial relationships.  Furthermore, so long as the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the proceedings.  The prolonged continuation of the Chapter 11 Cases may also require the Debtors to seek additional financing, either under the DIP Facility or otherwise, in order to service its debt and other obligations, It may not be possible for the Debtors to obtain additional financing during the pendency of the Chapter 11 Cases on commercially favorable terms or at all.  If the

- 114 -

Debtors were to require additional financing during the Chapter 11 Cases and were unable to obtain the financing on favorable terms or at all, it is unlikely the Debtors could successfully reorganize.

## ARTICLE VI.
## EXEMPTIONS FROM SECURITIES ACT REGISTRATION

A.    **SECTION 1145 OF THE BANKRUPTCY CODE AND SECTION 4(2) OF THE SECURITIES ACT**

1.    **Securities Issued in Reliance on Section 1145 of the Bankruptcy Code**

Under the Plan, the New Second Lien Notes and the Class A Common Shares will be issued to Holders of Old Notes Claims in reliance upon section 1145 of the Bankruptcy Code. The New Second Lien Notes and the Class A Common Shares, described in the proceeding sentences are collectively referred to herein as the "1145 Securities". Section 1145 of the Bankruptcy Code provides that the securities registration requirements of federal and state securities laws do not apply to the offer or sale of stock, warrants or other securities by a debtor if: (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of securities hold a claim against, an interest in or claim for administrative expense against the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or are reissued principally in such exchange and partly for Cash and property.

Such securities may be resold without registration under either (a) state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the several states or (b) the Securities Act pursuant to an exemption provided by section 4(1) of the Securities Act unless the holder is an "underwriter" (as such term is defined in the Bankruptcy Code) with respect to the securities. Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

- purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if that purchase is with a view to distributing any security received in exchange for such a claim or interest;

- offers to sell securities offered under a plan of reorganization for the holders of those securities;

- offers to buy those securities from the holders of the securities, if the offer to buy is (a) with a view to distributing those securities and (b) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is defined in the Securities Act.

The term "issuer" is defined in section 2(4) of the Securities Act; however, the reference contained in section 1145(b)(1)(D) of the Bankruptcy Code to section 2(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by or are under common control with, an issuer of securities. "Control" (as defined in rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of

- 115 -

reorganization may be deemed to be a "control person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of the securities of a reorganized debtor may be presumed to be a "control person."

## 2.    Securities to be Issued in Reliance on Section 4(2) of the Securities Act

The Debtors believe that the Class C Common Shares to be issued to the Backstop Investors and any other Rights Offering Participants, the Preferred Shares to be issued to the Backstop Investors and any other Rights Offering Participants, and the Class C Common Shares issuable upon conversion of the Preferred Shares (collectively, the "Rights Offering Securities"), as provided under the Plan, will be exempt from the registration requirements of the Securities Act, pursuant to section 4(2) of the Securities Act, as transactions by an issuer not involving any public offering, and equivalent exemptions in state securities laws.

The Debtors believe that the Class B Common Shares and the Warrants to be issued to the holders of existing Parent Equity Interests who purchase the Class B Common Shares for the Class B Common Stock Purchase Price, as provided under the Plan, and the additional shares of Class B Common Stock issuable upon exercise of the Warrants, will be exempt from the registration requirements of the Securities Act, pursuant to section 4(2) of the Securities Act, as transactions by an issuer not involving any public offering, and equivalent exemptions in state securities laws.

The Company will agree to register the Rights Offering Securities and the Class A Common Shares issuable upon conversion of the Class B Securities with the SEC pursuant to the Registration Agreement.

## 3.    Resales of New Common Stock

Resales of the Rights Offering Securities and the Class B Securities, Warrants, and additional Class B Common Shares issuable upon exercise of the Warrants (collectively, the "Class B Securities"), and, to the extent that persons who receive 1145 Securities are deemed to be "underwriters" (collectively, the "Restricted Holders"), resales by Restricted Holders of such 1145 Securities, would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Restricted Holders and, holders of the Rights Offering Securities and the holders of the Class B Securities would, however, be permitted to sell such securities without registration if they are able to comply with the provisions of rule 144 under the Securities Act, as described further below, or if such securities are registered with the SEC pursuant to the Registration Agreement or otherwise. With respect to the 1145 Securities, any person who is an "underwriter" but not an "issuer" with respect to an issue of securities is, in addition, entitled to engage in exempt "ordinary trading transactions" within the meaning of section 1145(b)(1) of the Bankruptcy Code.

In the event that any holders of 1145 Securities are deemed "underwriters," or trading of any 1145 Securities is otherwise restricted, by reason of certain holders having entered into the Noteholders RSA or otherwise, the Company will agree to register the affected 1145 Securities with the SEC pursuant to the Registration Agreement.

## 4.    Section 3(a)(9) of the Securities Act

The Solicitation is being conducted in reliance on Section 3(a)(9) of the Securities Act. Section 3(a)(9) provides an exemption from registration when an issuer issues new securities in exchange for its own outstanding securities. This exemption is available when (i) the new and

outstanding securities are issued by the same issuer, (ii) the exchange offer is made only to existing security holders, (iii) no compensation is paid for solicitation in connection with the exchange offer and (iv) no cash or property may be required to be paid by security holders to participate in the exchange offer.

The SEC has granted no-action relief in the case where a parent guarantor issues new stock in exchange for the securities of its wholly-owned subsidiary, treating the issuance of the stock by the parties a separate exchange for the parent's guaranty . Accordingly, for securities law purposes, the issuance by DE Lyon of the Class A Common Stock in exchange for the Old Notes (issued by CA Lyon) should be deemed as an issuance by DE Lyon of Class A Common Shares in exchange for its guaranty, in compliance with Section 3(a)(9). Notwithstanding this deemed treatment for the Solicitation, the Class A Common Shares when actually issued will be issued in reliance not upon section 3(a)(9) of the Securities Act, but rather, upon section 1145 of the Bankruptcy Code, and DE Lyon will first contribute the Class A Common Shares to CA Lyon, then CA Lyon will deliver to the appropriate Distribution Agent for distribution to the Holders of the Old Notes Claims.

The Company's financial advisors have been engaged to provide financial analysis and assist the Company with addressing the financial aspects of the restructuring, but have not been engaged to solicit votes for the Plan, and will not be paid any success fee or other compensation based on the acceptance of the Plan or the exchange of securities contemplated thereby.

The Rights Offering Purchasers will pay Cash for the Rights Offering Securities, but the Rights Offering will be effected as a private placement in reliance on Section 4(2) of the Securities Act, and not in reliance on Section 3(a)(9). No Cash will be paid for any securities distributed on account of any Claims.

### 5.    Rule 144

Under certain circumstances, Restricted Holders and holders of the Private Placement Securities may be entitled to resell their securities pursuant to the limited safe harbor resale provisions under rule 144 of the Securities Act, to the extent available and in compliance with applicable state and foreign securities laws.

Generally, rule 144 of the Securities Act provides that persons who are affiliates of an issuer who resell securities will not be deemed to be underwriters if certain conditions are met. These conditions include the requirement that current public information with respect to the issuer be available, a limitation as to the amount of securities that may be sold in any three-month period, the requirement that the securities be sold in a "brokers transaction" or in a transaction directly with a "market maker" and that notice of the resale be filed with the SEC.

Pursuant to the Plan, certificates evidencing 1145 Securities received by Restricted Holders and Rights Offering Securities will bear a legend substantially in the form below:

"THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR APPLICABLE STATE SECURITIES LAWS ("STATE ACTS"") AND MAY NOT BE SOLD, ASSIGNED, PLEDGED OR TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR STATE ACTS COVERING SUCH SECURITIES OR THE SECURITIES ARE SOLD AND TRANSFERRED IN A TRANSACTION THAT IS EXEMPT FROM OR NOT SUBJECT TO THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SUCH ACT."

**WHETHER OR NOT ANY PARTICULAR PERSON WOULD BE DEEMED TO BE AN "UNDERWRITER" OF SECURITIES TO BE ISSUED PURSUANT TO THE PLAN OR AN "AFFILIATE" OF THE REORGANIZED DEBTOR WOULD DEPEND UPON VARIOUS FACTS AND CIRCUMSTANCES APPLICABLE TO THAT PERSON. ACCORDINGLY, THE DEBTOR EXPRESSES NO VIEW AS TO WHETHER ANY SUCH PERSON WOULD BE SUCH AN "UNDERWRITER" OR AN "AFFILIATE." IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS, THE DEBTOR MAKES NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES OF THE REORGANIZED DEBTORS. ACCORDINGLY, THE DEBTOR RECOMMENDS THAT POTENTIAL RECIPIENTS OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

### ARTICLE VII.
### SUMMARY OF CERTAIN U.S. FEDERAL INCOME
### TAX CONSEQUENCES OF THE PLAN

**INTERNAL REVENUE SERVICE ("IRS") CIRCULAR 230 DISCLOSURE:  TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL INCOME TAX CONTAINED OR REFERRED TO IN THIS DISCLOSURE IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "TAX CODE"); (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

The following disclosure (the "**Tax Disclosure**") summarizes certain federal income tax consequences of the implementation of the Plan to the Debtors and a Holder of Allowed Old Notes Claims (but not the taxation of those to whom such a holder subsequently transfers New Common Stock, Preferred Shares, or a New Second Lien Note). This Tax Disclosure does not address the specific federal income tax consequences to those with a unique position with respect to their tax treatment, such as the Backstop Investors and Holders of Parent Equity Interests or Class 4 Prepetition Secured Loan Agreement Claims. The remainder of the Claims and Interests are unimpaired and hence not specifically addressed.

The Tax Disclosure summarizes only certain of the federal income tax consequences associated with the Plan's implementation. Of the consequences that are addressed, some of them are complex or uncertain. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation or position that the IRS will adopt.

In addition, the Tax Disclosure does not attempt to consider whether the particular circumstances of any Holder of an Equity Interest or a Claim may modify or alter the consequences described below, and assumes that all Old Notes Claims are held as "capital assets" within the meaning of Tax Code Section 1221 (generally, property held for investment). Examples of particular taxpayers who might have special tax treatment include but are not limited to those who hold a Claim as an ordinary asset, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, expatriates, and investors in pass-through entities. The Tax Disclosure also does not address state, local, or foreign tax consequences or the consequences of any federal tax other than the federal income tax.

