PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

*Set forth herein are terms and conditions for a proposed series of restructuring transactions (collectively, the "Restructuring Transactions"), to be effected through a pre-packaged plan of reorganization under Chapter 11. These terms and conditions are provided for discussion purposes only and do not constitute an offer, agreement or commitment, nor an advertisement or offer to buy or sell securities, by any party.*

*This Term Sheet is by its nature a summary only and is not all-inclusive. This Term Sheet does not include descriptions of all of the terms, conditions and other provisions that are to be contained in the definitive documentation relating to the exchange offer, the consent solicitation or the New Notes. This Term Sheet is not intended to limit the scope of discussion and negotiation of any matters even if inconsistent with the specific matters set forth herein. No oral agreements between or among the parties shall be binding under any circumstances at any time. The terms included in this Term Sheet shall be kept strictly confidential, shall not be reproduced or disclosed, and shall not be used other than in connection with evaluating the transaction described herein.*

*Capitalized terms used herein without other definition have the respective meanings assigned to such terms in the indentures respectively governing the Old Notes.*

## The New Securities

New Note Issuer .............................. CA Lyon.

New Equity Issuer .......................... DE Lyon.

The Exchange Offer........................ CA Lyon will issue $75 million in aggregate initial principal amount of 12% (8% cash interest) Senior Second Lien New Notes due 2016 (the "New Notes") to holders of the Old Notes.

DE Lyon will issue shares of new Class A Common Stock ("Class A Common Shares") initially representing 28.5% of the capital stock of DE Lyon on a fully-diluted basis (but before giving effect to the Management Incentive Plan or the Warrants) to holders of the Old Notes.

The Rights Offering........................ DE Lyon will issue shares of new Class C Common Stock ("Class C Common Shares") and shares of new Convertible Preferred Stock ("Preferred Shares"), convertible on a one-to-

2503959.

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

one basis into Class C Common Shares, collectively representing 51.5% of the capital stock of DE Lyon on a fully-diluted basis (but before giving effect to the Management Incentive Plan or the Warrants), for an aggregate cash purchase price of $60 million ($10 million for the Class C Common Shares, and $50 million for the Preferred Shares), in the rights offering.

Backstop Fee.................................... Upon receipt by DE Lyon of $60 million for the Class C Common Shares and the Preferred Shares issued in the Rights Offering, those parties that initially entered into a binding commitment to purchase at least $60 million of such shares (the "Backstop Investors") shall receive a backstop fee in the form of Class C Common Shares representing 2.00% of the Capital Stock of DE Lyon (included in the initial 51.5% allocated to Class C Common Shares); provided, that, the backstop fee may, subject to and in accordance with the backstop commitment, be payable in cash (in lieu of the Class C Common Shares) to the Backstop Investors in the amount of $2.5 million.

The Class B Shares......................... In connection with the consummation of the Exchange Offer and the Rights Offering and subject to all of the conditions set forth below, the existing equity of DE Lyon will be cancelled, and DE Lyon will issue to the holders of its existing equity, in exchange for a purchase price of $25 million in cash, shares of Class B Common Stock ("Class B Common Shares"), initially representing 20.0% of the capital stock of DE Lyon on a fully-diluted basis (but before giving effect to the Management Incentive Plan or the Warrants).

The Warrants ................................. In consideration for intrinsic value, DE Lyon will issue to the holders of its existing equity warrants to purchase Class B Common Shares ("Warrants") representing an additional 9.1%

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

of the capital stock of DE Lyon on a fully-diluted basis (but before giving effect to the Management Incentive Plan), at a strike price based on a $325 million equity value of DE Lyon.

After giving effect to the issuance of the Warrants, but before giving effect to the Management Incentive Plan, the Class A Common Shares will represent 25.9% of the capital stock of DE Lyon, the Class B Common Shares will represent 27.3% of the Capital Stock of DE Lyon, and the Class C Common Shares (assuming full conversion of the Preferred Shares) will represent 46.8% of the capital stock of DE Lyon.

| | |
|---|---|
| The Management Incentive Plan .... | Terms consistent with WLH proposal (e.g., 8% pool), subject to the following modifications: |

- Initial allocation: 4%
- Form of initial grant: 50% restricted stock, 50% options struck at Plan Value (rather than 100% restricted stock)
- Remaining allocation: subject to Board of Directors review, not to occur before 12 months post-emergence
- Tax gross-up: rather than cash bonus for taxes owed, employee can borrow same amount from WLH (secured by underlying shares), to be repaid upon earlier of liquidity event or 2 years, subject to compliance with SOX

| | |
|---|---|
| The Lease | The Noteholders will agree to assume the lease in any bankruptcy proceeding, and the lock-ups will so provide. |
| The Employment Contracts | WLH shall have entered into employment contracts with each of General William Lyon and William H. Lyon, on terms consistent with proposed draft agreements (e.g., $1.5 million combined salary), subject to following modifications: |

a) Performance bonus: first year capped at 50% of salary, thereafter, commensurate with position and contributions

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

as determined by a three-member compensation committee consisting of the two independent directors and one director appointed by the holders of the Class A Common Shares

    b) Severance: base salary for remaining contract term (from date to termination to 12/31/14) plus any earned but unpaid bonus, but in no event less than 18 months

2-year non-solicitation

| | |
|---|---|
| The Pre-packaged Plan | WLH will solicit the votes of the holders of the Old Notes to consummate the transactions contemplated hereby pursuant to WLH's proposed pre-packaged or pre-arranged plan of reorganization (the "Pre-packaged Plan"). |
| Conditions | The consummation of the Restructuring Transactions expressly conditioned on satisfaction of each of the following: |

1.     CA Lyon shall have received votes in favor of the Pre-packaged Plan, lock-ups and/or other documentation of the agreement by holders of Old Notes representing in the aggregate at least 66 2/3 % in principal amount of the Old Notes whose holders vote, and a majority in number of the holders of the Old Notes whose holders vote, agreeing to be bound by the Pre-packaged Chapter 11 Plan (the "Threshold Condition").

2.     CA Lyon shall have received votes in favor of the Pre-packaged Plan, of the agreement from the "Lenders" representing at least 66 2/3% of the principal amount of the Senior Secured Term Loan and at least half of the Lenders under the Secured Term Loan Agreement, agreeing to be bound by the Pre-packaged Chapter 11 Plan.

3.     CA Lyon shall have received a commitment letter from

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

the existing equity holders of DE Lyon with respect to the purchase of the Class B Common Shares.

4.    CA Lyon shall have received a commitment letter with respect to the Rights Offering described above.

5.    WLH shall have entered into an amendment, amendment and restatement, or refinancing, providing for an initial principal amount not to exceed $235 million, an annual interest rate not to exceed 10.25%, and otherwise on terms and conditions satisfactory to WLH and the Ad Hoc Committee of holders of Old Notes (the "Colony Amendment") to CA Lyon's Secured Term Loan Agreement dated as of October 20, 2009 (as heretofore amended, the "Senior Secured Loan Agreement") by and among CA Lyon, as Borrower, ColFin WLH Funding, LLC, as Administrative Agent (the "Administrative Agent"), ColFin WLH Funding, LLC, as a Lender and as Lead Arranger, and the other Lenders from time to time party thereto.

6.    CA Lyon shall have obtained consent to the Restructuring Transactions from the Administrative Agent.

7.    WLH shall have obtained any other necessary consents and approvals (including any required government consents or approvals) to the consummation of the Restructuring Transactions.

8.    CA Lyon, the Guarantors, the indenture trustee under the indenture governing New Notes, the collateral agent under each security document for the New Notes, and each other applicable party shall have executed and delivered definitive documentation reasonably satisfactory to all such

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

parties, including an intercreditor agreement with respect to the New Notes and the Senior Secured Term Loan, and appropriate equity documents, with respect to the new equity.

9.      The maturity of the Church Farm loan shall have been extended, and Mountain Falls loan to be restructured, both on terms and conditions satisfactory to CA Lyon and Ad Hoc Committee (it being understood that no such restructuring should require impairment of the claims of the lenders on such loans under the Plan).

10.     WLH shall have raised $85 million pursuant to the new money terms described above under "The Rights Offering" and "The Class B Shares".

11.     WLH shall have entered into the Employment Agreements described above.

12.     Other customary conditions including, without limitation, no legal impediment to or restraint on consummation of the Consent Solicitation or Exchange Offer.

The foregoing conditions are for the mutual benefit of WLH and the Ad Hoc Committee of holders of Old Notes, and may be asserted by either party regardless of the circumstances giving rise to any such condition or may be waived by either party in whole or in part at any time and from time to time in its sole discretion.

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

### *Summary of the Principal Terms of the New Notes*

Maturity Date...................................... The fifth anniversary of Issue Date.

Interest .............................................. The New Notes will bear interest at a fixed annual rate of 12%, consisting of an 8% cash interest component and a 4% PIK interest component. The cash interest component will be payable semi-annually in arrears. The PIK interest component will accrete and be added to principal semi-annually in arrears.

Ranking.............................................. The New Notes will be senior second lien debt obligations of CA Lyon, ranking ratably with any other unsubordinated indebtedness of CA Lyon (but structurally senior due to the second lien), but will be effectively subordinated to the Senior Secured Term Loan to the extent of the collateral securing such first lien indebtedness.

Guarantees ......................................... The New Notes will be guaranteed on a joint and several basis by the following entities (which will be the same guarantors that guaranty the Senior Secured Term Loan (the "Guarantors"):

DE Lyon
California Equity Funding, Inc., a California corporation
PH-LP Ventures, a California corporation
Duxford Financial, Inc., a California corporation
Sycamore CC, Inc., a California corporation
Presley CMR, Inc., a California corporation
William Lyon Southwest, Inc., an Arizona corporation
PH-Reilly Ventures, a California corporation
HSP, Inc., a California corporation
PH Ventures-San Jose, a California corporation
WLH Enterprises, a California Gen Partnership – formerly The Ranch Golf Club Co., formerly Carmel Mountain Ranch

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

Lyon Waterfront, LLC, a Delaware limited liability company
Lyon East Garrison Company I, LLC, a California limited
liability company

Collateral Security ........................... The New Notes will be secured by second priority liens on
substantially all assets of CA Lyon and the Guarantors, other
than "Excluded Assets" that are also excluded from the Senior
Secured Term Loan security interests.  The collateral for the
New Notes will be the same as the collateral for the Senior
Secured Term Loan.

Release of Collateral....................... Upon the release of the lien on any collateral securing the
Senior Secured Term Loan during the term of the Senior
Secured Term Loan, the lien on that collateral securing the
New Notes will be automatically released without the
necessity of any consent from the holders of the New Notes.

Sinking Fund.................................. None.

Optional Redemption....................... The New Notes will be redeemable at CA Lyon's option at any
time without penalty or premium, at the outstanding principal
amount thereof plus any accrued and unpaid interest thereon.

Trading........................................... The New Notes are expected to be eligible for trading in the
PORTAL market.

Use of Proceeds .............................. CA Lyon does not expect to receive any net cash proceeds
from the issuance of the New Notes.

Covenants ....................................... The New Indenture (as defined below) will  contain the
covenants summarized on Exhibit A hereto.

