| | |
|---|---|
| Other Covenants: | Substantially the same as provided in the Existing Credit Agreement except as follows: |

Transactions with Affiliates: In addition to the restrictions set forth in the Existing Credit Agreement, the Borrower and the Parent shall deliver to the Administrative Agent (a) an officer's certificate certifying that such transaction is on terms no more favorable than those that would be obtained from an unaffiliated third party and otherwise complies with the requirements of the Amended Credit Agreement for transactions in excess of $2 million and (b) a fairness opinion or written appraisal by an independent financial advisor for transactions in excess of $10 million.

Limitations on Equity Distributions: The Borrower shall be restricted from making any distribution on its equity securities (whether in the form of amounts paid as dividends, redemptions or repurchases or otherwise) other than regularly scheduled distributions in respect of the New Preferred Shares not to exceed 4.0% per annum.

Pledge of Equity Securities: No member of the Consolidated Group shall be permitted to pledge the equity securities of a Joint Venture in connection with permitted financing arrangements for such Joint Venture unless such permitted financing is fully non-recourse to the Borrower, the Parent and/or any other member of the Consolidated Group. If the equity securities of a Joint Venture are pledged in connection with a permitted financing arrangement for such Joint Venture, the Administrative Agent, on behalf of the Lenders, shall either release or subordinate its lien on such equity securities concurrently with the pledge thereof; provided that concurrently with the repayment of such permitted financing arrangements the equity securities of such Joint Venture shall be pledged, on a first priority basis, to the Administrative Agent, on behalf of the Lenders, and the proceeds from such Joint Venture, after repayment of the permitted financing, shall be promptly distributed to the equity holders thereof and subject to the lien of the Administrative Agent.

Limitations on Indebtedness: No member of the Consolidated Group (other than the Borrower subject to and as provided in the immediately preceding paragraph) will be permitted to incur secured Indebtedness other than the New Term Loan and the Indebtedness under the New Second Lien Notes (not to exceed $75 million plus increases in such amount as a result payments of interest on the New Second Lien Notes in-kind).

In addition, (a) subject to clause (b) below, the Borrower or any Joint Venture shall be entitled to incur secured Indebtedness which (i) in the case of a Joint Venture, may be guaranteed by the Borrower and/or the Parent or (ii) in the case of the Borrower, is a recourse loan secured by real estate, in the maximum principal amount not to exceed $100 million in the aggregate for both of clauses (i) and (ii), to be used solely for horizontal and vertical construction and for any land acquisition costs; provided that (x) in the case of land acquisition transactions, the principal amount of such Indebtedness shall not exceed $20 million in the aggregate for all such land acquisition costs and shall be secured by a first priority lien on and not exceed 50% of the lesser of the value or costs of the collateral securing such Indebtedness, and (y) in the case of Indebtedness used for

9

horizontal and vertical construction transactions in which the Borrower or such Joint Venture (as applicable) commences development within 12 months after acquisition, the principal amount of such Indebtedness shall be secured by a first priority lien on and shall not exceed 60% of the lesser of the value or cost (including land acquisition cost) of the collateral securing such Indebtedness (which, in the case of vertical construction, may be the value of the collateral as developed), and (z) any such Indebtedness shall be (A) on terms and conditions reasonably approved at such time by the Existing Lenders and (B) subject to additional covenants and restrictions to be determined in the Amended Credit Agreement; (b) the Borrower or the Parent may incur up to $50 million of unsecured recourse indebtedness to be used by the Borrower or the Parent for general working capital purposes, provided that any such Indebtedness incurred by the Borrower or the Parent under this clause (b) shall reduce the amount of Indebtedness available to be borrowed by any Joint Venture under clause (a) above on a dollar for dollar basis and shall be on terms reasonably satisfactory to the Lenders; and (c) the Borrower, or, if applicable, a Joint Venture, shall be entitled to incur $60 million of Indebtedness in the aggregate in connection with the development of the property subject to the HP/Palo Alto Purchase Option (the "Mayfield Site"), which Indebtedness shall be secured by the Mayfield Site and may be recourse to the Borrower.

In the case of Indebtedness used for land acquisition transactions as provided in clause (a)(x) above, the Lenders shall have the right of first refusal to provide such Indebtedness.

The Borrower shall grant ColFin WLH Funding, LLC (or one of its Affiliates) a right of first refusal, in form and substance acceptable to Administrative Agent and Lenders in their sole and absolute discretion, to provide equity financing for the Mayfield Site and its subsequent development thereof.

| | |
|---|---|
| Releases: | Blanket releases of the Administrative Agent and Existing Lenders by the Borrower, Parent and Guarantors (and their respective shareholders and affiliates) and the existing senior note holders and indemnification by the Borrower and Guarantors. The Plan will provide for releases from all creditors and other parties in interest to the maximum extent permitted by law. |
| Other Considerations / Conditions Precedent: | Occurrence of the effective date of the Plan shall be subject to closing conditions, including no legal impediment to or restraint on consummation of the Restructuring, satisfactory to the Administrative Agent in its sole and absolute discretion, including the Borrower (a) entering into employment contracts with General William Lyon and William H. Lyon on terms and conditions, including base salary, bonus compensation, and non-competes, satisfactory to the Lenders in their sole and absolute discretion, (b) restructuring the Project Specific Debt, including the debt of CF Owner and MF Owner, on terms and conditions satisfactory to the Lenders in their sole and absolute discretion, (c) having obtained all necessary consents and approvals (including any required government consents or approvals) to the consummation of the Plan and the Restructuring, (d) having received votes in favor of the Restructuring, by the holders of the Borrower's existing senior notes as required by section 1126(c) of the Bankruptcy Code, and all necessary and appropriate lockups and documentation necessary or appropriate from such holders, agreeing to be bound by the Restructuring, and (e) |

10

together with the Guarantors, the Administrative Agent, the Lenders, and each other applicable party having executed and delivered definitive documentation satisfactory to the Lenders in their sole and absolute discretion, including the Intercreditor and Subordination Agreement, and appropriate equity documents with respect to the New Common Equity.

The Administrative Agent and the Lenders' agreement to any such restructuring, including the Restructuring, and the restructuring of their outstanding loans as set forth in this term sheet is conditioned upon any use of the Lenders' cash collateral and any debtor in possession financing incurred by any of the Borrower or the Guarantors being on terms acceptable to the Administrative Agent and the Lenders in their sole and absolute discretion.

201644088 v8

SCHEDULE I

NEW COMMON EQUITY

## Class A Equity

1. The Class A Equity will initially represent 28.5% of the outstanding capital stock of the Parent after the Closing Date on a fully diluted basis, after giving effect to the Restructuring, but prior to the effectiveness of any management incentive plan or the issuance of Warrants (as defined below).

2. The Class A Equity will carry one vote per share and will have the right to appoint one director to a seven-director board.

3. The holders of a majority of the Class A Equity will have the right, subject to customary market exceptions and on terms and conditions satisfactory to the Lenders in their sole and absolute discretion, to compel an initial public offering of the Parent's New Common Equity.

## Class B Equity

1. The Class B Equity will initially represent 20.0% of the outstanding capital stock of the Parent after the Closing Date on a fully diluted basis and after giving effect to the Restructuring, but prior to the effectiveness of any management incentive plan or the issuance of Warrants.

2. The Class B Equity will carry two votes per share until transferred by the original holders.  Upon transfer of the Class B Equity by the original holders to any person or entity (other than a family member, heir, trust, estate planning device or similar transferee), the Class B Equity will automatically convert to Class A Equity, with one vote per share.

3. The Class B Equity will have the right to appoint two directors to a seven-director board.

## Class C Equity

1. The Class C Equity (together with the New Preferred Shares) will initially represent 51.5% (which includes a backstop fee payable to certain holders of the Borrower's existing senior notes) of the outstanding capital stock of the Parent after the Closing Date on a fully diluted basis, after giving effect to the Restructuring, but prior to the effectiveness of any management incentive plan or the issuance of the Warrants.

2. The Class C Equity will carry one vote per share and, together with the holders of the New Preferred Shares) will have the right to appoint two directors to a seven-director board.

## Day-to-Day Management of the Parent and the Borrower

No consent from any of the holders of the New Common Equity will be required for the day-to-day operations of the Borrower and/or the Parent.

## Board of Directors

The Parent's Board of Directors shall consist of seven members of which (a) five members shall be elected by the New Common Equity as set forth in this Schedule I and (b) two members shall be

201644088 v8

independent directors serving a one-year term who are initially satisfactory to the holders of (i) 66 2/3% of the Class A Equity, (ii) a majority of the Class B Equity and (iii) a majority of the New Preferred Shares and the Class C Equity voting as a class. Thereafter, the appointment of one new independent director will be subject to the approval of the holders of (x) 66 2/3% of the Class A Equity, (y) a majority of the Class B Equity and (z) the Class C Equity and New Preferred Shares (with the Class C Equity and the New Preferred Shares voting together). The other new independent director will be appointed by the holders of a majority of the Class C Equity and the New Preferred Shares, voting together.

## Warrants

In consideration for intrinsic value, the Parent will issue to the holders of its existing equity warrants to purchase Class B Equity ("Warrants") representing an additional 9.1% of the capital stock of the Parent on a fully-diluted basis (but before giving effect to any management incentive plan), at a strike price based on a $325 million equity value of the Parent.

After giving effect to the issuance of the Warrants, but before giving effect to any management incentive plan, the Class A Equity will represent 25.9% of the capital stock of the Parent, the Class B Equity will represent 27.3% of the capital stock of the Parent, and the Class C Equity (assuming full conversion of the New Preferred Shares) will represent 46.8% of the capital stock of the Parent.

## Management Incentive Plan

The Parent may enter into an incentive plan with management that is on terms and conditions satisfactory to the Lenders in their sole and absolute discretion.

13

**Plan Exhibit D**

Noteholders RSA

RESTRUCTURING SUPPORT AGREEMENT

RESTRUCTURING SUPPORT AGREEMENT (this "Agreement"), dated as of November 4, 2011, by and among (i) William Lyon Homes, Inc., a California corporation ("the Company") and William Lyon Homes, a Delaware corporation and the sole shareholder of the Company ("the Parent") on behalf of themselves and the subsidiaries listed on Schedule I hereto (collectively, "WLH") and (ii) the undersigned, each as the beneficial owners or advisor, nominee or investment manager for beneficial owners of Notes (as defined herein) issued by the Company (the "Consenting Noteholders"[1] and, together with the Company and the Parent, each referred to as a "Party" and collectively referred to as the "Parties").

## WHEREAS:

A.       Prior to the date hereof, representatives of WLH, the *ad hoc* steering committee representing the Consenting Noteholders (together with any successor committee thereto, the "Committee") and the Consenting Noteholders have engaged in good faith negotiations to discuss and address the possibility of the Consenting Noteholders supporting and consummating a financial restructuring of WLH indebtedness and other obligations (the "Restructuring") as set forth in this Agreement and the accompanying Restructuring Term Sheet (as defined herein).

