together with the Guarantors, the Administrative Agent, the Lenders, and each other applicable party having executed and delivered definitive documentation satisfactory to the Lenders in their sole and absolute discretion, including the Intercreditor and Subordination Agreement, and appropriate equity documents with respect to the New Common Equity.

The Administrative Agent and the Lenders' agreement to any such restructuring, including the Restructuring, and the restructuring of their outstanding loans as set forth in this term sheet is conditioned upon any use of the Lenders' cash collateral and any debtor in possession financing incurred by any of the Borrower or the Guarantors being on terms acceptable to the Administrative Agent and the Lenders in their sole and absolute discretion.

201644088 v8

SCHEDULE I

NEW COMMON EQUITY

**Class A Equity**

1. The Class A Equity will initially represent 28.5% of the outstanding capital stock of the Parent after the Closing Date on a fully diluted basis, after giving effect to the Restructuring, but prior to the effectiveness of any management incentive plan or the issuance of Warrants (as defined below).

2. The Class A Equity will carry one vote per share and will have the right to appoint one director to a seven-director board.

3. The holders of a majority of the Class A Equity will have the right, subject to customary market exceptions and on terms and conditions satisfactory to the Lenders in their sole and absolute discretion, to compel an initial public offering of the Parent's New Common Equity.

**Class B Equity**

1. The Class B Equity will initially represent 20.0% of the outstanding capital stock of the Parent after the Closing Date on a fully diluted basis and after giving effect to the Restructuring, but prior to the effectiveness of any management incentive plan or the issuance of Warrants.

2. The Class B Equity will carry two votes per share until transferred by the original holders. Upon transfer of the Class B Equity by the original holders to any person or entity (other than a family member, heir, trust, estate planning device or similar transferee), the Class B Equity will automatically convert to Class A Equity, with one vote per share.

3. The Class B Equity will have the right to appoint two directors to a seven-director board.

**Class C Equity**

1. The Class C Equity (together with the New Preferred Shares) will initially represent 51.5% (which includes a backstop fee payable to certain holders of the Borrower's existing senior notes) of the outstanding capital stock of the Parent after the Closing Date on a fully diluted basis, after giving effect to the Restructuring, but prior to the effectiveness of any management incentive plan or the issuance of the Warrants.

2. The Class C Equity will carry one vote per share and, together with the holders of the New Preferred Shares) will have the right to appoint two directors to a seven-director board.

**Day-to-Day Management of the Parent and the Borrower**

No consent from any of the holders of the New Common Equity will be required for the day-to-day operations of the Borrower and/or the Parent.

**Board of Directors**

The Parent's Board of Directors shall consist of seven members of which (a) five members shall be elected by the New Common Equity as set forth in this Schedule I and (b) two members shall be

12

201644088 v8

independent directors serving a one-year term who are initially satisfactory to the holders of (i) 66 2/3% of the Class A Equity, (ii) a majority of the Class B Equity and (iii) a majority of the New Preferred Shares and the Class C Equity voting as a class. Thereafter, the appointment of one new independent director will be subject to the approval of the holders of (x) 66 2/3% of the Class A Equity, (y) a majority of the Class B Equity and (z) the Class C Equity and New Preferred Shares (with the Class C Equity and the New Preferred Shares voting together). The other new independent director will be appointed by the holders of a majority of the Class C Equity and the New Preferred Shares, voting together.

## Warrants

In consideration for intrinsic value, the Parent will issue to the holders of its existing equity warrants to purchase Class B Equity ("Warrants") representing an additional 9.1% of the capital stock of the Parent on a fully-diluted basis (but before giving effect to any management incentive plan), at a strike price based on a $325 million equity value of the Parent.

After giving effect to the issuance of the Warrants, but before giving effect to any management incentive plan, the Class A Equity will represent 25.9% of the capital stock of the Parent, the Class B Equity will represent 27.3% of the capital stock of the Parent, and the Class C Equity (assuming full conversion of the New Preferred Shares) will represent 46.8% of the capital stock of the Parent.

## Management Incentive Plan

The Parent may enter into an incentive plan with management that is on terms and conditions satisfactory to the Lenders in their sole and absolute discretion.

13

**<u>Disclosure Statement Exhibit B</u>**

Organizational Chart of the Debtors



**ACTIVE COMPANIES**

William Lyon Homes
(a Delaware corporation)

(100%) California Equity Funding, Inc. (a California corporation)

(100%) William Lyon Homes, Inc. (a California corporation)

Presley Homes (a California corporation)

(100%) Duxford Financial, Inc. (formerly Presley Mortgage Company) (a California corporation)

(49.95%) Duxford Escrow, Inc. (Fidelity National Title Co.)

(100%) Duxford Insurance Services, LLC (a California limited liability company)

(100%) PH - LP Ventures (a California corporation)

(100%) Cerro Plata Associates, LLC (a Delaware limited liability company) (IHP)

(100%) Laguna Big Horn, LLC (a Delaware limited liability company) (Resmark Equity Partners)

(50%) Bayport Mortgage, L.P. (a California limited partnership) (Bayport Mortgage)

(50%) William Lyon Mortgage, LLC (a California limited liability company) (Countrywide/BofA)

(100%) PH Ventures - San Jose

(% owned by others) A Henry Ranch, LLC (a Delaware limited liability company) (IHP)

Lyon Vista Del Mar 833, LLC (a Delaware limited liability company) (Resmark Equity Partners)

(100%) HSP, Inc. (a California corporation)

(% owned by others) A Spectrum 90 Investors, LLC (a Delaware limited liability company) (IHP)

(50%) Queen Creek Joint Venture, LLC (an Arizona limited liability company) (Queen Creek Investors, Inc.)

(100%) Silvercreek Preserve (a California non-profit public benefit company)

(100%) Duxford Title Reinsurance Co. (a Vermont corporation)

(100%) Sycamore CC, Inc. (a California corporation)

Horsethief Canyon Partners (a California general partnership)

Circle G at the Church Farm North Joint Venture, LLC (an Arizona limited liability company) (Circle G One, LLC)

(100%) Presley CMR, Inc. (a California corporation)

(100%) Lyon Waterfront, LLC (a Delaware limited liability company)

(% owned by others) A 48 Ranch Planning Area 58, LLC (a Delaware limited liability company) (IHP)

(50%) WLH Enterprises (formerly The Ranch Golf Club Co.) (formerly Carmel Mountain Ranch) (a California general partnership)

(100%) Mountain Falls Golf Course, LLC (a Nevada limited liability co.) (Insight Holdings/Pahrump 885,LLC)

(50%) PLC/Lyon Waterfront Residential, LLC (a Delaware limited liability company) (PLC Homes, LLC)

(% owned by others) A San Miguel Village, LLC (a Delaware limited liability company) (IHP)

(100%) Mountain Falls, LLC (a Nevada limited liability co.) (Insight Holdings/Pahrump 885,LLC)

(100%) Lyon Mayfield, Inc. (a Delaware corporation)

(100%) Whitney Ranch Village 5, LLC (a Delaware limited liability company)

(% owned by others) A Lyon Traviso, LLC (a Delaware limited liability company) (IHP)

(100%) William Lyon Southwest, Inc. (an Arizona corporation)

(100%) Lyon Mayfield, LLC (a Delaware limited liability company)

(100%) Lyon East Garrison Company I, LLC (a California limited liability company)

(100%) PH-Rielly Ventures (a California corporation)

(50%) East Garrison Partners I, LLC (a California limited liability company) (Woodman Development Co.)

(50%) Tustin Villas Partners, LLC (a Delaware limited liability company) (Lennar)

(100%) Nobar Water Company (a California corporation)

(25%) Marble Mountain Partners, LLC (a Delaware limited liability company) (Lennar)

(100%) Moffett Meadows Partners, LLC (a Delaware limited liability company)

(100%) Tustin Villas Partners, LLC (a Delaware limited liability company)

Footnote A - Due to waterfall provisions in each operating agreement, percentage ownership changes over time.

Rev: 11/08/11

**<u>Disclosure Statement Exhibit C</u>**

The Reorganized Debtors' Financial Projections

**WILLIAM LYON HOMES**
Business Plan Assumptions
For the Years Ended December 31st, 2012 - 2016

The forecast was prepared to present the anticipated impact of the Plan and assume that the Plan will be implemented in accordance with its stated terms. The forecast may be significantly impacted by, among other factors, changes in the competitive environment, regulatory changes and/or a variety of other factors, including those factors listed in the Plan and the Disclosure Statement. Accordingly, the estimates and assumptions underlying the forecast are inherently uncertain and are subject to significant business, economic and competitive uncertainties. Therefore, such forecast, estimates and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein. The forecast included herein was prepared in 3rd Quarter of 2011. The Company is unaware of any circumstances as of the date of this Disclosure Statement that would require the re-forecasting of the forecast due to a material change in the Company's prospects. The Forecast should be read in conjunction with the significant assumptions, qualifications and notes set forth below.

THE FORECAST WAS NOT PREPARED TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS AND THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION. THE COMPANY'S INDEPENDENT ACCOUNTANTS AND ADVISORS HAVE NOT EXAMINED OR COMPILED THE FORECAST THAT ACCOMPANY THE DISCLOSURE STATEMENT AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE FORECAST, ASSUME NO RESPONSIBILITY FOR THE FORECAST, AND DISCLAIM ANY ASSOCIATION WITH THE FORECAST. EXCEPT FOR PURPOSES OF THE DISCLOSURE STATEMENT, THE COMPANY DOES NOT PUBLISH FORECAST OF ITS ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS. MOREOVER, THE FORECAST CONTAINS CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, WHICH ARE BEYOND THE CONTROL OF THE COMPANY, INCLUDING EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS, ACTS OF TERRORISM OR WAR, INDUSTRY-SPECIFIC RISK FACTORS (AS DETAILED IN SECTION OF THE DISCLOSURE STATEMENT ENTITLED "RISK FACTORS"), AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE COMPANY UNDERTAKES NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS UNLESS OTHERWISE AGREED. THE FORECAST, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, WHICH ARE BEYOND THE COMPANY'S CONTROL. NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE FORECAST OR TO THE COMPANY'S ABILITY TO ACHIEVE THE PROJECTED RESULTS. THEREFORE, SOME ASSUMPTIONS MAY PROVE TO BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE COMPANY PREPARED THESE FORECAST MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR DISCLOSURE STATEMENT, THE COMPANY, AS APPLICABLE, DOES NOT INTEND AND UNDERTAKES NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE FORECAST TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE THE DISCLOSURE STATEMENT IS INITIALLY CIRCULATED OR FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE FORECAST MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

***Key Assumptions - Income Statement***

Home Sale Revenue: The Company has forecasted 2012 revenue based on current sales prices. However, price appreciation on certain projects is projected to begin in 2013, ranging from 1% to 3% per year. On a consolidated basis, the Company expects a weekly sales rate of 0.7 sales per project for 2011, increasing gradually to 1.2 for 2015, with growth in 2016 commensurate with years prior.

In reaction to recent market activity, the Company temporarily suspended the development, sales and marketing activities at certain of its projects which are in the early stages of development. The projects currently on hold are:
- The Lofts and Gardens at 360 at South Bay (The Rows, The Court, and The Flats are active)
- Church Farms
- Rancho Mercado
- Antioch

Land Sales: In addition to the development and sale of homes, the Company assumes the following land sales (in unit equivalents) from 2012 through 2016:
- Hastings Ranch: 180 units for revenue of $9.0 million
- Lehi Farms: 187 units for revenue of $20.7 million
- Lyon's Gate (Apartment Site): 213 units for revenue of $3.7 million
- Astoria: 4 units for revenue of $0.8 million
- Mountain Falls: 1,926 units for revenue of $26.9 million

Joint Ventures: It is assumed that two new projects in Southern California (Irvine School Sites) and one new project in Northern California (HP Site in Palo Alto/Mountain View) will be built with joint venture partners during the forecast period. The Company will receive approximately 50% of the profits and cash flow from new homebuilding joint venture projects, after preferred returns on capital. In addition, new joint venture projects are assumed to be undertaken as land parcels are identified.

It is assumed that the Company will receive management fees from these joint ventures, generally equal to 3% of projected project revenues. These fees are primarily received as housing units close or, in a few cases, as the project is developed.

Selling Expenses: Expenses associated with the sale of homes includes, but is not limited to, model expenses, sales commissions and salaries, and advertising. These expenses are largely variable in nature, and are primarily dependent upon 1) the level of business activity and 2) the number of active selling communities in a given period. The Company has forecasted these based on historical incurrence levels, generally expressed as a percentage of revenue. In the aggregate, these costs are assumed at 7.2% of revenue in 2012, decreasing to 5.3% of revenue in 2016.

General & Administrative Expenses: The Company assumes that administrative costs are based on historical trends, maintaining the infrastructure necessary to support forecasted business activity.

Gross Margins: Over the forecast period, the impact of fresh start accounting and selling newer projects that feature a lower land and cost basis are developed. The increase in closings from these types of projects increase gross margin from 12.5% in 2011 to 24.0% in 2016.

***Key Assumptions - Balance Sheet***

Inventory: The forecast assumes that the Company continues land development and home construction activities. These activities result in the capitalization of expenditures which may include, but is not limited to, land acquisitions (see Land Acquisitions), development costs, home construction costs, interest costs, certain general and administrative costs, deposits and options, and other expenditures. As units are sold, amounts associated with those units are relieved from Inventory to Cost of Sales in the Income Statement. Inventory amounts also include real estate assets held by consolidated joint ventures. The third party equity interest in these joint ventures are reflected as Non-controlling Interest.

Land Acquisitions: Prospective land acquisitions are included in the plan based on the current data and timing available for these land parcels. In addition, land acquisitions are assumed for parcels that have yet to be identified, but that will be necessary for sustaining the long term home sales and revenue for the Company. In aggregate, through 2015 these acquisitions total:

- 2,024 lots in Southern California, at a cost of $424.1 million
- 1,048 lots in Northern California, at a cost of $129.5 million
- 348 lots in Arizona, at a cost of $3.2 million
- 1,041 lots in Nevada, at a cost of $15.6 million

Other Assets:  Receivables, deposits, pre-paid assets, and other assets are captured in Other Assets in the forecast.  Certain of these amounts, notably escrow receivables, fluctuate with business activity, while the remaining are forecasted based on historical balances.

Accounts Payable and Accrued Expenses:  The forecast captures near term liabilities such as payables to trade vendors, accrued interest, accrued warranty liabilities, and other amounts based on the cost incurrence and respective cash payments of liabilities that arise in the ordinary course of business.  These amounts result from the assumed activity at individual projects, or from corporate-level liabilities such as long term debt (see New Financing).

New Financing:  The forecast assumes the revised financing structure proposed herein is ratified in its entirety, resulting in the following debt structure:
- Secured Term Loan:  $235.0 million, 10.25% cash pay interest
- 2nd Lien Senior Note:  $75.0 million, 12.0% interest (8.0% cash pay interest, 4.0% PIK interest)
- Project Debt as noted below (also see Capitalization Summary)

Project Debt:  Certain projects have specific financing, including (see Capitalization Summary):
- Mountain Falls (Bank of the West), 10.0% cash pay interest
- Church Farm (US Bank), 5.5% cash pay interest (based on current negotiations with the lender)
- San Carlos (Irvine Company), 7.0% cash pay interest

William Lyon Homes
Forecast Financial Statements (1)

| | Estimate Twelve Months Ended Dec 31, 2011 (2) | Forecast Two Months Ending Feb 28, 2012 (2) | Transaction Adjustments Feb 28, 2012 | Est. Fresh Start Adjustments Feb 28, 2012 | Proforma Two Months Ending Feb 28, 2012 (5) | Forecast Twelve Months Ended Dec 31, 2012 (2) | Forecast Twelve Months Ended Dec 31, 2013 (2) | Forecast Twelve Months Ended Dec 31, 2014 (2) | Forecast Twelve Months Ended Dec 31, 2015 (2) | Forecast Twelve Months Ended Dec 31, 2016 (2) |
|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | |
| Cash and cash equivalents | $ 17,994 | $ (18,900) (3) | $ 75,000 (4) | $ - | $ 56,100 (5) | $ 51,032 | $ 71,297 | $ 141,651 | $ 24,498 | $ 24,498 |
| Restricted cash | 502 | 502 | - | - | 502 | 502 | 502 | 502 | 502 | 502 |
| Real estate inventories | | | | | | | | | | |
| Owned | 523,365 (3) | 525,507 | - | (99,848) (11) | 425,659 | 491,940 | 497,602 | 535,928 | 553,864 | 609,251 |
| Not owned | 44,908 | 44,908 | - | - | 44,908 | 27,519 | 10,480 | 0 | 0 | 0 |
| Deferred loan costs | 8,809 | 8,809 | 1,191 (6) | - | 10,000 | 8,072 | 5,759 | 3,465 | 1,935 | 500 |
| Goodwill | - | - | - | - | - | - | - | - | - | - |
| Other assets | 21,433 | 20,156 | - | - | 20,157 | 21,870 | 22,104 | 22,261 | 20,386 | 19,449 |
| Total Assets | $ 617,011 | $ 580,981 | $ 76,191 | $ (99,848) | $ 557,325 | $ 600,935 | $ 607,744 | $ 703,807 | $ 601,185 | $ 654,199 |
| | | | | | | | | | | |
| **Liabilities and Equity** | | | | | | | | | | |
| Accounts payable and accrued expenses | $ 45,775 | $ 27,045 | $ (15,593) | $ - | $ 11,452 | $ 32,974 | $ 32,244 | $ 32,874 | $ 28,799 | $ 28,799 |
| Liabilities from inventories not owned | 44,908 | 44,908 | - | - | 44,908 | 27,519 | 10,480 | 0 | 0 | 0 |
| Notes payable | 18,546 | 17,815 | - | - | 17,815 | 9,500 | 3,000 | 1,000 | 122,252 (12) | 139,666 (12) |
| Senior Secured Term Loan due October 20, 2014 | 206,000 | 206,000 | 29,000 (7) | - | 235,000 | 235,000 | 235,000 | 235,000 | - | - |
| 7.625 % Senior Notes due December 15, 2012 | 66,704 | 66,704 | (66,704) (8) | - | 0 | 0 | 0 | 0 | 0 | 0 |
| 10.75 % Senior Notes due April 1, 2013 | 138,910 | 138,962 | (138,962) (8) | - | (0) | (0) | 0 | 0 | 0 | 0 |
| 7.5 % Senior Notes due February 15, 2014 | 77,867 | 77,867 | (77,867) (8) | - | (0) | 0 | 0 | 0 | 0 | 0 |
| 2nd Lien Note | - | - | 75,000 (8) | - | 75,000 | 77,553 | 80,713 | 84,001 | 87,424 | 90,846 |
| FIN 46 Notes Payable | - | - | - | - | - | 63,037 | 64,713 | 25,285 | 19,980 | 14,674 |
| Stockholders' equity | (45,539) | (54,378) | 271,317 | (99,848) (11) | 117,090 | 103,695 | 105,553 | 133,142 | 178,858 | 239,283 |
| Non-controlling interest | 63,839 | 56,061 | - | - | 56,061 | 51,658 | 76,041 | 192,504 | 163,873 | 140,931 |
| Total Liabilities and Equity | $ 617,011 | $ 580,982 | $ 76,191 | $ (99,848) | $ 557,325 | $ 600,935 | $ 607,744 | $ 703,807 | $ 601,185 | $ 654,199 |

| | Estimate Twelve Months Ended Dec 31, 2011 | Forecast Two Months Ending Feb 28, 2012 | Transaction Adjustments Feb 28, 2012 | Est. Fresh Start Adjustments Feb 28, 2012 | Proforma Two Months Ending Feb 28, 2012 | Forecast Twelve Months Ended Dec 31, 2012 | Forecast Twelve Months Ended Dec 31, 2013 | Forecast Twelve Months Ended Dec 31, 2014 (2) | Forecast Twelve Months Ended Dec 31, 2015 (2) | Forecast Twelve Months Ended Dec 31, 2016 (2) |
|---|---|---|---|---|---|---|---|---|---|---|
| **Operating revenue** | | | | | | | | | | |
| Home sales | $ 217,564 | $ 17,579 | $ - | $ - | $ 17,579 | $ 244,042 | $ 430,539 | $ 577,425 | $ 673,381 | $ 794,802 |
| Lots, land and other sales | 1,610 | 800 | - | - | 800 | 12,183 | 16,500 | 10,174 | 10,267 | 10,314 |
| Total Revenue | 219,174 | 18,379 | - | - | 18,379 | 256,225 | 447,039 | 587,599 | 683,648 | 805,115 |
| **Operating costs** | | | | | | | | | | |
| Cost of sales – homes | (197,869) | (17,642) | - | - | (17,642) | (215,062) | (350,982) | (447,031) | (521,783) | (607,184) |
| Cost of sales – lots, land and other | (1,775) | (800) | - | - | (800) | (10,695) | (13,593) | (5,644) | (4,921) | (4,560) |
| Impairment loss on real estate assets | - | - | - | - | - | - | - | - | - | - |
| Impairment loss on goodwill | - | - | - | - | - | - | - | - | - | - |
| Construction services | 2,316 | 800 | - | - | 800 | 4,107 | 2,036 | 1,396 | 700 | 500 |
| Sales and marketing | (18,336) | (2,355) | - | - | (2,355) | (18,498) | (29,474) | (36,513) | (36,030) | (42,527) |
| General and administrative | (24,131) | (5,463) | - | - | (5,463) | (21,953) | (18,693) | (23,497) | (28,727) | (33,907) |
| Other | (2,600) | (37) | - | - | (37) | 195 | (275) | (249) | (251) | (250) |
| Total Costs | (242,396) | (25,497) | - | - | (25,497) | (261,906) | (410,981) | (511,539) | (591,014) | (687,928) |
| Equity in income (loss) of unconsolidated joint ventures | 3,677 | - | - | - | - | - | - | - | - | - |
| Operating (loss), income | (19,545) | (7,118) | - | - | (7,118) | (5,681) | 36,057 | 76,060 | 92,634 | 117,187 |
| Gain on retirement of debt and net FSA impact | - | - | 195,126 (9) | (99,848) (11) | 95,278 | 95,278 | - | - | - | - |
| Interest expense, net of amounts capitalized | (25,613) | (1,873) | (8,809) (10) | - | (10,682) | (21,615) | (15,384) | (17,948) | (3,425) | (1,713) |
| Other income (expense), net | (14,000) | - | - | - | - | - | - | - | - | - |
| (Loss), Income before benefit from income taxes | (59,159) | (8,991) | 186,317 | (99,848) | 77,477 | 67,982 | 20,674 | 58,112 | 89,209 | 115,475 |
| (Provision), Benefit from income taxes | (10) | - | - | - | (10) | (10) | (10) | (570) | (1,709) | (23,095) |
| Consolidated net (loss), income | (59,169) | (8,991) | 186,317 | (99,848) | 77,477 | 67,972 | 20,664 | 57,541 | 87,500 | 92,380 |
| Less: net (income) loss — non-controlling interest | (183) | 152 | - | - | 152 | (1,719) | (16,337) | (27,433) | (39,214) | (29,214) |
| Net (loss) gain attributable to William Lyon Homes | $ (59,352) | $ (8,840) | $ 186,317 | $ (99,848) | $ 77,629 | $ 66,253 | $ 4,327 | $ 30,108 | $ 48,286 | $ 63,165 |

*Notes*

(1) On November 4th, 2011, the Company filed an 8-K that included Certain Illustrative Financial Projections. These forecast financial statements shown here are based upon the same forecast assumptions, however they have been updated for the following material changes:

    1  The transaction date is assumed to be February 28th, 2012 compared to December 31st, 2011 as previously shown.

    2  Entry into the IUSD joint ventures was moved from January 2012 to March 2012.

    3  The December 2011 takedown at 360 at South Bay was moved to March 2012 (see footnote (2)).

(2) Discussions with Hearthstone regarding the timing of land takedowns on the 360 at South Bay project are ongoing. This forecast reflects a delay in the takedown scheduled for December 2011, replaced with a $2.5 million deposit. An adjustment to the timing may result in changes to the forecasted financial statements.

