# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| William Lyon Homes, et. al,[1] | Case No. 11-14019 |
| Debtors. | |

---

## PREPACKAGED JOINT PLAN OF
## REORGANIZATION FOR WILLIAM LYON HOMES, et al.

---

Dated: November 17, 2011

PACHULSKI STANG ZIEHL & JONES LLP
Richard M. Pachulski (CA Bar No. 90073)
Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Joshua M. Fried (CA Bar No. 181541)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
E-mail:     rpachulski@pszjlaw.com
            ljones@pszjlaw.com
            dbertenthal@pszjlaw.com
            jfried@pszjlaw.com

Proposed Counsel to Debtors and Debtors in Possession

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are set forth on Schedule 1 hereto.

## TABLE OF CONTENTS

**Page**

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME,
        GOVERNING LAW AND DEFINED TERMS ............................................. 1

    A.    Rules of Interpretation, Computation of Time and Governing Law ................... 1

    B.    Defined Terms ................................................................................................. 2

ARTICLE II. ADMINISTRATIVE, DIP FACILITY AND PRIORITY TAX CLAIMS .......... 19

    A.    Administrative Claims ..................................................................................... 19

    B.    DIP Facility Claims ......................................................................................... 20

    C.    Priority Tax Claims .......................................................................................... 20

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS
        AND EQUITY INTERESTS ............................................................... 21

    A.    Summary .......................................................................................................... 21

    B.    Classification and Treatment of Claims and Equity Interests ........................... 22

    C.    Special Provision Governing Unimpaired Claims ............................................ 28

    D.    Discharge of Claims ........................................................................................ 28

ARTICLE IV. ACCEPTANCE OR REJECTION OF THE PLAN ......................................... 28

    A.    Presumed Acceptance of Plan .......................................................................... 28

    B.    Presumed Rejection of Plan ............................................................................. 28

    C.    Voting Classes ................................................................................................. 28

    D.    Acceptance by Impaired Classes of Claims ...................................................... 28

    E.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code ................. 29

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN ....................................... 29

    A.    General Settlement of Claims ........................................................................... 29

    B.    Corporate Existence ........................................................................................ 29

    C.    Vesting of Assets in the Reorganized Debtors ................................................. 29

**Page**

D.  Restructured First Lien Loan Agreement and Sources of Cash for Plan Distributions..................................................................................................29

E.  New Second Lien Notes and Class A Common Shares Issued Under the Plan .......................................................................................................30

F.  New Class B Common Shares and Warrants Issued Under the Plan .................30

G.  Rights Offering ................................................................................................30

H.  Management Incentive Plan..............................................................................32

I.  Issuance of New Securities and Related Documentation .................................32

J.  Substantive Consolidation for Plan Purposes ..................................................33

K.  Release of Liens, Claims and Equity Interests..................................................34

L.  Certificate of Incorporation and Bylaws..........................................................34

M.  Directors and Officers of Reorganized Parent..................................................34

N.  Corporate Action..............................................................................................35

O.  Cancellation of Notes, Certificates and Instruments.........................................35

P.  Plan Supplement, Other Documents and Orders and Consents Required Under Noteholders RSA, Colony RSA and the Backstop Commitment Agreement.......................................................................................................36

ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................................................................................................36

A.  Assumption and Rejection of Executory Contracts and Unexpired Leases..............................................................................................................36

B.  Assignment of Executory Contracts or Unexpired Leases ................................37

C.  Rejection of Executory Contracts or Unexpired Leases....................................38

D.  Claims on Account of the Rejection of Executory Contracts or Unexpired Leases..............................................................................................38

E.  Cure of Defaults for Assumed Executory Contracts and Unexpired Leases..............................................................................................................38

F.  Assumption of Director and Officer Insurance Policies....................................38

**Page**

G.    Indemnification Provisions ................................................................39

H.    Compensation and Benefit Programs...............................................39

I.    Workers' Compensation Benefits .....................................................39

ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS............................................40

A.    Dates of Distributions ......................................................................40

B.    Distribution Agent ...........................................................................40

C.    Cash Distributions...........................................................................41

D.    Rounding of Payments .....................................................................41

E.    Distributions on Account of Claims Allowed After the Effective Date ............41

F.    General Distribution Procedures.......................................................41

G.    Address for Delivery of Distributions................................................41

H.    Undeliverable Distributions and Unclaimed Property. ......................42

I.    Withholding Taxes............................................................................42

J.    Setoffs. .............................................................................................42

K.    Surrender of Cancelled Instruments or Securities ...........................42

L.    Lost, Stolen, Mutilated or Destroyed Securities ...............................43

ARTICLE VIII. PROCEDURES FOR RESOLVING CONTINGENT,
    UNLIQUIDATED AND DISPUTED CLAIMS...........................................43

A.    No Filing of Proofs of Claim ...........................................................43

B.    Disputed Claims...............................................................................43

C.    Procedures Regarding Disputed Claims ..........................................44

D.    Allowance of Claims........................................................................44

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION  AND
    CONSUMMATION OF THE PLAN.......................................................45

A.    Conditions Precedent to Confirmation.............................................45

**Page**

B.    Conditions Precedent to Consummation................................................46

C.    Waiver of Conditions.............................................................................47

D.    Effect of Non Occurrence of Conditions to Consummation................47

ARTICLE X. DEBTORS' RELEASES ................................................................48

ARTICLE XI. RELEASE, INJUNCTION AND RELATED PROVISIONS............48

A.    General....................................................................................................48

B.    Release....................................................................................................48

ARTICLE XII. THIRD PARTY RELEASE ........................................................50

A.    Discharge of Claims..............................................................................50

B.    Exculpation............................................................................................51

C.    Preservation of Rights of Action..........................................................51

D.    Injunction...............................................................................................52

ARTICLE XIII. BINDING NATURE OF PLAN ................................................52

ARTICLE XIV. [INTENTIONALLY LEFT BLANK] .........................................52

ARTICLE XV. [INTENTIONALLY LEFT BLANK]............................................53

ARTICLE XVI. RETENTION OF JURISDICTION ............................................53

ARTICLE XVII. MISCELLANEOUS PROVISIONS ..........................................54

A.    Dissolution of the Committee................................................................54

B.    Payment of Statutory Fees ....................................................................54

C.    Payment of Fees and Expenses of Prepetition Indenture Trustee.......54

D.    Modification of Plan..............................................................................55

E.    Revocation of Plan................................................................................55

F.    Successors and Assigns.........................................................................55

G.    Reservation of Rights............................................................................55

**Page**

| | | |
|---|---|---|
| H. | Further Assurances | 56 |
| I. | Severability | 56 |
| J. | Service of Documents | 56 |
| K. | Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code | 57 |
| L. | Governing Law | 57 |
| M. | Tax Reporting and Compliance | 57 |
| N. | Schedules | 58 |
| O. | No Strict Construction | 58 |
| P. | Conflicts | 58 |
| Q. | Confirmation Request | 58 |

## PLAN SCHEDULES

Plan Schedule 1        List of Debtors

Plan Schedule 2        Non-Exclusive List of Litigation Claims Retained by the Reorganized
                       Debtors

## PLAN EXHIBITS

Exhibit A              Backstop Commitment Agreement

Exhibit B              Class B Common Stock Commitment Agreement

Exhibit C              Colony RSA

Exhibit D              Noteholders RSA

2474327.1 16
DOCS_SF:78801.13 93949-001

## JOINT PLAN OF REORGANIZATION FOR
### William Lyon Homes, et al.

William Lyon Homes ("**DE Lyon**" or "**Parent**"), a Delaware corporation, William Lyon Homes, Inc. ("**CA Lyon**"), a California corporation and a wholly-owned subsidiary of the Parent, and each of the other debtors and debtors-in-possession listed on Plan Schedule 1 hereto, propose the following joint plan of reorganization (the "**Plan**") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtors. Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I of the Plan. The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code. Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtors' history, business, results of operations, historical financial information, accomplishments leading up to Solicitation of the Plan, projections and properties, and for a summary and analysis of this Plan and the treatment provided for herein. There are other agreements and documents that will be filed with the Bankruptcy Court, that are referenced in this Plan, the Plan Supplement or the Disclosure Statement as Exhibits and Plan Schedules. All such Exhibits and Plan Schedules are incorporated into and are a part of this Plan as if set forth in full herein. Subject to certain restrictions set forth in the Noteholders RSA and the Colony RSA, and requirements set forth in 11 U.S.C. § 1127 and Fed. R. Bankr. P. 3019, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan prior to its Consummation.

The Plan contemplates deemed substantive consolidation of the Debtors for voting and Plan distribution purposes only with respect to the Claims. If, however, the Plan cannot be confirmed as to some or all of the Debtors, then, in the Debtors' sole discretion, but without prejudice to the respective parties' rights under the Colony RSA, the Noteholders RSA, or the Backstop Commitment Agreement, (a) the Plan may be revoked as to all of the Debtors, or (b) the Debtors may revoke the Plan as to any Debtor (and any such Debtor's Chapter 11 Case may be converted to a chapter 7 liquidation, continued or dismissed in the Debtors' sole discretion) and confirm the Plan as to the remaining Debtors to the extent required. The Debtors reserve the right to seek confirmation of the Plan pursuant to the "cram down" provisions contained in section 1129(b) of the Bankruptcy Code with respect to any non-accepting Class of Claims.

Notwithstanding any rights of approval that may exist pursuant to the Noteholders RSA, the Colony RSA, the Backstop Commitment Agreement, the Class B Common Stock Commitment Agreement, or otherwise, as to the form or substance of the Disclosure Statement, the Plan or any other document relating to the transactions contemplated hereunder or thereunder, neither the Prepetition Secured Lenders, the Prepetition Agent, the Ad Hoc Noteholders Group, the Backstop Investors, nor their respective representatives, members, financial or legal advisors or agents, has independently verified the information contained herein or takes any responsibility therefor and none of the foregoing entities or persons makes any representations or warranties whatsoever concerning the information contained herein.

### ARTICLE I.
### RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

**A.    Rules of Interpretation, Computation of Time and Governing Law**

For purposes hereof: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter

gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles", "Sections", "Exhibits" and "Plan Schedules" are references to Articles, Sections, Exhibits and Plan Schedules hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns; (h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be and (j) "$" or "dollars" means Dollars in lawful currency of the United States of America.  The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

**B.    Defined Terms**

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.      "*7 ½ % Senior Notes*" means the 7½ % Senior Notes due 2014 issued by CA Lyon pursuant to the 7½% Senior Notes Indenture.

2.      "*7 ½ % Senior Notes Indenture*" means the Indenture dated as of February 6, 2004 by and among CA Lyon, the Guarantors signatory thereto, and the Prepetition Indenture Trustee.

3.      "*7 5/8 % Senior Notes*" means the 7 5/8 % Senior Notes due 2012 issued by CA Lyon pursuant to the 7⅝% Senior Notes Indenture.

4.      "*7 5/8 % Senior Notes Indenture*" means the Indenture dated as of November 22, 2004 by and among CA Lyon, the Guarantors signatory thereto, and the Prepetition Indenture Trustee.

5.      "*10 ¾ % Senior Notes*" means the 10 ¾ % Senior Notes due 2013 issued by CA Lyon pursuant to the 10¾% Senior Notes Indenture.

