a result of such loss, claim, damage or liability in such proportion to reflect the economic interests of (i) the Company and its respective affiliates, stockholders or other equity holders on the one hand and (ii) such Indemnified Person on the other hand in the matters contemplated by this Stockholders Commitment Letter and the Restructuring as well as the relative fault of (i) the Company and its respective affiliates, stockholders or other equity holders on the one hand and (ii) such Indemnified Person on the other hand with respect to such loss, claim, damage or liability and any other relevant equitable considerations. In no event will any Indemnified Person, solely in its capacity as an investor hereunder with respect to the Commitment, be liable on any theory of liability for indirect, special or consequential damages, lost profits or punitive damages as a result of any failure to fund its obligations under the Commitment or otherwise in connection with the Commitment, the Restructuring or the offering of the New Offered Securities.

IV.    Expiration of Commitment; Termination Rights.

The Commitments will expire at 5:00 p.m., New York City time, on November 4, 2011, unless on or prior to such time you have executed and returned to the Stockholders a copy of this Stockholders Commitment Letter.

If you do so execute and deliver to the Stockholders this Stockholders Commitment Letter, the Stockholders agree to hold its Commitment available for you until the earlier of (i) the consummation of the Rights Offering, Stockholders Transactions and the Restructuring in accordance with the Term Sheet (the "*Closing Date*") and (ii) 5:00 p.m., New York City time, on May 15, 2012 (the "*Termination Date*"). Before such date, the Stockholders may, upon five business days prior written notice, terminate this Stockholder Commitment Letter and the Commitment hereunder, and their agreements to perform the obligations described herein upon the occurrence of any of the following events: (a) one or more events have occurred or information has become available that indicates with reasonable certainty that a condition precedent set forth or referred to in this Stockholders Commitment Letter cannot be satisfied prior to the Termination Date, (b) the Company has materially breached any of its obligations set forth in this Stockholders Commitment Letter, (c) the Company seeks authority to enter, or enters, into a restructuring transaction that deviates materially from the Term Sheet in a manner adverse to the Stockholders, or (d) the Company seeks authority to enter into the Restructuring and the $25.0 million investment in Class B Common Stock contemplated hereby is provided by a party other than one of the Stockholders or their affiliates. Termination by the Stockholders will not relieve the Stockholders of any liability for any breach (if any) of this Stockholders Commitment Letter by the Stockholders.

V.    Confidentiality.

This Stockholders Commitment Letter and the terms and conditions contained herein may not be disclosed by the Company to any person or entity (other than to such of your officers, directors, agents, attorneys and advisors) without the prior written consent of the Stockholders; *provided* that the Company may disclose the existence of and the terms and conditions of this Stockholders Commitment Letter to (a) the holders of the Existing Notes and their counsel and financial advisors, (b) to the "Lenders" and the "Administrative Agent" under the Company's existing secured term loan facility and their counsel and other professional

advisors, (c) in the disclosure statement relating to Restructuring or any offering memorandum or other documents with respect to the New Rights Offering, and (d) otherwise as may be required by applicable laws, including applicable securities laws in the opinion of the Company's outside securities counsel.

VI.    Survival.

The provisions of this Stockholders Commitment Letter relating to indemnification and contribution and confidentiality and the provisions of *Sections III, IV, V, VI, VII,* and *VIII* hereof will survive the expiration or termination of the Commitment or this Stockholders Commitment Letter (including any extensions) and the execution and delivery of definitive financing documentation.

VII.    Choice of Law; Jurisdiction; Waivers.

This Stockholders Commitment Letter will be governed by and construed in accordance with the laws of the State of California. The Company and the Stockholders hereby irrevocably submits to the non-exclusive jurisdiction of any California State court or Federal court sitting in the County of Orange in respect of any suit, action or proceeding arising out of or relating to the provisions of this Stockholders Commitment Letter and irrevocably agrees that all claims in respect of any such suit, action or proceeding may be heard and determined in any such court. The parties hereto hereby waive any objection that they may now or hereafter have to the laying of venue of any such suit, action or proceeding brought in any such court, and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.    THE PARTIES HERETO HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY ACTION OR PROCEEDING ARISING OUT OF RELATING TO THIS STOCKHOLDERS COMMITMENT LETTER.    Notwithstanding the foregoing consent to jurisdiction, upon the commencement of a proceeding under the Bankruptcy Code, each of the parties hereto agrees that the bankruptcy courts sitting in the District of Delaware shall have non-exclusive jurisdiction with respect to any matter under or arising out of or in connection with this Stockholders Commitment Letter.

VIII.    Miscellaneous.

This Stockholders Commitment Letter may be executed in one or more counterparts, each of which will be deemed an original, but all of which taken together will constitute one and the same instrument.    Delivery of an executed signature page of this Stockholders Commitment Letter by facsimile transmission will be effective as delivery of a manually executed counterpart hereof.    This Stockholders Commitment Letter may not be amended or waived except by an instrument in writing signed by each of the Company and the Stockholders.

The parties hereto agree that the Stockholders, and each of them, will have the right to transfer or assign (whether by operation of law, will, devise or otherwise) its rights and obligations (in whole or in part) to purchase the Class B Common Shares to a trust or trusts for the benefit of the Stockholders, and each of them, or their respective family members; provided

that any such transfer or assignment of rights and obligations to purchase the Class B Common Shares shall not relieve the Stockholders, and each of them, from his and their obligations under this Stockholder Commitment Letter.

This Stockholders Commitment Letter, the attached Exhibits set forth the entire understanding of the parties hereto as to the scope of the Commitments and the obligations of the Stockholders hereunder.   This Stockholders Commitment Letter supersedes all prior understandings and proposals, whether written or oral, between the Stockholders and you relating to their purchase of the Class B Common Shares.

This Stockholders Commitment Letter has been and is made solely for the benefit of the parties signatory hereto and the Indemnified Persons, and nothing in this Stockholders Commitment Letter, expressed or implied, is intended to confer or does confer on any other person or entity any rights or remedies under or by reason of this Stockholders Commitment Letter or the agreements of the parties contained herein.   Prior to commencing the Chapter 11 Cases, the Company shall not amend, waive or terminate this Stockholders Commitment Letter without the prior written consent of the Requisite Noteholders (as defined in the Restructuring Support Agreement).   After the commencement of the Chapter 11 Cases, the Company shall not amend, waive or terminate this Stockholders Commitment Letter without the approval of the bankruptcy court.

If you are in agreement with the foregoing, kindly sign and return to us the enclosed copy of this Stockholders Commitment Letter.

Very truly yours,

William Lyon

William H. Lyon

Accepted and agreed to as of the date first above written:

WILLIAM LYON HOMES, INC.

By: _____
Name:   Matthew R. Zaist
Title:    Executive Vice President

WILLIAM LYON HOMES

By: _____
Name:   Matthew R. Zaist
Title:    Executive Vice President

[SIGNATURE PAGE TO STOCKHOLDERS COMMITMENT LETTER]

**Exhibit A**

**TERM SHEET**

101176692.2

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

# WILLIAM LYON HOMES
## WILLIAM LYON HOMES, INC.
### SUMMARY OF THE PRINCIPAL TERMS FOR

**Solicitation of Votes for a Potential In-Court Pre-packaged Plan of Reorganization under Chapter 11**

**Issuance of**

New 12% (8% cash interest) Senior Second Lien Notes due 2016 of William Lyon Homes, Inc., a California corporation ("CA Lyon") and new Class A Common Stock of William Lyon Homes, a Delaware corporation ("DE Lyon," and collectively with CA Lyon, "WLH")

to Holders of CA Lyon's outstanding

| | |
|---|---|
| 7⅜% Senior Notes due 2012 | CUSIP #552075-AE-3 |
| 10¾% Senior Notes due 2013 | CUSIP #552075-AA-1 |
| 7½% Senior Notes due 2014 | CUSIP #552075-AC-7 |

("collectively, the "Old Notes")

and

**Rights Offering**
of New Class C Common Stock and Convertible Preferred Stock
of DE Lyon  for Cash

2503959.

