IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WILLIAM LYON HOMES, *et al.*,[1] | ) | Case No. 11-14019 (____) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**MOTION OF DEBTORS FOR ENTRY OF AN INTERIM ORDER (I) AUTHORIZING
DEBTORS TO CONTINUE TO SELL HOMES FREE AND CLEAR OF LIENS,
CLAIMS, ENCUMBRANCES AND OTHER INTERESTS IN THE ORDINARY
COURSE OF BUSINESS AND (II) ESTABLISHING PROCEDURES
FOR RESOLUTION AND PAYMENT OF LIEN CLAIMANTS**

William Lyon Homes, a Delaware corporation ("DE Lyon"), and its affiliated debtors and

debtors in possession (collectively, the "Debtors" or the "Company") file this motion (the

"Motion") for entry of an interim order (the "Interim Order"), substantially in the form attached

hereto, and final order pursuant to sections 105(a), 363(b), 363(c), 363(f), 541(d), 1107, and

1108 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6003 and 6004 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (a) authorizing the

Debtors to continue the sale and closing of homes to customers in the ordinary course of

business, (b) authorizing the Debtors to honor home sale contract obligations to homebuyers, (c)

providing that the sale of homes to the Debtors' customers shall be free and clear of all liens,

---

[1] The debtors and debtors in possession in these cases and the last four digits of their respective taxpayer identification numbers are as follows:  William Lyon Homes (4902); William Lyon Homes, Inc. (3855); Mountain Falls Golf Course, LLC (3291); Mountain Falls, LLC (9631); Circle G at the Church Farm North Joint Venture, LLC (1322); Presley CMR, Inc. (3862); William Lyon Southwest, Inc. (8474); Sycamore CC, Inc. (1307); PH-LP Ventures (9119); PH Ventures – San Jose (5089); HSP, Inc. (6045); PH Rielly Ventures (7710); Lyon Waterfront, LLC (1928); Lyon East Garrison Company I, LLC (5692); WLH Enterprises (3333); Duxford Financial, Inc. (0824); California Equity Funding, Inc. (0016); Laguna Big Horn, LLC (2590); Presley Homes (5035); Cerro Plata Associates, LLC (5090); Whitney Ranch Village 5, LLC (5256); and Duxford Insurance Services, LLC (8232). The Debtors' mailing address is 4490 Von Karman Avenue, Newport Beach, CA 92660.

claims, encumbrances and other interests, (d) authorizing, but not directing, the Debtors, in their

sole discretion or as otherwise ordered by the Court pursuant to the established procedures, to

pay claims secured by or capable of being secured by liens against the Debtors' homes or

projects, (e) establishing procedures for releasing disputed lien claims, and (f) authorizing the

Debtors to proceed immediately with the sale of homes notwithstanding the possible

applicability of Bankruptcy Rules 6004(h) or 6003.  In support of this Motion, the Debtors

respectfully represents as follows:

### Jurisdiction

1.      This Court has jurisdiction over this matter under 28 U.S.C §§ 157 and 1334.

Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding as

defined in 28 U.S.C. § 157(b)(2).

2.      The statutory predicates for the relief requested herein are sections 105(a), 363,

541(d), 1107, and 1108 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004.

### Background

**A.      General Background**

3.      On the date hereof (the "Petition Date"), the Debtors commenced these cases by

filing voluntary petitions for relief under chapter 11 the Bankruptcy Code.  Concurrently with the

filing of this Motion, the Debtors have requested joint administration of the above captioned

cases.

4.     The Debtors have continued in possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.     No request has been made for the appointment of a trustee or an examiner in this case, and no official committee has yet been appointed by the Office of the United States Trustee.

6.     The factual background regarding the Debtors, including their current and historical business operations and the events precipitating the chapter 11 filing, are set forth in detail in the *Declaration of Matthew R. Zaist, Executive Vice President of William Lyon Homes, in Support of First Day Motions* (the "Zaist Declaration") filed concurrently herewith and incorporated herein by reference. The Debtors are homebuilders with operations in Northern and Southern California, Arizona and Nevada.

7.     On the Petition Date, the Debtors filed the *Prepackaged Joint Plan of Reorganization for William Lyon Homes, et al.* dated November 17, 2011 (the "Plan") and related disclosure statement (the "Disclosure Statement"). The Plan represents a significant milestone for the Company and embodies the agreement reached with their major debt holders. If confirmed, the Plan will reduce the Company's leverage by approximately $182 million in funded note indebtedness, restructure the Company's primary secured credit facility, and provide for new equity capital investments of $85 million in the aggregate. Based on a prepetition solicitation of the Plan, the Plan has been overwhelmingly approved by those voting classes of creditors who are impaired under the Plan – (i) the Prepetition Secured Term Loan Agreement;

and (ii) the Old Notes.  Significantly, other than the holders of Prepetition Secured Term Loan

Agreement Claims, Old Notes Claims, and equity holders of DE Lyon (whose interests are being

cancelled), the Plan provides for the Debtors' remaining creditors to be unimpaired, which may

not have been possible absent the agreements reached under the Plan.  The Plan will allow the

Company to improve its liquidity position from its operations and be well-positioned going

forward.

B.    **The Debtors' Homebuilding Operations**

8.    The Debtors conduct their homebuilding operations through four reportable

operating segments:  Southern California, Northern California, Arizona and Nevada.  The

Company is most active in California.  In 2010, approximately 78% of the home closings of the

Company and its joint ventures were derived from the Northern California and Southern

California segments, and 88% of the Company's homes sales revenue was derived from these

segments.  The Company markets its homes through 18 sales locations.

9.    The prices of the Company's homes vary widely, but the Company targets mostly

entry-level and first time move-up homebuyers.  The Company utilizes a variety of product lines

in its various markets but largely standardizes its home designs to encourage efficiency in the

construction process.  The Company hires third-party subcontractors to perform virtually all of

the construction necessary to develop its various projects (discussed below in more detail).