The following summary is based on the Tax Code, the regulations promulgated thereunder by the Department of the Treasury ("**Treasury Regulations**"), judicial decisions, and published administrative rules and pronouncements of the IRS in effect on the date hereof. Changes in, or new interpretations of, such rules may have retroactive effect and could significantly affect the federal income tax consequences described below.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF A HOLDER OF AN EQUITY INTEREST OR A CLAIM. EACH HOLDER OF AN EQUITY INTEREST OR A CLAIM IS URGED TO CONSULT ITS OWN TAX ADVISOR FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

A.      **DEFINITION OF U.S. PERSON AND NON-U.S. PERSON**

In this Tax Disclosure, a "**U.S. Person**" is any Person that is

- a citizen or resident of the United States;

- a corporation (or entity treated as a corporation for U.S. federal income tax purposes) created or organized in the United States or under the laws of the United States, or of any state thereof, or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust if (1) one or more U.S. Persons have the authority to control all substantial decisions of the trust, and a United States court is able to exercise primary supervision over the administration of the trust; or (2) the trust is of a certain type, was in existence on August 20, 1996, was treated as a United States person on August 19, 1996 under the then-applicable Tax Code, and has made a valid election to be treated as a U.S. Person under the Tax Code.

A "**Non-U.S. Person**" is any Person that is not a U.S. Person.

If a Holder of an Old Note Claim is a partnership (including any entity treated as a partnership for U.S. federal income tax purposes), the treatment of a partner in the partnership will depend on whether the partner is a Non-U.S. Person and the extent of the partnership's activities in the United States.

- 119 -

**B.    TAX CONSEQUENCES FOR U.S. PERSONS HOLDING ALLOWED OLD NOTES CLAIMS**

**1.    Distributions in Discharge of Accrued Interest**

For purposes of the Tax Disclosure, "**Accrued Interest**" means interest that accrued but was unpaid while the underlying Claim was held by its Holder.

A U.S. Person holding an Allowed Old Notes Claim who, under its accounting method, was not previously required to include in income Accrued Interest attributable to that Allowed Claim, and who exchanges such an Allowed Claim for Cash or other property (including new indebtedness) pursuant to the Plan, should be treated as receiving ordinary interest income to the extent of any consideration so received allocable to such Accrued Interest, regardless of whether that U.S. Person realizes an overall gain or loss as a result of the exchange of its Allowed Claim, and regardless of whether the Person's Allowed Claim is a capital asset in its hands.  The tax basis of any property received in exchange for Allowed Claims for Accrued Interest should be the fair market value of such property.  The holding period for such property should begin the day after the exchange.

A U.S. Person holding an Allowed Claim generally should be able to recognize a deductible loss (or, possibly, a write-off against a reserve for bad debts) to the extent any Accrued Interest claimed was previously included in its gross income and is not paid in full by the applicable Debtors.

Under the Plan, distributions in respect of Allowed Claims will be allocated first to the stated principal amount of such Claims, with any excess allocated to Accrued Interest.  However, there can be no assurance that the IRS or the courts will respect the Plan allocation for federal income tax purposes.

**2.    Exchange of Old Notes Claims for New Second Lien Notes and Class A Common Shares**

The Plan provides for CA Lyon to transfer Class A Common Shares and issue its New Second Lien Notes to Holders of Allowed Old Notes Claims, in exchange for such Claims. From this exchange, a U.S. Person holding Allowed Old Note Claims should generally recognize capital gain or loss equal to the value of the New Second Lien Notes and Class A Common Shares received (other than the value received for Accrued Interest, as discussed in the previous section), minus the U.S. Person's tax basis in its Claim.  When computing gain or loss, the value of the New Second Lien Notes should equal their Issue Price as determined pursuant to the original issue discount rules.  See "New Second Lien Notes," Section B.2.b of this Tax Disclosure.  Capital gains on assets held more than one year are taxed at a favorable rate for non-corporate U.S. Persons.  Capital losses generally are limited to offsetting only capital gains.

Any gain from the exchange is probably ineligible to be treated as installment gain under Tax Code Section 453, for the New Second Lien Notes are likely to be treated as readily tradable.

Under the "market discount" provisions of Tax Code Sections 1276 through 1278, some or all of any gain recognized by a U.S. Person holding an Allowed Old Note Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued market discount on such Claim.  An Old Note Claim should be treated as having market discount when a U.S. Person has an adjusted tax basis in the Old Note that is less than the sum of all remaining payments to be made on the note (excluding stated interest).

- 120 -

Any gain recognized by a U.S. Person on a taxable disposition of Allowed Old Notes Claims that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claims were considered to be held by the U.S. Person, unless the U.S. Person elected to include the market discount in income as it accrued.

The IRS, however, could take the position that (i) Parent issued the Class A Common Shares directly to the Holders of Allowed Old Note Claims in satisfaction of a portion of their Claims and (ii) CA Lyon issued New Second Lien Notes to the Holders of Allowed Old Note Claims in satisfaction of the remaining portion of such Claims. Such a position (if upheld) should not affect the recognition of gain or loss on the portion of the Allowed Old Note Claims treated as exchanged for New Second Lien Notes. It would, however, likely change the treatment of the portion of the Allowed Old Note Claims exchanged for the Class A Common Shares. Such exchange would qualify as a non-taxable exchange pursuant to Tax Code Section 351 and, therefore, U.S. Persons who are Holders of Allowed Note Claims would recognize neither gain nor loss on the portion of the Old Notes treated as exchanged for the Class A Common Shares.

    (a)    <u>Class A Common Shares</u>

A U.S. Person's initial tax basis in the Class A Common Shares should equal the value of such shares on the Effective Date, and its holding period in such shares should begin the day after the Effective Date. Other tax consequences related to holding and disposing of the Class A Common Shares are addressed below, in "Tax Consequences for U.S. Persons Holding Stock of Reorganized Parent," Section B.4 of this Tax Disclosure.

If, however, as discussed above, the IRS were to contend successfully that the Class A Common Shares should be treated as having been received in a non-taxable exchange for a portion of the Allowed Old Note Claims, a U.S. Person's initial tax basis in the Class A Common Shares should equal such U.S. Person's tax basis in the portion of the Old Notes treated as exchanged for such shares, and its holding period in such shares should include such U.S. Person's holding period of the Old Notes.

    (b)    <u>New Second Lien Notes</u>

For each full year that a U.S. Person owns New Second Lien Notes, the U.S. Person should have taxable income of at least 12% of the stated principal. This income results from the 8% interest payable in Cash (the "**Qualified Stated Interest**") and the accrued original issue discount ("**OID**"). After December 31, 2012, interest income and OID of a non-corporate U.S. Person could be subject to the 3.8% "Medicare" tax on net investment income.

A note has OID when its "**Issue Price**" (the price at which the debt is initially issued) is less than its "**Stated Redemption Price at Maturity**" (the amount of principal plus accrued interest other than Qualified Stated Interest due at maturity). It is not clear how the Issue Price of the New Second Lien Notes should be determined. If the New Second Lien Notes are treated as publicly traded (pursuant to the original issue discount rules), their Issue Price should be their fair market value on the Effective Date. If the New Second Lien Notes are not treated as publicly traded, but the Old Notes are treated as publicly traded, the Issue Price of the New Second Lien Notes should be determined based on the fair market value of the Old Notes, taking into account the value of the Class A Common Shares received by Holders of the Old Notes Claims. If neither the New Second Lien Notes nor the Old Notes are treated as publicly traded, the Issue Price of the New Second Lien Notes should be their stated principal amount. Once the New Second Lien Notes are issued, CA Lyon will determine whether it will treat them or the Old Notes as publicly traded based on the trading information it obtains. CA Lyon expects that the

aggregate Issue Price for its New Second Lien Notes will be close to their aggregate stated principal amount ($75 million), and the notes' aggregate Stated Redemption Price at Maturity should be approximately $91 million. The difference between the Stated Redemption Price at Maturity and the Issue Price should equal the aggregate OID attributable to the New Second Lien Notes. The Tax Code treats OID as a form of accrued interest and requires the holders of notes with OID to include such OID in income (regardless of any holder's method of accounting) over the term of the notes even when such inclusion occurs far in advance of a corresponding payment from the issuer.

OID is determined for an accrual period, which may be of any length and may vary in length over the term of the indebtedness so long as no accrual period is longer than one year and each scheduled payment of interest or principal occurs on either the first or final day of an accrual period. The amount of OID attributable to each accrual period will be equal to

(1) the product of:

(i) the "**Adjusted Issue Price**" (discussed below) at the beginning of such accrual period, and

(ii) the "**Yield to Maturity**", which is the discount rate necessary to reduce the present value of all payments of principal and interest under a note to its Issue Price. The New Second Lien Notes should have a Yield to Maturity of at least 12%; minus

(2) any payments of Qualified Stated Interest attributable to the accrual period.

The "**Adjusted Issue Price**" at the beginning of an accrual period generally should be the Issue Price of the indebtedness plus the aggregate amount of OID that accrued in all prior accrual periods. Accordingly, a holder of indebtedness with OID often will be required to include OID thereon in gross income for tax purposes in advance of the receipt of Cash attributable to such income. The OID allocable to an initial short accrual period may be computed using any reasonable method if all other accrual periods, other than a final short accrual period, are of equal length. The amount of OID allocable to the final accrual period at maturity is the difference between the amount payable at maturity and the Adjusted Issue Price of the indebtedness as of the beginning of the final accrual period.

A U.S. Person's initial tax basis in New Second Lien Notes should equal their Issue Price. The tax basis should then be increased over time by accrued OID. The holding period should begin on the day after the Effective Date.

If a U.S. Person sells or exchanges any New Second Lien Notes, the U.S. Person should treat the amount of the proceeds it receives attributable to accrued but unpaid Qualified Stated Interest as ordinary interest income (to the extent the U.S. Person has not already accrued such income). The U.S. Person should also generally recognize capital gain or loss equal to the difference between the remainder of the proceeds and its tax basis in the notes sold or exchanged (excluding any tax basis attributable to accrued but unpaid interest). For non-corporate U.S. Persons, capital gains on assets held more than one year are taxed at a favorable rate, but gain recognized after December 31, 2012 could be subject to the 3.8% "Medicare" tax on net investment income. Capital losses generally are limited to offsetting only capital gains.

If CA Lyon redeems the New Second Lien Notes of a U.S. Person, the U.S. Person should be treated as if it had sold or exchanged such notes.

- 122 -

3. **The Rights Offering**

As described in Section III.D.7 of this Disclosure Statement, certain Holders of Allowed Old Notes Claims who are Eligible Participants are also receiving Subscription Rights to elect to purchase their Pro Rata share of Class C Common Shares and Preferred Shares of Reorganized Parent under the Rights Offering. The Reorganized Debtors intend to treat these Subscription Rights as having no value. If such valuation is accepted by the IRS, a U.S. Person that is an Eligible Participant should not recognize any taxable gain or loss as a result of its receipt of such Subscription Rights, and should have no basis in such rights. Such a U.S. Person should also recognize no gain or loss as a result of making its election to purchase or not to purchase shares under the Rights Offering.