Basic Provisions of New           The New Notes will be issued under an indenture (the "New
Indenture......................................... Indenture") containing provisions substantially similar to those
of the indentures governing the Old Notes, except (i) to the

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

extent otherwise described herein, (ii) the covenants, which are summarized on Exhibit A hereto and(iii) that the New Indenture will provide for second priority liens on substantially all of the assets of CA Lyon and the Guarantors, other than specified excluded assets.

| | |
|---|---|
| Basic Provisions of Intercreditor Agreement ....................................... | The New Notes will be subject to an Intercreditor and Subordination Agreement on substantially the terms and conditions summarized in the term sheet for the Colony Amendment, attached hereto as Exhibit B. : |

### *Summary of the Principal Terms of the Class A Common Shares*

| | |
|---|---|
| Class A Common Shares ............... | The Class A Common Shares will initially represent 28.5% of the outstanding capital stock of DE Lyon on a fully-diluted basis, after giving effect to the Restructuring Transactions, but prior to the effectiveness of the Management Incentive Plan and the Warrants. |
| Approval Rights............................. | The consent of the holders of 66 2/3% of the outstanding Class A Common Shares, a majority of the Class B Common Shares, and a majority of the Preferred Stock and Class C Common Shares voting as a class will be required for any merger, consolidation, or disposition of all or substantially all of the assets of DE Lyon or CA Lyon. |
| Voting Rights.................................. | The Class A Common Shares will carry one vote per share.<br><br>The consent of the holders of the Class A Common Shares will not be required for the day-to-day management or operations of DE Lyon, CA Lyon or their subsidiaries. |

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

Right to Appoint Directors ............. The holders of the Class A Shares will have the right to appoint one director to a seven-director Board.

In addition, initially two incumbent independent directors who are satisfactory to the holders of (a) 66 2/3% of the Class A Common Shares, (b) a majority of the Class B Common Shares and (c) a majority of the Preferred Stock and the Class C Common Shares voting as a class, will complete their one-year terms . Thereafter, the appointment of one new independent director will be subject to the approval of the holders of (i) 66 2/3% of the Class A Shares, (ii) a majority of the Class B Shares and (iii) the Class C Shares and Preferred Shares (with the Class C Shares and the Preferred Shares voting together). The other new independent director will be appointed by the holders of a majority of the Class C Shares and the Preferred Shares, voting together.

Right to Compel IPO ...................... The holders of a majority of the Class A Common Shares will have the right, subject to customary market exceptions, to require DE Lyon to consummate an initial public offering of its equity securities (an "IPO") within three years after the Issue Date, which right may be extended for up to two 12-month periods with the consent of a majority of the holders of the Class A Common Shares.

Conversion to Single Class of
Common Stock ............................... Upon the occurrence of (i) an IPO, automatically, or (ii) the vote of a majority of the holders of A) the Class A Common Shares and B) the Class C Common Shares and the Preferred Shares (voting together), the Class A Common Shares, the Class C Common Shares and the Preferred Shares will be converted into a single class of common stock on a one-for-one basis. The Class B Shares may also be converted into the same class of common stock, with the approval of a majority

2503959.

- 11 -

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

of the holders of the Class B Shares.

### *Summary of the Principal Terms of the Class B Common Shares*

| | |
|---|---|
| Class B Common Shares .............. | The Class B Common Shares will initially represent 20.0% of the outstanding capital stock of DE Lyon on a fully-diluted basis, after giving effect to the Restructuring Transactions, but prior to the effectiveness of the Management Incentive Plan or the Warrants. |
| Conditions to New Equity Contribution from Existing Equity Holders............................... | Upon consummation of the Exchange Offer and the Consent Solicitation, holders of existing equity of DE Lyon will contribute $25 million for new equity (in the form of Class B Common Stock) subject to the following conditions: (i) issuance of the Warrants on terms and conditions satisfactory to CA Lyon, DE Lyon and DE Lyon's existing equity holders (and otherwise acceptable to the Ad Hoc Committee of Old Notes), (ii) agreement on, and executed and delivery by all applicable parties of, definitive documentation for the New Notes and all of the new equity interests and (iii) satisfaction of all terms and conditions set forth in this Term Sheet, in the Exchange Offer and Consent Solicitation documents and in the definitive documentation for the New Notes and all of the new equity interests, all on terms and conditions satisfactory to CA Lyon, DE Lyon and DE Lyon's existing equity holders. |
| Approval Rights............................ | The consent of the holders of 66 2/3% of the outstanding Class A Common Shares, a majority of the Class B Common Shares, and a majority of the Preferred Stock and Class C Common Shares voting as a class will be required for any merger, consolidation, or disposition of all or substantially all |

2503959.

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

of the assets of DE Lyon or CA Lyon.

Voting Rights.................................. The Class B Common Shares will carry two votes per share until transferred by the original holders.   Upon transfer of the Class B Common Shares by the original holders to any person or entity (other than a family member, heir, trust, estate planning device or similar transferee), the Class B Common Shares will automatically convert to Class A Common Shares, with one vote per share.  The holders of the Class B Common Shares may convert all or any portion of the Class B Common Shares to Class A Common Shares at their election at any time.

The consent of the holders of the Class B Common Shares will not be required for the day-to-day management or operations of DE Lyon, CA Lyon or their subsidiaries.

Right to Appoint Directors ............. The holders of the Class B Shares will have the right to appoint two directors to a seven-director Board.

In addition, initially two incumbent independent directors who are satisfactory to the holders of (a) 66 2/3% of the Class A Common Shares, (b) a majority of the Class B Common Shares and (c) a majority of the Preferred Stock and the Class C Common Shares voting as a class, will complete their one-year terms .  Thereafter, the appointment of one new independent director will be subject to the approval of the holders of (i) 66 2/3% of the Class A Shares, (ii) a majority of the Class B Shares and (iii) the Class C Shares and Preferred Shares (with the Class C Shares and the Preferred Shares voting together).  The other new independent director will be appointed by the holders of a majority of the Class C Shares and the Preferred Shares, voting together.

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

Shelf Registration             DE Lyon will provide shelf registration for Class B Common Shares that have converted to Class A Common Shares.

### *Summary of the Principal Terms of the Preferred Shares*

Preferred Shares ..............................  Preferred Shares (together with the Class C Common Shares) will initially represent 51.5% of the outstanding capital stock of DE Lyon on a fully-diluted basis, after giving effect to the Restructuring Transactions, but prior to the effectiveness of the Management Incentive Plan or the Warrants. The Preferred Shares will convert to Class C Common Shares on a one-to-one basis.

Preferred Dividends........................  Holders of the Preferred Shares will be entitled to receive dividends to the extent permitted by the terms of the Senior Secured Loan Agreement, and the New Notes, at a rate of 6% per annum (based on a $50 million purchase price), payable in cash at the rate of 4% per annum, and PIK dividends at the rate of 2% per annum, or, at DE Lyon's option, any combination of cash and or PIK dividends. Accrued and unpaid PIK dividends will be payable in cash upon conversion (i) in connection with an IPO or (ii) to the extent cash payment is otherwise permitted by the Secured Term Loan Agreement.

Voting Rights...................................  The Preferred Shares will carry one vote per share (voting as Class C Common Stock on an as-converted basis).

The consent of the holders of the Preferred Shares will not be required for the day-to-day management or operations of DE Lyon, CA Lyon or their subsidiaries.

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

Right to Appoint Directors ............. The holders of the Preferred Shares and the Class C Shares will together have the right to appoint two directors to a seven-director Board.

In addition, initially two incumbent independent directors who are satisfactory to the holders of (a) 66 2/3% of the Class A Common Shares, (b) a majority of the Class B Common Shares and (c) a majority of the Preferred Stock and the Class C Common Shares voting as a class, will complete their one-year terms . Thereafter, the appointment of one new independent director will be subject to the approval of the holders of (i) 66 2/3% of the Class A Shares, (ii) a majority of the Class B Shares and (iii) the Class C Shares and Preferred Shares (with the Class C Shares and the Preferred Shares voting together). The other new independent director will be appointed by the holders of a majority of the Class C Shares and the Preferred Shares, voting together.

No Covenants ................................ The terms of the Preferred Shares will not include any covenants, mandatory prepayments, prepayments at the option of the holders, or debt-like provisions.

Shelf Registration                           DE Lyon will provide shelf registration for the Preferred Shares.

### *Summary of the Principal Terms of the Class C Common Shares*

Class C Common Shares ............... Class C Common Shares (together with the Preferred Shares) will initially represent 51.5% of the outstanding capital stock of DE Lyon on a fully-diluted basis, after giving effect to the Restructuring Transactions, but prior to the effectiveness of the

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

Management Incentive Plan or the Warrants.

Voting Rights................................. The Class C Common Shares will carry one vote per share.

The consent of the holders of the Class C Common Shares will not be required for the day-to-day management or operations of DE Lyon, CA Lyon or their subsidiaries.

Right to Appoint Directors ............. The holders of the Preferred Shares and the Class C Shares will together have the right to appoint two directors to a seven-director Board.

In addition, initially two incumbent independent directors who are satisfactory to the holders of (a) 66 2/3% of the Class A Common Shares, (b) a majority of the Class B Common Shares and (c) a majority of the Preferred Stock and the Class C Common Shares voting as a class, will complete their one-year terms . Thereafter, the appointment of one new independent director will be subject to the approval of the holders of (i) 66 2/3% of the Class A Shares, (ii) a majority of the Class B Shares and (iii) the Class C Shares and Preferred Shares (with the Class C Shares and the Preferred Shares voting together). The other new independent director will be appointed by the holders of a majority of the Class C Shares and the Preferred Shares, voting together.

Shelf Registration                         DE Lyon will provide shelf registration for the Class C Common Shares.

### *Summary of the Principal Terms of the Class D Common Shares*

2503959.

- 16 -

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

Class D Common Shares ............... The Class D Common Shares will be issued under the Management Incentive Plan.  The Class D Common Shares when issued, will represent up to 8% of the outstanding capital stock of DE Lyon on a fully-diluted basis.

Voting Rights.................................. The Class D Common Shares will not be entitled to voting rights.

Restrictions on Transfer ................ The Class D Common Shares will be subject to restrictions on transfer.

2503959.

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

**Exhibit A**

**Covenants**

[See attached]

2503959.

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

## Exhibit B

## Colony Amendment Term Sheet

[See attached]

**Plan Exhibit C**

Colony RSA

Execution Version

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (this "Agreement"), dated as of November 4, 2011, by and among (i) William Lyon Homes, Inc., a California corporation (the "Company"), and William Lyon Homes, a Delaware corporation and the sole shareholder of the Company (the "Parent"), on behalf of themselves and the subsidiaries listed on Schedule 1 hereto and their respective successors (collectively, "WLH"), (ii) ColFin WLH Funding, LLC, as Administrative Agent, Initial Lender and Lead Arranger (in such capacity, the "Administrative Agent") under the Senior Secured Term Loan Agreement, dated October 20, 2009, by and among the Company, the Administrative Agent, and the other lenders party thereto (the "Lenders"), as amended (the "Loan Agreement") and (iii) each of the undersigned Lenders (the "Consenting Lenders" and, together with the Company, the Parent and the Administrative Agent, each referred to as a "Party" and collectively referred to as the "Parties").