B.       It is anticipated that the Restructuring may be implemented through a solicitation of votes (the "Solicitation") for a chapter 11 plan of reorganization of WLH (which may be a pre-packaged or pre-negotiated plan), pursuant to applicable non-bankruptcy law and/or, as applicable, sections 1125, 1126 and 1145 of the Bankruptcy Code (the "Plan") containing in all material respects the same terms and conditions set forth in the Restructuring Term Sheet and in form and substance acceptable to the Requisite Noteholders (as defined below), the Company and the Parent.

C.       The Consenting Noteholders have agreed, subject to the terms and conditions set forth in this Agreement to support (i) the commencement of the Chapter 11 Cases to implement this Agreement and the Restructuring Term Sheet by WLH, and (ii) confirmation by the Bankruptcy Court of the Plan.

D.       This Agreement and the Restructuring Term Sheet, which is incorporated herein by reference and is made part of this Agreement, set forth the agreement among the Parties concerning their commitment, subject to the terms and conditions hereof and thereof, to implement the Restructuring. In the event the terms and conditions as set forth in the Restructuring Term Sheet and this Agreement are inconsistent, the terms and conditions contained in the Restructuring Term Sheet (and the Plan Related Documents) shall govern.

---

[1]       A list of the Consenting Noteholders, together with their respective addresses for Notice pursuant to Section 29 hereof, is set forth on Schedule II hereto.

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

1.    <u>Definitions</u>.  The following terms used in the Agreement shall have the following definitions:

"<u>Agreement</u>" has the meaning set forth in the preamble hereof.

"<u>Backstop Commitment</u>" means that certain Backstop Commitment Agreement dated as of the date hereof, by and among the Company, the Parent and the investors listed on Schedule III, attached hereto as Exhibit C.

"<u>Backstop Order</u>" means an order of the Bankruptcy Court approving the Backstop Commitment and authorizing the Company to assume the Backstop Commitment.

"<u>Ballot</u>" means the ballot distributed with the Disclosure Statement for voting on the Plan.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§101 *et seq*., as amended from time to time and applicable to the Chapter 11 Cases.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of Delaware.

"<u>Business Day</u>" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York, New York are authorized by law or other governmental action to close.

"<u>Cash Balance</u>" means WLH's cash on hand that is available for use in its operations.

"<u>Chapter 11 Cases</u>" means the chapter 11 cases of WLH.

"<u>Colony RSA</u>" means that certain Restructuring Support Agreement dated as of the date hereof, in substantially the form attached hereto as Exhibit D, by and among the Company, the Parent, ColFin WLH Funding, LLC, as Administrative Agent, as Lead Arranger and as a Lender and the other Lenders party to that certain Secured Term Loan Agreement dated as of October 20, 2009, as heretofore amended.

"<u>Confirmation Hearing</u>" means the hearing before the Bankruptcy Court on confirmation of the Plan.

"<u>Confirmation Order</u>" means an order in a form and substance reasonably acceptable to the Requisite Noteholders (as defined herein) and WLH entered by the Bankruptcy Court confirming the Plan, including all exhibits, appendices, supplements and related documents, consistent in all material respects with this Agreement and the Restructuring Term Sheet; and such order shall, unless waived by the Requisite Noteholders in writing, shall be a Final Order.

"Consent Solicitation Materials" means the Disclosure Statement and other solicitation materials in respect of the Plan to be approved by the Bankruptcy Court pursuant to section 1126(b) of the Bankruptcy Code to be provided to the Consenting Noteholders.

"Consenting Noteholders" means the informal group of investors who are holders (or advisors, nominees or investment managers having authority to vote on behalf of beneficial holders) of Noteholder Claims, comprised of the entities listed on Schedule II hereto together with (i) their respective successors and assigns, and (ii) any holder of Notes who after the date hereof executes a counterpart to this Agreement or takes the actions required of a transferee in accordance with Section 7.

"Corporate Governance Documents" means the following corporate governance documents of WLH, as applicable: (i) the articles of incorporation or certificate of formation, (ii) the by-laws and (iii) any applicable registration rights agreement.

"Court Date" means any Business Day on which the Bankruptcy Court is open.

"DIP Facility" means a debtor-in-possession senior secured superpriority loan facility or similar loan facility and all related loan documents thereto to be entered into by and among WLH, as debtors in possession, and the agent and lender or lenders thereto in form and substance reasonably acceptable to the Requisite Noteholders.

"DIP Facility Motion" means a motion, in form and substance reasonably acceptable to the Requisite Noteholders, that will be filed by WLH seeking Bankruptcy Court approval of the DIP Facility.

"DIP Facility Order" means an order of the Bankruptcy Court entered in the Chapter 11 Cases granting the relief requested in the DIP Facility Motion and approving the DIP Facility and authorizing WLH to enter into the DIP Facility, in form and substance reasonably acceptable to the Requisite Noteholders.

"Disclosure Statement" means, in respect of the Plan, the disclosure statement and all exhibits, schedules, supplements, modifications and amendments, which shall be in form and substance reasonably acceptable to the Requisite Noteholders and WLH.

"ECA" means that certain Equity Commitment Agreement dated as of the date hereof, by and among the Company, the Parent and the investors listed on Schedule IV, in substantially the form attached hereto as Exhibit E.

"Effective Date" means the date on which the Plan becomes effective.

"Final Order" means an order of the Bankruptcy Court as to which the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, new trial, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Consenting Noteholders, or, in the event that an appeal,

writ of certiorari, new trial, reargument, or rehearing thereof has been sought, no stay pending appeal has been granted or such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or certiorari, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not preclude such order from being a Final Order.

"Liquidity Event" means the date on which, prior to December 19, 2011, the Cash Balance is determined to be less than $5,000,000 (which determination shall be made by the Company's financial advisor in good-faith after consultation with the financial advisors to the Consenting Noteholders).

"New Notes Documents" means the indenture governing the "New Notes" (as defined in the Restructuring Term Sheet) and the related notes, guarantees, security documents, deeds of trust and intercreditor agreement.

"Non-material Subsidiaries" means any one or combination of subsidiaries of the Company and the Parent that have total tangible assets of less than $1,000,000 in the aggregate for all such subsidiaries on a combined basis.

"Noteholder Claims" means all claims (as that term is defined in section 101(5) of the Bankruptcy Code) arising under or relating to (i) the Notes (as defined below) and/or the indentures pursuant to which the Notes were issued, and (ii) all agreements and instruments relating to the foregoing (including, but not limited to, any guarantees with respect thereto) that remain unpaid and outstanding as of the Effective Date.

"Notes" means, collectively, (i) the 7½% Senior Notes due 2014 issued by the Company, (ii) the 10¾% Senior Notes due 2013 issued by the Company, and (iii) the $7^5/_8$% Senior Notes due 2012 issued by the Company.

"Office Lease" means the lease dated April 1, 2003, by and between CA Lyon and the William Harwell Lyon 1076 Trust, as amended.

"Outside Date" means the 17th day after the entry of the Confirmation Order (or, if such day is not a Court Date, the next succeeding Court Date).

"Parties" has the meaning set forth in the preamble hereof.

"Person" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group or any legal entity or association.

"Petition Date" means the date the Chapter 11 Cases are commenced.

"Plan" has the meaning set forth in the Preamble hereof.

"Plan Related Documents" means the ECA, the Backstop Commitment, the Colony RSA, the DIP Facility, the Backstop Order, the RSA Motion, the RSA Order, the DIP Facility Order, the New Notes Documents, the Plan, the Disclosure Statement, the Consent Solicitation Materials, the Confirmation Order, and any other documents or agreements filed with the Bankruptcy Court by WLH or at WLH's direction that are reasonably acceptable in form and substance to the Requisite Noteholders, the Company and the Parent and necessary to implement the Plan, including any appendices, amendments, modifications, supplements, exhibits and schedules relating to the Plan or the Disclosure Statement, including: (a) any term sheet and/or commitment letter for any proposed exit financing facility; (b) any operative documents for any proposed exit financing facility; (c) any documents disclosing the identity of the members of the board of directors of any of the reorganized debtors and the nature of and compensation for any "insider" under the Bankruptcy Code who is proposed to be employed or retained by any of the reorganized debtors; (d) any list of material executory contracts and unexpired leases to be assumed, assumed and assigned, or rejected; (e) a list of any material retained causes of action; (f) the certificates of incorporation and bylaws for the reorganized debtors; (g) any registration rights agreement; and (h) any stockholders agreement;

"Post-Petition" means the time period beginning immediately upon the filing of the Chapter 11 Cases and ending on the Effective Date.

"Requisite Noteholders" means the percentage of the Consenting Noteholders that is required by the terms of the arrangement among the Consenting Noteholders to approve any applicable action or the waiver of any applicable action in connection with this Agreement.

"Restructuring Term Sheet" means that certain term sheet containing the material terms and provisions of the Restructuring, as agreed upon by the Parties hereto, a copy of which is attached hereto as Exhibit A.

"Rights Offering " means a private placement rights offering or a private placement of Class C Common Shares and Preferred Shares offered to accredited investors in exchange for $60 million in cash.

"Rights Offering Motion" means a motion seeking approval by the Bankruptcy Court of the procedures for, and any documents concerning, the Rights Offering, which procedures and documents shall be in form and substance reasonably acceptable to the Requisite Noteholders.

"Rights Offering Order" means an order of the Bankruptcy Court granting the Rights Offering Motion, which order shall be in form and substance reasonably acceptable to the Requisite Noteholders.

"RSA Motion" means a motion, in form and substance reasonably acceptable to the Requisite Noteholders, the Parent and the Company that may be filed by WLH on the Petition Date seeking Bankruptcy Court approval of this Agreement and authorizing WLH to assume this Agreement Post-Petition.

"RSA Order" means an order of the Bankruptcy Court granting the relief requested in the RSA Motion and approving this Agreement and authorizing WLH to assume this Agreement Post-Petition.

"Termination Date" has the meaning set forth in Section 5 hereto.

"Termination Event" has the meaning set forth in Section 5 hereto.

"Transaction Expenses" has the meaning set forth in Section 34 hereto.

"Transfer" has the meaning set forth in Section 7 hereto.

2.    Action, Consent, or Approval of Consenting Noteholders.  For purposes of this Agreement, unless otherwise specified, where this Agreement provides for the action, consent, approval or waiver of the Consenting Noteholders collectively, such action, consent, approval or waiver shall be upon the agreement of the Requisite Noteholders.  The Consenting Holders shall instruct Milbank, Tweed, Hadley & McCloy LLP ("Milbank"), in its capacity as counsel to the Committee and the Consenting Noteholders, to communicate in writing to the Company or the Parent whether the Requisite Noteholders have agreed to any such action, consent, approval or waiver.