(3) As part of the transaction, it is assumed that there will be a DIP Loan Facility, which will be used for continuing operations and to support temporary cash uses.

(4) Reflects the contribution of $25.0 million of cash for 20% of Total Equity, and $60.0 million of cash for 51.5% of Total Equity, net of $10.0 million in estimated transactional expenses. All percentages are before the consideration of Warrants issued and any issuance of equity under a Management Incentive Plan. Estimated transactional fees of $10.0 million are anticipated to cover costs associated with the Debtor's Counsel, Debtor's Advisors, Noteholders' Counsel, Noteholders' Advisors, Secured Term Lender's Counsel, Secured Term Lender's Advisors, Secured Term Lender's Fees, and other advisors as necessary.

(5) The resulting Cash balance after the Equity Raise is reflective of costs associated with facilitating the transaction, and reflects temporary uses of cash. The balance may differ depending upon the timing and circumstances of emergence, as well as normal course cash impacts of the business.

(6) Reflects the net impact of the write-down of all previously capitalized loan costs, and the capitalization of $10.0 million in transactional expenses (see footnote (2)).

(7) The Prepetition Lenders and Administrative Agent have asserted potential claims in the amount of approximately $276 million, which includes a make-whole amount and exit fees. The amount of $29.0 million reflects a compromise with respect to the make-whole amount and exit fees. The Company does not express an opinion as to the make-whole or exit fees.

(8) Assumes all Senior Notes are exchanged pursuant to the terms provided by the transaction. In consideration of the cancellation of the Senior Notes, a new 2nd Lien Senior Note of $75.0 million is issued, as well as Equity that will be issued representing 28.5% of Total Equity, in the form of Common Equity. Percentage is before the consideration of Warrants issued and any issuance of equity under a Management Incentive Plan.

(9) Reflects the impact to Equity, facilitated through the Income Statement, of the Cancellation of Debt. Treatment for tax purposes may differ than treatment shown here.

(10) Reflects the write-off of previously capitalized loan costs associated with the Senior Secured Term Loan and Senior Notes (see footnote (4)).

(11) Reflects the estimated adjustment to inventory value consistent with the methodology prescribed via Fresh Start Accounting for entities Reorganizing and Emerging from Chapter 11, based on Accounting Standard Codification 852. This adjustment is an estimate and unaudited.

(12) The forecast assumes that upon the maturity of the restated Secured Term Loan, a future revolver (or other facility) will be used to refinance the debt, maintaining a minimum cash balance.

**William Lyon Homes**
Capitalization Summary

| | Actual Dec 31, 2010 | | Proforma [1] Feb 28, 2012 | |
|---|---|---|---|---|
| Cash and cash equivalents...................................................... | $ | 71,286 | $ | 56,602 [2] |
| | | | | |
| Senior Secured Term Loan due October 20th, 2014........................ | $ | 206,000 | $ | 235,000 [3] |
| 7.625 % Senior Notes due December 15th, 2012............................ | | 66,704 | | - [1] |
| 10.75% Senior Notes due April 1st, 2013................................... | | 138,619 | | - [1] |
| 7.5 % Senior Notes due February 15th, 2014............................... | | 77,867 | | - [1] |
| Project Debt.................................................................... | | 30,541 | | 17,815 [4] |
| Senior Subordinated Note..................................................... | | - | | 75,000 [1] |
| Total Long Term Debt......................................................... | $ | 519,731 | $ | 327,815 |
| | | | | |
| Shareholders' Equity.......................................................... | $ | 13,814 | $ | 117,090 [5] |
| Non-controlling interest....................................................... | | 11,563 | | 56,061 [6] |
| Total Equity.................................................................... | $ | 25,377 | $ | 173,151 |
| | | | | |
| Total Capitalization........................................................... | $ | 545,108 | $ | 500,966 |

*Notes*

(1) Assumes all Senior Notes are exchanged pursuant to the terms provided by the Plan.

(2) Reflects an Equity Raise from a Rights Offering of $85.0 million, less transaction fees of $10.0 million and the payoff of a DIP Loan Facility of approximately $20.0 million. Note that this amount is reflective of costs associated with facilitating the transaction, and does not assume the continuation of timing-related impacts of that facilitation. Estimated transactional fees of $10.0 million are anticipated to cover costs associated with the Debtor's Counsel, Debtor's Advisors, Noteholders' Counsel, Noteholders' Advisors, Secured Term Lender's Counsel, Secured Term Lender's Advisors, Secured Term Lender's Fees, and other advisors as necessary. The capital contribution of $25.0 million from existing holders will be in the form of cash or in the form of a combination of cash and the interests in an entity holding land deposits for sites at Rancho Mission Viejo. The cash balance may differ depending upon the timing and circumstances of emergence.

(3) Reflects a compromise on a potentially asserted claim of approximately $70.0 million related to the make-whole and exit fee on the Senior Secured Term Loan. The Company does not express an opinion as to the make-whole amount or exit fee.

(4) Project Debt as of February 28th, 2012 is forecast to include $2.3 million in Seller Notes related to San Carlos, $6.5 million in Project Debt related to Mountain Falls, and $9.0 million in Project Debt related to Church Farm.

(5) Reflects equity issued in consideration of :
  A. $50.0 million in cash contributed, representing 41.5% of Total Equity, in the form of Preferred Equity
  B. $25.0 million in cash contributed, representing 20.0% of Total Equity, in the form of Common Equity
  C. the extinguishment of the Senior Notes, representing 28.5% of Total Equity, in the form of Common Equity
  D. $10.0 million in cash contributed, representing 10.0% of Total Equity, in the form of Common Equity
  All percentages are before giving consideration to Warrants issued, or any issuance of equity under a Management Incentive Plan.

(6) Minority Interest includes $46.7 million associated with the Mayfield Project, located in Palo Alto and Mountain View, CA. The Company recently closed on the project as a wholly owned acquisition. The forecast assumes the project is pursued as a joint venture. The Company is still reviewing options as it pertains to the development of the project, and a joint venture partner is still being pursued. Due to this, the forecast is reflecting the Mayfield Project as a joint venture, although it currently has project specific debt of $55.0 million, which is instead reflected in Non-controlling interest.

**William Lyon Homes**
Sources and Uses

|  | | Proforma [1] Feb 28, 2012 | |
|---|---|---|---|
| **Cash Sources** | | | |
| Rights Offering: | | | |
| Contribution from Current Equity Holders.................... | $ | 25,000 | [2] |
| Contribution from Current Noteholders......................... | | 60,000 | [3] |
| Total Cash Sources................................................. | $ | 85,000 | |
| | | | |
| **Cash Uses** | | | |
| Transaction Expenses................................................ | $ | 10,000 | [4] |
| Payoff of DIP Loan Facility........................................ | | 18,900 | [5] |
| Cash to the Balance Sheet......................................... | | 56,100 | [5] |
| Total Cash Uses...................................................... | $ | 85,000 | |
| | | | |
| **Non-Cash Sources** | | | |
| Senior Secured Term Loan due October 20th, 2014............ | $ | 206,000 | [7] |
| 7.625 % Senior Notes due December 15th, 2012................ | | 66,704 | [6] |
| 10.75% Senior Notes due April 1st, 2013....................... | | 138,962 | [6] |
| 7.5 % Senior Notes due February 15th, 2014................... | | 77,867 | [6] |
| Total Non-Cash Sources............................................ | $ | 489,533 | |
| | | | |
| **Non-Cash Uses** | | | |
| Maintenance of Secured Term Loan Principal................... | $ | 206,000 | |
| Incremental Principal on Secured Term Loan.................... | | 29,000 | [7] |
| Issuance of New 2nd Lien Note.................................... | | 75,000 | [6] |
| Non-Cash Impact to Equity from Cancellation of Debt......... | | 179,533 | |
| Total Non-Cash Uses................................................ | $ | 489,533 | |

*Notes*
(1) Assumes all Senior Notes are exchanged pursuant to the terms provided by the Plan.
(2) In consideration of $25.0 million in cash contributed, Equity will be issued representing 20.0% of Total Equity, in the
   form of Common Equity, before considering the impact of Warrants or equity issued under a MIP.
   The capital contribution of $25.0 million from existing equity holders will be in the form of cash or in the form of a
   combination of cash and the interests in an entity holding land deposits for sites at Rancho Mission Viejo.
(3) In consideration of $60.0 million in cash contributed, Equity will be issued representing 51.5% of Total Equity, in the
   form of both Preferred Equity and Common Equity, before considering the impact of Warrants or equity issued
   under a MIP.
(4) Estimated transactional fees of $10.0 million are anticipated to cover costs associated with the Debtor's Counsel,
   Debtor's Advisors, Noteholders' Counsel, Noteholders' Advisors, Secured Term Lender's Counsel, Secured
   Term Lender's Advisors, Secured Term Lender's Fees, and other advisors as necessary.
(5) Note that this amount is reflective of costs associated with facilitating the transaction, and does not assume
   the continuation of timing-related impacts of that facilitation. The balance may differ depending upon
   the timing and circumstances of emergence, as well as the normal course cash impacts of the business.
(6) Assumes all Senior Notes are exchanged pursuant to the terms provided by the transaction.
   In consideration of the cancellation of the Senior Notes, a new 2nd Lien Senior Note of $75.0 million is issued,
   as well as Equity that will be issued representing 28.5% of Total Equity, in the form of Common Equity,
   before considering the impact of Warrants or equity issued under a MIP.
(7) The Prepetition Lenders and Administrative Agent may assert potential claims in the amount of
   approximately $276 million, which includes a make-whole amount and exit fees. The amount of $29.0 million
   reflects a compromise with respect to the make-whole amount and exit fees. The Company does not express an opinion
   as to the make-whole or exit fees.

Subject to Change
Tentative and Preliminary

**William Lyon Homes**
Debt Maturity Schedule

| At Sept. 30, 2011, Pre-Transaction: | Three Months Ended | Twelve Months Ended | | | |
| --- | --- | --- | --- | --- | --- |
| | Dec 31, 2011 | Dec 31, 2012 | Dec 31, 2013 | Dec 31, 2014 | Dec 31, 2015 |
| Senior Secured Term Loan Debt | | | | $ 206,000 | |
| Average Interest Rate | | | | 14.0% | |
| Senior Notes | | $ 66,704 | $ 139,278 | $ 77,867 | (1) |
| Average Interest Rate | | 7.6% | 10.8% | 7.5% | |
| Long Term Project Debt | $ 1,889 | $ 9,047 | $ 6,500 | $ 2,000 | $ 1,000 (2) |
| Average Interest Rate | 7.8% | 6.7% | 6.9% | 10.0% | 10.0% |
| Weighted Average Current Interest Rate | | | | | 11.1% |

| At Dec. 31, 2011: | Twelve Months Ended | | | | |
| --- | --- | --- | --- | --- | --- |
| | Dec 31, 2012 | Dec 31, 2013 | Dec 31, 2014 | Dec 31, 2015 | Later Periods |
| Senior Secured Term Loan Debt | | | | $ 235,000 | |
| Average Interest Rate | | | | 10.3% | |
| 2nd Lien Note | | | | | $ 75,000 (3) |
| Average Interest Rate | | | | | 12.0% |
| Long Term Project Debt | $ 9,047 | $ 6,500 | $ 2,000 | $ 1,000 | (4) |
| Average Interest Rate | 6.7% | 6.9% | 10.0% | 10.0% | |
| Weighted Average Current Interest Rate | | | | | 10.5% |

*Notes*
(1) The balance reflected for the Senior Notes due April 1st, 2013 is shown inclusive of Original Issue Discount, reflecting the face amount.
(2) Project Debt as of September 30th, 2011 includes $3.9 million in Seller Notes related to San Carlos, $7.5 million in Project Debt related to Mountain Falls, and $9.0 million in Project Debt related to Church Farm.
(3) The new 2nd Lien Note of $75.0 million has a maturity date on the fifth anniversary of the effective date.
(4) Project Debt as of February 28th, 2012 is estimated to include $2.3 million in Seller Notes related to San Carlos, $6.5 million in Project Debt related to Mountain Falls, and $9.0 million in Project Debt related to Church Farm.

**Disclosure Statement Exhibit D**

Historical Financial Statements

**William Lyon Homes**
Historical Financial Statements

|  | Nine Months Ended | Twelve Months Ended (1) | | |
|---|---|---|---|---|
|  | Sep 30, 2011 | Dec 31, 2010 | Dec 31, 2009 | Dec 31, 2008 |
| **Assets** | | | | |
| Cash and cash equivalents | $ 24,858 | $ 71,286 | $ 117,587 | $ 67,017 |
| Restricted cash | 502 | 641 | 4,352 | 5,079 |
| Receivables | 18,552 | 18,499 | 16,294 | 29,985 |
| Income tax refunds receivable | - | - | 106,989 | 46,696 |
| Real estate inventories: | | | | |
| Owned | 485,338 | 488,906 | 523,336 | 754,489 |
| Not owned | 47,408 | 55,270 | 55,270 | 107,763 |
| Property and equipment, net | 1,094 | 1,230 | 1,673 | 14,403 |
| Deferred loan costs | 9,715 | 12,404 | 14,859 | 6,264 |
| Other assets (1) | 6,060 | 768 | 19,739 | 13,147 |
| Total Assets | $ 593,527 | $ 649,004 | $ 860,099 | $ 1,044,843 |
| | | | | |
| **Liabilities and Equity** | | | | |
| Accounts payable | $ 9,712 | $ 6,904 | $ 11,046 | $ 16,331 |
| Accrued expenses | 39,653 | 41,722 | 45,294 | 62,987 |
| Liabilities from inventories not owned | 47,408 | 55,270 | 55,270 | 80,079 |
| Notes payable | 20,436 | 30,541 | 64,227 | 194,629 |
| Senior Secured Term Loan due October 20th, 2014 | 206,000 | 206,000 | 206,000 | - |
| 7.625 % Senior Notes due December 15th, 2012 | 66,704 | 66,704 | 67,204 | 133,800 |
| 10.75% Senior Notes due April 1st, 2013 | 138,833 | 138,619 | 168,158 | 218,176 |
| 7.5 % Senior Notes due February 15th, 2014 | 77,867 | 77,867 | 84,701 | 124,300 |
| Equity: | | | | |
| Stockholders' equity: | | | | |
| Common stock, par value $.01 per share; 3,000 shares authorized | - | - | - | - |
| Additional paid-in capital | 48,867 | 48,867 | 48,867 | 48,867 |
| (Accumulated deficit) Retained earnings | (72,187) | (35,053) | 101,733 | 122,258 |
| Non-controlling interest (1) | 10,234 | 11,563 | 7,599 | 43,416 |
| Total Liabilities and Equity | $ 593,526 | $ 649,004 | $ 860,099 | $ 1,044,843 |

*Notes*
(1) Certain items have been reclassified from their original presentation to conform to current period presentation.

**William Lyon Homes**
Historical Financial Statements

| | Nine Months Ended | Twelve Months Ended (1) | | |
|---|---|---|---|---|
| | Sep 30, 2011 | Dec 31, 2010 | Dec 31, 2009 | Dec 31, 2008 |
| Operating revenue | | | | |
| Home sales | $ 148,072 | $ 266,865 | $ 253,874 | $ 468,452 |
| Lots, land and other sales | - | 17,204 | 21,220 | 39,512 |
| Construction services | 13,579 | 10,629 | 34,149 | 18,114 |
| Total Revenue | 161,651 | 294,698 | 309,243 | 526,078 |
| Operating costs | | | | |
| Cost of sales — homes | (129,651) | (225,751) | (219,486) | (439,276) |
| Cost of sales — lots, land and other | - | (20,426) | (131,640) | (47,599) |
| Impairment loss on real estate assets | - | (111,860) | (45,269) | (135,311) |
| Impairment loss on goodwill | - | - | - | (5,896) |
| Construction services | (12,438) | (7,805) | (28,486) | (15,431) |
| Sales and marketing | (13,283) | (19,746) | (17,636) | (40,441) |
| General and administrative | (18,026) | (25,129) | (21,027) | (27,645) |
| Other (2) | (11,629) | (2,740) | (6,580) | (4,461) |
| Total Costs | (185,027) | (413,457) | (470,124) | (716,060) |
| Equity in income (loss) of unconsolidated joint ventures | 3,605 | 916 | (420) | (3,877) |
| Operating loss | (19,771) | (117,843) | (161,301) | (193,859) |
| Gain on retirement of debt | - | 5,572 | 78,144 | 54,044 |
| Interest expense, net of amounts capitalized | (17,981) | (23,653) | (35,902) | (24,440) |
| Other income (expense), net | 686 | 57 | (3,802) | 579 |
| Loss before benefit from income taxes | (37,066) | (135,867) | (122,861) | (163,676) |
| Benefit from income taxes | (10) | 412 | 101,908 | 41,592 |
| Consolidated net loss | (37,076) | (135,455) | (20,953) | (122,084) |
| Less: net (income) loss — non-controlling interest (1) | (58) | (1,331) | 428 | 10,446 |
| Net loss attributable to William Lyon Homes | $ (37,134) | $ (136,786) | $ (20,525) | $ (111,638) |

*Notes*
(1) Certain items have been reclassified from their original presentation to conform to current period presentation.
(2) Includes non-recurring professional fees, golf course operations and property tax expense on held projects that are expensed in the period incurred.

**William Lyon Homes**
Historical Financial Statements

| | Nine Months Ended | | Twelve Months Ended (1) | | | |
|---|---|---|---|---|---|---|
| | Sep 30, 2011 | | Dec 31, 2010 | | Dec 31, 2009 | Dec 31, 2008 |
| **Operating activities** | | | | | | |
| Consolidated net loss | $ (37,076) | $ | (135,455) | $ | (20,953) | $ (122,084) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | | | | | |
| Depreciation and amortization | 216 | | 385 | | 1,493 | 2,218 |
| Impairment loss on real estate assets | - | | 111,860 | | 45,269 | 135,311 |
| Impairment loss on goodwill | - | | - | | - | 5,896 |
| Equity in loss (income) of unconsolidated joint ventures | (3,605) | | (916) | | 420 | 3,877 |
| Distributions of income from unconsolidated joint ventures | - | | - | | - | 816 |
| Gain on retirement of debt | - | | (5,572) | | (78,144) | (54,044) |
| Loss on sale of fixed asset | - | | 122 | | 3,009 | - |
| Provision (Benefit) from income taxes | 10 | | (412) | | (101,908) | (41,592) |
| Net changes in operating assets and liabilities: | | | | | | |
| Restricted cash | 139 | | 3,711 | | 727 | (5,079) |
| Receivables | (53) | | (2,205) | | 19,879 | 9,628 |
| Income tax refunds receivable | - | | 107,401 | | 41,615 | 550 |
| Real estate inventories — owned | 4,582 | | (66,317) | | 130,436 | 167,516 |
| Deferred loan costs | 2,689 | | 3,333 | | 1,720 | 2,501 |
| Other assets | (3,922) | | 15,898 | | (7,658) | 4,257 |
| Accounts payable | 2,808 | | (4,142) | | (5,285) | (24,559) |
| Accrued expenses | (2,079) | | (3,572) | | (17,693) | (4,799) |
| Net cash (used in) provided by operating activities | (36,291) | | 24,119 | | 12,927 | 80,413 |
| | | | | | | |
| **Investing activities** | | | | | | |
| Net proceeds from sale of fixed asset | - | | - | | 2,063 | - |
| Investment in and advances to unconsolidated joint ventures | - | | (194) | | - | (3,003) |
| Net cash paid for purchase of partner's interest in unconsolidated joint venture | - | | - | | (194) | - |
| Distributions of capital from unconsolidated joint ventures | 1,435 | | 4,183 | | 840 | 212 |
| Purchases of property and equipment | (80) | | (64) | | (23) | (529) |
| Net cash provided by (used in) investing activities | 1,355 | | 3,925 | | 2,686 | (3,320) |
| | | | | | | |
| **Financing activities** | | | | | | |
| Proceeds from borrowings on notes payable, net | 0 | | 7,087 | | 113,467 | 591,427 |
| Principal payments on notes payable | (10,105) | | (52,797) | | (187,718) | (659,021) |
| Net proceeds from Senior Secured Term Loan | - | | - | | 193,904 | - |
| Net cash paid for repurchase of Senior Notes | - | | (31,268) | | (76,991) | (16,718) |
| Non-controlling interest contributions (distributions), net | (1,387) | | 2,633 | | (7,705) | 1,039 |
| Net cash (used in) provided by financing activities | (11,492) | | (74,345) | | 34,957 | (83,273) |
| | | | | | | |
| Net (decrease) increase in cash and cash equivalents | (46,428) | | (46,301) | | 50,570 | (6,180) |
| Cash and cash equivalents — beginning of year | 71,286 | | 117,587 | | 67,017 | 73,197 |
| Cash and cash equivalents — end of year | $ 24,858 | $ | 71,286 | $ | 117,587 | $ 67,017 |
| | | | | | | |
| Supplemental disclosure of non-cash activities: | | | | | | |
| Decrease in real estate inventories owned and related notes payable in variable interest entity | $ - | $ | - | $ | 56,151 | $ - |
| Distributions of real estate from unconsolidated joint ventures | $ 800 | $ | - | $ | - | $ - |
| Issuance of note receivable related to sale of aircraft | $ - | $ | - | $ | 6,188 | $ - |
| Reduction of notes payable to secure land option agreement | $ - | $ | - | $ | - | $ 4,709 |
| Net (decrease) increase in real estate inventories — not owned and liabilities from inventories not owned | $ (7,862) | $ | 10,652 | $ | (24,809) | $ 33,316 |
| Net (decrease) increase in real estate inventories — not owned and non-controlling interest | $ - | $ | - | $ | (27,684) | $ 3,186 |

*Notes*
(1) Certain items have been reclassified from their original presentation to conform to current period presentation.