6.      "*10 ¾ % Senior Notes Indenture*" means the Indenture dated as of March 17, 2003 by and among CA Lyon, the Guarantors signatory thereto, and the Prepetition Indenture Trustee.

7.      "*Accrued Professional Compensation*" means, with respect to a particular Professional, an Administrative Claim of such Professional for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date (including, without limitation, expenses of the members of any Committee incurred as members thereof in discharge of their duties as such).

8.      "*Ad Hoc Noteholders Group*" means those Holders of the Old Notes who are signatories to the Noteholders RSA.

9. *"Ad Hoc Noteholders Group Fees and Expenses"* means the Transaction Expenses (as defined in the Noteholders RSA).

10. *"Ad Hoc Noteholders Group Professionals"* means, collectively, (a) Milbank, Tweed, Hadley & McCloy LLP, (b) Houlihan, Lokey, Howard and Zukin, LLC, (c) Morris, Nichols, Arsht & Tunnell LLP, (d) any other attorneys or financial advisors retained by the Ad Hoc Noteholders Group as provided for in the Noteholders RSA, and (e) any successor law firm or financial advisor to any of the foregoing entities or individuals.

11. *"Administrative Claim"* means a Claim for costs and expenses of administration of the Chapter 11 Cases that is Allowed under section 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation: (a) any actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, and commissions for services and payments for inventory, leased equipment, and leased premises); (b) Accrued Professional Compensation and any other compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses Allowed by the Bankruptcy Court under section 327, 328, 330, 331, 363, or 503(b) of the Bankruptcy Code to the extent incurred prior to the Effective Date; (c) all fees and charges assessed against the Estates under section 1930, chapter 123, of title 28, United States Code; (d) the DIP Facility Claims, including, without limitation, the fees and expenses of the DIP Agent and the DIP Lenders, including their respective professional and advisory fees and expenses; (e) the Allowed Prepetition Indenture Trustee Fees; (f) the Backstop Fee (to the extent payable in Cash and subject to the terms of the Backstop Commitment Agreement); (g) the Backstop Transaction Expenses; and (h) the Ad Hoc Noteholders Group Fees and Expenses.

12. *"Administrative Claims Bar Date"* means the Business Day which is sixty (60) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

13. *"Affiliate"* means an "affiliate" as defined in section 101(2) of the Bankruptcy Code.

14. *"Allowed"* means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that is set forth in a Filed Proof of Claim as to which no timely objection has been Filed; (b) a Claim that has been allowed by a Final Order; (c) a Claim that is allowed: (i) in any stipulation of amount and nature of Claim executed by the Debtors prior to the Effective Date and approved by the Bankruptcy Court; (ii) in any stipulation of amount and nature of Claim executed by the Reorganized Debtors on or after the Effective Date; (iii) in accordance with the applicable Debtor's books and records; (d) a Claim relating to a rejected executory contract or unexpired lease that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order, in either case only if a Proof of Claim has been timely Filed by the Claimant before the applicable bar date for such claim or has otherwise been deemed timely Filed under applicable law; or (e) a Claim that is Allowed pursuant to the terms of this Plan.

15. *"Allowed Claim or Equity Interest"* means a Claim or an Equity Interest of the type that has been Allowed.

16. *"Amended Organizational Documents"* means the amended and restated certificate of incorporation and by-laws or other applicable organizational documents of the Reorganized Parent to be Filed with the Plan Supplement.

17. *"Avoidance Actions"* means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including, without

2474327.1 16
DOCS_SF:78801.13 93949-001

limitation, actions or remedies arising under sections 502, 510 or 542-553 of the Bankruptcy Code.

18.    *"Backstop Commitment"* means the agreement by each Backstop Investor pursuant to the Backstop Commitment Agreement to purchase its Backstop Proportion of all of the Rights Offering Securities that are not purchased by the other Eligible Participants as part of the Rights Offering.

19.    *"Backstop Commitment Agreement"* means the Backstop Commitment Agreement dated as of November 4, 2011 attached to this Plan as Exhibit A.

20.    *"Backstop Commitment Agreement Assumption Order"* means an order of the Bankruptcy Court authorizing, among other things, the assumption of the Backstop Commitment Agreement, payment of the Backstop Fee, payment of the Backstop Transaction Expenses, and the provision of an indemnity by the Debtors in favor of the Backstop Investors to the extent set forth in the Backstop Commitment Agreement.

21.    *"Backstop Fee"* means the "Backstop Fee" as defined in the Backstop Commitment Agreement, which shall be released to the Backstop Investors upon payment of the Rights Offering Purchase Price for the Rights Offering Securities on the Effective Date, in the form of shares of Class C Common Shares representing 2.0% of all of the outstanding Capital Stock of Reorganized Parent on the Effective Date (taking into account assumed conversion of the New Capital Stock of Reorganized Parent, but subject to dilution as a result of (i) the exercise of the Warrants and (ii) the Management Incentive Plan); provided that if the Backstop Investors do not purchase any Rights Offering Securities that are not otherwise purchased in the Rights Offering because of any of (1) the transactions contemplated by the Old Notes Restructuring Term Sheet are otherwise not approved by the Bankruptcy Court, (2) the transactions contemplated by the Backstop Commitment Agreement and the Old Notes Restructuring Term Sheet are otherwise not consummated by the Company (when the Backstop Investors are prepared to perform after satisfaction of all applicable conditions of the backstop commitment and in the Old Notes Restructuring Term Sheet), or (3) the "Commitment" (as defined in the Backstop Commitment Agreement) is terminated pursuant to the terms thereof, the Backstop Fee will be payable in the form of Cash in the amount of $2.5 million, subject to the limitations contained in the Backstop Commitment Agreement, including clause (vi) of Section II thereof.

22.    *"Backstop Investors"* means those certain parties signatories to the Backstop Commitment Agreement, their respective affiliates, or any permitted assignee under the Backstop Commitment Agreement.

23.    *"Backstop Proportion"* means the portion of the Backstop Commitment committed to by each Backstop Investor as set forth on Schedule A to the Backstop Commitment Agreement.

24.    *"Backstop Transaction Expenses"* means the "expenses" (accrued either prepetition or postpetition) payable pursuant to Section V of the Backstop Commitment Agreement.

25.    *"Ballots"* means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of this Plan, which includes the Master Ballots and Beneficial Holder Ballots.

26.    *"Bankruptcy Code"* means Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Cases.

27.     *"Bankruptcy Court"* means the United States Bankruptcy Court for the District of Delaware, or any other court having jurisdiction over the Chapter 11 Cases.

28.     *"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, in each case as amended from time to time and as applicable to the Chapter 11 Cases.

29.     *"Beneficial Holder"* means, as of the applicable date of determination, "Lender" under the Prepetition Secured Loan, a beneficial owner of the Old Notes as reflected in the records maintained by the Registered Record Owner or Intermediary Record Owner, as applicable.

30.     *"Beneficial Holder Ballots"* means the ballots accompanying the Disclosure Statement upon which Beneficial Holders of Class 7 Old Notes Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process.

31.     *"Business Day"* means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

32.     *"CA Lyon"* means William Lyon Homes, Inc., a California corporation.

33.     *"Cash"* means the legal tender of the United States of America or the equivalent thereof.

34.     *"Causes of Action"* means any claims, causes of action (including Avoidance Actions), demands, actions, suits, obligations, liabilities, cross-claims, counter-claims, offsets, or setoffs of any kind or character whatsoever, in each case whether known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in contract, in tort, in law, or in equity, or pursuant to any other theory of law, whether asserted or assertable directly or derivatively in law or equity or otherwise by way of claim, counterclaim, cross-claim, third party action, action for indemnity or contribution or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

35.     *"Certificate of Designation"* means the Certificate of Designation for the Preferred Shares to be Filed in the Plan Supplement.

36.     *"Chapter 11 Cases"* means the chapter 11 bankruptcy cases that may be commenced by the Debtors on the Petition Date in the Bankruptcy Court.

37.     *"Chapter 11 Transaction Expenses"* means the aggregate amount of reasonable fees and expenses payable by the Debtors in connection with the Chapter 11 Cases, including the fees and expenses payable to the DIP Agent, the DIP Lenders, the Backstop Investors (including the Backstop Transaction Expenses, the Backstop Fee, and any other fees, expenses, and indemnities contemplated by the Backstop Commitment Agreement), the Prepetition Agent, the Ad Hoc Noteholders Group Fees and Expenses, the Prepetition Indenture Trustee Fees (whether accrued prepetition or postpetition), as well as the fees and expenses payable under the Restructured First Lien Loan.

38.     *"Circle G Loan Agreement"* means the Loan Agreement by and between Circle G at the Church Farm North Joint Venture, LLC and U.S. Bank N.A., successor to California National Bank, N.A., dated February 14, 2006, as amended by the Extension and

Modification Agreement dated April 6, 2007, the Second Extension and Modification Agreement dated June 20, 2007, the Third Extension and Modification Agreement dated May 19, 2008, the Fourth Extension and Modification Agreement dated December 31, 2008, the Amendment and Waiver of Default dated April 14, 2011 (the "**U.S. Bank Amendment and Waiver**"), and the Fifth Extension and Modification Agreement dated July 11, 2011 (the "**U.S. Bank Fifth Extension**").

      39.     "*Claim*" means any "claim" against any Debtor as defined in section 101(5) of the Bankruptcy Code.

      40.     "*Claims Register*" means the official register of Claims maintained by the Voting Agent.

      41.     "*Class*" means a category of Holders of Claims or Equity Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

      42.     "*Class A Common Shares*" means shares of new Class A Common Stock of Reorganized Parent, to be issued on the Effective Date.

      43.     "*Class B Common Shares*" means shares of new Class B Common Stock of Reorganized Parent, to be issued on the Effective Date.

      44.     "*Class B Common Stock Commitment Agreement*" means the letter agreement dated as of November 4, 2011, by and among the Parent and the existing holders of Parent Equity Interests pursuant to which, and subject to the terms and conditions set forth therein, the existing holders of Parent Equity Interests agreed to purchase the Class B Common Shares for the Class B Common Stock Purchase Price.

      45.     "*Class B Common Stock Purchase Agreement*" means the Stock Purchase Agreement to be dated as of on or about the Effective Date, by and among DE Lyon and the Existing Holders of the Parent Equity Interests.

      46.     "*Class B Common Stock Purchase Price*" means $25 million in the form of Cash or, if pursuant to the Purchase and Sale, and Security Agreement between the Company and Lyon Rancho, LLC as the seller ("RMV PSA"), the Company on the Effective Date pays the purchase price for, and the seller delivers to the Company, 100% of the membership interests of the limited liability company that is the owner of the option to purchase the Rancho Mission Viejo Properties, then in the form of a combination of Cash and a credit in the amount of the purchase price paid by the Company for such membership interests (it being understood that no amount will be credited or set off for any unsecured claim of the seller based on the Company's breach of the RMV PSA).

      47.     "*Class B Securities*" means the Class B Common Shares issuable pursuant to the Class B Common Stock Commitment Agreement, the Warrants, and the additional Class B Common Shares issuable upon exercise of the Warrants.

      48.     "*Class B Purchasers*" means the purchasers of the Class B Common Shares and the Warrants pursuant to the Class B Common Stock Commitment Agreement

      49.     "*Class C Common Shares*" means shares of new Class C Common Stock of Reorganized Parent, to be issued on the Effective Date pursuant to the Rights Offering.