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

*Set forth herein are terms and conditions for a proposed series of restructuring transactions (collectively, the "Restructuring Transactions"), to be effected through a pre-packaged plan of reorganization under Chapter 11. These terms and conditions are provided for discussion purposes only and do not constitute an offer, agreement or commitment, nor an advertisement or offer to buy or sell securities, by any party.*

*This Term Sheet is by its nature a summary only and is not all-inclusive. This Term Sheet does not include descriptions of all of the terms, conditions and other provisions that are to be contained in the definitive documentation relating to the exchange offer, the consent solicitation or the New Notes. This Term Sheet is not intended to limit the scope of discussion and negotiation of any matters even if inconsistent with the specific matters set forth herein. No oral agreements between or among the parties shall be binding under any circumstances at any time. The terms included in this Term Sheet shall be kept strictly confidential, shall not be reproduced or disclosed, and shall not be used other than in connection with evaluating the transaction described herein.*

*Capitalized terms used herein without other definition have the respective meanings assigned to such terms in the indentures respectively governing the Old Notes.*

## *The New Securities*

New Note Issuer ............................... CA Lyon.

New Equity Issuer ........................... DE Lyon.

The Exchange Offer........................ CA Lyon will issue $75 million in aggregate initial principal amount of 12% (8% cash interest) Senior Second Lien New Notes due 2016 (the "New Notes") to holders of the Old Notes.

DE Lyon will issue shares of new Class A Common Stock ("Class A Common Shares") initially representing 28.5% of the capital stock of DE Lyon on a fully-diluted basis (but before giving effect to the Management Incentive Plan or the Warrants) to holders of the Old Notes.

The Rights Offering......................... DE Lyon will issue shares of new Class C Common Stock ("Class C Common Shares") and shares of new Convertible Preferred Stock ("Preferred Shares"), convertible on a one-to-

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

one basis into Class C Common Shares, collectively representing 51.5% of the capital stock of DE Lyon on a fully-diluted basis (but before giving effect to the Management Incentive Plan or the Warrants), for an aggregate cash purchase price of $60 million ($10 million for the Class C Common Shares, and $50 million for the Preferred Shares), in the rights offering.

Backstop Fee...................................... Upon receipt by DE Lyon of $60 million for the Class C Common Shares and the Preferred Shares issued in the Rights Offering, those parties that initially entered into a binding commitment to purchase at least $60 million of such shares (the "Backstop Investors") shall receive a backstop fee in the form of Class C Common Shares representing 2.00% of the Capital Stock of DE Lyon (included in the initial 51.5% allocated to Class C Common Shares); provided, that, the backstop fee may, subject to and in accordance with the backstop commitment, be payable in cash (in lieu of the Class C Common Shares) to the Backstop Investors in the amount of $2.5 million.

The Class B Shares .......................... In connection with the consummation of the Exchange Offer and the Rights Offering and subject to all of the conditions set forth below, the existing equity of DE Lyon will be cancelled, and DE Lyon will issue to the holders of its existing equity, in exchange for a purchase price of $25 million in cash, shares of Class B Common Stock ("Class B Common Shares"), initially representing 20.0% of the capital stock of DE Lyon on a fully-diluted basis (but before giving effect to the Management Incentive Plan or the Warrants).

The Warrants ................................... In consideration for intrinsic value, DE Lyon will issue to the holders of its existing equity warrants to purchase Class B Common Shares ("Warrants") representing an additional 9.1%

2503959.

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

of the capital stock of DE Lyon on a fully-diluted basis (but before giving effect to the Management Incentive Plan), at a strike price based on a $325 million equity value of DE Lyon.

After giving effect to the issuance of the Warrants, but before giving effect to the Management Incentive Plan, the Class A Common Shares will represent 25.9% of the capital stock of DE Lyon, the Class B Common Shares will represent 27.3% of the Capital Stock of DE Lyon, and the Class C Common Shares (assuming full conversion of the Preferred Shares) will represent 46.8% of the capital stock of DE Lyon.

| | |
|---|---|
| The Management Incentive Plan .... | Terms consistent with WLH proposal (e.g., 8% pool), subject to the following modifications: |

- Initial allocation: 4%
- Form of initial grant: 50% restricted stock, 50% options struck at Plan Value (rather than 100% restricted stock)
- Remaining allocation: subject to Board of Directors review, not to occur before 12 months post-emergence
- Tax gross-up: rather than cash bonus for taxes owed, employee can borrow same amount from WLH (secured by underlying shares), to be repaid upon earlier of liquidity event or 2 years, subject to compliance with SOX

| | |
|---|---|
| The Lease | The Noteholders will agree to assume the lease in any bankruptcy proceeding, and the lock-ups will so provide. |
| The Employment Contracts | WLH shall have entered into employment contracts with each of General William Lyon and William H. Lyon, on terms consistent with proposed draft agreements (e.g., $1.5 million combined salary), subject to following modifications: |

a) Performance bonus: first year capped at 50% of salary, thereafter, commensurate with position and contributions

2503959.

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

as determined by a three-member compensation committee consisting of the two independent directors and one director appointed by the holders of the Class A Common Shares

b) Severance: base salary for remaining contract term (from date to termination to 12/31/14) plus any earned but unpaid bonus, but in no event less than 18 months

2-year non-solicitation

The Pre-packaged Plan ................... WLH will solicit the votes of the holders of the Old Notes to consummate the transactions contemplated hereby pursuant to WLH's proposed pre-packaged or pre-arranged plan of reorganization (the "Pre-packaged Plan").

Conditions...................................... The consummation of the Restructuring Transactions expressly conditioned on satisfaction of each of the following:

1. CA Lyon shall have received votes in favor of the Pre-packaged Plan, lock-ups and/or other documentation of the agreement by holders of Old Notes representing in the aggregate at least 66 2/3 % in principal amount of the Old Notes whose holders vote, and a majority in number of the holders of the Old Notes whose holders vote, agreeing to be bound by the Pre-packaged Chapter 11 Plan (the "Threshold Condition").

2. CA Lyon shall have received votes in favor of the Pre-packaged Plan, of the agreement from the "Lenders" representing at least 66 2/3% of the principal amount of the Senior Secured Term Loan and at least half of the Lenders under the Secured Term Loan Agreement, agreeing to be bound by the Pre-packaged Chapter 11 Plan.

3. CA Lyon shall have received a commitment letter from

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

the existing equity holders of DE Lyon with respect to the purchase of the Class B Common Shares.

4. CA Lyon shall have received a commitment letter with respect to the Rights Offering described above.

5. WLH shall have entered into an amendment, amendment and restatement, or refinancing, providing for an initial principal amount not to exceed $235 million, an annual interest rate not to exceed 10.25%, and otherwise on terms and conditions satisfactory to WLH and the Ad Hoc Committee of holders of Old Notes (the "Colony Amendment") to CA Lyon's Secured Term Loan Agreement dated as of October 20, 2009 (as heretofore amended, the "Senior Secured Loan Agreement") by and among CA Lyon, as Borrower, ColFin WLH Funding, LLC, as Administrative Agent (the "Administrative Agent"), ColFin WLH Funding, LLC, as a Lender and as Lead Arranger, and the other Lenders from time to time party thereto.

6. CA Lyon shall have obtained consent to the Restructuring Transactions from the Administrative Agent.

7. WLH shall have obtained any other necessary consents and approvals (including any required government consents or approvals) to the consummation of the Restructuring Transactions.

8. CA Lyon, the Guarantors, the indenture trustee under the indenture governing New Notes, the collateral agent under each security document for the New Notes, and each other applicable party shall have executed and delivered definitive documentation reasonably satisfactory to all such

2503959.

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

parties, including an intercreditor agreement with respect to the New Notes and the Senior Secured Term Loan, and appropriate equity documents, with respect to the new equity.

9.    The maturity of the Church Farm loan shall have been extended, and Mountain Falls loan to be restructured, both on terms and conditions satisfactory to CA Lyon and Ad Hoc Committee (it being understood that no such restructuring should require impairment of the claims of the lenders on such loans under the Plan).

10.    WLH shall have raised $85 million pursuant to the new money terms described above under "The Rights Offering" and "The Class B Shares".

11.    WLH shall have entered into the Employment Agreements described above.

12.    Other customary conditions including, without limitation, no legal impediment to or restraint on consummation of the Consent Solicitation or Exchange Offer.