10.   During the nine months ended September 30, 2011, the Company had preaudit

consolidated revenues from home sales of $148.1 million and delivered 430 homes.  The

Company's dollar amount of backlog of homes sold but not closed as of September 30, 2011 was

$54.3 million.  The cancellation rate of buyers who contracted to buy a home but did not close

escrow was approximately 17% in through September 30, 2011.  The Company had preaudit

consolidated net loss of $37.1 million during the nine months ended September 30, 2011.

11.    Due to the Company's product and geographic diversification strategy, the prices

of the Company's homes vary substantially.  During 2010, base sales prices for the Company's

attached housing ranged from approximately $120,000 to $575,000, and base sales prices for

detached housing ranged from approximately $118,000 to $700,000.  On a consolidated basis,

the average sales price of homes closed for the year ended December 31, 2010 was $351,100.

**C.**    **Home Sale Contracts**

12.    <u>Sale Contracts</u>.  In the ordinary course of their business, the Debtors routinely

contract with their customers to build and close on the sale of homes in the various states in

which they operate (the "<u>Sale Contracts</u>").  The terms of the Sale Contracts vary, but generally

provide for, among other things, the payment of a deposit, the purchase price, selection of

options for the property, payment of closing costs, inspection rights and numerous disclosures.

13.    The Debtors believe that they are authorized to continue to honor existing Sale

Contracts and enter into new Sale Contracts to build and sell homes in the ordinary course of

business without the need for a court order.  Nonetheless, in an abundance of caution, and to

provide assurances to the Debtors' customers, contractors, and title insurers, the Debtors seek

authority to (a) continue to close on sales of homes currently under contract and to continue to

contract for and complete the construction and sale of homes to customers in the ordinary course

of business, (b) continue to enter into Sale Contracts with customers on a going forward basis,

- 5 -

and (c) close on the sale of homes, including pursuant to the Sale Contracts, once construction is finished and other conditions for closing are satisfied.

14.    <u>Applying Deposits to Purchase Price</u>.  Through this Motion, the Debtors also seek the ability to apply deposits at closing consistent with and subject to the terms and conditions of the existing Sale Contracts.  Again, the Debtors believe this is an ordinary course of business practice and no authority is needed, but they are requesting this relief out of an abundance of caution and to provide assurances to their title companies and future homeowners.  As described in more detail in the Customer Programs Motion filed concurrently herewith, the Debtors require an Earnest Money Deposit (as defined in the Customer Programs Motion) to be deposited of between $5,000 to $10,000 when a prospective purchaser enters into a Sale Contract.  If the purchaser adds on designer upgrades, the Debtors also require the purchaser to place a deposit of between 15% to 30% of the upgrade costs (the "<u>Upgrade Deposits</u>").

15.    Both the Earnest Money Deposits and the Upgrade Deposits are pre-payments of the purchase price and when a particular home sale closes, both are credited to the buyer on a closing statement.  Accordingly, by this Motion, the Debtors specifically seek authority, but not direction, to apply (or to direct their escrow agents to apply) the Earnest Money Deposits and the Upgrade Deposits pursuant to the terms of the Sale Contracts and consistent with the Debtors' ordinary business practices.[2]

16.    If the Debtors, or third party escrow agents at the Debtors' direction, are unable to apply deposits pursuant to the terms of the Sale Contracts, their reputation will be damaged, they

---

[2]By that concurrently filed Customer Programs Motion, the Debtors are requesting authority to return customer deposits as may be required of them by law, contract, or in their business judgment.

may not be able to close pending sales and they likely will be unable to continue to attract

customers to maintain the going concern value of their businesses.  Accordingly, the Debtors

believe that the only value to be obtained from seeking to avoid the application of the Deposits

will be outweighed by the harm that may befall their businesses and reputation.

17.    Closing Costs.  As sellers of homes and counterparties to the Sale Contracts, the

Debtors must satisfy certain required costs associated with the sale and conveyance of such

property to comply with the Sale Contracts (the "Closing Costs").  The Closing Costs include,

but are not limited to, broker commissions for those brokers representing the home buyer,

recording and development fees, title insurance policy costs, ad valorem taxes, documentary

stamp taxes, real property taxes, and sales taxes.  The Closing Costs are typically 1% to 4% of

the total sales price of the Sale Contract.

18.    The Closing Costs are paid by third-party escrow companies who hold the

purchase price paid by the homebuyers and net out all applicable Closing Costs.  The sale

proceeds net of the Closing Costs are remitted to the Debtors.  Absent authority to direct escrow

agents to pay Closing Costs, the Debtors will be unable to close on the sale of homes pursuant to

their Sale Contracts and receive into the estates the sale proceeds from their homes.  Failure to

close home sales will deprive the Debtors, their estates and creditors of substantial revenues that

otherwise would be collected.  Further, in the absence of such payments, prepetition buyers still

under contract may be entitled to rescind their Sale Contracts or assert other remedies that could

deprive the estate of revenue or lead to additional, unnecessary claims.  Accordingly, the Debtors

seek the ability to direct their escrow agents to pay Closing Costs in the ordinary course of business.

19.    _Contract Modifications._  In the ordinary course of their businesses, the Debtors will, from time to time, agree to modify the terms of a Sale Contract to facilitate the construction and closing of the sale of a home.  The Sale Contract modifications may include, but are not limited to, modification of purchase price, payment of certain Closing Costs as described above or an agreement to permit assignment of the Sale Contract to a new buyer.  Without the ability to continue to make such contract modifications postpetition in the ordinary course, the Debtors may fail in their efforts to complete construction and close on the sales of homes, and may lose significant revenues for the estates.  Accordingly, the Debtors require the ability to modify the Sale Contracts as set forth herein and otherwise in the exercise of their sole business judgment.

20.    The Debtors believe that modification of the Sale Contracts constitutes operations in the ordinary course of business.  Out of an abundance of caution however, the Debtors request authority to renegotiate any of the Sale Contracts pending as of the Petition Date, if in the reasonable exercise of the Debtors' business judgment, such modification is necessary to complete the sale of the home under contract.