If a U.S. Person that is an Eligible Participant elects to participate in the Rights Offering, its holding period for the Class C Common Shares and Preferred Shares purchased under the Rights Offering should begin on the day after the date of purchase. The Class C Common Shares and Preferred Shares should be received with a tax basis equal to their respective purchase prices.

4. **Tax Consequences for U.S. Person Holding of Stock of Reorganized Parent**

(a)    <u>Dividends Distributed to U.S. Persons</u>

Distributions with respect to shares of stock that are issued or received pursuant to the Plan should be dividends to the extent of Reorganized Parent's current and accumulated earnings and profits attributable to such shares as determined under the Tax Code as of the end of the taxable year in which the distribution is made. Any portion of a distribution that exceeds Reorganized Parent's current and accumulated earnings and profits should first be applied to reduce the holder's tax basis (but not below zero) in its shares, and the excess should be treated as gain from the disposition of the shares, the tax treatment of which is discussed below under "U.S. Person's Sale, Exchange or Conversion of Shares."

When received by a non-corporate U.S. Person holding stock of Reorganized Parent, distributions treated as dividends should generally be subject to a reduced maximum tax rate of 15% until January 1, 2012, when all dividend income of a non-corporate U.S. Person should be taxed as ordinary income. The reduced 15% rate should not apply to dividends received by a non-corporate U.S. Person to the extent that such Person elects to treat the dividends as "investment income" that may be offset against investment expenses. Furthermore, the reduced rate should not apply to dividends that are paid to non-corporate U.S. Persons holding stock of Reorganized Parent for 60 days or less during the 121-day period beginning on the date that is 60 days before the date on which such stock becomes ex-dividend. A 91-day minimum holding period applies to any dividends on the Preferred Shares that are attributable to a period in excess of 366 days. In addition, for non-corporate U.S. Persons, dividends recognized after December 31, 2012 could be subject to the 3.8% "Medicare" tax on net investment income.

When received by a corporate U.S. Person holding stock of Reorganized Parent, distributions treated as dividends should generally be eligible for a 70% dividends received deduction. The Tax Code, however, disallows this deduction when the underlying stock is held for less than 46 days during the 91-day period beginning on the date that is 45 days before the date on which such stock becomes ex-dividend. A 91-day minimum holding period applies to any dividends on the Preferred Shares that are attributable to a period in excess of 366 days.

In general, for purposes of meeting the holding period requirements for either the dividends received deduction or the reduced maximum tax rate on qualified dividends, a U.S. Person holding shares should not count towards its holding period any period in which it (1) has

- 123 -

the option to sell, is under a contractual obligation to sell, or has made but not yet closed a short sale of its New Common Stock or Preferred Shares, as the case may be, or substantially identical stock of Reorganized Parent; (2) has granted an option to buy the New Common Stock or Preferred Shares, as the case may be, or substantially identical securities; or (3) otherwise has diminished its risk of loss on its New Common Stock or Preferred Shares, as the case may be, by holding one or more other positions with respect to substantially similar or related property.

Corporate U.S. Persons holding stock of Reorganized Parent should consider the effect of Tax Code Section 246A, which reduces the dividends received deduction allowed with respect to "debt-financed portfolio stock." The Tax Code also imposes a 20% alternative minimum tax on corporate U.S. Persons. In some circumstances, the portion of dividends subject to the dividends received deduction should increase a corporate U.S. Person's minimum tax base in determining the alternative minimum tax. In addition, a corporate U.S. Person should reduce its basis in stock with respect to certain "extraordinary dividends" under Tax Code Section 1059.

> (b)     U.S. Person's Sale, Exchange or Conversion of Shares

Upon a U.S. Person's subsequent sale or exchange of the Class A Common Shares, Class C Common Shares or Preferred Shares, the U.S. Person should recognize capital gain or loss in an amount equal to the difference between the amount realized and its adjusted tax basis in the transferred shares. For non-corporate U.S. Persons, any capital gain should be taxed at a lower rate if the shares were held more than one year, and gain recognized after December 31, 2012 could be subject to the 3.8% "Medicare" tax on net investment income. Capital losses generally are limited to offsetting only capital gains.

A U.S. Person holding Preferred Shares should not have a taxable event upon the conversion of its Preferred Shares into Class C Common Shares. The U.S. Person should receive such Class C Common Shares with a tax basis equal to its basis in the converted Preferred Shares, and with a holding period that includes the U.S. Person's holding period for the Preferred Shares that were converted.

In the conversion, if the U.S. Person receives Cash for the accrued but unpaid dividends on the Preferred Shares that are converted, such Cash should be taxed as a dividend that has been declared and distributed, as discussed in the preceding section.

> 5.     **Backup Withholding**

Under federal income tax law, interest and other reportable payments may be subject to "backup withholding," at a rate of 28% (but increasing to 31% for payments received after 2012). Backup withholding generally applies if a U.S. Person (a) fails to furnish its social security number or other taxpayer identification number ("**TIN**"), (b) furnishes an incorrect TIN, (c) fails to report properly interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding.

C.    **TAX CONSEQUENCES FOR NON-U.S. PERSONS HOLDING ALLOWED OLD NOTES CLAIMS**

   1.    **Non-U.S. Person's Exchange of Old Notes Claims for New Second Lien Notes and Class A Common Shares**

The Plan provides for CA Lyon to transfer Class A Common Shares and issue its New Second Lien Notes to Holders of Allowed Old Notes Claims, in exchange for such Claims.

*Accrued Interest.* "**Accrued Interest**" means interest that accrued but was unpaid while the underlying Claim was held by its Holder. A Non-U.S. Person holding an Allowed Old Notes Claim who exchanges that Claim for New Second Lien Notes and Class A Common Shares pursuant to the Plan, should be treated as receiving interest to the extent of any consideration so received allocable to Accrued Interest that was not previously taken into account for U.S. tax purposes, regardless of whether that Non-U.S. Person realizes an overall gain or loss as a result of the exchange of its Allowed Claim, and regardless of whether the Non-U.S. Person's Allowed Claim is a capital asset in its hands. The taxation of interest is addressed below, in "Interest," Section C.2 of this Tax Disclosure.

Under the Plan, distributions in respect of Allowed Claims will be allocated first to the stated principal amount of such Claims, with any excess allocated to Accrued Interest. However, there can be no assurance that the IRS or the courts will respect the Plan allocation for federal income tax purposes.

*Gain or Loss from Exchange.* From the exchange, a Non-U.S. Person holding Allowed Old Note Claims should generally realize gain or loss equal to the value of the New Second Lien Notes and Class A Common Shares received (other than the value attributable to Accrued Interest, as discussed above), minus the Non-U.S. Person's tax basis in its Claim. When computing gain or loss, the value of the New Second Lien Notes should equal their Issue Price as determined pursuant to the original issue discount rules. See "New Second Lien Notes," Section B.2.b of this Tax Disclosure.

Any gain or loss a Non-U.S. Person realizes on the exchange generally should not be subject to U.S. federal income tax unless (1) such gain or loss is effectively connected with the conduct by such Non-U.S. Person of a trade or business in the United States; (2) in the case of U.S. source gains or losses derived by an individual Non-U.S. Person, such individual is present in the United States for 183 days or more in the taxable year of the disposition and certain other conditions are met; or (3) the Non-U.S. Person is subject to tax pursuant to the provisions of the Tax Code applicable to certain expatriates.

If, under (1) above, the gain or loss is effectively connected with the conduct by such Non-U.S. Person of a trade or business in the United States, net gain should be subject to regular U.S. federal income tax in the same manner as if the Non-U.S. Person were a U.S. Person. If the Non-U.S. Person is a corporation, the gain may also be subject to the branch profits tax at a rate of 30% or a lower rate specified under an applicable treaty. A Non-U.S. Person must report its effectively connected gain or loss from the sale or exchange of its New Common Stock or Preferred Shares on a U.S. income tax return.

If, under (2) above, gain is recognized by an individual Non-U.S. Person who is present in the United States for at least 183 days in the taxable year of the disposition and certain other conditions are met, even if the individual is not considered a resident of the United States the gain should be subject to a flat 30% tax, which may be offset by United States source capital losses.

- 125 -

The IRS, however, could take the position that (i) Parent issued the Class A Common Shares directly to the Holders of Allowed Old Note Claims in satisfaction of a portion of their Claims and (ii) CA Lyon issued New Second Lien Notes to the Holders of Allowed Old Note Claims in satisfaction of the remaining portion of such Claims. Such a position (if upheld) should not affect the recognition of gain or loss on the portion of the Allowed Old Note Claims treated as exchanged for New Second Lien Notes. It would, however, likely change the treatment of the portion of the Allowed Old Note Claims exchanged for the Class A Common Shares. Such exchange would qualify as a non-taxable exchange pursuant to Tax Code Section 351 and, therefore, Non-U.S. Persons who are Holders of Allowed Note Claims would recognize neither gain nor loss on the portion of the Old Notes treated as exchanged for the Class A Common Shares.

*Basis and Holding Period.* The tax basis of the Class A Common Shares received in the exchange should be their fair market value, and the tax basis of the New Second Lien Notes should be their Issue Price (which is discussed above in "New Second Lien Notes, Section B.2.b of this Tax Disclosure). The holding period for such property should begin the day after the exchange. Other tax consequences of holding such property are addressed in the following sections.

If, however, as discussed above, the IRS were to contend successfully that the Class A Common Shares should be treated as having been received in a non-taxable exchange for a portion of the Allowed Old Note Claims, a Non-U.S. Person's initial tax basis in the Class A Common Shares should equal such Non-U.S. Person's tax basis in the portion of the Old Notes treated as exchanged for such shares, and its holding period in such shares should include such U.S. Person's holding period of the Old Notes.

2.      **Interest**

Subject to the discussion in "Additional Withholding" (Section 4.d of this Tax Disclosure, below), and assuming that the DTC's book-entry procedures set forth in the section of Exhibit F (Description of the Notes) entitled "Book-Entry, Delivery and Form of Notes" are observed upon issuance and throughout the term of the New Second Lien Notes, the payment to a Non-U.S. Person of interest, including Accrued Interest attributable to Old Notes and the amount of any payment that is attributable to OID that accrues while such Non-U.S. Person holds a New Second Lien Note, should not be subject to U.S. federal withholding tax pursuant to the "portfolio interest exception," provided that two criteria are satisfied.