W H E R E A S:

A.    Prior to the date hereof, representatives of the Parties have discussed the possibility of consummating a financial restructuring of WLH's indebtedness and other obligations (the "Restructuring") as set forth in this Agreement and the accompanying Restructuring Term Sheet (as defined herein).

B.    It is anticipated that the Restructuring may be implemented through a solicitation of votes (the "Solicitation") for a chapter 11 plan of reorganization of WLH (the "Plan") pursuant to applicable federal and state securities law and sections 1125, 1126 and 1145 of title 11 of the Bankruptcy Code and containing in all material respects the same terms and conditions set forth in the Restructuring Term Sheet, which Plan must be in form and substance acceptable to the Administrative Agent (at the direction of the Consenting Lenders in their sole and absolute discretion).

C.    The Administrative Agent and the Consenting Lenders have agreed, subject to the terms and conditions set forth in this Agreement, to support (i) the commencement of the Chapter 11 Cases to implement the Restructuring by WLH, and (ii) confirmation by the Bankruptcy Court of the Plan.

D.    This Agreement and the Restructuring Term Sheet, which is incorporated herein by reference and is made part of this Agreement, set forth the agreement among the Parties concerning their commitment, subject to the terms and conditions hereof and thereof, to implement the Restructuring. In the event the terms and conditions as set forth in the Restructuring Term Sheet and this Agreement are inconsistent, the terms and conditions contained in this Agreement shall govern.

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

1.    Definitions.  The following terms shall have the following definitions:

"Agreement" has the meaning set forth in the preamble hereof.

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly controls, or is under common control with, or is controlled by, such Person. As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean, with respect to any Person, the possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise) of such Person.

"Assumption Agreement" means an agreement whereby a transferee of any Loan Claims agrees to assume and be bound by this Agreement and the Restructuring Term Sheet, and to assume the rights and obligations of the Consenting Lenders under this Agreement, a form of which is attached hereto as Exhibit A.

"Backstop Commitment" means that certain Backstop Commitment Agreement to be entered into by the Company, the Parent and the investors listed on Schedule II to the Noteholder Restructuring Support Agreement, which is attached hereto as Exhibit B.

"Backstop Order" means an order of the Bankruptcy Court approving the ECA and authorizing the Company to enter into or assume, as the case may be, the Backstop Commitment, which shall be in form and substance acceptable to the Administrative Agent (at the direction of the Consenting Lenders in their reasonable discretion).

"Ballot" means the ballot distributed with the Disclosure Statement for voting on the Plan.

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§101, et seq., as amended from time to time and applicable to the Chapter 11 Cases.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in California are authorized by law or other governmental action to close.

"Cash Balance" means WLH's cash on hand that is available for use in its operations. As of October 31, 2011, such balance equaled approximately $9,340,655.

"Chapter 11 Cases" means the chapter 11 cases of WLH.

"Confirmation Hearing" means the hearing before the Bankruptcy Court on confirmation of the Plan.

"Confirmation Order" means the order entered by the Bankruptcy Court confirming the Plan, which shall be in form and substance acceptable to the Administrative Agent (at the direction of the Consenting Lenders in their sole and absolute discretion),

including all exhibits, appendices and related documents, each in form and substance acceptable to the Administrative Agent (at the direction of the Consenting Lenders in their sole and absolute discretion); and such order shall, unless waived by the Administrative Agent (at the direction of the Consenting Lenders in their sole and absolute discretion) in writing, be a Final Order.

"Consent Solicitation Materials" means the Disclosure Statement and other solicitation materials in respect of the Plan to be provided to the Administrative Agent and the Consenting Lenders.

"Consenting Lenders" has the meaning set forth in the preamble hereof.

"Corporate Governance Documents" means the following corporate governance documents of WLH, as applicable: (i) the certificate of incorporation or certificate of formation, (ii) the by-laws, and (iii) any applicable registration rights agreement, each of which shall be in form and substance acceptable to the Administrative Agent (at the direction of the Consenting Lenders in their reasonable discretion).

"Court Date" means any Business Day on which the Bankruptcy Court is open.

"DIP Facility" means a debtor-in-possession senior secured superpriority loan facility or similar loan facility and all related loan documents thereto to be entered into by and among WLH, as debtors in possession, and the agent and lender or lenders thereto.

"DIP Facility Motion" means a motion that will be filed by WLH in the Chapter 11 Cases seeking Bankruptcy Court approval of the DIP Facility.

"DIP Facility Order" means an order of the Bankruptcy Court entered in the Chapter 11 Cases granting the relief requested in the DIP Facility Motion and approving the DIP Facility and authorizing WLH to enter into the DIP Facility.

"Disclosure Statement" means the disclosure statement in respect of the Plan, which disclosure statement shall be in form and substance acceptable to the Administrative Agent (at the direction of the Consenting Lenders in their sole and absolute discretion).

"ECA" means that certain Equity Commitment Agreement to be entered into by the Company, the Parent and the investors listed on Schedule III to the Noteholder Restructuring Support Agreement, which shall be in form and substance acceptable to the Administrative Agent (at the direction of the Consenting Lenders in their sole and absolute discretion).

"Effective Date" means the date on which the Plan becomes effective.

"Financing Orders" has the meaning set forth in Section 5(gg).

"Liquidity Event" means the date on which, prior to December 19, 2011, the Cash Balance is determined to be less than $5,000,000 (which determination shall be made

by the Company's financial advisor in good-faith after consultation with the Administrative Agent).

"Loan Agreement Claims" means all claims arising under or relating to (i) the Loan Agreement, and (ii) all agreements and instruments relating to the foregoing (including any guarantees with respect thereto) that remain unpaid and outstanding as of the Effective Date.

"Material Adverse Change" means, since November 4, 2011, any change, effect, event, occurrence, development, circumstance or state of facts occurs which has had or would reasonably be expected to have a materially adverse effect on the business, properties, prospects (financial or otherwise), operations, financial condition or results of operations of WLH, taken as a whole, or which would materially impair WLH's ability to perform its obligations under this Agreement or have a materially adverse effect on or prevent or materially delay the consummation of the transactions contemplated by this Agreement. The filing of voluntary petitions commencing the Chapter 11 Cases contemplated by this Agreement shall not constitute a Material Adverse Change.

"Non-material Subsidiaries" means any one or combination of subsidiaries of the Company and the Parent that have total tangible assets of less than $1,000,000 in the aggregate for all such subsidiaries on a combined basis.

"Notes" means, collectively, (i) the 7½% Senior Notes due 2014 issued by the Company, (ii) the 10¼% Senior Notes due 2013 issued by the Company, and (iii) the $7^5/_8$% Senior Notes due 2012 issued by the Company.

"Noteholder Restructuring Support Agreement" means that certain restructuring support agreement, dated as of November 4, 2011, by and among WLH and certain beneficial owners of the Notes, which Noteholder Restructuring Support Agreement shall be effective on or prior to the effective date of this Agreement, which is attached hereto as Exhibit C.

"Outside Date" means the 17th day after confirmation of the Plan unless such date is extended by the Administrative Agent (at the direction of the Consenting Lenders in their sole and absolute discretion).

"Parties" has the meaning set forth in the preamble hereof.

"Person" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group or any legal entity or association.

"Petition Date" means the date the Chapter 11 Cases are commenced.

"Plan" has the meaning set forth in the Preamble hereof.

"Plan Related Documents" means the Plan, the Disclosure Statement, the Consent Solicitation Materials, the Confirmation Order, and any other documents or agreements filed with the Bankruptcy Court by WLH or at WLH's direction that are

- 4 -

necessary to implement the Plan, including any appendices, amendments, modifications, supplements, exhibits and schedules relating to the Plan or the Disclosure Statement, including: (a) any term sheet and/or commitment letter for any proposed exit financing facility; (b) any operative documents for any proposed exit financing facility; (c) any documents disclosing the identity of the members of the board of directors of any of the reorganized debtors and the nature of and compensation for any "insider" under the Bankruptcy Code who is proposed to be employed or retained by any of the reorganized debtors; (d) any list of material executory contracts and unexpired leases to be assumed, assumed and assigned, or rejected; (e) a list of any material retained causes of action; (f) the certificate of incorporation and bylaws for the reorganized debtors; (g) any registration rights agreement; (h) any stockholders agreement; (i) any document relating to any obligation of the Reorganized Company, including any indenture, intercreditor agreement, or security document; and (j) any other documents associated with the Restructuring that are, or ordinarily would be, included in a "plan supplement" for a chapter 11 plan; provided that the Parties hereby covenant that each of the foregoing documents shall be in form and substance acceptable to the Administrative Agent (at the direction of the Consenting Lenders in their sole and absolute discretion).

"Restructuring Support Party" means each of the Consenting Lenders and the Administrative Agent.

"Restructuring Term Sheet" means that certain term sheet containing the material terms and provisions of the Restructuring, as agreed upon by the Parties, a copy of which is attached hereto as Exhibit D.

"Rights Offering " means a private placement rights offering or a private placement of Class C Common Shares and the Preferred Shares offered to accredited investors in exchange for $60 million in cash.

"Rights Offering Motion" means a motion seeking approval by the Bankruptcy Court of the procedures for, and any documents concerning, the Rights Offering, which procedures and documents shall be in form and substance acceptable to the Administrative Agent (at the direction of the Consenting Lenders in their sole and absolute discretion).

"Rights Offering Order" means an order of the Bankruptcy Court granting the Rights Offering Motion, which order shall be in form and substance acceptable to the Administrative Agent (at the direction of the Consenting Lenders in their sole and absolute discretion).

"RSA Motion" means a motion, in form and substance reasonably acceptable to the Administrative Agent and the Consenting Lenders that may be filed by WLH on the Petition Date seeking Bankruptcy Court approval of this Agreement and authorizing WLH to assume this Agreement Post-Petition.

"RSA Order" means any order, in form and substance acceptable to the Administrative Agent and the Consenting Lenders in their sole and absolute discretion, of the Bankruptcy Court granting the relief requested in the RSA Motion and approving this

Agreement and authorizing WLH to assume this Agreement under section 365 of the Bankruptcy Code.

"Transfer" has the meaning set forth in Section 8 hereto.

"Termination Date" has the meaning set forth in Section 7 hereto.

"Termination Event" has the meaning set forth in Section 5 hereto.

All terms in this Agreement shall be interpreted in accordance with section 102 of the Bankruptcy Code.

2.    Rules of Construction.  For the purposes of this Agreement, all consents, approvals or acceptances of the Administrative Agent or Consenting Lenders required by this Agreement shall be in the form of prior written consent, approval or acceptance.  Any consent, approval, or acceptance required from "Consenting Lenders" shall require consent, approval, or acceptance, as the case may be, of Consenting Lenders holding a majority of principal amount of loans under the Loan Agreement.