3.    Commitment of Consenting Noteholders.  Subject to the terms and conditions hereof and in the Restructuring Term Sheet, each Consenting Noteholder (severally and not jointly), agrees that, so long as no Termination Event has occurred:

(a)    so long as its vote has been properly solicited pursuant to applicable non-bankruptcy law and sections 1125 and 1126 of the Bankruptcy Code and Rules 3017 and 3018 of the Bankruptcy Rules, such Consenting Noteholder shall (i) vote all Noteholder Claims, now or hereafter beneficially owned by such Consenting Noteholder or for which it now or hereafter serves as the nominee, investment manager or advisor for beneficial holders thereof, in favor of the Plan in accordance with the applicable procedures set forth in the Consent Solicitation Materials and, to the extent such election is available, shall not elect on its ballot to preserve any claims (in respect of the Noteholder Claims that each Consenting Noteholder may own) that may be affected by any releases provided for under the Plan, and timely return a duly executed Ballot in connection therewith; and (ii) to take such other actions deemed reasonably appropriate in support of the Plan, which actions may include providing a letter in support of the Plan to be included with the Consent Solicitation Materials; provided, however, no Consenting Noteholder shall be obligated to vote in favor of the Plan, and each Consenting Noteholder may, acting individually and of its own accord, withdraw or revoke its tender, consent or vote with respect to the Plan upon and after (x) a Termination Event or (y) the withdrawal, amendment, modification of, or the filing of a pleading seeking to withdraw, amend or modify, the Plan, Disclosure Statement or other Plan Related Documents in a manner which is inconsistent with the Restructuring Term Sheet in a manner materially adverse to the Consenting Noteholders (in their capacity as such);

(b)    it shall not withdraw or revoke its tender, consent or vote with respect to the Plan except as otherwise expressly permitted pursuant to subsection (a) above;

#4836-8272-2061                               - 6 -

(c)    except as expressly permitted pursuant to subsection (a) above, following the commencement of the Chapter 11 Cases, it shall not (i) object to Bankruptcy Court approval of the Disclosure Statement or the consummation of the Restructuring Term Sheet or Plan, or any efforts to obtain acceptance of, to confirm, implement or consummate the Plan; (ii) initiate any legal proceedings, that are inconsistent with, or that would delay, prevent, frustrate or impede the approval, confirmation or consummation of, the Restructuring, the Disclosure Statement or the Plan or the transactions outlined therein or in the Restructuring Term Sheet or otherwise commence any proceeding to oppose any action or any of the Plan Related Documents, take any other action that is barred by this Agreement, so long as the Plan and all other Plan Related Documents contain terms and conditions effectuating the Restructuring that conform in all material respects to the Restructuring Term Sheet and this Agreement, subject to the rights of the Consenting Noteholders under subsection (a) of this Section 3 or accelerate, or vote or instruct any person to vote or take any other action to accelerate, the maturity of the Notes based on any failure by the Company to make, prior to the end of the applicable grace period, the interest payment on its 10¾% Notes due 2013, or enforce any rights or remedies against the Company in connection therewith; (iii) vote for, consent to, support or participate in the formulation of any other restructuring or settlement of WLH's claims or equity interests, any other transaction involving WLH, any of its assets or any of its stock, or any plan of reorganization (with the sole exception of the Plan) or liquidation under any bankruptcy, insolvency or similar laws, whether domestic or foreign, in respect of WLH; (iv) directly or indirectly seek, solicit, support, formulate entertain, encourage or engage in any inquiries, or discussions, or enter into any agreements relating to, any restructuring, plan of reorganization, receivership, proposal or offer of dissolution, winding up, liquidation, reorganization, merger, transaction, sale, assignment for the benefit of creditors, or restructuring in any manner of WLH (or any of its assets, liabilities or equity interests) other than the Plan or as otherwise set forth in the Restructuring Term Sheet; or (v) solicit, encourage, or direct any Person, including, without limitation, any trustee of any indenture governing the Notes, to undertake any action set forth in clauses (i) through (iv) of this subsection (c).

(d)    Notwithstanding the foregoing provisions of subsections (a), (b) and (c), nothing in this Agreement shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases so long as such appearance and the positions advocated in connection therewith are consistent with this Agreement and the Restructuring and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the Restructuring.

(e)    Notwithstanding anything contained in this Agreement, neither a vote to accept the Plan by a Consenting Noteholder, nor the acceptance of the Plan by any class of creditors, shall in any way be deemed to impair or waive the rights of a Consenting Noteholder to assert or raise any objection otherwise permitted under subsections (a), (c) or (d) in connection with the Plan or the Chapter 11 Cases.

(f)    Each Consenting Noteholder hereby waives until the Termination Date any default that might otherwise occur under the Notes or the indentures governing the Notes by reason of any failure of WLH to comply with Section 4.13 of the indentures

#4836-8272-2061                          - 7 -

governing the Notes (Additional Note Guarantees) as such provision relates to requiring guarantees and related documents from Lyon Mayfield, Inc. or Lyon Mayfield, LLC (collectively, "Mayfield"); provided, that (i) WLH has not transferred or disposed of its equity interests in Mayfield and (ii) Mayfield has not incurred any indebtedness other than the Qina financing (and any refinancing thereof) and any trade or similar obligations incurred in the ordinary course of business.

4.    Commitment of the Company and the Parent.  Subject to their fiduciary duties as debtors in possession, the Company and the Parent agree to (i) support and use reasonable best efforts to complete the Restructuring and all transactions contemplated under the Plan, (ii) take any and all necessary and appropriate actions in furtherance of the Restructuring and the transactions contemplated under the Plan, (iii) use their reasonable best efforts to complete the Restructuring and all transactions contemplated in the Restructuring Term Sheet, this Agreement and the Plan within the time-frame outlined herein, (iv) obtain any and all required regulatory and/or third party approvals for the Restructuring, (v) support assumption of the Office Lease (and in no event vote to reject the Office Lease) and (vi) take no actions inconsistent with this Agreement, the Restructuring Term Sheet, or the confirmation and consummation of the Plan.

5.    Termination by Consenting Noteholders.  (i) This Agreement may be terminated by the Requisite Noteholders upon the occurrence of any of the following events (each a "Termination Event"):

(a)    There shall have occurred a material breach under the ECA, the Colony RSA, the Backstop Commitment or the DIP Facility, or the ECA, the Colony RSA, the Backstop Commitment or the DIP Facility shall have been terminated;

(b)    WLH shall have failed to provide the Consenting Noteholders and the Committee with drafts of the Disclosure Statement and Plan by November 8, 2011;

(c)    The Petition Date shall not have occurred on or before December 19, 2011;

(d)    WLH fails to file the Plan and the Disclosure Statement on the Petition Date, unless both a Liquidity Event has occurred and the Chapter 11 Cases have been commenced by November 17, 2011, in which case WLH fails to file the Plan and Disclosure Statement by November 17, 2011;

(e)    The Solicitation has not commenced by November 17, 2011, unless, prior to such date, a Liquidity Event has occurred and the Chapter 11 Cases have been commenced;

(f)    The Solicitation has not been completed by December 19, 2011, unless prior to such date, a Liquidity Event has occurred and the Chapter 11 Cases have been commenced;

(g)    If the Solicitation has been completed prior to the Petition Date, (i) the Rights Offering Order shall not have been entered by the 58th day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date), (ii) the Confirmation

Hearing shall not have concluded by the 58th day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date), (iii) the Confirmation Order shall not been entered by the Bankruptcy Court by the 60th day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date), or (iv) the Effective Date shall not have occurred within 17 days after the entry of the Confirmation Order. In the event that the Rights Offering Order is not entered within 30 days after the Petition Date, the deadlines set forth in clauses (ii) and (iii) shall be extended by 30 days;

(h)     If a Liquidity Event has occurred and the Solicitation has not been completed prior to the Petition Date, (i) the entry of an order by the Bankruptcy Court approving the Consent Solicitation Materials shall not have occurred by the 60th day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date), (ii) the Confirmation Hearing shall not have concluded by to the 100th day after the Petition Date (or if such day is not a Court Date, the next succeeding Court Date), (iii) the Confirmation Order shall not have been entered by the Bankruptcy Court by the 102nd day after the Petition Date (or if such day is not a Court Date, the next succeeding Court Date), or (iv) the Effective Date shall not have occurred within 17 days after the entry of the Confirmation Order. In the event that the Rights Offering Order is not entered by the 45th day after the Petition Date, the deadlines set forth in clauses (ii) and (iii) shall be extended by 30 days;

(i)     WLH shall not have received the votes in support of the Plan from at least 66 2/3% of the principal amount of the Notes whose holders have voted, and a majority in number of the holders of Notes who have voted by any applicable voting deadline.

(j)     The Corporate Governance Documents and the indenture governing the second lien notes are not in form and substance reasonably acceptable to the Requisite Noteholders on or prior to the Petition Date;

(k)     WLH shall have failed to file the RSA Motion by the first Court Date after the Petition Date;

(l)     The RSA Order shall not have been entered by the Bankruptcy Court by the 45th day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date);

(m)     WLH shall have failed to file the DIP Facility Motion on or before the first Court Date after the Petition Date;

(n)     The DIP Facility Order shall not be entered on an interim basis on the first Court Date after the Petition Date or the DIP Facility Order shall not be entered as a Final Order on or before the 45th day after the Petition Date;

(o)     WLH fails to file the Rights Offering Motion by the first Court Date after the Petition Date;

(p)     WLH fails to use reasonable best efforts to obtain a hearing on the Rights Offering Motion before the Bankruptcy Court by the 25th day after the Petition Date;

#4836-8272-2061                          - 9 -

(q)     The Backstop Order shall not have been entered by the Bankruptcy Court by the 45th day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date);

(r)     The New Notes Documents (other than the indenture) shall not be in form and substance reasonably acceptable to the Requisite Noteholders prior to or on the 30th day after the Petition Date;

(s)     WLH shall have withdrawn the Plan without the consent of the Requisite Noteholders;

(t)     The amendment, modification of, or the filing of a pleading seeking to amend or modify, the Plan, the Disclosure Statement or any Plan Related Documents, notices, exhibits, appendices and orders by the Debtors, which amendment, modification or filing is materially inconsistent with this Agreement or the Restructuring Term Sheet in an manner that is not reasonably acceptable to the Consenting Noteholders;

(u)     The filing by WLH of any motion or other request for relief seeking (i) voluntary dismissal of any of the Chapter 11 Cases (other than the Chapter 11 Cases solely relating to Non-material Subsidiaries), (ii) conversion of any of the Chapter 11 Cases (other than the Chapter 11 Cases solely relating to Non-material Subsidiaries) to chapter 7 of the Bankruptcy Code, or (iii) appointment of a trustee or an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases (other than the Chapter 11 Cases solely relating to Non-material Subsidiaries);

(v)     The entry of an order by the Bankruptcy Court (i) dismissing any of the Chapter 11 Cases (other than the Chapter 11 Cases solely relating to Non-material Subsidiaries), (ii) converting any of the Chapter 11 Cases (other than the Chapter 11 Cases solely relating to Non-material Subsidiaries) to a case under chapter 7 of the Bankruptcy Code, (iii) appointing a trustee or an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code with respect to any of the Chapter 11 Cases (other than the Chapter 11 Cases solely relating to Non-material Subsidiaries); or (iv) making a finding of fraud, dishonesty, or material misconduct by any officer or director of WLH;