**William Lyon Homes**
Historical Financial Statements

| | Nine Months Ended | Twelve Months Ended (1) | | |
|---|---|---|---|---|
| | Sep 30, 2011 | Dec 31, 2010 | Dec 31, 2009 | Dec 31, 2008 |
| Net income (loss) | $ (37,134) | $ (136,786) | $ (20,525) | $ (111,638) |
| Benefit from income taxes | 10 | (412) | (101,908) | (41,592) |
| Interest expense: | | | | |
| Interest incurred | 45,763 | 62,791 | 48,782 | 66,748 |
| Interest capitalized | (27,782) | (39,138) | (12,880) | (42,308) |
| Amortization of capitalized interest included in cost of sales | 11,517 | 16,762 | 17,978 | 37,907 |
| Non-cash impairment charge | - | 111,860 | 45,269 | 141,207 |
| Gain on retirement of debt | - | (5,572) | (78,144) | (54,044) |
| Loss on sale of fixed asset | - | 122 | 3,009 | - |
| Depreciation and amortization | 216 | 385 | 1,493 | 2,218 |
| Cash distributions of income from unconsolidated joint ventures | - | - | - | 816 |
| Equity in (income) loss of unconsolidated joint ventures | (3,605) | (916) | 420 | 3,877 |
| Adjusted EBITDA | $ (11,015) | $ 9,096 | $ (96,506) | $ 3,191 |

*Notes*
(1) Certain items have been reclassified from their original presentation to conform to current period presentation.

**Disclosure Statement Exhibit E**

Liquidation Analysis

**William Lyon Homes**
Liquidation Analysis - Summary:  February 28th, 2012 (Forecasted)
In $000s, unless otherwise stated

### Consolidated Liquidation and Recovery Analysis (1)

| ASSETS: | Notes (2) | Book Value 2/28/2012 (F) | | Recovery % Low | Recovery % Mid | Recovery % High | | Recovery $ Low | Recovery $ Mid | Recovery $ High |
|---|---|---|---|---|---|---|---|---|---|---|
| Cash & Restricted Cash | (3) | $ | 2,144 | 41% | 41% | 41% | $ | 889 $ | 889 $ | 889 |
| Total Receivables | (4) | | 23,823 | 79% | 82% | 84% | | 18,927 | 19,497 | 20,067 |
| Real estate Inventories - Owned without Project Debt | (5) | | 345,293 | 76% | 80% | 84% | | 263,990 | 277,529 | 291,250 |
| Real estate Inventories - Owned with Project Debt | (6) | | 115,283 | 39% | 41% | 43% | | 44,631 | 47,129 | 49,627 |
| Property & equipment | (7) | | 1,089 | 5% | 15% | 25% | | 54 | 163 | 272 |
| Total Deferred loan costs | (8) | | 8,206 | 0% | 0% | 0% | | - | - | - |
| Total Other Assets | (9) | | 5,245 | 0% | 5% | 15% | | - | 262 | 787 |
| **Total Assets** | | $ | 501,083 | 66% | 69% | 72% | $ | 328,492 $ | 345,470 $ | 362,892 |

| | | Claim Amount | | | Recovery $ | | | Recovery Amount % | | |
|---|---|---|---|---|---|---|---|---|---|---|
| CLAIMS: | | Worst Case Unsecured Creditors | Mid Case | Best Case Unsecured Creditors | Worst Case Unsecured Creditors | Mid Case | Best Case Unsecured Creditors | Worst Case Unsecured Creditors | Mid Case | Best Case Unsecured Creditors |
| **Super-Priority Claims** | | | | | | | | | | |
| DIP Loan Facility | | $ 20,000 $ | 20,000 $ | 20,000 | $ 20,000 $ | 20,000 $ | 20,000 | 100.0% | 100.0% | 100.0% |
| Total Super-Priority Claims | (10) | $ 20,000 $ | 20,000 $ | 20,000 | $ 20,000 $ | 20,000 $ | 20,000 | 100.0% | 100.0% | 100.0% |
| **Proceeds Available after Super-Priority Claims** | | | | | $ 308,492 $ | 325,470 $ | 342,892 | | | |
| **Chapter 7 Administration Claims** | | | | | | | | | | |
| Chapter 7 Trustee Fees | | $ 2,500 $ | 3,750 $ | 5,000 | $ 2,500 $ | 3,750 $ | 5,000 | 100.0% | 100.0% | 100.0% |
| Chapter 7 Professional Fees | | 14,551 | 14,551 | 14,551 | 14,551 | 14,551 | 14,551 | 100.0% | 100.0% | 100.0% |
| Wind-Down Expenses | | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 100.0% | 100.0% | 100.0% |
| Total Chapter 7 Administration Claims | (11) | $ 23,051 $ | 24,301 $ | 25,551 | $ 23,051 $ | 24,301 $ | 25,551 | 100.0% | 100.0% | 100.0% |
| **Proceeds Available after Chapter 7 Administration Claims** | | | | | $ 285,441 $ | 301,169 $ | 317,342 | 100.0% | 100.0% | 100.0% |
| **Senior Secured Claims (Lienable)** | | | | | | | | | | |
| Accounts Payable | | $ 10,011 $ | 10,011 $ | 10,011 | $ 10,011 $ | 10,011 $ | 10,011 | 100.0% | 100.0% | 100.0% |
| Unbilled Accounts Payable | | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 100.0% | 100.0% | 100.0% |
| Accrued Expenses | | 3,499 | 3,499 | 3,499 | 3,499 | 3,499 | 3,499 | 100.0% | 100.0% | 100.0% |
| Total Senior Secured Claims | (12) | $ 23,510 $ | 23,510 $ | 23,510 | $ 23,510 $ | 23,510 $ | 23,510 | 100.0% | 100.0% | 100.0% |
| **Proceeds Available after Senior Secured Claims** | | | | | $ 261,931 $ | 277,659 $ | 293,832 | 100.0% | 100.0% | 100.0% |
| **Secured Claims** | | | | | | | | | | |
| US Bank - Church Farms Loan | | $ 8,999 $ | 8,999 $ | 8,999 | $ 8,999 $ | 8,999 $ | 8,999 | 100.0% | 100.0% | 100.0% |
| Bank of the West - Mountain Falls | | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 100.0% | 100.0% | 100.0% |
| Construction Seller Financing | | 2,316 | 2,316 | 2,316 | 2,316 | 2,316 | 2,316 | 100.0% | 100.0% | 100.0% |
| Term Loan Accrued Interest | | 2,403 | 2,403 | 2,403 | 2,106 | 2,403 | 2,403 | 87.6% | 100.0% | 100.0% |
| Secured Term Loan (with illustrative incremental principal) | (13) | 276,000 | 235,000 | 206,000 | 241,827 | 235,000 | 206,000 | 87.6% | 100.0% | 100.0% |
| Total Secured Claims | (14) | $ 296,218 $ | 255,218 $ | 226,218 | $ 261,747 $ | 255,218 $ | 226,218 | 88.4% | 100.0% | 100.0% |
| **Proceeds Available after Secured Claims** | | | | | $ 184 $ | 22,441 $ | 67,613 | | | |
| **Priority Claims (1)** | | | | | | | | | | |
| Accrued Taxes | | $ 382 $ | 382 $ | 382 | $ - $ | - $ | 382 | 0.0% | 0.0% | 100.0% |
| Total Priority Claims | (15) | $ 382 $ | 382 $ | 382 | $ - $ | - $ | 382 | 0.0% | 0.0% | 100.0% |
| **Proceeds Available after Priority Claims** | | | | | $ 184 $ | 22,441 $ | 67,231 | | | |
| **Unsecured Claims (1)** | | | | | | | | | | |
| 7 5/8% Senior Notes | | $ 66,704 $ | 66,704 $ | 66,704 | $ - | | 4,957 $ | 14,670 | 0.0% | 7.4% | 22.0% |
| 10 3/4% Senior Notes | | 139,278 | 139,278 | 139,278 | | 10,351 | 30,632 | 0.0% | 7.4% | 22.0% |
| 7 1/2% Senior Notes | | 77,867 | 77,867 | 77,867 | | 5,787 | 17,125 | 0.0% | 7.4% | 22.0% |
| Accrued Interest | | 15,593 | 15,593 | 15,593 | | 1,159 | 3,429 | 0.0% | 7.4% | 22.0% |
| Accrued Expenses | | 12,998 | 12,998 | 12,998 | 184 | 187 | 1,374 | 1.4% | 1.4% | 10.6% |
| Total Unsecured Claims | (16) | $ 312,440 $ | 312,440 $ | 312,440 | $ 184 $ | 22,441 $ | 67,231 | 0.1% | 7.2% | 21.5% |
| **Proceeds Available for Equity** | | | | | $ - $ | - $ | - | | | |

**William Lyon Homes**
Liquidation Analysis - Summary:  February 28th, 2012 (Forecasted)
In $000s, unless otherwise stated

Notes to the Liquidation Analysis

(1)  Analysis reflects an entity-by-entity liquidation for William Lyon Homes (CA), William Lyon Homes Southwest, Circle G, Mountain Falls, Mountain Falls Golf Course, and Duxford Financial.  Other entities were reviewed on a consolidated basis due to immaterial asset values.  This entity-by-entity approach can result in varying recoveries for entities with similar claims as recoveries within entities may vary from recoveries in other entities.

(2)  Balance Sheet reflects Pre-Transaction forecasted numbers as of the proposed effective date of February 28th, 2012.

(3)  Cash and Restricted cash consists of bank deposits and certificates of deposit.  Cash held at Consolidated Joint Ventures and Restricted Cash totaling $1.3 million is not expected to be recoverable by the liquidating entities.  The forecasted cash balance reflects minimal amounts maintained in certain entity-specific operating accounts, as well as Restricted Cash and Consolidated Joint Venture Cash, as of February 28th, 2012.  For continuing operations, the Company anticipates using a DIP Loan Facility (see footnote (10)).

(4)  Receivables consist primarily of Notes Receivable of $6.6 million, Receivables held at Consolidated Joint Ventures of $3.2 million, Escrow Receivables of $0.7 million, with the majority of the remaining $13.3 million consisting of Deposits, anticipated Reimbursements, and Refunds.  The Receivables held at Consolidated Joint Ventures are not expected to be recoverably by the liquidating entities.

(5)  Real Estate Inventories without Project Debt consists of the Company's land holdings.  These holdings include Work in Progress, Land Under Development, and Land Held for Development or Sale.  This balance excludes any amount of Inventory Not Owned, such as land under contract via land banking agreements.  The recovery value of these assets is determined as a sales price under an orderly wind-down, where the sales price was assessed using a discounted cash flow methodology or a market comparable methodology, and may have been informed by other market conditions.  Reflects wholly owned inventory only, and does not assume a recovery on joint venture projects.

(6)  Real Estate Inventories with Project Debt reflects the Company's land holdings at three projects:  San Carlos (Southern California), Mountain Falls (Nevada), and Church Farms (Arizona).  Each of these projects has associated debt that is secured by the real estate assets owned by certain consolidated entities.  Any recovery in excess of a debt claim, or corresponding deficiency resulting to the lender, is treated initially within the respective entity containing the asset with other unsecured claims of that entity.  Reflects wholly owned inventory only, and does not assume a recovery on joint venture projects (see footnote (3) and footnote (4)).

(7)  Property and Equipment consists of machinery, tools, and other hard assets that are owned and used in the construction and maintenance of the Real Estate Inventories.  Due to the nature of these assets, it is estimated that the recovery on the sale of these items would be de minimis.

(8)  Deferred Loan Costs reflect the unamortized balance of costs associated with the origination of the Company's current debt structure.  These amounts include fees and costs incurred by advisors in connection with the issuance of the securities, Original Issue Discount associated with the 10.75% Senior Notes, and certain fees paid to lenders at the time of origination, and therefore would not have any recovery.

(9)  Other Assets consist primarily of Prepaid Assets of $4.9 million, and certain Deposits.  Due to the nature of these assets and the uncertainty surrounding recovery in a liquidation, it is estimated that recovery on these assets would be de minimis.

(10)  Assumes availability of a DIP Facility to support operations through the projected Effective Date of February 28, 2012.  Any such DIP Facility will be subject to approval of the Bankruptcy Court and would be utilized to support uses of cash needed by the Company in accordance with the terms of such DIP Facility and related DIP Budget, if any.

(11)  Chapter 7 Administrative Claims consist of three cost categories resulting from the liquidation over twelve months and assumes the Secured Lender has approved these Claims.
*Chapter 7 Trustee Fees*:  Assumed to range from $2.5 million to $5.0 million, but below the 3% of total recoveries allowable under the Bankruptcy Code
*Chapter 7 Professional Fees*:  Estimated to be $14.5 million, inclusive of financial professionals, attorneys, brokers, and other advisors as needed.
*Wind-Down Expenses*:  Estimated to be $6.0 million, consisting of costs necessary to effectuate an orderly 12 month wind-down.  These costs include Salaries for continuing employees, expenses for claims management, WARN Act costs, bonuses payable to sales staff at the conclusion of liquidating inventories, and other miscellaneous costs.

(12)  Senior Secured Claims consist of claims that are lienable to specific assets, where the liquidation value of the asset is in excess of the lienable claim amount:
*Priority A/P*:  The majority of Accounts Payable balance reflects amounts owed to trade vendors who are able to assert mechanics liens to ensure payment for work performed.
*Unbilled Trade A/P*:  Due to the billing cycle of trade vendors which may be calendar-based or otherwise disconnected from work performed, there is an amount of incurred, unliquidated, unbilled accounts payable.  It is assumed that these amounts would be invoiced either in the ordinary course or upon news of a liquidation, resulting in pre-petition lienable claims received post-petition.  The estimate used to account for these claims is $10.0 million, and approximates the difference between costs incurred and work performed.
*Priority Accrued Expenses*:  An assumed amount of Accrued Expenses, which is set to 20% of accrued liabilities not elsewhere specified, are anticipated to be able to assert liens, and would be treated as priority claims.

(13)  The range of the claim that could be asserted is estimated to be between $206 million and $276 million.  The highest claim amount of $276 million is compared to the lowest asset recovery value to show the least favorable outcome for the Noteholders.  Likewise, the lowest claim amount of $206 million is compared to the highest asset recovery value to show the most favorable outcome for the Noteholders.  The $235 million mid-point is based on a compromise with the Senior Secured Term Lender as reflected in the Plan.  The Company does not express an opinion as to the make-whole amount or exit fees.

(14)  Secured Claims consist of amounts owed to lenders of project-specific debt instruments that are secured by certain collateral, as well as the  principal under the Colony Secured Term Loan (see footnote (13)).
Any shortfall on the recovery for these debt instruments is converted to an unsecured claim within the entity that is liable for the loan.  Any deficiency under the liquidation of that entity is assumed to create an unsecured claim at William Lyon Homes, Inc. (CA), and is treated pari passu to other unsecured claims at that entity.

(15)  Priority Claims reflect those claims given senior treatment in the liquidation, but may be unsecured:
*Taxes* :  Reflects accrued Taxes and Other Taxes, with de minimis amounts for Property Taxes (if any, due to December payment).  (Numbers reflect estimates based on September 30th, 2011 business activity.)

(16)  Unsecured Claims are provided any recovery available after Secured Claims, in accordance with the recovery of the entity at which the claim would reside.  Claims are treated pari passu within an entity
*Accrued Interest*:  Reflects interest accrued on unsecured debt.
*Accrued Expenses*:  Reflects all accrued expenses not identified as other claims forecasted as balance sheet liabilities.  No potential future contingent liabilities are assumed.

Subject to Change
Tentative and Preliminary

Confidential

**<u>Disclosure Statement Exhibit F</u>**

Principal Terms of the New Second Lien Notes

## DESCRIPTION OF THE NOTES

As used below in this "Description of the Notes" section, the "Issuer" means William Lyon Homes, Inc., a California corporation, and its successors, but not any of its subsidiaries, and the "Parent" means William Lyon Homes, a Delaware corporation, and its successors, but not any of its subsidiaries. The Issuer will issue the new notes (the "Notes"), described in this section "Description of the Notes" under an Indenture (the "Indenture"), among the Issuer, the Guarantors and U.S. Bank National Association, as trustee (the "Trustee"). The terms of the Notes will include those set forth in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act. Copies of the Indenture are available from the Issuer upon request.

The following is a summary of the material terms and provisions of the Notes. The following summary does not purport to be a complete description of the Notes and is subject to the detailed provisions of, and qualified in its entirety by reference to, the Indenture relating to the Notes. You can find definitions of certain terms used in this description under the heading "—Certain Definitions."

### Brief Description of the Notes and the Note Guarantees

#### The Notes

The Notes:

- will be senior subordinated secured obligations of the Issuer;

- will be secured on a second-priority basis by Liens on substantially all assets of the Issuer and the Guarantors other than the Excluded Assets, with such Liens subordinate in priority to the Liens securing the Issuer's obligations under the Senior Secured Term Loan and any other permitted prior liens;

- will be subordinated in right of payment (as further described below under the heading "**Security Documents and Intercreditor Agreement**") and junior, to the extent of the value of the Collateral, to the Issuer's obligations under the Senior Secured Term Loan, which will be secured on a first-priority basis by the same assets of the Issuer that secure the Notes;

- will be *pari passu* in right of payment with all other senior Indebtedness of the Issuer, other than the Indebtedness under the Senior Secured Term Loan (which Indebtedness is senior in right of payment to the Notes (as further described below under the heading "**Security Documents and Intercreditor Agreement**"));

- will be senior in right of payment to any future subordinated Indebtedness of the Issuer, if any; and

- will be unconditionally guaranteed by the Guarantors.

#### The Note Guarantees

The Issuer's obligations under the Notes and the Indenture will be jointly and severally guaranteed (the "Note Guarantees") by the Guarantors.

Each Note Guarantee:

- will be a senior subordinated secured obligation of that Guarantor;

- will be secured on a second-priority basis by Liens on substantially all of the assets of that Guarantor other than the Excluded Assets, with such Liens subordinate in priority to the Liens securing that Guarantor's guarantee of the obligations under the Senior Secured Term Loan and any other permitted prior liens;

- will be subordinated in right of payment (as further described below under the heading "**Security Documents and Intercreditor Agreement**") and junior, to the extent of the value of the Collateral, to that Guarantor's guarantee of the Senior Secured Term Loan, which will be secured on a first-priority basis by the same assets of that Guarantor that secure the Notes;

- will be *pari passu* in right of payment with all other senior Indebtedness of that Guarantor, other than such Guarantor's guarantee of Indebtedness under the Senior Secured Term Loan (which guarantee is senior in right of payment (as further described below under the heading "**Security Documents and Intercreditor Agreement**")); and

- will be senior in right of payment to any future subordinated Indebtedness of that Guarantor.

The Notes will also be structurally subordinated to all existing and future obligations, including Indebtedness, of Joint Ventures and any Unrestricted Subsidiaries. Claims of creditors of Joint Ventures and Unrestricted Subsidiaries, including trade creditors and holders of Indebtedness, will generally have priority as to the assets of those Joint Ventures and Unrestricted Subsidiaries over the claims of the Issuer and the holders of the Issuer's Indebtedness, including the Notes.

Not all of our Subsidiaries will guarantee the Notes. Unrestricted Subsidiaries will not be Guarantors. In addition, under certain circumstances, our Joint Ventures could become non-Guarantor Restricted Subsidiaries. In the event of a bankruptcy, liquidation or reorganization of any of these non-Guarantor Subsidiaries, these non-Guarantor Subsidiaries will pay the holders of their debts and their trade creditors before they will be able to distribute any of their assets to us.

As of the date of the Indenture, all of the Parent's Subsidiaries (other than Duxford Title Reinsurance Company, Cerro Plata Associates, LLC, 242 Cerro Plata, LLC, Silver Creek Preserve and Nobar Water Company), including the Issuer, will be "Restricted Subsidiaries," and the Parent and all of the Restricted Subsidiaries (other than the Issuer and Consolidated Joint Ventures and Restricted Joint Ventures that are not wholly-owned Restricted Subsidiaries) will be Guarantors. Under the circumstances described below under the subheading "—Certain Covenants—Designation of Unrestricted Subsidiaries," the Parent will be permitted to designate some of its other Subsidiaries (other than the Issuer) as "Unrestricted Subsidiaries." The effect of designating a Subsidiary as an "Unrestricted Subsidiary" will be:

- an Unrestricted Subsidiary will generally not be subject to the restrictive covenants in the Indenture;

- a Subsidiary that has previously been a Guarantor and that is Designated an Unrestricted Subsidiary will be released from its Note Guarantee; and

- the assets, income, cash flow and other financial results of an Unrestricted Subsidiary will not be consolidated with those of the Parent for purposes of calculating compliance with the restrictive covenants contained in the Indenture.

The obligations of each Guarantor under its Note Guarantee will be limited as necessary to prevent that Note Guarantee from constituting a fraudulent conveyance or fraudulent transfer under applicable law. Each Subsidiary Guarantor that makes a payment for distribution under its Note Guarantee is entitled to a contribution from each other Subsidiary Guarantor in a pro rata amount based on adjusted net assets of each Subsidiary Guarantor.

In the event of a sale or other disposition of all of the assets of any Subsidiary Guarantor, by way of merger, consolidation or otherwise, or a sale or other disposition of all of the Equity Interests of any Subsidiary Guarantor then held by the Parent and the Restricted Subsidiaries, then that Subsidiary Guarantor will be released and relieved of any obligations under its Note Guarantee; provided that the Net Available Proceeds of such sale or other disposition shall be applied in accordance with the applicable provisions of the Indenture, to the extent required thereby. See "—Certain Covenants—Limitations on Asset Sales." In addition, the Indenture will provide that any Subsidiary Guarantor that is Designated as an Unrestricted Subsidiary or that otherwise ceases to be a Subsidiary Guarantor, in each case in accordance with the provisions of the Indenture, will be released from its Note Guarantee upon effectiveness of such Designation or when it first ceases to be a Restricted Subsidiary, as the case may be.

**Principal, Maturity and Interest**

The Issuer will issue the Notes in an initial aggregate principal amount of $75 million. The Notes will be issued in registered form, without coupons, in denominations of $1.00 and integral multiples of $1.00. The Notes will mature on the fifth anniversary of the Issue Date.

The Notes will bear interest at a fixed annual rate of 12% per annum, consisting of a 4% PIK interest component and an 8% cash interest component. Interest on overdue principal and interest will accrue at a rate that is 2% higher than the applicable interest rate on the Notes. The PIK interest component will accrete and be added to principal semi-annually in arrears. The cash interest component will be payable semi-annually in arrears. Interest on the Notes will be computed on the basis of a 360-day year of twelve 30-day months.

The Issuer may issue an unlimited amount of additional Notes having identical terms and conditions to the Notes being issued (the "Additional Notes"), subject to compliance with the "Limitations on Additional Indebtedness" covenant described below. Any Additional Notes will be part of the same issue as the Notes being issued and will vote on all matters as one class with the Notes being issued, including, without limitation, waivers, amendments, redemptions and offers to purchase. For purposes of this "Description of the Notes," except for the covenant described under "—Certain Covenants—Limitations on Additional Indebtedness," references to the Notes include Additional Notes, if any.

### Methods of Receiving Payments on the Notes

If a Holder has given wire transfer instructions to the Issuer at least ten Business Days prior to the applicable payment date, the Issuer will make all payments on such Holder's Notes in accordance with those instructions. Otherwise, payments on the Notes will be made at the office or agency of the paying agent (the "Paying Agent") and registrar (the "Registrar") for the Notes within the City and State of New York unless the Issuer elects to make interest payments by check mailed to the Holders at their addresses set forth in the register of Holders.