50.    "*Class D Common Stock*" means shares of new Class D Common Stock of Reorganized Parent, to be issued on the Effective Date or otherwise under the Management Incentive Plan.

51.    "*Collateral*" means any property or interest in property of any Debtor's Estate that is subject to a valid and enforceable Lien to secure a Claim.

52.    "*Colony Restructuring Term Sheet*" means the term sheet attached as Exhibit D to the Colony RSA.

53.    "*Colony RSA*" means the Restructuring Support Agreement dated as of November 4, 2011, by and among DE Lyon, CA Lyon and the Prepetition Agent.

54.    "*Colony RSA Motion*" means a motion to be filed by WLH on the Petition Date seeking, among other things, Bankruptcy Court approval of the Colony RSA and authorizing WLH to assume the Colony RSA Postpetition.

55.    "*Colony RSA Order*" means any order of the Bankruptcy Court granting the relief requested in the Colony RSA Motion, and approving the Colony RSA and authorizing the Debtors to assume the Colony RSA under section 365 of the Bankruptcy Code.

56.    "*Committee*" means any committee of unsecured creditors in the Chapter 11 Cases appointed pursuant to section 1102 of the Bankruptcy Code.

57.    "*Company*" means the Debtors, collectively.

58.    "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

59.    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

60.    "*Confirmation Order*" means the order of the Bankruptcy Court both confirming this Plan pursuant to section 1129 of the Bankruptcy Code and approving the Disclosure Statement.

61.    "*Consummation*" means the occurrence of the Effective Date.

62.    "*DE Lyon*" means William Lyon Homes, a Delaware corporation and the sole shareholder of CA Lyon.

63.    "*DE Lyon Preferred Equity Interests*" means the preferred Equity Interests in DE Lyon.

64.    "*Debtor(s)*" means individually, Parent and each of its subsidiaries listed on Plan Schedule 1 hereto, and, collectively, Parent and all of its subsidiaries listed on Plan Schedule 1 hereto, in each case, in their capacities as debtors in the Chapter 11 Cases.

65.    "*Debtor(s) in Possession*" means, individually, each Debtor, as debtor in possession in their Chapter 11 Cases as of the Petition Date and, collectively, all Debtors, as debtors in possession in the Chapter 11 Cases.

66.    "*DIP Agent*" means the administrative agent and collateral agent under the DIP Facility, and any successors thereto.

67.    "*DIP Facility*" means that certain senior secured superpriority post-petition credit facility to be made available to CA Lyon and the other Debtors pursuant to the DIP Secured Loan Agreement and the DIP Orders.

68.    "*DIP Facility Claim*" means any Claim of the DIP Agent, any DIP Lender or any other "DIP Secured Party" (as defined in the DIP Orders) arising from, under or in connection with the DIP Facility (including, without limitation, any and all "Obligations" as defined in the DIP Facility Secured Loan Agreement), the other "Loan Documents" as defined therein and/or the DIP Orders, including in respect of all "DIP Obligations" as defined in the DIP Orders.

69.    "*DIP Facility Secured Loan Agreement*" means that certain Senior Secured Superpriority Debtor-In-Possession Secured Loan Agreement, dated as of December___, 2011 (as may be amended, waived, supplemented, refinanced and as otherwise modified from time to time), among CA Lyon, as borrower, the other Debtors, as guarantors, the DIP Agent, and the DIP Lenders thereto from time to time.

70.    "*DIP Lenders*" means the banks, financial institutions and other parties identified as "Secured Parties" in the DIP Facility Secured Loan Agreement or "DIP Secured Parties" in the DIP Orders from time to time.

71.    "*DIP Orders*" means, collectively, the Interim DIP Order and Final DIP Order.

72.    "*Disallowed*" means any Claim that is not Allowed.

73.    "*Disclosure Statement*" means that certain *Disclosure Statement for the Prepackaged Joint Plan of Reorganization for William Lyon Homes, et al. under Chapter 11 of the Bankruptcy Code*, as amended, supplemented, or modified from time to time and describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan.

74.    "*Disputed Claim or Equity Interest*" means a Claim or Equity Interest, or any portion thereof: (a) that is the subject of an objection or request for estimation filed or is otherwise disputed by any of the Debtors or any other party in interest in accordance with applicable law and which objection has not been withdrawn, resolved, or overruled by a Final Order of the Bankruptcy Court; or (b) that is otherwise disputed by any of the Debtors or any other party in interest in accordance with applicable law, which dispute has not been withdrawn, resolved, or overruled by Final Order.

75.    "*Distribution Agent*" means Reorganized Parent or any party designated by Reorganized Parent to serve as distribution agent under this Plan. For purposes of distributions under this Plan to the Holders of Allowed DIP Facility Claims and Allowed Prepetition Secured Loan Claims, the DIP Agent and the Prepetition Agent, respectively, will be and shall act as the Distribution Agent. For purposes of distributions under this Plan to Holders of Allowed Old Notes Claims, the Prepetition Indenture Trustee shall act as the Distribution Agent, unless the Prepetition Indenture Trustee consents to the direct distribution through the facilities of DTC.

76.    "*Distribution Record Date*" means the date for determining which Holders of Claims are eligible to receive distributions hereunder, as such date shall be fixed by order of the Bankruptcy Court.

77.    "*D&O Liability Insurance Policies*" means all insurance policies for directors and officers' liability maintained by the Debtors as of the Petition Date.

78.    "*DTC*" means the Depository Trust Company.

79.    "*Effective Date*" means the Business Day that this Plan becomes effective as provided in Article IX hereof.

80.    "*Eligible Participant*" means each Entity that as of the Rights Offering Record Date, is (i) an "accredited investor" as defined in Rule 501(a) of Regulation D under the Securities Act and (ii) holds at least $500,000 in outstanding principal amount of Old Notes as of the Rights Offering Record Date.

81.    "*Entity*" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

82.    "*Equity Interest*" means any Equity Security in any Debtor, including, without limitation, all issued, unissued, authorized or outstanding shares of stock, together with (i) any options, warrants or contractual rights to purchase or acquire any such Equity Securities at any time with respect to such Debtor, and all rights arising with respect thereto and (ii) the rights of any Entity to purchase or demand the issuance of any of the foregoing and shall include: (1) conversion, exchange, voting, participation, and dividend rights; (2) liquidation preferences; (3) options, warrants, and put rights; and (4) stock-appreciation rights.

83.    "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

84.    "*Estates*" means the bankruptcy estates of the Debtors created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

85.    "*Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.*, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder, and any similar federal, state or local law.

86.    "*Exculpated Parties*" means, collectively: (a) the Debtors; (b) the Reorganized Debtors; (c) the Ad Hoc Noteholders Group and the members thereof in their capacity as such; (d) the DIP Agent; (e) the DIP Lenders; (f) the Prepetition Secured Lenders; (g) the Backstop Investors; (h) the Prepetition Agent; and (i) the Prepetition Indenture Trustee, and the respective Related Persons of each of the foregoing Entities.

87.    "*Exculpation*" means the exculpation provision set forth in Article X.D hereof.

88.    "*Executory Contract*" means a contract to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

89.    "*Exhibit*" means an exhibit annexed to either this Plan or as an appendix to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time).

90.    *"File"* or *"Filed"* or *"Filing"* means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

91.    *"Final DIP Order"* means the order approving the DIP Facility on a final basis.

92.    *"Final Order"* means an order of the Bankruptcy Court as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtors or the Reorganized Debtors, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, no stay pending appeal has been granted or such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not preclude such order from being a Final Order.

93.    *"First Lien Security Documents"* means the "Security Documents" (as defined in the Prepetition Secured Loan Agreement), and as amended as of the Effective Date, securing the Restructured First Lien Loan Agreement.

94.    *"General Unsecured Claim"* means any Claim against any Debtor that is not a/an: (a) DIP Facility Claim; (b) Administrative Claim; (c) Priority Tax Claim; (d) Secured Tax Claim, (e) Other Priority Claim; (e) Other Secured Claim; (f) Prepetition Secured Loan Agreement Claim; (g) Project Loan Claim; (h) Old Notes Claim; (i) Intercompany Claim; or (j) Equity Interest.

95.    *"Governmental Unit"* means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

96.    *"Holder"* means an Entity holding a Claim against, or Equity Interest in, any Debtor and, with respect to the Old Notes Claims, the Beneficial Holder thereof as of the applicable date of determination or any authorized agent of such Entity who has completed and executed a Ballot or on whose behalf a Master Ballot has been completed and executed in accordance with the voting instructions that are attached to the Ballot or Master Ballot, as applicable.

97.    *"Impaired"* means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

98.    *"Indemnification Provision"* means each of the indemnification provisions currently in place (whether in the bylaws, certificates of incorporation, board resolutions, employment contracts or otherwise) for the current and former directors, officers, employees, attorneys, other professionals and agents of the Debtors who served in such capacity on or any time after the Petition Date.

99.    *"Indemnified Parties"* means, collectively, each Debtor and each of its officers, directors and employees, each in their respective capacities as such and solely to the extent that each such party was serving in such capacity on or any time after the Petition Date.

100. *"Initial Distribution Date"* means, subject to the "Treatment" sections in Article III hereof, the date that is as soon as reasonably practicable after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims.

101. *"Intercompany Claims"* means any Claims of a Debtor against any other Debtor.

102. *"Interim DIP Order"* means the order entered by the Bankruptcy Court approving the DIP Facility on an interim basis.

103. *"Intermediary Record Owners"* means, as of the applicable date of determination, the banks, brokerage firms, or the agents thereof as the Entity through which the Beneficial Holders hold Old Notes.

104. *"Lien"* means a "lien" as defined in section 101(37) of the Bankruptcy Code, and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

105. *"Litigation Claims"* means the claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, that any Debtor or Estate may hold against any Entity, including, without limitation, the Causes of Action of the Debtors. A non-exclusive list of the Litigation Claims held by the Debtors as of the Effective Date is attached hereto as Plan Schedule 2 or to be Filed in the Plan Supplement, which shall be deemed to include any derivative actions filed against the Debtors as of the Effective Date. The Debtors will serve Plan Schedule 2 on any Person or Entity added to such schedule.

106. *"Local Rules"* means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

107. *"Management Incentive Plan"* means a post-Effective Date employee Management Incentive Plan to be determined by the New Board providing for the issuance from time to time of shares of the New Common Stock of Parent, including the grant of incentive stock options within the meaning of Section 422 of the Internal Revenue Code of 1986, as amended.

108. *"Master Ballots"* means the ballot distributed to the Registered Record Owners or Intermediary Record Owners, as applicable, of the Old Notes to record the votes of the Beneficial Holders of the Old Notes as of the Voting Record Date applicable to Old Notes Claims.

109. *"Mountain Falls Loan Agreement"* means the Amended and Restated Loan Agreement by and between Mountain Falls, LLC and Mountain Falls Golf Course, LLC and Bank of the West.

110. *"New Board"* means the initial board of directors of Reorganized Parent.

111. *"New Capital Stock"* means the Class A Common Shares, the Class B Common Shares, the Class C Common Shares, the Class D Common Shares, the Preferred Shares, and, where applicable, the Warrants, all as authorized to be issued pursuant to this Plan and the Amended Organizational Documents.