The foregoing conditions are for the mutual benefit of WLH and the Ad Hoc Committee of holders of Old Notes, and may be asserted by either party regardless of the circumstances giving rise to any such condition or may be waived by either party in whole or in part at any time and from time to time in its sole discretion.

2503959.

- 7 -

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

### _Summary of the Principal Terms of the New Notes_

| | |
|---|---|
| Maturity Date.................................. | The fifth anniversary of Issue Date. |
| Interest ........................................... | The New Notes will bear interest at a fixed annual rate of 12%, consisting of an 8% cash interest component and a 4% PIK interest component.  The cash interest component will be payable semi-annually in arrears.  The PIK interest component will accrete and be added to principal semi-annually in arrears. |
| Ranking.......................................... | The New Notes will be senior second lien debt obligations of CA Lyon, ranking ratably with any other unsubordinated indebtedness of CA Lyon (but structurally senior due to the second lien), but will be effectively subordinated to the Senior Secured Term Loan to the extent of the collateral securing such first lien indebtedness. |
| Guarantees ..................................... | The New Notes will be guaranteed on a joint and several basis by the following entities (which will be the same guarantors that guaranty the Senior Secured Term Loan (the "Guarantors"): |

DE Lyon
California Equity Funding, Inc., a California corporation
PH-LP Ventures, a California corporation
Duxford Financial, Inc., a California corporation
Sycamore CC, Inc., a California corporation
Presley CMR, Inc., a California corporation
William Lyon Southwest, Inc., an Arizona corporation
PH-Reilly Ventures, a California corporation
HSP, Inc., a California corporation
PH Ventures-San Jose, a California corporation
WLH Enterprises, a California Gen Partnership – formerly The Ranch Golf Club Co., formerly Carmel Mountain Ranch

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

Lyon Waterfront, LLC, a Delaware limited liability company
Lyon East Garrison Company I, LLC, a California limited
liability company

Collateral Security ........................... The New Notes will be secured by second priority liens on
substantially all assets of CA Lyon and the Guarantors, other
than "Excluded Assets" that are also excluded from the Senior
Secured Term Loan security interests. The collateral for the
New Notes will be the same as the collateral for the Senior
Secured Term Loan.

Release of Collateral ....................... Upon the release of the lien on any collateral securing the
Senior Secured Term Loan during the term of the Senior
Secured Term Loan, the lien on that collateral securing the
New Notes will be automatically released without the
necessity of any consent from the holders of the New Notes.

Sinking Fund .................................. None.

Optional Redemption ...................... The New Notes will be redeemable at CA Lyon's option at any
time without penalty or premium, at the outstanding principal
amount thereof plus any accrued and unpaid interest thereon.

Trading ........................................... The New Notes are expected to be eligible for trading in the
PORTAL market.

Use of Proceeds .............................. CA Lyon does not expect to receive any net cash proceeds
from the issuance of the New Notes.

Covenants ....................................... The New Indenture (as defined below) will contain the
covenants summarized on Exhibit A hereto.

Basic Provisions of New                    The New Notes will be issued under an indenture (the "New
Indenture ........................................ Indenture") containing provisions substantially similar to those
of the indentures governing the Old Notes, except (i) to the

2503959.

- 9 -

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

extent otherwise described herein, (ii) the covenants, which are summarized on Exhibit A hereto and(iii) that the New Indenture will provide for second priority liens on substantially all of the assets of CA Lyon and the Guarantors, other than specified excluded assets.

Basic Provisions of Intercreditor Agreement ...................................... | The New Notes will be subject to an Intercreditor and Subordination Agreement on substantially the terms and conditions summarized in the term sheet for the Colony Amendment, attached hereto as Exhibit B. :

### *Summary of the Principal Terms of the Class A Common Shares*

Class A Common Shares ............... | The Class A Common Shares will initially represent 28.5% of the outstanding capital stock of DE Lyon on a fully-diluted basis, after giving effect to the Restructuring Transactions, but prior to the effectiveness of the Management Incentive Plan and the Warrants.

Approval Rights............................. | The consent of the holders of 66 2/3% of the outstanding Class A Common Shares, a majority of the Class B Common Shares, and a majority of the Preferred Stock and Class C Common Shares voting as a class will be required for any merger, consolidation, or disposition of all or substantially all of the assets of DE Lyon or CA Lyon.

Voting Rights.................................. | The Class A Common Shares will carry one vote per share.

The consent of the holders of the Class A Common Shares will not be required for the day-to-day management or operations of DE Lyon, CA Lyon or their subsidiaries.

2503959.

- 10 -

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

Right to Appoint Directors ............ The holders of the Class A Shares will have the right to appoint one director to a seven-director Board.

In addition, initially two incumbent independent directors who are satisfactory to the holders of (a) 66 2/3% of the Class A Common Shares, (b) a majority of the Class B Common Shares and (c) a majority of the Preferred Stock and the Class C Common Shares voting as a class, will complete their one-year terms . Thereafter, the appointment of one new independent director will be subject to the approval of the holders of (i) 66 2/3% of the Class A Shares, (ii) a majority of the Class B Shares and (iii) the Class C Shares and Preferred Shares (with the Class C Shares and the Preferred Shares voting together). The other new independent director will be appointed by the holders of a majority of the Class C Shares and the Preferred Shares, voting together.

Right to Compel IPO ..................... The holders of a majority of the Class A Common Shares will have the right, subject to customary market exceptions, to require DE Lyon to consummate an initial public offering of its equity securities (an "IPO") within three years after the Issue Date, which right may be extended for up to two 12-month periods with the consent of a majority of the holders of the Class A Common Shares.

Conversion to Single Class of Common Stock ............................... Upon the occurrence of (i) an IPO, automatically, or (ii) the vote of a majority of the holders of A) the Class A Common Shares and B) the Class C Common Shares and the Preferred Shares (voting together), the Class A Common Shares, the Class C Common Shares and the Preferred Shares will be converted into a single class of common stock on a one-for-one basis. The Class B Shares may also be converted into the same class of common stock, with the approval of a majority

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

of the holders of the Class B Shares.

### *Summary of the Principal Terms of the Class B Common Shares*

Class B Common Shares ...............   The Class B Common Shares will initially represent 20.0% of the outstanding capital stock of DE Lyon on a fully-diluted basis, after giving effect to the Restructuring Transactions, but prior to the effectiveness of the Management Incentive Plan or the Warrants.

Conditions to New Equity Contribution from Existing Equity Holders...............................   Upon consummation of the Exchange Offer and the Consent Solicitation, holders of existing equity of DE Lyon will contribute $25 million for new equity (in the form of Class B Common Stock) subject to the following conditions: (i) issuance of the Warrants on terms and conditions satisfactory to CA Lyon, DE Lyon and DE Lyon's existing equity holders (and otherwise acceptable to the Ad Hoc Committee of Old Notes), (ii) agreement on, and executed and delivery by all applicable parties of, definitive documentation for the New Notes and all of the new equity interests and (iii) satisfaction of all terms and conditions set forth in this Term Sheet, in the Exchange Offer and Consent Solicitation documents and in the definitive documentation for the New Notes and all of the new equity interests, all on terms and conditions satisfactory to CA Lyon, DE Lyon and DE Lyon's existing equity holders.

Approval Rights..............................   The consent of the holders of 66 2/3% of the outstanding Class A Common Shares, a majority of the Class B Common Shares, and a majority of the Preferred Stock and Class C Common Shares voting as a class will be required for any merger, consolidation, or disposition of all or substantially all

2503959.

- 12 -

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

of the assets of DE Lyon or CA Lyon.

| | |
|---|---|
| Voting Rights.................................. | The Class B Common Shares will carry two votes per share until transferred by the original holders.  Upon transfer of the Class B Common Shares by the original holders to any person or entity (other than a family member, heir, trust, estate planning device or similar transferee), the Class B Common Shares will automatically convert to Class A Common Shares, with one vote per share.  The holders of the Class B Common Shares may convert all or any portion of the Class B Common Shares to Class A Common Shares at their election at any time. |

The consent of the holders of the Class B Common Shares will not be required for the day-to-day management or operations of DE Lyon, CA Lyon or their subsidiaries.

| | |
|---|---|
| Right to Appoint Directors ............. | The holders of the Class B Shares will have the right to appoint two directors to a seven-director Board. |

In addition, initially two incumbent independent directors who are satisfactory to the holders of (a) 66 2/3% of the Class A Common Shares, (b) a majority of the Class B Common Shares and (c) a majority of the Preferred Stock and the Class C Common Shares voting as a class, will complete their one-year terms .  Thereafter, the appointment of one new independent director will be subject to the approval of the holders of (i) 66 2/3% of the Class A Shares, (ii) a majority of the Class B Shares and (iii) the Class C Shares and Preferred Shares (with the Class C Shares and the Preferred Shares voting together).  The other new independent director will be appointed by the holders of a majority of the Class C Shares and the Preferred Shares, voting together.