**D.    Operational Lien Claimants**

21.    As part of their homebuilding operations, the Debtors rely on, and routinely contract with vendors that may be able to assert liens under applicable state law against the Debtors' property (the "Operational Lien Claimants") to secure payment for certain prepetition goods and services delivered to the Debtors or for other prepetition claims (the "Operational Lien

- 8 -

Claims"). These Operational Lien Claimants may be subcontractors, civil engineers, architects, suppliers, vendors or a host of other service providers and suppliers. If Operational Lien Claimants are not paid for prepetition services, they may have a right under applicable state law to assert and perfect, construction, materialman's, warehouseman's and mechanics' or other liens (the "Operational Liens"), which attach to the Debtors' unsold homes and related real property. These liens will make it difficult if not impossible for the Debtors to obtain title insurance. Without title insurance guaranteeing clean title to their homes, it will be impossible for the Debtors to sell homes to customers in the ordinary course of business.

22.     The Debtors pay all the Operational Lien Claimants under progress payment contracts by which the Debtors pay the Operational Lien Claimants as work progresses on a house or improvement design (the "Progress Payment System"). Under the Progress Payment System, the Operational Lien Claimants are paid as they complete work on the property. Under state law, the Operational Lien Claimants have the ability to record Operational Liens against any property that benefits from their improvements if they are not paid in full for their services. Because of the Progress Payment System, the Operational Lien Claimants very rarely record Operational Liens against the Debtors' projects; however, it has occurred in cases where the asserted fees were disputed.

23.     On an average monthly basis, the Debtors pay approximately $8 million on account of contractors and vendors who may be able to assert Operational Lien Claims. Although the Debtors are generally current with the Progress Payment Systems, because of unbilled work in progress, the Debtors estimate that the prepetition outstanding amount of such

claims is approximately $17 million. If the Debtors do not have the ability to pay the Operational Lien Claimants in the ordinary course, the Debtors' businesses likely will be severely impaired. If Operational Lien Claimants are not timely paid, the Operational Lien Claimants may stop work that they are currently performing, devastating the Debtors' current operations. Switching contractors mid-stream would delay completion of the affected homes, providing buyers the opportunity to back out of a sale and jeopardizing or delaying the Debtors' receipt of cash. Lost home sales cost the Debtors much needed revenue at a time when they need to maximize revenue to continue operations. As well, Operational Lien Claimants would be able to assert liens against the Debtors' customers' homes for the Debtors' inability to pay. Further, the Debtors believe that failing to pay the Operational Lien Claimants in the ordinary course of business will cause many of them to require that the Debtors pay for all goods and services cash on delivery, causing an immediate liquidity issue for the Debtors, assuming they are prepared to work with the Debtors at all.

E. **Resmark Projects**

24.     In addition to developing and selling properties that it owns, the Company is party to certain construction management agreements with Resmark Equity Partners, LLC and its affiliate, Olympic Realty Advisors (together, "Resmark") under which the Company builds, sells and markets homes on land owned by Resmark in three separate communities. After the home is sold, the Debtors further provide a warranty against defects and workmanship similar to the warranty provided for their owned homes. For such services, the Company receives a 3% contractor's fee on the closing of each home sale, as well as a fee to compensate them for the

costs associated with selling and marketing the homes in the Resmark Projects (the "Sale Fee"). The amount of the Sale Fee differs based on the Resmark Project and costs that the Debtors incur. Additionally, the Debtors receive reimbursement for on-site supervision costs and a fee of 1% of the purchase price upon the closing of each home sale to compensate them for any warranty claims that may arise in the future. Once all homes in the Resmark Projects are sold, the Debtors may be eligible to receive an incentive fee tied to the profitability and other performance metrics generated by the Resmark Projects. The Resmark contracts are valuable to the Company and represent a net positive source of revenue.

25.      Currently, there are three Resmark Projects in various stages of completion. The Debtors and their supervisors hire the subcontractors (the "Resmark Subcontractors") and oversee the building and sale of homes that are built in the Resmark Projects. Time that the Debtors' employees spend working on the Resmark Projects is allocated to the Resmark Projects and it is billed to Resmark as part of the Resmark Progress Payments (defined below). Twice a month, the Debtors send Resmark a list of all of the Resmark Subcontractors that require payment and the amount of the proposed payment, including the proposed payment for the work that the Debtors' employees complete on the Resmark projects. Upon receipt of the list, Resmark wires the amount due to the Resmark Subcontractors into a designated account at California Bank and Trust (the "Resmark Progress Payments"). Each Resmark Project has its own dedicated and restricted account that is held by William Lyon Homes, Inc. ("CA Lyon"). The Debtors then use the money deposited in the account to make the Resmark Progress Payments; the Resmark Progress Payments do not flow through the Debtors' primary operating

- 11 -

account.  Only the Resmark Progress Payments designated to compensate the Debtors for the

work that their employees performed are transferred from the restricted accounts to the Debtors'

general operating account.  If the subcontractors do not receive the Resmark Progress Payments,

they may be entitled to record Operational Liens against the Resmark Projects.  The Debtors

estimate that as of the Petition Date, the Resmark Subcontractors are owed $4.3 million for

unbilled work in progress, which amounts are payable by Resmark (as opposed to the Debtors).

**F.**     **Arizona Sale Procedures**

26.     In Arizona, the Debtors sell their homes through William Lyon Southwest, Inc.,

an Arizona corporation ("Lyon Southwest").  CA Lyon, which is the Debtors' primary operating

company, builds the homes that Lyon Southwest sells and transfers the home title to Lyon

Southwest, simultaneously as the home closes.  Lyon Southwest also uses Lyon California's

operating account, which is the Debtors' primary operating account for purposes of holding

customer deposits and net sale proceeds (the "Arizona Sales Procedure").  The Debtors request

authority to continue to sell homes in Arizona pursuant to the Arizona Sales Procedure consistent

with their ordinary course of business.

**G.**     **Irvine Sales Procedures**

27.     CA Lyon is the borrower under that certain Builder Agreement dated January 26,

2010 by and between CA Lyon and Irvine Community Development Company LLC ("Irvine").

The purchase money promissory note under this agreement bears interest at 7% per annum,

payable upon certain specified dates and events, and matures in May, 2015 (the "Irvine Loan").