The first criterion is that the Non-U.S. Person does not actually or constructively own 10% or more of stock of Reorganized Parent, as measured by voting power, and is not a controlled foreign corporation that is related to Reorganized CA Lyon within the meaning of the Tax Code.

There are two ways the second criterion can be satisfied. One approach is for the beneficial owner of the note to certify to Reorganized CA Lyon or its agent, under penalties of perjury, that it is not a U.S. Person and provide its name and address on IRS Form W-8BEN (or a suitable substitute form). Reorganized CA Lyon or its agent may also require a certificate indicating that the beneficial owner is not a 10% shareholder or a related controlled foreign corporation. Alternatively, a securities clearing organization, bank or other financial institution that holds the note on behalf of such Non-U.S. Person in the ordinary course of its trade or business (a "financial institution") can certify under penalties of perjury that such a Form W-8BEN (or suitable substitute form) has been received from the beneficial owner by it (or by another financial institution between it and the beneficial owner) and furnish the payor with a copy thereof. Generally, no U.S. tax identification number ("**TIN**") need be provided. But if the notes are held by a foreign partnership, this certificate should be provided by the partners rather

- 126 -

than the foreign partnership, and the partnership is required to provide certain information, including a U.S. TIN.

If a Non-U.S. Person cannot satisfy the requirements of the portfolio interest exception described above, payments of interest made to such Non-U.S. Person, including the amount of any payment that is attributable to OID that accrues while such Non-U.S. Person holds a New Second Lien Note, should be subject to a 30% withholding tax, unless the beneficial owner of the Old Note or New Second Lien Note provides Reorganized CA Lyon or its paying agent, as the case may be, with a properly executed (1) IRS Form W-8BEN (or successor form) claiming an exemption from or reduction in the rate of withholding under an applicable income tax treaty or (2) IRS Form W-8ECI (or successor form) stating that interest paid on the Old Note or New Second Lien Note is not subject to withholding tax because it is effectively connected with the beneficial owner's conduct of a trade or business in the United States. In either case, a Non-U.S. Person must provide a U.S. TIN to claim either exemption from withholding, unless the New Second Lien Notes are actively traded and the Non-U.S. Person is claiming a treaty exemption under (1).

If a Non-U.S. Person holding an Old Note or New Second Lien Note is engaged in a trade or business in the United States and interest on such note is effectively connected with the conduct of such trade or business, such Non-U.S. Person should be subject to U.S. federal income tax on such interest, including OID. In addition, if such Non-U.S. Person is a foreign corporation, it may be subject to a branch profits tax equal to 30% of its effectively connected earnings and profits for that taxable year, subject to adjustment, unless it qualifies for a lower rate under an applicable income tax treaty.

### 3.    Non-U.S. Person's Sale, Exchange, or Redemption of New Second Lien Notes

If a Non-U.S. Person sells or exchanges any New Second Lien Notes, and the Non-U.S. Person was not previously treated as receiving interest that accrued on the notes while held by such Non-U.S. Person, such Person should be treated as receiving interest to the extent of any consideration allocable to such accrued interest, regardless of whether that Non-U.S. Person realizes an overall gain or loss as a result of the sale or exchange. The taxation of interest is addressed above in the immediately preceding section.

The Non-U.S. Person should also generally realize gain or loss equal to the purchase price received (other than the amount received for accrued interest), minus the Non-U.S. Person's tax basis in the New Second Lien Notes that it sold (excluding any tax basis attributable to accrued interest). Any gain or loss recognized by a Non-U.S. Person's sale or exchange of New Second Lien Notes generally should not be subject to U.S. federal income tax unless (1) such gain or loss is effectively connected with the conduct by such Non-U.S. Person of a trade or business in the United States, (2) in the case of gains or losses derived by an individual, such individual is present in the United States for 183 days or more in the taxable year of the disposition and certain other conditions are met, or (3) the Non-U.S. Person is subject to tax pursuant to the provisions of the Tax Code applicable to certain expatriates. The tax consequences of satisfying (1) or (2) are described above, in "Gain or Loss from Exchange," a subsection of Section C.1 of this Tax Disclosure.

If CA Lyon redeems a Non-U.S. Person's New Second Lien Notes, the Non-U.S. Person should be treated as if it has sold or exchanged such notes.

4.    **Non-U.S. Person Holding New Common Stock or Preferred Shares**

(a)    <u>Dividends Received by Non-U.S. Person</u>

Distributions with respect to shares of stock that are received pursuant to the Plan should be dividends to the extent of Reorganized Parent's current and accumulated earnings and profits attributable to such shares as determined under the Tax Code as of the end of the taxable year in which the distribution is made. Any portion of a distribution that exceeds Reorganized Parent's current and accumulated earnings and profits should first be applied to reduce the Non-U.S. Person's tax basis (but not below zero), and the excess should be treated as gain from the disposition of the stock, the tax treatment of which is discussed below under "Non-U.S. Person's Sale, Exchange or Conversion of Shares," Section C.4.b of this Tax Disclosure.

*Dividend Withholding.* Dividends paid to a Non-U.S. Person holding New Common Shares or Preferred Shares should generally be subject to withholding of U.S. federal income tax at a 30% rate or such lower rate as may be specified by an applicable income tax treaty. But dividends that are effectively connected with the conduct of a trade or business by the Non-U.S. Person within the United States are not subject to the withholding tax, provided certain certification and disclosure requirements are satisfied, including completing IRS Form W-8ECI (or other applicable form). Instead, such dividends are subject to U.S. federal income tax on a net income basis in the same manner as if the Non-U.S. Person were a U. S. Person, unless (in the case of a Non-U.S. Person which does not have a permanent establishment in the United States) an applicable income tax treaty provides otherwise. Any such effectively connected dividends received by a foreign corporation may be subject to an additional "branch profits tax" at a 30% rate or such lower rate as may be specified by an applicable income tax treaty. A Non-U.S. Person holding New Common Stock or Preferred Shares who wishes to claim the benefit of an applicable treaty rate and avoid backup withholding, as discussed below, for dividends will be required to (1) complete IRS Form W-8BEN (or other applicable form) including, unless the stock is actively traded, a TIN, and certify under penalty of perjury that such holder is not a United States person as defined under the Tax Code and is eligible for treaty benefits, or (2) if the New Common Stock or Preferred Shares are held through certain foreign intermediaries, satisfy the relevant certification requirements of applicable Treasury Regulations.

A Non-U.S. Person holding New Common Stock or Preferred Shares eligible for a reduced rate of U.S. withholding tax pursuant to an income tax treaty may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.

After December 31, 2013, any dividends not subject to the 30% dividend withholding (for the reasons discussed above) could nevertheless be subject to the 30% withholding that applies to payments made to certain foreign accounts. See "Withholding for Foreign Accounts," a subsection of Section C.4.d of this Tax Disclosure, below.

*FIRPTA.* In addition, Reorganized Parent believes that it is and will remain a U.S. real property holding corporation ("**USRPHC**") and its stock is a United States real property interest ("**USRPI**") under the Foreign Investment in Real Property Tax Act ("**FIRPTA**"). A United States corporation that makes distributions in excess of its current and accumulated earnings and profits to a Non-U.S. Person with respect to stock that is a USRPI is generally required to withhold ten percent (10%) of the amount distributed. For any distribution that exceeds its current and accumulated earnings and profits, Reorganized Parent can satisfy its withholding requirements in one of two ways. Reorganized Parent could treat the entire distribution as a dividend (whether or not any portion of the distribution represents a return of basis or capital gain), subject to the withholding rules for dividends (generally, at a rate of 30% unless a reduced rate applies to dividend distributions in general under an income tax treaty, in which case the applicable rate of withholding shall be no less than 10% or such lower rate as may be specified

- 128 -

by the applicable income tax treaty for distributions from a USRPHC). Alternatively, Reorganized Parent could treat only the amount of the distribution equal to its reasonable estimate of its current and accumulated earnings and profits as a dividend, subject to the dividend withholding rules in the immediately preceding paragraphs, with the excess portion of the distribution subject to withholding at a rate of 10% or such lower rate as may be specified by an applicable income tax treaty as if such excess were the result of a sale of shares in a USRPHC (discussed below under "Sale, Exchange or Conversion of Shares"). In the latter case, a credit equal to the amount withheld from such excess generally should be allowed against the Non-U.S. Person's U.S. federal income tax liability (determined by including the gain or loss recognized from the sale or other disposition of stock in a USRPHC as if such gain were effectively connected with such Non-U.S. Person's conduct of a trade or business in the United States).

(b)     Non-U.S. Person's Sale, Exchange or Conversion of Shares

*Sale or Exchange.* If a Non-U.S. Person sells or exchanges its New Common Stock or Preferred Shares, the Non-U.S. Person should generally recognize gain or loss under FIRPTA equal to the purchase price minus the Non-U.S. Person's tax basis in the shares sold, if the New Common Stock and Preferred Shares sold constitute a USRPI. Such shares will constitute USRPIs if Reorganized Parent is a USRPHC at any time during the five year period ending with the sale or exchange that such Non-U.S. Person held such shares and either (1) such shares are not readily tradable on an established securities market, or (2) the Non-U.S. Person beneficially owns, actually or constructively, more than five percent of the fair market value of the applicable class of stock at any time during the five year period ending with the sale or exchange.

FIRPTA also generally imposes a 10% withholding tax on the amount realized by a Non-U.S. Person on the disposition of a USRPI, but such Non-U.S. Person may claim a credit for such amount against its U.S. federal income tax liability. Such withholding may be reduced or eliminated if the Non-U.S. Person establishes that 10% of the amount realized exceeds its maximum tax liability and prior to the sale or exchange provides the purchaser with a withholding certificate from the IRS.

*Conversion of Preferred Shares.* It is unclear whether a conversion of Preferred Shares into Class C Common Shares will be treated as a "disposition" of the Preferred Shares for purposes of FIRPTA. If the conversion is not treated as a disposition, a Non-U.S. Person should not have a taxable event on the conversion of its Preferred Shares into Class C Common Shares. The Class C Common Shares would then have a tax basis equal to the basis of the converted Preferred Shares and a holding period that includes the holding period for such Preferred Shares.

If the conversion is treated as a disposition, a Non-U.S. Person who converts Preferred Shares into Class C Common Shares should recognize gain in an amount equal to the excess of the fair market value of the Class C Common Shares at the time of conversion over the tax basis for the Preferred Shares, unless:

- the Class C Common Shares received on the conversion constitute a USRPI; and

- such Non-U.S. Person complies with certain procedural requirements, including the requirement to file a U.S. income tax return.