3.    Commitment of Restructuring Support Parties.  Subject to the terms and conditions hereof and the terms and conditions set forth in the Restructuring Term Sheet, and only until the Termination Date, each Restructuring Support Party shall:

(a)    Subject to its receipt of the Consent Solicitation Materials, (i) vote all Loan Agreement Claims, now or hereafter beneficially owned by such Restructuring Support Party in favor of the Plan in accordance with the applicable procedures set forth in the Consent Solicitation Materials and, to the extent such election is available, shall not elect on its ballot to preserve any Loan Agreement Claim that may be affected by any releases provided for under the Plan, and (ii) timely return a duly executed Ballot in connection therewith;

(b)    Not withdraw or revoke its tender, consent or vote with respect to the Plan; provided, however, no Restructuring Support Party shall be obligated to vote to accept the Plan, and may withdraw or revoke its tender, consent or vote with respect to the Plan, upon (i) the termination of this Agreement; (ii) the withdrawal, amendment, modification of, or the filing of a pleading seeking to withdraw, amend, supplement or modify, the Plan or the documents included in the Plan Supplement (as such term shall be defined in the Plan), in a manner that is not acceptable to the Administrative Agent (at the direction of the Consenting Lenders in their sole and absolute discretion); or (iii) WLH taking any other action materially inconsistent with this Agreement or the Restructuring Term Sheet;

(c)    Following the commencement of the Chapter 11 Cases, shall not (i) object to, delay, or take any other action with the principal intention of delaying, preventing, frustrating or impeding the approval or confirmation of the Plan, the Consent Solicitation Materials or the consummation of the Plan, or any efforts to obtain acceptance of and to confirm and implement, the Plan, subject to the rights of the Restructuring Support Parties under subsection (b) of this Section 3; (ii) encourage any Person to take any actions described in the preceding clause (i); (iii) seek, solicit, support or encourage any plan of reorganization or liquidation other than the Plan; and

(d)    Not take any other action, including initiating or joining in any legal proceeding that is inconsistent with, or that would be reasonably likely to delay, consummation of the Restructuring.

Notwithstanding the foregoing, nothing in this Agreement shall be construed to prohibit any Party from appearing as a party in interest in any matter to be adjudicated in the Chapter 11 Cases so long as such appearance and the positions advocated in connection therewith are consistent with this Agreement and the Restructuring and are not for the purpose of, and could not reasonably be expected to have the effect of, materially hindering, delaying or preventing the consummation of the Restructuring.  Notwithstanding anything contained in this Agreement, neither a vote to accept the Plan by the Administrative Agent or the Consenting Lenders, nor the acceptance of the Plan by any class of creditors, shall in any way be deemed to impair or waive the rights of the Administrative Agent or the Consenting Lenders to assert or raise any objection otherwise permitted under subsections (a), (b), (c), or (d) above in connection with the Plan.

4.    <u>Commitment of WLH</u>.  Subject to their fiduciary duties as debtors in possession, WLH agrees to (i) support and use its best efforts to complete the Restructuring and all transactions contemplated under the Plan, (ii) take any and all necessary and appropriate actions in furtherance of the Restructuring and the transactions contemplated under the Plan, (iii) not delay, challenge, impede, appeal, or take any other negative action, directly or indirectly, to interfere with the acceptance or implementation of the Plan, or this Agreement, the Restructuring Term Sheet, and the transactions contemplated hereunder and thereunder, or encourage any other Person or entity to take any of the foregoing acts, (iv) not withdraw, amend, modify or file a pleading seeking to amend, supplement, or modify, either of the Plan, the Consent Solicitation Materials, or any notices, exhibits, appendices, plan supplement materials or orders, which withdrawal, amendment, modification or filing is inconsistent with the Restructuring Term Sheet, unless any such amendments, modifications, filings, etc. are in form an substance satisfactory to the Administrative Agent (at the direction of the Consenting Lenders in their sole and absolute discretion), (v) complete the Restructuring and all transactions contemplated under the Plan within the time-frame outlined pursuant to Section 5 hereof, and to achieve the Effective Date prior to the Outside Date, (vi) obtain any and all required regulatory and/or third party approvals for the Restructuring, and (vii) not otherwise take any actions inconsistent with this Agreement, the Restructuring Term Sheet, or the confirmation and consummation of the Plan.

5.    <u>Termination by the Restructuring Support Parties</u>.  The Restructuring Support Parties shall have the right to elect to terminate this Agreement, upon the occurrence of, among other things, any of the following events, each of which may be waived by the Administrative Agent (at the direction of the Consenting Lenders in their sole and absolute discretion) (each a "<u>Termination Event</u>"):

(a)    There shall have occurred a material breach under the ECA, the Noteholder Restructuring Support Agreement, or the Backstop Commitment;

(b)    The ECA and the Backstop Commitment, in each case having been executed by the parties thereto, have not been delivered to the Administrative Agent by November 4, 2011;

- 7 -

      (c)      WLH fails to provide the Administrative Agent and the Consenting Lenders with drafts of the Plan and Disclosure Statement by November 8, 2011;

      (d)      The Petition Date has not occurred by December 19, 2011;

      (e)      WLH fails to file the Plan and Disclosure Statement on the Petition Date, unless both a Liquidity Event has occurred and the Chapter 11 Cases have been commenced by November 17, 2011, in which case WLH fails to file the Plan and Disclosure Statement by November 17, 2011;

      (f)      The Solicitation has not commenced by November 17, 2011, unless, prior to such date, a Liquidity Event has occurred and the Chapter 11 Cases have been commenced;

      (g)      The Solicitation has not been completed by December 19, 2011, unless, prior to such date, a Liquidity Event has occurred and the Chapter 11 Cases have been commenced;

      (h)      If the Solicitation has been completed prior to the Petition Date, (i) the Rights Offering Order shall not have been entered by the 58th day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date), (ii) the Confirmation Hearing shall not have concluded by the 58th day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date), (iii) the Confirmation Order shall not been entered by the Bankruptcy Court by the 60th day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date), or (iv) the Effective Date shall not have occurred within 17 days after the entry of the Confirmation Order. In the event that the Rights Offering Order is not entered within 30 days after the Petition Date, the deadlines set forth in clauses (ii) and (iii) shall be extended by 30 days;

      (i)      If a Liquidity Event has occurred and the Solicitation has not been completed prior to the Petition Date, (i) the entry of an order by the Bankruptcy Court approving the Consent Solicitation Materials shall not have occurred by the 60th day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date), (ii) the Confirmation Hearing shall not have concluded by to the 100th day after the Petition Date (or if such day is not a Court Date, the next succeeding Court Date), (iii) the Confirmation Order shall not have been entered by the Bankruptcy Court by the 102nd day after the Petition Date (or if such day is not a Court Date, the next succeeding Court Date), or (iv) the Effective Date shall not have occurred within 17 days after the entry of the Confirmation Order. In the event that the Rights Offering Order is not entered by the 45th day after the Petition Date, the deadlines set forth in clauses (ii) and (iii) shall be extended by 30 days;

      (j)      WLH shall not have received the votes in support of the Plan from at least 66 2/3% of the principal amount of the Notes whose holders have voted, and a majority in number of the holders of Notes who have voted, by the voting deadline set forth in the Consent Solicitation Materials;

      (k)      WLH fails to file the Rights Offering Motion by the first Court Date after the Petition Date;

(l)    WLH fails to use reasonable best efforts to obtain a hearing on the Rights Offering Motion before the Bankruptcy Court by the 25th day after the Petition Date;

(m)    WLH fails to file the RSA Motion by the first Court Date after the Petition Date;

(n)    The RSA Order shall not have been entered by the Bankruptcy Court by the 45th day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date) or WLH shall file a motion subsequent to the entry of the RSA Order seeking to reject this Agreement;

(o)    The Backstop Order shall not have been entered by the Bankruptcy Court by the 45th day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date);

(p)    The DIP Facility Order shall not be entered on an interim basis by the third Court Date after the Petition Date or the DIP Facility Order shall not be entered as a Final Order by the 30th day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date);

(q)    The Corporate Governance Documents are not in form and substance reasonably acceptable to the Administrative Agent and the Consenting Lenders on or prior to the hearing on confirmation of the Plan;

(r)    The occurrence of an event of default under the Financing Orders, any agreement concerning the DIP Facility or any agreement concerning the use of the Administrative Agent's and the Lenders' cash collateral that has not been cured (only if such breach is susceptible to cure) within the applicable time period provided for in the applicable document;

(s)    The withdrawal, amendment, modification of, or the filing of a pleading seeking to amend or modify, supplement, the Plan, the Consent Solicitation Materials or any Plan Related Documents, or any notices, exhibits, appendices and orders by WLH, which such withdrawal, amendment, modification or filing associated with the foregoing, in a manner not acceptable to the Administrative Agent (at the direction of the Consenting Lenders in their sole and absolute discretion);

(t)    The filing by WLH of any motion or other request for relief seeking (i) dismissal of any of the Chapter 11 Cases (other than the Chapter 11 Cases solely relating to Non-material Subsidiaries), (ii) conversion of any of the Chapter 11 Cases to chapter 7 of the Bankruptcy Code (other than the Chapter 11 Cases solely relating to Non-material Subsidiaries), or (iii) appointment of a trustee or an examiner pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases (other than the Chapter 11 Cases solely relating to Non-material Subsidiaries); unless such motion is made with the consent of the Administrative Agent (at the direction of the Consenting Lenders in their sole and absolute discretion);

(u)    The entry of an order by the Bankruptcy Court (i) dismissing any of the Chapter 11 Cases (other than the Chapter 11 Cases solely relating to Non-material

- 9 -

Subsidiaries), (ii) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (other than the Chapter 11 Cases solely relating to Non-material Subsidiaries), or (iii) appointing a trustee or an examiner pursuant to section 1104 of the Bankruptcy Code with respect to the Company or the Parent, unless such order is entered with the consent of the Administrative Agent (at the direction of the Consenting Lenders in their sole and absolute discretion); or (iv) making a finding of fraud, dishonesty, or material misconduct by any officer or director of WLH;

(v)    A breach by the Company or the Parent of any of its obligations under this Agreement, the Restructuring Term Sheet or any of the other agreements governing the Restructuring, and any such breach by the Company or the Parent is not cured (only if such breach is susceptible to cure) by the earlier of three (3) Business Days after receipt of written notice from the Administrative Agent or the Consenting Lenders or, to the extent applicable, the cure period provided for under the agreements governing the Restructuring (or, if sooner, at or immediately prior to the hearing on confirmation of the Plan or the Effective Date, as the case may be);

(w)    The Company files, propounds or otherwise supports any plan of reorganization other than the Plan, or files any motion or application seeking authority to sell substantially all of its assets, without the consent of the Administrative Agent (at the direction of the Consenting Lenders in their sole and absolute discretion);

(x)    Any court of competent jurisdiction or other competent governmental or regulatory authority shall have issued an order making illegal or otherwise restricting, preventing, enjoining or prohibiting the consummation of the Restructuring;

(y)    The entry of an order by any court of competent jurisdiction invalidating, disallowing, subordinating, or limiting, in any respect, as applicable, the enforceability, priority, or validity of the Loan Agreement or Loan Agreement Claims;

(z)    The Company fails to pay the fees and expenses incurred by the legal and financial advisors to the Administrative Agent (including Akin Gump Strauss Hauer & Feld LLP and Pepper Hamilton LLP) as they become due;

(aa)    The occurrence of the Outside Date;

(bb)    The exclusive right of the Company or the Parent to file and solicit a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code shall have terminated;

(cc)    Any intercreditor agreement, indenture, credit agreement or any other document relating to the implementation of the Restructuring that has been executed, filed with the Bankruptcy Court or otherwise finalized shall be in form or substance not acceptable to the Administrative Agent or the Consenting Lenders in their sole and absolute discretion;