(w)     A material breach by the Company or the Parent of any of its obligations under this Agreement or the agreements governing the Restructuring, and any such breach by the Company or the Parent is not cured by 10 days after receipt of written notice and opportunity to cure, if such breach is curable, from the Consenting Noteholders or;

(x)     Any court of competent jurisdiction or other competent governmental or regulatory authority shall have issued an order making illegal or otherwise restricting, preventing, or prohibiting the Restructuring in a manner that cannot be reasonably remedied by WLH or the Consenting Noteholders;

(y)     The Effective Date shall not have occurred by the Outside Date

(z)     The exclusive right of the Company or the Parent to file and solicit a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code shall have terminated;

(aa)    any material adverse change (as defined or otherwise referenced in the ECA, the Colony RSA, the Backstop Commitment or the DIP Facility, as applicable, or any similar event giving rise to a right of termination under the ECA, the Colony RSA, the Backstop Commitment or the DIP Facility, as applicable) as a result of which, the non-WLH parties to the ECA, the Colony RSA, the Backstop Commitment or the DIP Facility, as the case may be, shall have the right to terminate their respective commitments, shall have occurred;

(bb)    WLH shall either (1) enter into a DIP Facility, a cash collateral use agreement or exit financing or (2) file any motion with the Bankruptcy Court seeking an order approving a DIP Facility, cash collateral use agreement or exit financing, in either case, that is materially inconsistent with this Agreement and the Restructuring Term Sheet in a manner that is not reasonably acceptable to the Requisite Noteholders;

(cc)    The filing of any motion in the Chapter 11 Cases under sections 363, 364, or 365 of the Bankruptcy Code that is materially inconsistent with the terms and conditions of the Restructuring Term Sheet or this Agreement in a manner that is not reasonably acceptable to the Requisite Noteholders; or

(dd)    The Company fails to pay any of the Transaction Fees as they become due.

(ii)    The date on which this Agreement is terminated in accordance with Section 5 or Section 6 of this Agreement shall be referred to as the "Termination Date" and the provisions of this Agreement and the Restructuring Term Sheet shall terminate.

(iii)    Notwithstanding anything in this Agreement to the contrary, upon either (a) the entry of an order by the Bankruptcy Code invalidating or disallowing any Noteholder Claim of any Consenting Noteholder or any documents governing or giving rise to such Claim or (b) the filing of a Plan, Plan-Related Documents, New Notes Documents or Corporate Governance Documents, in any of the foregoing cases, that materially deviates from the Restructuring Term Sheet in a manner that is not reasonably acceptable to any Consenting Noteholder, such Consenting Noteholder may, in its individual capacity, terminate its obligations under this Agreement upon three (3) Business Days' prior notice to the Company and the Parent, and the other Consenting Noteholders; provided, however that any termination by a Consenting Noteholder of its obligations under this Agreement pursuant to this sentence shall not constitute a Termination Event or affect the obligations of any other Consenting Noteholder hereunder or the Company or the Parent or affect an Indemnifying Party's obligations under this Agreement.

(iv)    No termination pursuant to this Section 5 shall limit the liability of WLH notwithstanding that any Consenting Noteholder has exercised termination rights under this Section 5.  The exercise of a right to terminate this Agreement pursuant to this Section 5 shall not limit any right of a Consenting Noteholder pursuant to Sections 25, 28 or 31.

(v)    A sale or other disposition to a third party in an arms' length transaction by WLH of its equity interests in, or the assets of, Mountain Falls, LLC and Mountain Falls Golf Course, LLC shall not constitute a Termination Event under Section 5(i)(s) or 5(i)(t), as

long as (A) such sale or other disposition occurs pursuant to a reasonable and customary sales process, (B) as a result of such sale or other disposition, WLH is relieved of all liabilities and other obligations associated with Mountain Falls, LLC and Mountain Falls Golf Course, LLC and their respective assets, other than liabilities owed to the principal lender to Mountain Falls, LLC and Mountain Falls Golf Course, LLC, and (C) after application of the proceeds of sale, the liabilities owed to such principal lender are not in excess of $2,000,000.

6.    Company Termination Events.  The Company on behalf of WLH may terminate this Agreement as to all Parties upon three (3) Business Days' prior written notice thereof, upon the occurrence of any of the following events (each, a "Company Termination Event"):

(a) any breach by any of the Consenting Noteholders or involuntary transfer of the Notes or Noteholder Claims that has the effect of reducing the ratio, expressed as a percentage, of (i) the aggregate principal amount of outstanding Notes whose holders (including the Consenting Noteholders) have voted to support the Plan to (ii) the aggregate principal amount of outstanding Notes whose holders (including the Consenting Noteholders) who have voted with respect to the Plan below 66 2/3 % in principal amount, which breach remains uncured for a period of five (5) Business Days after the receipt by the Consenting Noteholders of notice of such breach; or

(b) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Restructuring.

7.    Transfer of Noteholder Claims.  Notwithstanding anything to the contrary herein, each of the Consenting Noteholders agrees that, for so long as this Agreement has not been terminated in accordance with its terms, it shall not sell, assign, transfer, convey or otherwise dispose of, directly or indirectly (each such transfer, a "Transfer"), all or any of its Noteholder Claims (or any right related thereto and including any voting rights associated with such Noteholder Claims), unless the transferee thereof (a) agrees in an enforceable writing to assume and be bound by this Agreement and the Restructuring Term Sheet, and to assume the rights and obligations of the Consenting Noteholder under this Agreement and (b) promptly delivers such writing to the Company and to the Parent (each such transferee becoming, upon the Transfer, a Consenting Noteholder hereunder).  The Company shall promptly acknowledge any such Transfer in writing and provide a copy of that acknowledgement to the transferor.  By its acknowledgement of the relevant Transfer, the Company shall be deemed to have acknowledged that its obligations to the Consenting Noteholder hereunder shall be deemed to constitute obligations in favor of the relevant transferee.  Any Transfer of any Noteholder Claim by a Consenting Noteholder that does not comply with the procedure set forth in the first sentence of this Section 7 shall be deemed void ab initio.  This Agreement shall in no way be construed to preclude the Consenting Noteholders from acquiring additional Noteholder Claims, provided that any such additional Noteholder Claims shall automatically be deemed to be subject to the terms of this Agreement.

8.    <u>Effectiveness</u>.  This Agreement shall become effective and binding upon each of the undersigned persons as of the date when (i) the Parties have executed and delivered signed copies of this Agreement and (ii) WLH has received executed Agreements from the Consenting Noteholders (or advisors, nominees, or investment managers for beneficial holder(s)) which represent both (a) a majority in aggregate principal amount of the Notes, and (b) the majority in number of the holders of Notes who have executed confidentiality agreements with WLH; provided, however, that WLH may agree to waive the foregoing requirement.

9.    <u>Ownership of Claims</u>.  Each of the Consenting Noteholders represents and warrants (severally and not jointly) that:

(a)    as of the date of this Agreement, it is the beneficial owner of the principal amount of the Noteholder Claims, or is the nominee, investment manager or advisor for beneficial holders of the Noteholder Claims, as such Consenting Noteholder has indicated on Exhibit B to this Agreement; provided, however, that Exhibit B to this Agreement shall be disclosed only to WLH and WLH's legal counsel and financial advisors, Irell & Manella LLP and Pachulski, Stang, Ziehl & Jones and Alvarez & Marsal LLC and WLH agrees (and agrees to cause its legal counsel and financial advisors to maintain the confidentiality of such information) that, except for such disclosure as may be required by an order of the Bankruptcy Court in connection with the Chapter 11 Cases, such information shall be kept confidential in accordance with <u>Section 31</u>, and without limiting the foregoing, Exhibit B shall not be attached to the RSA Motion or the RSA Order;

(b)    each nominee, investment manager or advisor acting on behalf of beneficial holders of Noteholder Claims or Notes represents and warrants to WLH and the other Consenting Noteholders that it has the legal authority to so act and to bind the applicable beneficial holder; and

(c)    other than pursuant to this Agreement, such Noteholder Claims are free and clear of any equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition of any kind, that might adversely affect in any way such Consenting Noteholder's performance of its obligations contained in this Agreement at the time such obligations are required to be performed.

10.    <u>Cooperation, Filing of Motions and Scheduling of Hearings</u>.  WLH shall provide draft copies of all material "first day" motions, motions or applications, other documents and Plan Related Documents WLH intends to file with the Bankruptcy Court on the Petition Date to Milbank, as counsel for the Committee and the Consenting Noteholders as soon as reasonably practicable prior to the Petition Date and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing.  WLH will provide draft copies of all Plan Related Documents WLH intends to file with the Bankruptcy Court Post-Petition to counsel to the Consenting Noteholders within a reasonable time prior to filing such pleadings and/or documents and shall consult in good faith with such counsel regarding the form and substance of any such proposed pleading.  Court Hearings to be scheduled in compliance with Section 5 hereof shall not be re-scheduled, continued, post-poned or adjourned by WLH without the consent of the Requisite Noteholders; provided, that if no objection is made within five (5) Business Days after notice by WLH or its

advisors of a request for a re-scheduling, continuation, post-ponement or adjournment that does not extend beyond the applicable time periods specified in Section 5 hereof, the Consenting Noteholders shall be deemed to have consented thereto. The RSA Motion shall not be withdrawn by the Company or the Parent without the prior consent of the Requisite Noteholders.

11.    Claim Resolution Matters.  Prior to the entry of the Confirmation Order, WLH may enter into agreements with holders of claims (as defined in the Bankruptcy Code) (other than the Consenting Noteholders) relating to the allowance, estimation, validity, extent or priority of such claims, or the treatment and classification of such claims under the Plan; provided, however, that WLH shall provide the Consenting Noteholders with not less than five (5) Business Days written notice of the material terms of the proposed agreement and also of the motion seeking authorization for WLH to enter into such a proposed agreement, and upon the expiration of such period, if the Consenting Noteholders have not notified the Company and the Parent of an objection to such proposed treatment of such claims, WLH shall be authorized to proceed with such motion and, if such motion is approved by the Bankruptcy Court, abide by the proposed agreement.  Notwithstanding the forgoing, WLH shall not be required to provide the Consenting Noteholders with advance notice or any objection period with respect to payment of (i) any trade payables and employee benefits and obligations which arise in the ordinary course of the Debtors' business, (ii) claims asserted in a liquidated amount of $100,000 or less or $2,000,000 in the aggregate, and (iii) claims which WLH is authorized to resolve or pay pursuant to the terms of any applicable first day order and such resolution or payment complies with the terms and limitations, if any, imposed on WLH by such applicable order.