### Security

The obligations of the Issuer with respect to the Notes, the obligations of the Guarantors under the guarantees and the performance of all other obligations of the Parent and the Restricted Subsidiaries under the Note Documents will be secured by second-priority Liens in the Collateral granted to the Collateral Trustee for the benefit of the Holders. The Collateral consists of substantially all of the property and assets, in each case, that are held by the Parent and the Restricted Subsidiaries, to the extent that such assets secure the Senior Secured Term Loan and to the extent that a second-priority security interest is able to be granted or perfected therein.

### Security Documents and Intercreditor Agreement

The Issuer, the Guarantors (including the Parent), and the Collateral Trustee will enter into the Security Documents defining the terms of the security interests that secure the Notes. These security interests will secure the payment and performance when due of all of the obligations of the Issuer under the Notes, the Indenture and the Security Documents, as provided in the Security Documents.

The Collateral Trustee, Trustee, Administrative Agent, the Issuer and the Guarantors (including the Parent) will enter into an Intercreditor Agreement (as the same may be amended from time to time, the "Intercreditor Agreement").

Pursuant to the terms of the Intercreditor Agreement, there will be payment subordination of the Notes to all obligations (other than principal in excess of the Cap Amount) under the Senior Secured Term Loan (and any refinancings or amendments thereof as provided below), including, but not limited to, principal (up to the Cap Amount) and interest, fees, costs, charges and expenses, indemnification amounts, amounts owed by the Guarantors and postpetition interest, fees, costs, charges and expenses, in each case whether incurred before or after an insolvency proceeding and whether or not such amounts are allowed by the applicable bankruptcy court or other tribunal (the "Senior Obligations"). For the avoidance of doubt, the Cap Amount shall not apply to interest, fees, costs, charges and expenses, indemnification amounts, amounts owed by the Guarantors (as defined in the Senior Secured Term Loan) and postpetition interest, fees, costs, charges and expenses, in each case whether incurred before or after an insolvency proceeding and whether or not such amounts are allowed by the applicable bankruptcy court or other tribunal.

Further, pursuant to the terms of the Intercreditor Agreement, no payments of any kind will be made on the Notes, by set-off or in any other manner, other than Permitted Junior Payments (as defined below), unless and until all of the Senior Obligations under the Senior Secured Term Loan have been indefeasibly paid in full in cash. "Permitted Junior Payments" will be defined in the Intercreditor Agreement but will include permitted scheduled

interest payments on the Notes and, if the maturity date of the Senior Secured Term Loan is extended beyond the Maturity Date of the Notes, scheduled payments of principal on the Notes. Notwithstanding the foregoing, no such payments will be permitted to be paid (x) during the pendency of an insolvency proceeding and (y) during the continuation of certain specified defaults under the Senior Secured Term Loan (which defaults shall include any payment, insolvency, judgment or cross-default events of default, events of default related to breaches of any covenants relating to the Borrowing Base (as defined in the Senior Secured Term Loan), Excluded Assets (as defined in the Senior Secured Term Loan) or Distributions (as defined in the Senior Secured Term Loan) and certain other material events of default to be agreed in the definitive Intercreditor Agreement); provided that the Issuer may continue to make any scheduled interest payment on the Notes in kind (and not in cash or other property) by capitalizing and adding such interest payment to the outstanding principal amount of the Notes.

The Intercreditor Agreement will provide that the Senior Obligations have absolute lien priority over the Notes (including no Lien in favor of the Notes not pledged to Administrative Agent), with the Notes having only "silent" rights during the Standstill Period (as defined below), including the right to file proofs of claims, join (but not exercise control over) a foreclosure action initiated by Administrative Agent and the right to protect, enforce and secure second Lien position, but waiver of all other voting or consent rights. Any Liens securing obligations under the Notes will be pari passu in all respects on the collateral securing obligations under the Senior Secured Term Loan in excess of the Senior Obligations.

Pursuant to the terms of the Intercreditor Agreement, the Holders will not be permitted to enforce any of their rights and remedies under the Notes Documents, the Security Documents or at law for the period beginning on the date that Administrative Agent receives written notice from the Trustee that an Event of Default has occurred and is continuing and ending 360-days thereafter (the "Standstill Period"); provided, that, during the pendency of an insolvency proceeding the Notes shall have the right to propose a plan of reorganization that indefeasibly pays off the Senior Obligations in full in cash and to pursue rights and remedies as unsecured creditors. During the Standstill Period, the Administrative Agent will have the exclusive right to determine the time and method by which the security interests in the Collateral will be enforced. At the end of the Standstill Period, the Holders will be permitted to exercise any and all rights and remedies under the Note Documents.

If at any time the Administrative Agent sells the Collateral, after the indefeasible satisfaction in full in cash of the Senior Obligations, the Trustee in accordance with the provisions of the Indenture and Security Documents will distribute the cash proceeds (after payment of the costs of enforcement and collateral administration and other amounts owed to the Trustee) of the Collateral received by it under the Security Documents for the ratable benefit of the Holders. The proceeds from the sale of the Collateral remaining after the indefeasible satisfaction in full in cash of the Senior Obligations may not be sufficient to satisfy the obligations owed to the Holders. By its nature, some of the Collateral is and will be illiquid and may have no readily ascertainable market value. Accordingly, the Collateral may not be able to be sold in a short period of time, if salable.

If the Parent or any Restricted Subsidiary is subject to any insolvency or liquidation proceedings, the Trustee and the Holders will agree that:

(1) the lenders under the Senior Secured Term Loan will be entitled to post petition interest and reasonable fees, costs and expenses incurred in any insolvency proceeding and no Holder nor the Trustee nor the Collateral Trustee will object to the payment of such post petition interest and reasonable fees, costs, charges and expenses;

(2) the Holders will not object to debtor-in-possession financing provided by the lenders under the Senior Secured Term Loan (or any debtor-in-possession financing to which the lenders under the Senior Secured Term Loan do not object) in an amount not in excess of a cap to be agreed upon in the Intercreditor Agreement and so long as (i) interest rate, fees and advance rate of any such debtor-in-possession are commercially reasonable under the circumstances, (ii) any such debtor-in-possession does not compel any debtor to seek confirmation of a specific plan of reorganization for which all, substantially all or any material portion of the material terms are set forth in the debtor-in-possession documentation, (iii) any debtor-in-possession documentation does not expressly require the liquidation of the Collateral prior to a default under the debtor-in-possession documentation and (iv) in the event the Administrative Agent and the lenders under the Senior Secured Term Loan receive adequate protection in the form of a superpriority claim and replacement Liens on assets of the debtors (the "Subject Assets"), the Holders and the Trustee

will not object to the grant of such adequate protection and the Holders will receive adequate protection in the form of a superpriority claim and replacement Liens on the Subject Assets, junior only to the amount of such debtor-in-possession financing and the Senior Secured Term Loan up to the Cap Amount, to the extent it is determined by the applicable bankruptcy court judge that the Trustee and the Holders are entitled to receive such adequate protection;

(3) the Holders will not provide any debtor-in-possession financing secured by Liens senior to or *pari passu* with the Liens securing the Senior Secured Term Loan or with a superpriority claim that is senior to or *pari passu* with any superpriority claim of the lenders under the Senior Secured Term Loan and the Administrative Agent;

(4) there are customary limitations on the rights and powers of the Notes and the Holders, including that they will not vote in favor of any plan of reorganization unless it provides for the indefeasible payment in full in cash of the Senior Obligations and they will not credit bid on the Collateral unless such bid provides for the indefeasible payment in full in cash of the Senior Obligations.

Pursuant to the terms of the Intercreditor Agreement, the Holders will have the right, at their sole option and election, to purchase, or cause the repurchase of, the outstanding obligations not in excess of the Cap Amount under the Senior Secured Term Loan at par at such times and on such other terms described in the definitive Intercreditor Agreement.

The Intercreditor Agreement will provide that no amendment, modification, supplement or waiver to the provisions thereof will be effective without the prior written approval of the Administrative Agent acting as directed by the requisite holders in aggregate principal amount of the outstanding obligations under the Senior Secured Term Loan and the Collateral Trustee as directed by the holders of a majority in aggregate principal amount of the outstanding obligations under the Notes.

## Release of Collateral

Upon the release of the Lien on any Collateral securing the Senior Secured Term Loan during the term of the Senior Secured Term Loan, the Lien on such Collateral securing the Notes will be automatically released without the necessity of any consent from, or notice to, the Holders.

## Optional Redemption

At any time the Issuer, at its option, may redeem the Notes, in whole or in part, at 100% of the principal amount outstanding, together with accrued and unpaid interest thereon, if any, to the redemption date.

The Issuer may acquire Notes by means other than a redemption, whether pursuant to an issuer tender offer, open market purchase or otherwise, so long as the acquisition does not otherwise violate the terms of the Indenture.

## Selection and Notice of Redemption

In the event that less than all of the Notes are to be redeemed at any time pursuant to an optional redemption, selection of the Notes for redemption will be made by the Trustee as follows:

- in compliance with the requirements of the principal national securities exchange, if any, on which the Notes are listed; or

- if the Notes are not then listed on a national security exchange, on a pro rata basis, by lot or by such method as the Trustee shall deem fair and appropriate.

No individual Note shall be redeemed in part. In addition, if a partial redemption is made, selection of the Notes or portions thereof for redemption shall be made by the Trustee only on a pro rata basis or on as nearly a pro rata basis as is practicable (subject to the procedures of The Depository Trust Company), unless that method is otherwise prohibited.

Notice of redemption will be mailed by first-class mail at least 30 but not more than 60 days before the date of redemption to each Holder of Notes to be redeemed at its registered address. If any Note is to be redeemed in part only, the notice of redemption that relates to that Note will state the portion of the principal amount of the Note to be redeemed. A new Note in a principal amount equal to the unredeemed portion of the Note will be issued in the name of the Holder of the Note upon cancellation of the original Note. On and after the date of redemption, interest will cease to accrue on Notes or portions thereof called for redemption so long as the Issuer has deposited with the paying agent for the Notes funds in satisfaction of the redemption price (including accrued and unpaid interest on the Notes to be redeemed) pursuant to the Indenture.

**Material Covenants**

The Indenture will contain, among others, the following covenants:

*Limitations on Additional Indebtedness*

The Parent will not, and will not permit any Restricted Subsidiary to, directly or indirectly, incur any Indebtedness; provided that the Issuer or any Guarantor may incur additional Indebtedness (including Acquired Indebtedness) if no Default shall have occurred and be continuing at the time of or as a consequence of the incurrence of the Indebtedness and if, after giving effect thereto, either (a) the Consolidated Fixed Charge Coverage Ratio would be at least 2.00 to 1.00 or (b) the ratio of Consolidated Indebtedness to Consolidated Tangible Net Worth would be less than 3.00 to 1.00 (either (a) or (b), the "Ratio Exception").

Notwithstanding the above, so long as no Default shall have occurred and be continuing at the time of or as a consequence of the incurrence of the following Indebtedness, each of the following shall be permitted (the "Permitted Indebtedness"):

(1) Indebtedness of the Parent and any Restricted Subsidiary under the Senior Secured Term Loan the principal amount of which shall not to exceed the Cap Amount, except by an amount equal to accrued interest, discounts, premiums thereon and fees and expenses incurred in connection with a refinancing of thereof;

(2) the Notes and the Note Guarantees issued on the Issue Date;

(3) Indebtedness of the Parent and the Guarantors to the extent outstanding on the Issue Date (other than Indebtedness referred to in clauses (1) and (2) above and in clauses (7), (14) and (15) below, and after giving effect to the intended use of proceeds of the Notes);

(4) Indebtedness of the Parent and the Restricted Subsidiaries under Hedging Obligations; provided that (a) such Hedging Obligations relate to payment obligations on Indebtedness otherwise permitted to be incurred by this covenant, and (b) the notional principal amount of such Hedging Obligations at the time incurred does not exceed the principal amount of the Indebtedness to which such Hedging Obligations relate;

(5) Indebtedness of the Parent owed to a Restricted Subsidiary and Indebtedness of any Restricted Subsidiary owed to the Parent or any other Restricted Subsidiary; provided, however, that (a) any Indebtedness of the Parent or the Issuer owed to a Restricted Subsidiary is unsecured and subordinated, pursuant to a written agreement, to the Parent or the Issuer's obligations under the Indenture and the Notes and (b) upon any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or such Indebtedness being owed to any Person other than the Parent or a Restricted Subsidiary, such Restricted Subsidiary shall be deemed to have incurred Indebtedness not permitted by this clause (5);

(6) Indebtedness in respect of bid, performance or surety bonds issued for the account of the Parent or any Restricted Subsidiary in the ordinary course of business, including guarantees or obligations of the Parent or any Restricted Subsidiary with respect to letters of credit supporting such bid, performance or surety obligations (in each case other than for an obligation for money borrowed);

(7) Purchase Money Indebtedness incurred by the Parent or any Restricted Subsidiary, in an aggregate amount not to exceed at any time outstanding $15.0 million;

(8)  Non-Recourse Indebtedness of the Parent or any Restricted Subsidiary incurred for the acquisition, development and/or improvement of real property and secured by Liens only on such real property and Directly Related Assets;

(9)  Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business; provided, however, that such Indebtedness is extinguished within five Business Days of incurrence;

(10) Indebtedness arising in connection with endorsement of instruments for deposit in the ordinary course of business;

(11) Refinancing Indebtedness with respect to Indebtedness incurred pursuant to the Ratio Exception, clause (1), (2) or (3) above or this clause (11);

(12) the guarantee by the Parent or any Restricted Subsidiary of Indebtedness (other than Indebtedness incurred pursuant to clause (8), (13), or (15) hereof or, in the case of the guarantee by a Restricted Subsidiary that is not a Guarantor, pursuant to the Ratio Exception) of a Restricted Subsidiary, in the case of the Parent, or of the Parent or another Restricted Subsidiary, in the case of a Restricted Subsidiary, in either case, that was permitted to be incurred by another provision of this covenant;

(13) Indebtedness of any Restricted Subsidiary engaged primarily in the mortgage origination and lending business (a "Mortgage Subsidiary") under warehouse lines of credit and repurchase agreements, and Indebtedness secured by mortgage loans and related assets of such Restricted Subsidiary, in each case incurred in the ordinary course of such business; provided that the only legal recourse for collection of obligations owing on such Indebtedness is against such Restricted Subsidiary, any other Mortgage Subsidiary and their respective assets;

(14) Indebtedness of the Parent or any Restricted Subsidiary in an aggregate amount not to exceed $10.0 million at any time outstanding;

(15) Indebtedness of Consolidated Joint Ventures in an aggregate amount at any time outstanding not to exceed $115.0 million less the aggregate amount of liabilities that would constitute Indebtedness of the Parent and the Restricted Subsidiaries but for clause (c) of the last paragraph of the definition of "Indebtedness" on the date of determination; and

(16) Any other Indebtedness permitted under the Senior Secured Term Loan.

For purposes of determining compliance with this covenant, in the event that an item of Indebtedness meets the criteria of more than one of the categories of Permitted Indebtedness described in clauses (1) through (15) above or is entitled to be incurred pursuant to the Ratio Exception, the Parent shall, in its sole discretion, classify such item of Indebtedness and may divide and classify such Indebtedness in more than one of the types of Indebtedness described, except that Indebtedness outstanding under the Senior Secured Term Loan on the Issue Date shall be deemed to have been incurred under clause (1) above and (b) Indebtedness of Joint Ventures on the date they became or become Consolidated Joint Ventures shall be deemed to have been incurred under clause (15) above.

*Limitations on Restricted Payments*

The Parent will not, and will not permit any Restricted Subsidiary to, directly or indirectly, make any Restricted Payment if at the time of such Restricted Payment:

(1)  a Default shall have occurred and be continuing or shall occur as a consequence thereof;

(2)  the Parent cannot incur $1.00 of additional Indebtedness pursuant to the Ratio Exception; or

(3)  the amount of such Restricted Payment, when added to the aggregate amount of all other Restricted Payments made after the Issue Date (other than Restricted Payments made pursuant to clause (2), (3) or (5) of the next paragraph), exceeds the sum (the "Restricted Payments Basket") of (without duplication):

(a) 50% of Consolidated Net Income for the period (taken as one accounting period) from the Issue Date to and including the last day of the fiscal quarter ended immediately prior to the date of such calculation for which consolidated financial statements are available (or, if such Consolidated Net Income shall be a deficit, minus 100% of such aggregate deficit), plus

(b) 100% of the aggregate net cash proceeds received by the Parent either (x) as contributions to the common equity of the Parent after the Issue Date or (y) from the issuance and sale of Qualified Equity Interests after the Issue Date, other than to the extent any such proceeds are used to redeem Notes in accordance with the second paragraph under "—Optional Redemption," plus

(c) the aggregate amount by which Indebtedness of the Parent or any Restricted Subsidiary is reduced on the Parent's balance sheet upon the conversion or exchange (other than by a Subsidiary of the Parent) of Indebtedness issued subsequent to the Issue Date into Qualified Equity Interests (less the amount of any cash, or the fair value of assets, distributed by the Parent or any Restricted Subsidiary upon such conversion or exchange), plus

(d) in the case of the disposition or repayment of or return on any Investment that was treated as a Restricted Payment made after the Issue Date, an amount (to the extent not included in the computation of Consolidated Net Income) equal to the lesser of (i) the return of capital with respect to such Investment and (ii) the amount of such Investment that was treated as a Restricted Payment, in either case, less the cost of the disposition of such Investment and net of taxes, plus

(e) upon a Redesignation of an Unrestricted Subsidiary as a Restricted Subsidiary (including, for avoidance of doubt, any Joint Venture becoming a Consolidated Joint Venture which is a Restricted Subsidiary), the lesser of (i) the Fair Market Value of the Parent's proportionate interest in such Subsidiary immediately following such Redesignation, and (ii) the aggregate amount of the Parent's Investments in such Subsidiary to the extent such Investments reduced the amount available for subsequent Restricted Payments under this clause (3) and were not previously repaid or otherwise reduced, plus

(f) $5.0 million.

The foregoing provisions will not prohibit:

(1) the payment by the Parent or any Restricted Subsidiary of any dividend within 60 days after the date of declaration thereof, if on the date of declaration the payment would have complied with the provisions of the Indenture;

(2) so long as no Default shall have occurred and be continuing at the time of or as a consequence of such redemption, the redemption of any Equity Interests of the Parent or any Restricted Subsidiary in exchange for, or out of the proceeds of the substantially concurrent issuance and sale of, Qualified Equity Interests;

(3) so long as no Default shall have occurred and be continuing at the time of or as a consequence of such redemption, the redemption of Subordinated Indebtedness of the Parent or any Restricted Subsidiary (a) in exchange for, or out of the proceeds of the substantially concurrent issuance and sale of, Qualified Equity Interests or (b) in exchange for, or out of the proceeds of the substantially concurrent incurrence of, Refinancing Indebtedness permitted to be incurred under the "Limitations on Additional Indebtedness" covenant and the other terms of the Indenture;

(4) so long as no Default shall have occurred and be continuing at the time of or as a consequence of such redemption, the redemption of Equity Interests of the Parent held by officers, directors or employees or former officers, directors or employees (or their transferees, estates or beneficiaries under their estates), upon their death, disability, retirement, severance or termination of employment or service; provided that the aggregate cash consideration paid for all such redemptions shall not exceed $2.0 million during any calendar year;

(5) (i) regularly scheduled cash distributions in respect of the New Preferred Shares not to exceed 4% per annum; and (ii) distributions of any accrued and unpaid cash dividends in respect of the New Preferred

Shares that have accrued at a rate not to exceed 6% per annum, reduced by the amount of distributions paid in cash, upon conversion of the New Preferred Shares; or

(6) repurchases of Equity Interests deemed to occur upon the exercise of stock options if the Equity Interests represents a portion of the exercise price thereof;

provided that no issuance and sale of Qualified Equity Interests pursuant to clause (2) or (3) above shall increase the Restricted Payments Basket, except to the extent the proceeds thereof exceed the amounts used to effect the transactions described therein.

*Limitations on Dividend and Other Restrictions Affecting Restricted Subsidiaries*

The Parent will not, and will not permit any Restricted Subsidiary to, directly or indirectly, create or otherwise cause or permit to exist or become effective any consensual encumbrance or consensual restriction on the ability of any Restricted Subsidiary (other than the Issuer) to:

(a) pay dividends or make any other distributions on or in respect of its Equity Interests;

(b) make loans or advances or pay any Indebtedness or other obligation owed to the Parent or any other Restricted Subsidiary; or

(c) transfer any of its assets to the Parent or any other Restricted Subsidiary;

except for:

(1) encumbrances or restrictions existing under or by reason of applicable law;

(2) encumbrances or restrictions existing under the Indenture, the Notes and the Note Guarantees;

(3) non-assignment provisions of any contract or any lease entered into in the ordinary course of business;

(4) encumbrances or restrictions existing under agreements existing on the date of the Indenture (including, without limitation, the Senior Secured Term Loan) as in effect on that date;

(5) restrictions on the transfer of assets subject to any Lien permitted under the Indenture imposed by the holder of such Lien;

(6) restrictions on the transfer of assets imposed under any agreement to sell such assets permitted under the Indenture to any Person pending the closing of such sale;

(7) any instrument governing Acquired Indebtedness, which encumbrance or restriction is not applicable to any Person, or the assets of any Person, other than the Person or the assets so acquired;

(8) encumbrances or restrictions arising in connection with Refinancing Indebtedness; provided, however, that any such encumbrances and restrictions are not materially more restrictive than those contained in the agreements creating or evidencing the Indebtedness being refinanced;

(9) customary provisions in leases, licenses, partnership agreements, limited liability company organizational governance documents, joint venture agreements and other similar agreements entered into in the ordinary course of business that restrict the transfer of leasehold interests or ownership interests in such partnership, limited liability company, joint venture or similar Person;

(10) Purchase Money Indebtedness incurred in compliance with the covenant described under "—Limitations on Additional Indebtedness" that impose restrictions of the nature described in clause (c) above on the assets acquired;

(11) Non-Recourse Indebtedness incurred in compliance with the covenant described under "—Limitations on Additional Indebtedness" that impose restrictions of the nature described in clause (c) above on the assets secured by such Non-Recourse Indebtedness or on the Equity Interests in the Person holding such assets;

(12) customary restrictions in other Indebtedness incurred in compliance with the covenant described under "—Limitations on Additional Indebtedness;" provided that such restrictions, taken as a whole, are, in the good faith judgment of the Parent's board of directors, no more materially restrictive with respect to such encumbrances and restrictions than those contained in the existing agreements referenced in clause (4) above; and

(13) any encumbrances or restrictions imposed by any amendments or refinancings of the contracts, instruments or obligations referred to in clauses (1) through (12) above; provided that such amendments or refinancings are, in the good faith judgment of the Parent's board of directors, no more materially restrictive with respect to such encumbrances and restrictions than those prior to such amendment or refinancing.