112. *"New Common Stock"* means the Class A Common Shares, the Class B Common Shares, the Class C Common Shares, the Class D Common Shares, and, where

applicable, the Warrants, all as authorized to be issued pursuant to this Plan and the Amended Organizational Documents.

113.    *"New Second Lien Notes"* means the 12% (8% cash interest) Second Lien Notes due 2017 in the initial aggregate principal amount of $75 million to be issued by CA Lyon pursuant to this Plan.

114.    *"New Second Lien Notes Collateral Agent"* means US Bank, National Association, acting in its capacity as collateral agent for the New Second Lien Notes, and its successors.

115.    *"New Second Lien Notes Indenture"* means the indenture pursuant to which the New Second Lien Notes will be issued on the Effective Date to be Filed in the Plan Supplement.

116.    *"New Second Lien Notes Indenture Trustee"* means US Bank, National Association, in its capacity as indenture trustee under the New Second Lien Notes, and its successors.

117.    *"New Securities and Documents"* means collectively, the Restructured First Lien Loan Agreement, the First Lien Security Documents, the Subscription Rights, the Class A Common Shares, the Class B Common Shares, the Class C Common Shares, the Class D Common Shares, the Preferred Shares, the Warrants, the Registration Agreement, the New Second Lien Notes, the New Second Lien Notes Indenture, the Second Lien Security Documents, the Subordination and Intercreditor Agreement, and any and all other securities, notes, stock, instruments, certificates, and other documents or agreements required to be issued, executed or delivered pursuant to this Plan.

118.    *"Non-Voting Classes"* means, collectively, Classes 1, 2, 3, 5, 6, 8, 9, and 10.

119.    *"Noteholders RSA"* means that certain Restructuring Support Agreement, dated as of November 4, 2011, by and among DE Lyon and CA Lyon, on behalf of themselves and the subsidiaries identified therein, and each of the holders of the Old Notes signatories thereto, attached hereto as Exhibit D.

120.    *"Noteholders RSA Motion"* means a motion, in form and substance reasonably acceptable to the Requisite Noteholders, DE Lyon and CA Lyon that may be filed by the Debtors on the Petition Date seeking Bankruptcy Court approval of the Noteholders RSA and authorizing the Debtors to assume the Noteholders RSA Postpetition.

121.    *"Noteholders RSA Order"* means an order of the Bankruptcy Court granting the relief requested in the Noteholders RSA Motion and approving the Noteholders RSA and authorizing the Debtors to assume the Noteholders RSA Postpetition.

122.    *"Old Notes"* means, collectively, the 7½% Notes, the 10¾% Notes and the 7 5/8% Notes.

123.    *"Old Notes Claim"* means all claims (as that term is defined in section 101(5) of the Bankruptcy Code) arising under or relating to (i) the Old Notes and/or the Prepetition Indentures, and (ii) all agreements and instruments relating to the foregoing (including, but not limited to, any guarantees with respect thereto) that remain unpaid and outstanding as of the Effective Date.

124.    *"Old Notes Restructuring Term Sheet"* means the term sheet attached as Exhibit A to the Noteholders RSA.

125.    *"Ordinary Course Professionals Order"* means any Order approving the motion to employ ordinary course professionals to be filed on or after the Petition Date in the Chapter 11 Cases.

126.    *"Other Secured Claim"* means any Secured Claim other than an Administrative Claim, DIP Facility Claim, Secured Tax Claim, Prepetition Secured Loan Agreement Claim or Project Loan Claim.

127.    *"Parent Equity Interests"* means all Equity Interests in DE Lyon other than DE Lyon Preferred Equity Interests.

128.    *"Person"* means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, corporation, general or limited partnership, limited liability company, firm, trust, association, government, governmental agency or other Entity, whether acting in an individual, fiduciary or other capacity.

129.    *"Petition Date"* means the date on which the Debtors commence the Chapter 11 Cases.

130.    *"Plan"* means this *Prepackaged Joint Plan of Reorganization for William Lyon Homes, et al.*, dated November 15, 2011, including the Exhibits and Plan Schedules and all supplements, appendices, and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

131.    *"Plan Schedule"* means a schedule annexed to either this Plan or as an appendix to the Disclosure Statement (as amended, modified or otherwise supplemented from time to time).

132.    *"Plan Supplement"* means, collectively, the compilation of documents and forms of documents, and all exhibits, attachments, schedules, agreements, documents and instruments referred to therein, ancillary or otherwise, including, without limitation, the Exhibits and Plan Schedules, all of which are incorporated by reference into, and are an integral part of, this Plan, as all of the same may be amended, modified, replaced and/or supplemented from time to time, which shall be filed with the Bankruptcy Court on or before 10 days prior to the Confirmation Hearing.

133.    *"Post-Emergence Agent"* means ColFin WLH Funding, LLC in its capacity as administrative agent and/or collateral agent under the Restructured First Lien Loan Agreement, and its successors.

134.    *"Post-Emergence First Lien Lenders"* means the "Lenders" as defined in the Restructured First Lien Loan Agreement.

135.    *"Postpetition"* means the time period beginning immediately upon the filing of the Chapter 11 Cases and ending on the Effective Date.

136.    *"Preferred Shares"* means the shares of Convertible Preferred Stock to be issued by Parent to the Rights Offering Purchasers and/or the Backstop Investors pursuant to the Rights Offering, the Backstop Commitment Agreement and this Plan, the terms of which are described in the Certificate of Designation. The Preferred Shares will be convertible on a one-to-one basis to Class C Common Shares.

137.    *"Prepetition Agent"* means ColFin WLH Funding, LLC in its capacity as administrative agent and/or collateral agent under the Prepetition Secured Loan Agreement, and its successors.

138.    *"Prepetition Guarantors"* means DE Lyon, California Equity Funding, Inc., a California corporation, PH-LP Ventures, a California corporation, Duxford Financial, Inc., a California corporation, Sycamore CC, Inc., a California corporation, Presley CMR, Inc., a California corporation, William Lyon Southwest, Inc., an Arizona corporation, PH-Reilly Ventures, a California corporation, HSP, Inc., a California corporation, PH Ventures-San Jose, a California corporation, WLH Enterprises, a California Gen Partnership – formerly The Ranch Golf Club Co., formerly Carmel Mountain Ranch, Lyon Waterfront, LLC, a Delaware limited liability company.

139.    *"Prepetition Indentures"* means, collectively, the 7 ½ % Senior Notes Indenture, the 10 ¾ % Senior Notes Indenture and the 7 5/8 % Senior Notes Indenture, in each case, as amended, waived, supplemented, refinanced and as otherwise modified from time to time) between CA Lyon, as issuer, certain guarantors, and the Prepetition Indenture Trustee.

140.    *"Prepetition Indenture Trustee"* means U.S. Bank National Association, in its capacity as indenture trustee under the Prepetition Indentures, or any successor trustee.

141.    *"Prepetition Indenture Trustee Fees"* means the reasonable fees and reasonable unpaid out-of-pocket costs and expenses incurred by the Prepetition Indenture Trustee through the Effective Date in accordance with the Prepetition Indentures.

142.    *"Prepetition Secured Loan Claim"* means any Claim arising under the Prepetition Secured Loan Agreement and the "Loan Documents" as defined therein.

143.    *"Prepetition Secured Lenders"* means the banks, financial institutions and other parties identified as "Lenders" in the Prepetition Secured Loan Agreement from time to time.

144.    *"Prepetition Secured Loan Agreement"* means CA Lyon's Secured Term Loan Agreement dated as of October 20, 2009 by and among CA Lyon, as Borrower, the Prepetition Agent, ColFin WLH Funding, LLC, as a Lender and as Lead Arranger, and the other Lenders from time to time party thereto (as amended, waived, supplemented, refinanced and as otherwise modified from time to time).

145.    *"Prepetition Secured Loans"* means "Loans" as such term is defined in the Prepetition Secured Loan Agreement that are outstanding on the Petition Date.

146.    *"Priority Claim"* means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

147.    *"Priority Tax Claim"* means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

148.    *"Pro Rata"* means the proportion that (a) the Allowed amount of a Claim in a particular Class (or several Classes taken as a whole) bears to (b) the aggregate Allowed amount of all Claims in such Class (or several Classes taken as a whole), unless this Plan provides otherwise.

149.    *"Professional"* means (a) any Entity employed in the Chapter 11 Cases pursuant to section 327, 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

150.    *"Professional Fee Claim"* means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code for Accrued Professional Compensation.

151.    *"Professional Fees Bar Date"* means the Business Day that is sixty (60) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

152.    *"Project Loan Claims"* means Claims arising under the Circle G Loan Agreement, the Mountain Falls Loan Agreement or the San Carlos Loan Agreement.

153.    *"Proof of Claim"* means a proof of Claim or Equity Interest Filed against any Debtor in the Chapter 11 Cases.

154.    *"Registered Record Owners"* means, as of the applicable date of determination, the Holders of Old Notes on the books and records of DTC.

155.    *"Registration Agreement"* means the Registration Agreement, in substantially the form to be Filed in the Plan Supplement.

156.    *"Reinstated"* means, with respect to any Claim, (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the holder of such Claim in accordance with Section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a non-monetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

157.    *"Related Persons"* means, with respect to any Person, such Person's predecessors, successors, assigns and present and former Affiliates (whether by operation of law or otherwise) and subsidiaries, and each of their respective current and former officers, directors, principals, employees, shareholders, members (including *ex officio* members), general partners, limited partners, agents, managers, managing members, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, and other professionals, in each case acting in such capacity on or any time after the Petition Date, and any Person claiming by or through any of them

158.    *"Release"* means the release given by the Releasing Parties to the Released Parties as set forth in Article XI.B hereof.

159.    *"Released Party"* means collectively, each in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c)  the Ad Hoc Noteholders Group and the members thereof; (e) the Prepetition Agent; (f) the Prepetition Secured Lenders; (g) the DIP Agent; (h) the DIP Lenders; (h) the Backstop Investors; (i) the Prepetition Indenture Trustee, and/or (j) the Related Persons of each of (a) through (i) of the foregoing.

160.    *"Releasing Party"* has the meaning set forth in Article X.B hereof.

161.    *"Reorganized CA Lyon"* means CA Lyon, as reorganized pursuant to his Plan on or after the Effective Date.

162.    *"Reorganized Debtors"* means (i) Reorganized Parent and (ii) each other Debtor, as reorganized pursuant to this Plan on or after the Effective Date.

163.    *"Reorganized Debtors Total Assets"* means the total assets of the Reorganized Debtors, calculated on a consolidated basis in accordance with past reporting practices.

164.    *"Reorganized Parent"* means DE Lyon, as reorganized pursuant to this Plan on or after the Effective Date.

165.    *"Requisite Noteholders"* means the Requisite Noteholders, as defined in the Noteholders RSA.

166.    *"Requisite Holders"* means, (a) with respect to the Class A Common Shares, holders of at least $66^2/_3$% of the Class A Common Shares, (b) with respect to the Class B Common Shares, holders of at least a majority of the Class B Common Shares and (c) with respect to the Class C Common Shares, holders of at least a majority of the Class C Common Shares and the Preferred Shares, voting as a single class.