2503959.

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

Shelf Registration — DE Lyon will provide shelf registration for Class B Common Shares that have converted to Class A Common Shares.

### *Summary of the Principal Terms of the Preferred Shares*

Preferred Shares ............................ — Preferred Shares (together with the Class C Common Shares) will initially represent 51.5% of the outstanding capital stock of DE Lyon on a fully-diluted basis, after giving effect to the Restructuring Transactions, but prior to the effectiveness of the Management Incentive Plan or the Warrants.  The Preferred Shares will convert to Class C Common Shares on a one-to-one basis.

Preferred Dividends........................ — Holders of the Preferred Shares will be entitled to receive dividends to the extent permitted by the terms of the Senior Secured Loan Agreement, and the New Notes, at a rate of 6% per annum (based on a $50 million purchase price), payable in cash at the rate of 4% per annum, and PIK dividends at the rate of 2% per annum, or, at DE Lyon's option, any combination of cash and or PIK dividends.  Accrued and unpaid PIK dividends will be payable in cash upon conversion (i) in connection with an IPO or (ii) to the extent cash payment is otherwise permitted by the Secured Term Loan Agreement.

Voting Rights.................................. — The Preferred Shares will carry one vote per share (voting as Class C Common Stock on an as-converted basis).

The consent of the holders of the Preferred Shares will not be required for the day-to-day management or operations of DE Lyon, CA Lyon or their subsidiaries.

2503959.

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

| | |
|---|---|
| Right to Appoint Directors | The holders of the Preferred Shares and the Class C Shares will together have the right to appoint two directors to a seven-director Board. |
| | In addition, initially two incumbent independent directors who are satisfactory to the holders of (a) 66 2/3% of the Class A Common Shares, (b) a majority of the Class B Common Shares and (c) a majority of the Preferred Stock and the Class C Common Shares voting as a class, will complete their one-year terms . Thereafter, the appointment of one new independent director will be subject to the approval of the holders of (i) 66 2/3% of the Class A Shares, (ii) a majority of the Class B Shares and (iii) the Class C Shares and Preferred Shares (with the Class C Shares and the Preferred Shares voting together). The other new independent director will be appointed by the holders of a majority of the Class C Shares and the Preferred Shares, voting together. |
| No Covenants | The terms of the Preferred Shares will not include any covenants, mandatory prepayments, prepayments at the option of the holders, or debt-like provisions. |
| Shelf Registration | DE Lyon will provide shelf registration for the Preferred Shares. |

### _Summary of the Principal Terms of the Class C Common Shares_

| | |
|---|---|
| Class C Common Shares | Class C Common Shares (together with the Preferred Shares) will initially represent 51.5% of the outstanding capital stock of DE Lyon on a fully-diluted basis, after giving effect to the Restructuring Transactions, but prior to the effectiveness of the |

2503959.

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

Management Incentive Plan or the Warrants.

Voting Rights................................. The Class C Common Shares will carry one vote per share.

The consent of the holders of the Class C Common Shares will not be required for the day-to-day management or operations of DE Lyon, CA Lyon or their subsidiaries.

Right to Appoint Directors ............ The holders of the Preferred Shares and the Class C Shares will together have the right to appoint two directors to a seven-director Board.

In addition, initially two incumbent independent directors who are satisfactory to the holders of (a) 66 2/3% of the Class A Common Shares, (b) a majority of the Class B Common Shares and (c) a majority of the Preferred Stock and the Class C Common Shares voting as a class, will complete their one-year terms . Thereafter, the appointment of one new independent director will be subject to the approval of the holders of (i) 66 2/3% of the Class A Shares, (ii) a majority of the Class B Shares and (iii) the Class C Shares and Preferred Shares (with the Class C Shares and the Preferred Shares voting together). The other new independent director will be appointed by the holders of a majority of the Class C Shares and the Preferred Shares, voting together.

Shelf Registration                DE Lyon will provide shelf registration for the Class C Common Shares.

*Summary of the Principal Terms of the Class D Common Shares*

2503959.

- 16 -

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

| | |
|---|---|
| Class D Common Shares ............... | The Class D Common Shares will be issued under the Management Incentive Plan. The Class D Common Shares when issued, will represent up to 8% of the outstanding capital stock of DE Lyon on a fully-diluted basis. |
| Voting Rights.................................. | The Class D Common Shares will not be entitled to voting rights. |
| Restrictions on Transfer ................. | The Class D Common Shares will be subject to restrictions on transfer. |

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

## Exhibit A

## Covenants

[See attached]

William Lyon Homes
2nd Lien Note - Covenant Review
as of 11-2-2011

**2nd Lien Note - Covenant Review**

| Item # | Covenant | Description | Note |
|---|---|---|---|
| 1 | Payment of Notes | Must pay interest and principal when due and must pay 2% default interest on overdue interest principal and interest | |
| 2 | Reports to Holders | Report within time periods specified by SEC rules and regs (10-Q, 10-K, etc), subject to extensions permitted by SEC rules and regs | |
| 3 | Waiver of Stay, Extension or Usury Laws | Each of the Issuer and Guarantors covenants not to claim or take advantage of any stay or extension law or usury law that would prohibit the issuer and the Guarantor from paying Notes or which may affect the covenants or the performance of the Indenture; and (to the extent that they may lawfully do so) each of the Issuer and the Guarantors will waive, benefit or advantage of any such law, and covenants that it will not hinder, delay or impede the execution of any power granted in the Indenture to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted. | |
| 4 | Compliance Certificate | a) Deliver to Trustee within 90 days at end of each year an Officer's Certificate (confirming the company fulfilled obligations under this indenture) b) Deliver to Trustee (upon becoming aware of any default) an officer's certificate specifying such default and next steps to take in addressing c) Provide written notice to Trustee of any change in its fiscal year end (12/31) | |
| 5 | Tax | Issuer and Guarantors shall pay prior to delinquency all material taxes, assessments, and governmental levies except as contested in good faith | |
| 6 | Limitation on Transactions with Affiliates | No affiliate transaction, unless: 1) on arm's length transaction 2) Parent deliver to Trustee: a) officer's certificate certifying 1 above for transaction in excess of $2M and b) fairness opinion or written appraisal by independent Financial Advisor in event transaction is in excess of $10M (same as existing Indenture) | |
| 7 | Limitations on Additional Debt | The principal amount of the loans under the Secured Term Loan agreement (and any refinancing thereof) not to exceed the Cap Amount (as defined in Exhibit B to the Restructuring Term Sheet), except by an amount equal to accrued interest, discounts, premiums thereon and fees and expenses incurred in connection with any such refinancing.   Note: additional carveouts to mirror those in restructured Colony facility. | |
| 8 | Limits on restricted payments | See current Indentures; re-set to cumulative commencing on issue date, with joint pro rata or contracted venture distributions, preferred stock dividends, and any other mutually-agreed necessary updates | |
| 9 | Limitations on Dividend and Other Restrictions Affecting Restricted Subsidiaries | See current Indentures with any necessary updates to be mutually agreed | |
| 10 | Limitations on Designation of Unrestricted | See current Indentures with any necessary updates to be mutually agreed | |