The original principal amount under the Irvine Loan was approximately $10.7 million and the

- 12 -

outstanding balance as of September 30, 2011 was approximately $3.9 million.  The Irvine Loan

is secured by certain real property of CA Lyon in Orange County, California.  Under the terms of

the Irvine Loan, CA Lyon is required to pay Irvine $115,000 for each lot that it sells that is

encumbered by Irvine's security interest in exchange for Irvine releasing its lien against the lot.

The average sales prices of homes sold that are encumbered by Irvine's security interest is

approximately $381,000.  In addition, the Debtors pay Irvine approx $17,500 per month on

account of interest for the Irvine Loan, which amounts are reflected in the DIP Budget and

proposed DIP financing motion filed concurrently herewith.  Through this Motion, the Debtors

request authority, in their sole and absolute discretion to continue to make all required payments

under the Irvine Loan as may be required to release Irvine's liens on homes sold that are

encumbered by Irvine.

## Relief Requested

28.     By this Motion, the Debtors request approval to continue to operate in their

ordinary course of business to sell and close homes to customers, including with respect to

crediting deposits and paying Closing Costs (including sales taxes, real property taxes, escrow

fees, and other amounts typically payable by the Debtors at closing) that may have accrued on

account of a prepetition Sale Contract or be on account of a prepetition period, and making any

modifications to the Sale Contracts as set forth above.

29.     The Debtors further seek entry of an order that authorizes them, pursuant to

section 363(f) of the Bankruptcy Code, to sell homes free and clear of any Operational Liens and

authorize the Debtors to pay any prepetition Operational Lien Claim that comes due in the

ordinary course of business, including any that may be on account of a prepetition period,

provided, however, that with respect to each Operational Lien Claim: (a) the Debtors are not

authorized to pay an Operational Lien Claimant unless the claimant has perfected or, in the

Debtors' judgment, is capable of perfecting or may be capable of perfecting in the future, one or

more Operational Liens against the Debtors' assets, their customers' homes, or a Resmark

Project asset or home, (b) such payment would not be deemed to be a waiver of rights regarding

the extent validity, perfection or possible avoidance of the related Liens, (c) the Operational Lien

Claimant agrees to release promptly any Liens upon payment of the Operational Lien Claim;

provided, however, that should the claimant fail to release promptly such liens upon payment by

the Debtors, any such Lien would be deemed released and expunged, without further action, and

(d) the Operational Lien Claimant agrees to continue providing services to the Debtors on

payment terms equivalent to the payment terms that the Operational Lien Claimant extended the

Debtors prior to the Petition Date or on other payment terms acceptable to the Debtors.

30.    On an interim basis, the Debtors seek authority to pay up to $14 million on

account of Operational Lien Claims.  On a final basis, the Debtors seek authority to pay up to

$17 million on account of Operational Lien Claims consistent with the Budget and proposed

financing order submitted herewith.  The Debtors shall provide the agent for their proposed DIP

Lender ("Colony") and counsel to the Ad Hoc Noteholders Group, on a bi-weekly basis, a list of

all payments of Operational Lien Claims paid pursuant to this Motion.  Except for payments

already issued prior to the Petition Date, prior to the payment of any Operational Lien Claim in

excess of $50,000, the Debtors shall obtain the prior written consent of Colony, unless the proposed payment is within two weeks of a Sale Contract closing date.

31.     Further, the Debtors request that this Court adopt the following procedures to resolve any disputed Operational Liens that may arise (the "Disputed Lien Release Procedures"):

a.    All valid and enforceable Operational Liens on a subject property shall transfer to and shall attach to the proceeds of the sale of such property at the time of closing (the "Closing Date").  Claims secured by valid and enforceable Operational Liens shall be deemed secured claims against the Debtors to the extent of the proceeds (the "Sale Proceeds") with the same priority such claims would be entitled to under applicable law as of the Petition Date.  The Debtors shall be authorized to use the sale proceeds, subject to the procedures set forth herein and in any DIP order or cash collateral order entered in these cases.  No Operational Lien Claimant shall have any claim against the Debtors' title companies or any purchaser of a home with respect to any asserted Operational Lien or other claim arising from services performed for or goods delivered to the Debtors.

b.    Any Operational Lien Claimant that believes it has a valid Operational Lien that arose prior to the Petition Date against a particular property sold by the Debtors and that has not been paid by the Debtors may send to the Debtors a written demand for payment (i) setting forth the location(s) of the property sold, (ii) stating the amount of its asserted claim(s), (iii) describing when its alleged claim arose regardless of when the affected property is sold.  Nothing contained in the Lien Procedures should be construed to expand any lien rights to cover the post-Petition Date period or to any other extent beyond what would be provided pursuant to applicable state law and bankruptcy laws. The statement must state with particularity, the reason(s) the Operational Lien Claimant believes it has a valid Operational Lien against the individual property sold, and (iv) attaching documentation (i.e., invoices or purchase orders) or other information sufficient to demonstrate that a valid Operational Lien claim existed as of the Closing Date with respect to such property (a "Demand").

c.    The Demand must be mailed to (a) William Lyon Homes, 4490 Von Karman Avenue, Newport Beach, CA 92660 Attn: Matthew Zaist, Executive Vice President; (b) Counsel for William Lyon Homes, Pachulski, Stang, Ziehl & Jones, 919 North Market Street, 17th Floor, Wilmington Delaware 19801, Attn: Laura Davis Jones, Esq.; and (c) Alvarez & Marsal North America, LLC, 2355 East Camelback Road, Suite 805, Phoenix, AZ 85016, Attn: Michael Liebman; (d) counsel for the Ad Hoc Noteholders Group:  Mark Shinderman, Milbank Tweed, Hadley & McCloy, 601 South Figueroa Street, 30th Floor, Los Angeles, CA 90017; (e) counsel for the Prepetition Secured Lenders, David Simonds,

Akin Gump Strauss Hauer & Feld, 2029 Century Park East, Suite 2400, Los Angeles, CA 90067-3010; and (d) counsel for any committee appointed in these cases.