Class C Common Shares received on a conversion of Preferred Shares should constitute a USRPI if either (1) such Class C Common Shares are not readily tradable on an established securities market, or (2) the converting Non-U.S. Person beneficially owned, actually or constructively, more than five percent of the fair market value of such Class C Common Shares at any time during the five year period ending with the conversion.

- 129 -

Whether or not a conversion of Preferred Shares into Class C Common Shares is treated as a disposition, no loss will be recognized on such conversion.

If, in connection with a conversion, a Non-U.S. Person receives Cash for accrued but unpaid dividends on the Preferred Shares, such Cash should be treated as a dividend to the extent of the Reorganized Parent's earnings and profits attributable to the converted shares, as discussed in "Dividends Received by a Non-U.S. Person," Section C.4.a of this Tax Disclosure.

(c)    Information Reporting

*Reporting by Reorganized Parent.* Reorganized Parent must report annually to the IRS and to each Non-U.S. Person holding its stock the amount of dividends paid to such Non-U.S. Person and the tax withheld with respect to such dividends, regardless of whether withholding was required. Copies of the information returns reporting such dividends and withholding may also be made available to the tax authorities in the country in which the Non-U.S. Person resides under the provisions of an applicable treaty.

*Reporting by Non-U.S. Person Holding New Common Stock or Preferred Shares.* Under Tax Code Section 6039C, the IRS is authorized to issue regulations that require United States information returns to be filed by a Non-U.S. Person who is not engaged in a trade or business in the United states and who holds a USRPI having a fair market value of at least $50,000. Although no such regulations have yet been issued, Non-U.S. Persons holding New Common Stock or Preferred Shares could become subject to such regulations in the future.

(d)    Additional Withholding

*Withholding for Foreign Accounts.* Even if withholding is not required under the provisions discussed above, a 30% withholding tax generally should apply to dividends paid after December 31, 2013, or gross proceeds from a disposition of New Common Stock or Preferred Shares paid after December 31, 2014, to (1) a foreign financial institution (as that term is defined in Tax Code Section 1471(d)(4)) unless that foreign financial institution enters into an agreement with the U.S. Treasury Department to collect and disclose information regarding U.S. account holders of that foreign financial institution (including certain account holders that are foreign entities that have U.S. owners) and satisfies other requirements; and (2) specified other foreign entities unless such entity certifies that it does not have any substantial U.S. owner and such entity satisfies other specified requirements.

*Backup Withholding.* A Non-U.S. Person should not be subject to backup withholding on dividends paid to such Non-U.S. Person as long as such Non-U.S. Person certifies under penalty of perjury that it is a Non-U.S. Person (and the payor does not have actual knowledge or reason to know that such Non-U.S. Person is a United States person as defined under the Code), or such Non-U.S. Person otherwise establishes an exemption.

Depending on the circumstances, information reporting and backup withholding may apply to the proceeds received from a sale or other disposition of New Common Stock or Preferred Shares, unless the beneficial owner certifies under penalty of perjury that it is a Non-U.S. Person (and the payor does not have actual knowledge or reason to know that the beneficial owner is a United States person as defined under the Code), or such owner otherwise establishes an exemption.

U.S. backup withholding tax is not an additional tax. Any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against a Non-U.S. Person's U.S. federal income tax liability provided the required information is timely furnished to the IRS.

- 130 -

### D. TAX CONSEQUENCES FOR THE DEBTORS AND THE REORGANIZED DEBTORS

#### 1. Cancellation of Debt

To the extent that the Plan provides for the cancellation of a Debtor's debt that has an Adjusted Issue Price that exceeds the value of property (including Equity Interests and new indebtedness) that the Debtor provides to the Holder of such debt, the Debtor has income from the cancellation of debt ("**COD**") with respect to such cancelled debt. (Adjusted Issue Price is discussed above in "New Second Lien Notes," Section B.2.b, regarding original issue discount.) The fair market value of new indebtedness is generally deemed to equal its Issue Price. (Issue Price is also discussed above in "New Second Lien Notes," Section B.2.b, regarding original issue discount.)

No COD income is realized to the extent that the payment of the debt being discharged would have given rise to a deduction, however. So no COD income should arise from the cancellation of interest that has accrued but has not yet been taken into account for tax purposes by the applicable Debtor under its method of accounting.

The Plan provides for Parent to contribute the Class A Common Shares to CA Lyon, and for CA Lyon to transfer such shares and issue the New Second Lien Notes to Holders of its Old Notes in cancellation of such notes. Parent's contribution of the Class A Common Shares to CA Lyon and CA Lyon's distribution of such shares should not result in taxable income to the Reorganized Debtors. Since the Class A Common Shares and the New Second Lien Notes should have a value that is less than the Adjusted Issue Price of the Old Notes (including any accrued interest that CA Lyon has already taken into account for tax purposes under its method of accounting), CA Lyon should receive COD income from the cancellation. A Debtor should also have COD income to the extent that Holders of unsecured, unscheduled Claims against the Debtor fail to timely file a Proof of Claim and have their Claims discharged on the Effective Date pursuant to section 1141 of the Bankruptcy Code. The Debtors estimate that in the aggregate they should have approximately $170 million of COD income under the Plan.

Although the Tax Code generally requires COD income to be included in gross income in the taxable year of discharge, under the "**Bankruptcy Exception**," COD income is specifically excluded from gross income when the debtor is in a case under the Bankruptcy Code and its indebtedness is cancelled pursuant to a confirmed plan. When a debtor is a member of a consolidated group, the Bankruptcy Exception is applied on a debtor by debtor basis. Accordingly, the Debtors believe that they should not be required to include in income any COD income that results from the Plan.

Tax Code Section 108(b), however, requires that certain tax attributes of the Debtors be reduced by the amount of COD income they exclude from income under the Bankruptcy Exception. Tax attributes are reduced in the following order of priority: net operating losses and net operating loss carryovers; general business credits; minimum tax credits; capital loss carryovers; basis of property of the taxpayer; passive activity loss or credit carryovers; and foreign tax credit carryovers. Tax attributes are generally reduced by one dollar for each dollar excluded from gross income, except that general tax credits, minimum tax credits, and foreign tax credits are reduced by 33.3 cents for each dollar excluded from gross income. When the Bankruptcy Exception applies to a member of a consolidated group, other member's attributes could be reduced. Therefore, each member of the Debtors' consolidated group could have some of its attributes reduced. The Debtors believe that their consolidated NOLs will be their principal attributes to be reduced.

- 131 -

A debtor may elect to first reduce its basis in depreciable property held by the taxpayer in an amount not to exceed the aggregate adjusted basis of such property. When debtors are members of a consolidated group, different elections can be made with respect to different members with COD income excluded under the Bankruptcy Exception. The Debtors presently do not intend to make this election for any member of their consolidated group. If this decision were to change, the deadline for making such election is the due date (including extensions) of their consolidated federal income tax return for the taxable year in which the COD income arises under the Plan and is excludible under the Bankruptcy Exception.

2.      **Net Operating Losses**

Based on its federal income tax returns, as filed, and estimates of its tax return position for the tax year ending on December 31, 2011 (including the estimated reduction of attributes under the Bankruptcy Exception discussed above), the Debtors' consolidated group reported that approximately $115 million of net operating losses ("**NOLs**") carried forward to its tax year ending on December 31, 2011, and the group estimates that it will have approximately $25 million of NOLs carry forward to its tax year ending on December 31, 2013 (excluding any other taxable income or loss resulting from operations in 2012). Those NOLs would expire, if not reduced or used, in 2031. The NOL amounts reported in tax returns are subject to examination, and possible significant adjustment, upon such examination, by the IRS and other taxing authorities. In addition, estimates of the Reorganized Debtors' NOLs are subject to legal and factual uncertainty.

Various limitations could apply to the Reorganized Debtors' use of NOLs to offset taxable income arising in tax years ending after the Effective Date. Such limitations could arise under the alternative minimum tax rules or the current or future suspension of NOL carryforwards for state or federal purposes. Moreover, the Debtors expect that Tax Code Section 382 will limit their use of NOL carryforwards, as discussed in the next section.

3.      **Section 382 Limitation**

Tax Code Section 382 generally limits the use of certain losses after a corporation undergoes an "ownership change". In general, an ownership change occurs when the percentage of the corporation's stock (based on value) owned by certain "5 percent shareholders" increases by more than 50 percentage points over the lowest percentage owned at any time during the applicable "testing period" (generally the three-year period preceding the testing date). A "5 percent shareholder" for these purposes generally includes an individual or entity that directly or indirectly owns 5 percent or more of a corporation's stock during the relevant period, and may include one or more groups of shareholders that, in the aggregate, own less than 5 percent of the value of the corporation's stock. Under applicable Treasury Regulations, an ownership change with respect to an affiliated group of corporations filing a consolidated return that have consolidated NOLs is generally measured by changes in stock ownership of the parent corporation of the group. An ownership change should arise from the receipt of New Common Stock and Preferred Shares in Reorganized Parent under the Plan (the Reorganized Debtors' "**Ownership Change**").

Tax Code Section 382(l)(5) sometimes enables a corporation in bankruptcy to undergo an ownership change without being subject to the limitation imposed by Tax Code Section 382 (the "**Section 382 Limitation**"). To be eligible for this exception, at least 50 percent of the corporation's stock, by value and voting power, must be received as payment for certain liabilities or in exchange for other stock of the corporation It is unlikely that this condition will be satisfied on the Effective Date, so the Debtors expect that the Ownership Change will not be eligible for the exception provided by Tax Code Section 382(l)(5).

The Ownership Change should accordingly generate a Section 382 Limitation, which specifies the maximum aggregate amount of certain losses that may offset income for a taxable year. Such limited losses should include the approximately $25 million of pre-change NOLs that the Debtors estimate will carry forward past the Ownership Change (as discussed in the preceding section). The Debtors also estimate that their consolidated group should have approximately $257 million of built-in losses when it undergoes such Ownership Change. The Section 382 Limitation should also apply to any such built-in losses that are recognized during a five-year period that begins on the date of the Ownership Change.

A corporation's Section 382 Limitation is an annual limitation on the use of pre-change losses and recognized built-in losses and generally equals the value of the corporation when its ownership changed, multiplied by the average yield for long-term U.S. obligations, adjusted to the rate the bonds would have if tax exempt (as of November 2011, the federal long-term tax-exempt rate was 3.78%). The value of the corporation is generally treated as the pre-change value of the corporation's stock. For affiliated corporations that file a consolidated tax return, the limitation is generally the aggregate pre-change value of the stock of each member other than stock owned directly or indirectly by another member.