(dd)    Any Plan Related Document that has been executed, filed with the Bankruptcy Court or otherwise finalized shall be in form or substance not acceptable to the Administrative Agent or the Consenting Lenders in their sole and absolute discretion;

(ee)    A Termination Event under the ECA or the Backstop Commitment (as defined in such document) shall have occurred (except if such occurrence has been permanently waived) or the ECA or the Backstop Commitment shall otherwise have been terminated, or the ECA or the Backstop Commitment shall have been amended, modified, or supplemented in a manner not acceptable to the Administrative Agent or the Consenting Lenders in their sole and absolute discretion;

(ff)    A Termination Event under the Noteholder Restructuring Support Agreement (as defined in such document) shall have occurred (except if such occurrence has been permanently waived) or the Noteholder Restructuring Support Agreement shall otherwise have been terminated, or the Noteholder Restructuring Support Agreement shall have been amended, modified, or supplemented in a manner not acceptable to the Administrative Agent or the Consenting Lenders in their sole and absolute discretion;

(gg)    WLH shall (1) enter into a DIP Facility, a cash collateral use agreement or exit financing, (2) file any motion with the Bankruptcy Court seeking an order approving any DIP Facility, cash collateral use agreement or exit financing, in either case, that is in form or substance not acceptable to the Administrative Agent or the Consenting Lenders in their sole and absolute discretion, or an order or orders shall be entered by the Bankruptcy Court authorizing the use of the Administrative Agent and the Lenders' cash collateral or authorizing WLH to enter into a DIP Facility, cash collateral use agreement or exit financing (the "Financing Orders") on terms and conditions that are not acceptable to the Administrative Agent or the Consenting Lenders in their sole and absolute discretion;

(hh)    Upon the occurrence of any Material Adverse Change;

(ii)    The Bankruptcy Court shall enter an order granting relief from the automatic stay to the holder or holders of any other security interest or lien (other than the Administrative Agent or the Lenders) in any collateral to permit the pursuit of any judicial or non-judicial transfer or other remedy against any of the collateral or granting any form of adequate protection, including requiring cash payments by WLH to such holder or holders, in lieu of such relief;

(jj)    The filing of any motion in the Chapter 11 Cases under sections 363, 364, or 365 of the Bankruptcy Code that is not acceptable to the Administrative Agent or the Consenting Lenders in their sole and absolute discretion; or

(kk)    The occurrence of any default under the Loan Agreement (excluding the filing of voluntary petitions commencing the Chapter 11 Cases contemplated by this Agreement), including the failure to make any payment of interest or any other payment that is due and payable.

6.    <u>Company Termination Events</u>.  The Company on behalf of WLH may terminate this Agreement as to all Parties upon three (3) Business Days' prior written notice thereof, upon the occurrence of any of the following events (each, a "Company Termination Event"): (a) the breach by any Restructuring Support Party of any of the representations, warranties or covenants set forth in this Agreement that would have a material adverse impact on any entity included in WLH, or which may materially hinder, delay or prevent or

have a material adverse impact on the consummation of the Restructuring, that remains uncured for a period of five (5) Business Days after the receipt by the Administrative Agent of notice of such breach or (b) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Restructuring (except to the extent that such ruling or order had been sought or encouraged by WLH).

      7.    <u>Effect of Termination</u>. The date on which this Agreement is terminated in accordance with Sections 5 and 6 of this Agreement shall be referred to as the "<u>Termination Date</u>" and the provisions of this Agreement and the Restructuring Term Sheet shall terminate, except as otherwise provided herein; <u>provided</u>, <u>however</u>, that any claim for breach of this Agreement that occurs prior to termination shall survive such termination and all rights and remedies with respect to such claims shall not be prejudiced in any way; <u>provided</u>, <u>further</u>, that except as set forth in Section 26 hereof, the breach of this Agreement by one or more Parties shall not create any rights or remedies against any non-breaching Party. Upon any termination of this Agreement prior to the Effective Date, each of the Parties shall have the immediate right, without further order of the Bankruptcy Court, and without the consent of the Company, to withdraw or change any vote previously tendered by such Party, irrespective of whether or not any voting deadline or similar deadline or bar has passed.

      8.    <u>Transfer of Loan Agreement Claims</u>. Notwithstanding anything to the contrary herein, the Restructuring Support Parties agree that, for so long as this Agreement has not been terminated in accordance with its terms, they shall not sell, assign, transfer, convey, pledge, hypothecate or otherwise dispose of, directly or indirectly (each such transfer, a "<u>Transfer</u>"), all or any of their Loan Agreement Claims (or any right related thereto and including any voting rights associated with such Loan Agreement Claims), unless: (a) the transferee thereof (i) agrees and executes the Assumption Agreement, (ii) promptly delivers such writing to the other Parties (each such transferee becoming, upon the Transfer, a Restructuring Support Party), (iii) the Restructuring Support Party effecting such Transfer provides written notice of such Transfer to the respective legal counsel of the other Restructuring Support Parties and the Company, in each case no more than one (1) Business Day after the execution of an agreement (or trade confirmation) in respect of such Transfer, and (iv) the Company and the Administrative Agent (at the direction of the Consenting Lenders) are each reasonably satisfied prior to such Transfer that registration under the Securities Act of 1933, as amended, and the applicable securities laws of any other jurisdiction is not required in connection with or as a result of the transaction resulting in such Transfer; (b) the Transfer is by one Restructuring Support Party to an Affiliate of such Restructuring Support Party or one or more affiliated funds or affiliated entity or entities with a common investment advisor (in each case, other than portfolio companies) so long as such Affiliate agrees in writing to be bound by the terms hereof in the same manner as the transferee; (c) the Transfer is by one Restructuring Support Party to another Restructuring Support Party; or (d) the Transfer is approved in writing in advance of such Transfer by each of the Company and the Administrative Agent (at the direction of the Consenting Lenders). The Company shall promptly acknowledge any such Transfer in writing and provide a copy of that acknowledgement to the transferor. By its acknowledgement of the relevant Transfer, the Company shall be deemed to have acknowledged that its obligations to the Administrative Agent and the Consenting Lenders hereunder shall be deemed to constitute

obligations in favor of the relevant transferee. Any Transfer of any Loan Agreement Claim by the Administrative Agent or the Consenting Lenders that does not comply with the procedure set forth in the first sentence of this Section 8 shall be deemed void *ab initio*. Notwithstanding anything to the contrary in this Section 8, any Transfer made to an "insider" under the Bankruptcy Code of any Loan Agreement Claim (or any right related thereto and including any voting rights associated with such Loan Agreement Claim) shall be null and void *ab initio*.

9.    Effectiveness. This Agreement shall become effective and binding upon each of the undersigned persons as of the date when (i) the Parties have executed and delivered signed copies of this Agreement and (ii) the Noteholder Restructuring Support Agreement shall have become effective. This Agreement is not and shall not be deemed to be a solicitation of votes for the acceptance of the Plan (or any other plan of reorganization) for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.

10.    Ownership of Claims. Each Restructuring Support Party represents and warrants that:

        (a)    As of the date of this Agreement, it is the beneficial owners of the stated principal amount of the Loan Agreement Claims; and

        (b)    Other than pursuant to this Agreement, such Loan Agreement Claims are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition or encumbrances of any kind, that is reasonably likely to adversely affect the Administrative Agent's or the Consenting Lenders' performance of its obligations contained in this Agreement at the time such obligations are required to be performed.

11.    Cooperation. WLH shall provide draft copies of all motions or applications, other documents and Plan Related Documents WLH intends to file with the Bankruptcy Court on the Petition Date or during the Chapter 11 Cases to Akin Gump Strauss Hauer & Feld LLP, as counsel for the Administrative Agent and the Consenting Lenders as soon as reasonably practicable prior to the Petition Date and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing. WLH will provide draft copies of all Plan Related Documents WLH intends to file with the Bankruptcy Court Post-Petition to counsel to the Administrative Agent and Consenting Lenders within a reasonable time prior to filing such pleadings and/or documents and shall consult in good faith with such counsel regarding the form and substance of any such proposed pleading. Court Hearings to be scheduled in compliance with Section 5 hereof shall not be re-scheduled, continued, postponed or adjourned by WLH without the consent of the Administrative Agent (at the direction of the Consenting Lenders in their sole and absolute discretion); provided, that Court Hearings to be scheduled in compliance with Section 5 hereof may be re-scheduled, continued, postponed or adjourned by WLH to the extent such re-scheduling, continuance, postponement or adjournment, as the case may be, would not, nor could be expected to, otherwise cause WLH to fail to satisfy any deadline set forth in Section 5 hereof; provided, further, that if no objection is made within five (5) Business Days after notice by WLH or its advisors of a request for a re-scheduling, continuation, postponement or adjournment that does not extend beyond the time periods specified in

Section 5 hereof, the Administrative Agent and the Consenting Lenders shall be deemed to have consented thereto. The RSA Motion shall not be withdrawn by the Company or the Parent without the consent of the Administrative Agent (at the direction of the Consenting Lenders in their sole and absolute discretion).

12.     Claim Resolution Matters. Prior to the entry of the Confirmation Order, the Company may enter into any agreements with holders of Claims (as such term shall be defined in the Plan) or Equity Interests (as such term shall be as defined in the Plan) relating to the allowance, estimation, validity, extent or priority of such Claims or Equity Interests, or the treatment and classification of such Claims or Equity Interests under the Plan; provided, however, that WLH shall provide the Administrative Agent with not less than five (5) Business Days written notice of the material terms of the proposed agreement and also of the motion seeking authorization for WLH to enter into such a proposed agreement, and upon the expiration of such period, if the Administrative Agent (at the direction of the Consenting Lenders) has not notified the Company and the Parent of an objection to such proposed treatment of such claims, WLH shall be authorized to proceed with such motion and, if such motion is approved by the Bankruptcy Court, abide by the proposed agreement. Notwithstanding the forgoing, WLH shall not be required to provide the Administrative Agent with advance notice or any objection period with respect to payment of (i) any trade payables and employee benefits and obligations which arise in the ordinary course of the Debtors' business, (ii) claims asserted in a liquidated amount of $100,000 or less or $2,000,000 in the aggregate, and (iii) claims which WLH is authorized to resolve or pay pursuant to the terms of any applicable first day order and such resolution or payment complies with the terms and limitations, if any, imposed on WLH by such applicable order.

13.     Business Continuance. Except as contemplated by this Agreement or with the consent of the Administrative Agent (acting at the direction of the Consenting Lenders in their sole and absolute discretion), the Company and the Parent covenant and agree that, between the date hereof and the Effective Date, WLH shall operate its businesses in the ordinary course in a manner consistent with past practice in all material respects (other than any changes in operations (i) resulting from or relating to the Solicitation or the proposed or actual filing of the Chapter 11 Cases or (ii) imposed by the Bankruptcy Court). At the reasonable request and upon reasonable notice of the Restructuring Support Parties or their advisors, the Company and the Parent also agree to respond to reasonable requests from the Restructuring Parties and provide reasonable access to WLH's senior management personnel regarding WLH's business, the Chapter 11 Cases, the general status of ongoing operations and operating results of WLH during normal business hours and at other reasonable times in a manner that does not unreasonably interfere with the normal business operations of WLH. Further, except as expressly contemplated by this Agreement and except for changes resulting from or relating to the filing of the Chapter 11 Cases or imposed by the Bankruptcy Court, the Company and the Parent will continue (i) using commercially reasonable efforts to preserve the relationships with current important customers, distributors, suppliers, vendors and others having business dealings with the Company, including the performance of all material obligations under any executory contracts which have not been rejected and compliance with historical billing practices, (ii) maintaining and insuring its physical assets, properties and facilities in their current working order, condition and repair as of the date hereof (ordinary wear and tear excepted) and maintaining all existing insurance on the foregoing, (iii) not taking any action, or omitting to

- 14 -

take any action, the intent of which is to cause the termination of its current executive officers (other than for good reason or for cause), (iv) maintaining WLH's books and records on a basis consistent with prior practice, including prior billing and collection practices, and (v) providing the Administrative Agent with such copies of standard operating reports concerning WLH as are prepared for senior management, if any, and updated monthly financial information concerning the Company.