12.    Business Continuance; Access.

(a)    Except as contemplated by this Agreement or with the prior written consent of the Requisite Noteholders, the Company and the Parent covenant and agree that, between the date hereof and the Effective Date, WLH shall operate its businesses in the ordinary course in a manner consistent with past practice in all material respects (other than any changes in operations (i) resulting from or relating to the Solicitation or the proposed or actual filing of the Chapter 11 Cases or (ii) imposed by the Bankruptcy Court).  Further, except as expressly contemplated by this Agreement and except for changes resulting from or relating to the filing of the Chapter 11 Cases or imposed by the Bankruptcy Court, the Company and the Parent will continue (i) using commercially reasonable efforts to preserve the relationships with current important customers, distributors, suppliers, vendors and others having business dealings with the Company, including but not limited to the performance of all material obligations under any executory contracts which have not been rejected and compliance with historical billing practices, (ii) maintaining and insuring its physical assets, properties and facilities in their current working order, condition and repair as of the date hereof (ordinary wear and tear excepted) and maintaining all existing insurance on the foregoing, (iii) not taking any action, or omitting to take any action, the intent of which is to cause the termination of its current executive officers (other than for good reason or for cause) and (iv) maintaining WLH's books and records on a basis consistent with prior practice, including prior billing and collection practices.

(b)    Subject to the entry by any Consenting Noteholder and no more than a total of three sets of legal advisors (which shall include Milbank, local counsel, and, to the extent necessary, conflicts counsel), acting on behalf of one or more of the Consenting Noteholders (each, a "Representative") into a confidentiality agreement reasonably acceptable to WLH,[2] at the reasonable request and upon reasonable notice of one or more such Consenting Noteholders or advisors, the Company and the Parent also agree to respond to reasonable requests from such Representatives (each of whom shall be bound by a confidentiality agreement in favor of the Company and the Parent) and provide (i) reasonable access to the Company's and the Parent's senior management personnel regarding WLH's business, the Chapter 11 Cases, the general status of ongoing operations and operating results of WLH during normal business hours and at other reasonable times in a manner that does not unreasonably interfere with the normal business operations of WLH and (ii) the Consenting Noteholders who have entered into confidentiality agreements reasonably acceptable to WLH with such copies of standard operating reports concerning WLH as are prepared for senior management.

13.    Representations.

(a)    Each Party represents to each other Party that, as of the date of this Agreement:

(i)    such Party is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization, and has all requisite corporate, partnership, or limited liability company power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(ii)    The execution, delivery and performance of this Agreement by such Party does not and shall not (x) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its organizational documents or those of any of its subsidiaries or (y) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligations to which it or any of its subsidiaries is a party or under its organizational documents;

(iii)    The execution, delivery and performance by it of this Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body, except such filing as may be necessary and/or required for disclosure by the Securities and Exchange Commission or pursuant to state securities or "blue sky" laws, and the possible approval by the Bankruptcy Court of the Company's and the Parent's authority to enter into and implement this Agreement; and

(iv)    Subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is the legally valid and binding obligation of such Party,

---

[2] For the avoidance of doubt, any confidentiality agreement entered into by WLH and counsel and/or an advisor to the Consenting Noteholders in connection with the negotiation of the Restructuring shall be deemed acceptable to WLH.

enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws, both foreign and domestic, relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

14.    Entire Agreement.  This Agreement, including the exhibits, schedules and annexes hereto constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all other prior negotiations, agreements and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement.

15.    Survival of Agreement.  Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning the Restructuring and in contemplation of possible Chapter 11 Cases to be filed by WLH.

16.    Waiver.  This Agreement and the Restructuring Term Sheet are part of a proposed settlement of a dispute among the Parties.  Regardless of whether or not the transactions contemplated herein are consummated, or whether or not the Termination Date has occurred, if applicable, nothing shall be construed herein as a waiver by any Party of any or all of such Party's rights or remedies and the Parties expressly reserve any and all of their respective rights and remedies.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

17.    Impact of Appointment of Official Committee of Unsecured Creditors in the Chapter 11 Cases.  Notwithstanding anything herein to the contrary, if any Consenting Noteholder is appointed to, and serves on, an official committee of unsecured creditors in the Chapter 11 Cases, then the terms of this Agreement shall not be construed to limit such Consenting Noteholder's exercise (in its discretion) of its fiduciary duties to any person arising from its service as a member of such committee, and any such exercise (in the sole discretion of such Consenting Noteholder) of such fiduciary duties, each in a manner consistent with this Agreement in all material respects, shall not be deemed to constitute a breach of the terms of the Agreement; provided, however, that appointment of a Consenting Noteholder as a member of any such committee shall not relieve such Consenting Noteholder of its individual obligations to affirmatively support, and vote for, the Plan, on the terms and conditions set forth herein.

18.    Company Fiduciary Duties.  Notwithstanding anything to the contrary herein, nothing in this Agreement shall require the Parent, the Company or any of their subsidiaries or any of its or their respective directors or officers (in such person's capacity as a director or officer) to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action would be inconsistent with such person's fiduciary obligations under applicable law.

19.    Representation by Counsel.  Each Party hereto acknowledges that it has been represented by counsel (or had the opportunity to and waived its right to do so) in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party hereto with

#4836-8272-2061                                   - 16 -

a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived. The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the Patties hereto. None of the Parties hereto shall have any term or provision construed against such Party solely by reason of such Party having drafted the same.

20.    <u>Independent Due Diligence and Decision-Making</u>. Each Consenting Noteholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions and prospects of WLH.

21.    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

22.    <u>Amendments</u>. Except as otherwise provided herein, this Agreement may not be modified, amended or supplemented without prior written consent of the Company, the Parent and the Requisite Noteholders; provided, that if the modification, amendment or supplement adversely impacts the economic treatment or rights of some of the Consenting Noteholders, then in addition to the foregoing, the agreement in writing of such affected Consenting Noteholders shall be required for such modification, amendment or supplement to be effective.

23.    <u>Headings</u>. The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

24.    <u>Relationship Among Parties</u>. Notwithstanding anything herein to the contrary, the duties and obligations of the Consenting Noteholders under this Agreement shall be several, not joint. It is understood and agreed that any Consenting Noteholder may trade in the Noteholder Claims or other debt or equity securities of the Company without the consent of the Company or the Parent or any Consenting Noteholder to the extent permitted by the applicable confidentiality agreement entered into by such Consenting Noteholder, subject to applicable securities laws and Section 7 of this Agreement. No Party hereto shall have any responsibility for any such trading by any other entity by virtue of this Agreement. No prior history, pattern or practice of sharing confidences among or between the Parties hereto shall in any way affect or negate this understanding and agreement.

25.    <u>Specific Performance</u>. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder; provided, however, that each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

26.    Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in the United States District Court for the Southern District of New York, and by execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to New York jurisdiction, if the Chapter 11 Cases are commenced by WLH, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

27.    Tax Matters. WLH shall not, without the written consent of the Requisite Noteholders: (i) cause, or cause another party to make, any new or change a current "check the box election" under Treasury Regulations § 301.7701-3 with respect to WLH; or (ii) merge, consolidate or liquidate; if any of the actions specified in clause (i) or (ii) has material adverse tax consequences for WLH or holders of Noteholder Claims.

28.    Indemnification. (a) Whether or not the Restructuring is consummated or this Agreement is terminated for any reason, the Company and the Parent (each individually, in such capacity, the "Indemnifying Party") shall indemnify and hold harmless the Consenting Noteholders and their successors and assigns, their respective affiliates and their affiliates' respective officers, directors, managing directors, employees, agents, members, partners, managers, advisors, controlling persons, attorneys, investment bankers and financial advisors (each, an "Indemnified Person") from and against any and all losses, claims, damages, liabilities and reasonable fees and expenses, joint or several, to which any such Indemnified Person may become subject to the extent arising out of or in connection with (i) any third party claim, challenge, litigation, investigation or proceeding with respect to this Agreement, the Chapter 11 Cases or the transactions contemplated hereby or thereby, or (ii) any breach by the Company of this Agreement and to reimburse such Indemnified Persons for any reasonable legal or other reasonable out of pocket expenses as they are incurred in connection with investigating, responding to or defending any of the foregoing; provided that the foregoing indemnification will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or expenses to the extent that they are finally judicially determined to have resulted from any breach of this Agreement by such Indemnified Person or bad faith, gross negligence or willful misconduct on the part of such Indemnified Person. If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless, then the Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Person as a result of such loss, claim, damage, liability or expense in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, but also the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, as well as any relevant equitable considerations.

#4836-8272-2061                          - 18 -

(b)      Promptly after receipt by an Indemnified Person of notice of the
commencement of any claim, litigation, investigation or proceeding relating to this
Agreement, the Chapter 11 Cases or any of the transactions contemplated hereby or thereby
("Proceedings"), such Indemnified Person will, if a claim is to be made hereunder against
the Indemnifying Party in respect thereof, notify the Indemnifying Party in writing of the
commencement thereof; provided that the omission so to notify the Indemnifying Party will
not relieve it from any liability that it may have hereunder except to the extent it has been
materially prejudiced by such failure.  In case any such Proceedings are brought against any
Indemnified Person and it notifies the Indemnifying Party of the commencement thereof, the
Indemnifying Party will be entitled to participate therein, and, to the extent that it may elect
by written notice delivered to such Indemnified Person, to assume the defense thereof, with
counsel reasonably satisfactory to such Indemnified Person; provided that if the defendants
in any such Proceedings include both such Indemnified Person and the Indemnifying Party
and such Indemnified Person shall have reasonably concluded that there may be legal
defenses available to it that are different from or additional to those available to the
Indemnifying Party, such Indemnified Persons shall have the right to select separate counsel
to assert such legal defenses and to otherwise participate in the defense of such Proceedings
(provided, that WLH shall not be responsible for any legal fees or expenses related to more
than one such separate counsel) on behalf of such Indemnified Person.  Upon receipt of
notice from the Indemnifying Party to such Indemnified Person of its election so to assume
the defense of such Proceedings and approval by such Indemnified Person of counsel, the
Indemnifying Party shall not be liable to such Indemnified Person for expenses incurred by
such Indemnified Person in connection with the defense thereof (other than reasonable costs
of investigation) unless (i) such Indemnified Person shall have employed separate counsel in
connection with the assertion of legal defenses in accordance with the proviso to the next
preceding sentence (it being understood, however, that the Indemnifying Party shall not be
liable for the expenses of more than one separate counsel representing the Indemnified
Persons who are parties to such Proceedings), (ii) the Indemnifying Party shall not have
employed counsel reasonably satisfactory to such Indemnified Person to represent such
Indemnified Person within a reasonable time after notice of commencement of the
Proceedings or (iii) the Indemnifying Party shall have authorized in writing the employment
of counsel for such Indemnified Person.