### *Limitations on Transactions with Affiliates*

The Parent will not, and will not permit any Restricted Subsidiary to, directly or indirectly, in one transaction or a series of related transactions, sell, lease, transfer or otherwise dispose of any of its assets to, or purchase any assets from, or enter into any contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate (an "Affiliate Transaction"), unless:

(1) such Affiliate Transaction is on terms that are no less favorable to the Parent or the relevant Restricted Subsidiary than those that may have been obtained in a comparable transaction at such time on an arm's-length basis by the Parent or that Restricted Subsidiary from a Person that is not an Affiliate of the Parent or that Restricted Subsidiary; and

(2) the Parent delivers to the Trustee:

(a) with respect to any Affiliate Transaction involving aggregate value expended or received by the Parent or any Restricted Subsidiary in excess of $2.0 million, an Officers' Certificate of the Parent certifying that such Affiliate Transaction complies with clause (1) above and a Secretary's Certificate which sets forth and authenticates a resolution that has been adopted by the Independent Directors approving such Affiliate Transaction; and

(b) with respect to any Affiliate Transaction involving aggregate value expended or received by the Parent or any Restricted Subsidiary of $10.0 million or more, the certificates described in the preceding clause (a) and (x) a written opinion as to the fairness of such Affiliate Transaction to the Parent or such Restricted Subsidiary from a financial point of view or (y) a written appraisal supporting the value of such Affiliate Transaction, in either case, issued by an Independent Financial Advisor.

The foregoing restrictions shall not apply to:

(1) transactions exclusively between or among (a) the Parent and one or more Restricted Subsidiaries or (b) Restricted Subsidiaries; provided, in each case, that no Affiliate of the Parent (other than another Restricted Subsidiary) owns Equity Interests of any such Restricted Subsidiary;

(2) reasonable director, officer, employee and consultant compensation (including bonuses) and other benefits (including retirement, health, stock and other benefit plans) and indemnification and insurance arrangements;

(3) the allocation of employee services among the Parent, its Subsidiaries and the Joint Ventures on a fair and equitable basis in the ordinary course of business; provided that, in the case of any such Subsidiary or Joint Venture, no officer, director or stockholder of the Parent beneficially owns any Equity Interests in such Subsidiary or Joint Venture (other than indirectly through ownership of Equity Interests in the Parent);

(4) loans and advances permitted by clause (3) of the definition of "Permitted Investments";

(5) any agreement as in effect as of the Issue Date or any extension, amendment or modification thereto (so long as any such extension, amendment or modification satisfies the requirements set forth in clause (1) of the first paragraph of this covenant) or any transaction contemplated thereby;

(6) Restricted Payments which are made in accordance with the covenant described under "—Limitations on Restricted Payments" and Permitted Investments (other than any Permitted Investment made in accordance with clause (13) of the definition of "Permitted Investments" to the extent that such Permitted Investment is in a Joint Venture or Unrestricted Subsidiary of which any officer, director or stockholder of the Parent beneficially owns any Equity Interests (other than indirectly through ownership of Equity Interests in the Parent));

(7) licensing of trademarks to, and allocation of overhead, sales and marketing, travel and like expenses among, the Parent, its Subsidiaries and the Joint Ventures on a fair and equitable basis in the ordinary course of business; provided that, in the case of any such Subsidiary or Joint Venture, no officer, director or stockholder of the Parent beneficially owns any Equity Interests in such Subsidiary or Joint Venture (other than indirectly through ownership of Equity Interests in the Parent); or

(8) sales or other dispositions of Qualified Equity Interests for cash by the Parent to an Affiliate.

*Limitations on Liens*

The Parent shall not, and shall not permit any Restricted Subsidiary to, directly or indirectly, create, incur, assume or permit or suffer to exist any Lien of any nature whatsoever against any assets now owned or hereafter acquired by the Parent or such Restricted Subsidiary (including Equity Interests of a Restricted Subsidiary), or any proceeds, income or profits therefrom securing any Indebtedness, except Permitted Liens.

*Limitations on Asset Sales*

The Parent will not, and will not permit any Restricted Subsidiary to, directly or indirectly, consummate any Asset Sale unless:

(1) the Parent or such Restricted Subsidiary receives consideration at the time of such Asset Sale at least equal to the Fair Market Value of the assets included in such Asset Sale; and

(2) at least 75% of the total consideration received in such Asset Sale or series of related Asset Sales consists of cash or Cash Equivalents.

For purposes of clause (2), the following shall be deemed to be cash:

(a) the amount (without duplication) of any Indebtedness (other than Subordinated Indebtedness) of the Parent or such Restricted Subsidiary that is expressly assumed by the transferee in such Asset Sale and with respect to which the Parent or such Restricted Subsidiary, as the case may be, is unconditionally released by the holder of such Indebtedness,

(b) the amount of any obligations received from such transferee that are within 60 days converted by the Parent or such Restricted Subsidiary to cash (to the extent of the cash actually so received), and

(c) the Fair Market Value of any assets (other than securities, unless such securities represent Equity Interests in an entity engaged solely in a Permitted Business, such entity becomes a Restricted Subsidiary and the Parent or a Restricted Subsidiary acquires voting and management control of such entity) received by the Parent or any Restricted Subsidiary to be used by it in the Permitted Business.

If at any time any non-cash consideration received by the Parent or any Restricted Subsidiary, as the case may be, in connection with any Asset Sale is repaid or converted into or sold or otherwise disposed of for cash (other than interest received with respect to any such non-cash consideration), then the date of such repayment, conversion or disposition shall be deemed to constitute the date of an Asset Sale hereunder and the Net Available Proceeds thereof shall be applied in accordance with this covenant.

If the Parent or any Restricted Subsidiary engages in an Asset Sale, the Parent or such Restricted Subsidiary shall, no later than 360 days following the consummation thereof, apply all or any of the Net Available Proceeds therefrom to:

(1) repay any Indebtedness under the Senior Secured Term Loan;

(2) repay any Indebtedness which was secured by the assets sold in such Asset Sale; and/or

(3) invest all or any part of the Net Available Proceeds thereof in the purchase of assets (other than securities, unless such securities represent Equity Interests in an entity engaged solely in a Permitted Business, such entity becomes a Restricted Subsidiary and the Parent or a Restricted Subsidiary acquires voting and management control of such entity) to be used by the Parent or any Restricted Subsidiary in the Permitted Business.

### *Limitations on Designation of Unrestricted Subsidiaries*

The Parent may designate any Subsidiary of the Parent (other than the Issuer) as an "Unrestricted Subsidiary" under the Indenture (a "Designation") only if:

(1) no Default shall have occurred and be continuing at the time of or after giving effect to such Designation; and

(2) the Parent would be permitted to make, at the time of such Designation, (a) a Permitted Investment or (b) an Investment pursuant to the first paragraph of "—Limitations on Restricted Payments" above, in either case, in an amount (the "Designation Amount") equal to the Fair Market Value of the Parent's proportionate interest in such Subsidiary on such date.

No Subsidiary shall be Designated as an "Unrestricted Subsidiary" unless such Subsidiary:

(1) has no Indebtedness other than Permitted Unrestricted Subsidiary Debt;

(2) is not party to any agreement, contract, arrangement or understanding with the Parent or any Restricted Subsidiary unless the terms of the agreement, contract, arrangement or understanding (i) are no less favorable to the Parent or the Restricted Subsidiary than those that might be obtained at the time from Persons who are not Affiliates of the Parent or such Restricted Subsidiary or (ii) would be permitted as (a) an Affiliate Transaction under and in compliance with "—Limitations on Transactions with Affiliates", (b) an Asset Sale under and in compliance with "—Limitations on Asset Sales", (c) a Permitted Investment or (d) an Investment under and in compliance with "—Limitations on Restricted Payments";

(3) is a Person with respect to which neither the Parent nor any Restricted Subsidiary has any direct or indirect obligation (a) to subscribe for additional Equity Interests or (b) to maintain or preserve the Person's financial condition or to cause the Person to achieve any specified levels of operating results; and

(4) has not guaranteed or otherwise directly or indirectly provided credit support for any Indebtedness of the Parent or any Restricted Subsidiary.

If, at any time after the Designation, any Unrestricted Subsidiary fails to meet the requirements set forth in the preceding paragraph, it shall thereafter cease to be an Unrestricted Subsidiary for purposes of the Indenture and any Indebtedness of the Subsidiary and any Liens on assets of such Subsidiary shall be deemed to be incurred by a Restricted Subsidiary as of the date and, if the Indebtedness is not permitted to be incurred under the covenant described under "—Limitations on Additional Indebtedness" or the Lien is not permitted under the covenant described under "—Limitations on Liens," the Parent shall be in default of the applicable covenant.

Notwithstanding the foregoing, the Parent may Designate a Subsidiary as an Unrestricted Subsidiary without complying with the first two paragraphs of this covenant if (a) such Subsidiary is a Consolidated Joint Venture and (b) such Designation is made within 30 days of such Joint Venture becoming a Subsidiary. Any such Unrestricted Subsidiary shall, however, be required subsequent to such Designation to comply with the immediately preceding paragraph; provided that such Unrestricted Subsidiary shall not be deemed to be in violation of the requirements set

forth in the second paragraph of this covenant to the extent that the Indebtedness, obligation, agreement or other arrangement that would otherwise violate such paragraph was in existence at the time such Joint Venture became a Subsidiary as in effect at such time.

The Parent may not Designate the Issuer as an Unrestricted Subsidiary. As of the Issue Date, the Parent shall be deemed to have Designated Duxford Title Reinsurance Company, Cerro Plata Associates, LLC, 242 Cerro Plata, LLC, Silver Creek Preserve and Nobar Water Company as Unrestricted Subsidiaries.

The Parent may redesignate an Unrestricted Subsidiary as a Restricted Subsidiary (a "Redesignation") only if:

(1)  no Default shall have occurred and be continuing at the time of and after giving effect to such Redesignation; and

(2)  all Liens, Indebtedness and Investments of such Unrestricted Subsidiary outstanding immediately following such Redesignation would, if incurred or made at such time, have been permitted to be incurred or made for all purposes of the Indenture.

All Designations and Redesignations must be evidenced by resolutions of the Board of Directors of the Parent delivered to the Trustee and certifying compliance with the foregoing provisions.

*Limitations on Mergers, Consolidations, Etc.*

Neither the Parent nor the Issuer will, directly or indirectly, in a single transaction or a series of related transactions, (a) consolidate or merge with or into any Person (other than a merger that satisfies the requirements of clause (1) below with a Wholly-Owned Restricted Subsidiary solely for the purpose of changing the Parent's or the Issuer's jurisdiction of incorporation, as the case may be, to another State of the United States), or sell, lease, transfer, convey or otherwise dispose of or assign all or substantially all of the assets of the Parent or the Parent and the Restricted Subsidiaries (taken as a whole) or the Issuer or the Issuer and the Restricted Subsidiaries that are Subsidiaries of the Issuer (taken as a whole), as the case may be, to any Person or (b) adopt a Plan of Liquidation unless, in either case:

(1)  either:

(a)  the Parent or the Issuer, as the case may be, will be the surviving or continuing Person; or

(b)  the Person formed by or surviving such consolidation or merger or to which such sale, lease, conveyance or other disposition shall be made (or, in the case of a Plan of Liquidation, any Person to which assets are transferred) (collectively, the "Successor") is a corporation or limited liability company organized and existing under the laws of any State of the United States of America or the District of Columbia, and the Successor expressly assumes, by supplemental indenture in form and substance satisfactory to the Trustee, all of the obligations of the Issuer or the Parent, as the case may be, under the Notes or the Parent's Note Guarantee, as applicable, and the Indenture; provided that, in the case of the Issuer, at any time the Successor is a limited liability company, there shall be a co-issuer of the Notes that is a corporation;

(2)  immediately prior to and immediately after giving effect to such transaction and the assumption of the obligations as set forth in clause (1)(b) above and the incurrence of any Indebtedness to be incurred in connection therewith, no Default shall have occurred and be continuing; and

(3)  immediately after and giving effect to such transaction and the assumption of the obligations set forth in clause (1)(b) above and the incurrence of any Indebtedness to be incurred in connection therewith, and the use of any net proceeds therefrom on a pro forma basis, (a) the Consolidated Net Worth of the Parent or the Successor, as the case may be, would be at least equal to the Consolidated Net Worth of the Parent immediately prior to such transaction (disregarding the effect of fees, commissions, discounts, taxes and other amounts payable in respect of such transaction) and (b) the Parent or the Successor, as the case may be, could incur $1.00 of additional Indebtedness pursuant to the Ratio Exception.

For purposes of this covenant, any Indebtedness of the Successor which was not Indebtedness of the Parent or the Issuer, as the case may be, immediately prior to the transaction shall be deemed to have been incurred in connection with such transaction.

Except as provided under the caption "—Note Guarantees," no Subsidiary Guarantor may consolidate with or merge with or into (whether or not such Subsidiary Guarantor is the surviving Person) another Person, whether or not affiliated with such Subsidiary Guarantor, unless:

(1)  either:

(a)  such Subsidiary Guarantor will be the surviving or continuing Person; or

(b)  the Person formed by or surviving any such consolidation or merger assumes, by supplemental indenture in form and substance satisfactory to the Trustee, all of the obligations of such Subsidiary Guarantor under the Note Guarantee of such Subsidiary Guarantor and the Indenture; and

(2)  immediately after giving effect to such transaction, no Default shall have occurred and be continuing.

For purposes of the foregoing, the transfer (by lease, assignment, sale or otherwise, in a single transaction or series of transactions) of all or substantially all of the assets of one or more Restricted Subsidiaries, the Equity Interests of which constitute all or substantially all of the assets of the Parent or the Issuer, will be deemed to be the transfer of all or substantially all of the assets of the Parent or the Issuer, as the case may be.

Upon any consolidation, combination or merger of the Issuer or a Guarantor, or any transfer of all or substantially all of the assets of the Parent or the Issuer in accordance with the foregoing, in which the Issuer or such Guarantor is not the continuing obligor under the Notes or its Note Guarantee, the surviving entity formed by such consolidation or into which the Issuer or such Guarantor is merged or to which the conveyance, lease or transfer is made will succeed to, and be substituted for, and may exercise every right and power of, the Issuer or such Guarantor under the Indenture, the Notes and the Note Guarantees with the same effect as if such surviving entity had been named therein as the Issuer or such Guarantor and, except in the case of a conveyance, transfer or lease, the Issuer or such Guarantor, as the case may be, will be released from the obligation to pay the principal of and interest on the Notes or in respect of its Note Guarantee, as the case may be, and all of the Issuer's or such Guarantor's other obligations and covenants under the Notes, the Indenture and its Note Guarantee, if applicable.

Notwithstanding the foregoing, any Restricted Subsidiary (other than the Issuer) may merge into the Parent or another Restricted Subsidiary.

### Additional Note Guarantees

If, after the Issue Date, (a) the Parent or any Restricted Subsidiary shall acquire or create another Subsidiary (other than (i) a Subsidiary that has been designated an Unrestricted Subsidiary, (ii) a Joint Venture that has become a Restricted Subsidiary because of a change in GAAP relating to consolidation and (iii) any Subsidiary that is a project financed special purpose entity) or (b) any Unrestricted Subsidiary is redesignated a Restricted Subsidiary, then, in each such case, to the extent the obligations under the Senior Secured Term Loan have not been repaid or refinanced, and the lenders under the Senior Secured Term Loan have received a guaranty from such Restricted Subsidiary, the Parent shall cause such Restricted Subsidiary to:

(1)  execute and deliver to the Trustee (a) a supplemental indenture in form and substance satisfactory to the Trustee pursuant to which such Restricted Subsidiary shall unconditionally guarantee all of the Issuer's obligations under the Notes and the Indenture and (b) a notation of guarantee in respect of its Note Guarantee; and

(2)  deliver to the Trustee one or more opinions of counsel that such supplemental indenture (a) has been duly authorized, executed and delivered by such Restricted Subsidiary and (b) constitutes a valid and legally binding obligation of such Restricted Subsidiary in accordance with its terms.

### Conduct of Business

The Parent will not, and will not permit any Restricted Subsidiary to, engage in any business other than the Permitted Business and businesses necessary, reasonably related or ancillary thereto.

### Payments for Consent

The Parent will not, and will not permit any Restricted Subsidiary to, directly or indirectly, pay or cause to be paid any consideration, to any Holder of Notes for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of the Indenture or the Notes unless such consideration is offered to be paid or agreed to be paid to all Holders of the Notes that consent, waive or agree to amend in the time frame set forth in solicitation documents relating to such consent, waiver or agreement; provided, that neither Parent nor any of its Restricted Subsidiaries will be required to make any payments for consents so long as the Senior Secured Term Loan is outstanding.

### Further Assurances

The Parent will, and will cause the Guarantors to, do or cause to be done all acts and things which may be required, or which the Collateral Trustee from time to time may reasonably request, to assure and confirm that the Collateral Trustee holds, for the benefit of the Holders, duly created, enforceable and perfected security interests upon all Collateral, including any property or assets that are acquired or otherwise become Collateral after the Notes are issued, in each case, as contemplated by, and with the Lien priority required under, the Indenture, the Security Documents and the Intercreditor Agreement.

Upon the reasonable request of the Collateral Trustee, at any time or from time to time, Parent will, and Parent will cause each of the Guarantors to, promptly execute, acknowledge and deliver such security documents, instruments, certificates, notices and other documents, and take such other actions, as may reasonably be required, or which the Collateral Trustee may reasonably request, to create, perfect, ensure the priority of, protect, assure or enforce the security interests and benefits intended to be conferred upon the Collateral Trustee and the Holders by Parent or such Restricted Subsidiary as contemplated by the Security Documents.

The Collateral Trustee will be named as additional insured (as a second priority lienholder) on all liability insurance policies of the Parent and the Guarantors, and, upon the indefeasible payment in full in cash of all of the Senior Obligations, the Collateral Trustee will be named as loss payee on all property and casualty insurance policies of the Parent and the Guarantors.

## Reports

Whether or not required by the SEC, so long as any Notes are outstanding, the Parent will furnish to the Holders of Notes, within the time periods specified in the SEC's rules and regulations (including any grace periods or extensions permitted by the SEC):

(1)  all quarterly and annual financial information that would be required to be contained in a filing with the SEC on Forms 10-Q and 10-K if the Parent were required to file these Forms, including a "Management's Discussion and Analysis of Financial Condition and Results of Operations" and, with respect to the annual information only, a report on the annual financial statements by the Parent's certified independent accountants; and

(2)  all current reports that would be required to be filed with the SEC on Form 8-K if the Parent were required to file these reports.

In addition, whether or not required by the SEC, the Parent will file a copy of all of the information and reports referred to in clauses (1) and (2) above with the SEC for public availability within the time periods specified in the SEC's rules and regulations (unless the SEC will not accept the filing) and make the information available to securities analysts and prospective investors upon request.

The Issuer will also deliver to the trustee, within 90 days after the end of each fiscal year, an Officers' Certificate stating that, to the signing Officers' knowledge, no Default has occurred under the indenture, or, if a Default has occurred, what action the Issuer and/or Guarantors are taking or propose to take with respect thereto.

**Events of Default**

Each of the following is an "Event of Default":

(1) failure by the Issuer to pay interest on any of the Notes when it becomes due and payable and the continuance of any such failure for 30 days;

(2) failure by the Issuer to pay the principal on any of the Notes when it becomes due and payable, whether at stated maturity, upon redemption, upon purchase, upon acceleration or otherwise;

(3) failure by the Parent or the Issuer to comply with any of its agreements or covenants described above under "—Certain Covenants—Limitations on Mergers, Consolidations, Etc.";

(4) failure by the Parent or the Issuer to comply with any other agreement or covenant in the Indenture and continuance of this failure for 30 days after written notice of the failure has been given to the Issuer by the Trustee or by the Holders of at least 25% of the aggregate principal amount of the Notes then outstanding;

(5) default under any mortgage, indenture or other instrument or agreement under which there may be issued or by which there may be secured or evidenced Indebtedness (other than Non-Recourse Indebtedness) of the Parent or any Restricted Subsidiary, whether such Indebtedness now exists or is incurred after the Issue Date, which default:

(a) is caused by a failure to pay when due principal on such Indebtedness within the applicable express grace period,

(b) results in the acceleration of such Indebtedness prior to its express final maturity, or

(c) results in the commencement of judicial proceedings to foreclose upon, or to exercise remedies under applicable law or applicable security documents to take ownership of, the assets securing such Indebtedness, and

in each case, the principal amount of such Indebtedness, together with any other Indebtedness with respect to which an event described in clause (a), (b) or (c) has occurred and is continuing, aggregates $10.0 million or more;

(6) one or more judgments or orders that exceed $10.0 million in the aggregate (net of amounts covered by insurance or bonded) for the payment of money have been entered by a court or courts of competent jurisdiction against the Parent or any Restricted Subsidiary and such judgment or judgments have not been satisfied, stayed, annulled or rescinded within 60 days of being entered;

(7) the Parent, the Issuer or any Significant Subsidiary pursuant to or within the meaning of any Bankruptcy Law:

(a) commences a voluntary case,

(b) consents to the entry of an order for relief against it in an involuntary case,

(c) consents to the appointment of a Custodian of it or for all or substantially all of its assets, or

(d) makes a general assignment for the benefit of its creditors;

(8) a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(a) is for relief against the Parent, the Issuer or any Significant Subsidiary as debtor in an involuntary case,

(b) appoints a Custodian of the Parent, the Issuer or any Significant Subsidiary or a Custodian for all or substantially all of the assets of the Parent, the Issuer or any Significant Subsidiary, or

(c) orders the liquidation of the Parent, the Issuer or any Significant Subsidiary,

and the order or decree remains unstayed and in effect for 60 days;

(9) the Note Guarantee of the Parent or any Note Guarantee of any Significant Subsidiary ceases to be in full force and effect (other than in accordance with the terms of such Note Guarantee and the Indenture) or is declared null and void and unenforceable or found to be invalid or any Guarantor denies its liability under its Note Guarantee (other than by reason of release of a Guarantor from its Note Guarantee in accordance with the terms of the Indenture and the Note Guarantee);

(10) except as permitted by the Security Documents or the Intercreditor Agreement, any Security Document ceases for any reason to be fully enforceable;

(11) except as permitted by the Security Documents or the Intercreditor Agreement, any Lien ceases to be valid, enforceable and of the same effect and priority purported to be created thereby on any material portion of the Collateral, or the Parent or any Restricted Subsidiary shall assert, in any pleading in any court of competent jurisdiction, that any such Lien is invalid or unenforceable; or

(12) failure by the Parent or any Restricted Subsidiary to comply with any agreement or covenant in the Security Documents and continuance of this failure for 30 days after written notice of the failure has been given to the Issuer by the Trustee or by the Holders of at least 25% of the aggregate principal amount of the Notes then outstanding.

If an Event of Default (other than an Event of Default specified in clause (7) or (8) above with respect to the Issuer), shall have occurred and be continuing under the Indenture, the Trustee, by written notice to the Issuer, or the Holders of at least 25% in aggregate principal amount of the Notes then outstanding by written notice to the Issuer and the Trustee, may declare all amounts owing under the Notes to be due and payable immediately. Upon such declaration of acceleration, the aggregate principal of and accrued and unpaid interest on the outstanding Notes shall immediately become due and payable; provided, however, that after such acceleration, but before a judgment or decree based on acceleration, the Holders of a majority in aggregate principal amount of such outstanding Notes may rescind and annul such acceleration. If an Event of Default specified in clause (7) or (8) with respect to the Issuer occurs, all outstanding Notes shall become due and payable without any further action or notice.