167.    *"Requisite Lenders"* shall mean Lenders holding more than 50% in principal amount of the Prepetition Secured Loans.

168.    *"Restructured First Lien Loan Agreement"* means that certain secured term loan agreement to be filed in the Plan Supplement, which amends and restates the Prepetition Secured Loan Agreement in accordance with the Colony Restructuring Term Sheet, and other related "Loan Documents" (as defined therein), which will amend and restate the "Loan Documents" (as defined in the Prepetition Secured Loan Agreement), as applicable.

169.    *"Restructured Project Loan Agreements"* means, collectively, the Circle G Loan Agreement and the Mountain Falls Loan Agreement, as restructured or otherwise treated pursuant to the Plan.

170.    *"Rights Offering"* means that certain rights offering of Rights Offering Securities to be offered to the Eligible Participants, the terms of which are set forth in Article V.H of this Plan, to be approved by the Bankruptcy Court in the Rights Offering Approval Order.

171.    *"Rights Offering Agreement"* means the Stock Purchase Agreement by and among DE Lyon and the Rights Offering Purchasers.

172.    *"Rights Offering Approval Order"* means an order pursuant to which the Bankruptcy Court will be requested to approve the Rights Offering.

2474327.1 16
DOCS_SF:78801.13 93949-001

173.    *"Rights Offering Documents"* means the Rights Offering Subscription Form, Rights Offering Purchase Agreement, the Certificate of Designation and the Registration Agreement.

174.    *"Rights Offering Purchase Price"* means $60 million.

175.    *"Rights Offering Purchaser"* means an Eligible Participant who timely and properly executes and delivers the Subscription Form to the Debtors or other Entity specified in the Subscription Form prior to the expiration of the Subscription Deadline.

176.    *"Rights Offering Record Date"* means the date for determining which Holders of Old Notes Claims are Eligible Participants and shall be such date as designated in the Rights Offering Approval Order.

177.    *"Rights Offering Securities"* means the Preferred Shares and the Class C Common Shares.

178.    *"San Carlos Loan Agreement"* means the Builder Agreement by and between CA Lyon and Irvine Community Development Company LLC dated January 26, 2010.

179.    *"SEC"* means the Securities and Exchange Commission, or any successor agency.

180.    *"Second Lien Security Documents"* means the security agreement, collateral agreement, deeds of trust, mortgages and other documents granting or governing liens securing the New Second Lien Notes.

181.    *"Secured Claim"* means a Claim that is secured by a Lien on property in which any Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

182.    *"Secured Tax Claim"* means any Secured Claim which, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code.

183.    *"Securities Act"* means the Securities Act of 1933, 15 U.S.C. §§ 77c-77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder, and any similar federal, state or local law.

184.    *"Solicitation"* means the solicitation of votes of those parties in Classes 4 and 7 to accept or reject the Plan.

185.    *"Stamp or Similar Tax"* means any stamp tax, recording tax, personal property tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

186.    *"Subordination and Intercreditor Agreement"* means the Subordination and Intercreditor Agreement to be entered into as of the Effective Date, by and among CA Lyon,

DE Lyon, the Post-Emergence Agent and the New Second Lien Notes Indenture Collateral Agent and New Second Lien Notes Indenture Trustee to be Filed in the Plan Supplement.

187.    "*Subscription Commencement Date*" means the date on which the Subscription Period commences, which shall be the earliest date reasonably practicable occurring after the Rights Offering Record Date.

188.    "*Subscription Deadline*" means the date on which the Rights Offering shall expire as set forth in the Subscription Form, as specified in the Rights Offering Approval Order.

189.    "*Subscription Form*" means, collectively, that certain subscription form and subscription agreement to be distributed to Eligible Participants pursuant to which each Eligible Participant may exercise their Subscription Rights.

190.    "*Subscription Notification Date*" means a date that is not later than five (5) Business Days following the Subscription Deadline.

191.    "*Subscription Payment Amount*" means, with respect to a particular Rights Offering Purchaser, an amount of Cash equal to the Rights Offering Purchase Price multiplied by such Rights Offering Purchaser's subscribed for portion of its Pro Rata Share of the Rights Offering Securities.

192.    "*Subscription Payment Date*" means a date that is not later than five (5) Business Days following the applicable Subscription Notification Date (or such later date as approved in writing by the Debtors); provided, however, that such date must occur on or prior to the Effective Date.

193.    "*Subscription Period*" means the time period during which the Eligible Participant may subscribe to purchase the Rights Offering Securities, which period shall commence on the Subscription Commencement Date and expire on the Subscription Deadline.

194.    "*Subscription Right*" means the right of Eligible Participant to participate in the Rights Offering, which right shall be non-Transferable and non-certificated as set forth in Article V.H of this Plan.

195.    "*Subsequent Distribution*" means any distribution of property under this Plan to Holders of Allowed Claims other the initial distribution given on the Initial Distribution Date.

196.    "*Subsequent Distribution Date*" means the date ninety (90) days after the Initial Distribution Date and the date that is each ninety (90) days thereafter.

197.    "*Subsidiaries*" means the Entities listed on Plan Schedule 1 other than DE Lyon.

198.    "*Transfer*" or "*Transferable*" means, with respect to any security or the right to receive a security or to participate in any offering of any security, including the Rights Offering, (i) the sale, transfer, pledge, hypothecation, encumbrance, assignment, constructive sale, participation in, or other disposition of such security or right or the beneficial ownership thereof, (ii) the offer to make such a sale, transfer, constructive sale, or other disposition, and (iii) each option, agreement, arrangement, or understanding, whether or not in writing and whether or not directly or indirectly, to effect any of the foregoing. The term "constructive sale" for purposes of this definition means (i) a short sale with respect to such security or right,

(ii) entering into or acquiring an offsetting derivative contract with respect to such security or right, (iii) entering into or acquiring a futures or forward contract to deliver such security or right, or (iv) entering into any transaction that has substantially the same effect as any of the foregoing. The term "beneficially owned" or "beneficial ownership" as used in this definition shall include, with respect to any security or right, the beneficial ownership of such security or right by a Person and by any direct or indirect subsidiary of such Person.

199.    *"Unexpired Lease"* means a lease to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

200.    *"Unimpaired"* means, with respect to a Class of Claims or Equity Interests that is not Parent Equity Interests, a Claim or Equity Interest that is not a Parent Equity Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

201.    *"Voting Agent"* means Kurtzman Carson Consultants LLC and any successor.

202.    *"Voting Classes"* means, collectively, Classes 4 and 9.

203.    *"Voting Deadline"* means December 16, 2011 at 5:00 p.m. prevailing Eastern Time for all Holders of Claims, which is the date and time by which all Ballots must be received by the Voting Agent, or such other date and time as may be established by the Debtors with respect to any Voting Class.

204.    *"Voting Record Date"* means the date for determining which Holders of Claims are entitled to receive the Disclosure Statement and vote to accept or reject this Plan, as applicable, which date is November 10, 2011 for all Holders of Claims.

205.    *"Warrants"* means the Warrants to be issued by Reorganized Parent pursuant to the Class B Common Stock Commitment Agreement, the form of which will be Filed in the Plan Supplement, exercisable for Class B Common Shares initially representing in the aggregate 9.1% of the New Capital Stock of Reorganized Parent on a fully-diluted basis.

## ARTICLE II.
## ADMINISTRATIVE, DIP FACILITY AND PRIORITY TAX CLAIMS

A.    **Administrative Claims**

Subject to sub-paragraph (1) below, on the later of the Effective Date or the date on which an Administrative Claim becomes an Allowed Administrative Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Claim will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) payment in full in Cash for the unpaid portion of such Allowed Administrative Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder; provided, however, that Administrative Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtors or Reorganized Debtors in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court. All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

1.    Professional Compensation and Reimbursement Claims

*Professional Fee Claims.* Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized

Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claim; provided that the Reorganized Debtors will pay Professionals in the ordinary course of business for any work performed after the Effective Date, including those fees and expenses incurred by Professionals in connection with the implementation and consummation of the Plan, in each case without further application or notice to or order of the Bankruptcy Court; provided, further, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order. Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) 90 days after the Effective Date and (b) 30 days after the Filing of the applicable request for payment of the Professional Fee Claim. Each Holder of an Allowed Professional Fee Claim will be paid by the Reorganized Debtors in Cash within five Business Days of entry of the order approving such Allowed Professional Fee Claim.

*Ad Hoc Noteholders Group Fees and Expenses, Secured Lenders' Fees and Expenses, Backstop Transaction Expenses, Prepetition Indenture Trustee's Fees and Expenses; and Committee Members' Fees and Expenses.* The fees and expenses incurred by the Ad Hoc Noteholders Group Professionals, the DIP Agent's and the DIP Lenders' professionals, the Prepetition Agent's professionals, the Prepetition Indenture Trustee and his professionals, and the Backstop Investors (pursuant to the terms of the Backstop Commitment Agreement) will be paid in connection with any applicable orders entered by the Bankruptcy Court. Nothing herein shall require such professionals (or the Prepetition Indenture Trustee) to file applications with, or otherwise seek approval of, the Bankruptcy Court as a condition to the payment of such fees and expenses.

## B.    DIP Facility Claims

Unless otherwise agreed to by the DIP Lenders, the Allowed DIP Facility Claims will be indefeasibly paid and satisfied in full in Cash on the Effective Date in full satisfaction, settlement, discharge and release of, and in exchange for, such DIP Facility Claims in accordance with any applicable order entered by the Bankruptcy Court. Upon indefeasible payment and satisfaction in full of all Allowed DIP Facility Claims, the DIP Facility Secured Loan Agreement and all "Loan Documents" as defined therein, and all Liens and security interests granted to secure the DIP Facility Claims, will be immediately terminated, extinguished and released, and the DIP Agent will promptly execute and deliver to the Reorganized Debtors, at the Reorganized Debtors' sole cost and expense, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors. Notwithstanding the above, any indemnity provisions contained in the DIP Facility Secured Loan Agreement will survive such termination, release and satisfaction in the manner and to the extent set forth therein.

## C.    Priority Tax Claims

On or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors or Reorganized Debtors: (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (b) such other less favorable treatment as agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder;

provided, however, that such parties may further agree for the payment of such Allowed Priority Tax Claim at a later date; or (c) pursuant to and in accordance with sections 1129(a)(9)(C) and (D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installment payments over a period ending not more than five years after the Petition Date, plus simple interest at the rate required by applicable law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code. Any installment payments to be made under clause (c) above will be made in equal quarterly Cash payments beginning on the Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Priority Tax Claim. Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree or order converting or dismissing the Chapter 11 Cases *provided, however,* that the Debtors may prepay any or all such Claims at any time, without premium or penalty.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF
## CLASSIFIED CLAIMS AND EQUITY INTERESTS

A.      **Summary**

All Claims and Equity Interests, except Administrative Claims, DIP Facility Claims and Priority Tax Claims, are placed in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims and Priority Tax Claims have not been classified as described in Article III.B of the Plan.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including, without limitation, voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date.