Subject to Change
Tentative and Preliminary
#4819-4365-5437v3

Privileged and Confidential
Prepared at the Direction of Counsel

Page 3 of 1

William Lyon Homes
2nd Lien Note - Covenant Review
as of 11-2-2011

Subsidiaries

| | | | |
|---|---|---|---|
| 11 | Limitations on Asset Sales | See current Indentures with any necessary updates to be mutually agreed; provided, that the Issuer shall not be required to make any Net Proceeds Offers as contemplated in the current Indentures. | |
| 12 | Limitations on Liens | Second lien protection, i.e. no prior or pari passu liens except as contemplated by intercreditor agreement, project specific debt and vendor financings, etc. and liens arising by operation of law (mechanics liens, etc.) and other liens permitted by existing Indentures and restructured Colony facility. | |
| 13 | Conduct of Business | Will not engage in any business other than the Permitted Business and businesses necessary, reasonably related or ancillary thereto | |
| 14 | Additional Note Guarantee | Those new entities acquired or created after this agreements and required to guaranty the first lien facility. To the extent Colony facility is repaid or refinanced, will still get entity guaranties other than project financed SPEs. | Except for project financed SPE's |
| 15 | Maintenance of Properties, Insurance; Compliance with Law | Same as existing Indentures | |
| 16 | Payment for Consent | No payments to any holder of any notes, unless consideration is offered to be paid to all Holders; provided, that neither the Parent nor any of its Subsidiaries shall be required to make any payments for consents so long as the restructured Colony facility is outstanding. | |
| 17 | Legal Existence | Keep in full force and effect its legal existence, etc. | |
| 18 | Further Assurances | Issuer and Guarantors to, do or cause to be done all acts and things which may be required, or which the Collateral Agent from time to time may reasonably request, to assure and confirm that the Collateral Agent holds, for the benefit of the holders of obligations under the Notes, duly created, enforceable and perfected security interests upon all Collateral, including any property or assets that are acquired or otherwise become Collateral after the Notes are issued, subject only to permitted prior Liens.<br><br>Upon the reasonable request of the Collateral Agent, at any time or from time to time, Issuer will, and the Parent or Issuer will cause each Guarantor to, will promptly execute, acknowledge and deliver such security documents, instruments, certificates, notices and other documents, and take such other actions, as may reasonably be required, or which the Collateral Agent may reasonably request, to create, perfect, ensure the priority of, protect, assure or enforce the security interests and benefits intended to be conferred upon the Collateral Agent and the holders of the obligations under the Notes by such Guarantor as contemplated by the security documents. | Also to add event of default if any Lien created by any of the security documents on any material portion of the Collateral shall cease to be enforceable and of the same effect and priority purported to be created thereby |
| 19 | Limits on Mergers, Consolidations, etc. | See current Indentures | |
| 20 | Successor Person | See current Indentures | |

Subject to Change
Tentative and Preliminary
#4819-4365-5437v3

Privileged and Confidential
Prepared at the Direction of Counsel

Page 3 of 2

William Lyon Homes
2nd Lien Note - Covenant Review
as of 11-2-2011

     Substituted

Subject to Change
Tentative and Preliminary
#4819-4365-5437v3

Privileged and Confidential
Prepared at the Direction of Counsel

Page 3 of 3

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO SETTLEMENT NEGOTIATIONS

**Exhibit B**

**Colony Amendment Term Sheet**

[See attached]

CONFIDENTIAL
SETTLEMENT DISCUSSIONS SUBJECT TO FRE 408
(AND ANY STATE LAW EQUIVALENT)
SUBJECT TO LENDER REVIEW AND APPROVAL

NOT A COMMITMENT – FOR DISCUSSION PURPOSES ONLY

<u>Lender Term Sheet for the Potential In-Court Pre-Packaged Plan of Reorganization under Chapter 11 and
Restructuring of the Senior Secured Term Loan Agreement</u>

This term sheet, including Schedule I hereto, sets forth the principal terms for (i) the potential in-court
pre-packaged reorganization under chapter 11 of the Parent, the Borrower (each as defined below) and
their respective subsidiaries (the "<u>Restructuring</u>") and (ii) restructuring the Senior Secured Term Loan
Agreement, dated as of October 20, 2009 (as amended, restated, supplemented or otherwise modified
from time to time, the "<u>Existing Credit Agreement</u>"), among William Lyon Homes, Inc., as Borrower,
Colfin WLH Funding, LLC, as Administrative Agent, and Colfin WLH Funding, LLC, as Initial Lender
and Lead Arranger, and the Lenders party thereto or their assigns (collectively, the "<u>Existing Lenders</u>").
Capitalized terms used and not defined herein shall have the meaning assigned to such term in the
Existing Credit Agreement.

This term sheet is (a) for settlement and discussion purposes only under FRE 408 and (b) is not an offer to
amend or otherwise modify the Existing Credit Agreement.

| | |
|---|---|
| Borrower: | William Lyon Homes, Inc., a California corporation (the "<u>Borrower</u>") |
| Guarantors | William Lyon Homes, a Delaware corporation and the sole shareholder of Borrower (the "<u>Parent</u>"); California Equity Funding, Inc., a California corporation; PH-LP Ventures, a California corporation; Duxford Financial, Inc., a California corporation; Sycamore CC, Inc., a California corporation; Presley CMR, Inc., a California corporation; William Lyon Southwest, Inc., an Arizona corporation; PH-Reilly Ventures, a California corporation; HSP, Inc., a California corporation; PH Ventures-San Jose, a California corporation; WLH Enterprises, a California General Partnership – formerly The Ranch Golf Club Co., formerly Carmel Mountain Ranch; Lyon East Garrison Company I, LLC, a California limited liability company; Lyon Waterfront, LLC, a Delaware limited liability company and any other subsidiary of Parent or Borrower that is required to become a party to the Unconditional Guaranty pursuant to the terms of the Existing Credit Agreement. |
| Lenders: | The Existing Lenders |
| Administrative Agent: | Colfin WLH Funding, LLC (in such capacity, the "<u>Administrative Agent</u>"). |
| Arranger: | Colfin WLH Funding, LLC (in such capacity, the "<u>Arranger</u>"). |
| Amended and Restated Credit Facility: | Upon the Closing Date, the Existing Credit Agreement will be amended and restated to reflect an increase in the outstanding principal amount of loans from $206 million to $235 million (the "<u>Amended Credit Agreement</u>"; and the loans thereunder, the "<u>New Term Loan</u>") in consideration of (x) the final settlement and satisfaction of the existing Make Whole Amount obligations, (y) a reduction in the interest rate as provided for below and (z) the other amendments and changes summarized herein and as otherwise reflected in the definitive form of Amended Credit Agreement satisfactory to the Administrative Agent and the Existing |

Lenders, in their sole and absolute discretion. The Amended Credit Agreement shall be in form and substance substantially the same as the Existing Credit Agreement with such changes therein necessary to reflect the provisions of this Lender Term Sheet and such other changes as determined by the Administrative Agent and the Existing Lenders in their sole and absolute discretion.

**Maturity Date:**

The New Term Loan shall be due and payable by the Borrower on the earlier to occur of the third (3rd) anniversary of the Closing Date and January 31, 2015 (the "Maturity Date").

**Closing Date:**

The effective date (the "Closing Date") of a plan of reorganization for the Borrower, the Parent and all of the Guarantors that effectuates the restructuring outlined in this term sheet and which plan of reorganization is in form and substance acceptable to the Administrative Agent and the Lenders in their sole and absolute discretion (the "Plan"). The Closing Date shall occur no later than May 18, 2012.

**Senior Notes Exchange Offer; New Money Issuances:**

Under the Plan, the restructuring of the Existing Credit Agreement shall take place on the Closing Date concurrent with, and contingent upon, the consummation of (a)(i) the issue of up to $75 million in initial principal amount of new second lien notes of the Borrower (the "New Second Lien Notes") and (ii) new common equity securities (Class A) of the Parent (the "Class A Equity"), which New Second Lien Notes and Class A Equity of the Parent shall be issued in exchange for all of the Borrower's existing senior notes and the Parent's existing guarantees thereof; (b) the issuance of new convertible preferred equity securities of the Parent (the "New Preferred Shares"), new common equity securities (Class C) of the Parent (the "Class C Equity") and new common equity securities (Class B) of the Parent (the "Class B Equity" and together with the Class A Equity and the Class C Equity, collectively, the "New Common Equity"), the cash proceeds of which will be at least $85 million (net of any fees payable under the Backstop Commitment Letter or the Equity Contribution Agreement to be entered into by the Parent, the Borrower and the other entities party thereto concurrently herewith) and be contributed by the Parent to the Borrower on the Closing Date.