d. If the Debtors' books and records reflect that the Demand is valid and the Operational Lien Claimant has a valid lien, the Debtors will satisfy the Operational Lien by making a payment, out of the Sale Proceeds, within three (3) business days of such determination, which determination will be made no later than 15 business business days of receipt of the Demand. The Debtors are authorized to pay a Demand that they determine valid without further order of this Court.

e. If the Debtors dispute the validity, extent or priority of the claim asserted in the Demand, the parties shall negotiate in good faith to resolve the dispute. If the Debtors resolve the dispute at a lower value than the amount reflected in the Demand, the Debtors may pay such amount without further order of the Court. If the dispute is not resolved within thirty (30) days after receipt of the Demand (the "Resolution Period"), either party may file a motion (a "Demand Resolution Motion") seeking a determination from the Court as to the validity and extent of the underlying Operational Lien.

f. Upon a determination by the Court that the Debtors are required to satisfy an Operational Lien, the Debtors shall pay such Operational Lien within ten (10) business days of the date of the order resolving the Demand Resolution Motion.

g. The Debtors are authorized to use proceeds from the sale of homes in the ordinary course of business, pursuant to the terms of the DIP/cash collateral order and the budget submitted concurrently therewith; provided, however, that until all disputed Operational Liens are resolved or paid, the Debtors maintain cash proceeds on hand in an aggregate amount sufficient to satisfy all Demands against sold properties that have been received but that remain unresolved; provided, further, however, that (i) in no event shall the Debtors be required to maintain cash on hand for unresolved Demands in an amount greater than the purchase price for a particular property and (ii) with respect to any Demand that asserts an Operational Lien applicable to more than one property, the Debtors shall be required to reserve only for the portion of the Operational Lien Claim allocable to the particular property or properties sold pursuant to this Motion.

32.     By this Motion, the Debtors also seek entry of an order that authorizes them to

pay the pre and post-petition claims of the Resmark Subcontractors subject to the same

conditions and Disputed Lien Release Procedures set forth above for the Operational Lien

Claimants, including payments due to the Debtors for their work on the Resmark Projects, from

the Resmark Progress Payments.  If the Debtors cannot pay the pre and post-petition claims from

the Resmark Progress Payments, the Resmark subcontractors will record Operational Liens

against the Resmark Projects.  The Operational Liens will make it difficult to sell the homes in

the Resmark Projects.  If the Debtors cannot close homes in the Resmark Projects, they will not

receive their fees for building the homes for the Resmark Project.  Further, if the Debtors do not

pay the Resmark Subcontractors, Resmark may cease to do business with the Debtors and likely

will assert claims against the Debtors.

33.    By this Motion, the Debtors seek entry of an order that authorizes them to

maintain the Arizona Sales Procedures.  If the Debtors cannot maintain the Arizona Sales

Procedures, the Debtors will be forced to restructure their operations, which will be detrimental

to existing home Sale Contracts in Arizona.

34.    The Debtors also request authority to pay Irvine consistent with the terms of the

Irvine Loan and consistent with the terms of the Budget and any DIP financing order or cash

collateral order entered in these cases.

**Basis for Relief Requested**

**A.    The Debtors are Authorized to Continue Selling Homes in the Ordinary Course of Business**

35.    Sections 1107(a) and 1108 of the Bankruptcy Code authorize a debtor-in-

possession to continue to operate its business.  Section 363(c) of the Bankruptcy Code authorizes

a debtor-in-possession operating its business pursuant to section 1108 of the Bankruptcy Code to

use property of the estate in the ordinary course of business without notice or a hearing.  The

Debtors submit that the continued sale of homes falls within the ordinary course of business and

is permitted by sections 363(c), 1107(a) and 1108 of the Bankruptcy Code, without further application to the Court.

36.    Under section 363(b) of the Bankruptcy Code, a debtor-in-possession "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363(c) of the Bankruptcy Code authorizes a debtor-in-possession to "enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1).

37.    Under applicable case law, if a debtor's proposed use of its assets pursuant to section 363(b) of the Bankruptcy Code represents a reasonable business judgment on part of the debtor, such use should be approved. *See, e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991); *Stephens Indus. Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions."); *In re Delaware & Hudson R.R. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (courts have applied the "sound business purpose" test to evaluate motions brought pursuant to section 363(b) of the Bankruptcy Code).

38.    Moreover, pursuant to section 105(a) of the Bankruptcy Code, "the court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions

of this title." 11 U.S.C. § 105(a). The basic purpose of section 105(a) is "to assure the bankruptcy courts power to take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction." 2 COLLIER ON BANKRUPTCY, § 105.01 (15th ed. rev. 2007). Essentially, section 105(a) codifies the bankruptcy court's equitable powers. The Debtors submit that even if the sales of homes do not constitute ordinary course transactions under section 363(c)(1), there exists sufficient business justification to close sales of homes, pay the associated costs and continue to contract for the construction and sale of homes in the ordinary course.

39.     In these cases, there is sufficient business justification for the Debtors to close sales of homes, pay the associated costs and continue to contract for the construction and sale of homes in the ordinary course of business. The Debtors have received the necessary votes to approve their prepackaged Plan and are seeking to confirm such Plan on an expedited basis. The seamless development and sale of the homes pursuant to the existing Sale Contracts and future sales would provide the Debtors' estates with the best opportunity to realize value from the homes, provide immediate cash recovery to the Debtors' creditors, and enable the Debtors to emerge from bankruptcy quickly. Conversely, failure of the Debtors to meet their obligations under existing Sale Contracts would cause immediate and substantial damage to the Debtors reputation in the marketplace, and destroy the going concern value of the Debtors' businesses. Also, the Debtors should be authorized to continue to enter into new Sale Contracts in order to maximize the value of their businesses for the benefit of all of their stakeholders.