Tax Code Section 382(l)(6), however, provides an alternative rule regarding the value of a corporation that is in bankruptcy and undergoes an ownership change pursuant to a bankruptcy plan of reorganization, so long as Tax Code Section 382(l)(5) does not apply. The Debtors' Ownership Change should accordingly qualify for Tax Code Section 382(l)(6), under which the value of the Debtors' consolidated group should be treated as the lesser of (a) the aggregate post-change value of the stock of each member other than stock owned directly or indirectly by another member or (b) the aggregate pre-change value of each member's assets other than stock of another member. In applying Tax Code Section 382(l)(6), the Debtors estimate that their Ownership Change should generate a Section 382 Limitation that equals approximately $5.9 million(based on the federal long-term tax-exempt rate for November 2011). Any unused Section 382 Limitation can be carried forward to the next taxable year.

### 4.    Alternative Minimum Tax

In general, an alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carry forwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carry forwards (as computed for AMT purposes).

In addition, if a corporation undergoes an ownership change (within the meaning of Tax Code Section 382) and has a net unrealized built-in loss (as determined for AMT purposes) on the date of the ownership change, the corporation's aggregate tax basis in its assets would be adjusted for certain AMT purposes to reflect the fair market value of such assets as of the change date.

### E.    GENERAL DISCLAIMER

THE FOREGOING FEDERAL INCOME TAX SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES OF THE PLAN.

- 133 -

# ARTICLE VIII.
## RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors and interest holders than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims and Allowed Equity Interests than that which is proposed under the Plan. Accordingly, the Debtors recommend that Holders of Claims and Equity Interests entitled to vote on the Plan support confirmation of the Plan and vote to accept the Plan.

Respectfully submitted,

Matthew Zaist, Executive Vice President
WILLIAM LYON HOMES, on behalf of itself and its
direct and indirect subsidiaries listed below

> William Lyon Homes, a Delaware Corporation
> William Lyon Homes, Inc., a California
> Corporation
> Mountain Falls Golf Course, LLC
> Mountain Falls, LLC
> Circle G at the Church Farm North Joint Venture,
> LLC
> Presley CMR, Inc.
> William Lyon Southwest, Inc.
> Sycamore CC, Inc.
> PH-LP Ventures
> PH Ventures – San Jose
> HSP, Inc.
> PH Rielly Ventures
> Lyon Waterfront, LLC
> Lyon East Garrison Company I, LLC
> WLH Enterprises
> Duxford Financial, Inc.
> California Equity Funding, Inc.
> Laguna Big Horn, LLC
> Presley Homes
> Cerro Plata Associates, LLC
> Whitney Ranch Village 5, LLC
> Duxford Insurance, LLC

Respectfully submitted,

Richard S. Robinson, Senior Vice President
Duxford Title Reinsurance Co.

- 134 -

## <u>Disclosure Statement Schedule 1</u>

### List of Debtors

William Lyon Homes, a Delaware Corporation (4902);

William Lyon Homes, Inc., a California Corporation (3855);

Mountain Falls Golf Course, LLC (3291);

Mountain Falls, LLC (9631);

Circle G at the Church Farm North Joint Venture, LLC (1322);

Presley CMR, Inc. (3862);

William Lyon Southwest, Inc. (8474);

Sycamore CC, Inc. (1307);

PH-LP Ventures (9119);

PH Ventures – San Jose (5089);

HSP, Inc. (6045);

PH Rielly Ventures (7710);

Lyon Waterfront, LLC (1928);

Lyon East Garrison Company I, LLC (5692);

WLH Enterprises (3333);

Duxford Financial, Inc. (0824);

California Equity Funding, Inc. (0016);

Laguna Big Horn, LLC (2590);

Duxford Title Reinsurance Co. (7859);

Presley Homes (5035);

Cerro Plata Associates, LLC (5090);

Whitney Ranch Village 5, LLC (5256); and

Duxford Insurance Services, LLC (8232).

**Disclosure Statement Exhibit A**

Plan of Reorganization

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| William Lyon Homes, et. al,[1] | ) | Case No. _____ |
| | ) | |
| Debtors. | ) | |
| | ) | |
| | ) | |

---

### PREPACKAGED JOINT PLAN OF
### REORGANIZATION FOR WILLIAM LYON HOMES, et al.

Dated: November 17, 2011

PACHULSKI STANG ZIEHL & JONES LLP
Richard M. Pachulski (CA Bar No. 90073)
Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Joshua M. Fried (CA Bar No. 181541)
919 North Market Street, Seventeenth Floor
P.O. Box 8705
Wilmington, Delaware  19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:      rpachulski@pszjlaw.com
             ljones@pszjlaw.com
             dbertenthal@pszjlaw.com
             jfried@pszjlaw.com

Proposed Counsel to Debtors and Debtors in Possession

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are set forth on Schedule 1 hereto.

## TABLE OF CONTENTS

**Page**

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS ............................................. 1

    A.    Rules of Interpretation, Computation of Time and Governing Law .................... 1

    B.    Defined Terms ........................................................................................ 2

ARTICLE II. ADMINISTRATIVE, DIP FACILITY AND PRIORITY TAX CLAIMS .......... 19

    A.    Administrative Claims ................................................................ 19

    B.    DIP Facility Claims ................................................................... 20

    C.    Priority Tax Claims .................................................................... 20

ARTICLE III. CLASSIFICATION AND TREATMENT OF  CLASSIFIED CLAIMS AND EQUITY INTERESTS ........................................................ 21

    A.    Summary ................................................................................... 21

    B.    Classification and Treatment of Claims and Equity Interests ............................ 22

    C.    Special Provision Governing Unimpaired Claims ........................ 28

    D.    Discharge of Claims ................................................................... 28

ARTICLE IV. ACCEPTANCE OR REJECTION OF THE PLAN ........................................... 28

    A.    Presumed Acceptance of Plan .................................................... 28

    B.    Presumed Rejection of Plan ........................................................ 28

    C.    Voting Classes .......................................................................... 28

    D.    Acceptance by Impaired Classes of Claims ................................. 28

    E.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code ................. 29

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN ........................................ 29

    A.    General Settlement of Claims ..................................................... 29

    B.    Corporate Existence ................................................................... 29

    C.    Vesting of Assets in the Reorganized Debtors ............................. 29

**Page**

D.   Restructured First Lien Loan Agreement and Sources of Cash for Plan Distributions.................................................................................29

E.   New Second Lien Notes and Class A Common Shares Issued Under the Plan ...............................................................................................30

F.   New Class B Common Shares and Warrants Issued Under the Plan ................30

G.   Rights Offering ...............................................................................................30

H.   Management Incentive Plan.............................................................................32

I.   Issuance of New Securities and Related Documentation ..................................32

J.   Substantive Consolidation for Plan Purposes ..................................................33

K.   Release of Liens, Claims and Equity Interests.................................................34

L.   Certificate of Incorporation and Bylaws..........................................................34

M.   Directors and Officers of Reorganized Parent..................................................34

N.   Corporate Action.............................................................................................35

O.   Cancellation of Notes, Certificates and Instruments.........................................35

P.   Plan Supplement, Other Documents and Orders and Consents Required Under Noteholders RSA, Colony RSA and the Backstop Commitment Agreement.......................................................................................................36

ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..........................................................................................................36

A.   Assumption and Rejection of Executory Contracts and Unexpired Leases.............................................................................................................36

B.   Assignment of Executory Contracts or Unexpired Leases ................................37

C.   Rejection of Executory Contracts or Unexpired Leases ....................................38

D.   Claims on Account of the Rejection of Executory Contracts or Unexpired Leases............................................................................................38

E.   Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.............................................................................................................38

F.   Assumption of Director and Officer Insurance Policies ....................................38

**Page**

G.      Indemnification Provisions ........................................................................39

H.      Compensation and Benefit Programs ........................................................39

I.      Workers' Compensation Benefits ...............................................................39

ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS ...........................................40

A.      Dates of Distributions ...............................................................................40

B.      Distribution Agent .....................................................................................40

C.      Cash Distributions .....................................................................................41

D.      Rounding of Payments ...............................................................................41

E.      Distributions on Account of Claims Allowed After the Effective Date ............41

F.      General Distribution Procedures ................................................................41

G.      Address for Delivery of Distributions ........................................................41

H.      Undeliverable Distributions and Unclaimed Property ................................42

I.      Withholding Taxes .....................................................................................42

J.      Setoffs .......................................................................................................42

K.      Surrender of Cancelled Instruments or Securities .....................................42

L.      Lost, Stolen, Mutilated or Destroyed Securities ........................................43

ARTICLE VIII. PROCEDURES FOR RESOLVING CONTINGENT,
        UNLIQUIDATED AND DISPUTED CLAIMS ...........................................43

A.      No Filing of Proofs of Claim .....................................................................43

B.      Disputed Claims ........................................................................................43

C.      Procedures Regarding Disputed Claims ....................................................44

D.      Allowance of Claims ..................................................................................44

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION  AND
        CONSUMMATION OF THE PLAN ...........................................................45

A.      Conditions Precedent to Confirmation ......................................................45

**Page**

B.    Conditions Precedent to Consummation ........................................................ 46

C.    Waiver of Conditions ....................................................................................... 47

D.    Effect of Non Occurrence of Conditions to Consummation ............................ 47

ARTICLE X. DEBTORS' RELEASES ...................................................................................... 48

ARTICLE XI. RELEASE, INJUNCTION AND RELATED PROVISIONS ............................ 48

A.    General ............................................................................................................. 48

B.    Release ............................................................................................................. 48

ARTICLE XII. THIRD PARTY RELEASE ................................................................................ 50

A.    Discharge of Claims ........................................................................................ 50

B.    Exculpation ..................................................................................................... 51

C.    Preservation of Rights of Action ..................................................................... 51

D.    Injunction ......................................................................................................... 52

ARTICLE XIII. BINDING NATURE OF PLAN ....................................................................... 52

ARTICLE XIV. [INTENTIONALLY LEFT BLANK] .............................................................. 52

ARTICLE XV. [INTENTIONALLY LEFT BLANK] ................................................................ 53

ARTICLE XVI. RETENTION OF JURISDICTION .................................................................. 53

ARTICLE XVII. MISCELLANEOUS PROVISIONS ............................................................... 54

A.    Dissolution of the Committee ......................................................................... 54

B.    Payment of Statutory Fees .............................................................................. 54

C.    Payment of Fees and Expenses of Prepetition Indenture Trustee .................... 54

D.    Modification of Plan ........................................................................................ 55

E.    Revocation of Plan .......................................................................................... 55

F.    Successors and Assigns ................................................................................... 55

G.    Reservation of Rights ...................................................................................... 55

2474327.1 16
DOCS_SF:78801.13 93949-001

**Page**

| | | |
|---|---|---|
| H. | Further Assurances | 56 |
| I. | Severability | 56 |
| J. | Service of Documents | 56 |
| K. | Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code | 57 |
| L. | Governing Law | 57 |
| M. | Tax Reporting and Compliance | 57 |
| N. | Schedules | 58 |
| O. | No Strict Construction | 58 |
| P. | Conflicts | 58 |
| Q. | Confirmation Request | 58 |