14.    Access. The Company will afford the Administrative Agent and its attorneys, consultants, accountants and other authorized representatives full access, upon reasonable notice during normal business hours, and at other reasonable times, to all properties, books, contracts, commitments, records, management personnel, lenders and advisors of the Company.

15.    Representations. Each Party represents to each other Party that, as of the date of this Agreement:

(a)    Such Party is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization, and has all requisite corporate, partnership, or limited liability company power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(b)    The execution, delivery and performance of this Agreement by such Party does not and shall not (x) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its organizational documents or those of any of its subsidiaries or (y) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligations to which it or any of its subsidiaries is a party or under its organizational documents;

(c)    The execution, delivery and performance by it of this Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body, except such filing as may be necessary and/or required for disclosure by the Securities and Exchange Commission or pursuant to state securities or "blue sky" laws, and the possible approval by the Bankruptcy Court of the Company's and the Parent's authority to enter into and implement this Agreement; and

(d)    Subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws, both foreign and domestic, relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

16.    Entire Agreement. This Agreement, including the exhibits, schedules and annexes hereto constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all other prior negotiations, agreements and

understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement.

17.    Survival of Agreement.  Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning a possible financial restructuring of WLH and in contemplation of possible Chapter 11 Case filings by WLH, and that the exercise by any of the Plan Support Parties of its rights under this Agreement shall not be prevented, impeded or forestalled by the automatic stay imposed in the Chapter 11 Cases.

18.    Waiver.  This Agreement and the Restructuring Term Sheet are part of a proposed settlement of a dispute among the Parties.  Regardless of whether or not the transactions contemplated herein are consummated, or whether or not the Termination Date has occurred, if applicable, nothing shall be construed herein as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights, including any Defaults or Events of Default (as those terms are defined in the Loan Agreement), or any other rights, under the Loan Agreement.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

19.    Company Fiduciary Duties.  Notwithstanding anything to the contrary herein, nothing in this Agreement shall require the Parent, the Company or any of their subsidiaries or any of its or their respective directors or officers (in such person's capacity as a director or officer) to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action would be inconsistent with such person's fiduciary obligations under applicable law.

20.    Representation by Counsel.  Each Party hereto acknowledges that it has been represented by counsel (or had the opportunity to and waived its right to do so) in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party hereto with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.  The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the Parties hereto.  None of the Parties hereto shall have any term or provision construed against such Party solely by reason of such Party having drafted the same.

21.    Independent Due Diligence and Decision-Making.  The Administrative Agent and the Consenting Lenders hereby confirm that their decision to execute this Agreement has been based upon their independent investigation of the operations, businesses, financial and other conditions and prospects of WLH.

22.    Counterparts.  This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

23. <u>Amendments</u>. Except as otherwise provided herein, this Agreement may not be modified, amended or supplemented without consent of the Parties; provided, that if the modification, amendment or supplement adversely impacts the economic treatment or rights of any of the Loan Agreement Claim holders, then in addition to the foregoing, the agreement in writing of the Parties shall be required for such modification, amendment or supplement to be effective.

24. <u>Headings</u>. The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

25. <u>Relationship Among Parties</u>. Notwithstanding anything herein to the contrary, the duties and obligations of the Restructuring Support Parties under this Agreement shall be several, not joint. It is understood and agreed that any Restructuring Support Party may trade in the Loan Agreement Claims or other debt or equity securities of the Company without the consent of the Company or any other Restructuring Support Party, subject to applicable securities laws and Section 8 herein. No Restructuring Support Party shall have any responsibility for any such trading by any other entity by virtue of this Agreement. No prior history, pattern or practice of sharing confidences

26. <u>Specific Performance</u>. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder; provided, however, that each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

27. <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of California, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in the United States District Court for Central District of California, and by execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to California jurisdiction, if the Chapter 11 Cases are commenced, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

28. <u>Tax Matters</u>. WLH shall not, without the consent of the Administrative Agent: (i) cause, or cause another party to make, any new or change a current "check the box election" under Treasury Regulation § 301.7701-3 with respect to WLH; or (ii) merge, consolidate or liquidate; if any of the actions specified in clause (i) or (ii) has material adverse tax consequences for WLH or holders of Loan Agreement Claims.

- 17 -

29.    Indemnification. (a) Whether or not the Restructuring is consummated or this Agreement is terminated for any reason, the Company and the Parent (each individually, in such capacity, the "Indemnifying Party") shall indemnify and hold harmless the Administrative Agent and the Consenting Lenders and their successors and assigns, their respective affiliates and their affiliates' respective officers, directors, managing directors, employees, agents, members, partners, managers, advisors, controlling persons, attorneys, investment bankers and financial advisors (each, an "Indemnified Person") from and against any and all losses, claims, damages, liabilities and reasonable fees and expenses, joint or several, to which any such Indemnified Person may become subject to the extent arising out of or in connection with (i) any third party claim, challenge, litigation, investigation or proceeding with respect to this Agreement, the Chapter 11 Cases or the transactions contemplated hereby or thereby, or (ii) any breach by the Company of this Agreement and to reimburse such Indemnified Persons for any reasonable legal or other reasonable out of pocket expenses as they are incurred in connection with investigating, responding to or defending any of the foregoing; provided that the foregoing indemnification will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or expenses to the extent that they are finally judicially determined to have resulted from any breach of this Agreement by such Indemnified Person or bad faith, gross negligence or willful misconduct on the part of such Indemnified Person. If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless, then the Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Person as a result of such loss, claim, damage, liability or expense in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, but also the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, as well as any relevant equitable considerations.

(b)    Promptly after receipt by an Indemnified Person of notice of the commencement of any claim, litigation, investigation or proceeding relating to this Agreement, the Chapter 11 Cases or any of the transactions contemplated hereby or thereby ("Proceedings"), such Indemnified Person will, if a claim is to be made hereunder against the Indemnifying Party in respect thereof, notify the Indemnifying Party in writing of the commencement thereof; provided that the omission so to notify the Indemnifying Party will not relieve it from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure. In case any such Proceedings are brought against any Indemnified Person and it notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, to the extent that it may elect by written notice delivered to such Indemnified Person, to assume the defense thereof, with counsel reasonably satisfactory to such Indemnified Person; provided that if the defendants in any such Proceedings include both such Indemnified Person and the Indemnifying Party and such Indemnified Person shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to the Indemnifying Party, such Indemnified Persons shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Proceedings (provided, that WLH shall not be responsible for the payment of fees and expenses for more than one such separate counsel) on behalf of such Indemnified Person. Upon receipt of notice from the Indemnifying Party to such Indemnified Person of its election so to assume the defense of such Proceedings and approval by such Indemnified Person of counsel, the

Indemnifying Party shall not be liable to such Indemnified Person for expenses incurred by such Indemnified Person in connection with the defense thereof (other than reasonable costs of investigation) unless (i) such Indemnified Person shall have employed separate counsel in connection with the assertion of legal defenses in accordance with the proviso to the next preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate counsel (other than local co-counsel) representing the Indemnified Persons who are parties to such Proceedings), (ii) the Indemnifying Party shall not have employed counsel reasonably satisfactory to such Indemnified Person to represent such Indemnified Person within a reasonable time after notice of commencement of the Proceedings or (iii) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Person.

(c)     The Indemnifying Party shall not be liable for any settlement of any Proceedings effected without its consent (which consent shall not be unreasonably withheld or delayed).  If any settlement of any Proceeding is consummated with the written consent of the Indemnifying Party or if there is a final judgment for the plaintiff in any such Proceedings, the Indemnifying Party agrees to indemnify and hold harmless each Indemnified Person from and against any and all losses, claims, damages, liabilities and expenses by reason of such settlement or judgment in accordance with, and subject to the limitations of, the provisions of this Section 29.  The Indemnifying Party shall not, without the consent of an Indemnified Person (which consent shall not be unreasonably withheld or delayed), effect any settlement of any pending or threatened Proceedings in respect of which indemnity has been sought hereunder by such Indemnified Person unless such settlement (a) includes an unconditional release of such Indemnified Person in form and substance reasonably satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such Proceedings and (b) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

30.     Notices.  All notices, requests, consents, approvals, waivers, and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally, by email, or overnight courier to the parties at the following addresses, or email addresses, with any such notice being deemed delivered only upon receipt:

If to the Company and/or the Parent:

William Lyon Homes
William Lyon Homes, Inc.
Attention: Matthew R. Zaist
4490 Von Karman
Newport Beach, CA 92660
Telephone: (949) 833-3600
Facsimile: (949) 252-2544

with a copy to (which shall not constitute notice):

Irell & Manella LLP
Attention: Jeffrey M. Reisner, Esq.
840 Newport Center Drive
Suite 400
Newport Beach, CA 92660-6324
Telephone: (949) 760-0991
Facsimile: (949) 760-5200

If to the Administrative Agent or the Consenting Lenders:

Colfin WLH Funding, LLC
2450 Broadway, 6th Floor
Santa Monica, California 90404
Telephone:       (310) 282-8820
Attention:       Linda Bodenstein

and

Colony Capital, LLC
660 Madison Avenue, Suite 1600
New York, New York 10021
Telephone:       (212) 230-3306
Attention:       Ronald M. Sanders, Esq.

with a copy to (which shall not constitute notice):

Akin Gump Strauss Hauer & Feld LLP
2029 Century Park East
Los Angeles, CA 90067
Telephone:       (310) 552-6692
Facsimile:       (310) 229-1001
Attention:       David Simonds, Esq.


     31.    No Third-Party Beneficiaries.  The terms and provisions of this Agreement are intended solely for the benefit of the Parties hereto and their respective successors and

permitted assigns, and it is not the intention of the Parties to confer third-party beneficiary rights upon any other Person.

32.    <u>Public Disclosure</u>.  WLH shall not (a) use the name of the Administrative Agent or the Consenting Lenders in any press release without the Administrative Agent's consent, which consent may be granted or withheld in the sole and absolute discretion of the Administrative Agent and the Consenting Lenders, or (b) disclose to any person other than legal and financial advisors to WLH the principal amount or percentage of any Loan Agreement Claims held by any holder thereof or any of their respective subsidiaries; provided, however, that WLH shall be permitted to disclose at any time the aggregate principal amount of and aggregate percentage of Loan Agreement Claims held by the holders thereof.  Notwithstanding the foregoing, the Administrative Agent and the Consenting Lenders hereby consent to the disclosure by WLH in the Plan, Disclosure Statement, Plan Related Documents, any exchange offer, rights offering, consent solicitation and related documents, memoranda or statements, and any filings by WLH with the Bankruptcy Court or the Securities and Exchange Commission or as required by law or regulation of the execution and contents of this Agreement.