(c)      The Indemnifying Party shall not be liable for any settlement of any
Proceedings effected without its written consent (which consent shall not be unreasonably
withheld or delayed).  If any settlement of any Proceeding is consummated with the written
consent of the Indemnifying Party or if there is a final judgment for the plaintiff in any such
Proceedings, the Indemnifying Party agrees to indemnify and hold harmless each
Indemnified Person from and against any and all losses, claims, damages, liabilities and
expenses by reason of such settlement or judgment in accordance with, and subject to the
limitations of, the provisions of this Section 28.  The Indemnifying Party shall not, without
the prior written consent of an Indemnified Person (which consent shall not be unreasonably
withheld or delayed), effect any settlement of any pending or threatened Proceedings in
respect of which indemnity has been sought hereunder by such Indemnified Person unless
such settlement (a) includes an unconditional release of such Indemnified Person in form
and substance reasonably satisfactory to such Indemnified Person from all liability on the
claims that are the subject matter of such Proceedings and (b) does not include any statement

as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

29.    Notices.  All notices, requests and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally, by email, courier, by facsimile transmission or mailed (first class postage prepaid) to the parties at the following addresses, emails or facsimile numbers:

If to the Company and/or the Parent:

William Lyon Homes
William Lyon Homes, Inc.
Attention:  Matthew R. Zaist
4490 Von Karman
Newport Beach, CA  92660
Telephone:  (949) 833-3600
Facsimile:  (949) 252-2544

with a copy to (which shall not constitute notice):

Irell & Manella LLP
Attention:  Jeffrey M. Reisner, Esq.
840 Newport Center Drive
Suite 400
Newport Beach, CA  92660-6324
Telephone:  (949) 760-0991
Facsimile:  (949) 760-5200

Pachulski Stang Ziehl & Jones LLP
Attention:  Richard M. Pachulski
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, California  90067-4100
Telephone:  (310) 277-6910
Facsimile:  (310) 201-0760

If to the Consenting Noteholders:

To each Consenting Noteholder at the address identified in <u>Schedule II</u>

with a copy to (which shall not constitute notice):

Milbank, Tweed, Hadley & McCloy
601 S. Figueroa Street, 30th Floor
Los Angeles, CA 90017
Telephone: (213) 892-4000
Facsimile: (213) 629-5063
Attention:    Mark Shinderman, Esq.
              Neil Wertlieb, Esq.

30.    <u>No Third-Party Beneficiaries</u>. The terms and provisions of this Agreement are intended solely for the benefit of the Parties hereto and their respective successors and permitted assigns, and it is not the intention of the Parties to confer third-party beneficiary rights upon any other Person.

31.    <u>Public Disclosure</u>. WLH shall not (and shall cause each of its legal and financial advisors to not) (a) use the name of any Consenting Noteholder in any press release without such Consenting Noteholder's prior written consent or (b) disclose to any Person other than legal and financial advisors to WLH (x) the principal amount or percentage of any Noteholder Claims held by any Consenting Noteholder or any of their respective subsidiaries or file such information with the Bankruptcy Court or any court of competent jurisdiction or (y) the identity of any Consenting Noteholder without such Consenting Noteholder's prior written consent except as required by Bankruptcy Court order or other applicable law; provided, however, that WLH shall be permitted to disclose at any time the aggregate principal amount of and aggregate percentage of Noteholder Claims held by Consenting Noteholders and the contents of this Agreement in the RSA Motion, the Plan, Disclosure Statement, Plan Related Documents and any filings by WLH with the Bankruptcy Court or the Securities and Exchange Commission or as required by law or regulation.

32.    <u>No Waiver of Participation and Preservation of Rights</u>. This Agreement and the Restructuring Term Sheet are part of a proposed settlement of disputes among the Parties. Without limiting the foregoing sentence in any way, if the transactions contemplated by this Agreement or otherwise set forth in the Restructuring Term Sheet are not consummated as provided herein, if a (x) Termination Event occurs, or (y) if this Agreement is otherwise terminated for any reason, the Parties each fully reserve any and all of their respective rights, remedies, claims and interests.

33.    <u>Federal Rule of Evidence 408</u>. This Agreement and the Restructuring Term Sheet are part of a proposed settlement of a dispute among the Parties. Nothing herein shall be deemed a direct or indirect admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement, the Restructuring Term

Sheet and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

34.    <u>Transaction Expenses</u>. (i) Subject to the professionals identified in subsection 34(ii) providing invoices (without limiting the right of such professionals to redact privileged, confidential or sensitive information) to the Company and the Parent, whether or not the Restructuring or any of the transactions contemplated hereby are consummated, the Company and the Parent will reimburse or pay, as the case may be, all reasonable and documented fees and out of pocket expenses of the Committee (A) incurred in connection with this Agreement and the Restructuring and their participation in the Chapter 11 Cases through the earlier to occur of (1) the date on which this Agreement is terminated and (2) the 60th day following the Effective Date, and (B) incurred in connection with the enforcement of any rights of the Committee or any Consenting Noteholder under this Agreement and any document or instrument entered into in connection with this Agreement or the transactions contemplated hereby (such fees and expenses, collectively, "<u>Transaction Expenses</u>").

(ii)    The Transaction Expenses include the reasonable and documented fees and expenses of: (a) Houlihan Lokey ("<u>Houlihan Lokey</u>"), financial advisor to the Committee and the Consenting Noteholders, (b) Milbank, the legal advisor to the Committee and the Consenting Noteholder, (c) local counsel to the Committee and Consenting Noteholders in Wilmington, Delaware, in each case, in connection with the Restructuring and the transactions contemplated hereby and (d) if applicable, conflicts counsel to the Committee and Consenting Noteholders in connection with the Restructuring and the transactions contemplated hereby.

(iii)    The reimbursement or payment of Transaction Expenses shall be made by the Company or the Parent within five (5) Business Days after presentation of an invoice, without Bankruptcy Court review or Bankruptcy Court order whether or not the Restructuring or the transactions contemplated hereby are consummated.

(iv) The obligations of the Company and the Parent under this Section 34 are in addition to, and do not limit, its obligations under Section 12 hereof or to provide indemnification to each Indemnified Party pursuant to Section 28.

(v)    The Company's and the Parent's agreement to reimburse or pay, as the case may be, the Transaction Expenses is an integral part of the transactions contemplated by this Agreement and, without such agreement, the Committee would not have entered into this Agreement, and the Transaction Expenses shall constitute an administrative expense of the Company under sections 364(c)(1) and 503(b) of the Bankruptcy Code.

35.    <u>No Solicitation</u>. This Agreement is not intended to be, and each signatory to this Agreement acknowledges that this Agreement is not (a) an offer for the purchase, sale, exchange, hypothecation, or other transfer of securities for purposes of the Securities Act and the Securities Exchange Act of 1934, or (b) a solicitation of votes for the acceptance of a chapter 11 plan of reorganization (including the Plan) for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Solicitation of acceptance of the

Restructuring will not be solicited from any holder of Notes until such holder has received the disclosures required under or otherwise in compliance with applicable law.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the Parent and the Company, on behalf of WLH, have executed this Agreement as of the date first written above.

WILLIAM LYON HOMES,
a Delaware corporation

By: _____
Name:  Matthew R. Zaist
Title:    Executive Vice President

WILLIAM LYON HOMES, INC.
a California corporation

By: _____
Name: Matthew R. Zaist
Title:  Executive Vice President

THE COPY OF THE NOTEHOLDERS RSA ATTACHED HERETO, ALTHOUGH FULLY EXECUTED BY ALL PARTIES THERETO, FOR CONFIDENTIALITY REASONS, EXCLUDES (I) EXHIBIT "B" HERETO AND (II) THE SIGNATURE PAGES OF THE CONSENTING NOTEHOLDERS -- BUT DOES INCLUDE SCHEDULE II (WHICH CONTAINS A LIST OF THE CONSENTING NOTEHOLDERS) AND ALL OTHER SCHEDULES AND EXHIBITS THERETO.

## Schedule I
## Subsidiaries

Circle G at the Church Farm North Joint Venture, LLC, an AZ limited liability company
Mountain Falls Golf Course, LLC, a NV limited liability company
Mountain Falls, LLC, a NV limited liability company
William Lyon Southwest, Inc., an AZ corporation
California Equity Funding, Inc., a CA corporation
Duxford Financial, Inc., a CA corporation
Duxford Insurance Services LLC, a CA limited liability company
Presley CMR, Inc., a CA corporation
WLH Enterprises, a CA general partnership
Laguna Big Horn, LLC, a DE limited liability company
Duxford Title Reinsurance Co., an NV corporation
PH - LP Ventures, a CA corporation
Lyon Waterfront, LLC, a DE limited liability company
Whitney Ranch Village 5, LLC, a DE limited liability company
Cerro Plata Associates, LLC, a DE limited liability company
PH-Rielly Ventures, a CA corporation
Sycamore WLH, Inc., a CA corporation
PH Ventures – San Jose, a CA corporation
HSP, Inc., a CA corporation
Nobar Water Company, a CA corporation
Silver Creek Preserve, a CA nonprofit corporation
Lyon East Garrison Company I, LLC, a CA limited liability company

**Schedule II**
**Consenting Noteholders**

Trapeza CDO X, Ltd.
Trapeza CDO XI, Ltd.

Atrium II
Atrium III
Atrium IV
Atrium V
Bentham Wholesale High Yield Fund
Castle Garden Funding
CSAM Funding I
CSAM Funding II
CSAM Funding III
CSAM Funding IV
First Dominion Funding III
Madison Park Funding I, Ltd.
Madison Park Funding II, Ltd.
Policemen & Firemen Retirement Systems of Detroit
Credit Suisse Floating Rate High Income Fund
Credit Suisse High Yield Bond Fund
Credit Suisse Asset Management Income Fund, Inc.
Credit Suisse Bond (Lux) High Yield USD

Columbia High Yield Bond Fund, a series of Columbia Funds Series II
Columbia Variable Portfolio – High Yield Bond Fund,
a series of Columbia Funds Variable Series Trust II
Columbia Variable Portfolio – Income Opportunities Fund,
a series of Columbia Funds Variable Series Trust II
Columbia Income Opportunities Fund, a series of Columbia Funds Series II

Corre Opportunities Fund, LP

Luxor Capital Partners, LP
Luxor Capital Partners Offshore Master Fund, LP
Luxor Spectrum, LLC
Luxor Spectrum Offshore Master Fund, LP
Luxor Wavefront, LP
OC 19 Master Fund, LP – LCG
GAM Equity Six, Inc.


Phoenix Investment Adviser, LLC

**Schedule III**
**Investors Party to Backstop Commitment**

Luxor Capital Partners, LP

Luxor Capital Partners Offshore Master Fund, LP

Luxor Spectrum, LLC

Luxor Spectrum Offshore Master Fund, LP

Luxor Wavefront, LP

OC 19 Master Fund L.P. – LCG

Gam Equity Six Inc.

**<u>Schedule IV</u>**
**<u>Investors Party to Equity Commitment Agreement</u>**

General William Lyon


William H. Lyon

**Exhibit A**


**Restructuring Term Sheet**

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

# WILLIAM LYON HOMES
## WILLIAM LYON HOMES, INC.
### SUMMARY OF THE PRINCIPAL TERMS FOR

### Solicitation of Votes for a Potential In-Court Pre-packaged Plan of Reorganization under Chapter 11

#### Issuance of

New 12% (8% cash interest) Senior Second Lien Notes due 2016 of William Lyon Homes, Inc., a California corporation ("CA Lyon") and new Class A Common Stock of William Lyon Homes, a Delaware corporation ("DE Lyon," and collectively with CA Lyon, "WLH")

#### to Holders of CA Lyon's outstanding

| | |
|---|---|
| 7⅝% Senior Notes due 2012 | CUSIP #552075-AE-3 |
| 10¾% Senior Notes due 2013 | CUSIP #552075-AA-1 |
| 7½% Senior Notes due 2014 | CUSIP #552075-AC-7 |

("collectively, the "Old Notes")

and

#### Rights Offering
of New Class C Common Stock and Convertible Preferred Stock
of DE Lyon  for Cash

2503959.