The Trustee shall, within 90 days after becoming aware of the occurrence of any Default with respect to the Notes, give the Holders notice of all uncured Defaults thereunder known to it; provided, however, that, except in the case of an Event of Default in payment with respect to the Notes or a Default in complying with "—Certain Covenants—Limitations on Mergers, Consolidations, Etc.," the Trustee shall be protected in withholding such notice if and so long as a committee of its trust officers in good faith determines that the withholding of such notice is in the interest of the Holders.

No Holder will have any right to institute any proceeding with respect to the Indenture or for any remedy thereunder, unless the Trustee:

has failed to act for a period of 60 days after receiving written notice of a continuing Event of Default by such Holder and a request to act by Holders of at least 25% in aggregate principal amount of Notes outstanding;

has been offered indemnity satisfactory to it in its reasonable judgment; and

has not received from the Holders of a majority in aggregate principal amount of the outstanding Notes a direction inconsistent with such request; provided, that only the Collateral Trustee will have the right to institute any proceeding with respect to the Collateral.

However, such limitations (other than the limitation that only the Collateral Trustee will have the right to institute any proceeding with respect to the Collateral) do not apply to a suit instituted by a Holder of any Note for enforcement of payment of the principal of or interest on such Note on or after the due date therefor (after giving effect to the grace period specified in clause (1) of the first paragraph of this "—Events of Default" section); *provided* that a Holder shall not have the right to institute any such suit for the enforcement of payment if and to the extent that the institution or prosecution thereof or the entry of judgment therein would, under applicable law, result

in the surrender, impairment, waiver or loss of the Lien of the Collateral Trustee upon any property subject to such Lien.

The Issuer is required to deliver to the Trustee annually a statement regarding compliance with the Indenture and, upon any Officer of the Issuer becoming aware of any Default, a statement specifying such Default and what action the Issuer is taking or proposes to take with respect thereto.

**Legal Defeasance and Covenant Defeasance**

The Issuer may, at its option and at any time, elect to have its obligations and the obligations of the Guarantors discharged with respect to the outstanding Notes ("Legal Defeasance"). Legal Defeasance means that the Issuer and the Guarantors shall be deemed to have paid and discharged the entire Indebtedness represented by the Notes and the Note Guarantees, and the Indenture shall cease to be of further effect as to all outstanding Notes and Note Guarantees, except as to

(1) rights of Holders to receive payments in respect of the principal of and interest on the Notes when such payments are due from the trust funds referred to below,

(2) the Issuer's obligations with respect to the Notes concerning issuing temporary Notes, registration of Notes, mutilated, destroyed, lost or stolen Notes, and the maintenance of an office or agency for payment and money for security payments held in trust,

(3) the rights, powers, trust, duties, and immunities of the Trustee, and the Issuer's obligation in connection therewith, and

(4) the Legal Defeasance provisions of the Indenture.

In addition, the Issuer may, at its option and at any time, elect to have its obligations and the obligations of the Guarantors released with respect to most of the covenants under the Indenture, except as described otherwise in the Indenture ("Covenant Defeasance"), and thereafter any omission to comply with such obligations shall not constitute a Default. In the event Covenant Defeasance occurs, certain Events of Default (not including non-payment and, solely for a period of 91 days following the deposit referred to in clause (1) of the next paragraph, bankruptcy, receivership, rehabilitation and insolvency events) will no longer apply. Covenant Defeasance will not be effective until such bankruptcy, receivership, rehabilitation and insolvency events no longer apply. The Issuer may exercise its Legal Defeasance option regardless of whether it previously exercised Covenant Defeasance.

In order to exercise either Legal Defeasance or Covenant Defeasance:

(1) the Issuer must irrevocably deposit with the Trustee, in trust, for the benefit of the Holders, U.S. legal tender, U.S. Government Obligations or a combination thereof, in such amounts as will be sufficient (without reinvestment) in the opinion of a nationally recognized firm of independent public accountants selected by the Issuer, to pay the principal of and interest on the Notes on the stated date for payment or on the redemption date of the principal or installment of principal of or interest on the Notes, and the Trustee must have a valid, perfected, exclusive security interest in such trust,

(2) in the case of Legal Defeasance, the Issuer shall have delivered to the Trustee an opinion of counsel in the United States reasonably acceptable to the Trustee confirming that:

(a) the Issuer has received from, or there has been published by the Internal Revenue Service, a ruling, or

(b) since the date of the Indenture, there has been a change in the applicable U.S. federal income tax law,

in either case to the effect that, and based thereon this opinion of counsel shall confirm that, the Holders will not recognize income, gain or loss for U.S. federal income tax purposes as a result of the Legal Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred.

(3) in the case of Covenant Defeasance, the Issuer shall have delivered to the Trustee an opinion of counsel in the United States reasonably acceptable to the Trustee confirming that the Holders will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Covenant Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if the Covenant Defeasance had not occurred,

(4) no Default shall have occurred and be continuing on the date of such deposit (other than a Default resulting from the borrowing of funds to be applied to such deposit and the grant of any Lien securing such borrowing),

(5) the Legal Defeasance or Covenant Defeasance shall not result in a breach or violation of, or constitute a default under, the Indenture, any Security Document or any other material agreement or instrument to which the Parent or any of its Subsidiaries is a party or by which the Parent or any of its Subsidiaries is bound,

(6) the Issuer shall have delivered to the Trustee an Officers' Certificate stating that the deposit was not made by it with the intent of preferring the Holders over any other of its creditors or with the intent of defeating, hindering, delaying or defrauding any other of its creditors or others, and

(7) the Issuer shall have delivered to the Trustee an Officers' Certificate and an opinion of counsel, each stating that the conditions provided for in, in the case of the Officers' Certificate, clauses (1) through (6) and, in the case of the opinion of counsel, clauses (1) (with respect to the validity and perfection of the security interest), (2) and/or (3) and (5) of this paragraph have been complied with.

If the funds deposited with the Trustee to effect Covenant Defeasance are insufficient to pay the principal of and interest on the Notes when due, then the obligations of the Issuer and the Guarantors under the Indenture will be revived and no such defeasance will be deemed to have occurred.

**Satisfaction and Discharge**

The Indenture will be discharged and will cease to be of further effect (except as to rights of registration of transfer or exchange of Notes which shall survive until all Notes have been canceled) as to all outstanding Notes when either

(1) all the Notes that have been authenticated and delivered (except lost, stolen or destroyed Notes which have been replaced or paid and Notes for whose payment money has been deposited in trust or segregated and held in trust by the Issuer and thereafter repaid to the Issuer or discharged from this trust) have been delivered to the Trustee for cancellation, or

(2) (a)  all Notes not delivered to the Trustee for cancellation otherwise have become due and payable or have been called for redemption pursuant to the provisions described under "—Optional Redemption," and the Issuer has irrevocably deposited or caused to be deposited with the Trustee trust funds in trust in an amount of money sufficient to pay and discharge the entire Indebtedness (including all principal and accrued interest) on the Notes not theretofore delivered to the Trustee for cancellation,

(b)  the Issuer has paid all sums payable by it under the Indenture,

(c)  the Issuer has delivered irrevocable instructions to the Trustee to apply the deposited money toward the payment of the Notes at maturity or on the date of redemption, as the case may be, and

(d)  the Trustee, for the benefit of the Holders, has a valid, perfected, exclusive security interest in this trust.

In addition, the Issuer must deliver an Officers' Certificate and an opinion of counsel (as to legal matters) stating that all conditions precedent to satisfaction and discharge have been complied with.

**Transfer and Exchange**

A Holder will be able to register the transfer of or exchange Notes only in accordance with the provisions of the Indenture. The Registrar may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and to pay any taxes and fees required by law or permitted by the Indenture. Without the prior consent of the Issuer, the Registrar is not required (1) to register the transfer of or exchange any Note selected for redemption, (2) to register the transfer of or exchange any Note for a period of 15 days before a selection of Notes to be redeemed or (3) to register the transfer or exchange of a Note between a record date and the next succeeding interest payment date.

The Notes will be issued in registered form and the registered Holder will be treated as the owner of such Note for all purposes.

### Amendment, Supplement and Waiver

Subject to certain exceptions and the Intercreditor Agreement, the Indenture, the Notes or the Security Documents may be amended with the consent (which may include consents obtained in connection with a tender offer or exchange offer for Notes) of the Holders of at least a majority in principal amount of the Notes then outstanding, and any existing Default under, or compliance with any provision of, the Indenture may be waived (other than any continuing Default in the payment of the principal or interest on the Notes) with the consent (which may include consents obtained in connection with a tender offer or exchange offer for Notes) of the Holders of a majority in principal amount of the Notes then outstanding; provided that without the consent of each Holder affected, the Issuer, the Guarantors and the Trustee may not:

(1) change the maturity of any Note;

(2) reduce the amount, extend the due date or otherwise affect the terms of any scheduled payment of interest on or principal of the Notes;

(3) reduce any premium payable upon optional redemption of the Notes, change the date on which any Notes are subject to redemption or otherwise alter the provisions with respect to the redemption of the Notes;

(4) make any Note payable in money or currency other than that stated in the Notes;

(5) modify or change any provision of the Indenture or the related definitions to subordinate the Notes or any Note Guarantee to other Indebtedness in a manner that adversely affects the Holders;

(6) reduce the percentage of Holders necessary to consent to an amendment or waiver to the Indenture or the Notes;

(7) impair the rights of Holders to receive payments of principal of or interest on the Notes;

(8) release the Parent from any of its obligations under its Note Guarantee or the Indenture, except as permitted by the Indenture; or

(9) make any change in these amendment and waiver provisions.

Without the consent of the Holders of at least 66⅔% in the aggregate outstanding principal amount of the Notes then outstanding, an amendment, supplement or waiver may not (with respect to any Notes held by a non-consenting Holder) release all or substantially all of the Collateral from the Liens created by the Security Documents, except as specifically provided for in the Security Documents.

Notwithstanding the foregoing, the Issuer, the Guarantors and the Trustee may amend the Indenture, the Note Guarantees, the Notes or the Security Documents, in each case subject to the Intercreditor Agreement, without the consent of any Holder, to cure any ambiguity, defect or inconsistency, to provide for uncertificated Notes in addition to or in place of certificated Notes, to provide for the assumption of the Issuer's or any Guarantor's obligations to the Holders in the case of a merger or acquisition, to release any Guarantor from any of its obligations under its Note Guarantee or the Indenture (to the extent permitted by the Indenture), to make any change that does not materially adversely affect the rights of any Holder, to comply with SEC rules and regulations or changes to applicable law, in the case of the Indenture, to maintain the qualification of the Indenture under the Trust Indenture Act or to make,

complete or confirm any grant of Collateral permitted or required by the Indenture or any of the Security Documents or any release of Collateral that becomes effective as set forth in the Indenture, any of the Security Documents or the Intercreditor Agreement.

### No Personal Liability of Directors, Officers, Employees and Stockholders

No director, officer, employee, incorporator or stockholder of the Issuer or any Guarantor will have any liability for any obligations of the Issuer under the Notes, Security Documents or the Indenture or of any Guarantor under its Note Guarantee or Security Documents or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes and the Note Guarantees. The Securities and Exchange Commission takes the position that this waiver will not be effective to waive liabilities under the federal securities laws.

### Concerning the Trustee

U.S. Bank National Association is the Trustee under the Indenture and has been appointed by the Issuer as Registrar and Paying Agent with regard to the Notes. The Indenture contains certain limitations on the rights of the Trustee, should it become a creditor of the Issuer, to obtain payment of claims in certain cases, or to realize on certain assets received in respect of any such claim as security or otherwise. The Trustee will be permitted to engage in other transactions; however, if it acquires any conflicting interest (as defined in the Indenture), it must eliminate such conflict or resign.

The Holders of a majority in principal amount of the then outstanding Notes will have the right to direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee, subject to certain exceptions. The Indenture provides that, in case an Event of Default occurs and is not cured, the Trustee will be required, in the exercise of its power, to use the degree of care of a prudent person in similar circumstances in the conduct of his or her own affairs. Subject to such provisions, the Trustee will be under no obligation to exercise any of its rights or powers under the Indenture at the request of any Holder, unless such Holder shall have offered to the Trustee security and indemnity satisfactory to the Trustee.

### Governing Law

The Indenture, the Notes and the Note Guarantees will be governed by, and construed in accordance with, the laws of the State of New York.

### Certain Definitions

Set forth below is a summary of certain of the defined terms used in the Indenture. Reference is made to the Indenture for the full definition of all such terms.

"Acquired Indebtedness" means (1) with respect to any Person that becomes a Restricted Subsidiary after the Issue Date (other than a Consolidated Joint Venture or a Restricted Joint Venture), Indebtedness of such Person and its Subsidiaries existing at the time such Person becomes a Restricted Subsidiary that was not incurred in connection with, or in contemplation of, such Person becoming a Restricted Subsidiary and (2) with respect to the Parent or any Restricted Subsidiary, any Indebtedness of a Person (other than the Parent or a Restricted Subsidiary) existing at the time such Person is merged with or into the Parent or a Restricted Subsidiary, or Indebtedness expressly assumed by the Parent or any Restricted Subsidiary in connection with the acquisition of an asset or assets from another Person, which Indebtedness was not, in any case, incurred by such other Person in connection with, or in contemplation of, such merger or acquisition.

"Administrative Agent" means Colfin WLH Funding, LLC in its capacity as "Administrative Agent" under the Senior Secured Term Loan and any successor thereto in such capacity.

"Affiliate" of any Person means any other Person which directly or indirectly controls or is controlled by, or is under direct or indirect common control with, the referent Person. For purposes of the covenant described under "— Certain Covenants—Limitations on Transactions with Affiliates," Affiliates shall be deemed to include, with respect

to any Person, any other Person (1) which beneficially owns or holds, directly or indirectly, 10% or more of any class of the Voting Stock of the referent Person, (2) of which 10% or more of the Voting Stock is beneficially owned or held, directly or indirectly, by the referent Person or (3) with respect to an individual, any immediate family member of such Person. For purposes of this definition, "control" of a Person shall mean the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

"Asset Acquisition" means

(1) an Investment by the Parent or any Restricted Subsidiary in any other Person if, as a result of such Investment, such Person shall become a Restricted Subsidiary or shall be merged with or into the Parent or any Restricted Subsidiary, or

(2) the acquisition by the Parent or any Restricted Subsidiary of all or substantially all of the assets of any other Person or any division or line of business of any other Person.

"Asset Sale" means any sale, issuance, conveyance, transfer, lease, assignment or other disposition by the Parent or any Restricted Subsidiary to any Person other than the Parent or any Restricted Subsidiary (including by means of a Sale and Leaseback Transaction or a merger or consolidation) (collectively, for purposes of this definition, a "transfer"), in one transaction or a series of related transactions, of any assets (including Equity Interests) of the Parent or any of its Restricted Subsidiaries other than in the ordinary course of business. For purposes of this definition, the term "Asset Sale" shall not include:

(1) transfers of cash or Cash Equivalents;

(2) transfers of assets (including Equity Interests) that are governed by, and made in accordance with, the provisions described under "—Certain Covenants—Limitations on Mergers, Consolidations, Etc.";

(3) Permitted Investments and Restricted Payments permitted under the covenant described under "—Certain Covenants—Limitations on Restricted Payments";

(4) the creation or realization of any Permitted Lien;

(5) transactions in the ordinary course of business, including, without limitation, dedications and other donations to governmental authorities, sales (directly or indirectly), leases, sales and leasebacks and other dispositions of (A) homes, improved land and unimproved land, whether in single or multiple lots, (B) real estate (including related amenities and improvements), whether in single or multiple lots and (C) Equity Interests of a Subsidiary, the assets of which consist entirely of amenities and improvements related to real estate, such as golf courses, and real estate underlying such amenities and improvements;

(6) dispositions of mortgage loans and related assets and mortgage-backed securities in the ordinary course of a mortgage lending business; and

(7) any transfer or series of related transfers that, but for this clause, would be Asset Sales, if after giving effect to such transfers, the aggregate Fair Market Value of the assets transferred in such transaction or any such series of related transactions does not exceed $2.0 million.

"Attributable Indebtedness", when used with respect to any Sale and Leaseback Transaction, means, as at the time of determination, the present value (discounted at a rate equivalent to the Issuer's then-current weighted average cost of funds for borrowed money as at the time of determination, compounded on a semi-annual basis) of the total obligations of the lessee for rental payments during the remaining term of any Capitalized Lease included in any such Sale and Leaseback Transaction.

"Bankruptcy Law" means Title 11 of the United States Code, as amended, or any similar federal or state law for the relief of debtors.

"Business Day" means a day other than a Saturday, Sunday or other day on which banking institutions in New York are authorized or required by law to close.

"Cap Amount" means the sum of (a) the greater of (1) 120% of the outstanding principal amount of the obligations under the Senior Secured Term Loan on the closing date of the Senior Secured Term Loan and (2) 65% of the Borrowing Base (as defined in the Senior Secured Term Loan) and (b) an aggregate principal amount not to exceed $25,000,000 for protective advances permitted under the Senior Secured Term Loan and the loan documents executed in connection therewith.

"Capitalized Lease" means a lease required to be capitalized for financial reporting purposes in accordance with GAAP.

"Capitalized Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under a Capitalized Lease, and the amount of such obligation shall be the capitalized amount thereof determined in accordance with GAAP.

"Cash Equivalents" means:

(1)    marketable obligations with a maturity of 360 days or less issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof;

(2)    demand and time deposits and certificates of deposit or acceptances with a maturity of 180 days or less of any financial institution that is a member of the Federal Reserve System having combined capital and surplus and undivided profits of not less than $500 million and is assigned at least a "B" rating by Thomson Financial BankWatch;

(3)    commercial paper maturing no more than 180 days from the date of creation thereof issued by a corporation that is not the Parent or an Affiliate of the Parent, and is organized under the laws of any State of the United States of America or the District of Columbia and rated at least A-1 by Standard & Poor's or at least P-1 by Moody's;

(4)    repurchase obligations with a term of not more than ten days for underlying securities of the types described in clause (1) above entered into with any commercial bank meeting the specifications of clause (2) above; and

(5)    investments in money market or other mutual funds substantially all of whose assets comprise securities of the types described in clauses (1) through (4) above.

"Collateral" means all property subject or purported to be subject, from to time, to a Lien under any Security Documents.

"Collateral Trustee" means the Trustee in its capacity as "Collateral Trustee" under the Indenture and under the Security Documents and any successor thereto in such capacity.

"Consolidated Amortization Expense" for any period means the amortization expense of the Parent and the Restricted Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP.

"Consolidated Cash Flow Available for Fixed Charges" for any period means, without duplication, the sum of the amounts for such period of

(1)    Consolidated Net Income, plus

(2)    in each case only to the extent (and in the same proportion) deducted in determining Consolidated Net Income and with respect to the portion of Consolidated Net Income attributable to any Restricted Subsidiary (other than the Issuer) only if a corresponding amount would be permitted at the date of determination to be distributed to the Parent by such Restricted Subsidiary without prior approval (that has not been obtained), pursuant to the terms of its charter and all agreements, instruments, judgments, decrees, orders, statutes, rules and governmental regulations applicable to such Restricted Subsidiary or its stockholders,

(a)    Consolidated Income Tax Expense,

(b)  Consolidated Amortization Expense (but only to the extent not included in Consolidated Interest Expense),

(c)  Consolidated Depreciation Expense,

(d)  Consolidated Interest Expense and interest and other charges amortized to "cost of sales—homes" or "cost of sales—lots, land and other", and

(e)  all other non-cash items reducing the Consolidated Net Income (excluding any non-cash charge that results in an accrual of a reserve for cash charges in any future period) for such period,

in each case determined on a consolidated basis in accordance with GAAP, minus

(3)  the aggregate amount of all non-cash items, determined on a consolidated basis, to the extent such items increased Consolidated Net Income for such period.

"Consolidated Depreciation Expense" for any period means the depreciation expense of the Parent and the Restricted Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP.

"Consolidated Fixed Charge Coverage Ratio" means the ratio of Consolidated Cash Flow Available for Fixed Charges during the most recent four consecutive full fiscal quarters for which internal financial statements are available (the "Four-Quarter Period") ending on or prior to the date of the transaction giving rise to the need to calculate the Consolidated Fixed Charge Coverage Ratio (the "Transaction Date") to Consolidated Interest Incurred for the Four-Quarter Period.  For purposes of this definition, Consolidated Cash Flow Available for Fixed Charges and Consolidated Interest Incurred shall be calculated after giving effect on a pro forma basis for the period of such calculation to:

(1)  the incurrence of any Indebtedness, the inclusion of any Indebtedness on the balance sheet or the issuance of any preferred stock, in each case of the Parent or any Restricted Subsidiary (and the application of the proceeds thereof) and any repayment of other Indebtedness or redemption of other preferred stock (and the application of the proceeds therefrom) (other than the incurrence or repayment of Indebtedness in the ordinary course of business for working capital purposes pursuant to any revolving credit arrangement) occurring during the Four-Quarter Period or at any time subsequent to the last day of the Four-Quarter Period and on or prior to the Transaction Date, as if such incurrence, repayment, issuance or redemption, as the case may be (and the application of the proceeds thereof), occurred on the first day of the Four-Quarter Period; and

(2)  any Asset Sale or Asset Acquisition (including, without limitation, any Asset Acquisition giving rise to the need to make such calculation as a result of the Parent or any Restricted Subsidiary (including any Person who becomes a Restricted Subsidiary as a result of such Asset Acquisition) incurring Acquired Indebtedness and also including any Consolidated Cash Flow Available for Fixed Charges (including any pro forma expense and cost reductions calculated on a basis consistent with Regulation S-X under the Securities Exchange Act of 1934, as amended) associated with any such Asset Acquisition) occurring during the Four-Quarter Period or at any time subsequent to the last day of the Four-Quarter Period and on or prior to the Transaction Date, as if such Asset Sale or Asset Acquisition or other disposition (including the incurrence of, or assumption or liability for, any such Indebtedness or Acquired Indebtedness) occurred on the first day of the Four-Quarter Period.

If the Parent or any Restricted Subsidiary directly or indirectly guarantees Indebtedness of a third Person (other than a Restricted Subsidiary, in the case of the Parent, or the Parent or another Restricted Subsidiary, in the case of a Restricted Subsidiary), the preceding sentence shall give effect to the incurrence of such guaranteed Indebtedness as if the Parent or such Restricted Subsidiary had directly incurred or otherwise assumed such guaranteed Indebtedness.

In calculating Consolidated Interest Incurred for purposes of determining the denominator (but not the numerator) of this Consolidated Fixed Charge Coverage Ratio:

(1)  interest on outstanding Indebtedness determined on a fluctuating basis as of the Transaction Date and which will continue to be so determined thereafter shall be deemed to have accrued at a fixed rate per annum equal to the rate of interest on this Indebtedness in effect on the Transaction Date;

(2)  if interest on any Indebtedness actually incurred on the Transaction Date may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rates, then the interest rate in effect on the Transaction Date will be deemed to have been in effect during the Four-Quarter Period; and

(3)  notwithstanding clause (1) or (2) above, interest on Indebtedness determined on a fluctuating basis, to the extent such interest is covered by agreements with a term of at least one year after the Transaction Date relating to Hedging Obligations, shall be deemed to accrue at the rate per annum resulting after giving effect to the operation of these agreements.