### Summary of Classification and Treatment of Classified Claims and Equity Interests

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Secured Tax Claims | Unimpaired | Deemed to Accept |
| 4 | Prepetition Secured Loan Agreement Claims | Impaired | Entitled to Vote |
| 5 | Project Loan Claims | Unimpaired | Deemed to Accept |
| 6 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| 7 | Old Notes Claims | Impaired | Entitled to Vote |
| 8 | Intercompany Claims | Unimpaired | Deemed to Accept |

2474327.1 16
DOCS_SF:78801.13 93949-001

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 9 | Parent Equity Interests | Impaired | Deemed to Reject |
| 10 | Equity Interests in Subsidiaries | Unimpaired | Deemed to Accept |

**B.**   **Classification and Treatment of Claims and Equity Interests**

1. Class 1 - Priority Claims

   • *Classification*:  Class 1 consists of the Priority Claims.

   • *Treatment*:  The legal, equitable and contractual rights of the Holders of Class 1 Claims are unaltered by the Plan.  With respect to each Class 1 Claim that becomes due and payable prior to the Effective Date, on or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 1 Claim is an Allowed Class 1 Claim on the Effective Date or (ii) the date on which such Class 1 Claim becomes an Allowed Class 1 Claim, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtors or Reorganized Debtors:  (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code.

   • *Voting*:  Class 1 is an Unimpaired Class, and the Holders of Class 1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims will not be entitled to vote to accept or reject the Plan.

2. Class 2 - Other Secured Claims

   • *Classification*:  Each Class 2 Claim is an Other Secured Claim against the applicable Debtors.  With respect to each applicable Debtors this Class will be further divided into subclasses designated by letters of the alphabet (Class 2A, Class 2B and so on), so that each holder of any Other Secured Claim against such Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class, and except for a precautionary class of otherwise unclassified Other Secured Claims.

   • *Treatment*:  The legal, equitable and contractual rights of the Holders of Class 2 Claims are unaltered by the Plan.  With respect to each Class 2 Claim that becomes due and payable prior to the Effective Date, on or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 2 Claim is an Allowed Class 2 Claim on the Effective Date or (ii) the date on

2474327.1 16
DOCS_SF:78801.13 93949-001

which such Class 2 Claim becomes an Allowed Class 2 Claim, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim, at the election of the Debtors or Reorganized Debtors: (A) Cash equal to the amount of such Allowed Class 2 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors and the Holder of such Allowed Class 2 Claim will have agreed upon in writing; (C) any defaults shall be cured and shall be paid or satisfied in accordance with and pursuant to the terms of the applicable agreement between the Debtors and the Holder of the Allowed Class 2 Claim; or (D) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code. Each Holder of an Allowed Other Secured Claim will retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final payment of such Allowed Other Secured Claim is made as provided herein. On the full payment or other satisfaction of such obligations, the Liens securing such Allowed Other Secured Claim will be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

- *Voting*: Class 2 is an Unimpaired Class, and the Holders of Class 2 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 2 Claims will not be entitled to vote to accept or reject the Plan.

3.    Class 3 - Secured Tax Claims

- *Classification*: Each Class 3 Claim is a Secured Tax Claim against the applicable Debtors. With respect to each applicable Debtor, this Class will be further divided into subclasses designated by letters of the alphabet (Class 3A, Class 3B and so on), so that each holder of any Secured Tax Claim against such Debtor is in a Class by itself, except to the extent that there are Secured Tax Claims that are substantially similar to each other and may be included within a single Class, and except for a precautionary class of otherwise unclassified Secured Tax Claims.

- *Treatment*: The legal, equitable and contractual rights of the Holders of Class 3 Claims are unaltered by the Plan. On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is an Allowed Class 3 Claim as of the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 3 Claim, at the election of the Debtors or Reorganized Debtors: (a) Cash in an amount equal to the amount of such Allowed Class 3 Claim; (b) such other less favorable treatment as agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and

such Holder; provided, however, that such parties may further agree for the payment of such Allowed Class 3 Claim at a later date; or (c) pursuant to and in accordance with sections 1129(a)(9)(C) and (D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Class 3 Claim payable in regular installment payments over a period ending not more than five years after the Petition Date, plus simple interest at the rate required by applicable law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; provided, further, that Class 3 Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto in the discretion of the Debtors or Reorganized Debtors without further notice to or order of the Bankruptcy Court. Each Holder of an Allowed Class 3 Claim will retain the Liens securing its Allowed Class 3 Claim as of the Effective Date until full and final payment of such Allowed Class 3 Claim is made as provided herein. On the full payment or other satisfaction of such obligations, the Liens securing such Allowed Class 3 Claim will be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Any installment payments to be made under clause (c) above will be made in equal quarterly Cash payments beginning on the first Subsequent Distribution Date following the Effective Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Secured Tax Claim.

- *Voting*: Class 3 is an Unimpaired Class, and the Holders of Class 3 Claims will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 3 Claims will not be entitled to vote to accept or reject the Plan.

4.    Class 4 - Prepetition Secured Loan Agreement Claims

- *Classification*: Class 4 consists of the Prepetition Secured Loan Agreement Claims.

- *Allowance*: On the Effective Date, the Prepetition Secured Loan Agreement Claims will be deemed Allowed in an aggregate amount equal to $235 million.

- *Treatment*: On the Effective Date, the Prepetition Secured Loan Agreement will, subject to satisfaction or waiver of the conditions precedent set forth in the Restructured First Lien Loan Agreement, be amended and restated by the Restructured First Lien Loan Agreement, "Loan Documents" as defined in the Prepetition Secured Loan Agreement will, as applicable, be amended and restated  by the "Loan Documents" as defined in the Restructured

First Lien Loan Agreement, and certain "Security Documents" (as defined in the Prepetition Secured Loan Agreement) will be amended, supplemented or otherwise modified and will constitute and become "Security Documents" (as defined in the Restructured First Lien Loan Agreement), and will secure all the obligations under the Restructured First Lien Loan Agreement and the other "Loan Documents" (as defined in the Restructured First Lien Loan Agreement). On the Effective Date, each Holder of an Allowed Prepetition Secured Loan Agreement Claim shall be a "Lender" under the Restructured First Lien Loan Agreement with all of the rights set forth therein, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim.

- *Voting*: Class 4 is Impaired, and Holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

5. Class 5 – Project Loan Agreements

- *Classification*: Each Class 5 Claim is an Project Loan Claim against the applicable Debtors. With respect to each applicable Debtors this Class will be further divided into subclasses designated by letters of the alphabet (Class 5A, Class 5B and so on), so that each holder of any Project Loan Claim against such Debtor is in a Class by itself.

- *Treatment*: The legal, equitable and contractual rights of the Holders of Class 5 Claims are unaltered by the Plan. On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 5 Claim is an Allowed Class 5 Claim on the Effective Date or (ii) the date on which such Class 5 Claim becomes an Allowed Class 5 Claim, each Holder of an Allowed Class 5 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 5 Claim, at the election of the Debtors or Reorganized Debtors: (A) Cash equal to the amount of such Allowed Class 5 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors and the Holder of such Allowed Class 5 Claim will have agreed upon in writing; (C) any defaults shall be cured or otherwise satisfied shall be paid in accordance with and pursuant to the terms of the applicable agreement between the Debtors and the Holder of the Allowed Class 5 Claim; or (D) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code. Each Holder of an Allowed Project Loan Claim will retain the Liens securing its Allowed Project Loan Claim as of the Effective Date until full and final payment of such Allowed Project Loan Claim is made as provided herein. On the full payment or other satisfaction of such obligations, the Liens securing such Allowed Project Loan Claim will be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

- *Voting*: Class 5 is an Unimpaired Class, and the Holders of Class 5 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 5 Claims will not be entitled to vote to accept or reject the Plan.

6.    Class 6 - General Unsecured Claims

- *Classification*: Class 6 consists of the General Unsecured Claims.

- *Treatment*: With respect to each Class 6 Claim that becomes due and payable prior to the Effective Date, on or as soon as reasonably practicable after the Effective Date, solely to the extent that any of the legal, equitable and contractual rights in respect of any Class 6 Claim under applicable non-bankruptcy law, each Allowed Class 6 Claim will be, at the Debtors' option: (i) Reinstated, and paid, subject to the terms and conditions thereof, in Cash on the later to occur of the Effective Date or when such Claims become due in the ordinary course of the Debtors' business operations; or (ii) otherwise rendered not impaired pursuant to section 1124 of the Bankruptcy Code, including with respect to payment on the Effective Date or as soon as practicable thereafter, except to the extent that the Reorganized Debtors and such Holder agree to other less favorable treatment in writing.

- *Voting*: Class 6 is an Unimpaired Class, and the Holders of Class 6 Claims will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, Therefore, Holders of Class 6 Claims are not entitled to vote to accept or reject the Plan.

7.    Class 7 - Old Notes Claims

- *Classification*: Class 7 consists of the Old Notes Claims.

- *Allowance*: Notwithstanding any provisions of Article VIII to the contrary, the Old Notes Claims will be deemed Allowed, without offset, counterclaim or defense of any kind, in the aggregate approximate amount of $299,541,611.62.

- *Treatment*: Treatment: On the Effective Date, the Distribution Agent will receive for and on behalf of each and every Holder of an Allowed Old Notes Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim, $75 million in initial principal amount of New Second Lien Notes of CA Lyon and Class A Common Shares representing initially in the aggregate 28.5% of the New Capital Stock of Reorganized Parent. Notwithstanding any provisions in Article VII to the contrary, unless the Prepetition Indenture Trustee consents to the direct distribution via DTC, the Distribution Agent will promptly distribute the New Second Lien Notes and the Class A Common Shares to the Prepetition Indenture Trustee. For the avoidance of doubt, the Debtors will take all reasonable steps to ensure that all New Second Lien Notes and Class A Common Shares will be in a

2474327.1 16
DOCS_SF:78801.13 93949-001

form that is DTC eligible. Notwithstanding any provision in the Plan to the contrary, the distribution on account of Allowed Old Notes Claims will not be dependent on the surrender or cancellation of the Old Notes. The Prepetition Indenture Trustee will send such notices and take such other actions as are reasonably requested by the Debtors to effect the cancellation of the Old Notes held by Cede & Co.

- *Voting*: Class 7 is Impaired, and Holders of Class 7 Claims are entitled to vote to accept or reject the Plan.

8.    Class 8 - Intercompany Claims

- *Classification*: Class 8 consists of the Intercompany Claims.

- *Treatment*: On the Effective Date, all Class 8 Intercompany Claims will be Reinstated.

- *Voting*: Class 8 is an Unimpaired Class, and the Holders of Class 8 Claims will be conclusively deemed to have accepted the Plan. Therefore, Holders of Class 8 Claims will not be entitled to vote to accept or reject the Plan.

9.    Class 9 - Parent Equity Interests

- *Classification*: Class 9 consists of the Parent Equity Interests.

- *Treatment*: On the Effective Date, all Class 9 Parent Equity Interests will be deemed canceled and will be of no further force and effect, whether surrendered for cancellation or otherwise. Holders of Class 9 Parent Equity Interests will not receive any distribution on account of their Parent Equity Interests.

- *Voting*: Class 9 is Impaired, and the Holders of Class 9 Equity Interests are deemed to reject the Plan.

10.    Class 10 -- Equity Interests in Subsidiaries

- *Classification*: Class 10 consists of the Equity Interests in the Subsidiaries.

- *Treatment*: On the Effective Date, Reorganized Parent or CA Lyon, as applicable, will own 100% of the Equity Interests in the Subsidiaries.