Immediately following the Closing Date the outstanding principal balance of all indebtedness of the Borrower (not including indebtedness incurred or to be incurred in connection with the Mayfield Site (as defined below)) shall not exceed (in millions):

| | |
|---|---|
| New Term Loan | $235 |
| New Second Lien Notes | 75.0 |
| Project Specific Debt | 19.4 |
| Total Debt | 329.4 |

The New Second Lien Notes (and the definitive documentation in respect thereof) shall (x) have a maturity date later than the one-year anniversary of the Maturity Date and shall not provide for any principal amortization during the period that the New Term Loan is outstanding, (y) provide for cash interest of no greater than 8.0% per annum and PIK interest of no greater than 4.0% per annum during the period that the New Term Loan is outstanding (with a default rate no greater than 2% in excess thereof payable in-kind) and (z) otherwise be satisfactory to the

2

Administrative Agent in its sole and absolute discretion.

Distributions on the New Preferred Shares shall be subject to the restrictions on distributions set forth in the Amended Credit Agreement (as set forth below) and the New Preferred Shares (a) may provide for cash distributions not in excess of 4.0% per annum; however, if distributions are not paid in cash, such amount will be payable in kind, (b) may contain a liquidation preference, (c) shall not have any obligations that could trigger a default thereunder, and (d) shall be convertible to Class C Equity on a one-to-one basis.

| | |
|---|---|
| Interest Rate: | The New Term Loan will bear interest at the rate of 10.25% per annum, which shall be payable monthly in cash in arrears on the first business day of each month based on actual number of days elapsed over 365/6 days. |

Upon the occurrence and during the continuance of any payment default (regardless of any applicable grace period) or other event of default under the Amended Credit Agreement, the Loans (and any other amount payable under the Amended Credit Agreement) will bear interest at the rate 5% in excess of the base rate provided for above and any late payment will be subject to a late charge of 5%.

| | |
|---|---|
| Fees: | (a)    The Borrower shall pay, in cash on the Closing Date, a restructuring fee to the Lenders in an amount equal to $2.35 million. |

(b)    The Borrower shall pay to the Administrative Agent, an administrative agency fee in an amount equal to 0.10% per annum of the principal amount of the New Term Loan on the Closing Date. Such fee shall be payable quarterly in advance on the Closing Date and on each quarterly anniversary thereof occurring prior to the payment in full of the Amended Credit Agreement.

| | |
|---|---|
| Collateral: | Substantially the same as the Existing Credit Agreement except that the definition of "Excluded Assets" shall be modified to: (x) cap Excluded Assets constituting cash and deposit accounts utilized (I) for payroll, payroll taxes, and other employee wage and benefit payments or (II) to collateralize permitted letters of credit or reimbursement arrangements with respect to performance bonds, guarantees or suretyship bonds, at an amount equal to the sum of (A) the amount of deposits required by Fidelity in connection with providing title insurance as contemplated by the Amended Credit Agreement and the New Second Lien Notes not to exceed $5 million, plus (B) cash collateral for performance bonds as necessary to support and complete projects not to exceed $12.5 million; provided that the aggregate value of any cash or deposit accounts in respect of clause (I) above shall not exceed that amount payable on or prior to the next regularly scheduled payroll payment date for the Borrower's salaried employees; (y) cap Excluded Assets constituting Investments in Joint Ventures at an aggregate principal amount of $45 million less prior Investments in Joint Ventures constituting Excluded Assets existing on the Closing Date, but after giving effect to return of capital on any prior Investment (but not giving any credit for profit or return on such prior Investment) (such aggregate amount to be referred to herein as "JV Excluded Amount"); provided, however, that the JV Excluded Amount may be increased at any time after the second anniversary of the Closing Date by up to a maximum additional $20 million in Investments in Joint Ventures, in the |

3

aggregate (after giving effect to return of capital on any prior Investment, but not giving any credit for profit or return on such prior Investment), so long as the Borrowing Base ratio calculated for the two fiscal quarters immediately preceding the proposed date of such Investment is less than 60% and will remain less than 60% on a pro-forma basis after giving effect to (and deducting for) such Investment; and (z) the reference to "Excluded Property" shall be deleted.

In addition, the Borrower shall, or shall cause the applicable member of the Consolidated Group to, pledge to the Administrative Agent, on behalf of the Lenders, its equity interest in any Joint Venture in which the Borrower, or a member of the Consolidated Group, is an equity holder, together with a pledge of the proceeds therefrom, in each case on a first priority basis. The terms of the documents governing such Joint Venture shall be reasonably acceptable to the Lenders, based on parameters to be agreed upon, including provisions for distributions to the Borrower.

|  |  |
|---|---|
| Intercreditor and Subordination Agreement: | The respective rights and remedies of the holders of the New Second Lien Notes shall be subordinated to the obligations under the New Term Loan on terms satisfactory to the Arranger pursuant to an Intercreditor and Subordination Agreement (the "Intercreditor and Subordination Agreement") to be drafted by counsel to the Administrative Agent, which terms shall include the following: |

(i)    payment subordination of the New Second Lien Notes to all obligations (other than principal in excess of the Cap Amount (as defined below)) under the New Term Loan (and any refinancings or amendments thereof as provided below), including, but not limited to, principal (up to the Cap Amount) and interest, fees, costs, charges and expenses, indemnification amounts, amounts owed by the Guarantors and postpetition interest, fees, costs, charges and expenses, in each case whether incurred before or after an insolvency proceeding and whether or not such amounts are allowed by the Bankruptcy Court or other tribunal (the "Senior Obligations"). For the avoidance of doubt, the Cap Amount shall not apply to interest, fees, costs, charges and expenses, indemnification amounts, amounts owed by the Guarantors and postpetition interest, fees, costs, charges and expenses, in each case whether incurred before or after an insolvency proceeding and whether or not such amounts are allowed by the Bankruptcy Court or other tribunal.

Pursuant thereto, no payments of any kind will be made on the New Second Lien Notes, by set-off or in any other manner, other than, Permitted Junior Payments, unless and until all of the Senior Obligations under the New Term Loan have been indefeasibly paid in full in cash. "Permitted Junior Payments" will be defined in the definitive Intercreditor and Subordination Agreement but will include permitted scheduled interest payments on the New Second Lien Notes and, if the Maturity Date of the New Term Loan is extended beyond the scheduled maturity date of the New Second Lien Notes, scheduled payments of principal on the New Second Lien Notes. Notwithstanding the foregoing, no such payments will be permitted to be paid (x) during the pendency of an insolvency proceeding and (y) during the continuation of any Specified Senior Default (which shall include any payment, insolvency, judgment or cross-default events of default, events of default related to breaches of any covenants relating to the Borrowing Base, Excluded Assets or Distributions and certain other material events of default to be agreed in

4

the definitive Intercreditor and Subordination Agreement); provided that the Borrower may continue to make any scheduled interest payment on the New Second Lien Notes in kind (and not in cash or other property) by capitalizing and adding such interest payment to the outstanding principal amount of such New Second Lien Notes;

(ii)    absolute lien priority of all Senior Obligations under the New Term Loan over the New Second Lien Notes (including no lien in favor of the New Second Lien Notes not pledged to senior obligations), with the New Second Lien Notes having only "silent" rights during a 360-day standstill period (e.g., right to file proof of claim, join (but not exercise control over) a foreclosure action initiated by Administrative Agent and right to protect, enforce and secure Second Lien position, but waiver of all other voting or consent rights). Liens securing obligations under the New Second Lien Notes will be pari passu in all respects on the collateral securing any obligations under the New Term Loan in excess of the Senior Obligations;

(iii)    exclusive enforcement of claims by Administrative Agent (with waivers by New Second Lien Notes) with respect to the Collateral during the 360-day standstill period; provided that during the pendency of an insolvency proceeding the New Second Lien Notes shall have the right to propose a plan of reorganization that indefeasibly pays off the New Term Loan in full in cash and to pursue rights and remedies as unsecured creditors; at the end of such 360-day period, the New Second Lien Notes shall be able to exercise any and all rights and remedies;