**H.**    **Section 363(f) Allows the Debtors to Sell Homes Free and Clear of the Operational Liens**

40.    Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property free and clear of liens, claims, encumbrances and other interests if one of the following conditions is satisfied:

    (1)    Applicable nonbankruptcy law permits the sale of such property free and clear of such interest;

    (2)    The [lienholder or claimholder] consents;

    (3)    Such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property

    (4)    Such interest is in a bona fide dispute, or

    (5)    [the lienholder] or claimholder could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363 (f).

41.    Because section 363(f) is stated in the disjunctive, satisfaction of any one of its five requirements will suffice to warrant approval of the proposed sale of homes. *Citicorp Homeowners Services, Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Penn. 1988).

42.    The Debtors can satisfy at least one of the five conditions set forth in section 363(f) as to each lien, claim, encumbrances or other interest in the Debtors' homes. In particular, section 363(f)(3) will be satisfied in every instance because the Debtors intend to sell all homes on a going forward basis at fair market value. Many courts have found that a sale for the property's fair market value satisfies the requirement that a property must be sold for an amount in excess of the aggregate value of all liens on such property. *See In re Beker Indus. Corp.*, 63 B.R. 474 (Bankr. S.D.N.Y. 1986); *In re Electroglas, Inc.*, 2009 Bankr. Lexis 4994, *13 (Bankr. D. Del. 2009). Thus, if the Debtors sell property for the fair market value, section 363(f)(3) is

satisfied because the property is sold for an amount equal to the amount of liens on the property.

Further, the Debtors could confirm a plan of reorganization that compels the Operational Lien

Claimants to accept a monetary satisfaction of their interests in the Debtors' property, satisfying

Section 365(f)(5). *In re Perroncello*, 170 B.R. 189, 191 (Bankr.D. Mass. 1994) (creditor who

could be crammed down under § 1129(b) could be compelled to accept a money satisfaction of

his interest under § 363(d)(5)).

43.     The Debtors will serve notice of the final hearing of the Motion to any known

UCC-1 lien holder.  If no response is received, consent will be deemed under section 363(f)(2) of

the Bankruptcy Code.  Additionally, the Debtors' primary prepetition secured lenders, ColFin

WLH Funding, LLC ("Colony") has consented to the release of their liens when a home is sold

in the ordinary course of business consistent with the terms set forth above, the DIP financing

order and any Budget or reporting requirements thereunder relating to home closings,

constituting consent under section 363(f)(2) of the Bankruptcy Code.

44.     Finally, the promissory note and deed of trust held by Irvine in connection with

the Irvine Loan require that Irvine release its lien on a particular home when the Debtors sell the

home in the ordinary course of business and pay approximately $115,000 out of escrow to Irvine.

Because, the Irvine Loan requires Irvine to release its lien under certain conditions, section

363(f)(5) is satisfied as to the deed of trust held by Irvine. *Pacific Capital Bancorp, N.A. v. East

Airport Development, LLC (In re East Airport Development, LLC)* 443 B.R. 823 (9th Cir. B.A.P

2011) (finding that a debtor could have brought an action to compel a lienholder to release its

lien when lien documents required the lender to release the lien upon payment of a release price).

45.     Accordingly, the Debtors request that the Court authorize the sale of homes to customers in the ordinary course of business, free and clear of liens, claims, encumbrances and other interests, with such liens and interests to attach to the cash proceeds of such sales in the Debtors' possession.

## I.     The Operational Lien Claimants are Adequately Protected

46.     The Disputed Lien Release Procedures afford adequate protection to any interest of the Operational Lien Claimants in sale proceeds.  Although section 363(c)(1) of the Bankruptcy Code provides broad authority for the Debtors to operate their businesses and enter into ordinary course transactions, section 363(c)(2) of the Bankruptcy Code restricts the Debtors' ability to use cash collateral. "Cash Collateral" is defined in the Bankruptcy Code as, "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest.," 11 U.S.C. § 363(a). Pursuant to section 363(c)(2) of the Bankrupt Code, the Court may authorize the Debtors to use cash collateral as long as the applicable secured creditors consent or are adequately protected. *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984).

47.     Appropriate adequate protection is decided on a case-by-case basis. *See e.g., In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Mosello*, 195 B.R. 277- 289 (Bankr.S.D.N.Y. 1996); *In re Beker Indus. Corp.*, 58 B.R. 725 (Bankr. S.D.N.Y. 1986); *see also In re JKJ Chevrolet, Inc.*, 190 B.R. 542, 545 (Bankr. E.D. Va. 1995) (adequate protection is a flexible concept that is determined by considering the facts of each case) (citing *In re O'Connor*, 808 F.2d 1393, 1396-97 (10th Cir. 1987)).  Section 361 of the Bankruptcy Code provides that

adequate protection may be afforded through a replacement lien or by "such other relief . . . as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property."

48.    Lien procedures similar to those sought herein have been adopted and approved by bankruptcy courts in several recent similarly-sized home-builder cases. *See, e.g., In re WL Homes*, Case No. 09-10571 (BLS) (Bankr. D. Del. March 23, 2009); *In re WCI Communities, Inc.*, Case No. 08-11643 (KJC) (Bankr. D. Del. Aug. 5, 2008); *In re The Rhodes Companies, LLC*, Case No. 09-14814 (LBR) (Bankr. D. Nev. April 10, 2009); *In re Lake at Las Vegas Joint Venture, LLC*, Case No. 08-17814 (LBR) (Bankr. D. Nev. July 24, 2008); *In re Woodside Group, LLC*, Case No. 08-20682 (PC) (Bankr. C.D. Cal. Sept. 22, 2008); *In re Kimball Hill, Inc.*, Case No. 08-10095 (SPS) (Bankr. N.D. Ill. May 13, 2008); and *In re TOUSA, Inc.*, Case No. 08-10928 (JKO) (Bankr. S.D. Fla. Feb. 28, 2008).