## PLAN SCHEDULES

Plan Schedule 1        List of Debtors

Plan Schedule 2        Non-Exclusive List of Litigation Claims Retained by the Reorganized
                       Debtors

## PLAN EXHIBITS

Exhibit A        Backstop Commitment Agreement

Exhibit B        Class B Common Stock Commitment Agreement

Exhibit C        Colony RSA

Exhibit D        Noteholders RSA

2474327.1 16
DOCS_SF:78801.13 93949-001

## JOINT PLAN OF REORGANIZATION FOR
### William Lyon Homes, et al.

William Lyon Homes ("**DE Lyon**" or "**Parent**"), a Delaware corporation, William Lyon Homes, Inc. ("**CA Lyon**"), a California corporation and a wholly-owned subsidiary of the Parent, and each of the other debtors and debtors-in-possession listed on Plan Schedule 1 hereto, propose the following joint plan of reorganization (the "**Plan**") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtors. Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I of the Plan. The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code. Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtors' history, business, results of operations, historical financial information, accomplishments leading up to Solicitation of the Plan, projections and properties, and for a summary and analysis of this Plan and the treatment provided for herein. There also are other agreements and documents that will be filed with the Bankruptcy Court, that are referenced in this Plan, the Plan Supplement or the Disclosure Statement as Exhibits and Plan Schedules. All such Exhibits and Plan Schedules are incorporated into and are a part of this Plan as if set forth in full herein. Subject to certain restrictions set forth in the Noteholders RSA and the Colony RSA, and requirements set forth in 11 U.S.C. § 1127 and Fed. R. Bankr. P. 3019, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan prior to its Consummation.

The Plan contemplates deemed substantive consolidation of the Debtors for voting and Plan distribution purposes only with respect to the Claims. If, however, the Plan cannot be confirmed as to some or all of the Debtors, then, in the Debtors' sole discretion, but without prejudice to the respective parties' rights under the Colony RSA, the Noteholders RSA, or the Backstop Commitment Agreement, (a) the Plan may be revoked as to all of the Debtors, or (b) the Debtors may revoke the Plan as to any Debtor (and any such Debtor's Chapter 11 Case may be converted to a chapter 7 liquidation, continued or dismissed in the Debtors' sole discretion) and confirm the Plan as to the remaining Debtors to the extent required. The Debtors reserve the right to seek confirmation of the Plan pursuant to the "cram down" provisions contained in section 1129(b) of the Bankruptcy Code with respect to any non-accepting Class of Claims.

Notwithstanding any rights of approval that may exist pursuant to the Noteholders RSA, the Colony RSA, the Backstop Commitment Agreement, the Class B Common Stock Commitment Agreement, or otherwise, as to the form or substance of the Disclosure Statement, the Plan or any other document relating to the transactions contemplated hereunder or thereunder, neither the Prepetition Secured Lenders, the Prepetition Agent, the Ad Hoc Noteholders Group, the Backstop Investors, nor their respective representatives, members, financial or legal advisors or agents, has independently verified the information contained herein or takes any responsibility therefor and none of the foregoing entities or persons makes any representations or warranties whatsoever concerning the information contained herein.

### ARTICLE I.
### RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

**A.     Rules of Interpretation, Computation of Time and Governing Law**

For purposes hereof: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter

gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles", "Sections", "Exhibits" and "Plan Schedules" are references to Articles, Sections, Exhibits and Plan Schedules hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns; (h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be and (j) "$" or "dollars" means Dollars in lawful currency of the United States of America. The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

## B.    Defined Terms

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    "*7 ½ % Senior Notes*" means the 7½ % Senior Notes due 2014 issued by CA Lyon pursuant to the 7½% Senior Notes Indenture.

2.    "*7 ½ % Senior Notes Indenture*" means the Indenture dated as of February 6, 2004 by and among CA Lyon, the Guarantors signatory thereto, and the Prepetition Indenture Trustee.

3.    "*7 5/8 % Senior Notes*" means the 7 5/8 % Senior Notes due 2012 issued by CA Lyon pursuant to the 7⅝% Senior Notes Indenture.

4.    "*7 5/8 % Senior Notes Indenture*" means the Indenture dated as of November 22, 2004 by and among CA Lyon, the Guarantors signatory thereto, and the Prepetition Indenture Trustee.

5.    "*10 ¾ % Senior Notes*" means the 10 ¾ % Senior Notes due 2013 issued by CA Lyon pursuant to the 10¾% Senior Notes Indenture.

6.    "*10 ¾ % Senior Notes Indenture*" means the Indenture dated as of March 17, 2003 by and among CA Lyon, the Guarantors signatory thereto, and the Prepetition Indenture Trustee.

7.    "*Accrued Professional Compensation*" means, with respect to a particular Professional, an Administrative Claim of such Professional for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date (including, without limitation, expenses of the members of any Committee incurred as members thereof in discharge of their duties as such).

8.    "*Ad Hoc Noteholders Group*" means those Holders of the Old Notes who are signatories to the Noteholders RSA.

9.    *"Ad Hoc Noteholders Group Fees and Expenses"* means the Transaction Expenses (as defined in the Noteholders RSA).

10.    *"Ad Hoc Noteholders Group Professionals"* means, collectively, (a) Milbank, Tweed, Hadley & McCloy LLP, (b) Houlihan, Lokey, Howard and Zukin, LLC, (c) Morris, Nichols, Arsht & Tunnell LLP, (d) any other attorneys or financial advisors retained by the Ad Hoc Noteholders Group as provided for in the Noteholders RSA, and (e) any successor law firm or financial advisor to any of the foregoing entities or individuals.

11.    *"Administrative Claim"* means a Claim for costs and expenses of administration of the Chapter 11 Cases that is Allowed under section 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation:  (a) any actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, and commissions for services and payments for inventory, leased equipment, and leased premises); (b) Accrued Professional Compensation and any other compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses Allowed by the Bankruptcy Court under section 327, 328, 330, 331, 363, or 503(b) of the Bankruptcy Code to the extent incurred prior to the Effective Date; (c) all fees and charges assessed against the Estates under section 1930, chapter 123, of title 28, United States Code; (d) the DIP Facility Claims, including, without limitation, the fees and expenses of the DIP Agent and the DIP Lenders, including their respective professional and advisory fees and expenses; (e) the Allowed Prepetition Indenture Trustee Fees; (f) the Backstop Fee (to the extent payable in Cash and subject to the terms of the Backstop Commitment Agreement); (g) the Backstop Transaction Expenses; and (h) the Ad Hoc Noteholders Group Fees and Expenses.

12.    *"Administrative Claims Bar Date"* means the Business Day which is sixty (60) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

13.    *"Affiliate"* means an "affiliate" as defined in section 101(2) of the Bankruptcy Code.

14.    *"Allowed"* means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that is set forth in a Filed Proof of Claim as to which no timely objection has been Filed; (b) a Claim that has been allowed by a Final Order; (c) a Claim that is allowed: (i) in any stipulation of amount and nature of Claim executed by the Debtors prior to the Effective Date and approved by the Bankruptcy Court; (ii) in any stipulation of amount and nature of Claim executed by the Reorganized Debtors on or after the Effective Date; (iii) in accordance with the applicable Debtor's books and records; (d) a Claim relating to a rejected executory contract or unexpired lease that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order, in either case only if a Proof of Claim has been timely Filed by the Claimant before the applicable bar date for such claim or has otherwise been deemed timely Filed under applicable law; or (e) a Claim that is Allowed pursuant to the terms of this Plan.

15.    *"Allowed Claim or Equity Interest"* means a Claim or an Equity Interest of the type that has been Allowed.

16.    *"Amended Organizational Documents"* means the amended and restated certificate of incorporation and by-laws or other applicable organizational documents of the Reorganized Parent to be Filed with the Plan Supplement.

17.    *"Avoidance Actions"* means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including, without

limitation, actions or remedies arising under sections 502, 510 or 542-553 of the Bankruptcy Code.

18.    "*Backstop Commitment*" means the agreement by each Backstop Investor pursuant to the Backstop Commitment Agreement to purchase its Backstop Proportion of all of the Rights Offering Securities that are not purchased by the other Eligible Participants as part of the Rights Offering.

19.    "*Backstop Commitment Agreement*" means the Backstop Commitment Agreement dated as of November 4, 2011 attached to this Plan as Exhibit A.

20.    "*Backstop Commitment Agreement Assumption Order*" means an order of the Bankruptcy Court authorizing, among other things, the assumption of the Backstop Commitment Agreement, payment of the Backstop Fee, payment of the Backstop Transaction Expenses, and the provision of an indemnity by the Debtors in favor of the Backstop Investors to the extent set forth in the Backstop Commitment Agreement.

21.    "*Backstop Fee*" means the "Backstop Fee" as defined in the Backstop Commitment Agreement, which shall be released to the Backstop Investors upon payment of the Rights Offering Purchase Price for the Rights Offering Securities on the Effective Date, in the form of shares of Class C Common Shares representing 2.0% of all of the outstanding Capital Stock of Reorganized Parent on the Effective Date (taking into account assumed conversion of the New Capital Stock of Reorganized Parent, but subject to dilution as a result of (i) the exercise of the Warrants and (ii) the Management Incentive Plan); provided that if the Backstop Investors do not purchase any Rights Offering Securities that are not otherwise purchased in the Rights Offering because of any of (1) the transactions contemplated by the Old Notes Restructuring Term Sheet are otherwise not approved by the Bankruptcy Court, (2) the transactions contemplated by the Backstop Commitment Agreement and the Old Notes Restructuring Term Sheet are otherwise not consummated by the Company (when the Backstop Investors are prepared to perform after satisfaction of all applicable conditions of the backstop commitment and in the Old Notes Restructuring Term Sheet) , or (3) the "Commitment" (as defined in the Backstop Commitment Agreement) is terminated pursuant to the terms thereof, the Backstop Fee will be payable in the form of Cash in the amount of $2.5 million, subject to the limitations contained in the Backstop Commitment Agreement, including clause (vi) of Section II thereof.