*(Signature Pages Follow)*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

WILLIAM LYON HOMES,
a Delaware corporation

By: _____

Name:  Matthew R. Zaist
Title:    Executive Vice President

WILLIAM LYON HOMES, INC.
a California corporation

By: _____

Name: Matthew R. Zaist
Title:   Executive Vice President

COLFIN WLH FUNDING, LLC
a Delaware limited liability company

By: _____
     Name:
     Title:

Colfin WLH Funding, LLC, Lender

COLFIN WLH FUNDING, LLC
a Delaware limited liability company

By: _____
Name:        Mark M. Hedstrom
Title:        Vice President

COLFIN WLH FUNDING, LLC, as Lender
a Delaware limited liability company

By: _____
Name:        Mark M. Hedstrom
Title:        Vice President

[Signature Page to Restructuring Support Agreement]

Execution Version

## Schedule I

California Equity Funding, Inc., a California corporation
Cerro Plata Associates, LLC, a DE limited liability company
Circle G at the Church Farm North Joint Venture, LLC, an Arizona limited liability
company
Duxford Financial, Inc., a California corporation
Duxford Insurance Services LLC, a CA limited liability company
Duxford Title Reinsurance Co., an NV corporation
HSP, Inc., a California corporation
Laguna Big Horn, LLC, a DE limited liability company
Lyon East Garrison Company I, LLC, a California limited liability company
Lyon Waterfront, LLC, a Delaware limited liability company
Mountain Falls, LLC, a Nevada limited liability company
Mountain Falls Golf Course, LLC, a Nevada limited liability company
Nobar Water Company, a CA corporation
PH – LP Ventures, a California corporation
PH-Rielly Ventures, a California corporation
PH Ventures – San Jose, a California corporation
Presley CMR, Inc., a California corporation
Silver Creek Preserve, a CA nonprofit corporation
Sycamore CC, Inc., a California corporation
Whitney Ranch Village 5, LLC, a DE limited liability company
William Lyon Southwest, Inc., an Arizona corporation
WLH Enterprises, a California general partnership

**EXHIBIT A**
**Form of Assumption Agreement**

**EXHIBIT B**
**Backstop Commitment**

**EXHIBIT C**
**Noteholder Restructuring Support Agreement**

**EXHIBIT D**
**Restructuring Term Sheet**

CONFIDENTIAL
SETTLEMENT DISCUSSIONS SUBJECT TO FRE 408
(AND ANY STATE LAW EQUIVALENT)
SUBJECT TO LENDER REVIEW AND APPROVAL

NOT A COMMITMENT – FOR DISCUSSION PURPOSES ONLY

<u>Lender Term Sheet for the Potential In-Court Pre-Packaged Plan of Reorganization under Chapter 11 and Restructuring of the Senior Secured Term Loan Agreement</u>

This term sheet, including Schedule I hereto, sets forth the principal terms for (i) the potential in-court pre-packaged reorganization under chapter 11 of the Parent, the Borrower (each as defined below) and their respective subsidiaries (the "<u>Restructuring</u>") and (ii) restructuring the Senior Secured Term Loan Agreement, dated as of October 20, 2009 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Existing Credit Agreement</u>"), among William Lyon Homes, Inc., as Borrower, Colfin WLH Funding, LLC, as Administrative Agent, and Colfin WLH Funding, LLC, as Initial Lender and Lead Arranger, and the Lenders party thereto or their assigns (collectively, the "<u>Existing Lenders</u>"). Capitalized terms used and not defined herein shall have the meaning assigned to such term in the Existing Credit Agreement.

This term sheet is (a) for settlement and discussion purposes only under FRE 408 and (b) is not an offer to amend or otherwise modify the Existing Credit Agreement.

| | |
|---|---|
| Borrower: | William Lyon Homes, Inc., a California corporation (the "<u>Borrower</u>") |
| Guarantors | William Lyon Homes, a Delaware corporation and the sole shareholder of Borrower (the "<u>Parent</u>"); California Equity Funding, Inc., a California corporation; PH-LP Ventures, a California corporation; Duxford Financial, Inc., a California corporation; Sycamore CC, Inc., a California corporation; Presley CMR, Inc., a California corporation; William Lyon Southwest, Inc., an Arizona corporation; PH-Reilly Ventures, a California corporation; HSP, Inc., a California corporation; PH Ventures-San Jose, a California corporation; WLH Enterprises, a California General Partnership – formerly The Ranch Golf Club Co., formerly Carmel Mountain Ranch; Lyon East Garrison Company I, LLC, a California limited liability company; Lyon Waterfront, LLC, a Delaware limited liability company and any other subsidiary of Parent or Borrower that is required to become a party to the Unconditional Guaranty pursuant to the terms of the Existing Credit Agreement. |
| Lenders: | The Existing Lenders |
| Administrative Agent: | Colfin WLH Funding, LLC (in such capacity, the "<u>Administrative Agent</u>"). |
| Arranger: | Colfin WLH Funding, LLC (in such capacity, the "<u>Arranger</u>"). |
| Amended and Restated Credit Facility: | Upon the Closing Date, the Existing Credit Agreement will be amended and restated to reflect an increase in the outstanding principal amount of loans from $206 million to $235 million (the "<u>Amended Credit Agreement</u>"; and the loans thereunder, the "<u>New Term Loan</u>") in consideration of (x) the final settlement and satisfaction of the existing Make Whole Amount obligations, (y) a reduction in the interest rate as provided for below and (z) the other amendments and changes summarized herein and as otherwise reflected in the definitive form of Amended Credit Agreement satisfactory to the Administrative Agent and the Existing |

201644088 v8

Lenders, in their sole and absolute discretion. The Amended Credit Agreement shall be in form and substance substantially the same as the Existing Credit Agreement with such changes therein necessary to reflect the provisions of this Lender Term Sheet and such other changes as determined by the Administrative Agent and the Existing Lenders in their sole and absolute discretion.

**Maturity Date:** The New Term Loan shall be due and payable by the Borrower on the earlier to occur of the third (3rd) anniversary of the Closing Date and January 31, 2015 (the "Maturity Date").

**Closing Date:** The effective date (the "Closing Date") of a plan of reorganization for the Borrower, the Parent and all of the Guarantors that effectuates the restructuring outlined in this term sheet and which plan of reorganization is in form and substance acceptable to the Administrative Agent and the Lenders in their sole and absolute discretion (the "Plan"). The Closing Date shall occur no later than May 18, 2012.

**Senior Notes Exchange Offer; New Money Issuances:** Under the Plan, the restructuring of the Existing Credit Agreement shall take place on the Closing Date concurrent with, and contingent upon, the consummation of (a)(i) the issue of up to $75 million in initial principal amount of new second lien notes of the Borrower (the "New Second Lien Notes") and (ii) new common equity securities (Class A) of the Parent (the "Class A Equity"), which New Second Lien Notes and Class A Equity of the Parent shall be issued in exchange for all of the Borrower's existing senior notes and the Parent's existing guarantees thereof; (b) the issuance of new convertible preferred equity securities of the Parent (the "New Preferred Shares"), new common equity securities (Class C) of the Parent (the "Class C Equity") and new common equity securities (Class B) of the Parent (the "Class B Equity" and together with the Class A Equity and the Class C Equity, collectively, the "New Common Equity"), the cash proceeds of which will be at least $85 million (net of any fees payable under the Backstop Commitment Letter or the Equity Contribution Agreement to be entered into by the Parent, the Borrower and the other entities party thereto concurrently herewith) and be contributed by the Parent to the Borrower on the Closing Date.

Immediately following the Closing Date the outstanding principal balance of all indebtedness of the Borrower (not including indebtedness incurred or to be incurred in connection with the Mayfield Site (as defined below)) shall not exceed (in millions):

| | |
|---|---|
| New Term Loan | $235 |
| New Second Lien Notes | 75.0 |
| Project Specific Debt | 19.4 |
| Total Debt | 329.4 |

The New Second Lien Notes (and the definitive documentation in respect thereof) shall (x) have a maturity date later than the one-year anniversary of the Maturity Date and shall not provide for any principal amortization during the period that the New Term Loan is outstanding, (y) provide for cash interest of no greater than 8.0% per annum and PIK interest of no greater than 4.0% per annum during the period that the New Term Loan is outstanding (with a default rate no greater than 2% in excess thereof payable in-kind) and (z) otherwise be satisfactory to the

2

Administrative Agent in its sole and absolute discretion.

Distributions on the New Preferred Shares shall be subject to the restrictions on distributions set forth in the Amended Credit Agreement (as set forth below) and the New Preferred Shares (a) may provide for cash distributions not in excess of 4.0% per annum; however, if distributions are not paid in cash, such amount will be payable in kind, (b) may contain a liquidation preference, (c) shall not have any obligations that could trigger a default thereunder, and (d) shall be convertible to Class C Equity on a one-to-one basis.

| | |
|---|---|
| Interest Rate: | The New Term Loan will bear interest at the rate of 10.25% per annum, which shall be payable monthly in cash in arrears on the first business day of each month based on actual number of days elapsed over 365/6 days. |

Upon the occurrence and during the continuance of any payment default (regardless of any applicable grace period) or other event of default under the Amended Credit Agreement, the Loans (and any other amount payable under the Amended Credit Agreement) will bear interest at the rate 5% in excess of the base rate provided for above and any late payment will be subject to a late charge of 5%.

| | |
|---|---|
| Fees: | (a)     The Borrower shall pay, in cash on the Closing Date, a restructuring fee to the Lenders in an amount equal to $2.35 million. |

(b)     The Borrower shall pay to the Administrative Agent, an administrative agency fee in an amount equal to 0.10% per annum of the principal amount of the New Term Loan on the Closing Date. Such fee shall be payable quarterly in advance on the Closing Date and on each quarterly anniversary thereof occurring prior to the payment in full of the Amended Credit Agreement.

| | |
|---|---|
| Collateral: | Substantially the same as the Existing Credit Agreement except that the definition of "Excluded Assets" shall be modified to: (x) cap Excluded Assets constituting cash and deposit accounts utilized (I) for payroll, payroll taxes, and other employee wage and benefit payments or (II) to collateralize permitted letters of credit or reimbursement arrangements with respect to performance bonds, guarantees or suretyship bonds, at an amount equal to the sum of (A) the amount of deposits required by Fidelity in connection with providing title insurance as contemplated by the Amended Credit Agreement and the New Second Lien Notes not to exceed $5 million, plus (B) cash collateral for performance bonds as necessary to support and complete projects not to exceed $12.5 million; provided that the aggregate value of any cash or deposit accounts in respect of clause (I) above shall not exceed that amount payable on or prior to the next regularly scheduled payroll payment date for the Borrower's salaried employees; (y) cap Excluded Assets constituting Investments in Joint Ventures at an aggregate principal amount of $45 million less prior Investments in Joint Ventures constituting Excluded Assets existing on the Closing Date, but after giving effect to return of capital on any prior Investment (but not giving any credit for profit or return on such prior Investment) (such aggregate amount to be referred to herein as "<u>JV Excluded Amount</u>"); provided, however, that the JV Excluded Amount may be increased at any time after the second anniversary of the Closing Date by up to a maximum additional $20 million in Investments in Joint Ventures, in the |

3

aggregate (after giving effect to return of capital on any prior Investment, but not giving any credit for profit or return on such prior Investment), so long as the Borrowing Base ratio calculated for the two fiscal quarters immediately preceding the proposed date of such Investment is less than 60% and will remain less than 60% on a pro-forma basis after giving effect to (and deducting for) such Investment; and (z) the reference to "Excluded Property" shall be deleted.