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

*Set forth herein are terms and conditions for a proposed series of restructuring transactions (collectively, the "Restructuring Transactions"), to be effected through a pre-packaged plan of reorganization under Chapter 11. These terms and conditions are provided for discussion purposes only and do not constitute an offer, agreement or commitment, nor an advertisement or offer to buy or sell securities, by any party.*

*This Term Sheet is by its nature a summary only and is not all-inclusive. This Term Sheet does not include descriptions of all of the terms, conditions and other provisions that are to be contained in the definitive documentation relating to the exchange offer, the consent solicitation or the New Notes. This Term Sheet is not intended to limit the scope of discussion and negotiation of any matters even if inconsistent with the specific matters set forth herein. No oral agreements between or among the parties shall be binding under any circumstances at any time. The terms included in this Term Sheet shall be kept strictly confidential, shall not be reproduced or disclosed, and shall not be used other than in connection with evaluating the transaction described herein.*

*Capitalized terms used herein without other definition have the respective meanings assigned to such terms in the indentures respectively governing the Old Notes.*

## *The New Securities*

New Note Issuer ............................. CA Lyon.

New Equity Issuer .......................... DE Lyon.

The Exchange Offer........................ CA Lyon will issue $75 million in aggregate initial principal amount of 12% (8% cash interest) Senior Second Lien New Notes due 2016 (the "New Notes") to holders of the Old Notes.

DE Lyon will issue shares of new Class A Common Stock ("Class A Common Shares") initially representing 28.5% of the capital stock of DE Lyon on a fully-diluted basis (but before giving effect to the Management Incentive Plan or the Warrants) to holders of the Old Notes.

The Rights Offering........................ DE Lyon will issue shares of new Class C Common Stock ("Class C Common Shares") and shares of new Convertible Preferred Stock ("Preferred Shares"), convertible on a one-to-

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

one basis into Class C Common Shares, collectively representing 51.5% of the capital stock of DE Lyon on a fully-diluted basis (but before giving effect to the Management Incentive Plan or the Warrants), for an aggregate cash purchase price of $60 million ($10 million for the Class C Common Shares, and $50 million for the Preferred Shares), in the rights offering.

Backstop Fee....................................... Upon receipt by DE Lyon of $60 million for the Class C Common Shares and the Preferred Shares issued in the Rights Offering, those parties that initially entered into a binding commitment to purchase at least $60 million of such shares (the "Backstop Investors") shall receive a backstop fee in the form of Class C Common Shares representing 2.00% of the Capital Stock of DE Lyon (included in the initial 51.5% allocated to Class C Common Shares); provided, that, the backstop fee may, subject to and in accordance with the backstop commitment, be payable in cash (in lieu of the Class C Common Shares) to the Backstop Investors in the amount of $2.5 million.

The Class B Shares ......................... In connection with the consummation of the Exchange Offer and the Rights Offering and subject to all of the conditions set forth below, the existing equity of DE Lyon will be cancelled, and DE Lyon will issue to the holders of its existing equity, in exchange for a purchase price of $25 million in cash, shares of Class B Common Stock ("Class B Common Shares"), initially representing 20.0% of the capital stock of DE Lyon on a fully-diluted basis (but before giving effect to the Management Incentive Plan or the Warrants).

The Warrants ................................... In consideration for intrinsic value, DE Lyon will issue to the holders of its existing equity warrants to purchase Class B Common Shares ("Warrants") representing an additional 9.1%

2503959.                                          - 3 -

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

of the capital stock of DE Lyon on a fully-diluted basis (but before giving effect to the Management Incentive Plan), at a strike price based on a $325 million equity value of DE Lyon.

After giving effect to the issuance of the Warrants, but before giving effect to the Management Incentive Plan, the Class A Common Shares will represent 25.9% of the capital stock of DE Lyon, the Class B Common Shares will represent 27.3% of the Capital Stock of DE Lyon, and the Class C Common Shares (assuming full conversion of the Preferred Shares) will represent 46.8% of the capital stock of DE Lyon.

| | |
|---|---|
| The Management Incentive Plan .... | Terms consistent with WLH proposal (e.g., 8% pool), subject to the following modifications: <ul><li>Initial allocation: 4%</li><li>Form of initial grant: 50% restricted stock, 50% options struck at Plan Value (rather than 100% restricted stock)</li><li>Remaining allocation: subject to Board of Directors review, not to occur before 12 months post-emergence</li><li>Tax gross-up: rather than cash bonus for taxes owed, employee can borrow same amount from WLH (secured by underlying shares), to be repaid upon earlier of liquidity event or 2 years, subject to compliance with SOX</li></ul> |
| The Lease | The Noteholders will agree to assume the lease in any bankruptcy proceeding, and the lock-ups will so provide. |
| The Employment Contracts | WLH shall have entered into employment contracts with each of General William Lyon and William H. Lyon, on terms consistent with proposed draft agreements (e.g., $1.5 million combined salary), subject to following modifications: <br><br>a) Performance bonus: first year capped at 50% of salary, thereafter, commensurate with position and contributions |

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

as determined by a three-member compensation committee consisting of the two independent directors and one director appointed by the holders of the Class A Common Shares

b) Severance: base salary for remaining contract term (from date to termination to 12/31/14) plus any earned but unpaid bonus, but in no event less than 18 months

2-year non-solicitation

The Pre-packaged Plan ................... WLH will solicit the votes of the holders of the Old Notes to consummate the transactions contemplated hereby pursuant to WLH's proposed pre-packaged or pre-arranged plan of reorganization (the "Pre-packaged Plan").

Conditions....................................... The consummation of the Restructuring Transactions expressly conditioned on satisfaction of each of the following:

1.    CA Lyon shall have received votes in favor of the Pre-packaged Plan, lock-ups and/or other documentation of the agreement by holders of Old Notes representing in the aggregate at least 66 2/3 % in principal amount of the Old Notes whose holders vote, and a majority in number of the holders of the Old Notes whose holders vote, agreeing to be bound by the Pre-packaged Chapter 11 Plan (the "Threshold Condition").

2.    CA Lyon shall have received votes in favor of the Pre-packaged Plan, of the agreement from the "Lenders" representing at least 66 2/3% of the principal amount of the Senior Secured Term Loan and at least half of the Lenders under the Secured Term Loan Agreement, agreeing to be bound by the Pre-packaged Chapter 11 Plan.

3.    CA Lyon shall have received a commitment letter from

2503959.

- 5 -

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

the existing equity holders of DE Lyon with respect to the purchase of the Class B Common Shares.

4.      CA Lyon shall have received a commitment letter with respect to the Rights Offering described above.

5.      WLH shall have entered into an amendment, amendment and restatement, or refinancing, providing for an initial principal amount not to exceed $235 million, an annual interest rate not to exceed 10.25%, and otherwise on terms and conditions satisfactory to WLH and the Ad Hoc Committee of holders of Old Notes (the "Colony Amendment") to CA Lyon's Secured Term Loan Agreement dated as of October 20, 2009 (as heretofore amended, the "Senior Secured Loan Agreement") by and among CA Lyon, as Borrower, ColFin WLH Funding, LLC, as Administrative Agent (the "Administrative Agent"), ColFin WLH Funding, LLC, as a Lender and as Lead Arranger, and the other Lenders from time to time party thereto.

6.      CA Lyon shall have obtained consent to the Restructuring Transactions from the Administrative Agent.

7.      WLH shall have obtained any other necessary consents and approvals (including any required government consents or approvals) to the consummation of the Restructuring Transactions.

8.      CA Lyon, the Guarantors, the indenture trustee under the indenture governing New Notes, the collateral agent under each security document for the New Notes, and each other applicable party shall have executed and delivered definitive documentation reasonably satisfactory to all such

2503959.

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

parties, including an intercreditor agreement with respect to the New Notes and the Senior Secured Term Loan, and appropriate equity documents, with respect to the new equity.

9.      The maturity of the Church Farm loan shall have been extended, and Mountain Falls loan to be restructured, both on terms and conditions satisfactory to CA Lyon and Ad Hoc Committee (it being understood that no such restructuring should require impairment of the claims of the lenders on such loans under the Plan).

10.     WLH shall have raised $85 million pursuant to the new money terms described above under "The Rights Offering" and "The Class B Shares".

11.     WLH shall have entered into the Employment Agreements described above.

12.     Other customary conditions including, without limitation, no legal impediment to or restraint on consummation of the Consent Solicitation or Exchange Offer.

The foregoing conditions are for the mutual benefit of WLH and the Ad Hoc Committee of holders of Old Notes, and may be asserted by either party regardless of the circumstances giving rise to any such condition or may be waived by either party in whole or in part at any time and from time to time in its sole discretion.

2503959.

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

### *Summary of the Principal Terms of the New Notes*

Maturity Date.................................... The fifth anniversary of Issue Date.

Interest ............................................ The New Notes will bear interest at a fixed annual rate of 12%, consisting of an 8% cash interest component and a 4% PIK interest component.  The cash interest component will be payable semi-annually in arrears.  The PIK interest component will accrete and be added to principal semi-annually in arrears.

Ranking............................................ The New Notes will be senior second lien debt obligations of CA Lyon, ranking ratably with any other unsubordinated indebtedness of CA Lyon (but structurally senior due to the second lien), but will be effectively subordinated to the Senior Secured Term Loan to the extent of the collateral securing such first lien indebtedness.

Guarantees ...................................... The New Notes will be guaranteed on a joint and several basis by the following entities (which will be the same guarantors that guaranty the Senior Secured Term Loan (the "Guarantors"):

DE Lyon
California Equity Funding, Inc., a California corporation
PH-LP Ventures, a California corporation
Duxford Financial, Inc., a California corporation
Sycamore CC, Inc., a California corporation
Presley CMR, Inc., a California corporation
William Lyon Southwest, Inc., an Arizona corporation
PH-Reilly Ventures, a California corporation
HSP, Inc., a California corporation
PH Ventures-San Jose, a California corporation
WLH Enterprises, a California Gen Partnership – formerly The Ranch Golf Club Co., formerly Carmel Mountain Ranch

2503959.

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

Lyon Waterfront, LLC, a Delaware limited liability company
Lyon East Garrison Company I, LLC, a California limited
liability company

Collateral Security .......................... The New Notes will be secured by second priority liens on
substantially all assets of CA Lyon and the Guarantors, other
than "Excluded Assets" that are also excluded from the Senior
Secured Term Loan security interests. The collateral for the
New Notes will be the same as the collateral for the Senior
Secured Term Loan.