"Consolidated Income Tax Expense" for any period means the provision for taxes of the Parent and the Restricted Subsidiaries, determined on a consolidated basis in accordance with GAAP.

"Consolidated Indebtedness" means, as of any date, the total Indebtedness of the Parent and the Restricted Subsidiaries as of such date, determined on a consolidated basis.

"Consolidated Interest Expense" for any period means the sum, without duplication, of the total interest expense (other than interest and other charges amortized to "cost of sales—homes" or "cost of sales—lots, land and other") of the Parent and the Restricted Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP and including, without duplication,

(1)  imputed interest on Capitalized Lease Obligations and Attributable Indebtedness,

(2)  commissions, discounts and other fees and charges owed with respect to letters of credit securing financial obligations, bankers' acceptance financing and receivables financings,

(3)  the net costs associated with Hedging Obligations,

(4)  amortization of debt issuance costs, debt discount or premium and other financing fees and expenses,

(5)  the interest portion of any deferred payment obligations,

(6)  all other non-cash interest expense,

(7)  the product of (a) all dividend payments on any series of Disqualified Equity Interests of the Parent or any preferred stock of any Restricted Subsidiary (other than any such Disqualified Equity Interests or any preferred stock held by the Parent or a Wholly-Owned Restricted Subsidiary), multiplied by (b) a fraction, the numerator of which is one and the denominator of which is one minus the then current combined federal, state and local statutory tax rate of the Parent and the Restricted Subsidiaries, expressed as a decimal,

(8)  all interest payable with respect to discontinued operations, and

(9)  all interest on any Indebtedness of any other Person (other than a Restricted Subsidiary, in the case of the Parent, or the Parent or another Restricted Subsidiary, in the case of a Restricted Subsidiary) guaranteed by the Parent or any Restricted Subsidiary.

"Consolidated Interest Incurred" for any period means the sum, without duplication, of (1) Consolidated Interest Expense and (2) interest capitalized for such period (including interest capitalized with respect to discontinued operations but not including interest or other charges amortized to "cost of sales—homes" or "cost of sales—lots, land and other").

"Consolidated Joint Venture" means a Joint Venture in existence on the Issue Date which has become or becomes a Subsidiary because of a change in GAAP relating to consolidation.

"Consolidated Joint Venture Indebtedness" means Indebtedness of Consolidated Joint Ventures included on the consolidated balance sheet of the Parent and its Restricted Subsidiaries.

"Consolidated Net Income" for any period means the net income (or loss) of the Parent and the Restricted Subsidiaries for such period determined on a consolidated basis in accordance with GAAP; provided that there shall be excluded from such net income (to the extent otherwise included therein), without duplication:

(1) the net income (or loss) of any Person (other than a Restricted Subsidiary) in which any Person other than the Parent or any of its Restricted Subsidiaries has an ownership interest, except to the extent that cash in an amount equal to any such income has actually been received by the Parent or any of its Restricted Subsidiaries during such period;

(2) except to the extent includible in the consolidated net income of the Parent pursuant to the foregoing clause (1), the net income (or loss) of any Person that accrued prior to the date that (a) such Person becomes a Restricted Subsidiary or is merged into or consolidated with the Parent or any Restricted Subsidiary or (b) the assets of such Person are acquired by the Parent or any Restricted Subsidiary;

(3) the net income of any Restricted Subsidiary (other than the Issuer) during such period to the extent that the declaration or payment of dividends or similar distributions by such Restricted Subsidiary of that income is not permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary during such period;

(4) that portion of the net income of any Restricted Subsidiary (other than the Issuer) that is not a Guarantor and is not a Wholly-Owned Restricted Subsidiary attributable to the portion of the Equity Interests of such Restricted Subsidiary that is not owned by the Parent or the Restricted Subsidiaries;

(5) for the purposes of calculating the Restricted Payments Basket only, in the case of a successor to the Parent or the Issuer by consolidation, merger or transfer of its assets, any income (or loss) of the successor prior to such merger, consolidation or transfer of assets;

(6) other than for purposes of calculating the Restricted Payments Basket, any gain (or loss), together with any related provisions for taxes on any such gain (or the tax effect of any such loss), realized during such period by the Parent or any Restricted Subsidiary upon (a) the acquisition of any securities, or the extinguishment of any Indebtedness, of the Parent or any Restricted Subsidiary or (b) any Asset Sale by the Parent or any Restricted Subsidiary; and

(7) other than for purposes of calculating the Restricted Payments Basket, any extraordinary gain (or extraordinary loss), together with any related provision for taxes on any such extraordinary gain (or the tax effect of any such extraordinary loss), realized by the Parent or any Restricted Subsidiary during such period.

In addition, any return of capital with respect to an Investment that increased the Restricted Payments Basket pursuant to clause (3)(d) of the first paragraph under "—Certain Covenants—Limitations on Restricted Payments" or decreased the amount of Investments outstanding pursuant to clause (14) of the definition of "Permitted Investments" shall be excluded from Consolidated Net Income for purposes of calculating the Restricted Payments Basket.

"Consolidated Net Worth" means, with respect to any Person as of any date, the consolidated stockholders' equity of such Person, determined on a consolidated basis in accordance with GAAP, less (without duplication) (1) any amounts thereof attributable to Disqualified Equity Interests of such Person or its Subsidiaries or any amount attributable to Unrestricted Subsidiaries (other than Cerro Plata Associates, LLC and 242 Cerro Plata, LLC) and (2) all write-ups (other than write-ups resulting from foreign currency translations and write-ups of tangible assets of a going concern business made within twelve months after the acquisition of such business) subsequent to the Issue Date in the book value of any asset owned by such Person or a Subsidiary of such Person.

"Consolidated Tangible Assets" means, as of any date, the total amount of assets of the Parent and the Restricted Subsidiaries on a consolidated basis at the end of the fiscal quarter immediately preceding such date, as

determined in accordance with GAAP, less (1) Intangible Assets and (2) any assets securing Non-Recourse Indebtedness.

"Consolidated Tangible Net Worth" means, with respect to any Person as of any date, the Consolidated Net Worth of such Person as of such date less (without duplication) all Intangible Assets of such Person as of such date.

"Custodian" means any receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law.

"Default" means (1) any Event of Default or (2) any event, act or condition that, after notice or the passage of time or both, would be an Event of Default.

"Designation" has the meaning given to this term in the covenant described under "—Certain Covenants—Limitations on Designation of Unrestricted Subsidiaries;" and "Designate" and "Designated" shall have correlative meanings.

"Designation Amount" has the meaning given to this term in the covenant described under "—Certain Covenants—Limitations on Designation of Unrestricted Subsidiaries."

"Developed Land" means all Entitled Land of the Parent, its Restricted Subsidiaries (other than Consolidated Joint Ventures) and the Restricted Joint Ventures which is undergoing active development or is ready for vertical construction.

"Directly Related Assets" means, with respect to any particular property, assets directly related thereto or derived therefrom, such as proceeds (including insurance proceeds), products, rents, and profits thereof and improvements and accessions thereto.

"Disqualified Equity Interests" of any Person means any class of Equity Interests of such Person that, by their terms, or by the terms of any related agreement or of any security into which they are convertible, puttable or exchangeable, are, or upon the happening of any event or the passage of time would be, required to be redeemed by such Person, whether or not at the option of the holder thereof, or mature or are mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, in whole or in part, on or prior to the date which is 91 days after the final maturity date of the Notes.

"Entitled Land" means all land of the Parent, its Restricted Subsidiaries (other than Consolidated Joint Ventures) and the Restricted Joint Ventures (a) on which Units may be constructed or which may be utilized for commercial, retail or industrial uses, in each case, under applicable laws and regulations and (b) the intended use by the Parent for which is permissible under the applicable regional plan, development agreement or applicable zoning ordinance.

"Equity Interests" of any Person means (1) any and all shares or other equity interests (including common stock, preferred stock, limited liability company interests and partnership interests) in such Person and (2) all rights to purchase, warrants or options (whether or not currently exercisable), participations or other equivalents of or interests in (however designated) such shares or other interests in such Person.

"Fair Market Value" means, with respect to any asset, the price (after taking into account any liabilities relating to such assets) that would be negotiated in an arm's-length transaction for cash between a willing seller and a willing and able buyer, neither of which is under any compulsion to complete the transaction, as such price is determined in good faith by the board of directors of the Parent or a duly authorized committee thereof, as evidenced by a resolution of such board or committee.

"GAAP" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as may be approved by a significant segment of the accounting profession of the United States, as in effect from time to time.

"guarantee" means a direct or indirect guarantee by any Person of any Indebtedness of any other Person and includes any obligation, direct or indirect, contingent or otherwise, of such Person: (1) to purchase or pay (or

advance or supply funds for the purchase or payment of) Indebtedness of such other Person (whether arising by virtue of partnership arrangements, or by agreements to keep-well, to purchase assets, goods, securities or services (unless such purchase arrangements are on arm's-length terms and are entered into in the ordinary course of business), to take-or-pay, or to maintain financial statement conditions or otherwise); or (2) entered into for purposes of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part).  Notwithstanding the foregoing, the liability of a general partner for the Indebtedness of a partnership that is secured by assets of such partnership whose Fair Market Value on the Issue Date exceeds the amount of such Indebtedness shall not be deemed to be a guarantee for purposes of this definition; provided that (i) the general partner has not otherwise guaranteed or assumed such Indebtedness, (ii) such Indebtedness is not included on the balance sheet of the general partner and is not required to be so included in accordance with GAAP as in effect on the date of such determination (except, in each case in this clause (ii), if the partnership was a Joint Venture which became a Subsidiary and which was Designated as an Unrestricted Subsidiary in accordance with the fourth paragraph of the covenant described under "Certain Covenants—Limitations on Designation of Unrestricted Subsidiaries"), (iii) to the extent the aggregate amount of liabilities of the Parent and the Restricted Subsidiaries that would constitute guarantees but for this sentence on the date of determination exceeds $115.0 million less the aggregate amount of Indebtedness outstanding under clause (15) of the definition of "Permitted Indebtedness" on the date of determination, then such excess shall be deemed to be guarantees by the Parent and the Restricted Subsidiaries and (iv) such partnership was in existence on the Issue Date. "guarantee," when used as a verb, and "guaranteed" have correlative meanings.

"Guarantors" means the Parent and each Restricted Subsidiary of the Parent on the Issue Date (other than the Issuer and Joint Ventures that have become Restricted Subsidiaries as a result of changes in GAAP), and each other Person that is required to become a Guarantor by the terms of the Indenture after the Issue Date, in each case, until such Person is released from its Note Guarantee.  On the Issue Date, the Guarantors will be the Parent, California Equity Funding, Inc., a California corporation, PH-LP Ventures, a California corporation, Duxford Financial, Inc., a California corporation, Sycamore CC, Inc., a California corporation, Presley CMR, Inc., a California corporation, William Lyon Southwest, Inc., an Arizona corporation, PH-Reilly Ventures, a California corporation, HSP, Inc., a California corporation, PH Ventures-San Jose, a California corporation, WLH Enterprises, a California Gen Partnership (formerly The Ranch Golf Club Co., formerly Carmel Mountain Ranch), Lyon Waterfront, LLC, a Delaware limited liability company and Lyon East Garrison Company I, LLC, a California limited liability company.

"Hedging Obligations" of any Person means the obligations of such Person pursuant to (1) any interest rate swap agreement, interest rate collar agreement or other similar agreement or arrangement designed to protect such Person against fluctuations in interest rates, (2) agreements or arrangements designed to protect such Person against fluctuations in foreign currency exchange rates in the conduct of its operations, or (3) any forward contract, commodity swap agreement, commodity option agreement or other similar agreement or arrangement designed to protect such Person against fluctuations in commodity prices, in each case entered into in the ordinary course of business for bona fide hedging purposes and not for the purpose of speculation.

"Holder" means any registered holder, from time to time, of the Notes.

"incur" means, with respect to any Indebtedness or obligation, incur, create, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to such Indebtedness or obligation; provided that (1) the Indebtedness of a Person existing at the time such Person became a Restricted Subsidiary or at the time such Person merged with or into the Parent or a Restricted Subsidiary shall be deemed to have been incurred at such time and (2) neither the accrual of interest nor the accretion of original issue discount shall be deemed to be an incurrence of Indebtedness.

"Indebtedness" of any Person at any date means, without duplication:

(1)  all liabilities, contingent or otherwise, of such Person for borrowed money (whether or not the recourse of the lender is to the whole of the assets of such Person or only to a portion thereof);

(2)  all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(3)  all obligations of such Person in respect of letters of credit or other similar instruments (or reimbursement obligations with respect thereto);

(4)  all obligations of such Person to pay the deferred and unpaid purchase price of property or services, except trade payables and accrued expenses incurred by such Person in the ordinary course of business in connection with obtaining goods, materials or services;

(5)  the maximum fixed redemption or repurchase price of all Disqualified Equity Interests of such Person;

(6)  all Capitalized Lease Obligations of such Person;

(7)  all Indebtedness of others secured by a Lien on any asset of such Person, whether or not such Indebtedness is assumed by such Person;

(8)  all Indebtedness of others guaranteed by such Person to the extent of such guarantee; provided that (i) Indebtedness of the Parent or its Subsidiaries that is guaranteed by the Parent or the Parent's Subsidiaries shall be counted only once in the calculation of the amount of Indebtedness of the Parent and its Subsidiaries on a consolidated basis and (ii) only the liabilities relating to any such guarantee that are recorded as liabilities, or required (in accordance with GAAP) to be recorded as liabilities, on the balance sheet of such Person shall be considered Indebtedness of such Person (it being understood that any increase in liabilities recorded or required to be recorded on such Person's balance sheet shall be deemed to be an "incurrence" of Indebtedness by such Person at the time of such increase);

(9)  all Attributable Indebtedness;

(10) to the extent not otherwise included in this definition, Hedging Obligations of such Person;

(11) all obligations of such Person under conditional sale or other title retention agreements relating to assets purchased by such Person; and

(12) the liquidation value of preferred stock of a Subsidiary of such Person issued and outstanding and held by any Person other than such Person (or one of its Wholly-Owned Restricted Subsidiaries).

Notwithstanding the foregoing, the following shall not be considered Indebtedness:  (a) earn-outs or similar profit sharing or participation arrangements provided for in acquisition agreements which are determined on the basis of future operating earnings or other similar performance criteria (which are not determinable at the time of acquisition) of the acquired assets or entities, (b) accrued expenses, trade payables, customer deposits or deferred income taxes arising in the ordinary course of business, (c) the liability of a general partner for the Indebtedness of a partnership that is secured by assets of such partnership whose Fair Market Value on the Issue Date exceeds the amount of such Indebtedness; provided that, in the case of this clause (c), (i) the general partner has not otherwise guaranteed or assumed such Indebtedness, (ii) such Indebtedness is not included on the balance sheet of the general partner and is not required to be so included in accordance with GAAP as in effect on the date of such determination (except, in each case in this clause (ii), if the partnership is a Consolidated Joint Venture which was Designated as an Unrestricted Subsidiary in accordance with the fourth paragraph of the covenant described under "Certain Covenants—Limitations on Designation of Unrestricted Subsidiaries"), (iii) to the extent the aggregate amount of liabilities of the Parent and the Restricted Subsidiaries that would constitute Indebtedness but for this clause (c) on the date of determination exceeds $115.0 million less the aggregate amount of Indebtedness outstanding under clause (15) of the definition of "Permitted Indebtedness" on the date of determination, then such excess shall be considered Indebtedness of the Parent and the Restricted Subsidiaries and (iv) such partnership was in existence on the Issue Date, (d) completion guarantees entered into in the ordinary course of business and (e) obligations in respect of district improvement bonds pertaining to roads, sewers and other infrastructure.  The amount of Indebtedness of any Person at any date shall be the outstanding balance at such date of all unconditional obligations as described above, the maximum liability of such Person for any such contingent obligations at such date and, in the case of clause (7), the lesser of (a) the Fair Market Value of any asset subject to a Lien securing the Indebtedness of others on the date that the Lien attaches and (b) the amount of the Indebtedness secured; provided, however, that the amount outstanding at any time of any Indebtedness issued with original issue discount shall be deemed to be the face amount of such Indebtedness less the remaining unamortized portion of the original issue discount of such

Indebtedness at such time, as determined in accordance with GAAP.  For purposes of clause (5), the "maximum fixed redemption or repurchase price" of any Disqualified Equity Interests that do not have a fixed redemption or repurchase price shall be calculated in accordance with the terms of such Disqualified Equity Interests as if such Disqualified Equity Interests were redeemed on any date on which an amount of Indebtedness outstanding shall be required to be determined pursuant to the Indenture.

"Independent Director" means a director of the Parent who

(1)  is independent with respect to the transaction at issue;

(2)  does not have any material financial interest in the Parent or any of its Affiliates (other than as a result of holding securities of the Parent); and

(3)  has not and whose Affiliates or affiliated firm has not, at any time during the twelve months prior to the taking of any action hereunder, directly or indirectly, received, or entered into any understanding or agreement to receive, compensation, payment or other benefit, of any type or form, from the Parent or any of its Affiliates, other than customary directors' fees and indemnity and insurance arrangements for serving on the board of directors of the Parent or any Affiliate and reimbursement of out-of-pocket expenses for attendance at the Parent's or Affiliate's board and board committee meetings.

"Independent Financial Advisor" means an accounting, appraisal or investment banking firm of nationally recognized standing that is, in the reasonable judgment of the Parent's board of directors, qualified to perform the task for which it has been engaged and disinterested and independent with respect to the Parent and its Affiliates; provided, however, that the prior rendering of service to the Parent or an Affiliate of the Parent shall not, by itself, disqualify the advisor.

"Intangible Assets" means, with respect to any Person, all unamortized debt discount and expense, unamortized deferred charges, goodwill, patents, trademarks, service marks, trade names, copyrights, write-ups of assets over their carrying value (other than write-ups which occurred prior to the Issue Date and other than, in connection with the acquisition of an asset, the write-up of the value of such asset to its Fair Market Value in accordance with GAAP on the date of acquisition) and all other items which would be treated as intangibles on the consolidated balance sheet of such Person prepared in accordance with GAAP.

"interest" means, with respect to the Notes, interest on the Notes.

"Investments" of any Person means, without duplication:

(1)  all direct or indirect investments by such Person in any other Person in the form of loans, advances or capital contributions or other credit extensions constituting Indebtedness of such other Person, and any guarantee of Indebtedness of any other Person;

(2)  all purchases (or other acquisitions for consideration) by such Person of Indebtedness, Equity Interests or other securities of any other Person;

(3)  all other items that would be classified as investments on a balance sheet of such Person prepared in accordance with GAAP; and

(4)  the Designation of any Subsidiary as an Unrestricted Subsidiary.

Except as otherwise expressly specified in this definition, the amount of any Investment (other than an Investment made in cash) shall be the Fair Market Value thereof on the date such Investment is made.  The amount of any Investment pursuant to clause (4) shall be the Designation Amount determined in accordance with the covenant described under "—Certain Covenants—Limitations on Designation of Unrestricted Subsidiaries." If the Parent or any Restricted Subsidiary sells or otherwise disposes of any Equity Interests of any direct or indirect Restricted Subsidiary such that, after giving effect to any such sale or disposition, such Person is no longer a Restricted Subsidiary, the Parent shall be deemed to have made an Investment on the date of any such sale or other disposition equal to the Fair Market Value of the Equity Interests of and all other Investments in such Restricted

Subsidiary not sold or disposed of, which amount shall be determined by the board of directors of the Parent. Notwithstanding the foregoing, redemptions of Equity Interests of the Parent shall be deemed not to be Investments.

"Issue Date" means the date on which the Notes are issued.

"Joint Venture" means a corporation, limited liability company, partnership or other entity engaged in a Permitted Business (other than an entity constituting a Subsidiary of the Parent) in which the Parent or any of its Restricted Subsidiaries owns, directly or indirectly, at least 10% of the Equity Interests.

"Lien" means, with respect to any asset, any mortgage, deed of trust, lien (statutory or other), pledge, lease, easement, restriction, covenant, charge, security interest or other encumbrance of any kind or nature in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, and any lease in the nature thereof, any option or other agreement to sell, and any filing of, or agreement to give, any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction (other than cautionary filings in respect of operating leases).

"Net Available Proceeds" means, with respect to any Asset Sale, the proceeds thereof in the form of cash or Cash Equivalents, net of

(1) brokerage commissions and other fees and expenses (including fees and expenses of legal counsel, accountants and investment banks) of such Asset Sale;

(2) provisions for taxes payable as a result of such Asset Sale (after taking into account any available tax credits or deductions and any tax sharing arrangements);

(3) amounts required to be paid to any Person (other than the Parent or any Restricted Subsidiary) owning a beneficial interest in the assets subject to the Asset Sale or having a Lien thereon;

(4) payments of unassumed liabilities (not constituting Indebtedness) relating to the assets sold at the time of, or within 30 days after the date of, such Asset Sale; and

(5) appropriate amounts to be provided by the Parent or any Restricted Subsidiary, as the case may be, as a reserve required in accordance with GAAP against any liabilities associated with such Asset Sale and retained by the Parent or any Restricted Subsidiary, as the case may be, after such Asset Sale, including pensions and other postemployment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Sale, all as reflected in an Officers' Certificate of the Parent delivered to the Trustee; provided, however, that any amounts remaining after adjustments, revaluations or liquidations of such reserves shall constitute Net Available Proceeds.

"New Preferred Shares" means the shares of Convertible Preferred Stock issued by Parent on the Issue Date convertible into shares of Class C Common Stock of Parent.

"Non-Recourse Indebtedness" with respect to any Person means Indebtedness of such Person for which (1) the sole legal recourse for collection of principal and interest on such Indebtedness is against the specific property identified in the instruments evidencing or securing such Indebtedness and such property was acquired with the proceeds of such Indebtedness or such Indebtedness was incurred within 90 days after the acquisition of such property and (2) no other assets of such Person may be realized upon in collection of principal or interest on such Indebtedness.

"Note Documents" means the Indenture, the Notes, the Note Guarantees and the Security Documents.

"Officer" of any Person means any of the following of such Person:  the Chairman of the board of directors, the Chief Executive Officer, the Chief Financial Officer, the President, any Vice President, the Treasurer or the Secretary.

"Officers' Certificate" of any Person means a certificate signed by two Officers of such Person.

"Parent" means William Lyon Homes, a Delaware corporation.

"Pari Passu Indebtedness" means any Indebtedness of the Issuer or any Guarantor that ranks pari passu as to payment with the Notes or the Note Guarantee of such Guarantor, as applicable.

"Permitted Business" means the businesses engaged in by the Parent and its Subsidiaries on the Issue Date as described in this section "Description of the Notes" and businesses that are reasonably related thereto or reasonable extensions thereof.