- *Voting*: Class 10 is an Unimpaired Class, and the Holders of Class 10 Equity Interests will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 10 Equity Interests are not entitled to vote to accept or reject the Plan.

2474327.1 16
DOCS_SF:78801.13 93949-001

## C.      Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtors' rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims, including the right to cure any arrears or defaults that may exist with respect to contracts to be assumed under the Plan.

## D.      Discharge of Claims

Except as otherwise provided in the Plan and effective as of the Effective Date: (i) the rights afforded herein and the treatment of all Claims and Equity Interests will be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including (except in the case of postpetition interest comprising part of the Prepetition Secured Loan Agreement Claim or the DIP Facility Claim) any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property, or Estates; (ii) the Plan will bind all Holders of Claims and Equity Interests, notwithstanding whether any such Holders abstained from voting to accept or reject the Plan or voted to reject the Plan; (iii) all Claims and Equity Interests will be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto will be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (iv) all Entities will be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, each of their successors and assigns, and each of their assets and properties, any other Claims or Equity Interests based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

# ARTICLE IV.
## ACCEPTANCE OR REJECTION OF THE PLAN

## A.      Presumed Acceptance of Plan

Classes 1, 2, 3, 5, 6, 8, and 10 are Unimpaired under the Plan, and are, therefore, presumed to have accepted the Plan pursuant to section 1126 of the Bankruptcy Code.

## B.      Presumed Rejection of Plan

Class 9 is Impaired and Holders of Parent Equity Interests shall receive no distribution under the Plan on account of the Parent Equity Interests and are, therefore, deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

## C.      Voting Classes

Each Holder of an Allowed Claim as of the applicable Voting Record Date in each of the Voting Classes (Classes 4 and 7) will be entitled to vote to accept or reject the Plan.

## D.      Acceptance by Impaired Classes of Claims

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

E.    **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

The Debtors request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Debtors (subject to any consents that may be required under the Colony RSA, the Noteholders RSA, or the Backstop Commitment Agreement) reserve the right to modify the Plan or any Exhibit thereto or Plan Schedule in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

## ARTICLE V.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    **General Settlement of Claims**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan.

B.    **Corporate Existence**

The Debtors will continue to exist after the Effective Date as a separate legal entities, with all the powers of corporations, limited liability companies, memberships and partnerships pursuant to the applicable law in their states of incorporation or organization and pursuant to the Amended Organizational Documents.

C.    **Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan or the Confirmation Order, on or after the Effective Date, all property and assets of the Estates (including, without limitation, Causes of Action and, unless otherwise waived or released pursuant to an order of the Bankruptcy Court or the Plan, Avoidance Actions) and any property and assets acquired by the Debtors pursuant to the Plan will vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges or other encumbrances except for the Liens of the Prepetition Indenture Trustee on distributions to Holders of Class 7 Claims as provided in the Prepetition Indentures. Except as may be otherwise provided in the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors will pay the charges that they incur after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

D.    **Restructured First Lien Loan Agreement and Sources of Cash for Plan Distributions**

On the Effective Date, the applicable Reorganized Debtors will be authorized to execute and deliver the Restructured First Lien Loan Agreement and the related "Loan Documents," as defined therein, and will be authorized to execute, deliver, file, record and issue any other notes, guarantees, deeds of trust, documents (including UCC financing statements), amendments to the foregoing, or agreements in connection therewith, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote,

consent, authorization or approval of any Entity (other than expressly required by the Restructured First Lien Loan Agreement).

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments required pursuant to the Plan will be obtained from the Reorganized Debtors' Cash balances, including Cash from operations, the Rights Offering Purchase Price and the Class B Common Stock Purchase Price. Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors.

**E.**   **New Second Lien Notes and Class A Common Shares Issued Under the Plan**

On the Effective Date, the applicable Reorganized Debtors will be authorized to execute and deliver the Restructured New Second Lien Notes Indenture and the related "Note Documents," as defined therein, and will be authorized to execute, deliver, file, record and issue any other notes, guarantees, deeds of trust, documents (including UCC financing statements), or agreements in connection therewith, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than expressly required by the Restructured First Lien Loan Agreement).

On the Effective Date, Reorganized Parent will contribute the Class A Common Shares to Reorganized CA Lyon, and Reorganized CA Lyon will distribute the Class A Common Shares to Holders of Allowed Old Notes Claims pursuant to the terms set forth in the Plan and herein.

**F.**   **New Class B Common Shares and Warrants Issued Under the Plan**

On the Effective Date, Reorganized Parent will issue Class B Common Shares and Warrants to Class B Purchasers, pursuant to the terms set forth herein.

**G.**   **Rights Offering**

1.    Issuance of Subscription Rights.

On the Petition Date, the Debtors expect to file a motion seeking Bankruptcy Court approval of the Rights Offering. Approval of the procedures governing the Rights Offering (which are summarized below) are subject to entry of an order by the Bankruptcy Court. Each Eligible Participant will receive Subscription Rights to subscribe for its Pro Rata Share of the Rights Offering Securities for an aggregate purchase price in Cash equal to the Rights Offering Purchase Price. In accordance with the terms and conditions of the Backstop Commitment Agreement, the Backstop Investors have committed to purchase all Remaining Rights Offering Securities. The Rights Offering Securities, including the Remaining Rights Offering Securities, will be issued to the Eligible Participants (including the Backstop Investors), for the Rights Offering Purchase Price. The Preferred Shares will be subject to the terms of the Certificate of Designation. On the Effective Date, Reorganized Parent will be authorized to enter into and consummate the transactions contemplated by the Amended Organizational Documents, including the Certificate of Designation, and such Amended Organizational Documents, and the Rights Offering Securities, will become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by the Amended Organizational Documents).

2.      Subscription Period.

The Rights Offering will commence on the Subscription Commencement Date and expire on the Subscription Deadline.  Each Eligible Participant that wishes to participate in the Rights Offering will be required to affirmatively elect to exercise its Subscription Rights, and provide written notice thereof to the Entities specified in the Subscription Form, on or prior to the Subscription Deadline in accordance with the terms of the Plan and the Subscription Form.  All Remaining Rights Offering Securities will be allocated to the Backstop Investors on the Subscription Deadline, and will be purchased by the Backstop Investors on the Effective Date, all in accordance with the terms and conditions of the Backstop Commitment Agreement.

3.      Exercise of Subscription Rights and Payment of Rights Offering Purchase Price.

On the Subscription Commencement Date, the Distribution Agent will mail the Subscription Form to each Eligible Participant known as of the Rights Offering Record Date, together with appropriate instructions for the proper completion, due execution, and timely delivery of the Subscription Form, as well as instructions for the payment of the eventual Rights Offering Purchase Price for that portion of the Subscription Rights sought to be exercised by such Person.  The Debtors may adopt such additional detailed procedures consistent with the provisions of the Plan as the Debtors may deem necessary to effectuate, or desirable to more efficiently administer the exercise of the Subscription Rights and ascertain payment of the Rights Offering Purchase Price, to the extent authorized by the Bankruptcy Court.

4.      No Assignment; No Revocation.

The Subscription Rights will not be assignable, and cannot be assigned by the Eligible Participants.  Any assignment, or attempted assignment, will be null and void.  Once an Eligible Participant has exercised any of its Subscription Rights by properly executing and delivering the Subscription Form to the Debtors or other Entity specified in the Subscription Form, such exercise may only be revoked, rescinded or annulled in the sole discretion of the Debtors or Reorganized Debtors.

5.      Distribution of Rights Offering Securities.

On, or as soon as reasonably practicable after, the Effective Date, Reorganized Parent or another applicable Distribution Agent will distribute the Rights Offering Securities purchased by each Rights Offering Purchaser or Backstop Investor to such Rights Offering Purchaser or Backstop Investor.

6.      Validity of Exercise of Subscription Rights.

All questions concerning the timeliness, validity, form, and eligibility of any exercise, or purported exercise, of Subscription Rights will be determined by the Debtors or Reorganized Debtors.  The Debtors, in their discretion reasonably exercised in good faith, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any Subscription Rights.  A Subscription Form will be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtors determine in their discretion reasonably exercised in good faith.  The Debtors will use commercially reasonable efforts to give written notice to any Eligible Participant regarding any defect or irregularity in connection with any purported exercise of Subscription Rights by such Person and may permit such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate; provided, however, that neither the Debtors and Reorganized Debtors nor any of their Related

Persons will incur any liability for giving, or failing to give, such notification and opportunity to cure.

       7.     Rights Offering Proceeds.

     The proceeds of the Rights Offering will fund Cash payments required to be made under the Plan, including, without limitation, payments in respect of Allowed Claims, Chapter 11 Transaction Expenses and repayment of the DIP Facility Claims, and be used for general corporate purposes by the Debtors to the extent approved by the Bankruptcy Court in the First Day Motions or otherwise, and by the Reorganized Debtors after the Effective Date.

       8.     Registration Agreement.

     On the Effective Date, Reorganized Parent will be authorized to enter into and consummate the transactions contemplated by the Registration Agreement and such documents, and any agreement or document entered into in connection therewith, will become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by the Registration Agreement).

## H.    **Management Incentive Plan**

     Following the Effective Date, Reorganized Parent will adopt and implement the Management Incentive Plan, which would, subject to certain terms and conditions, provide for, the issuance of up to 8% of the New Capital Stock of the Reorganized Parent to key executives of the Company, with the first 4% subject to a split of 50% in the form of restricted Class D Common Shares and 50% in the form of stock options to purchase additional Class D Common Shares to be issued on the Effective Date, and the remaining 4% to be issued at the discretion of the New Board.

## I.    **Issuance of New Securities and Related Documentation**

     On the Effective Date, each of Reorganized DE Lyon and Reorganized CA Lyon will be authorized to and will issue, the applicable New Securities and Documents, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  The issuance, distribution and exercise of the Subscription Rights, the issuance and distribution of the Class C Common Shares, the issuance and distribution of the Preferred Shares,  the issuance and distribution of Class C Common Shares upon conversion of the Preferred Shares, the issuance and distribution of the Class B Common Shares, the issuance and distribution of the Warrants, and the issuance and distribution of Class B Common Shares upon exercise of the Warrants will be exempt from registration under applicable securities laws, pursuant to section 4(2) of the Securities Act and/or other applicable exemptions.  The Rights Offering and issuance of the Rights Offering Securities, the Class B Common Shares, the Warrants, and the additional Class B Common Shares issuable upon exercise of the Warrants are not being made pursuant to section 1145(a) of the Bankruptcy Code and are not on account of the Claims and/or Equity Interests. The Class A Common Shares and the New Second Lien Notes will be issued in reliance on the exemption from registration provided by Section 1145(a) of the Bankruptcy Code. Without limiting the effect of section 1145 of the Bankruptcy Code, all financing documents, agreements, and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Plan, including, without limitation, the Restructured First Lien Loan Agreement, the Restructured Project Loan Agreements, the New Second Lien Notes Indenture, the New Second Lien Notes, the Preferred Shares, the New Common Stock, the Registration

Agreement and any other agreement or document related to or entered into in connection with any of the foregoing, will become, and the Backstop Commitment Agreement and the Class B Common Stock Purchase Commitment will remain, effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement). The aggregate number of shares of New Capital Stock of Reorganized Parent to be authorized on the Effective Date will be 157,200,000 shares consisting of (a) 44,793,255 Class A Common Shares, (b) 31,464,548 Class B Common Shares, (c) 16,110,366 Class C Common Shares, and (d) 64,831,831 Preferred Shares (exclusive of dilutive impact associated with the Management Incentive Plan)

Upon the Effective Date, after giving effect to the transactions contemplated hereby, the authorized capital stock or other equity securities of the Reorganized Debtors will be that number of shares of New Capital Stock as may be designated in the Amended Organizational Documents. Without limiting the effect of section 1145 of the Bankruptcy Code, on the Effective Date, Reorganized Parent will enter into the Registration Agreement with each holder of Class B Common Shares, Preferred Shares and Class C Common Shares, and each other Person (a) who by virtue of the issuance by Parent to such Person on the Effective Date of the New Capital Stock and/or its relationship with Parent (i) holds shares of New Capital Stock or New Second Lien Notes that are "restricted" (as such term is used within the meaning of the applicable securities laws) because acquired in a private placement under section 4(2) of the Securities Act, or (ii) could otherwise reasonably be deemed to be an "underwriter" or "affiliate" (as such terms are used within the meaning of applicable securities laws) of Parent, and (b) who requests in writing that Parent execute such agreement. In connection with the distribution of New Second Lien Notes or New Capital Stock to current or former employees of the Debtors, Parent may take whatever actions are necessary to comply with applicable federal, state, local and international tax withholding obligations, including withholding from distributions a portion of the New Capital Stock and selling such securities to satisfy tax withholding obligations including, without limitation, income, social security and Medicare taxes.