(iv)    agreement by the holders of the New Second Lien Notes that (x) the Lenders shall be entitled to post petition interest and reasonable fees, costs and expenses incurred in any insolvency proceeding and no holder of New Second Lien Notes or the Trustee shall object to the payment of such post petition interest and reasonable fees, costs, charges and expenses (the Lenders and the Administrative Agent shall agree that the New Second Lien Notes are similarly entitled to such post petition interest, fees, costs, charges and expenses to the extent that the value of the collateral securing the New Second Lien Notes is determined to exceed the amount of the claims of the Administrative Agent and the Lenders plus the amount of principal and interest due and owing on the New Second Lien Notes as of the date of the commencement of the insolvency proceeding), (y) the holders of the New Second Lien Notes will not object to DIP financing provided by the Lenders (or any DIP financing to which the Lenders do not object) in an amount not in excess of a cap to be agreed upon and so long as (i) interest rate, fees and advance rate of any such DIP are commercially reasonable under the circumstances, (ii) any such DIP does not compel any debtor to seek confirmation of a specific plan of reorganization for which all, substantially all or any material portion of the material terms are set forth in the DIP documentation, (iii) any DIP documentation does not expressly require the liquidation of the Collateral prior to a default under the DIP documentation and (iv) in the event the Administrative Agent and the Lenders receive adequate protection in the form of a superpriority claim and replacement liens on assets of the debtors (the "Subject Assets"), the holders of the New Second Lien Notes and the Trustee shall not object to the grant of such adequate protection and the holders of the New Second Lien Notes shall receive adequate protection in the form of a superpriority claim

5

and replacement liens on the Subject Assets, junior only to such DIP financing and the New Term Loan up to the agreed cap, to the extent it is determined by the applicable bankruptcy court judge that the Trustee and the holders of the New Second Lien Notes are entitled to receive such adequate protection, and (z) the holders of the New Second Lien Notes will not provide any DIP financing secured by liens senior to or pari passu with the liens securing the New Term Loan or with a superpriority claim that is senior to or pari passu with any superpriority claim of the Lenders and the Administrative Agent, although the holders of the New Second Lien Notes will have the right to purchase, or cause the repurchase, of the New Term Loan at par at such times and on such other terms to be agreed in the definitive Intercreditor and Subordination Agreement;

(v)    application of proceeds of any recovery strictly in accordance with priorities set forth in the Intercreditor and Subordination Agreement and disposition and release of collateral upon direction of Administrative Agent;

(vi)    customary limitations of New Second Lien Notes' and their representatives' and holders' rights and powers during an insolvency proceeding, including a restriction on the right to vote in favor of any plan of reorganization unless it provides for the payment in full in cash of the New Term Loan or credit bid on the Collateral unless such bid provides for the payment in full in cash of the New Term Loan; and

(vii)    for purposes of this term sheet, "Cap Amount" shall mean the sum of (a) the greater of (1) 120% of the principal amount on the Closing Date and (2) 65% of the Borrowing Base and (b) an aggregate principal amount not to exceed $25,000,000 for protective advances permitted under the Existing Credit Agreement and the Loan Documents executed in connection therewith.

| Refinancings of the Amended Credit Agreement: | At any time while the Intercreditor and Subordination Agreement remains in effect for the benefit of the New Second Lien Notes, the Amended Credit Agreement may, in accordance with its terms, be amended, restated, modified, supplemented, extended, repaid, reborrowed, increased, renewed, replaced or refinanced, in whole or in part, at any time; provided, that no such amendment, restatement, modification, supplement, extension, repayment, reborrowing, increase, renewal, replacement or refinancing of the Credit Facilities (collectively referred to as a "First Lien Refinancing" or the "Refinanced Credit Agreement") so long as: |
|---|---|

(i)    the principal amount of the Refinanced Credit Agreement does not exceed the Cap Amount, except by an amount equal to accrued interest, discounts, premiums thereon and fees and expenses incurred in connection with such refinancing; and

(ii)    no additional collateral is pledged to support the First Lien Refinancing unless such collateral is also pledged to the Second Lien Notes and treated in accordance with the Intercreditor and Subordination Agreement.

To the extent that the principal amount of the Refinanced Credit Agreement exceeds the Cap Amount, other than amounts arising as a result of accrued interest, discounts, premiums thereon and fees and expenses incurred in connection with such refinancing, such principal amount shall rank pari passu in

6

right of payment and lien priority with the New Second Lien Notes.

| | |
|---|---|
| Refinancing of the New Second Lien Notes: | The New Second Lien Notes may, in accordance with their terms, be amended, restated, modified, supplemented, extended, renewed, replaced or refinanced, in whole or in part, (collectively referred to as a "Second Lien Refinancing" or the "Refinanced Second Lien Notes") at any time so long as: |

(1) The representatives of such Refinanced Second Lien Notes shall become parties to the Intercreditor and Subordination Agreement;

(2) Such  Refinanced Second Lien Notes shall (w) have a maturity date later than the one-year anniversary of the maturity date of the New Term Loan (x) have a principal balance no greater than the amount outstanding immediately prior to such Second Lien Refinancing (except by an amount equal to accrued interest, discounts, premiums thereon and fees and expenses incurred in connection with such refinancing) and not provide for any principal amortization during the period that the New Term Loan is outstanding, (y) provide for cash interest of no greater than 8.0% per annum and PIK interest of no greater than 4.0% per annum during the period that the New Term Loan is outstanding (with a default rate no greater than 2% in excess thereof) and (z) otherwise be satisfactory to the Administrative Agent in its sole and absolute discretion; and

(3) No additional collateral is pledged to support such Refinanced Second Lien Notes unless such collateral is also pledged to secure the New Term Loan and treated in accordance with the Intercreditor and Subordination Agreement.

| | |
|---|---|
| Prepayment | The New Term Loan may be prepaid at any time without penalty or premium. |
| Reporting Requirements: | Substantially  the same as the Existing Credit Agreement except that Borrower shall be permitted 30 days after end of each fiscal quarter to deliver preliminary Borrowing Base Report |
| Financial Covenants: | Substantially the same as the Existing Credit Agreement except that: |

(a) the Tangible Net Worth test shall be deleted; and

(b) The Borrowing Base shall be set at an advance ratio against Unrestricted Cash, plus Escrow Receivables, plus Eligible Real Property Collateral Valuation in an amount equal to the percentages set forth below for the applicable periods.

| Period | Advance Ratio |
|---|---|
| From the Closing Date through but excluding the 1st anniversary of the Closing Date | 67.5% |
| From the 1st anniversary of the Closing Date through but excluding the 2nd anniversary of the Closing | 65% |

7

| Date | |
|---|---|
| From the 2nd anniversary of the Closing Date and thereafter | 60% |

8

| | |
|---|---|
| Other Covenants: | Substantially the same as provided in the Existing Credit Agreement except as follows: |

Transactions with Affiliates: In addition to the restrictions set forth in the Existing Credit Agreement, the Borrower and the Parent shall deliver to the Administrative Agent (a) an officer's certificate certifying that such transaction is on terms no more favorable than those that would be obtained from an unaffiliated third party and otherwise complies with the requirements of the Amended Credit Agreement for transactions in excess of $2 million and (b) a fairness opinion or written appraisal by an independent financial advisor for transactions in excess of $10 million.

Limitations on Equity Distributions: The Borrower shall be restricted from making any distribution on its equity securities (whether in the form of amounts paid as dividends, redemptions or repurchases or otherwise) other than regularly scheduled distributions in respect of the New Preferred Shares not to exceed 4.0% per annum.

Pledge of Equity Securities: No member of the Consolidated Group shall be permitted to pledge the equity securities of a Joint Venture in connection with permitted financing arrangements for such Joint Venture unless such permitted financing is fully non-recourse to the Borrower, the Parent and/or any other member of the Consolidated Group. If the equity securities of a Joint Venture are pledged in connection with a permitted financing arrangement for such Joint Venture, the Administrative Agent, on behalf of the Lenders, shall either release or subordinate its lien on such equity securities concurrently with the pledge thereof; provided that concurrently with the repayment of such permitted financing arrangements the equity securities of such Joint Venture shall be pledged, on a first priority basis, to the Administrative Agent, on behalf of the Lenders, and the proceeds from such Joint Venture, after repayment of the permitted financing, shall be promptly distributed to the equity holders thereof and subject to the lien of the Administrative Agent.