49.    The proposed Disputed Lien Release Procedures provide adequate protection to the Operational Lien Claimants to the extent they have an interest in property used by the Debtors by giving them a replacement lien in the sale proceeds, of the same extent and priority of their lien on the sold property.  Because the Disputed Lien Release Procedures require the Debtors to reserve or "block" cash in an amount equal to all unresolved Demands, the Disputed Lien Release Procedures effectively bar the Debtors from using cash collateral of the Operational Lien Claimants to the extent that a Demand has been asserted and remains unresolved.  With respect to Demands reflecting Operational Liens spanning multiple lots, the Disputed Lien Release Procedures require that the Debtors reserve only that portion of the asserted Operational

- 23 -

Lien Claim allocable to the sold lot, but the Operational Lien Claimants remain adequately

protected by virtue of their Operational Liens on the unsold lots.

**J.      Sections 363 (c) & (b) of the Bankruptcy Code Allow the Debtors to Maintain the Arizona Sales Procedure**

50.      As described above, section 363(c) allows debtors to operate in the ordinary

course of business and section 363(b) allows debtors to conduct operations outside of the normal

course of business if they receive court authorization for their proposed operations.  The Debtors

have been utilizing the Arizona Sales Procedure for all of their Arizona sales for several years,

and therefore submit that the maintenance of the Arizona Sales Procedure constitutes operations

in the ordinary course of their business.  The Debtors request that this Court authorize them to

continue the procedure, because the Arizona Sales Procedure represents a reasonable exercise of

the Debtors' business judgment and if required to change their ordinary course procedures,

would disrupt home sales in Arizona.

**K.      Sections 105(a) and 541(d) of the Bankruptcy Code Allows the Payment of Resmark Subcontractors' Pre-Petition Claims**

51.      Pursuant to section 541(a) of the Bankruptcy Code, all of a debtor's pre-petition

legal or equitable interests in property becomes property of the bankruptcy estate upon the filing

of a bankruptcy petition.  11 U.S.C. § 541(a).  However, if the debtor holds legal title in property

but not an equitable interest, the property only becomes property of the estate to the extent of the

legal title and "not to the extent of any equitable interest in such property that the debtor does not

hold."  11 U.S.C. § 541(d).  Thus, if the debtor holds property in trust for a third party, only the

debtor's trust interest transfers to the estate; the estate still must still hold the property for the

benefit of the party holding the equitable interest in the property. *See, e.g., EBS Pension LLC v. Edison Bros. Stores, Inc. (In re Edison Bros., Inc.)*, 243 B.R. 231, 235 (Bankr. D. Del. 2000) (noting that property held in trust, whether constructively or expressly, does not become part of the estate when the debtor filed its bankruptcy petition).

52.     The Debtors' interest in the Resmark Progress Payments is identical to a Trustee's interest in a trust corpus.  The Debtors only received the Resmark Progress Payments because they are obligated to pay the Resmark Subcontractors on behalf of Resmark; the Debtors may only pay themselves the amounts authorized and approved by Resmark.  Further the Resmark Progress payments flow through different accounts designated for each Resmark Project.  The payments are never commingled with the funds in the Debtors' general accounts.  Thus, the Debtors should be allowed to distribute the Resmark Progress Payments to the Resmark Subcontractors, regardless of whether the Resmark Subcontractors interest arose prior to the Petition Date.

53.     Even if the Resmark Progress Payments are part of the Debtors' estate, the doctrine of necessity supports using the funds to pay the pre and post-petition claims of the debtors.  If the Resmark Subcontractors record liens against the Resmark Projects, the Debtors will be compelled to indemnify Resmark for any money that it expends paying the Resmark Subcontractors.  Resmark may be able to deduct this money from the fees that it pays the Debtors for building and selling the Resmark Projects.  Further Resmark likely will cease doing business with the Debtors, depriving the Debtors of much needed revenues.

**L.**     **The Court Has Authority to Authorize Payment of Prepetition Claims**

54.     Payment of the Closing Costs, Operational Liens, and other items requested in this Motion is appropriate here.  In authorizing payments of certain prepetition obligations, courts have relied on several legal theories, rooted in sections 1107(a), 1108, 363(b) and 105(a) of the Bankruptcy Code.

55.     Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Implicit in the fiduciary duties of any debtor in possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." *Id.*  Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.*  The *CoServ* court specifically noted that the preplan satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate. . . ." *Id.*

56.     Consistent with a debtor's fiduciary duties, courts have also authorized payment of prepetition obligations under sections 363(b) and 105(a) of the Bankruptcy Code where a sound business purpose exists for doing so.  *See, e.g., In re Tropical Sportswear Int'l Corp.*, 320 B.R. 15, 17 18 (Bankr. M.D. Fla. 2005) (authorizing payment to critical vendors for prepetition amounts and finding that a sound business justification existed for payment because the vendors would not do business with the debtors absent the critical vendor status, and the disfavored creditors were not any worse off due to the critical vendor order); *In re Ionosphere Clubs, Inc.*,

- 26 -

98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (finding that a sound business justification existed to

justify payment of prepetition wages); *see also Armstrong World Indus., Inc. v. James A.*

*Phillips, Inc. (In re James A. Phillips, Inc.),* 29 B.R. 391, 397 (S.D.N.Y. 1983) (relying on

section 363 to allow contractor to pay prepetition claims of suppliers who were potential

Operational Lien Claimants because the payments were necessary for general contractors to

release funds owed to debtors).

57.    Here, where the Debtors are seeking approval of a prepackaged plan of

reorganization that pays all unimpaired creditors, including secured and general unsecured

claims in full, and are expected to emerge within a short period of time from bankruptcy, any

disruption in their business would be harmful to the Debtors' estates.  The relief requested in this

Motion is also supported by the well-established "necessity of payment" doctrine.   The

"necessity of payment" doctrine, which has been embraced by the Third Circuit, "teaches no

more than, if payment of a claim which arose prior to reorganization is essential to the continued

operation of the [business] during reorganization, payment may be authorized even if it is made

out of corpus." *In re Lehigh & New England Ry. Co.,* 657 F.2d 570, 581 (3rd Cir. 1981).  *See*

*also In re Sharon Steel Corp.,* 159 B.R. 730, 737 (Bankr. W.D. Pa. 1993) (embracing "necessity

of payment" doctrine and citing *Lehigh & New England Ry. Co.* with approval).  Similarly, the

court *in In re Ionosphere Clubs, Inc.,* 98 B.R. 174 (Bankr. S.D.N.Y. 1989), stated that the