22.    "*Backstop Investors*" means those certain parties signatories to the Backstop Commitment Agreement, their respective affiliates, or any permitted assignee under the Backstop Commitment Agreement.

23.    "*Backstop Proportion*" means the portion of the Backstop Commitment committed to by each Backstop Investor as set forth on Schedule A to the Backstop Commitment Agreement.

24.    "*Backstop Transaction Expenses*" means the "expenses" (accrued either prepetition or postpetition) payable pursuant to Section V of the Backstop Commitment Agreement.

25.    "*Ballots*" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of this Plan, which includes the Master Ballots and Beneficial Holder Ballots.

26.    "*Bankruptcy Code*" means Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Cases.

27.    *"Bankruptcy Court"* means the United States Bankruptcy Court for the District of Delaware, or any other court having jurisdiction over the Chapter 11 Cases.

28.    *"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, in each case as amended from time to time and as applicable to the Chapter 11 Cases.

29.    *"Beneficial Holder"* means, as of the applicable date of determination, "Lender" under the Prepetition Secured Loan, a beneficial holder of the Old Notes as reflected in the records maintained by the Registered Record Owner or Intermediary Record Owner, as applicable.

30.    *"Beneficial Holder Ballots"* means the ballots accompanying the Disclosure Statement upon which Beneficial Holders of Class 7 Old Notes Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process.

31.    *"Business Day"* means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

32.    *"CA Lyon"* means William Lyon Homes, Inc., a California corporation.

33.    *"Cash"* means the legal tender of the United States of America or the equivalent thereof.

34.    *"Causes of Action"* means any claims, causes of action (including Avoidance Actions), demands, actions, suits, obligations, liabilities, cross-claims, counter-claims, offsets, or setoffs of any kind or character whatsoever, in each case whether known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in contract, in tort, in law, or in equity, or pursuant to any other theory of law, whether asserted or assertable directly or derivatively in law or equity or otherwise by way of claim, counterclaim, cross-claim, third party action, action for indemnity or contribution or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

35.    *"Certificate of Designation"* means the Certificate of Designation for the Preferred Shares to be Filed in the Plan Supplement.

36.    *"Chapter 11 Cases"* means the chapter 11 bankruptcy cases that may be commenced by the Debtors on the Petition Date in the Bankruptcy Court.

37.    *"Chapter 11 Transaction Expenses"* means the aggregate amount of reasonable fees and expenses payable by the Debtors in connection with the Chapter 11 Cases, including the fees and expenses payable to the DIP Agent, the DIP Lenders, the Backstop Investors (including the Backstop Transaction Expenses, the Backstop Fee, and any other fees, expenses, and indemnities contemplated by the Backstop Commitment Agreement), the Prepetition Agent, the Ad Hoc Noteholders Group Fees and Expenses, the Prepetition Indenture Trustee Fees (whether accrued prepetition or postpetition), as well as the fees and expenses payable under the Restructured First Lien Loan.

38.    *"Circle G Loan Agreement"* means the Loan Agreement by and between Circle G at the Church Farm North Joint Venture, LLC and U.S. Bank N.A., successor to California National Bank, N.A., dated February 14, 2006, as amended by the Extension and

Modification Agreement dated April 6, 2007, the Second Extension and Modification Agreement dated June 20, 2007, the Third Extension and Modification Agreement dated May 19, 2008, the Fourth Extension and Modification Agreement dated December 31, 2008, the Amendment and Waiver of Default dated April 14, 2011 (the "**U.S. Bank Amendment and Waiver**"), and the Fifth Extension and Modification Agreement dated July 11, 2011 (the "**U.S. Bank Fifth Extension**").

39. *"Claim"* means any "claim" against any Debtor as defined in section 101(5) of the Bankruptcy Code.

40. *"Claims Register"* means the official register of Claims maintained by the Voting Agent.

41. *"Class"* means a category of Holders of Claims or Equity Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

42. *"Class A Common Shares"* means shares of new Class A Common Stock of Reorganized Parent, to be issued on the Effective Date.

43. *"Class B Common Shares"* means shares of new Class B Common Stock of Reorganized Parent, to be issued on the Effective Date.

44. *"Class B Common Stock Commitment Agreement"* means the letter agreement dated as of November 4, 2011, by and among the Parent and the existing holders of Parent Equity Interests pursuant to which, and subject to the terms and conditions set forth therein, the existing holders of Parent Equity Interests agreed to purchase the Class B Common Shares for the Class B Common Stock Purchase Price.

45. *"Class B Common Stock Purchase Agreement"* means the Stock Purchase Agreement to be dated as of on or about the Effective Date, by and among DE Lyon and the Existing Holders of the Parent Equity Interests.

46. *"Class B Common Stock Purchase Price"* means $25 million in the form of Cash or, if pursuant to the Purchase and Sale, and Security Agreement between the Company and Lyon Rancho, LLC as the seller ("RMV PSA"), the Company on the Effective Date pays the purchase price for, and the seller delivers to the Company, 100% of the membership interests of the limited liability company that is the owner of the option to purchase the Rancho Mission Viejo Properties, then in the form of a combination of Cash and a credit in the amount of the purchase price paid by the Company for such membership interests (it being understood that no amount will be credited or set off for any unsecured claim of the seller based on the Company's breach of the RMV PSA).

47. *"Class B Securities"* means the Class B Common Shares issuable pursuant to the Class B Common Stock Commitment Agreement, the Warrants, and the additional Class B Common Shares issuable upon exercise of the Warrants.

48. *"Class B Purchasers"* means the purchasers of the Class B Common Shares and the Warrants pursuant to the Class B Common Stock Commitment Agreement

49. *"Class C Common Shares"* means shares of new Class C Common Stock of Reorganized Parent, to be issued on the Effective Date pursuant to the Rights Offering.

50. "*Class D Common Stock*" means shares of new Class D Common Stock of Reorganized Parent, to be issued on the Effective Date or otherwise under the Management Incentive Plan.

51. "*Collateral*" means any property or interest in property of any Debtor's Estate that is subject to a valid and enforceable Lien to secure a Claim.

52. "*Colony Restructuring Term Sheet*" means the term sheet attached as Exhibit D to the Colony RSA.

53. "*Colony RSA*" means the Restructuring Support Agreement dated as of November 4, 2011, by and among DE Lyon, CA Lyon and the Prepetition Agent.

54. "*Colony RSA Motion*" means a motion to be filed by WLH on the Petition Date seeking, among other things, Bankruptcy Court approval of the Colony RSA and authorizing WLH to assume the Colony RSA Postpetition.

55. "*Colony RSA Order*" means any order of the Bankruptcy Court granting the relief requested in the Colony RSA Motion, and approving the Colony RSA and authorizing the Debtors to assume the Colony RSA under section 365 of the Bankruptcy Code.

56. "*Committee*" means any committee of unsecured creditors in the Chapter 11 Cases appointed pursuant to section 1102 of the Bankruptcy Code.

57. "*Company*" means the Debtors, collectively.

58. "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

59. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

60. "*Confirmation Order*" means the order of the Bankruptcy Court both confirming this Plan pursuant to section 1129 of the Bankruptcy Code and approving the Disclosure Statement.

61. "*Consummation*" means the occurrence of the Effective Date.

62. "*DE Lyon*" means William Lyon Homes, a Delaware corporation and the sole shareholder of CA Lyon.

63. "*DE Lyon Preferred Equity Interests*" means the preferred Equity Interests in DE Lyon.

64. "*Debtor(s)*" means individually, Parent and each of its subsidiaries listed on Plan Schedule 1 hereto, and, collectively, Parent and all of its subsidiaries listed on Plan Schedule 1 hereto, in each case, in their capacities as debtors in the Chapter 11 Cases.

65. "*Debtor(s) in Possession*" means, individually, each Debtor, as debtor in possession in their Chapter 11 Cases as of the Petition Date and, collectively, all Debtors, as debtors in possession in the Chapter 11 Cases.

66. *"DIP Agent"* means the administrative agent and collateral agent under the DIP Facility, and any successors thereto.

67. *"DIP Facility"* means that certain senior secured superpriority post-petition credit facility to be made available to CA Lyon and the other Debtors pursuant to the DIP Secured Loan Agreement and the DIP Orders.

68. *"DIP Facility Claim"* means any Claim of the DIP Agent, any DIP Lender or any other "DIP Secured Party" (as defined in the DIP Orders) arising from, under or in connection with the DIP Facility (including, without limitation, any and all "Obligations" as defined in the DIP Facility Secured Loan Agreement), the other "Loan Documents" as defined therein and/or the DIP Orders, including in respect of all "DIP Obligations" as defined in the DIP Orders.

69. *"DIP Facility Secured Loan Agreement"* means that certain Senior Secured Superpriority Debtor-In-Possession Secured Loan Agreement, dated as of December__, 2011 (as may be amended, waived, supplemented, refinanced and as otherwise modified from time to time), among CA Lyon, as borrower, the other Debtors, as guarantors, the DIP Agent, and the DIP Lenders thereto from time to time.

70. *"DIP Lenders"* means the banks, financial institutions and other parties identified as "Secured Parties" in the DIP Facility Secured Loan Agreement or "DIP Secured Parties" in the DIP Orders from time to time.

71. *"DIP Orders"* means, collectively, the Interim DIP Order and Final DIP Order.

72. *"Disallowed"* means any Claim that is not Allowed.

73. *"Disclosure Statement"* means that certain *Disclosure Statement for the Prepackaged Joint Plan of Reorganization for William Lyon Homes, et al. under Chapter 11 of the Bankruptcy Code*, as amended, supplemented, or modified from time to time and describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan.

74. *"Disputed Claim or Equity Interest"* means a Claim or Equity Interest, or any portion thereof: (a) that is the subject of an objection or request for estimation filed or is otherwise disputed by any of the Debtors or any other party in interest in accordance with applicable law and which objection has not been withdrawn, resolved, or overruled by a Final Order of the Bankruptcy Court; or (b) that is otherwise disputed by any of the Debtors or any other party in interest in accordance with applicable law, which dispute has not been withdrawn, resolved, or overruled by Final Order.

75. *"Distribution Agent"* means Reorganized Parent or any party designated by Reorganized Parent to serve as distribution agent under this Plan. For purposes of distributions under this Plan to the Holders of Allowed DIP Facility Claims and Allowed Prepetition Secured Loan Claims, the DIP Agent and the Prepetition Agent, respectively, will be and shall act as the Distribution Agent. For purposes of distributions under this Plan to Holders of Allowed Old Notes Claims, the Prepetition Indenture Trustee shall act as the Distribution Agent, unless the Prepetition Indenture Trustee consents to the direct distribution through the facilities of DTC.