In addition, the Borrower shall, or shall cause the applicable member of the Consolidated Group to, pledge to the Administrative Agent, on behalf of the Lenders, its equity interest in any Joint Venture in which the Borrower, or a member of the Consolidated Group, is an equity holder, together with a pledge of the proceeds therefrom, in each case on a first priority basis. The terms of the documents governing such Joint Venture shall be reasonably acceptable to the Lenders, based on parameters to be agreed upon, including provisions for distributions to the Borrower.

| | |
|---|---|
| Intercreditor and Subordination Agreement: | The respective rights and remedies of the holders of the New Second Lien Notes shall be subordinated to the obligations under the New Term Loan on terms satisfactory to the Arranger pursuant to an Intercreditor and Subordination Agreement (the "Intercreditor and Subordination Agreement") to be drafted by counsel to the Administrative Agent, which terms shall include the following: |

(i)     payment subordination of the New Second Lien Notes to all obligations (other than principal in excess of the Cap Amount (as defined below)) under the New Term Loan (and any refinancings or amendments thereof as provided below), including, but not limited to, principal (up to the Cap Amount) and interest, fees, costs, charges and expenses, indemnification amounts, amounts owed by the Guarantors and postpetition interest, fees, costs, charges and expenses, in each case whether incurred before or after an insolvency proceeding and whether or not such amounts are allowed by the Bankruptcy Court or other tribunal (the "Senior Obligations"). For the avoidance of doubt, the Cap Amount shall not apply to interest, fees, costs, charges and expenses, indemnification amounts, amounts owed by the Guarantors and postpetition interest, fees, costs, charges and expenses, in each case whether incurred before or after an insolvency proceeding and whether or not such amounts are allowed by the Bankruptcy Court or other tribunal.

Pursuant thereto, no payments of any kind will be made on the New Second Lien Notes, by set-off or in any other manner, other than, Permitted Junior Payments, unless and until all of the Senior Obligations under the New Term Loan have been indefeasibly paid in full in cash. "Permitted Junior Payments" will be defined in the definitive Intercreditor and Subordination Agreement but will include permitted scheduled interest payments on the New Second Lien Notes and, if the Maturity Date of the New Term Loan is extended beyond the scheduled maturity date of the New Second Lien Notes, scheduled payments of principal on the New Second Lien Notes. Notwithstanding the foregoing, no such payments will be permitted to be paid (x) during the pendency of an insolvency proceeding and (y) during the continuation of any Specified Senior Default (which shall include any payment, insolvency, judgment or cross-default events of default, events of default related to breaches of any covenants relating to the Borrowing Base, Excluded Assets or Distributions and certain other material events of default to be agreed in

4

the definitive Intercreditor and Subordination Agreement); provided that the Borrower may continue to make any scheduled interest payment on the New Second Lien Notes in kind (and not in cash or other property) by capitalizing and adding such interest payment to the outstanding principal amount of such New Second Lien Notes;

(ii)    absolute lien priority of all Senior Obligations under the New Term Loan over the New Second Lien Notes (including no lien in favor of the New Second Lien Notes not pledged to senior obligations), with the New Second Lien Notes having only "silent" rights during a 360-day standstill period (e.g., right to file proof of claim, join (but not exercise control over) a foreclosure action initiated by Administrative Agent and right to protect, enforce and secure Second Lien position, but waiver of all other voting or consent rights).  Liens securing obligations under the New Second Lien Notes will be pari passu in all respects on the collateral securing any obligations under the New Term Loan in excess of the Senior Obligations;

(iii)    exclusive enforcement of claims by Administrative Agent (with waivers by New Second Lien Notes) with respect to the Collateral during the 360-day standstill period; provided that during the pendency of an insolvency proceeding the New Second Lien Notes shall have the right to propose a plan of reorganization that indefeasibly pays off the New Term Loan in full in cash and to pursue rights and remedies as unsecured creditors; at the end of such 360-day period, the New Second Lien Notes shall be able to exercise any and all rights and remedies;

(iv)    agreement by the holders of the New Second Lien Notes that (x) the Lenders shall be entitled to post petition interest and reasonable fees, costs and expenses incurred in any insolvency proceeding and no holder of New Second Lien Notes or the Trustee shall object to the payment of such post petition interest and reasonable fees, costs, charges and expenses (the Lenders and the Administrative Agent shall agree that the New Second Lien Notes are similarly entitled to such post petition interest, fees, costs, charges and expenses to the extent that the value of the collateral securing the New Second Lien Notes is determined to exceed the amount of the claims of the Administrative Agent and the Lenders plus the amount of principal and interest due and owing on the New Second Lien Notes as of the date of the commencement of the insolvency proceeding), (y) the holders of the New Second Lien Notes will not object to DIP financing provided by the Lenders (or any DIP financing to which the Lenders do not object) in an amount not in excess of a cap to be agreed upon and so long as (i) interest rate, fees and advance rate of any such DIP are commercially reasonable under the circumstances, (ii) any such DIP does not compel any debtor to seek confirmation of a specific plan of reorganization for which all, substantially all or any material portion of the material terms are set forth in the DIP documentation, (iii) any DIP documentation does not expressly require the liquidation of the Collateral prior to a default under the DIP documentation and (iv) in the event the Administrative Agent and the Lenders receive adequate protection in the form of a superpriority claim and replacement liens on assets of the debtors (the "Subject Assets"), the holders of the New Second Lien Notes and the Trustee shall not object to the grant of such adequate protection and the holders of the New Second Lien Notes shall receive adequate protection in the form of a superpriority claim

5

and replacement liens on the Subject Assets, junior only to such DIP financing and the New Term Loan up to the agreed cap, to the extent it is determined by the applicable bankruptcy court judge that the Trustee and the holders of the New Second Lien Notes are entitled to receive such adequate protection, and (z) the holders of the New Second Lien Notes will not provide any DIP financing secured by liens senior to or pari passu with the liens securing the New Term Loan or with a superpriority claim that is senior to or pari passu with any superpriority claim of the Lenders and the Administrative Agent, although the holders of the New Second Lien Notes will have the right to purchase, or cause the repurchase, of the New Term Loan at par at such times and on such other terms to be agreed in the definitive Intercreditor and Subordination Agreement;

(v)     application of proceeds of any recovery strictly in accordance with priorities set forth in the Intercreditor and Subordination Agreement and disposition and release of collateral upon direction of Administrative Agent;

(vi)     customary limitations of New Second Lien Notes' and their representatives' and holders' rights and powers during an insolvency proceeding, including a restriction on the right to vote in favor of any plan of reorganization unless it provides for the payment in full in cash of the New Term Loan or credit bid on the Collateral unless such bid provides for the payment in full in cash of the New Term Loan; and

(vii)     for purposes of this term sheet, "Cap Amount" shall mean the sum of (a) the greater of (1) 120% of the principal amount on the Closing Date and (2) 65% of the Borrowing Base and (b) an aggregate principal amount not to exceed $25,000,000 for protective advances permitted under the Existing Credit Agreement and the Loan Documents executed in connection therewith.

| | |
|---|---|
| **Refinancings of the Amended Credit Agreement:** | At any time while the Intercreditor and Subordination Agreement remains in effect for the benefit of the New Second Lien Notes, the Amended Credit Agreement may, in accordance with its terms, be amended, restated, modified, supplemented, extended, repaid, reborrowed, increased, renewed, replaced or refinanced, in whole or in part, at any time; provided, that no such amendment, restatement, modification, supplement, extension, repayment, reborrowing, increase, renewal, replacement or refinancing of the Credit Facilities (collectively referred to as a "First Lien Refinancing" or the "Refinanced Credit Agreement") so long as: |

(i)     the principal amount of the Refinanced Credit Agreement does not exceed the Cap Amount, except by an amount equal to accrued interest, discounts, premiums thereon and fees and expenses incurred in connection with such refinancing; and

(ii)     no additional collateral is pledged to support the First Lien Refinancing unless such collateral is also pledged to the Second Lien Notes and treated in accordance with the Intercreditor and Subordination Agreement.

To the extent that the principal amount of the Refinanced Credit Agreement exceeds the Cap Amount, other than amounts arising as a result of accrued interest, discounts, premiums thereon and fees and expenses incurred in connection with such refinancing, such principal amount shall rank pari passu in

6

right of payment and lien priority with the New Second Lien Notes.

| | |
|---|---|
| Refinancing of the New Second Lien Notes: | The New Second Lien Notes may, in accordance with their terms, be amended, restated, modified, supplemented, extended, renewed, replaced or refinanced, in whole or in part, (collectively referred to as a "Second Lien Refinancing" or the "Refinanced Second Lien Notes") at any time so long as: |

(1) The representatives of such Refinanced Second Lien Notes shall become parties to the Intercreditor and Subordination Agreement;

(2) Such Refinanced Second Lien Notes shall (w) have a maturity date later than the one-year anniversary of the maturity date of the New Term Loan (x) have a principal balance no greater than the amount outstanding immediately prior to such Second Lien Refinancing (except by an amount equal to accrued interest, discounts, premiums thereon and fees and expenses incurred in connection with such refinancing) and not provide for any principal amortization during the period that the New Term Loan is outstanding, (y) provide for cash interest of no greater than 8.0% per annum and PIK interest of no greater than 4.0% per annum during the period that the New Term Loan is outstanding (with a default rate no greater than 2% in excess thereof) and (z) otherwise be satisfactory to the Administrative Agent in its sole and absolute discretion; and

(3) No additional collateral is pledged to support such Refinanced Second Lien Notes unless such collateral is also pledged to secure the New Term Loan and treated in accordance with the Intercreditor and Subordination Agreement.

| | |
|---|---|
| Prepayment | The New Term Loan may be prepaid at any time without penalty or premium. |
| Reporting Requirements: | Substantially the same as the Existing Credit Agreement except that Borrower shall be permitted 30 days after end of each fiscal quarter to deliver preliminary Borrowing Base Report |
| Financial Covenants: | Substantially the same as the Existing Credit Agreement except that: |

(a) the Tangible Net Worth test shall be deleted; and

(b) The Borrowing Base shall be set at an advance ratio against Unrestricted Cash, plus Escrow Receivables, plus Eligible Real Property Collateral Valuation in an amount equal to the percentages set forth below for the applicable periods.

| Period | Advance Ratio |
|---|---|
| From the Closing Date through but excluding the 1st anniversary of the Closing Date | 67.5% |
| From the 1st anniversary of the Closing Date through but excluding the 2nd anniversary of the Closing | 65% |

7

201644088 v8

| Date | |
|---|---|
| From the 2nd anniversary of the Closing Date and thereafter | 60% |

8