Release of Collateral ....................... Upon the release of the lien on any collateral securing the
Senior Secured Term Loan during the term of the Senior
Secured Term Loan, the lien on that collateral securing the
New Notes will be automatically released without the
necessity of any consent from the holders of the New Notes.

Sinking Fund .................................... None.

Optional Redemption ....................... The New Notes will be redeemable at CA Lyon's option at any
time without penalty or premium, at the outstanding principal
amount thereof plus any accrued and unpaid interest thereon.

Trading ............................................ The New Notes are expected to be eligible for trading in the
PORTAL market.

Use of Proceeds ............................... CA Lyon does not expect to receive any net cash proceeds
from the issuance of the New Notes.

Covenants ....................................... The New Indenture (as defined below) will contain the
covenants summarized on Exhibit A hereto.

Basic Provisions of New
Indenture ......................................... The New Notes will be issued under an indenture (the "New
Indenture") containing provisions substantially similar to those
of the indentures governing the Old Notes, except (i) to the

2503959.

- 9 -

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

extent otherwise described herein, (ii) the covenants, which are summarized on Exhibit A hereto and(iii) that the New Indenture will provide for second priority liens on substantially all of the assets of CA Lyon and the Guarantors, other than specified excluded assets.

Basic Provisions of Intercreditor Agreement ...................................... | The New Notes will be subject to an Intercreditor and Subordination Agreement on substantially the terms and conditions summarized in the term sheet for the Colony Amendment, attached hereto as Exhibit B. :

### *Summary of the Principal Terms of the Class A Common Shares*

Class A Common Shares ............... | The Class A Common Shares will initially represent 28.5% of the outstanding capital stock of DE Lyon on a fully-diluted basis, after giving effect to the Restructuring Transactions, but prior to the effectiveness of the Management Incentive Plan and the Warrants.

Approval Rights............................... | The consent of the holders of 66 2/3% of the outstanding Class A Common Shares, a majority of the Class B Common Shares, and a majority of the Preferred Stock and Class C Common Shares voting as a class will be required for any merger, consolidation, or disposition of all or substantially all of the assets of DE Lyon or CA Lyon.

Voting Rights.................................. | The Class A Common Shares will carry one vote per share.

The consent of the holders of the Class A Common Shares will not be required for the day-to-day management or operations of DE Lyon, CA Lyon or their subsidiaries.

2503959.

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

Right to Appoint Directors ............    The holders of the Class A Shares will have the right to appoint one director to a seven-director Board.

In addition, initially two incumbent independent directors who are satisfactory to the holders of (a) 66 2/3% of the Class A Common Shares, (b) a majority of the Class B Common Shares and (c) a majority of the Preferred Stock and the Class C Common Shares voting as a class, will complete their one-year terms . Thereafter, the appointment of one new independent director will be subject to the approval of the holders of (i) 66 2/3% of the Class A Shares, (ii) a majority of the Class B Shares and (iii) the Class C Shares and Preferred Shares (with the Class C Shares and the Preferred Shares voting together). The other new independent director will be appointed by the holders of a majority of the Class C Shares and the Preferred Shares, voting together.

Right to Compel IPO ......................    The holders of a majority of the Class A Common Shares will have the right, subject to customary market exceptions, to require DE Lyon to consummate an initial public offering of its equity securities (an "IPO") within three years after the Issue Date, which right may be extended for up to two 12-month periods with the consent of a majority of the holders of the Class A Common Shares.

Conversion to Single Class of
Common Stock ...............................    Upon the occurrence of (i) an IPO, automatically, or (ii) the vote of a majority of the holders of A) the Class A Common Shares and B) the Class C Common Shares and the Preferred Shares (voting together), the Class A Common Shares, the Class C Common Shares and the Preferred Shares will be converted into a single class of common stock on a one-for-one basis. The Class B Shares may also be converted into the same class of common stock, with the approval of a majority

2503959.

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

of the holders of the Class B Shares.

### *Summary of the Principal Terms of the Class B Common Shares*

| | |
|---|---|
| Class B Common Shares | The Class B Common Shares will initially represent 20.0% of the outstanding capital stock of DE Lyon on a fully-diluted basis, after giving effect to the Restructuring Transactions, but prior to the effectiveness of the Management Incentive Plan or the Warrants. |
| Conditions to New Equity Contribution from Existing Equity Holders | Upon consummation of the Exchange Offer and the Consent Solicitation, holders of existing equity of DE Lyon will contribute $25 million for new equity (in the form of Class B Common Stock) subject to the following conditions: (i) issuance of the Warrants on terms and conditions satisfactory to CA Lyon, DE Lyon and DE Lyon's existing equity holders (and otherwise acceptable to the Ad Hoc Committee of Old Notes), (ii) agreement on, and executed and delivery by all applicable parties of, definitive documentation for the New Notes and all of the new equity interests and (iii) satisfaction of all terms and conditions set forth in this Term Sheet, in the Exchange Offer and Consent Solicitation documents and in the definitive documentation for the New Notes and all of the new equity interests, all on terms and conditions satisfactory to CA Lyon, DE Lyon and DE Lyon's existing equity holders. |
| Approval Rights | The consent of the holders of 66 2/3% of the outstanding Class A Common Shares, a majority of the Class B Common Shares, and a majority of the Preferred Stock and Class C Common Shares voting as a class will be required for any merger, consolidation, or disposition of all or substantially all |

2503959.

- 12 -

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

of the assets of DE Lyon or CA Lyon.

| | |
|---|---|
| Voting Rights................................. | The Class B Common Shares will carry two votes per share until transferred by the original holders.  Upon transfer of the Class B Common Shares by the original holders to any person or entity (other than a family member, heir, trust, estate planning device or similar transferee), the Class B Common Shares will automatically convert to Class A Common Shares, with one vote per share.  The holders of the Class B Common Shares may convert all or any portion of the Class B Common Shares to Class A Common Shares at their election at any time. |
| | The consent of the holders of the Class B Common Shares will not be required for the day-to-day management or operations of DE Lyon, CA Lyon or their subsidiaries. |
| Right to Appoint Directors ............. | The holders of the Class B Shares will have the right to appoint two directors to a seven-director Board. |
| | In addition, initially two incumbent independent directors who are satisfactory to the holders of (a) 66 2/3% of the Class A Common Shares, (b) a majority of the Class B Common Shares and (c) a majority of the Preferred Stock and the Class C Common Shares voting as a class, will complete their one-year terms . Thereafter, the appointment of one new independent director will be subject to the approval of the holders of (i) 66 2/3% of the Class A Shares, (ii) a majority of the Class B Shares and (iii) the Class C Shares and Preferred Shares (with the Class C Shares and the Preferred Shares voting together).  The other new independent director will be appointed by the holders of a majority of the Class C Shares and the Preferred Shares, voting together. |

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

Shelf Registration     DE Lyon will provide shelf registration for Class B Common Shares that have converted to Class A Common Shares.

### *Summary of the Principal Terms of the Preferred Shares*

Preferred Shares .............................     Preferred Shares (together with the Class C Common Shares) will initially represent 51.5% of the outstanding capital stock of DE Lyon on a fully-diluted basis, after giving effect to the Restructuring Transactions, but prior to the effectiveness of the Management Incentive Plan or the Warrants.  The Preferred Shares will convert to Class C Common Shares on a one-to-one basis.

Preferred Dividends........................     Holders of the Preferred Shares will be entitled to receive dividends to the extent permitted by the terms of the Senior Secured Loan Agreement, and the New Notes, at a rate of 6% per annum (based on a $50 million purchase price), payable in cash at the rate of 4% per annum, and PIK dividends at the rate of 2% per annum, or, at DE Lyon's option, any combination of cash and or PIK dividends.  Accrued and unpaid PIK dividends will be payable in cash upon conversion (i)  in connection with an IPO or (ii) to the extent cash payment is otherwise permitted by the Secured Term Loan Agreement.

Voting Rights...................................     The Preferred Shares will carry one vote per share (voting as Class C Common Stock on an as-converted basis).

The consent of the holders of the Preferred Shares will not be required for the day-to-day management or operations of DE Lyon, CA Lyon or their subsidiaries.

2503959.

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

Right to Appoint Directors .............
The holders of the Preferred Shares and the Class C Shares will together have the right to appoint two directors to a seven-director Board.

In addition, initially two incumbent independent directors who are satisfactory to the holders of (a) 66 2/3% of the Class A Common Shares, (b) a majority of the Class B Common Shares and (c) a majority of the Preferred Stock and the Class C Common Shares voting as a class, will complete their one-year terms . Thereafter, the appointment of one new independent director will be subject to the approval of the holders of (i) 66 2/3% of the Class A Shares, (ii) a majority of the Class B Shares and (iii) the Class C Shares and Preferred Shares (with the Class C Shares and the Preferred Shares voting together). The other new independent director will be appointed by the holders of a majority of the Class C Shares and the Preferred Shares, voting together.

No Covenants .................................
The terms of the Preferred Shares will not include any covenants, mandatory prepayments, prepayments at the option of the holders, or debt-like provisions.

Shelf Registration
DE Lyon will provide shelf registration for the Preferred Shares.

### *Summary of the Principal Terms of the Class C Common Shares*

Class C Common Shares ...............
Class C Common Shares (together with the Preferred Shares) will initially represent 51.5% of the outstanding capital stock of DE Lyon on a fully-diluted basis, after giving effect to the Restructuring Transactions, but prior to the effectiveness of the

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

Management Incentive Plan or the Warrants.

Voting Rights.................................. The Class C Common Shares will carry one vote per share.

The consent of the holders of the Class C Common Shares will not be required for the day-to-day management or operations of DE Lyon, CA Lyon or their subsidiaries.

Right to Appoint Directors ............. The holders of the Preferred Shares and the Class C Shares will together have the right to appoint two directors to a seven-director Board.

In addition, initially two incumbent independent directors who are satisfactory to the holders of (a) 66 2/3% of the Class A Common Shares, (b) a majority of the Class B Common Shares and (c) a majority of the Preferred Stock and the Class C Common Shares voting as a class, will complete their one-year terms . Thereafter, the appointment of one new independent director will be subject to the approval of the holders of (i) 66 2/3% of the Class A Shares, (ii) a majority of the Class B Shares and (iii) the Class C Shares and Preferred Shares (with the Class C Shares and the Preferred Shares voting together). The other new independent director will be appointed by the holders of a majority of the Class C Shares and the Preferred Shares, voting together.

Shelf Registration                          DE Lyon will provide shelf registration for the Class C Common Shares.

### *Summary of the Principal Terms of the Class D Common Shares*

2503959.

- 16 -

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

Class D Common Shares .............. The Class D Common Shares will be issued under the Management Incentive Plan. The Class D Common Shares when issued, will represent up to 8% of the outstanding capital stock of DE Lyon on a fully-diluted basis.

Voting Rights.................................. The Class D Common Shares will not be entitled to voting rights.

Restrictions on Transfer ................. The Class D Common Shares will be subject to restrictions on transfer.

2503959.

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

**Exhibit A**

**Covenants**

[See attached]