"Permitted Investment" means:

(1) Investments by the Parent or any Restricted Subsidiary in (a) the Issuer or any Guarantor or (b) in any Person that is or will become immediately after such Investment a Guarantor or that will merge or consolidate into the Issuer or a Guarantor;

(2) Investments in the Parent by any Restricted Subsidiary;

(3) loans and advances to directors, employees and officers of the Parent and the Restricted Subsidiaries for bona fide business purposes and to purchase Equity Interests of the Parent not in excess of $2.0 million at any one time outstanding;

(4) Hedging Obligations incurred pursuant to clause (4) of the second paragraph under the covenant described under "—Certain Covenants—Limitations on Additional Indebtedness";

(5) Cash Equivalents;

(6) receivables owing to the Parent or any Restricted Subsidiary if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms; provided, however, that such trade terms may include such concessionary trade terms as the Parent or any such Restricted Subsidiary deems reasonable under the circumstances;

(7) Investments in securities of trade creditors or customers received pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of such trade creditors or customers;

(8) Investments made by the Parent or any Restricted Subsidiary as a result of consideration received in connection with an Asset Sale made in compliance with the covenant described under "—Certain Covenants—Limitations on Asset Sales";

(9) lease, utility and other similar deposits in the ordinary course of business;

(10) Investments made by the Parent or a Restricted Subsidiary for consideration consisting only of Qualified Equity Interests;

(11) stock, obligations or securities received in settlement of debts created in the ordinary course of business and owing to the Parent or any Restricted Subsidiary or in satisfaction of judgments;

(12) Investments in existence on the Issue Date;

(13) completion guarantees entered into in the ordinary course of business;

(14) the Designation of a Subsidiary as an Unrestricted Subsidiary in accordance with the fourth paragraph of the covenant described under "Certain Covenants—Limitations on Designation of Unrestricted Subsidiaries"; and

(15) other Investments in an aggregate amount not to exceed $5.0 million at any one time outstanding (with each Investment being valued as of the date made and without regard to subsequent changes in value).

The amount of Investments outstanding at any time pursuant to clause (15) above shall be deemed to be reduced:

(a) upon the disposition or repayment of or return on any Investment made pursuant to clause (15) above, by an amount equal to the return of capital with respect to such Investment to the Parent or any Restricted Subsidiary (to the extent not included in the computation of Consolidated Net Income), less the cost of the disposition of such Investment and net of taxes; and

(b) upon a Redesignation of an Unrestricted Subsidiary as a Restricted Subsidiary (including, for avoidance of doubt, any Joint Venture becoming a Consolidated Joint Venture which is a Restricted Subsidiary), by an amount equal to the lesser of (x) the Fair Market Value of the Parent's proportionate interest in such Subsidiary immediately following such Redesignation, and (y) the aggregate amount of Investments in such Subsidiary that increased (and did not previously decrease) the amount of Investments outstanding pursuant to clause (15) above.

"Permitted Liens" means the following types of Liens:

(1) (a) statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, suppliers, materialmen, repairmen and other Liens imposed by law incurred in the ordinary course of business and (b) Liens for taxes, assessments or governmental charges or claims, in either case, for sums not yet delinquent or being contested in good faith, if such reserve or other appropriate provision, if any, as shall be required by GAAP shall have been made in respect thereof;

(2) Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

(3) Liens upon specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(4) Liens securing reimbursement obligations with respect to commercial letters of credit which encumber documents, goods covered thereby and other assets relating to such letters of credit and products and proceeds thereof;

(5) Liens encumbering deposits made to secure obligations arising from statutory, regulatory, contractual or warranty requirements of the Parent or any Restricted Subsidiary, including rights of offset and setoff;

(6) bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by the Parent or any Restricted Subsidiary, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank with respect to cash management and operating account arrangements, including those involving pooled accounts and netting arrangements; provided that in no case shall any such Liens secure (either directly or indirectly) the repayment of any Indebtedness;

(7) leases or subleases, licenses or sublicenses, (or any Liens related thereto) granted to others that do not materially interfere with the ordinary course of business of the Parent or any Restricted Subsidiary;

(8) Liens arising from filing Uniform Commercial Code financing statements regarding leases;

(9) Liens securing all of the Notes and Liens securing any Note Guarantee;

(10) Liens in favor of the Trustee under and as permitted by the Indenture;

(11) Liens existing on the Issue Date securing Indebtedness outstanding on the Issue Date;

(12) Liens in favor of the Issuer or a Guarantor;

(13) Liens securing Indebtedness under the Senior Secured Term Loan incurred pursuant to clause (1) of "—Limitations on Additional Indebtedness";

(14) without limiting any other clause in this definition of "Permitted Liens," Liens securing Indebtedness of the Parent or any Restricted Subsidiary permitted to be incurred under the Indenture; provided, that the aggregate amount of all Consolidated Indebtedness of the Parent and the Restricted Subsidiaries secured by Liens (including all Indebtedness permitted to be secured by the other provisions of this definition, but excluding Non-Recourse Indebtedness) shall not exceed 30% of Consolidated Tangible Assets at any one time outstanding (after giving effect to the incurrence of such Indebtedness and the use of the proceeds thereof);

(15) Liens securing Non-Recourse Indebtedness of the Parent or any Restricted Subsidiary permitted to be incurred under the Indenture; provided, that such Liens apply only to (a) the property financed out of the net proceeds of such Non-Recourse Indebtedness within 90 days after the incurrence of such Non-Recourse Indebtedness and (b) Directly Related Assets;

(16) Liens securing Purchase Money Indebtedness permitted to be incurred under the Indenture; provided that such Liens apply only to (a) the property acquired, constructed or improved with the proceeds of such Purchase Money Indebtedness within 90 days after the incurrence of such Purchase Money Indebtedness and (b) Directly Related Assets;

(17) Liens securing Acquired Indebtedness permitted to be incurred under the Indenture; provided that the Liens do not extend to assets not subject to such Lien at the time of acquisition (other than Directed Related Assets) and are no more favorable to the lienholders than those securing such Acquired Indebtedness prior to the incurrence of such Acquired Indebtedness by the Parent or a Restricted Subsidiary;

(18) Liens on assets of a Person existing at the time such Person is acquired or merged with or into or consolidated with the Parent or any such Restricted Subsidiary (and not created in anticipation or contemplation thereof);

(19) Liens to secure Attributable Indebtedness permitted to be incurred under the Indenture; provided that any such Lien shall not extend to or cover any assets of the Parent or any Restricted Subsidiary other than (a) the assets which are the subject of the Sale and Leaseback Transaction in which the Attributable Indebtedness is incurred and (b) Directly Related Assets;

(20) Liens securing Consolidated Joint Venture Indebtedness permitted to be incurred under the Indenture; provided that, with respect to Indebtedness of any particular Consolidated Joint Venture, such Liens do not extend to assets other than those of the Consolidated Joint Venture;

(21) [Intentionally Omitted];

(22) Liens to secure Refinancing Indebtedness which is incurred to refinance any Indebtedness which has been secured by a Lien permitted under the Indenture and which has been incurred in accordance with the provisions of the Indenture; provided that in each case such Liens do not extend to any additional assets (other than Directly Related Assets);

(23) attachment or judgment Liens not giving rise to a Default and which are being contested in good faith by appropriate proceedings;

(24) easements, rights-of-way, restrictions and other similar charges or encumbrances not materially interfering with the ordinary course of business of the Parent and its Subsidiaries;

(25) zoning restrictions, licenses, restrictions on the use of real property or minor irregularities in title thereto, which do not materially impair the use of such real property in the ordinary course of business of the Parent and its Subsidiaries or the value of such real property for the purpose of such business;

(26) Liens on Equity Interests in an Unrestricted Subsidiary to the extent that such Liens secure Indebtedness of such Unrestricted Subsidiary owing to lenders who have also been granted Liens on assets of such Unrestricted Subsidiary to secure such Indebtedness;

(27) any option, contract or other agreement to sell an asset; provided such sale is not otherwise prohibited under the Indenture; and

(28) any other Liens permitted under the Senior Secured Term Loan.

"Permitted Unrestricted Subsidiary Debt" means Indebtedness of an Unrestricted Subsidiary:

(1) as to which neither the Parent nor any Restricted Subsidiary (a) provides credit support of any kind (including any undertaking, agreement or instrument that would constitute Indebtedness), (b) is directly or indirectly liable as a guarantor or otherwise, or (c) constitutes the lender, other than, in the case of clause (a) or (b), obligations of the Parent or any Restricted Subsidiary arising as a result of being the general partner of such Unrestricted Subsidiary to the extent such obligations do not constitute Indebtedness of the Parent or such Restricted Subsidiary in accordance with the definition of "Indebtedness"; and

(2) as to which the lenders have been notified in writing that they will not have any recourse to the Equity Interests or assets of the Parent or any Restricted Subsidiary.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, incorporated or unincorporated association, joint-stock company, trust, unincorporated organization or government or other agency or political subdivision thereof or other entity of any kind.

"Plan of Liquidation" with respect to any Person, means a plan that provides for, contemplates or the effectuation of which is preceded or accompanied by (whether or not substantially contemporaneously, in phases or otherwise): (1) the sale, lease, conveyance or other disposition of all or substantially all of the assets of such Person otherwise than as an entirety or substantially as an entirety; and (2) the distribution of all or substantially all of the proceeds of such sale, lease, conveyance or other disposition of all or substantially all of the remaining assets of such Person to creditors and holders of Equity Interests of such Person.

"principal" means, with respect to the Notes, the principal of, and premium, if any, on the Notes.

"Purchase Money Indebtedness" means Indebtedness, including Capitalized Lease Obligations, of the Parent or any Restricted Subsidiary incurred for the purpose of financing all or any part of the purchase price of property, plant or equipment used in the business of the Parent or any Restricted Subsidiary or the cost of installation, construction or improvement thereof; provided, however, that (1) the amount of such Indebtedness shall not exceed such purchase price or cost (including financing costs), (2) such Indebtedness shall not be secured by any asset other than the specified asset being financed or, in the case of real property or fixtures, including additions and improvements, the real property to which such asset is attached and Directly Related Assets and (3) such Indebtedness shall be incurred within 90 days after such acquisition of such asset by the Parent or such Restricted Subsidiary or such installation, construction or improvement.

"Qualified Equity Interests" means Equity Interests of the Parent other than Disqualified Equity Interests; provided that such Equity Interests shall not be deemed Qualified Equity Interests to the extent sold or owed to a Subsidiary of the Parent or financed, directly or indirectly, using funds (1) borrowed from the Parent or any Subsidiary of the Parent until and to the extent such borrowing is repaid or (2) contributed, extended, guaranteed or advanced by the Parent or any Subsidiary of the Parent (including, without limitation, in respect of any employee stock ownership or benefit plan).

"Qualified Equity Offering" means the issuance and sale of Qualified Equity Interests; provided, however, that cash proceeds therefrom equal to not less than 100% of the aggregate principal amount of any Notes to be redeemed are received by the Issuer as a capital contribution immediately prior to such redemption.

"Ratio Exception" has the meaning set forth in the proviso in the first paragraph of the covenant described under "—Certain Covenants—Limitations on Additional Indebtedness."

"redeem" means to redeem, repurchase, purchase, defease, retire, discharge or otherwise acquire or retire for value; and "redemption" shall have a correlative meaning.

"Redesignation" has the meaning given to such term in the covenant described under "—Certain Covenants— Limitations on Designation of Unrestricted Subsidiaries."

"Refinancing Indebtedness" means Indebtedness of the Parent or a Restricted Subsidiary issued in exchange for, or the proceeds from the issuance and sale or disbursement of which are used substantially concurrently to redeem or refinance in whole or in part, or constituting an amendment of, any Indebtedness of the Parent or any Restricted Subsidiary (the "Refinanced Indebtedness") in a principal amount not in excess of the principal amount of the Refinanced Indebtedness so repaid or amended (plus the amount of any premium paid and the amount of reasonable expenses incurred by the Parent or any Restricted Subsidiary in connection with such repayment or amendment) (or, if such Refinancing Indebtedness refinances Indebtedness under a revolving credit facility or other agreement providing a commitment for subsequent borrowings, with a maximum commitment not to exceed the maximum commitment under such revolving credit facility or other agreement); provided that:

(1) if the Refinanced Indebtedness was subordinated to or pari passu with the Notes or the Note Guarantees, as the case may be, then such Refinancing Indebtedness, by its terms, is expressly pari passu with (in the case of Refinanced Indebtedness that was pari passu with) or subordinate in right of payment to (in the case of Refinanced Indebtedness that was subordinated to) the Notes or the Note Guarantees, as the case may be, at least to the same extent as the Refinanced Indebtedness;

(2) the Refinancing Indebtedness is scheduled to mature either (a) no earlier than the Refinanced Indebtedness being repaid or amended or (b) after the maturity date of the Notes;

(3) the portion, if any, of the Refinancing Indebtedness that is scheduled to mature on or prior to the maturity date of the Notes has a Weighted Average Life to Maturity at the time such Refinancing Indebtedness is incurred that is equal to or greater than the Weighted Average Life to Maturity of the portion of the Refinanced Indebtedness being repaid that is scheduled to mature on or prior to the maturity date of the Notes; and

(4) the Refinancing Indebtedness is secured only to the extent, if at all, and by the assets, that the Refinanced Indebtedness being repaid, extended or amended is secured;

provided, that, the foregoing restrictions shall not apply to the refinancing of the Senior Secured Term Loan, which refinancing shall be governed by the Intercreditor Agreement.

"Restricted Joint Venture" means a partnership formed after the Issue Date which, at the time of its formation, constituted a Joint Venture (whether or not it subsequently becomes a Restricted Subsidiary) and of which the Issuer or any Guarantor is a general partner, to the extent that (i) the Indebtedness of such partnership is secured by assets whose Fair Market Value on the date of determination exceed the amount of such Indebtedness and (ii) the general partner has not otherwise guaranteed or assumed such Indebtedness.

"Restricted Payment" means any of the following:

(1) the declaration or payment of any dividend or any other distribution on Equity Interests of the Parent or any Restricted Subsidiary or any payment made to the direct or indirect holders (in their capacities as such) of Equity Interests of the Parent or any Restricted Subsidiary, including, without limitation, any payment in connection with any merger or consolidation involving the Parent or the Issuer, but excluding (a) dividends or distributions payable solely in Qualified Equity Interests and (b) in the case of Restricted Subsidiaries, dividends or distributions payable to the Parent or to a Restricted Subsidiary and pro rata dividends or distributions payable to minority stockholders of any Restricted Subsidiary;

(2) the redemption of any Equity Interests of the Parent or any Restricted Subsidiary, including, without limitation, any payment in connection with any merger or consolidation involving the Parent or the Issuer, but excluding any such Equity Interests held by the Parent or any Restricted Subsidiary;

(3) any Investment other than a Permitted Investment; or

(4) any redemption prior to the scheduled maturity or prior to any scheduled repayment of principal or sinking fund payment, as the case may be, in respect of Subordinated Indebtedness.

"Restricted Payments Basket" has the meaning given to such term in the first paragraph of the covenant described under "—Certain Covenants—Limitations on Restricted Payments."

"Restricted Subsidiary" means any Subsidiary of the Parent other than an Unrestricted Subsidiary.

"Sale and Leaseback Transaction" means, with respect to any Person, an arrangement with any bank, insurance company or other lender or investor or to which such lender or investor is a party, providing for the leasing by such Person of any asset of such Person which has been or is being sold or transferred by such Person to such lender or investor or to any Person to whom funds have been or are to be advanced by such lender or investor on the security of such asset.

"Secretary's Certificate" means a certificate signed by the Secretary of the Parent.

"Security Documents" means the security agreements, pledge agreements, collateral assignments, mortgages and related agreements, as amended, supplemented, restated, renewed, refunded, replaced, restructured, repaid, refinanced or otherwise modified from time to time, creating the security interests in the Collateral as contemplated by the Indenture, in each case which are subject to the terms and conditions of the Intercreditor Agreement.

"Senior Secured Term Loan" means the Amended and Restated Senior Secured Term Loan Agreement, dated as of the Issue Date, by and among the Issuer, Colfin WLH Funding, LLC, as administrative agent, and Colfin WLH Funding, LLC, as arranger, and the lenders party thereto or their assigns, including any notes, guarantees, collateral and security documents, instruments and agreements executed in connection therewith, and in each case as amended, supplemented, modified or refinanced in whole or in part from time to time, including any agreement extending the maturity of, refinancing, replacing or otherwise restructuring (including increasing the amount of borrowings or other Indebtedness outstanding or available to be borrowed thereunder) all or any portion of the Indebtedness under such agreements, and any successor or replacement agreement or agreements with the same or any other agents, creditor, lender or group of creditors or lenders.

"Significant Subsidiary" means (1) any Restricted Subsidiary (other than the Issuer) that would be a "significant subsidiary" as defined in Regulation S-X promulgated pursuant to the Securities Act as such Regulation is in effect on the Issue Date and (2) any Restricted Subsidiary (other than the Issuer) that, when aggregated with all other Restricted Subsidiaries (other than the Issuer) that are not otherwise Significant Subsidiaries and as to which any event described in clause (7) or (8) under "—Events of Default" has occurred and is continuing, would constitute a Significant Subsidiary under clause (1) of this definition.

"Subordinated Indebtedness" means Indebtedness of the Issuer or any Guarantor that is subordinated in right of payment to the Notes or the Note Guarantees, respectively.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity that is or is required to be consolidated in the consolidated financial statements of such Person in accordance with GAAP. Unless otherwise specified, "Subsidiary" refers to a Subsidiary of the Parent.

"Subsidiary Guarantor" means any Guarantor other than the Parent.

"Trust Indenture Act" means the Trust Indenture Act of 1939, as amended.

"Unit" means a residence, whether single or part of a multifamily building, whether completed or under construction, held by the Parent, any Restricted Subsidiary (other than Consolidated Joint Ventures) or any Restricted Joint Venture for sale in the ordinary course of business.

"Unrestricted Subsidiary" means (1) any Subsidiary that at the time of determination shall be designated an Unrestricted Subsidiary by the Board of Directors of the Parent in accordance with the covenant described under "— Certain Covenants—Limitations on Designation of Unrestricted Subsidiaries" and (2) any Subsidiary of an Unrestricted Subsidiary.

"U.S. Government Obligations" means direct non-callable obligations of, or obligations guaranteed by, the United States of America for the payment of which guarantee or obligations the full faith and credit of the United States is pledged.

"Voting Stock" with respect to any Person, means securities of any class of Equity Interests of such Person entitling the holders thereof (whether at all times or only so long as no senior class of stock or other relevant equity interest has voting power by reason of any contingency) to vote in the election of members of the board of directors of such Person.

"Weighted Average Life to Maturity" when applied to any Indebtedness at any date, means the number of years obtained by dividing (1) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payment of principal, including payment at final maturity, in respect thereof by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment by (2) the then outstanding principal amount of such Indebtedness.

"Wholly-Owned Restricted Subsidiary" means a Restricted Subsidiary of which 100% of the Equity Interests (except for directors' qualifying shares or certain minority interests owned by other Persons solely due to local law requirements that there be more than one stockholder, but which interest is not in excess of what is required for such purpose) are owned directly by the Parent or through one or more Wholly-Owned Restricted Subsidiaries.

## BOOK-ENTRY, DELIVERY AND FORM OF NOTES

The Notes will be represented by one or more global Notes (the "Global Notes") in definitive form. The Global Notes will be deposited on the Issue Date with, or on behalf of, the Depository Trust Company ("DTC") and registered in the name of Cede & Co., as nominee of DTC (such nominee being referred to herein as the "Global Note Holder"). DTC will maintain the Notes in denominations of $1.00 and integral multiples thereof through its book-entry facilities.

DTC has advised us as follows:

DTC is a limited-purpose trust company that was created to hold securities for its participating organizations, including the Euroclear System and Clearstream Banking, Société Anònyme, Luxembourg (collectively, the "Participants" or the "Depositary's Participants"), and to facilitate the clearance and settlement of transactions in these securities between Participants through electronic book-entry changes in accounts of its Participants. The Depositary's Participants include securities brokers and dealers (including the underwriters), banks and trust companies, clearing corporations and certain other organizations. Access to DTC's system is also available to other entities such as banks, brokers, dealers and trust companies (collectively, the "Indirect Participants" or the "Depositary's Indirect Participants") that clear through or maintain a custodial relationship with a Participant, either directly or indirectly. Persons who are not Participants may beneficially own securities held by or on behalf of DTC only through the Depositary's Participants or the Depositary's Indirect Participants. Pursuant to procedures established by DTC, ownership of the Notes will be shown on, and the transfer of ownership thereof will be effected only through, records maintained by DTC (with respect to the interests of the Depositary's Participants) and the records of the Depositary's Participants (with respect to the interests of the Depositary's Indirect Participants).

The laws of some states require that certain persons take physical delivery in definitive form of securities that they own. Consequently, the ability to transfer the Notes will be limited to such extent.

So long as the Global Note Holder is the registered owner of any Notes, the Global Note Holder will be considered the sole holder of outstanding Notes represented by such Global Notes under the Indenture. Except as provided below, owners of the Notes will not be entitled to have the Notes registered in their names and will not be considered the owners or holders thereof under the Indenture for any purpose, including with respect to the giving of any directions, instructions, or approvals to the Trustee thereunder. None of the Issuer, the Guarantors or the Trustee will have any responsibility or liability for any aspect of the records relating to or payments made on account of the Notes by DTC, or for maintaining, supervising or reviewing any records of DTC relating to such Notes.

Payments in respect of the principal of, premium, if any, and interest on any Notes registered in the name of a Global Note Holder on the applicable record date will be payable by the Trustee to or at the direction of such Global Note Holder in its capacity as the registered holder under the Indenture. Under the terms of the Indenture, we and the Trustee may treat the persons in whose names any Notes, including the Global Notes, are registered as the owners thereof for the purpose of receiving such payments and for any and all other purposes whatsoever. Consequently, neither we nor the Trustee has or will have any responsibility or liability for the payment of such amounts to beneficial owners of the Notes (including principal, premium, if any, and interest). We believe, however, that it is currently the policy of DTC to immediately credit the accounts of the relevant Participants with such payments, in amounts proportionate to their respective beneficial interests in the relevant security as shown on the records of DTC. Payments by the Depositary's Participants and the Depositary's Indirect Participants to the beneficial owners of the Notes will be governed by standing instructions and customary practice and will be the responsibility of the Depositary's Participants or the Depositary's Indirect Participants.

Subject to certain conditions, any person having a beneficial interest in the Global Notes may, upon request to the Trustee and confirmation of such beneficial interest by the Depositary or its Participants or Indirect Participants, exchange such beneficial interest for Notes in definitive form. Upon any such issuance, the Trustee is required to register such notes in the name of and cause the same to be delivered to, such person or persons (or the nominee of any thereof). Such notes would be issued in fully registered form. In addition, if (1) we notify the trustee in writing that DTC is no longer willing or able to act as a depositary and we are unable to locate a qualified successor within 90 days or (2) we, at our option, notify the trustee in writing that we elect to cause the issuance of notes in definitive form under the Indenture, then, upon surrender by the relevant Global Note Holder of its Global Note, Notes in such form will be issued to each person that such Global Note Holder and DTC identifies as being the beneficial owner of the related Notes.

Neither we nor the trustee will be liable for any delay by the Global Note Holder or DTC in identifying the beneficial owners of Notes and we and the Trustee may conclusively rely on, and will be protected in relying on, instructions from the Global Note Holder or DTC for all purposes.