## J.  Substantive Consolidation for Plan Purposes

The Plan serves as a motion by the Debtors seeking entry, pursuant to section 105 of the Bankruptcy Code, of an order authorizing, on the Effective Date, the substantive consolidation of the Estates of all of the Debtors for purposes of classifying and treating all Claims under the Plan, including for voting, confirmation, and distribution purposes only. Substantive consolidation will not (i) alter the state of incorporation of any Debtor for purposes of determining applicable law of any of the Causes of Action, (ii) alter or impair the legal and equitable rights of the Debtors to enforce any of the Causes of Action, or (iii) otherwise impair, release, discharge, extinguish or affect any of the Causes of Action or issues raised as a part thereof.

If substantive consolidation is ordered, then on and after the Effective Date, all Assets and liabilities of the Debtors shall be treated as though they were merged into a single estate for purposes of treatment of and distributions on Claims. All duplicative Claims (identical in both amount and subject matter) Filed against more than one of the Debtors shall automatically be expunged so that only one Claim survives against the consolidated Debtors. All guarantees by any Debtor of the obligations of any other Debtor shall be eliminated so that any Claim and any guarantee thereof by any other Debtor, as well as any joint and/or several liability of any Debtor with respect to any other Debtor, shall be treated as one collective obligation of the Debtors. Any alleged defaults under any applicable agreement with the Debtors arising from substantive consolidation under this Plan shall be deemed cured as of the Effective Date.

**K.**     **Release of Liens, Claims and Equity Interests**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estates will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity except for the Liens of the Prepetition Indenture Trustee on distributions to holders of Class 7 claims as provided in the Prepetition Indentures. Any Entity holding such Liens or Interests will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors.

**L.**     **Certificate of Incorporation and Bylaws**

The Amended Organizational Documents shall amend or succeed the certificates or articles of incorporation, by-laws, membership agreements, partnership agreements and other organizational documents of the Debtors to satisfy the provisions of the Plan and the Bankruptcy Code, and will (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code; (ii) authorize the issuance of New Capital Stock in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by the Plan; (iii) to the extent necessary or appropriate, include restrictions on the Transfer of New Capital Stock; and (iv) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein. After the Effective Date, the Reorganized Debtors may amend and restate their certificates or articles of incorporation and by-laws, and other applicable organizational documents, as permitted by applicable law.

**M.**     **Directors and Officers of Reorganized Parent**

The New Board will initially be comprised of up to seven (7) directors, who will initially be appointed as follows:  (i) one director appointed by the Requisite Holders of the Class A Common Shares, (ii) two directors, including the Chairman of the Board, appointed by the Requisite Holders of the Class B Common Shares, (iii) two directors appointed by the Requisite Holders of the Class C Common Shares and Preferred Shares voting as a class, and (iv) initially, two incumbent independent directors who are satisfactory to the holders of (a) 66 2/3% of the Class A Common Shares, (b) a majority of the Class B Common Shares and (c) a majority of the Preferred Stock and the Class C Common Shares voting as a class.  Thereafter, the appointment of one new independent director will be subject to the approval of the holders of (i) 66 2/3% of the Class A Common Shares, (ii) a majority of the Class B Common Shares and (iii) the Class C Common Shares and Preferred Shares (with the Class C Shares and the Preferred Shares voting together).  The other new independent director will be appointed by the holders of a majority of the Class C Common Shares and the Preferred Shares, voting together.

As of the Effective Date, the initial officers of the Reorganized Debtors will be the officers of the Debtors existing immediately prior to the Effective Date and the existing directors of the Reorganized Debtors other than Reorganized Parent will be the directors of such Debtors immediately prior to the Effective Date.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose, prior to the Confirmation Hearing, the identity and affiliations of any Person proposed to serve on the

initial board of directors or as an officer of the Reorganized Debtors, and, to the extent such Person is an insider other than by virtue of being a director or officer, the nature of any compensation for such Person. Each such director and each officer will serve from and after the Effective Date pursuant to applicable law and the terms of the Amended Organizational Documents and the other constituent and organizational documents of the Reorganized Debtors. The existing board of directors of Parent will be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

**N.**   **Corporate Action**

Each of the Debtors and the Reorganized Debtors, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the distribution of the securities to be issued pursuant hereto in the name of and on behalf of the Reorganized Debtors and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtors or the Reorganized Debtors and as applicable or by any other Person (except for those expressly required pursuant to the Plan).

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the stockholders, directors or members of any Debtor (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, directors, managers or partners of such Debtors, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in the Plan involving the legal or corporate structure of any Debtor or any Reorganized Debtors, as applicable, and any legal or corporate action required by any Debtor or any Reorganized Debtor as applicable, in connection with the Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of any Debtor or any Reorganized Debtors, as applicable, or by any other Person. On the Effective Date, the appropriate officers of each Debtor and each Reorganized Debtors, as applicable, are authorized to issue, execute, and deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in the Plan in the name of and on behalf of the Debtor and each Reorganized Debtors, as applicable, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The secretary and any assistant secretary of each Debtor and each Reorganized Debtor as applicable, will be authorized to certify or attest to any of the foregoing actions.

**O.**   **Cancellation of Notes, Certificates and Instruments**

On the Effective Date, all notes, stock, instruments, certificates, agreements and other documents evidencing the DIP Facility Claims, Project Loan Claims, Old Notes Claims, and the Parent Equity Interests will be canceled, and the obligations of the Debtors thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case

without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.

On the Effective Date, except to the extent otherwise provided herein, the Prepetition Indentures will be deemed to be canceled, as permitted by section 1123(a)(5)(F) of the Bankruptcy Code, and the obligations of the Debtors thereunder will be fully released, terminated, extinguished and discharged. The Prepetition Indentures will continue in effect solely for the purposes of: (1) allowing Holders of the Old Notes Claims to receive distributions under the Plan; and (2) allowing and preserving the rights of the Prepetition Indenture Trustee to (a) make distributions in satisfaction of Allowed Old Notes Claims, (b) exercise its charging liens against any such distributions, and (c) seek compensation and reimbursement for any fees, expenses (including attorney's fees) or indemnity to the extent permitted by the Prepetition Indentures. Upon completion of all such distributions, the Old Notes and the Prepetition Indentures will terminate completely. From and after the Effective Date, the Prepetition Indenture Trustee will have no duties or obligations under the Prepetition Indentures other than to make distributions. As of the Effective Date, the Old Notes will be deemed surrendered to the Prepetition Indenture Trustee in accordance with the terms of the Prepetition Indentures. All surrendered and canceled Old Notes held by the Prepetition Indenture Trustee will be disposed of in accordance with the applicable terms and conditions of the Prepetition Indenture.

P.    **Plan Supplement, Other Documents and Orders and Consents Required Under Noteholders RSA, Colony RSA and the Backstop Commitment Agreement**

So long as the Noteholders RSA, the Colony RSA, or the Backstop Commitment Agreement, as applicable, have not been terminated, the documents to be Filed as part of the Plan Supplement and the other documents and orders referenced herein, or otherwise to be executed in connection with the transactions contemplated hereunder, shall be subject to the consents and the approval rights, as applicable, of (a) the Prepetition Agent and the Consenting Lenders as set forth in the Colony RSA, (b) the Consenting Noteholders and the Requisite Noteholders as set forth in the Noteholders RSA and (c) the Backstop Investors as set forth in the Backstop Commitment Agreement. To the extent that there is any inconsistency between the Colony RSA, the Noteholders RSA, or the Backstop Commitment Agreement, on the one hand, and the Plan, on the other hand, as to such consents and the approval rights and  the Colony RSA, the Noteholders RSA or the Backstop Commitment Agreement, as applicable, has not been terminated, then the consents and the approval rights required in the Colony RSA, the Noteholders RSA or the Backstop Commitment Agreement, as applicable, shall govern.

**ARTICLE VI.**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

A.    **Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors will be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts (including, without limitation, employment agreements) and Unexpired Leases that:

- have been rejected by order of the Bankruptcy Court;

- are the subject of a motion to reject pending on the Effective Date;

- are identified in the Plan Supplement (in either case which list may be amended by the Debtors to add or remove Executory Contracts

and Unexpired Leases by filing with the Bankruptcy Court an amended list and serving it on the affected contract parties at least ten (10) days prior to the Confirmation Hearing); or

- are rejected pursuant to the terms of the Plan.

Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such assumptions and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code. To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan (including, without limitation, any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Reorganized Debtors' assumption of such Executory Contract or Unexpired Lease, then such provision will be deemed modified such that the transactions contemplated by the Plan will not entitle the non-debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Each Executory Contract and Unexpired Lease assumed pursuant to this Article of the Plan will revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

## B.    Assignment of Executory Contracts or Unexpired Leases

In the event of an assignment of an Executory Contract or Unexpired Lease, at least twenty (20) days prior to the Confirmation Hearing, the Debtors will serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption and assignment, which will:  (a) list the applicable cure amount, if any; (b) identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court; additionally, the Debtors will file with the Bankruptcy Court a list of such Executory Contracts and Unexpired Leases to be assigned and the proposed cure amounts. Any applicable cure amounts will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assignment or any related cure amount must be filed, served and actually received by the Debtors at least five (5) days prior to the Confirmation Hearing. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assignment or cure amount will be deemed to have consented to such assignment of its Executory Contract or Unexpired Lease. The Confirmation Order will constitute an order of the Bankruptcy Court approving any proposed assignments of Executory Contracts or Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any cure payment, (b) the ability of any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assigned or (c) any other matter pertaining to assignment, the applicable cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assignment. If an objection to assignment or cure amount is sustained by the Bankruptcy Court, the Reorganized Debtors in their sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming and assigning it.

2474327.1 16
DOCS_SF:78801.13 93949-001