Limitations on Indebtedness: No member of the Consolidated Group (other than the Borrower subject to and as provided in the immediately preceding paragraph) will be permitted to incur secured Indebtedness other than the New Term Loan and the Indebtedness under the New Second Lien Notes (not to exceed $75 million plus increases in such amount as a result payments of interest on the New Second Lien Notes in-kind).

In addition, (a) subject to clause (b) below, the Borrower or any Joint Venture shall be entitled to incur secured Indebtedness which (i) in the case of a Joint Venture, may be guaranteed by the Borrower and/or the Parent or (ii) in the case of the Borrower, is a recourse loan secured by real estate, in the maximum principal amount not to exceed $100 million in the aggregate for both of clauses (i) and (ii), to be used solely for horizontal and vertical construction and for any land acquisition costs; provided that (x) in the case of land acquisition transactions, the principal amount of such Indebtedness shall not exceed $20 million in the aggregate for all such land acquisition costs and shall be secured by a first priority lien on and not exceed 50% of the lesser of the value or costs of the collateral securing such Indebtedness, and (y) in the case of Indebtedness used for

9

horizontal and vertical construction transactions in which the Borrower or such Joint Venture (as applicable) commences development within 12 months after acquisition, the principal amount of such Indebtedness shall be secured by a first priority lien on and shall not exceed 60% of the lesser of the value or cost (including land acquisition cost) of the collateral securing such Indebtedness (which, in the case of vertical construction, may be the value of the collateral as developed), and (z) any such Indebtedness shall be (A) on terms and conditions reasonably approved at such time by the Existing Lenders and (B) subject to additional covenants and restrictions to be determined in the Amended Credit Agreement; (b) the Borrower or the Parent may incur up to $50 million of unsecured recourse indebtedness to be used by the Borrower or the Parent for general working capital purposes, provided that any such Indebtedness incurred by the Borrower or the Parent under this clause (b) shall reduce the amount of Indebtedness available to be borrowed by any Joint Venture under clause (a) above on a dollar for dollar basis and shall be on terms reasonably satisfactory to the Lenders; and (c) the Borrower, or, if applicable, a Joint Venture, shall be entitled to incur $60 million of Indebtedness in the aggregate in connection with the development of the property subject to the HP/Palo Alto Purchase Option (the "Mayfield Site"), which Indebtedness shall be secured by the Mayfield Site and may be recourse to the Borrower.

In the case of Indebtedness used for land acquisition transactions as provided in clause (a)(x) above, the Lenders shall have the right of first refusal to provide such Indebtedness.

The Borrower shall grant ColFin WLH Funding, LLC (or one of its Affiliates) a right of first refusal, in form and substance acceptable to Administrative Agent and Lenders in their sole and absolute discretion, to provide equity financing for the Mayfield Site and its subsequent development thereof.

| | |
|---|---|
| Releases: | Blanket releases of the Administrative Agent and Existing Lenders by the Borrower, Parent and Guarantors (and their respective shareholders and affiliates) and the existing senior note holders and indemnification by the Borrower and Guarantors. The Plan will provide for releases from all creditors and other parties in interest to the maximum extent permitted by law. |
| Other Considerations / Conditions Precedent: | Occurrence of the effective date of the Plan shall be subject to closing conditions, including no legal impediment to or restraint on consummation of the Restructuring, satisfactory to the Administrative Agent in its sole and absolute discretion, including the Borrower (a) entering into employment contracts with General William Lyon and William H. Lyon on terms and conditions, including base salary, bonus compensation, and non-competes, satisfactory to the Lenders in their sole and absolute discretion, (b) restructuring the Project Specific Debt, including the debt of CF Owner and MF Owner, on terms and conditions satisfactory to the Lenders in their sole and absolute discretion, (c) having obtained all necessary consents and approvals (including any required government consents or approvals) to the consummation of the Plan and the Restructuring, (d) having received votes in favor of the Restructuring, by the holders of the Borrower's existing senior notes as required by section 1126(c) of the Bankruptcy Code, and all necessary and appropriate lockups and documentation necessary or appropriate from such holders, agreeing to be bound by the Restructuring, and (e) |

10

201644088 v8

together with the Guarantors, the Administrative Agent, the Lenders, and each other applicable party having executed and delivered definitive documentation satisfactory to the Lenders in their sole and absolute discretion, including the Intercreditor and Subordination Agreement, and appropriate equity documents with respect to the New Common Equity.

The Administrative Agent and the Lenders' agreement to any such restructuring, including the Restructuring, and the restructuring of their outstanding loans as set forth in this term sheet is conditioned upon any use of the Lenders' cash collateral and any debtor in possession financing incurred by any of the Borrower or the Guarantors being on terms acceptable to the Administrative Agent and the Lenders in their sole and absolute discretion.

201644088 v8

SCHEDULE I

NEW COMMON EQUITY

**Class A Equity**

1. The Class A Equity will initially represent 28.5% of the outstanding capital stock of the Parent after the Closing Date on a fully diluted basis, after giving effect to the Restructuring, but prior to the effectiveness of any management incentive plan or the issuance of Warrants (as defined below).

2. The Class A Equity will carry one vote per share and will have the right to appoint one director to a seven-director board.

3. The holders of a majority of the Class A Equity will have the right, subject to customary market exceptions and on terms and conditions satisfactory to the Lenders in their sole and absolute discretion, to compel an initial public offering of the Parent's New Common Equity.

**Class B Equity**

1. The Class B Equity will initially represent 20.0% of the outstanding capital stock of the Parent after the Closing Date on a fully diluted basis and after giving effect to the Restructuring, but prior to the effectiveness of any management incentive plan or the issuance of Warrants.

2. The Class B Equity will carry two votes per share until transferred by the original holders.  Upon transfer of the Class B Equity by the original holders to any person or entity (other than a family member, heir, trust, estate planning device or similar transferee), the Class B Equity will automatically convert to Class A Equity, with one vote per share.

3. The Class B Equity will have the right to appoint two directors to a seven-director board.

**Class C Equity**

1. The Class C Equity (together with the New Preferred Shares) will initially represent 51.5% (which includes a backstop fee payable to certain holders of the Borrower's existing senior notes) of the outstanding capital stock of the Parent after the Closing Date on a fully diluted basis, after giving effect to the Restructuring, but prior to the effectiveness of any management incentive plan or the issuance of the Warrants.

2. The Class C Equity will carry one vote per share and, together with the holders of the New Preferred Shares) will have the right to appoint two directors to a seven-director board.

**Day-to-Day Management of the Parent and the Borrower**

No consent from any of the holders of the New Common Equity will be required for the day-to-day operations of the Borrower and/or the Parent.

**Board of Directors**

The Parent's Board of Directors shall consist of seven members of which (a) five members shall be elected by the New Common Equity as set forth in this Schedule I and (b) two members shall be

12

201644088 v8

independent directors serving a one-year term who are initially satisfactory to the holders of (i) 66 2/3% of the Class A Equity, (ii) a majority of the Class B Equity and (iii) a majority of the New Preferred Shares and the Class C Equity voting as a class. Thereafter, the appointment of one new independent director will be subject to the approval of the holders of (x) 66 2/3% of the Class A Equity, (y) a majority of the Class B Equity and (z) the Class C Equity and New Preferred Shares (with the Class C Equity and the New Preferred Shares voting together). The other new independent director will be appointed by the holders of a majority of the Class C Equity and the New Preferred Shares, voting together.

## Warrants

In consideration for intrinsic value, the Parent will issue to the holders of its existing equity warrants to purchase Class B Equity ("Warrants") representing an additional 9.1% of the capital stock of the Parent on a fully-diluted basis (but before giving effect to any management incentive plan), at a strike price based on a $325 million equity value of the Parent.

After giving effect to the issuance of the Warrants, but before giving effect to any management incentive plan, the Class A Equity will represent 25.9% of the capital stock of the Parent, the Class B Equity will represent 27.3% of the capital stock of the Parent, and the Class C Equity (assuming full conversion of the New Preferred Shares) will represent 46.8% of the capital stock of the Parent.

## Management Incentive Plan

The Parent may enter into an incentive plan with management that is on terms and conditions satisfactory to the Lenders in their sole and absolute discretion.

13

201644088 v8