"necessity of payment" doctrine "recognizes the existence of the judicial power to authorize a

debtor in a reorganization case to pay prepetition claims where such payment is essential to the

continued operation of the debtor." *Id.* at 176.  In that case, the court permitted Eastern Air

Lines, Inc., to pay its current employees' prepetition wages, salaries, medical benefits, and business expense claims. Judge Lifland relied on his equitable powers under Bankruptcy Code section 105(a) and, in particular, the "necessity of payment" doctrine to authorize such payments, recognizing that the debtor had to make the payments in order to retain its current employees and maintain positive employee morale—two factors that he deemed critical to the rehabilitation of an operating debtor. *Id.* at 176-77 (citing H.R. Rep. No. 595 95th Cong. 1st Sess. 16 (1977)). Other courts also have found that the "necessity of payment" doctrine applies to the payment of prepetition employee compensation and benefits. *See In re Chateaugay Corp.*, 80 B.R. 279, 281 (Bankr. S.D.N.Y. 1987) (under the "necessity of payment" doctrine, bankruptcy court should defer to the debtor's business judgment in permitting payment of certain workers' compensation claims).

58.    The legal inevitability of payment is another rationale for payment in these circumstances. *See, e.g., In re Equalnet Commc'ns*, 258 B.R. 368, 370 (Bankr. S.D. Tex. 2000) ("exceptions [to general rule of nonpayment] arise primarily out of common sense and the presence of a legal or factual inevitability of payment"). Such a rationale is particularly apropos in these cases, where there is no secured lender and both mechanics' liens and section 503(b)(9) claims are proposed to be paid in full under the Plan. It is a long-standing rule that a bankruptcy court has broad discretion over the timing of payment of administrative claims. *In re Continental Airlines*, 146 B.R. 520, 529-30 (Bankr. D. Del. 1992).

59.    The relief sought herein is well within these recognized standards. Many of the Operational Lien Claimants are critical to the Debtors' operations and failure to pay their claims

- 28 -

may lead such vendors to refuse to provide building materials and services going forward, which would substantially impede the Debtors' ability to construct homes, or at minimum would cause significant expense and delay while the Debtors scramble to find alternate goods and service providers.

60.     Moreover, the Operational Lien Claimants have fully secured claims that will entitle them to be paid in full, with interest, immediately upon confirmation of the Plan, which has been accepted by all impaired classes of creditors.  Consequently, approval of the Lien Procedures, which provide a mechanism for the Debtors to pay certain fully secured prepetition obligations, will provide the Operational Lien Claimants with no more than that which they otherwise would be entitled to under a plan and will save the Debtors the interest costs that otherwise might accrue on the Lien Claims during these chapter 11 cases.

61.     Selling houses in the ordinary course of business free and clear of liens and honoring Sale Contract obligations are essential to the continuation of the Debtors' business. The Disputed Lien Procedures provide a mechanism for addressing the various legal rights of all interested parties, and provide for a negotiation period designed to avoid burdening the Court with disputed issues unless circumstances require otherwise.  To the extent any of these actions require Court approval as outside of the ordinary course of business, ample authority supports granting all of the relief requested herein.

**M.    Cause Exists to Waive Bankruptcy Rules 6003(b) and 6004(h)**

62.     Pursuant to Rule 6003(b) of the Federal Rules of Bankruptcy Procedure, "a motion to pay all or part of a claim that arose before the filing of the petition" shall not be

granted by the Court within 21 days after the filing of the petition "[e]xcept to the extent that

relief is necessary to avoid immediate and irreparable harm . . . ." Fed. R. Bankr. P. 6003(b).

The Debtors submit that the instant facts satisfy the requirements for a waiver of the rule, in

order to avoid the disruption to operations that would result in the absence of immediate relief.

For the same reason, the Debtors request that the Court waive Bankruptcy Rule 6004(h), which

provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the

expiration of 14 days after entry of the order, unless the court orders otherwise." *Id.* (emphasis

added).

     63.    As described above, the ability to continue to sell homes to customers "free and

clear," including, where appropriate, to satisfy valid and enforceable Operational Liens, is

integral to the Debtors' business operations and necessary to maintain the confidence and

goodwill of customers, which is critical to facilitate a successful reorganization. Any failure by

the Debtors to close sales on schedule and in the ordinary course of business and satisfy

obligations to customers during the first twenty-one days of these cases will jeopardize the

Debtors' ability to reorganize by destroying customer confidence. Absent entry of the order

requested herein, current customers may be unwilling to close home purchases and prospective

customers may be unwilling to sign contracts to buy homes, and the Debtors' title companies

may refuse to continue with home sale closings. Further, the Resmark Subcontractors might

walk off their job sites, delaying completion of the Resmark projects. Accordingly, the Debtors

submit that they have satisfied the requirements of Bankruptcy Rule 6003 for immediate relief

and that cause exists to waive the stay imposed by Bankruptcy Rule 6004(h).

64.     Nothing in this Motion shall be construed as a request for authority to assume any executory contract under Section 365 of the Bankruptcy Code.

## Notice

65.     Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known:  (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the Prepetition Secured Lenders and proposed DIP Lender; (iii) counsel to the Ad Hoc Noteholders Group; and (iv) counsel to the Backstop Investors.

66.     As the Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Del. Bankr. LR 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request entry of an order (i) granting the relief

requested herein and (ii) granting the Debtors such other and further relief as the Court deems

just and proper.

Dated:  December 19, 2011

PACHULSKI STANG ZIEHL & JONES LLP

By: *Laura Davis Jones*

Richard M. Pachulski (CA Bar No. 90073)
Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Joshua M. Fried (CA Bar No. 181541)
Shirley S. Cho (CA Bar No. 192616)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
e-mail:     rpachulski@pszjlaw.com
            ljones@pszjlaw.com
            dbertenthal@pszjlaw.com
            jfried@pszjlaw.com
            scho@pszjlaw.com
            tcairns@pszjlaw.com

[Proposed] Counsel for the Debtors and Debtors in
Possession